IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**ORDER**

AND NOW, this   day of       , 2007, upon consideration of the Motion to Dismiss

the Amended Complaint of defendants Millersville University, J. Barry Girvin, Dr. Jane

S. Bray and Dr. Vilas A. Prabhu, it is hereby ORDERED that the Motion is GRANTED.

The Amended Complaint is hereby DISMISSED with prejudice.

_____

Diamond, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**MILLERSVILLE DEFENDANTS' MOTION TO
DISMISS AMENDED COMPLAINT**

Defendants Millersville University, Professor J. Barry Girvin, Dr. Jane S. Bray and Dr. Vilas A. Prabhu (together "Millersville"), hereby file, pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), this Motion to Dismiss the Amended Complaint, for the following reasons:

1.    The Eleventh Amendment and <u>Will v. Michigan Department of State Police</u> bar the § 1983 Claim.

2.    Plaintiff fails to state a procedural due process claim.

3.    Plaintiff fails to state a First Amendment claim.

4.    Qualified Immunity bars the § 1983 damages claim against the individual defendants.

5.    The State law claims are barred by sovereign immunity.

Therefore, Millersville University requests that this court dismiss plaintiff's Amended Complaint.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL


BY:     s/s Barry N. Kramer
        BARRY N. KRAMER
        Senior Deputy Attorney General
        Identification No. 41624

        Susan J. Forney
        Chief Deputy Attorney General
        Civil Litigation Section

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-1581
Fax:      (215) 560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MILLERSVILLE UNIVERSITY'S
MOTION TO DISMISS AMENDED COMPLAINT**

## I.    INTRODUCTION

Plaintiff Stacy Snyder, a 2006 graduate of Millersville University, files this

Amended Complaint, pursuant to 42 U.S.C. § 1983 and raising supplemental State law

claims, against Millersville University, Professor J. Barry Girvin, Dean of the School of

Education Dr. Jane S. Bray and University Provost Dr. Vilas A. Prabhu (together

"Millersville" or "Commonwealth defendants"). In May 2006, Snyder failed her student

teaching clinical at Conestoga Valley High School ("Conestoga Valley"), which she

needed to successfully complete in order to receive a Bachelor of Science in Education

degree ("B.S.Ed.") from the University and her teaching certification from the

Pennsylvania Department of Education ("PDE").

As reflected in the Amended Complaint, during the entire course of her spring-

semester student teaching clinical Snyder received mixed, and at times highly critical,

evaluations regarding her student teaching from her supervising teacher at Conestoga

Valley as well as from Professor Girvin, her University internship supervisor. At the end

of the semester, after many interactions with Conestoga Valley personnel and Professor

Girvin about her unsatisfactory performance in student teaching, plaintiff failed the

clinical. She filed an Academic Appeal to Dr. Bray, who permitted her to graduate with a

Bachelor of Arts degree in English.[1] Seven months later, plaintiff filed an Academic

Appeal to the University Provost, Dr. Prabhu, who denied the appeal. This lawsuit

followed. Plaintiff filed a Complaint and, before defendants could respond, filed an

Amended Complaint. Even in the current procedural posture, there is a sufficient record

to show that plaintiff cannot state a claim upon which relief can be granted.

## II.    ARGUMENT

### A.    STANDARD ON A MOTION TO DISMISS

A motion to dismiss should be granted "if, accepting all well pleaded allegations

in the complaint as true, and viewing them in the light most favorable to plaintiff,

plaintiff is not entitled to relief." In re Burlington Coat Factory Sec. Litig., 114 F.3d

1410, 1420 (3d Cir. 1997). See Christopher v. Harbury, 536 U.S. 403, 406 (2002). A

court need not credit either "bald assertions" or "legal conclusions" unsupported by the

factual allegations in a complaint. Id. 114 F.3d at 1429-30. See Morse v. Lower Merion

School District, 132 F.3d 902, 908, 909 (3d Cir. 1997).  If the facts alleged in the

complaint, and inferences and implications reasonably proceeding from them, would not

entitle plaintiff to relief as a matter of law, the complaint should be dismissed. Id.

A Rule 12(b)(1) motion is the proper mechanism for raising the issue of whether

Eleventh Amendment immunity bars federal jurisdiction. Blanciak v. Allegheny Ludlum

---

[1] Contrary to her unsupported assertion, plaintiff was never dismissed from the School of Education. She merely failed the student teaching clinical that is requisite to receiving a B.S.Ed and teaching certification.

Corp., 77 F.3d 690, 694 n. 2 (3d Cir.1996), citing Pennhurst State Sch. & Hosp. v.

Halderman, 465 U.S. 89, 98-100 (1984).

**B.      THE § 1983 CLAIM FAILS**

**1.      The Eleventh Amendment Bars the § 1983 Claim**

Absent consent by the State, the Eleventh Amendment[2] bars suits in federal court

by private parties for money damages against states, state agencies and state officials in

their official capacities. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997);

Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996); Puerto Rico Aqueduct and

Sewer Authority v. Metcalf and Eddy, 506 U.S. 139 (1993); Kentucky v. Graham, 473

U.S. 159, 169 (1985) (state officials sued in their official capacities are immunized from

federal suit); Melo v. Hafer, 912 F.2d 628, 642 (3d Cir.1990), aff'd, 502 U.S. 21, 31

(1991). The Eleventh Amendment's bar extends to suits against departments or agencies

of the state having no existence apart from the state. Laskaris v. Thornburgh, 661 F. 2d

23, 25 (3d Cir. 1981), citing Mt. Healthy City Board v. Doyle, 429 U.S. 274, 280 (1977).

The Eleventh Amendment applies regardless of the relief requested. Seminole

Tribe of Florida, 517 U.S. at 58; Cory v. White, 457 U.S. 85, 90-91 (1982).  While a state

may consent to be sued in federal court, e.g., Kimel v. Florida Bd. of Regents, 528 U.S.

62, 73 (2000); Seminole Tribe of Florida, 517 U.S. at 55-56; Pennhurst, 465 U.S. at 99

(waiver must be "unequivocally expressed"), Pennsylvania has expressly withheld

consent. 42 Pa. C.S. § 8521(b); 1 Pa. C.S. § 2310. See Laskaris, 661 F. 2d at 25. Neither

---

[2] The Eleventh Amendment provides that "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

pendent (supplemental) jurisdiction nor any other basis of jurisdiction overrides the

Eleventh Amendment. Pennhurst, 465 U.S. at 121. Specifically, § 1983 does not override

the Eleventh Amendment. Quern v. Jordan, 440 U.S. 332, 341-42 (1979).

Separate from Eleventh Amendment immunity, Will v. Michigan Department of

State Police, 491 U.S. 58, 69-71, & n.10 (1989), holds that States, State agencies and

departments and individually-named state officials in their official capacities are not

considered "persons" amenable to suit for purposes of a damages claim under § 1983.

Millersville University is a component of the Pennsylvania State System of Higher

Education ("SSHE"), a state agency operating public universities such as Millersville. 24 P.S.

§§ 20-2001 et seq. Skehan v. State System of Higher Education, 815 F. 2d 244 (3d Cir.

1987), cemented the rule that Millersville University, as one of those State universities, is

immune from suit under the Eleventh Amendment. In Skehan, the Third Circuit analyzed in

detail the background of 24 P.S. §§ 20-2001, the statute which, in 1983, converted fourteen

former Pennsylvania state colleges into universities and established their status as

components of SSHE. 24 P.S. §§ 20-2002-A(a).[3] See O'Hara v. Indiana University of

Pennsylvania, 171 F. Supp. 2d 490,   (W.D.Pa. 2001)

Other federal decisions confirm that SSHE and its component universities enjoy

---

[3] 24 P.S. § 20-2002-A(a) provides, in pertinent part:
Subject to the regulatory powers conferred by law upon the State Board of Education, there is hereby established a body corporate and politic constituting a public corporation and government instrumentality which shall be known as the State System of Higher Education, independent of the Department of Education, hereinafter referred to as the system, which shall consist of the following institutions and such other institutions, presently existing or newly created, as may hereafter be admitted by the board in concurrence with other agencies as required by law: (1) Bloomsburg State College, (2) California State College, (3) Cheyney State College, (4) Clarion State College, (5) East Stroudsburg State College, (6) Edinboro State College, (7) Indiana University of Pennsylvania, (8) Kutztown State College, (9) Lock Haven State College, (10) Mansfield State College, (11) Millersville State College, (12) Shippensburg State College, (13) Slippery Rock State College, and (14) West Chester State College.

immunity under the Eleventh Amendment. In <u>O'Hara v. Indiana University of Pennsylvania</u>, 171 F. Supp. 2d 490 (W.D.Pa. 2001), the court concluded that Indiana University of Pennsylvania is an arm of the State in the context of a suit brought under § 1983 and protected by the Eleventh Amendment.   In <u>Roseman v. Hassler</u>, 382 F.Supp. 1328 (W.D.Pa.1974), <u>aff'd</u>, 520 F.2d 1364 (3d Cir.1975), <u>cert</u>. <u>denied</u>, 424 U.S. 921 (1976), the court concluded that it had no jurisdiction over the University which was not a person under the Civil Rights Act, but rather a branch of the state government of Pennsylvania. The court held that the University was established as a subdivision of PDE (24 P.S. § 20-2002(14). 382 F.Supp. at 1334. The court concluded that "considering all the other provisions of the law indicating that the institution is an integral part of the state government ... [the University] is included in the sovereign immunity of the Commonwealth." <u>Id</u>. at 1334-35.

See also <u>Lewis v. Kelchner</u>, 658 F.Supp. 358 (M.D.Pa.1986) (Eleventh Amendment bars action against SSHE in federal court); <u>Lach v. Robb</u>, 679 F.Supp. 508, 513 (W.D.Pa.), <u>aff'd,</u> 857 F.2d 1464 (3d Cir.1988) (because SSHE is state agency immune from suit in federal court under the Eleventh Amendment, "it follows that the constituent parts of the State System, the state universities also share Eleventh Amendment immunity");  <u>Layser v. Morrison</u>, 935 F.Supp. 562 (E.D.Pa.1995) (West Chester State University's status as a state agency with sovereign immunity precludes plaintiff from asserting a § 1983 claim against it);  <u>Seybert v. West Chester University</u>, 83 F.Supp.2d 547, 553 (E.D.Pa.2000) (as a "member Institution" of SSHE, West Chester University is immune from suit). <u>See also</u> <u>Finkelstein v. Shippensburg State College</u>, 29 Pa.Cmwlth. 373, 370 A.2d 1259 (1977) (state college was state agency, owned and

operated by Commonwealth); <u>Williams v. West Chester State College</u>, 29 Pa.Cmwlth. 240, 370 A.2d 774 (1977) (same as <u>Finkelstein</u>). <u>Cf</u>. <u>Dynamic Student Services v. SSHE</u>, 548 Pa. 347, 697 A.2d 239 (1997) (Millersville is state agency subject to disclosure requirements of state Right-to-Know Act).

Millersville is a public university that is a component of SSHE (24 P.S. § 20-2002(14)). <u>See</u> Amended Complaint ¶ 2. The individual defendants--Girvin, Bray and Prabhu--are employed by Millersville. <u>Id</u>. ¶¶ 3-5. Therefore, the University and the individual defendants in their official capacity are synonymous with the Commonwealth. Pursuant to the Eleventh Amendment and, separately, to <u>Will</u>, they are immune from the First Amendment Claim (Count I); the due process claim (Count II), and the "failure to train" claim (Count III)[4] brought pursuant to § 1983.

**2.      Plaintiff Fails To State a Procedural Due Process Claim in Count II[5]**

This case presents the issue of due process requirements in a state university's action against a student for unsatisfactory academic performance.  The Supreme Court discussed the due process rights of students in state operated universities in <u>Board of Curators of the University of Missouri v. Horowitz</u>, 435 U.S. 78 (1978), and in <u>Regents</u>

---

[4] In Count III, plaintiff sues only Millersville. She alleges it is a municipality, Amended Complaint ¶ 89, while also alleging it is a State entity. <u>Id</u>. ¶ 2. In fact, the applicable statute and case law provide that Millersville is a state-entity that is immunized from suit under § 1983 by the Eleventh Amendment. <u>Skehan v. State System of Higher Education</u>, <u>supra</u>.

[5] Plaintiff's reliance on both the Fifth and Fourteenth Amendments is somewhat misplaced. In evaluating a procedural due process claim, the courts first determine "whether the asserted individual interests are encompassed within the fourteenth amendment's protection of life, liberty, or property." <u>Alvin v. Suzuki</u>, 227 F.3d 107, 116 (3d Cir.2000) (quotations omitted). <u>See</u> <u>Baraka v. McGreevy</u>, 481 F. 3d 187, 205 (3d Cir. 2007). The first eight amendments to the Constitution, on their face, constrain only the conduct of the federal government and, to the extent of their incorporation in the Fourteenth Amendment Due Process Clause, also limit state governments. The Fourteenth Amendment Due Process Clause limits only state action. Laurence Tribe, <u>American Constitutional Law</u>, 1147 n. 1 (1978). <u>Cf</u>. <u>Graham v. Conner</u>, 490 U.S. 386, 393-94 (1989) (courts must identify the specific constitutional right allegedly infringed by the challenged conduct and then judge the claim by reference to the specific constitutional standard which governs that right); <u>Albright v. Oliver</u>, 510 U.S. 266, 267-81 (1994).

of the University of Michigan v. Ewing, 474 U.S. 214 (1985). Horowitz focused on

procedural due process, while the student's claim in Ewing was based on substantive due

process.[6]   In both cases the Court expressly assumed without deciding the existence of a

liberty or property interest but found no basis for holding the universities liable because

due process had been satisfied.[7]

    The Supreme Court distinguishes between disciplinary and academic dismissals.[8]

Horowitz, 435 U.S. at 90. Courts recognize they are ill-equipped to review the largely

---

[6] Plaintiff does not assert a substantive due process claim. This is just as well. In his concurrence in Ewing, Justice Powell noted that in contrast to the procedural due process cases where the protected interests originate under state law, substantive due process rights are created by the federal constitution.  He found that the student's claim bore "little resemblance to the fundamental interests that previously had been viewed as implicitly protected by the Constitution." 474 U.S. at 229-30. A substantive due process violation must "shock the conscience." E.g., County of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998). For example, in Dixon v. Alabama State Board of Education, 294 F. 2d 150 (5th Cir.), cert. denied, 368 U.S. 930 (1961), plaintiffs were African-American students who were expelled from a tax-supported college for seeking to purchase lunch at a publicly owned grill in the basement of the Montgomery, Alabama, county courthouse.  Id. at 152 n. 3, 157. The due process requirements developed in the Dixon line of cases have been carefully limited to disciplinary decisions. See Horowitz, 435 U.S. at 88 n. 4. Ms. Snyder's claim hardly rises to the level as the students in Dixon.

[7] For purposes of this memorandum, we assume arguendo, without conceding, that plaintiff's receipt of a B.A., and not a B.S.Ed., deprived her of a "property" interest protected by the Due Process Clause. Because property interests are creatures of state law, Perry v. Sindermann, 408 U.S. 593, 599-603 (1972), plaintiff would have to show that her B.S.Ed. degree was a property interest recognized by Pennsylvania law.  It is not likely plaintiff could make such a showing. See Board of Regents v. Roth, 408 U.S. 564 (1972) (State had not deprived a teacher of any liberty or property interest in dismissing her from a nontenured position); Bishop v. Wood, 426 U.S. 341 (1976) (upholding dismissal of a policeman without a hearing and rejecting theory that the mere fact of dismissal could amount to a stigma infringing one's liberty).  As Justice Powell wrote in his concurrence in Ewing, the student's "claim to a property right is dubious at best." 474 U.S. at 229-30. One relevant factor in determining the nature of the requisite due process is "the private interest that [was] affected by the official action." Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  Thus, in Horowitz, the court recognized that the deprivation to which respondent was subjected--dismissal from a graduate medical school--was more severe than the 10-day suspension to which the high school students were subjected in Goss v. Lopez, 419 U.S. 565, 581 (1975).  At bar, the severity of plaintiff's alleged "deprivation" is virtually non-existent. She received a B.A. instead of a B.S.Ed.

[8] The Supreme Court observed in Horowitz, 435 U.S. at 87, that since the issue first arose, state and lower federal courts have recognized that there are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons.  The Court pointed to Barnard v. Inhabitants of Shelburne, 216 Mass. 19, 102 N.E. 1095 (1913), in which the Massachusetts Supreme Court rejected an argument that school officials must grant a hearing before excluding a student on academic grounds.  "Misconduct is a very different matter from failure to attain a standard of excellence in studies.  A determination as to the fact involves investigation of a quite different kind.  A public hearing may be regarded as helpful to the ascertainment of misconduct and useless or harmful in finding out the truth as to scholarship." Id., at 22-23, 102 N.E., at 1097. See Horowitz, 435 U.S. at 87.

subjective academic appraisals of faculty. Id. at 92. Thus, in academic actions taken against a student, a formal hearing is not necessary to satisfy due process. It suffices if the school informs the student of its dissatisfaction with her academic progress and makes a careful and deliberate decision to take the academic action. Id. at 85. Echoing the Massachusetts Court's decision in Barnard v. Inhabitants of Shelburne, the Supreme Court observed that in an academic setting, "a hearing may be useless or harmful in finding out the truth as to scholarship." Horowitz, 435 U.S. at 86.

        In Horowitz, a medical student was dismissed for inadequate performance during her clinical rotations. Faculty members had noted that her "performance was below that of her peers in all clinical patient-oriented settings," that she was erratic in her attendance at clinical sessions, and that she lacked a critical concern for personal hygiene. Id. at 80-81. The decision to dismiss the student rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Id. at 89-90. The Court noted that such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Id. at 90. Like the decision of an individual professor as to the proper grade for a student in his course, the "determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making." Id. 435 U.S. at 90.

        Concluding that no hearing was required, the Court observed that the educational process is not by nature adversarial. Instead, it centers on a continuing relationship between faculty and students, "one in which the teacher must occupy many roles-

educator, adviser, friend, and, at times, parent-substitute." 435 U.S. at 90 (citation omitted). This is especially true as a student advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized. Thus, in an academic setting, informal review and evaluation sessions between student and faculty meet constitutional requirements. Id.

In Mauriello v. University of Medicine and Dentistry of New Jersey, 781 F. 2d 46, 50 (3d Cir. 1986), the Third Circuit, interpreting Horowitz, held that "when a student is discharged for academic reasons, an informal faculty evaluation with the student is all that is required." Id. at 51. The Court easily concluded that the plaintiff's dismissal from the University's Ph.D. program was based on academic not disciplinary grounds.[9] "[I]t was not a case of her being compelled by rule, order, or law of the school to do something and not having done it getting discharged. ... This is not a case of somebody being disruptive in her misconduct, it is not a Goss v. Lopez situation," where students allegedly engaged in violent and destructive behavior. 781 F. 2d at 50. The University's inquiry focused on the quality of Mauriello's research and her dedication to academic pursuits, not misconduct. It was not disputed that plaintiff made serious errors in research and that University officials had expressed dissatisfaction with the quality of her work and with her irresponsible attitude. 781 F. 2d at 51.

Noting that in an educational setting, a student bears a heavy burden in persuading the courts to set aside a faculty's judgment of academic performance, it was evident that plaintiff's academic record was a determinative, if not the sole, reason for her dismissal from the program. Id. Mauriello was informed of her academic deficiencies, was given an

---

[9] Paralleling this case, in which Millersville awarded plaintiff a B.A., as opposed to a B.S.Ed., in Mauriello, the University noted that plaintiff had satisfied the requirements for an M.S. degree and recommended that she be awarded a Master's Degree instead of the Ph.D. Id. at 48 n. 1.

opportunity to rectify them, and was allowed to present her grievance to the graduate committee. That she was eventually dismissed did not negate the existence of those favorable forms of due process. Id. The Circuit held that "in view of the professional evaluations contained in this record, we cannot say that the dismissal of plaintiff from the doctoral program was "beyond the pale of reasoned academic decision making." Id.[10]

Hennessey v. City of Melrose, 194 F. 3d 237 (1st Cir. 1999), demonstrates conclusively why Millersville's action was considered academic and not disciplinary (and also why plaintiff's First Amendment rights were not abridged). In Hennessey, in his senior year appellant was placed at a local public school as part of his program to get a teaching degree and State teaching certification. Issuance of certification hinged on successful completion of the student teaching practicum. Id. at 242. During his student teaching semester, the State University considered his deficiencies, determining that his performance was "incomplete" and assigning him failing grades in various teacher competencies. The University removed him from the teaching certification program because he (1) received a failing grade in his student teaching practicum; and (2) had not satisfied four of the common teaching competencies required for certification by the State Department of Education. The First Circuit wrote that "these reasons seem quintessentially scholastic." 194 F. 3d at 251. The Court recognized that plaintiff's conduct while student teaching had "academic significance because it spoke volumes

---

[10] In Ewing, the Supreme Court also concluded that the student's dismissal "rested on an academic judgment that is not beyond the pale of reasoned academic decision making when viewed against the background of his entire career at the University." 474 U.S. 225. The Court admonished that when judges are asked to "review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Id.

about his capacity to function professionally in a public school setting." Id. Plaintiff was terminated from the program because of his competence, not his conduct and entitled to only the due process described in Horowitz. Id.

Similarly, in Hankins v. Temple University, 829 F.2d 437 (3d Cir. 1987), a medical student was terminated from a fellowship as a result of academic decisions made by her professors over the course of several months of interaction and observation. She was afforded opportunities to discuss her performance and provided with at least two written evaluations. Her supervisors determined that she did not meet the standards set by the medical school. Id. at 445. Based on Horowitz, Ewing and Mauriello, the Third Circuit affirmed that the student was not denied due process rights simply because she was not afforded an opportunity to plead her case in a formal hearing. Id. See also Manning v. Temple University, 157 Fed.App'x. 509, 514-515, 2005 WL 3288162 (3d Cir. 2005) (medical school student provided with due process where she was given fair warning of inadequate performance, presented her position to student promotions committee and permitted to appeal committee's decision to dismiss her to the Dean).

Contrary to plaintiff's claim, even in disciplinary actions, Goss v. Lopez, 419 U.S. 565 (1975) and progeny do not entitle the student to the full panoply of rights attendant to criminal trials. In Goss, the high school's decision to discipline the students rested on factual conclusions that the individual students had participated in demonstrations that had disrupted classes, attacked a police officer and caused physical damage to school property. Assuming that the Due Process Clause applied, the Supreme Court ruled that the student was entitled only to "some kind of notice" of the charges and "some kind of hearing." 419 U.S. at 579. Holding that oral notice sufficed, the Court ruled that due

process is satisfied by an informal "give and take" between the student and the

administration that gives the student the opportunity to characterize her conduct and put it

in what she deems a proper context. 419 U.S. at 581, 584. This "provide[s] a meaningful

hedge against erroneous action."  419 U.S. at 583. Nothing else is required.[11] See Dixon

v. Ala. State Bd. of Educ., 294 F.2d at 158-59.


Based on the factual allegations in Snyder's Complaint, as opposed to counsel's

bald legal conclusions, it cannot be disputed that the decision to permit plaintiff to

graduate with a B.A. in English, instead of her desired B.S.Ed., was in a purely academic

context. Millersville admitted plaintiff into its Advanced Professional Studies Program,

which required her to complete a student teaching component in order to receive a

B.S.Ed.  As with all student teachers, she was provided with a Guide for Student

Teaching. Exhibit A, hereto.[12] The Guide explains that, according to polices of the PDE,

to receive teaching certification in Pennsylvania, a student must satisfactorily complete

student teaching. Id. at 10. Each student teacher candidate is evaluated in the categories

set forth in the PDE-430 form, which are Planning and Preparation, Classroom

---

[11] Plaintiff is wrong about the due process requirements in disciplinary hearings. Even there, the student is not entitled to (1) application of the rules of evidence and rules of civil or criminal procedure; (2) active representation by legal counsel or some other sort of campus advocate; (3) call or cross-examine witnesses; (4) have the university produce some sort of record of the proceedings; (5) a written statement of reasons for a decision against him; (6) an appeal from a school's decision that was reached through constitutional means. See, e.g., Flaim v. Medical College of Ohio, 418 F. 3d 629, 635-36 (6th Cir. 2005). In any event, Millersville exceeded the due process requirements for an academic action and, in fact, provided plaintiff with sufficient process to satisfy even the requirements for a disciplinary sanction.

[12] A court may consider "matters of public record, exhibits attached to the complaint, and indisputably authentic documents attached to a motion to dismiss." Delaware Nation v. Pennsylvania, 446 F. 3d 410, 413 at n. 2 (3d Cir. 2006) (citation omitted); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F. 3d 1380, 1391 (3d Cir. 1994). In the attachments to her Amended Complaint, plaintiff includes only selected portions of certain documents. Attached hereto to defendants' memorandum are those complete documents. In addition, defendants attach other documents that, notwithstanding that this is a motion to dismiss, the court should consider because they are matters of public record or indisputably authentic, such as those penned by plaintiff or defendants. Alternatively, where the parties rely on materials not properly considered on a Rule 12(b)(6) motion, the court may consider the motion as one for summary judgment under Rule 56. See Rule 12(b).

Environment, Instructional Delivery and Professionalism. Id. at 18. According to the Guide, each candidate must receive a satisfactory rating in all of the categories listed on the PDE-430 in order to be eligible for certification by the Commonwealth. Id. at 20. The Guide also provides that "…the Student Teacher needs to maintain the same professional standards expected of the teaching employees of the cooperating school." Id. at 7. In addition, plaintiff was provided with the University's Undergraduate Catalog, which contains information on Academic appeals at the University. Exhibit B, hereto.

During the spring 2006 semester, plaintiff was a student teacher at Conestoga Valley. Complaint ¶ 14. Nicole Reinking was her teacher-advisor and Deann Buffington was her supervisor. Id. ¶ 15. Throughout the student teaching semester, plaintiff received feedback, both orally and in writing, from Ms. Reinking and Professor Garvin, the University supervisor, regarding her overall student teaching performance. The evaluation forms document multiple serious concerns at both the mid and end-points of plaintiff's student teaching semester. Amended Complaint ¶¶ 16-24.

On March 20, 2006, at the midpoint of the semester, Ms. Reinking, after frequent observations of plaintiff's student teaching, evaluated plaintiff as needing improvement or significant remediation in twelve different areas. Her criticisms included the following:

- "Though Ms. Snyder has had a lesson plan for each day of teaching, many plans were not submitted until the day of the lesson."

- "Many errors were made in daily lessons that were partly due to weak content knowledge and due to a lack of preparation."

- She is failing "to account for struggling students who are clearly not grasping the content during the lesson."

- "Too many students are left behind as a result of ineffective lessons…"

- "She has worked to develop on-task behavior through trial and error; however, frequently, she resorts to talking over the students, twice shouting 'Shut up,' and overall feeling and showing that she is frustrated and not in control."

- "Many students who completed Miss Snyder's earlier units in the course would not, I'm afraid, demonstrate a strong evidence of learning."

Exhibit C, hereto. See Complaint ¶ 18.

Also at the mid-point of the semester, on March 17, Professor Girvin evaluated plaintiff as needing improvement or significant remediation in twelve areas on the Millersville Student Teaching Mid-Evaluation - English.  Exhibit D, hereto. See Complaint ¶¶ 17, 19. Consistent with this, he rated her performance as unsatisfactory in the Classroom Environment category of the mid-placement PDE-430 form. Exhibit E, hereto. This equates to failing the practicum, although at mid-semester, the PDE-430 is designed to provide the student with feedback and an opportunity to improve. Id. In the Planning/Preparation and Instructional Delivery categories of the mid-placement PDE-430 form, she received only "Satisfactory." Id.

By the end of the semester, Ms. Reinking was quite displeased with plaintiff's student teaching. Exhibit F, hereto. In "Unprofessional Behavior/Performance in the Classroom," Ms. Reinking listed some criticisms, including playing a song to students that included profane language; attempting to regain order in the classroom by telling the students to "shut up"; discussing personal matters in front of students; failing to wear

17

appropriate professional attire; and not following the proper chain of command at the school.  Ms. Reinking also admonished plaintiff to avoid discussions about myspace.com, looking up student online accounts or corresponding with students on the website. <u>Id</u>.[13]

Plaintiff responded to Ms. Reinking's criticisms. <u>Id</u>. Although she denied some of the incidents raised by Ms. Reinking, nonetheless, portraying herself as "naïve" and "inexperienced," she conceded in writing that:

- She played a song for background music which contained profane and inappropriate language.

- She gave an account of her Valentine's Day with her boyfriend, former husband and children that made the students visibly uncomfortable.

- She told the students to "shut up" to regain control of the classroom.

- She dressed inappropriately at least once.

- She posted a "pirate" photograph of herself on her myspace.com website. On May 4, 2006, she wrote in her "blog":

  First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop that low as to mess with my future. So, bring on the love! I figure a couple of students will actually send me a message when I am no longer their offical (sic) teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)?

<u>Id</u>. On or about May 8, Ms. Buffington, the Conestoga Valley supervisor, telephoned plaintiff about the pirate picture appearing on plaintiff's myspace.com website. Amended

---

[13] Plaintiff's lists Ms. Reinking's document in her Self-Executing Discovery Enclosures. Exhibit Q, hereto.

Complaint ¶ 25. Ms. Buffington forbade her from entering the school. Id. ¶ 25. See Exhibit G, hereto.[14]

Thus, it should have come as no surprise that plaintiff's final academic evaluations from the Conestoga Valley professionals and Professor Girvin reflected serious deficiencies in her student teaching. Ms. Reinking's final Student Teaching Final Evaluation – English, shows unsatisfactory ratings in four of the six indicators of Professionalism and in two indicators of Preparation. Exhibit H, hereto. Her criticisms included the following:

- "In terms of professionalism, Miss Snyder evidenced some aspects of poor judgment during the semester, especially in regard to one specific instance….At Conestoga Valley High School, a teacher who earns a mark of unsatisfactory for professionalism will fail the final evaluation overall…"

- "However, most of Miss Snyder's written and oral communications with students and staff contained numerous grammatical and/or content errors, which is a cause for concern for an evaluator of a future English teacher. Frequently, in fact, her students corrected her during her lessons."

Consistent with the evaluation from Conestoga Valley, the final PDE-430 form completed by Professor Girvin on May 12, 2006, and required by the Commonwealth for eligibility for teaching certification, shows an unsatisfactory rating in Professionalism. Exhibit I, hereto. See Complaint ¶¶ 27-28, 33.  There are eight performance indicators for

---

[14] Ironically, since she is now suing him, in that diatribe against Ms. Reinking, plaintiff praised Professor Girvin as a "great supervisor. If I wouldn't have had you to receive guidance and support this semester, I would have been lost! I appreciate all your hard work and effort." Exhibit G, hereto.

the Professionalism category and Professor Girvin cited half of the total list as not having

been demonstrated, including the following:

- Integrity and ethical behavior, professional conduct as stated in <u>Pennsylvania</u>
  <u>Code of Professional Practice and Conduct for Educators</u>; and local, state, and
  federal, laws and regulations

- Effective communication, both oral and written with students, colleagues,
  paraprofessionals, related service personnel, and administrators.

- Ability to cultivate professional relationships with school colleagues.

- Knowledge of Commonwealth requirements for continuing professional
  development and licensure.

In addition, Professor Girvin rated her performance in the Professionalism component of

the student teaching evaluation as unsatisfactory. Exhibit J, hereto.

On May 11, 2006, plaintiff met with Ms. Buffington, Ms. Reinking and Professor

Girvin, to review her final student teaching evaluation. Amended Complaint ¶ 29. Ms.

Buffington took the lead in criticizing plaintiff's student teaching as "incompetent" and

her conduct as "unprofessional." <u>Id</u>. ¶¶31-32. As a result of these deficiencies, plaintiff

failed student teaching and was ineligible to receive a B.S.Ed. or Pennsylvania teaching

certification.[15] Thereafter, plaintiff sought an Academic Appeal, pursuant to

Millersville's policy, with Dr. Jane Bray, Dean of Millersville's School of Education.

Plaintiff submitted additional materials and met with Dr. Bray, who denied the appeal.

Exhibit L, hereto. As an accommodation, Dr. Bray granted plaintiff's request for an

---

[15] After plaintiff filed this litigation, Conestoga Valley in a "Response to Stacy Snyder Lawsuit" published
on its website (www.cvsd.k12.pa.us) confirmed many details of plaintiff's poor student teaching
performance and described with some particularity interactions between plaintiff and Conestoga Valley
personnel about the unprofessional postings on her website. That public document is attached hereto as
Exhibit K.

exception to graduation requirements, which permitted her to graduate in May 2006 with a B.A. in English Literature. Exhibit M, hereto. <u>See</u> Amended Complaint ¶¶ 35-38.

On January 27, 2007, plaintiff through counsel requested a hearing pursuant to Millersville's Academic Appeals Policy. Amended Complaint ¶ 56. University Provost Dr. Prabhu advised counsel he would hear her appeal and that plaintiff should bring copies of any documentation she would like to submit. <u>Id</u>. ¶ 57. Plaintiff solicited witnesses for the meeting and accurately characterized the meeting as an "academic hearing" and not as a "disciplinary hearing." Exhibit N, hereto. In advance of the meeting, plaintiff's counsel submitted a Statement of Issues, and lists of Exhibits and Witnesses to Dr. Prabhu. Exhibit O, hereto. Dr. Prabhu conducted the Academic Appeal. Exhibit P, hereto. He met personally with plaintiff and her attorney and reviewed the materials she submitted in support of her academic appeal. <u>Id</u>. Drs. Bray and Judith Wenrich, Student Teaching Coordinator in the School of Education, also attended the meeting and submitted materials regarding plaintiff's poor student teaching. <u>Id</u>. After evaluating the evidence, Dr. Prabhu upheld Dr. Bray's determination. <u>Id</u>.

It should be evident from plaintiff's allegations why courts shy away from getting enmeshed in situations that are essentially divorces in the Groves of Academe. The court need only note the wide and destructive swath of discovery that plaintiff intends to cut in this litigation. <u>See</u> Plaintiff's Self Executing Discovery Disclosures, Exhibit Q, hereto. Even at this early stage, plaintiff lists 23 witnesses, including multiple Conestoga Valley and Millersville personnel. It seems that plaintiff intends to engage in a vendetta against Dr. Bray for allegedly engaging in "censorship and backlash … against disfavored students." <u>Id</u>. at 2-3. Plaintiff also lists 32 documents, including a photograph allegedly

showing the Bloomsburg University President with "drunken students" holding up their citation for underage drinking. Id. at 3, 5.

Courts appreciate that faculty judgment on a student, like the decision of an individual professor as to a student proper course grade, is inherently more subjective and evaluative than the typical factual questions presented in a disciplinary decision.  The determination to take academic action entails expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial decision making. Horowitz, 435 U.S. at 90. In academic actions, informal review and evaluation sessions between student and faculty meet constitutional requirements.

Millersville took action against plaintiff for purely academic reasons, i.e., she failed student teaching at Conestoga Valley, and that she received all the process that was due. Snyder, as cases demonstrate, was the subject of academic action because of "clinical incompetence," an academic inquiry, and not for disciplinary reasons. Given that the cooperating school, Conestoga Valley, terminated its relationship with plaintiff and forbade her from entering the school to finish her student teaching, Amended Complaint, ¶ 25, Exhibit G, hereto, the successful completion of which was a prerequisite to certification, it is difficult to see how Millersville, from a purely academic standpoint, could have recommended plaintiff for teaching certification or awarded her a teaching degree. See Hennessey, 194 F. 3d at 250-51. The issue relates to plaintiff's competence, not her conduct. Her conduct at Conestoga Valley had academic significance because it spoke to her capacity to function professionally in a public school setting. Id.

Millersville accorded Snyder's academic failure with appropriate process. During the course of the semester, Ms. Reinking and Professor Garvin repeatedly informed

Snyder of and documented their dissatisfaction with her student teaching. She was given opportunities to rectify her deficiencies. At the end of the semester, she met with Ms. Buffington, Ms. Reinking and Professor Girvin to discuss her insufficient improvement during the semester. That semester long poor performance caused her to fail student teaching. Snyder appealed to Dr. Bray pursuant to Millersville's policy on Academic Appeals. She submitted additional documentation and met with Dr. Bray to evaluate the issues. Dr. Bray resolved the complaint by granting her request to graduate with a B.A. Thereafter, Snyder presented her grievance to the University Provost, conceding that the meeting was an "academic hearing," and not a "disciplinary hearing." In the academic hearing, plaintiff submitted documentary evidence, was permitted to call witnesses, was accompanied by counsel and received a detailed written explanation of the bases for denying her appeal.

This record leaves no doubt that plaintiff's academic record--her failure in student teaching at Conestoga Valley--was the determinative, if not the sole, reason for the University action. It cannot be doubted that the University's action was carefully and deliberately considered and processed and that Millersville went above and beyond the minimum due process requirements. Her due process claim should be dismissed.

**3.      Plaintiff Fails to State a First Amendment Claim**

Count I alleges that defendants impinged upon plaintiff's First Amendment rights for posting the pirate photograph on her private website. Amended Complaint ¶ 74 and Exhibit R thereto. Plaintiff alleges that she should be treated as a student vis-à-vis defendants and that Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969), sets the appropriate standard. This is incorrect. Plaintiff's claim falls under

Pickering v. Board of Education, 391 U.S. 563, 568 (1968), and Connick v. Myers, 461 U.S. 138, 146 (1983), because her status as a student teacher put her, for all intents and purposes, in the status of public employee.

In Hennessey v. City of Melrose, 194 F. 3d 237 (1st Cir. 1999), appellant's placement as a student teacher at a local public elementary school related to his role as a public university undergraduate. He was not at the elementary school to take the courses offered there and was not in any meaningful sense a pupil of the school. 194 F. 3d at 245. Rather, his position more nearly approximated that of an apprentice, that is, the elementary school relied on him in essentially the same way that it would rely on any teacher-in-training or teacher's aide. Id. He was there to master the rudiments of a profession and, in return, expected to work with the primary teacher and other school personnel to implement the designated curriculum and to participate in class activities. Though unpaid, the Circuit concluded, this apprentice-type relationship more closely resembles an employer-employee relationship than a school-pupil relationship. Id. The Circuit held that the employer-employee model furnished the best analogy and that the case law dealing with the First Amendment in the government employment context, rather than the public school student context, provides the appropriate framework for inquiry.  Id. See Andersen v. McCotter, 100 F.3d 723, 726 (10th Cir.1996) (holding that a student intern, working for college credit in a penitentiary, was properly treated as a public employee rather than as a student in a suit against the Department of Corrections alleging First Amendment violations). See also Rivero v. City & County of San Francisco, 316 F.3d 857, 864 (9th Cir.2002) (applying the public concern test in a case involving government retaliation against an independent contractor); Pinard v. Clatskanie

S.D., 467 F. 3d 755, 767 n. 16 (9th Cir. 2006) (recognizing that Connick's public concern test has been applied in cases where the relationship between the plaintiff and the government was sufficiently similar to an employment relationship).

Here, plaintiff's status as a student teacher puts her in the status of public employee. Millersville's Guide to Student Teaching, Exhibit A, hereto, makes clear that plaintiff was placed at Conestoga Valley not to take the courses offered there and that she was not a pupil of the school. Rather, her position paralleled that of an apprentice. Conestoga Valley relied on her in essentially the same way that it would rely on any teacher-in-training or teacher's aide. She was there to master the fundamentals of the teaching profession and, in return, was expected to work with the primary teacher, Ms. Reinking, and other school personnel, such as Ms. Buffington, to implement the designated curriculum and to participate in class activities. Millersville's Guide to Student Teaching, Exhibit A, hereto, at 7, provides that

- "...the Student Teacher needs to maintain the same professional standards expected of the teaching employees of the cooperating school";

- "The Student Teacher is urged ... to fulfill as effectively as possible every role of the classroom teacher ...";

- "The Student Teacher is expected to be well-groomed and appropriately dressed as a member of the teaching profession and to adhere to the Pennsylvania Code of Professional Ethics.";

- "The Coordinator, in consultation with the Cooperating Teacher and the University Supervisor, has authority to change or terminate the Student Teacher's assignment if professional conduct is not maintained";

- "During the semester of student teaching, each Student Teacher is expected to be in the assigned classroom every day the school is in session. The Student Teacher will follow the school calendar and the calendar furnished by the Office of Field Services… Student Teachers are expected to attend in-service meetings, faculty meetings and special school events (e.g. Parent-Teacher Conferences, I.E.P. Conferences, Open Houses)."

Conestoga Valley, the putative employer, terminated the relationship and forbade plaintiff from returning to the school. Amended Complaint, ¶ 25. As the First Circuit held in Hennessey, case law dealing with the First Amendment in government employment, rather than the public school student context, provides the appropriate legal framework.

To state a § 1983 claim predicated on the First Amendment plaintiff must show that (1) she was engaged in a protected activity; (2) defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising her rights; and (3) there was a causal connection between the protected activity and the retaliatory action. Mount Healthy City Board of Education v. Doyle, 429 U.S. 274, 284-287 (1987). See Green v. Philadelphia Housing Authority, 105 F.3d 882, 885 (3d Cir. 1997).

Plaintiff must first establish that she engaged in an activity protected by the First Amendment. Connick v. Myers, 461 U.S. 138, 147 (1983). See also Suarez Corp. Indust. v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000); Green, 105 F.3d at 885. See Pickering v. Board of Education, 391 U.S. 563, 568 (1968) (to qualify as a protected activity, plaintiff's conduct must satisfy the balancing test).  The threshold requirement is that the activity must address a matter of public concern. Connick, 461 U.S. at 146; Swineford v. Snyder County of Pennsylvania, 15 F.3d 1258, 1270 (3d Cir. 1994). See Pickering, 391

U.S. at 568. To be considered a matter of public concern, the conduct must relate "to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146; Pickering, 391 U.S. at 568; Swineford, 15 F.3d at 1270. That, in turn, depends upon the "content, form, and context" of the activity in question. Connick, 461 U.S. at 147-148; Swineford, 15 F.3d at 1270. If the activity in question is purely personal, it is not protected by the First Amendment. Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003); Swineford, 15 F.3d at 1270, 1273 (First Amendment does not convert private complaints into constitutional cases).

Whether speech is a matter of public concern is a question of law for the court. Brennan, 350 F.3d at 414-416; Green, 105 F.3d at 885. Even where the presence of factual disputes would normally preclude the court from ruling as a matter of law, Supreme Court precedent requires the trial court to do so. 105 F.3d at 887-88. The court does not reach the second step in the Pickering test, i.e., causation, if it determines that the plaintiff did not engage in protected activity. Id. 105 F.3d at 889.

To evaluate whether plaintiff's internet posting falls within the ambit of matters of public concern, it is instructive to refer to other cases which raise the issue of whether speech was held to involve matters of public concern. The content of the speech may involve a matter of public concern if it attempts "to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir.1993). See also Connick, 461 U.S. at 148-153 (survey questions circulated by plaintiff assistant district attorney to other employees concerning office transfer policy, office morale, need for grievance committee and level of confidence in supervisors involved personal grievance and not a matter of public

concern); <u>Swineford</u>, 15 F.3d at 1271 ("[S]peech disclosing public officials' misfeasance is protected."); <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 195 (3d Cir.2001) (investigator's speech in connection with his internal investigation of fellow law enforcement officers' alleged buying of previously leased county vehicles at below market price was on matter of public concern). "Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern." <u>Feldman v. Phila. Hous. Auth.</u>, 43 F.3d 823, 829 (3d Cir.1994) (citation omitted); <u>Brennan</u>, 350 F.3d at 414-416 (speech regarding asbestos in fire stations was a matter of public concern, although speech concerning the speed at which township purchased uniforms and protective clothing was not).

The cases, and common sense, compel the conclusion that plaintiff's internet posting of herself wearing a pirate hat and drinking from a cup does not rise to the level of speech touching on matters of public concern. Plaintiff's posting hardly rises to the level of concerns of government malfeasance or corruption. It is just a silly picture taken for plaintiff's and her friends' amusement. While there is nothing wrong in that, it beggars the imagination to consider that it touches on the kinds of weighty public matters designated for constitutional protection by the United States Supreme Court.

Assuming <u>arguendo</u>--but not conceding--that <u>Tinker v. Des Moines Ind. Com. S.D.</u>, 393 U.S. 503 (1969), applies, Amended Complaint ¶ 77, plaintiff's claim fails. Defendants do not dispute that "students have First Amendment rights to political speech in public schools." <u>Brandon v. Bd. of Educ.</u>, 635 F.2d 971, 980 (2d Cir.1980). <u>See</u> <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506 (1969). In three seminal cases, the Supreme Court enunciated the standards for assessing whether a school's restriction of student speech is constitutionally permissible. From this trilogy--

Tinker; Bethel School District v. Fraser, 478 U.S. 675 (1986); and Hazelwood Sch. Dist.

v. Kuhlmeier, 484 U.S. 260 (1988)--courts have distilled the following precepts:

(1)     Schools have wide discretion to prohibit speech that is less than obscene-to wit,

vulgar, lewd, indecent or plainly offensive speech, Fraser, 478 U.S. at 683-85;

Hazelwood, 484 U.S. at 272 n. 4;

(2)     If the speech at issue is "school-sponsored," educators may censor student speech

so long as the censorship is "reasonably related to legitimate pedagogical concerns,"

Hazelwood, 484 U.S. at 273; and

(3)     For speech that is neither vulgar, lewd, indecent or plainly offensive under Fraser,

nor school-sponsored under Hazelwood, the rule of Tinker applies. Thus, schools may

not regulate such student speech unless it would materially and substantially disrupt class

work and discipline in the school.   Tinker, 393 U.S. at 513. See, e.g., Saxe v. State Coll.

Area Sch. Dist., 240 F.3d 200, 214 (3d Cir.2001)  ("To summarize: Under Fraser, a

school may categorically prohibit lewd, vulgar or profane language.  Under Hazelwood, a

school may regulate school-sponsored speech.... Speech falling outside of these

categories is subject to Tinker's general rule....").

        The factual permutations that occur in the school freedom of speech cases and the

dozens of court decisions spawned therefrom are mind-boggling. For purposes of the

present Motion, however, those conundrums are not pertinent. Unlike the arresting

Pennsylvania State Troopers in Egolf v. Witmer, 421 F. Supp. 2d 858, 867 (E.D.Pa.

2006) (thong-clad protestors formed human pyramid) (Diamond, J.) , appeal docketed,

No. 06-2193 (3d Cir. April 7, 2006), Millersville contends that plaintiff's action of

posting the photograph on her website was not expressive conduct protected by the First

Amendment. As the person seeking to engage in allegedly expressive conduct, it is plaintiff's burden to demonstrate that the First Amendment even applies. <u>Clark v. Community for Creative Non-Violence</u>, 468 U.S. 288, 293, n. 5 (1984). "To hold otherwise would be to create a rule that all conduct is presumptively expressive." <u>Id</u>.

The courts reject "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." <u>United States v. O'Brien</u>, 391 U.S. 367, 376 (1968). Expressive conduct is protected by the First Amendment only where "an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it," or if the nature, context and environment of the conduct "was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." <u>Spence v. Washington</u>, 418 U.S. 405, 410-11 (1974) (two-part "particularized message" test).  <u>See</u> <u>Rumsfeld v. FAIR</u>, 126 S. Ct. 1297, 1310 (2006) (explaining that Supreme Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea…[W]e have extended First Amendment protection only to conduct that is inherently expressive"). "[T]he nature of appellant's activity, combined with the factual context and environment in which it was undertaken" are considered in determining whether the communicative aspects of conduct amount to speech.  <u>O'Brien</u>, 391 U.S. at 376.

A sampling of Supreme Court cases on expressive activity gives an idea of the definition of protected activity. The First Amendment shields such acts as marching in Boston's St. Patrick's Day Parade, <u>Hurley v. Irish-American Gay, Lesbian and Bisexual Group</u>, 515 U.S. 557 (1995); saluting a flag (and refusing to do so), <u>West Virginia Bd. of</u>

Ed. v. Barnette, 319 U.S. 624, 642 (1943); wearing an armband to protest a war, Tinker, 393 U.S. at 505-506; displaying a red flag, Stromberg v. California, 283 U.S. 359 (1931); "[m]arching, walking or parading" in uniforms displaying the swastika, National Socialist Party of America v. Skokie, 432 U.S. 43 (1977).

Parades, to choose one recent example of expressive activity, are more than "a group of people [who] march from here to there … to reach a destination." Hurley, 515 U.S. at 568. They are, instead, "public dramas of social relations, and in them performers define who can be a social actor and what subjects and ideas are available for communication and consideration." Id. (citation omitted). "Parades are thus a form of expression, not just motion, and the inherent expressiveness of marching to make a point explains our cases involving protest marches." Id. The expressive nature of a parade was central to the Court's holding. See Rumsfeld v. FAIR, 126 S. Ct. at 1309. See, e.g., Gregory v. Chicago, 394 U.S. 111 (1969) (procession to express grievances to the city government); Edwards v. South Carolina,  372 U.S. 229 (1963) (petitioners joined in a march of protest and pride, carrying placards and singing The Star Spangled Banner).

In contrast to the expressive, almost communal, nature of a parade, the Court held that the conduct regulated by the Solomon Amendment that was the subject in Rumsfeld v. Fair, is not inherently expressive. 126 S.Ct. at 1310. Prior to the adoption of the Solomon Amendment's equal-access requirement for military recruiters, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. An observer who saw military recruiters interviewing away from the law school has no way of knowing whether the law

school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else. The expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it. Id. at 1310-1311. The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under O'Brien. Id. at 1310. If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it. Id. See also Northern Indiana Gun & Outdoor Shows, Inc. v. Hedman, 104 F. Supp. 2d 1009, 1013-14 (N.D.Ind. 2000) (patrons having guns at the gun show to repair, show, and sell was not an expressive activity because it did not convey a particular message to anyone); Cabrol v. Youngsville, 106 F.3d 101, 109-10 (5th Cir. 1997) (plaintiff continuing to keep chickens in his yard despite new ordinance banning them was not expressive conduct because his actions would not communicate any particular message to viewers).

Plaintiff does not sustain the burden of showing that her internet posting is inherently expressive or an action otherwise protected by the First Amendment. Clark, 468 U.S. at 293, n. 5. It is hard to imagine how the single picture of her wearing a pirate hat and drinking from a plastic cup could conceivably be "sufficiently imbued with elements of communication" or to discern any specific expressive purpose that would implicate the First Amendment. Spence at 409. Without putting too fine a point on it, plaintiff's picture, posted on her "private www.myspace.com account," Amended Complaint, ¶ 74, reflects no expressive purpose and has no point whatsoever. It does not convey any message--particularized or not--and it is unfathomable that any message

would be understood by those who viewed it absent explanation. Where "explanatory speech is necessary [it] is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." Rumsfeld v. FAIR, 126 S. Ct. at 1311. Frankly, even with an explanation, it would be hard to discern what idea, if any, plaintiff may have intended to express. It is, after all, merely a photograph of plaintiff wearing a pirate hat and drinking from a plastic cup.

Plaintiff alleges that her www.myspace.com website is "private." Amended Complaint, ¶ 74. Accepting this, then plaintiff implies that she never intended Conestoga Valley or Millersville officials or anyone other than select friends or students to view it. This concession undermines any possibility that her posting could be considered an "expressive message," which requires that someone be available to perceive the purported idea. Like the proverbial tree falling in the empty forest that no one perceives, plaintiff's conduct--her internet posting--does not make any perceptible "noise." It has no relationship or interaction with any receptor in the environment.

Were the posting entitled to First Amendment protection, then anyone--student, government employee, or alleged whistleblower--could point to family photographs purposely and deliberately posted on the internet and, in the event of some subsequent adverse academic or employment action, fabricate a viable constitutional claim. Here, there was no intent to convey a particularized message and no likelihood that any message would be understood by anyone who viewed it. The context of the posting--a private website--was not imbued with elements of communication to warrant First Amendment protection. Surely, the framers of the First Amendment contemplated something loftier as deserving constitutional protection than an inert pirate picture.

**C.      Qualified Immunity Bars the § 1983 Damages Claim**

As argued above, plaintiff's constitutional rights have not been violated. If the court finds otherwise, then defendants are entitled to qualified immunity because a reasonable person would not have believed they were violating clearly established rights. The defense of qualified immunity shields government officials from liability whenever "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). See Behrens v. Pelletier, 516 U.S. 299, 305 (1996); Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." Blackhawk v. Pennsylvania, 381 F.3d 202, 215 (3d Cir. 2004).  It "is an entitlement not to stand trial or face the other burdens of litigation," and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002), quoting Mitchell v. Forsyth, 472 U.S. 511 at 526 (1985).  See Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005).

Regardless of whether the rights at issue are ones that "a reasonable person would have known" or are "clearly established," the court must begin its evaluation of the qualified immunity defense by determining whether any constitutional rights have been violated. Saucier v. Katz, 533 U.S. 194, 201(2001). The court "must next determine whether [that right] was a clearly established one, about which a reasonable person would have known." McGreevy, 413 F.3d at 364, quoting Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000). "Clearly established" means 'some but not precise factual

correspondence' between relevant precedents and the conduct at issue," although "officials need not predict the future course of constitutional law." <u>McLaughlin v. Watson</u>, 271 F.3d 566, 571 (3d Cir. 2001), <u>quoting</u> <u>Ryan v. Burlington County,</u> 860 F.2d 1199, 1208-09 (3d Cir. 1988)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." <u>Thomas v. Independence Twp</u>., 463 F. 3d 285 (3d Cir. 2006). Defendants are entitled to qualified immunity if "a reasonable officer could have believed that the challenged conduct was lawful under the circumstances." <u>Blackhawk</u>, 381 F.3d at 215.

      Courts have generally found the law to be "clearly established" only (1) where the "relevant principles" "apply with obvious clarity to the specific conduct in question"; or (2) where a "closely analogous case" holds the conduct unconstitutional and no "reasonable official could have distinguished" it. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739-40 (2002); <u>Galvin v. Hy</u>, 361 F.3d 1134 (9th Cir. 2004); <u>Paff v. Kaltenbach</u>, 204 F.3d 425, 433 (3d Cir. 2000). Here, neither approach suggests that plaintiff has asserted First Amendment rights that were "clearly established" at the time she posted her picture.

      The Second Circuit recently  pronounced that such [First Amendment] inquiries "require[] us to sail into the unsettled waters of free speech rights in public schools, waters rife with rocky shoals and uncertain currents." <u>Guiles v. Marineau</u>, 461 F. 3d 320, 321 (2d Cir. 2006). At bar, it is not even evident that the <u>Tinker</u> line of cases applies. Instead, the appropriate legal framework is speech in public employment analyzed according to <u>Connick</u> and <u>Pickering</u>. Even assuming that <u>Tinker</u> applies, defendants are still entitled to qualified immunity. That general rule that students have free speech rights

that may not be regulated unless disruptive, as is evident from the myriad of school speech cases raging then and now in the courts, does not advance the analysis. The specific legal context of this case--free speech rights of students or employees on the internet--is a nascent field only now developing. There is virtually no case law touching on free speech rights in public schools on the internet. Specifically, legal research reveals no case pertinent to whether plaintiff's internet posting, such as it is, on her ostensibly private website constitutes expressive speech such that defendants, academics of a previous generation, would have any reason to believe the pirate picture falls within the contours of protected activity. The relevant general principles do not apply with obvious clarity to the specific conduct in question and research finds no "closely analogous case" holding defendants' conduct unconstitutional such that a reasonable official could have believed his conduct was unlawful.

With respect to the due process claim, defendants are also entitled to qualified immunity. The Supreme Court has not yet decided whether a student at a state university has a constitutionally protected property interest in continued enrollment. See Ewing, 474 U.S. at 223, and Horowitz, 435 U.S. at 84-85, both of which leave open the question of whether such an interest even exists. In any event, the claim to such a property interest is dubious. see Ewing, 474 U.S. at 229 (Powell, J., concurring).

At bar, plaintiff's purported interest is especially tenuous because Millersville did not expel her, but merely awarded her a B.A. instead of the desired B.S.Ed. It has not been clearly established that plaintiff has a protected property interest in a B.S.Ed. and teaching certification. Moreover, from defendants' perspective, it is clear that plaintiff was pursuing an academic appeal. She was enrolled in an academic clinical. Supervisors

at Conestoga Valley and Millersville criticized her for poor academic performance. Plaintiff was never accused of misconduct or behavior that was destructive of property or person. Plaintiff pursued an appeal to the Dean pursuant to Millersville's policy on Academic Appeals. The sanction was academic: she received a B.A. and not a B.S.Ed. She was not dismissed from the School of Education or from Millersville. She correctly characterized the later meeting with Dr. Prabhu as an "academic hearing," and not as a "disciplinary hearing." After receiving the process that was due, plaintiff was not eligible for a degree or certification in teaching only because she failed the student teaching clinical. Given the underlying allegations, it was reasonable for Millersville defendants to believe they were not violating clearly established rights.

**D.    The State Law Claims Are Barred By Sovereign Immunity**

Plaintiff alleges that Commonwealth defendants violated Pennsylvania's Public School Code (Count IV) and intentionally inflicted emotionally distress (Count V). Both claims are barred by sovereign immunity.[16]

The constitutionally-based doctrine of sovereign immunity bars damages claims against the Commonwealth, its agencies and its officials and employees acting within the scope of their duties[17] except where the legislature provides otherwise.[18]  1 Pa. C.S. §

---

[16] Although not specifically alleged, presumably plaintiff wants this court to exercise supplemental jurisdiction over her State law claims. However, neither pendent (supplemental) jurisdiction nor any other basis of jurisdiction overrides the Eleventh Amendment. Pennhurst, 465 U.S. at 121.

[17] Title 1 Pa. C.S. § 2310 provides in relevant part: "Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." Section 2310 immunizes not only Commonwealth officials acting in their official capacity but also Commonwealth agencies. See Johnson v. Commonwealth of Pa. DOC, No. 92-5149, 1992 WL 392601, at *1 (E.D. Pa. Dec. 18, 1992).

[18] Sovereign immunity applies to all claims except for nine narrowly enumerated exceptions, none of which apply in this case. The categories are (1) vehicle liability; (2) medical-professional liability; (3) care,

2310. <u>See</u> 42 Pa. C.S. §§ 8501, 8521-22. The cases supporting this principle are legion.

<u>E.g.</u>, <u>Heicklen v. Hoffman</u>, 761 A. 2d 207, 209 (Pa. Cmwlth. 2000); <u>McGrath v. Johnson</u>,

67 F. Supp. 2d 499, 511 (E.D. Pa. 1999), <u>aff'd</u>, 35 Fed. App'x. 357, 2002 WL 1271713

(3d Cir. 2002); <u>Frazier v. SEPTA</u>, 868 F. Supp 757 (E.D.Pa. 1994) (state agency enjoys

sovereign immunity from claims for damages for intentional torts--fraud and intentional

infliction of emotional distress--and for negligent infliction of emotional distress);

<u>LaFrankie v. Miklich</u>, 618 A.2d 1145, 1148-49 (Pa. Cmwlth.1992) (state trooper has

immunity for intentional torts--here, false arrest, abuse of legal process and malicious

prosecution--committed within scope of employment); <u>Yakowicz v. McDermott</u>, 120 Pa.

Cmwlth. Ct. 479, 548 A.2d 1330 (1988), <u>appeal</u> <u>denied</u>, 565 A.2d 1168 (Pa. 1989)

(sovereign immunity for defamation and invasion of privacy); <u>Pickering v. Sacavage</u>, 164

Pa. Cmwlth. Ct. 117, 642 A.2d 555, 559-60, <u>appeal</u> <u>denied</u>, 652 A.2d 841 (Pa. 1994)

(state trooper acting within scope of duties is protected by sovereign immunity from

intentional infliction of emotional distress and civil conspiracy claims); <u>Ray v.

Pennsylvania State Police</u>, 654 A.2d 140 (Pa. Cmwlth Ct. 1995) (state trooper immunity

from claims of negligent and intentional infliction of emotional distress), <u>aff'd</u>, 676 A. 2d

194 (Pa. 1996); <u>Maute v. Frank</u>, 441 Pa.Super. 401, 657 A.2d 985, 986 (1995) (state

prison officials enjoy sovereign immunity); <u>Robles v. Pennsylvania Dep't. of

Corrections</u>, 718 A.2d 882, 884 (Pa.Cmwlth.1998) (same); <u>Martz v. SEPTA</u>, 598 A.2d

580 (Pa.Cmwlth. 1991) (immunity for intentional acts of false imprisonment and

malicious prosecution); <u>Faust v. Commonwealth Dep't of Revenue</u>, 592 A. 2d 835, 839,

---

custody or control of personal property;(4) Commonwealth real estate, highways and sidewalks;(5) potholes; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa. C.S. § 8522(b).  Tort claims and civil rights actions are not within these narrow exceptions. <u>See</u> <u>Robinson v. Ridge</u>, 996 F. Supp. 447 (E.D.Pa. 1997), <u>aff'd</u>, 175 F. 3d 1011 (3d Cir. 1999)

140 Pa. Cmwlth. 389 (1991), appeal denied, 607 A. 2d 257, 530 Pa. 647 (1992) (State and its employees acting within scope of employment enjoy sovereign immunity for claims based upon the Pennsylvania Constitution and for intentional torts). See also Shoop v. Dauphin County, 766 F. Supp. 1327 (M.D.Pa. 1991), aff'd, 945 F. 2d 396 (3d Cir. 1991), cert. denied, 502 U.S. 1097 (1992) (state trooper had sovereign immunity from suit with regard to civil rights plaintiff's pendent state law claims of false imprisonment, assault and battery, malicious abuse of process and intentional infliction of emotional distress); Boone v. Pa. Office of Vocational Rehabilitation, 373 F. Supp. 2d 484 (M.D.Pa. 2005)(sovereign immunity barred claim of intentional infliction of emotional distress against executive director of division where plaintiff had worked).[19]

Plaintiff's Count IV claim that defendants violated the Pennsylvania Public School Code and the Pennsylvania Code and Count V claim of intentional infliction of emotional distress are barred by sovereign immunity. The claims fail to come within any exception to immunity. Moreover, insofar as the claims are based on alleged violations of Pennsylvania law, based on the Eleventh Amendment, "federal courts have no jurisdiction to review state officials' compliance with state law." Blake v. Papadakos, 953

---

[19] Any suggestion that arguably improper conduct by a Commonwealth employee is beyond the scope of the employee's duties would be contrary to established agency principles. Pennsylvania courts look to the general standard set forth in Restatement (Second) of Agency § 228 in determining whether an employee's act was undertaken within the scope of employment. Aliota v. Graham, 984 F.2d 1350, 1358 (3d Cir.), citing Butler v. Flo-Ron Vending Co., 383 Pa.Super. 633, 557 A.2d 730, 736 appeal denied, 523 Pa. 646, 567 A.2d 650 (1989), cert. denied, 114 S.Ct. 68 (1993); Advanced Power Sys. v. Hi-Tech Sys., No. 90 Civ. 7952, 1994 WL 116121, at *3 (E.D.Pa. Mar. 21, 1994). Under § 228, conduct of an employee is within the scope of employment if it is of the kind and nature that the employee is employed to perform; it occurs substantially within authorized time and space limits; and it is actuated, at least in part, by a purpose to serve the employer. Natt v. Labar, 543 A.2d 223, 225 (Pa. Cmwlth. 1988). See Advanced Power Sys. Inc., 1994 WL 116121, at *3. Acts of an employee are within the scope of employment even if the employee acted disobediently, Commonwealth v. Cox, 476 A.2d 1012, 1014 (Pa. Cmwlth. 1984); abused his authority, Potter Title and Trust v. Knox, 113 A.2d 549, 551 (Pa. 1955); or behaved tortiously or criminally, First Nat'l Bank of Altoona v. Turchetta, 181 A.2d 285, 288 (Pa. 1962), unless the legislature has explicitly waived the Commonwealth's immunity from suit on such theories. It has not. It cannot be disputed that defendants acted within the scope of their duties.

F. 2d 68, 73 n. 5 (3d Cir. 1992). <u>See</u> <u>Pennhurst</u>, 465 U.S. at 104-05 (the Supreme Court expressly held that the Eleventh Amendment bars federal courts from ordering state agencies or officials to comply with state law.[20] Thus, the state law claims against Commonwealth defendants are barred by sovereign immunity.

## III.    CONCLUSION

For these reasons, Commonwealth defendants request that the Amended Complaint be dismissed with prejudice.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL


BY:    <u>s/s Barry N. Kramer</u>
       BARRY N. KRAMER
       Senior Deputy Attorney General
       Identification No. 41624

       Susan J. Forney
       Chief Deputy Attorney General
       Civil Litigation Section

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-1581
Fax:    (215) 560-1031

---

[20] Although not set forth as causes of action, plaintiff references alleged violations of other State law-based policies. These are form PDE-430 (¶¶ 41-43); the Pennsylvania Code of Professional Practice and Conduct for Educators (¶ 44), which would not apply in any event to plaintiff because is not certified to teach in Pennsylvania; Millersville Code of Conduct (¶¶ 45-51). In addition to the defense of sovereign immunity, violation of these policies does not give rise to a cause of action. Moreover, this court may not review defendants' state officials' compliance with state law. <u>Blake</u>, 953 F. 2d at 73 n. 5. The question is not what state law requires but what is required by federal due process, which "sets only the floor or lowest level of procedures acceptable." <u>See Flaim</u>, 418 F. 3d at 636.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STACY SNYDER,              :        CIVIL ACTION
                           :
        Plaintiff,         :
                           :
        v.                 :
                           :
MILLERSVILLE UNIVERSITY,   :
et al.                     :        07-1660
                           :
        Defendants.        :

**CERTIFICATE OF SERVICE**

I, Barry N. Kramer hereby certify that on May 23, 2007, Defendants' Motion to Dismiss the Amended Complaint has been filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System.  The ECF System's electronic service of the Notice of Electronic Case Filing constitutes service on all parties who have consented to electronic service:

    Mark W. Voigt, Esquire
    Plymouth Meeting Executive Campus
    Suite 400
    600 West Germantown Pike
    Plymouth Meeting, PA  19462
    mwvoigt2@aol.com


                        BY:    s/s Barry N. Kramer_____
                               BARRY N. KRAMER