## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 07-1660 |
| | : | |
| MILLERSVILLE UNIVERSITY, J. BARRY | : | JURY TRIAL DEMANDED |
| GIRVIN, DR. JANE S. BRAY, and DR. VILAS | : | |
| A. PRABHU, | : | |
| Defendants | : | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

I.    **ISSUES PRESENTED**

   A.    **Whether Stacy Properly States a Claim Under 42 U.S.C. §1983 and The First and Fourteenth Amendments Since Millersville's University's Dismissal of Stacy from Its School of Education Violated Her Right to Freedom of Expression and Speech?**

   B.    **Whether MU's Dismissal of Stacy Without Proper Notice and a Fair Administrative Hearing Violated Her Right to Procedural Due Process Under §1983 and The Fifth and Fourteenth Amendments?**

   C.    **Whether MU's Dismissal of Stacy Violates §1983 Since MU Failed to Train Its Employees Concerning the Fundamental Constitutional Rights of Its Student Teachers?**

       1.    **The Eleventh Amendment/ Sovereign Immunity Does Not Bar Stacy's Claims.**

       2.    **Stacy's Claims Are Not Barred by Qualified Immunity.**

   D.    **Whether Millersville Violated the Public School Code by Expelling Stacy, *Inter Alia*, Without Reasonably Specifying in Advance the Offense and Penalty for Which She Was Held Accountable?**

1

Dockets.Justia.com

E. **Whether Stacy Properly States a Cause of Action Against the Individual Defendants for Intentional Infliction of Emotional Distress in View of the Outrageous and Extreme Intentional Misconduct they Perpetrated on Her?**

F. **Whether Stacy Properly States a Cause of Action Against MU for Breach of Contract in View of MU's Failure to Award Her the Degree She Earned?**

**SUGGESTED ANSWERS TO ALL THE ABOVE:    YES.**

## II.    STATEMENT OF FACTS

The pertinent facts are set forth at length in the Amended Complaint of Plaintiff, Stacy Snyder ("Plaintiff" or "Stacy") and are well known to this Honorable Court. Briefly, Stacy overcame a high school pregnancy and single motherhood to two boys to enroll in Millersville University ("MU") in June, 2002. (Amended Complaint, ¶8.) There, she majored in Secondary English Education and enrolled in MU's School of Education, expecting to achieve her lifelong dream of becoming a teacher. Despite working and raising two children alone, Stacy maintained a grade point average of between 3.0 and 3.9. (*Id.*)

During her teacher training, Stacy successfully completed several "field experiences" in area public schools. One supervising teacher, Neil Weidman, lauded Stacy as "exceptionally professional" and predicted she "will become an excellent teacher." (*Id.*, ¶11.) Stacy made the Dean's list at MU, and MU's Dean lauded her as "one of [MU's] finest student scholars." (*Id.*, pp. 12-13.)

Stacy was scheduled to graduate from MU with her teaching degree in May, 2006. As her final requirement, Stacy served as a student teacher at Conestoga Valley High School ("CV"). In his March 17, 2006 "mid evaluation," Stacy's supervisor at MU, J. Barry Girvin, awarded her the highest mark in ethics. (*Id.*, ¶17.) Similarly, in her March 20, 2006 "mid evaluation," Nicole Reinking,

2

Stacy's cooperating teacher, awarded Stacy high marks in "professionalism." (*Id.*, ¶18.)

Admittedly, in their mid evaluations, Reinking and Girvin identified areas in which Stacy needed remediation. Thereafter, Stacy's teaching performance improved dramatically. On April 3, 2006, Girvin extolled on Stacy's "excellent" lesson plan. (*Id.*, ¶20.) In an April 18, 2006 note, Girvin commended Stacy for her "great improvement in content" and her "excellent CIRQL unit planning." (*Id.*, ¶23.) In a May 2, 2006 evaluation summary, Girvin rated Stacy as "exemplary" in all areas. (*Id.*, ¶24.)

On or about May 8, 2006, Reinking, without notice or permission, snooped onto Stacy's web page at www.myspace.com. (*Id.*, ¶29.) There, she discovered a picture of Stacy at a costume party outside of school hours wearing a party hat and holding a plastic cup. (*Id.*, ¶30.) The photograph does not show the cup's contents. (*Id.*) Stacy believes the photograph bore the insignia "drunken pirate." (*Id.*) Importantly, Stacy's web site also contained the following "update:"

> "First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop that low as to mess with my future. So, bring on the love! I figure a couple of students will actually send me a message when I am no longer their official teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)?" (*Id.*, ¶30.)[1]

On the afternoon of May 8, 2006, Reinking's supervisor, Deann Buffington, telephoned Stacy

---

[1] Given the notice pleading requirements in Federal Court, when ruling on Rule 12(b)(6) motions, courts may consider the full text of documents referred to, but not attached to, a plaintiff's Complaint. *Cooper v. Pickett*, 137 F.3d 616, 622-623 (9th Cir. 1997); See also, *Duferco Steel, Inc. v. M/V Kalisti*, 121 F.3d 321, 324 n.3 (7th Cir. 1997.) Here, while she summarizes the comments Reinking observed on Stacy's website in paragraph 30 of the Amended Complaint, Plaintiff does not set forth the document's full text. Accordingly, the Court should consider the full text of Stacy's commentary, attached hereto as Exhibit "A."

at home.  (*Id.*, ¶25.)  She advised Stacy that an "issue" had just arisen concerning her "professionalism" as a teacher.  (*Id.*)  Buffington then forbade Stacy from returning to CV until Thursday, May 11, 2006.  (*Id.*)

Stacy spoke to Girvin about the matter on May 10, 2006.  Girvin explained only that someone delivered a picture of Stacy to Buffington.  (*Id.*, ¶26.)  Girvin refused to give Stacy any details, explaining only that she may lose her teaching certificate.  (*Id.*)

Also on May 10, 2006, Girvin prepared Stacy's "final evaluation."  (*Id.*, ¶27.)  He awarded Stacy "superior" or "competent" ratings in all areas except "professionalism."  (*Id.*, ¶27.)  In that area, Girvin deemed Stacy's performance "unsatisfactory," explaining only that she made unspecified "errors in judgment that allegedly violated Pennsylvania's "Code of Professional Practice and Conduct for Educators."  (*Id.*)

On May 11, 2006, Stacy met with Girvin, Reinking and Buffington to review her final evaluation.  Buffington showed Stacy the "drunken pirate" photograph.  (*Id.*, ¶29.)  She explained that Stacy's posting the photo, caption and text on her web page was "unprofessional."  She asserted that, if CV students viewed the web page, they might find the information offensive.  (*Id.*, ¶31.)  Buffington mentioned no students who actually saw the information.  (*Id.*)

On or about May 12, 2006, Girvin prepared statewide evaluation form PDE-430 regarding Stacy's performance.  (*Id.*, ¶33.)  Girvin awarded Stacy passing grades in all areas except "professionalism."  There, Girvin deemed Stacy's performance "unsatisfactory," explaining only that Stacy lacked "integrity and ethical behavior."  (*Id.*, ¶33.)

On May 12, 2006, Stacy met with Dr. Jane S. Bray, dean of MU's School of Education.  (*Id.*, ¶35.)  Bray accused Stacy of promoting underage drinking through her "drunken pirate" photo.  (*Id.*)

4

Then, without notice or a hearing, she stripped Stacy of her teaching degree. (*Id.*) She informed Stacy that MU graciously would "allow" her to graduate with a Bachelor of Arts ("BA") Degree, a rank Stacy had not pursued. (*Id.*, ¶36.) At graduation ceremonies the next day, Stacy received her BA Degree. (*Id.*)

Since the above events took place, Stacy learned that well-placed representatives of CV advised high-ranking MU officials that CV would not accept any more MU student teachers if MU did not punish Stacy swiftly and severely. (*Id.*, ¶39.)

Since her expulsion from MU's School of Education, Stacy has been unable to obtain the teaching certificate she earned. She has been unable to find any work as a teacher. Instead, she supports her two children by working as a nanny, a clothing store clerk and a waitress.

MU now asks this Honorable Court to dismiss Stacy's Amended Complaint based on sovereign immunity and a variety of other technical defenses. For the reasons that follow, this Honorable Court should deny MU's Motion to Dismiss and force MU to answer for its misconduct in court before a jury of Stacy's peers.

## III.    ARGUMENT

### Standard of Review

In its liberality, Rule 12(b)(6) erects a powerful presumption against dismissing pleadings for failure to state a cognizable claim for relief. *Strand v. Diversified Collection Services, Inc.*, 380 F.3d 316 (8th Cir. 2004). Such dismissals are disfavored and, in view of the "notice pleading" requirements of the Federal Rules of Civil Procedure, are not routinely granted. *Gregson v. Zurich American Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003). A claim will only be dismissed under Rule 12(b)(6) if it appears beyond doubt that the pleader can prove no set of facts in support of the claim that would

entitle him to relief.  *Hishon v. King and Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

A claim will not be dismissed merely because the trial court doubts the pleader's allegations or suspects the pleader ultimately will not prevail at trial.  *Oatway v. American Int'l Group, Inc.*, 325 F.3d 184, 187 (3rd Cir. 2003).  Courts are especially hesitant to dismiss at the pleading stage those claims pressing novel legal theories, particularly where it could better examine the claims following development of the facts through discovery.  *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004).

A.    **Stacy Properly States a Cause of Action Under 42 U.S.C. §1983 and The First and Fourteenth Amendments Since MU's Dismissal of Stacy from Its School of Education Violated Her Right to Freedom of Expression and Speech.**

Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. §1983, imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or the laws of the United States.  *Shuman, et al. v. Penn Manor Sch. Dist., et al.*, 422 F.3d 141, 146 (3rd Cir. 2005).  In this case, it is beyond dispute that MU and the individual defendants were acting under color of state law, specifically 24 P.S. §20-2001-A, *et seq.*, when they deprived Stacy of her BSE degree and teaching certificate in violation of her First Amendment rights.

The First Amendment to the Constitution of the United States provides "Congress shall make no law . . . abridging the freedom of speech, . . . ."  The Fifteenth Amendment provides, in pertinent part:

**"Section 1"**

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property, without due process of law; . . . ."

\* \* \*

**"Section 5"**

"The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

The touchstone for First Amendment cases in the public school context is *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 21 L.Ed.2d 731, 89 S.Ct. 733 (1969). In *Tinker*, the Supreme Court established that a public school building was not off limits to free speech rights. *Killion v. Franklin Regional Sch. Dist., et al.*, 136 F. Supp. 2d 446, 452 (W.D. Pa. 2001). In recognizing students' expressive rights, the *Tinker* court imposed a significant burden on the school to justify punishment of speech by demonstrating ". . . that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Tinker*, 393 U.S. 503, 509 (citation omitted).

Since there was little evidence of actual or potential disruption in the school, the *Tinker* court found in favor of the student. (*Id.*) According to the Court, the Constitution required more than an "undifferentiated fear or apprehension of disturbance." (*Id.*, at 508.) Instead, the school must present evidence of an actual or likely disruption. (*Id.*)

Federal courts are loathe to find "substantial disruption" when the speech in question occurs off campus, over the internet. For instance, in *Killion*, *supra*, a high school student compiled a "top ten" list on his home computer disparaging the district's athletic director. (*Id.*, 136 F. Supp. 2d 446, 448). The student then e-mailed the list to his friends from his home computer. He never brought

7

the list to school or distributed it on school premises.  (*Id.*)

The *Killion* court found the First Amendment protected the student's speech.  (*Id.*, pp. 455-456.)  In finding no "actual disruption," the *Killion* court rejected the district's argument that the list could ". . . impair the administration's ability to appropriately discipline the students."  (*Id.*, p. 456.)  The court continued:

> "We cannot accept, without more, that the childish and boorish antics of a minor could impair the administrators' abilities to discipline students and maintain control.  Accord *Tinker*, 393 U.S. at 508 ("in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"); *Klein v. Smith*, 635 F. Supp. 1440, 1442 ("the court cannot accept, however heartfelt it may presently be, [that] the future course of the administration of discipline . . . [will] dissolve, willy-nilly, in the face of the digital posturing this splenetic, bad-mannered little boy")."  *Killion*, 136 F. Supp. 2d at 456.

In the case at bar, applying the above, the "drunken pirate" photo, caption and text did not substantially disrupt education at either MU or CV.  Stacy's speech occurred off campus and was composed on her private, home computer.  She did not produce it in connection with any class or school project. *Killion, supra*, citing *Emmett v. Kent Sch. Dist. No. 415*, 92 F. Supp. 2d 1088 (W.D. Wa. 2000).  Further, Stacy's speech did not threaten anyone.  Although it upset the CV and MU administration, her comments did not criticize any particular administrators.  *Killion* at 455.  Accordingly, under the above cases, Stacy's speech enjoys Constitutional protections.

MU next contends Stacy's web posting is not protected speech because it is "vulgar, lewd, indecent or plainly offensive."  (MU Brief, p. 29, citing *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986)).  However, in *Fraser*, the court emphasized that school officials may only punish lewd speech "to make the point to pupils that such speech is wholly inconsistent with the 'fundamental values of

8

public education.'" 478 U.S. at 686-687; *Killion*, 136 F. Supp. 2d at p. 456.  Moreover, courts considering lewd and obscene speech occurring off school grounds have held that students cannot be punished for such speech absent exceptional circumstances.  *Killion, supra; Thomas v. Bd. of Educ., Granville Central Sch. Dist.*, 607 F.2d 1043 (2nd Cir. 1979).

In the case at bar, Stacy's speech and expression was neither lewd nor obscene.  The photo does not depict the contents of the plastic cup.  MU and CV merely concluded from the "drunken pirate" caption that the cup contained alcohol.  Even if it did, Stacy was 25 years old at the time the photo was taken.  She broke no laws whatsoever by drinking an alcoholic beverage in her free time.  Similarly, nothing in the caption or text is even remotely lewd or obscene.  Again, the Constitution protects Stacy's free speech.

MU next contends Stacy does not enjoy First Amendment protection because the "drunken pirate" photo, caption and text is not "inherently expressive." (MU Brief, p. 30.) MU claims Stacy's web posting resembles a meaningless parade, "reflect[ing] no expressive purpose and ha[ving] no point whatsoever." (*Id.*, p. 32.)

However, MU's argument ignores the "drunken pirate" caption and the meaningful text accompanying Stacy's photo.  (MU Brief, pp. 31-33.)  In her commentary, Stacy raises concerns about the improper motives of the teachers and administrators at CV and MU.  (See Exhibit "A.")  Far from meaningless, her expressions are precisely what the framers of the Constitution sought to protect when the penned the First Amendment.

Even focusing just on the photo, it is well established that symbolic speech enjoys First Amendment protection.  For instance, in *Klein v. Smith*, 635 F. Supp. 1440 (D. Me. 1986), the court struck down the suspension of a student who gave his teacher "the finger" after school hours and off

school grounds. The *Klein* court reasoned ". . . the First Amendment protection of freedom of expression may not be made a casualty of the effort to force feed good manners to the ruffians among us." (*Id.* at 1441-1442.)

In the case at bar, Stacy's photo symbolizes the rebellious spirit of youth. It underscores the importance of sucking the marrow of life while one is young, before job, family and other adult responsibilities sap the free spirit. This message resonates with young adults even if MU's teachers and administrators are incapable of understanding it. Under the above cases, the "drunken pirate" photo constitutes protected free expression.

MU then avers Stacy enjoys no free speech rights since her student-teaching assignment at CV magically transformed her, "for all intents and purposes," from a tuition-paying student into an unpaid "public employee." (MU Brief, pp. 23-28.) This argument, however meritless, presents a question of fact for the jury. Stacy deserves the right to question MU and CV employees, through discovery and at trial, on the nature of her relationship with those institutions. Since MU raises at least one factual question, the Court must deny its Rule 12(b)(6) motion. *See Carino v. Stefan*, 376 F.3d 156, 159 (3rd Cir. 2004).

Assuming *arguendo* that the Court considers MU's frivolous argument, the evidence overwhelmingly demonstrates Stacy was not a "public employee" of either CV or MU. Under Pennsylvania law, the relationship between student and university is contractual. *Ross v. Pennsylvania State Univ.*, 445 F. Supp. 147, 152 (M.D. Pa. 1978); *Strank v. Mercy Hosp. of Johnstown*, 383 Pa. 54, 117 A.2d 697 (1955). Thus, the Court must look to MU's official publications and policies to determine its legal relationship with Stacy. *Ross, supra*, 445 F. Supp. at p. 152.

In particular, MU publishes *A Guide For Student Teaching* ("the Guide",) which it distributes to all its student teachers, including Stacy.  (See Exhibit "B" hereto[2]; see also, Prabhu letter to Snyder dated March 26, 2007, Exhibit "BB" to Amended Complaint, p. 1.)  The Guide clearly shows that MU views student-teaching assignments as merely an extension of the student's undergraduate experience.  For instance:

> "The overall policies in regard to student teaching are determined by the various teacher education departments, with the approval of the dean of the School of Education.  The administration of student teaching is a **joint responsibility of [MU's] coordinator of field services and the education faculty** of the professional education unit."  (Exhibit "B," p. 7 of 25; emphasis added)

The Guide goes on to provide:

> "Assignments for student teaching locations are made by the coordinator **in cooperation with [MU] departmental personnel**, and administrators and teachers in cooperating school districts. **Student teachers are assigned to cooperating teachers, not to schools or school districts.**  Student teachers are responsible for arranging their own transportation to and from their school assignments."  (*Id.*; emphasis added.)

Importantly, MU considers **the student teacher a guest, not an employee, at the cooperating school.**  (*Id,* p. 7 of 25)  The Guide mentions nothing about MU's convenient employer/ employee relationship.  Rather, MU expects student teachers to continue their education by "[accepting] every task as a potential learning experience."  MU emphasizes that "receiving

---

[2]Courts considering Rule 12(b)(6) motions may consider "undisputably authentic documents," provided the authenticity of the documents is not challenged, the documents are attached to the brief and plaintiff's claims are premised on the documents.  *Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144, 145 (3rd Cir. 1997.)  Here, MU makes the Guide available on its website, and Prabhu referred to it as authoritative in his March 26, 2007 letter.  (Exhibit "BB" to the Amended Complaint.)  Thus, MU cannot dispute the Guide's authenticity.  This Honorable Court should consider the Guide in ruling on MU's motion to dismiss.

compensation for student teaching is also forbidden," again belying its novel theory. (*Id.*, p. 9 of 25.)

MU directs the court to *Hennessey v. City of Melrose*, 194 F.3d 237 (1st Cir. 1999), to support its claim that it was Stacy's employer, not her teaching facility. (MU Brief, p. 24.) However, the facts of *Hennessey* are entirely different from those in the case at bar. Initially, the *Hennessey* court only considered whether the **cooperating school** (in this case, CV) violated plaintiff's First Amendment rights by terminating his student teaching assignment. (*Id.*, p. 244.) The court specifically did not address any First Amendment claims plaintiff raised against the state university he attended. *Id.*

Next, the cooperating school in *Hennessey* contended plaintiff engaged in "erratic behavior" and made numerous improper remarks **during class.** (*Id.*, p. 243.) Here, the "drunken pirate" incident occurred **outside of school**. Therefore, the *Hennessey* court scrutinized plaintiff's allegedly protected speech much more closely than is warranted here.

Further, the court in *Hennessey* found the relationship between **the cooperating school** and the student teacher more closely resembled that of master/apprentice than pupil/school. (*Id.*, p. 245.) Here, Plaintiff brings her claims against MU, not the cooperating school.

Moreover, the *Hennessey* court never considered the contractual relationship between the parties. Here, MU's student handbook specifically prohibits the creation of any employer/ employee relationship between the student teacher and the cooperating school. (Exhibit "B," p. 7 of 25.) It emphasizes that student teachers are assigned to cooperating teachers, not to schools or school districts. (*Id.*) MU stresses that the student teacher is "a representative of the university," not the cooperating school. Lastly, because *Hennessey* is a First Circuit case, its erroneous holding is not binding on this Honorable Court. Since, *Hennessey* is inapplicable to the present case, the court

should deny MU's creative attempt to dodge its First Amendment responsibilities.

Assuming *arguendo* that the Court considers her a "public employee" of MU, Stacy still has pleaded an actionable First Amendment claim. As MU observes, to state a §1983 claim predicated on the First Amendment in an employment context, a plaintiff must show (1) she engaged in a protected activity; (2) defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising her rights; and (3) a causal connection between the protected activity and the retaliatory action. *Mount Healthy City Bd. of Education v. Doyle*, 429 U.S. 274, 284-287 (1987). (MU Brief, p. 26.)

Applying the first prong, the "drunken pirate" photo, caption and text clearly constitute protected speech. In the text accompanying her photo, Stacy hints that she decided not to apply for a teaching position at CV because of malfeasance by its officials and teachers. (See Exhibit "A.") Misconduct in the public schools is a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147 (1983). Stacy's speech threatens to bring to light potential wrongdoing or breach of public trust by CV officials. *Holder v. City of Allentown*, 987 F.2d 188, 195 (3rd Cir. 1993). Additionally, the Third Circuit has recognized that speech disclosing malfeasance by public officials is protected under the First Amendment. *Swineford v. Snyder County of Penna.*, 15 F.3d 1258, 1270 (3rd Cir. 1994). Thus, the first prong of the §1983 test is satisfied.

Next, MU dismissed Stacy from its School of Education in response to her exercising her First Amendment rights. Clearly, denial of one's lifelong dream constitutes retaliatory action sufficient to deter a person of ordinary firmness from speaking out against MU. Thus, the second prong of the §1983 test is satisfied.

Finally, MU expelled Stacy just one or two days after it discovered the photo, caption and text

in question.  Both CV and MU officials told Stacy they were denying her the teaching degree she earned because of the photo.  Clearly, there is a "causal connection" between the protected activity and the retaliatory action.  Accordingly, Stacy meets the third prong.

Based on the above, even under MU's baseless "employer/employee" theory, Stacy has stated a cause of action for a First Amendment violation.  Accordingly, MU's Motion to Dismiss must be denied.

**B.    MU's Dismissal of Stacy Without Proper Notice and a Fair Administrative Hearing Violated Her Right to Procedural Due Process Under §1983 and The Fifth and Fourteenth Amendments.**

The Fifth Amendment to the Constitution provides, in pertinent part: "No person shall . . . be deprived of life, liberty or property without due process of law; . . . ."  It is well established that students at public schools enjoy a " . . . legitimate entitlement to a public education as a property interest which is protected by the due process clause [of the Constitution] and which may not be taken away for misconduct without adherence to the minimum procedures by that clause."  *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725, 733-734 (1975).

Under Pennsylvania's Administrative Code, "education is a statutory right and students must be afforded all appropriate elements of due process if they are to be excluded from school."  22 Pa. Code §12.8(a) (2005).  Thus, on the basis of state law, Stacy has a legitimate entitlement to her public university education.  (*Id.;  See also, Bd. of Regents v. Roth*, 408 U.S. 564, 577, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972) (finding that on the basis of Ohio state law, appellees had a legitimate claim of entitlement to a public education).)  *Shuman, et al. v. Penn Manor Sch. Dist., et al.*, 422 F.3d 141 (3rd Cir. 2005).

Admittedly, the Supreme Court has not directly applied the *Goss* principles to public universities.  *See Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 88 L.Ed.2d 523, 106 S.Ct. 507 (1985).  However, in *Goss*, *supra*, the Supreme Court observed:

> " . . . The lower federal courts have uniformly held the due process clause applicable to decisions made by tax supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion."  *Goss*, 419 U.S. at p. 576, fn. 8.

Absent direct Supreme Court guidance, the Third Circuit Court of Appeals has held that a student's dismissal from a public institution of higher education implicates property rights.  For instance, in *Stoller v. Coll. of Medicine*, 562 F. Supp. 403, 412 (M.D. Pa. 1983) *aff'd without opinion*, 727 F.2d 1101 (3rd Cir. 1984), the court held that plaintiff has a constitutionally protected interest in continuing his medical education.  Other circuit courts of appeals have reached a similar conclusion.  *See, e.g., Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988).  Thus, the "property interest" prong is satisfied.

MU then cavalierly dismisses any deprivation Stacy endured by its awarding her a BA instead of a BSEd as "virtually nonexistent."  (MU Brief, p. 10, fn. 7.)  However, Stacy suffered a tremendous loss in earning power due to MU's wrongful actions.  Rather than teaching America's youth as she trained to do, Stacy feeds her family by toiling as a waitress and a clothing store clerk.  Evidence at trial will establish Stacy's lost earning potential in the hundreds of thousands of dollars.  Moreover, she has suffered a tremendous loss of job satisfaction.  Clearly, Stacy has met the "deprivation" prong of the §1983 test.

Next, due process usually requires at a minimum that a deprivation of property **be proceeded by** a notice and an opportunity for a hearing appropriate to the nature of the case.  *Goss, supra*; *Ross,*

*supra*, at p. 153.  The Supreme Court has distinguished between "disciplinary" and "academic"

dismissals as follows:

> "Misconduct and failure to attain a standard of scholarship cannot be
> equated.   A hearing may be required to determine charges of
> misconduct, but a hearing may be useless or harmful in finding out the
> truth concerning scholarship.   There is a clear dichotomy between a
> student's due process rights in disciplinary dismissals and in academic
> dismissals." *Board of Curators of Univ. of Missouri v. Horowitz,* 435
> U.S. 78, 90, 55 L.Ed.2d 124, 98 S. Ct. 948 (citations omitted).

In the case at bar, MU clearly dismissed Stacy for disciplinary reasons.  According to MU's

Student Code of Conduct, students are subject to "disciplinary sanction" when, either on or off

campus, they allegedly violate MU's "regulations," including a) "violation of federal, state or local

law;" b) "allegations of academic dishonesty;" and c) "conduct threatening the welfare of others.

(Amended Complaint, ¶50.)  In its final evaluation, MU faulted only Plaintiff's "professionalism," not

her academic skills.   (Amended Complaint, ¶51.)   It went on to allege that Plaintiff, in some

unspecified way, violated "local, state and federal laws, and regulations."  (*Id.*)

Similarly, MU's Student Code of Conduct provides for "disciplinary sanction" against

students who "interfere with orderly university operations" engaged in "public drunkenness," or

commit "deliberate acts that interfere with the use of university electronic resources."  Since by its

own definitions, MU dismissed Stacy for "disciplinary reasons," she is entitled to a full disciplinary

hearing.

Given the above, MU failed by a wide margin to offer Stacy due process.  Initially, a

"fundamental requirement of due process is notice reasonably calculated, under all circumstances, to

apprise interested parties of the pendency of the action and afford them an opportunity to present

their objections." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306 (1950).  Here, MU refused

to notify Stacy of the reasons for her dismissal until she met with Bray on May 12, 2006.  (Amended

Complaint, ¶35.)  Even then, Bray did not reveal the identity of Stacy's accuser.  Bray did not even

give Stacy a copy of the "drunken pirate" photo caption and text which formed the basis for Stacy's

dismissal.  *Id.*  Since MU failed to meet Constitutional notice requirements, its dismissal of Stacy was

improper.

      Apart from grossly improper notice, MU violated Stacy's right to a fair and impartial hearing.

In its Student Code of Conduct, MU guarantees all students subject to "disciplinary" action the right

to question witnesses, examine evidence and documents presented, introduce witness testimony,

testify on their own behalf under oath, consult with an advisor and conduct the hearing "in a timely

fashion."  (Amended Complaint, Exhibit "W," p. 3 of 5.)  MU afforded Stacy none of these rights.

(Amended Complaint, ¶¶29-37.)

      In its Brief, MU wisely does not even claim it provided Stacy with "disciplinary" due process.

Rather, MU contends it afforded Stacy sufficient "academic" due process.

      In *Ewing*, the court explained: "When judges are asked to review the substance of a

**genuinely academic decision**, they should show great respect for the faculty's professional

judgment."  *Ewing*, 474 U.S. at 225 (emphasis added.)  As a result, courts require less stringent

procedural requirements in such cases.  *See Horowitz*, 435 U.S. at 86.

      Initially, whether the Constitution required "disciplinary" or "academic" due process under

the facts presented is a question for the jury.  The Court should decline to decide this issue as a matter

of law as part of a Rule 12(b)(6) Motion.

      Regardless, the case at bar does not involve a "genuinely academic decision."  As discussed

above, MU treated the "drunken pirate" incident as a "violation of state laws and rules" and a "breach

of professionalism." (See, e.g., Amended Complaint, ¶50.) These claims do not require any "expert evaluation of cumulative information" to "[find] out the truth as to [Stacy's] scholarship." *Mauriello v. Univ. of Medicine and Dentistry of New Jersey, et al.*, 781 F.2d 46, 50 (3rd Cir. 1986). Rather, MU's existing student disciplinary procedures, if followed, were more than sufficient to find the truth behind Stacy's dismissal. MU's rush to dismiss Stacy without resorting to those procedures underscores its willful misconduct as alleged in Stacy's Amended Complaint. Thus, the court should deny MU's request to apply the "academic" due process standard.

Even assuming *arguendo* that the Court applies "academic" due process, MU still denied Stacy due process. In *Mauriello*, the court upheld the University's academic dismissal of the plaintiff because she:

> " . . . was informed of her academic deficiencies, was given an opportunity to rectify them during a probationary period before being dismissed, and was allowed to present her grievance to the graduate committee." (*Id.*, 781 F.2d at p. 52.)

Similarly, in the unpublished opinion[3] of *Manning v. Temple University*, 157 Fed. Appx. 509, 515; 2005 U.S. App. LEXIS 26483 (3rd Cir. 2005), the Third Circuit upheld plaintiff's academic dismissal since:

> "Manning was given fair warning that she had been placed on probation and was in danger of dismissal. She presented her position to an eight member board, and a vote of that board was required for her dismissal. Manning was also permitted a limited appeal to the dean. . . . All relevant information about Temple's appeals process was contained in the student handbook, which was easily available to Manning." *Manning*, *supra.*

MU claims it notified Stacy of her academic deficiencies through her mid-term evaluation.

---

[3]As an unpublished decision, *Manning* is not considered precedential and is therefore not binding on this court. *Third Circuit Internal Operating Procedure 5.7.*

(MU Brief, pp. 15-21.) However, in her mid-term conferences, MU never placed Stacy on probation or otherwise advised her that she would lose her teaching certificate if she did not improve her performance. Rather, the mid-year evaluation identified weaknesses in Stacy's classroom performance, not her "professionalism." (Amended Complaint, Exhibit "K.") MU officials encouraged Stacy, explaining that many students struggle in the first half of their internships.

In response, Stacy improved her performance dramatically. In fact, in his May 2, 2006 evaluation, days before Stacy's ouster, Girvin rated her as "exemplary" in all areas. (Amended Complaint, Exhibit "P.") Then, in his final form PDE-430, Girvin awarded Stacy passing grades in all "academic" areas. (*Id.*, Exhibit "S.") The only area in which Girvin failed Stacy was "professionalism," directly resulting from the "drunken pirate" incident. (*Id.*) Importantly, in all prior evaluations, MU rated Stacy at least satisfactory in "professionalism." (Amended Complaint, Exhibits "D" - "P".)

As the above demonstrates, MU never informed Stacy of any alleged deficiencies in "professionalism" before dismissing her from the School of Education. It never gave Stacy any opportunity to rectify any poor "professionalism" prior to her dismissal. Before her ouster, MU denied Stacy any meaningful opportunity to present her grievance about her "unprofessionalism" to a graduate committee or other impartial fact finder. *Mauriello* at p. 52.

Next, MU contends it afforded Stacy proper "academic" due process because, eight months later, it allowed Stacy to complain about her mistreatment to MU provost Vilas Prabhu. (MU Brief, p. 21.) However, public universities must conduct least a preliminary hearing prior to depriving a student of her protected interest, that is, before the expulsion or suspension of a student from school. *Gorman*, 837 F.2d at pp. 12-13. In *Mauriello* and *Manning*, the state universities allowed the

unfortunate plaintiff a hearing **before** the academic dismissal.

Here, MU conducted no such preliminary hearing. Stacy's belated hearing before Prabhu afforded her no meaningful due process. Prabhu, in charge of the hearing, refused to allow counsel to address him, much less question either Stacy or MU witnesses. (Amended Complaint, ¶¶ 57, 64-66.) MU did not present Stacy with the evidence it used against her. *Id*. MU did not keep any transcript of the "hearing," and testimony was not under oath. *Id*. Since MU's "kangaroo court" did not even meet the relaxed standards of "academic" due process, Stacy states a claim under the Fifth and Fourteenth Amendments.

### C.    MU's Dismissal of Plaintiff Violates §1983 Since MU Failed to Train Its Employees Concerning the Fundamental Constitutional Rights of Its Student Teachers.

The Supreme Court has held that, where a municipal employee unconstitutionally applies a valid policy, the municipality is liable if it failed to adequately train the employee and the constitutional wrong is caused by that failure to train. *City of Canton, Ohio v. Harris, et al.*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Inadequacy of training may serve as a basis for §1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the employees come into contact. (*Id.*) Also, the §1983 violation must be the "moving force" behind the Constitutional violation. (*Id.*, citing *Monell, et al. v. Dept. of Social Services of City of New York, et al.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

In the case at bar, MU failed to establish any Constitutionally valid policies and procedures for the discipline and expulsion of students like Stacy who post personal photographs and writings in their free time on privately owned web sites such as www.myspace.com. (Amended Complaint, ¶90.) MU also failed to train its employees in the proper manner for evaluating student teachers for

20

purposes of state certification. (*Id.*)

MU failed to train its employees in how to complete the critical form PDE-430 without trampling a student's First Amendment rights. (*Id.*) Lastly, MU failed to train its administrators in the Constitutional requirements of procedural due process prior to expelling students for alleged misconduct.

Each of these failures amounts to a deliberate indifference to the rights of students like Stacy with whom MU's employees come into contact. MU's failure to train its employees clearly was the "moving force" in Stacy's expulsion and resulting damages. *Monell, supra.* Based on the above, Stacy has stated a cause of action against MU under §1983.

### 1. The Eleventh Amendment/ Sovereign Immunity Does Not Bar Stacy's Claims.

MU claims that, as a state institution, under the Eleventh Amendment to the Constitution, it is immune from liability even for misconduct that violates the First, Fifth and Fourteenth Amendments. Immunity from suit "is a fundamental aspect of the sovereignty which the states enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the convention **or certain Constitutional amendments**." *Northern Ins. Co. v. Chatham County*, 547 U.S. 189, 190, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006) (emphasis added.)

In this regard, the Supreme Court has held that the Fourteenth Amendment supersedes the state sovereignty embodied in the Eleventh Amendment. For instance, in *Fitzpatrick, et al. v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), petitioners, present and retired male employees of the state of Connecticut, sued the State Employees Retirement Commission for back pay pursuant to Congressional legislation enacted under §5 of the Fourteenth Amendment. (*Id.*, p. 453.) The state

21

contended the Eleventh Amended precluded such claims. (*Id.*)

The *Fitzpatrick* court rejected the state's sovereign immunity claim, finding that well-established Constitutional jurisprudence:

> ". . . has sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the states. The legislation considered in each case was grounded on the expansion of Congress's powers - with the corresponding diminution of state sovereignty - found to be intended by the framers and made part of the Constitution upon the state's ratification of those amendments, . . . . It is true that none of these previous cases presented the question of the relationship between the Eleventh Amendment and the enforcement power granted to Congress under §5 of the Fourteenth Amendment **but we think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of §5 of the Fourteenth Amendment.** In that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority**.**" (*Id.*, pp. 455-456; emphasis added.)

Similarly, in *Seminole Tribe v. Florida, et al.*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Court reaffirmed that states enjoy no sovereign immunity in actions brought under the Fourteenth Amendment:

> "In *Fitzpatrick*, we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal powers struck by the Constitution. We noted that §1 of the Fourteenth Amendment contained prohibitions expressly directed at the states and that §5 of the amendment expressly provided that "the Congress shall have power to enforce, by appropriate legislation, the provision of this article." **We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that §5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that amendment**." (*Id.*, at p. 59; emphasis added.)

22

The Supreme Court has, on numerous occasions, held that the Bill of Rights applies with equal force to state and federal action. For instance, in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 657 (1965), the court held that the Fifth Amendment's privilege against self-incrimination applied to actions in state court. In reaching this decision, the *Malloy* court cited prior Supreme Court decisions which:

> ". . . [held] immune from state invasion every First Amendment protection for the cherished rights of mind and spirit -- the **freedoms of speech**, press, religion, assembly, association, and petition for redress of grievances." *(Id.* at 1492; emphasis added.)

Recently, citing *Malloy*, in *Siebert v. Missouri*, 542 U.S. 600, 607, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court found:

> "[t]he **Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement**--the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." (*Id.*, emphasis added.)

Given the above line of cases, MU's absurd argument that it can ignore Stacy's civil rights as guaranteed her by the Bill of Rights merely because it is an arm of a "sovereign state" must fail.

In its Brief, MU cites numerous cases in which sovereign immunity barred plaintiffs from suing certain arms of Pennsylvania government under various federal statutes. (MU Brief, pp. 6-9.) For instance, in *O'Hara v. Indiana Univ. of Penna., et al.*, 171 F.Supp.2d 490 (W.D. Pa.), the court held that the Eleventh Amendment bars plaintiff's suit under Title VII of the Civil Rights Act of 1964 against the state university for whom she taught. (*Id.*, at 495.)

However, each of the cases cited by MU involved Congressional action taken under its general law-making authority, Article I of the Constitution. None of those cases involved actions

taken by Congress pursuant to Section 5 of the Fourteenth Amendment. **Moreover, none of the cases cited by MU held that the Eleventh Amendment and sovereign immunity barred plaintiffs from suing the state or its administrative arms for Constitutional violations under the Fourteenth Amendment.** (MU Brief, pp. 6-9.)

In this regard, the Court in *Seminole Tribe* reasoned:

> "*Fitzpatrick* was based upon a rationale wholly inapplicable to the Interstate Commerce Clause, viz., **that the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution, operated to alter the preexisting balance between state and federal power achieved by Article III and the Eleventh Amendment.**" (*Seminole Tribe*, at 1128; emphasis added.)

Here, Plaintiff's freedom of speech and due process claims rest on the First and Fifth Amendments, respectively, as applied to the states through the Fourteenth Amendment. Under *Fitzpatrick* and *Seminole Tribe*, sovereign immunity does not apply to these claims.

Abrogation of sovereign immunity of this case fosters essential public policy concerns. The Bill of Rights sets forth the most fundamental beliefs in American society. The Founding Fathers fought a long and bloody revolutionary war to ensure that all citizens would enjoy both freedom of speech and the right to due process of law. Years later, our nation fought a terrible Civil War to make certain that no state could ignore the rights of any of its citizens, black or white, under the Constitution. The Fourteenth Amendment, once and for all, enshrined the primacy of the federal government against the states.

Under MU's twisted vision of the Constitution, any state (or state agency) could simply ignore the Bill of Rights when it suits its purposes. States could restore slavery, enact religious prohibitions, eliminate free speech or seize the life, liberty or property of their disfavored citizens with

24

impunity.  Under MU's view of the Eleventh Amendment, since states enjoy absolute sovereign immunity, no aggrieved citizen could challenge such decisions in State or Federal Court.  This Honorable Court should not sanction such a catastrophic result.  Accordingly and emphatically, MU's Motion to Dismiss should be denied.

### 2.    Stacy's Claims Are Not Barred by Qualified Immunity.

MU next contends that qualified immunity bars Stacy's §1983 damages claims against the individual MU Defendants.  (MU Brief, pp. 34-37.)  In a suit against a public official for an alleged Constitutional violation, a court considering qualified immunity must first determine the following: Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a Constitutional right?  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  In its brief, MU wisely does not dispute that Stacy's First, Fifth and Fourteenth Amendment claims meet this first prong of the qualified immunity test.

Next, since Plaintiff establishes a Constitutional violation, the court must inquire whether the right was "clearly established."  (*Id.*, p. 201.)  To determine whether a right is "clearly established," the court must inquire whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.  (*Id.*, p. 202.)

In the case at bar, MU claims Stacy's First Amendment rights were not "clearly established" since "there is virtually no case law to touching on free speech rights in public schools on the internet." (MU Brief, p. 36.)  This is simply not the case.  *Killion, supra*, addresses this topic in great detail.  Further, in *J.S., a minor v. Bethlehem Area School District*, 757 A.2d 412 (Pa. Cmwlth. 2000), the court affirmed a student's expulsion because he created a website on his home computer entitled "teacher sux."  Beyond internet related free speech, there is a plethora of cases outlining

students' rights in free speech cases both on and off campus.  (See First Amendment discussion, *supra*.)

Moreover, Bray and Prabhu hold doctorate degrees, while Girvin has a master's degree.  All individual Defendants are high-ranking officials in a public university.  MU's claim that these well-educated professional educators were unaware that all citizens, including Stacy, hold a First Amendment right to free speech is disingenuous in the extreme.

MU's claimed qualified immunity against Stacy's due process allegations is equally meritless.  MU devotes at least a page of its Student Code of Conduct to disciplinary procedures.  (Amended Complaint, Exhibit "S.")  It is laughable to suggest that provost Prabhu, dean Bray and teaching supervisor Girvin were unaware of these requirements.  Indeed, discovery may reveal that one or all of these persons actually wrote the Code requirements in question.

MU next contends Bray, Prabhu and Girvin did not know the difference between "disciplinary" due process" and "academic due process."  (MU Brief, pp. 36-37.)  Again, these officials run a multi-million dollar public university.  Bray, Prabhu and Girvin are well aware of this basic distinction, yet they chose to ignore it in Stacy's case.   This Honorable Court should hold them accountable for their misdeeds.

Qualified immunity is designed to protect police officers who are often forced to make split second judgments about the amount of force that is necessary in a particular situation. *Saucier*, 533 U.S. at 204-205.  Here, MU has a general counsel's office at its disposal.  In fact, MU's general counsel has been actively involve in this case from the outset.  If they so desired, Bray, Prabhu and Girvin had plenty of time to consult their attorneys about any Constitutional questions.  Clearly, they either received bad legal advice or chose to ignore counsel altogether in their rush to judgment against

Stacy.

Moreover, qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Malloy v. Briggs*, 475 U.S. 335, 341, 89 L.Ed.2d 271, 106 S.Ct. 1092 (1986). Since the individual Defendants fall into one or both of these categories, they are not entitled to hide behind qualified immunity and deny Stacy her day in court.

      **D.**    **Millersville Violated the Public School Code by Expelling Stacy, *Inter Alia*, Without Reasonably Specifying in Advance the Offense and Penalty for Which She Was Held Accountable.**

In its Brief, MU admits it is a public university under the Pennsylvania School Code, 24 P.S. §§20-2001, *et seq.* (MU Brief, p. 7, fn. 3.) As such, MU is bound by the School Code's disciplinary regulations for public universities, which provide, in pertinent part:

> "Subject to the stated authority of the board [of trustees] and the council [of trustees], each [state university] president shall have the following powers and duties:

> \* \* \*

> (4)    To establish policies and procedures for the admission, **discipline and expulsion** of students which shall be consistent with policies of the board and the local council." 24 P.S. §20-2010-A(4) (emphasis added).

Consistent with this mandate, the Pennsylvania Code provides explicit disciplinary due process requirements for all students in public universities. 22 Pa. Code §505.1, *et seq.* For instance:

> "Each university president, with trustee approval, shall create rules of student conduct and judicial procedure, consistent with this chapter which shall provide substantive rules **that define with reasonable specificity disciplinary offenses, penalties or sanctions** and procedure guidelines to adjudicate rules offenses." 22 Pa. Code §505.1.

In this case, MU created no policy addressing student internet use, either on or off its campus.

27

(Amended Complaint, ¶95(a).)  As a result, Stacy had no idea that her posting the "drunken pirate" photo caption and text violated any of MU's rules and regulations.  Worse, MU's lack of a policy in this regard allowed them to choose whatever sanction they wanted against Stacy.  It is outrageous that MU could impose the "death penalty" of denying Stacy her teaching certificate just days before graduation when either a reprimand or probation would have been the appropriate sanction.  If MU openly created and freely disseminated such a draconian internet usage policy, the MU community never would have condoned it.  This is a fundamental due process violation.

MU violated Stacy's due process rights under the Pennsylvania Code in other ways as well. It failed to publish any student internet rules and regulations in its student handbooks and other publications, in violation of 22 Pa. Code §505.2.  Additionally, the Pennsylvania Code provides procedural guarantees for student disciplinary hearings, guaranteeing students the rights to:

> "(1)    Reasonably specific advanced written notice of charges containing a description of the alleged acts of misconduct, including time, date and place of occurrence and the rules of conduct allegedly violated by the student.
>
> * * *
>
> (3)    An opportunity for submission of written, physical and testimonial evidence and for reasonable questioning of witnesses by both parties.
>
> * * *
>
> (6)    Maintenance of a written summary or audiotape record of the hearing at university expense, . . . .
>
> (7)    A decision based upon evidence sufficient to make a reasonable person believe that a fact sought to be proved is more likely true than not."  22 Pa. Code §505.3

Additionally, the Pennsylvania Code provides for only limited interim suspensions:

> "The president or a designee may suspend a student from the university, including the student's privilege to enter a university facility or property pending the final disposition of the student's case if it is determined that the student's continued presence constitutes **an immediate threat of harm to the student, other students, university personnel or university property.** If a student is suspended under these conditions, **a hearing shall be convened within ten working days**, unless extenuating circumstances warrant an extension, in which case a hearing shall be provided at the earliest possible date." (22 Pa. Code §505.9. - emphasis added.)

In the case at bar, MU followed none of these procedures. It never published any internet usage guidelines in its student handbooks and other publications. *See* 22 Pa. Code §505.2. Before expelling Stacy from its School of Education, MU never presented Stacy with any remotely specific charges, written or otherwise.

Moreover, Stacy's only course work at MU during the spring semester of 2006 was her internship at CV. By banning Stacy from her internship, MU effectively suspended Stacy from MU. Despite this, MU never made any determination that Stacy's conduct made her an "immediate threat" in any way whatsoever. 22 Pa. Code §505.9. Likewise, MU never convened the required due process hearing within ten working days.

Lastly, the "disciplinary hearing" MU offered Stacy was grievously inadequate. MU only reluctantly convened the hearing upon insistence of undersigned counsel in February, 2007, nine months after Stacy's expulsion. MU never provided Stacy with any written notice of charges. 22 Pa. Code §505.3(1). Prabhu, who presided over the hearing, denied Stacy any opportunity to question witnesses during the hearing. Girvin, Reinking and Buffington never attended the hearing, and Stacy had no chance to compel their testimony.

29

Further, Prabhu was hardly an "impartial" fact finder, since he took his orders directly from Bray. MU neither created nor maintained any written summary or audiotape record of the hearing. As a result, Prabhu's predetermined decision was insufficient to make any reasonable person believe in the credibility of the proceedings. 22 Pa. Code §505.3(1)-(9). Accordingly, Stacy has stated a cause of action MU under Pennsylvania's Public School Code.

MU contends Stacy's state law claims, including those brought under the public school code, are barred by sovereign immunity. (MU Brief, pp. 37-40.) **As discussed *supra*, sovereign immunity does not bar Stacy's claims since they are based upon the First, Fifth and Fourteenth Amendments to the Constitution, not upon Congress' general Article I powers.**

Regardless, as MU admits, a state legislature may waive sovereign immunity if it so chooses. (MU Brief, pp. 37-38; 1 Pa. C.S. §2310.) Here, the legislature effectively waived sovereign immunity by enacting the student disciplinary due process requirements described above. Stacy's claims under the public school code must stand.

### E.    Stacy Properly States a Cause of Action Against the Individual Defendants for Intentional Infliction of Emotional Distress in View of the Outrageous and Extreme Intentional Misconduct they Perpetrated on Her.

Under Pennsylvania law, defendants commit the tort of intentional inflection of emotion distress by engaging in conduct which is so outrageous in character, and so extreme in degree, that it extended beyond the bounds of decency and is utterly intolerable in a civilized society. *See Cox v. Keystone Carbon Co., et al.*, 861 F.2d 390, 395 (3rd Cir. 1998).

In the case at bar, the misconduct committed by Girvin, Bray and Prabhu more than meets this standard. Girvin and Bray expelled Stacy from MU's School of Education after Stacy spent four

years less four days pursuing her dream of teaching. These three did so in retaliation for Stacy's posting a photograph, caption and text on her private website which, *inter alia*, threatened to expose wrongdoing at CV. (See Exhibit "A".) Girvin, Bray and Prabhu acted because officials at CV threatened to bar MU students from student-teaching at CV unless the officials punished Stacy harshly. (Amended Complaint, ¶39.)

To protect their personal interests, Girvin, Prabhu and Bray utterly disregarded Stacy's Constitutional rights. They completely ignored the devastating effect of their indefensible actions on Stacy and her family. This is the definition of intentional infliction of emotional distress.

MU correctly observes Pennsylvania's sovereign tort immunity statute, 42 Pa. C.S. §8522(b), bars Stacy's claims against it under intentional infliction of emotional distress. (MU Brief, p. 38.) **However, sovereign tort immunity does not extend to Girvin, Bray and Prabhu in their individual capacities.**

A suit against a governmental official in his personal capacity seeks to impose personal liability upon the official for actions taken under color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099 (1985). An award of damages against an official in his personal capacity can be executed only against the official's personal assets. (*Id.*) In contrast, official-capacity suits seek to impose liability upon the governmental entity the official represents. (*Id.*)

Importantly, state officials sued in their individual capacities, are "persons" within the meaning of §1983. *Hafer v. Mello*, 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The Eleventh Amendment does not bar such suits, nor are state officials absolutely immune from personal liability under §1983 solely by virtue of the "official nature of their acts." (*Id.*)

MU contends Pennsylvania's sovereign immunity statute confers immunity upon Girvin, Bray

and Prabhu even in their individual capacities. (MU Brief, pp. 38-39.) However, an employee of a Commonwealth agency only enjoys sovereign immunity against intentional tort claims while acting within the scope of his or her duties. *LaFrankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Cmwlth. 1992). Similarly, the state does not extend immunity to those individuals who commit crimes, actual fraud, actual malice or reckless or willful misconduct, even when acting in the scope of employment. 42 Pa. C.S. §8550. Reckless or wanton misconduct means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. *Evans v. Philadelphia Transp. Co.*, 418 Pa. 567, 212 A.2d 440 (1965).

In the case at bar, whether the individual MU defendants meet this standard is a question of fact for the jury. Certainly, a reasonable jury could infer that, by expelling Stacy from MU's School of Education just days before her graduation for personal gain in clear violation of Stacy's Constitutional rights, constitutes an intentional act "of an unreasonable character." *Evans*, 418 Pa. at 574, 212 A.2d at 443. A jury could then infer that the MU defendants "acted with a willful disregard of their duties and for the safety and welfare of Stacy. See *Robbins v. Cumberland County Children and Youth Services*, 802 A.2d 1239, 1256 (Pa. Cmwlth. 2002) (dissenting opinion).

Moreover, the individual Defendants were acting outside the scope of their employment when they snooped into Stacy's private website. Discovery will likely reveal that Bray and Girvin hacked into Stacy's web page in their free time, outside of school hours. Nothing in either's job description authorizes them to do this. Accordingly, Bray and Girvin are individually liable for their misdeeds.

Based on the above, Stacy has properly stated a cause of action the individual Defendants for intentional infliction of emotional distress. MU's Motion to Dismiss this count should be denied.

F.    **Stacy Properly States a Cause of Action Against MU for Breach of Contract in View of MU's Failure to Award Her the Degree She Earned.**

As stated previously, the relationship between Stacy and MU is contractual. *Ross*, 445 F.Supp. at 152. In fulfillment of the contract, Stacy attended MU from the fall of 2002 until the spring of 2006. (Amended Complaint, ¶101(a).) She paid all required tuition and fees. (*Id.*) Stacy performed all her school work in a satisfactory manner, as shown by her Praxis scores, her making the dean's list and her citation by school officials as "one of [MU's] finest scholars." (*Id.*, Exhibits "A," "E" and "F.") Stacy also compiled sufficient credits and grades to graduate from MU with a BSED degree. (*Id.*)

MU then breached its contract with Stacy by violating her civil rights as set forth herein. (*Id.*, ¶102.) MU also violated Stacy's contract by awarding her only a BA degree after Stacy completed all course work and practical exercises necessary to achieve a BSED degree. (*Id.*) As a result of MU's breach of contract, Stacy is unable to obtain a teaching certification and work as a teacher either in Pennsylvania or anywhere else. MU has caused Stacy to suffer lost wages and benefits totaling in the hundreds of thousands of dollars through the duration of her work life. Even if this Honorable Court limits Stacy's damages to a refund of her prepaid tuition and fees, Stacy's damages are substantial. Accordingly, Stacy has alleged a cause of action for breach of contact.

In its Brief, MU does not even mention Stacy's breach of contract claim. Thus, the court should deny MU's Motion to Dismiss this count.

IV.    **CONCLUSION**

For the foregoing reasons, Plaintiff, Stacy Snyder, respectfully requests this Honorable Court **DENY** MU's Motion to Dismiss her Amended Complaint.

33

Dated: <u>9/3/07</u>                          Respectfully submitted,

                                **LAW OFFICE OF MARK W. VOIGT**

            BY:      <u>/s/ Mark W. Voigt</u>
                                **MARK W. VOIGT, ESQUIRE**
                                Attorney I.D. No. 64387
                                Validation of Signature Code: MWV6003
                                Plymouth Meeting Executive Campus, Suite 400
                                600 West Germantown Pike
                                Plymouth Meeting, PA 19462
                                (610) 940-1709
                                (Attorney for Plaintiff, Stacy Snyder)