IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF MILLERSVILLE
UNIVERSITY'S MOTION TO DISMISS AMENDED COMPLAINT**

On the record already generated at this stage of the proceedings, MU defendants

are entitled to have the case dismissed or judgment entered in their favor as a matter of

law under Fed. R. Civ. P. 56.

**I.    PLAINTIFF'S FIRST AMENDMENT CLAIM SHOULD BE DISMISSED**

**A.    Morse v. Frederick Bars Snyder's First Amendment Claim[1]**

Snyder's First Amendment claim should be dismissed under the recently

announced decision of Morse v. Frederick, 127 S.Ct. 2618 (June 25, 2007). After

Millersville filed its Motion to Dismiss, the United States Supreme Court issued its

decision in Morse, a/k/a the "BONG HiTS 4 JESUS" case. In Morse, a public high school

---

[1] Plaintiff raises several red herrings in her brief. Plaintiff's Memorandum of Law In
Opposition To Defendants' Motion to Dismiss ("Snyder Memorandum") 8. Contrary to
her claims, MU did not argue that plaintiff's internet posting "substantially disrupted"
education or that her posting was "vulgar, lewd, indecent or plainly offensive," citing
Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986). Thus, plaintiff's
reliance on Killion v. Franklin Regional S.D., 136 F. Supp. 2d 446 (W.D.Pa. 2001),
Snyder Memorandum at 7-8, is misplaced.

student brought a § 1983 action against his principal and school board, alleging that his First Amendment rights had been violated by a suspension for waving a banner proclaiming "BONG HiTS 4 JESUS" at an off-campus activity. Reversing the United States Court of Appeals for the Ninth Circuit, the Supreme Court held that the school principal did not violate the student's right to free speech by confiscating a banner she reasonably viewed as promoting illegal drug use.

The Supreme Court affirmed that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," Morse, 127 S.Ct. at 2622, citing Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'" Morse, 127 S.Ct. at 2622, quoting Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988).

The Court concluded that, consistent with these principles, schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use. 127 S.Ct. at 2622. While the words on the student's banner, "BONG HiTS 4 JESUS," could be interpreted in many ways ("cryptic," offensive," "amusing," "nonsense"), Id. at 2624-25, the school district's interpretation of the words as promoting illegal drug use "is plainly a reasonable one" because the phrase on the banner could be reasonably understood as advocating the use of illegal drugs. Id. at 2625. Therefore, the school may take appropriate action against the student without offending the First Amendment. Id. In so holding, the Court re-affirmed the principle that deterring drug use by schoolchildren is an "important-indeed, perhaps compelling" national interest and recognized that drug abuse can cause severe and permanent damage to the health and

well-being of young people. Id. at 2628 (citations omitted).

     The courts take an equally dim view of alcohol usage in schools. As Justice Stevens recognized in Morse, the effects of alcohol abuse are no less pernicious than the effects of illegal drug use. He wrote that "[g]iven the tragic consequences of teenage alcohol consumption--drinking causes far more fatal accidents than the misuse of marijuana--the school district's interest in deterring teenage alcohol use is at least comparable to its interest in preventing marijuana use." Id. at 2650 (Stevens, J., dissenting). Cf. Hazelwood School Dist., 484 U.S. at 570 ("A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,'" quoting Fraser, 478 U.S. at 683.)

     Application of these principles precludes Snyder's First Amendment claim. She alleges that Ms. Buffington, the Conestoga Valley supervisor, showed plaintiff the photograph from Snyder's myspace.com web page that portrays plaintiff wearing a party hat and holding a plastic cup, with the caption of "drunken pirate." The photograph does not show the cup's contents. Amended Complaint, ¶¶ 29-30.[2] According to Snyder, Ms. Buffington criticized the photograph as "unprofessional," accused her of incompetence, stated that she should have been removed from student-teaching months earlier and barred her from entering the school. Id. ¶¶ 25, 29-31. Days later, Dean Bray, according to plaintiff, "accused plaintiff of promoting underage drinking through her 'drunken pirate'

---

[2] In a radio interview reported in "LancasterOnline," plaintiff later admitted that the cup contained alcohol. www.http://local.lancasteronline.com/6/203818. Exhibit R, hereto.

photo." <u>Id</u>. ¶ 35.[3]

While the "drunken pirate" photograph, with or without the caption could be interpreted in many ways, Snyder argues that school officials interpreted it as promoting underage drinking. <u>Id</u>. ¶ 35. Snyder was student teaching minors in a public high school and was expected to act as a role model.[4]  She concedes she posted the photograph of herself on her myspace.com website, Amended Complaint ¶¶ 29-31, and that her students had viewed her webpage. Exhibit A, to Snyder's Memorandum. On May 4, 2006, she wrote in her "blog":

> First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop that low as to mess with my future. So, bring on the love! I figure a couple of students will actually send me a message when I am no longer their offical (sic) teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)?

<u>Id</u>.

Ms. Snyder may be "over 21," but the children for whom she had responsibility in her role as student teacher were not.  The Supreme Court's holding in <u>Morse</u> makes clear

---

[3] If the plaintiff's complaint pleads specific facts, those facts, taken as true for purposes of deciding the motion to dismiss, may create a defense to his claim. <u>Gagliardi v. Clark</u>, C.A. No. 06-20, 2006 WL 2847409 at * 4 (W.D.Pa. Sept. 28, 2006); <u>Camero v. Kostos</u>, 253 F.Supp. 331, 338 (D.N.J.1966) (granting motion to dismiss where plaintiff's complaint pled facts demonstrating defendant was subject to immunity). <u>See</u> <u>ALA, Inc. v. CCAir, Inc</u>., 29 F.3d 855, 859 (3d Cir.1994); 5 Allen Wright & Miller, Federal Practice and Procedure § 1226 (3d Ed.2004). Where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck-he has pleaded himself out of court." <u>Jefferson v. Ambroz</u>, 90 F.3d 1291, 1296 (7th Cir.1996).

[4] As described in Millersville's Guide to Student Teaching, plaintiff was expected "to maintain the same professional standards expected of the teaching employees of the cooperating school"; to fulfill as effectively as possible every role of the classroom teacher ..."; to be well-groomed and appropriately dressed as a member of the teaching profession and to adhere to the Pennsylvania Code of Professional Ethics."  Snyder Memorandum, Exhibit B at 7.

that school officials have a responsibility for their students' welfare and may take steps
to safeguard them from conduct or speech that can reasonably be regarded as
glamorizing, encouraging or making alcohol usage acceptable to minor students. With
respect to Snyder's posting, the Supreme Court's observation in <u>Morse</u> applies here as
well: "Gibberish is surely a possible interpretation of the words on the banner, but it is
not the only one, and dismissing the banner as meaningless ignores its undeniable
reference to illegal drugs." 127 S.Ct. at 2625. School officials' interpretation that
Snyder's posting was unprofessional and may promote underage drinking "is plainly a
reasonable one" and, thus, actions based on that interpretation did not offend the First
Amendment.

**B.     Plaintiff's Internet Posting is not Protected by the First Amendment**

This is not a school-speech case. Plaintiff's claim falls under <u>Pickering v. Board
of Education</u>, 391 U.S. 563, 568 (1968), and progeny because her status as a student
teacher put her in the status of public employee.

Another analogous case is <u>Watts v. Florida International University</u>, 02-60199-
CIV, 2005 WL 3730879 (S.D.Fla. 2005). Watts was enrolled in a graduate program in
social work at Florida International University ("FIU"). In his last semester he was
required to successfully complete a field practicum consisting of a semester-long
supervised educational experience in an agency setting designed to provide him with an
opportunity to develop and practice social work skills in his area of concentration. Watts
registered for the course, paid his tuition to FIU, and was assigned to complete the
practicum at Fair Oaks Hospital under the supervision of an FIU graduate field instructor
and advisor and a field instructor for FIU and/or Fair Oaks. Watts was not an employee

of Fair Oaks during the practicum and was not paid a salary or provided with any other benefits by Fair Oaks. At all times, he was under the authority of FIU. Id., 2005 WL 3730879 at * 1. Watts was terminated from the practicum and from FIU's graduate program because of inappropriate speech related to patients regarding religion. Id. at * 2.

Watts brought a § 1983 claim alleging violation of his First Amendment under the rubric of student speech cases, such as Tinker v. Des Moines Independent School District, 393 U.S. 503 (1969). The court rejected his argument and concluded that the correct analysis was under the public employment cases. Id. at * 3. The court agreed with FIU that, despite Watts' student status with FIU, he "was like an apprentice, intern, or extern at Fair Oaks, where he had been placed to get actual field experience. While at Fair Oaks, he was expected to comport himself like those who were on staff in dealing with patients and others, and to abide by the institution's rules and procedures." Id. Thus, Watts' claim was governed by employee speech cases, Pickering v. Board of Education, supra, and progeny. Id. Because Watts failed to factually allege that his speech was on a matter of public concern, the court dismissed the amended complaint. Id. at * 4.

Similarly apt is Hennessy v. City of Melrose, 194 F.3d 237, 245-46 (1st Cir.1999), which involved a college student who failed the teacher certification program when the city elementary school where he had been assigned terminated his student teaching practicum due to the student's religious speech and criticism of elementary school's curriculum. The First Circuit Court of Appeals analyzed the student's First Amendment claim under the Pickering standard. Plaintiff does not distinguish Hennessy by arguing that the court's First Amendment analysis focused not on the State defendants. As detailed in the court's opinion, determining the plaintiff's status calls for evaluating

the relationship among all the parties. Id. 194 F.3d at 245. The factors to be considered are the same, e.g., the relationship between plaintiff and the two schools; the relationship between the schools; the purpose of the placement; the schools' expectations of the student teacher; the student teacher's expectations of the practicum, etc. Hennessy analyzed those elements and concluded that for purposes of a First Amendment analysis, the student teacher should be considered a public employee. This court should do the same. See also Smith v. School District of Philadelphia, 158 F. Supp. 2d 599 (E.D.Pa. 2001) (Judge DuBois concluded that a First Amendment retaliation claim of a parent volunteer serving on a public high school evaluation organization should be analyzed under Pickering); Anderson v. McCotter, 100 F.3d 723, 726-27 (10th Cir.1996) (First Amendment claim of university student receiving college credit and a part-time salary for work as intern at state board of pardons, who was fired for criticizing changes in sex offender program, analyzed under Pickering).

In this case, plaintiff's First Amendment claim fails. Snyder's student teaching was comparable to working as an apprentice, intern, or extern at Conestoga Valley, where she had been placed to get actual field experience.  At Conestoga Valley, she was expected to comport herself as a staff member in dealing with students, parents and others and to abide by the school's rules and procedures.  See Defendants Memorandum of Law in Support of the Motion to Dismiss ("MU Memorandum"), at 25-26. While MU's Guide for Student Teaching provides that the "Student Teacher is a guest of the cooperating school," that phrase is included in the section on "Professional Conduct." The provision then provides that "…the Student Teacher needs to maintain the same professional standards expected of the teaching employees of the cooperating school."

Snyder Memorandum, Exhibit B, at 7. Plaintiff's "guest" status at Conestoga Valley did not entitle her to room service. Instead, it stresses the importance of maintaining positive relations with the school's personnel and students and admonishing the student teacher to evince the highest standards of professionalism during the practicum. Based on the record, the court may, and should, analyze plaintiff's First Amendment claim under the public employee cases.

Plaintiff argues that, even if the court applies the public employee First Amendment analysis, her posting is protected because it concerns a matter of public concern. Snyder Memorandum at 13. Plaintiff is wrong. Activity that is purely personal is not protected by the First Amendment. Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003); Swineford v. Snyder County of Pennsylvania, 15 F.3d 1258, 1273 (3d Cir. 1994). (First Amendment does not convert private complaints into constitutional cases). See City of San Diego v. Roe, 125 S.Ct. 521, 525-26 (2004) (to touch upon a matter of public concern, speech must be of legitimate news interest at the time it is made, i.e., it must be a subject of general interest and of value and concern to the public).

The Amended Complaint does not allege that her posting concerns a matter of public concern. Her claim fails for that reason alone. See Watts, at * 4. Instead, in her Memorandum she now claims that the photograph's caption somehow "hints" at "malfeasance" by Conestoga Valley teachers. Snyder Memorandum at 13. Such a penumbra is not at all evident. The caption does not name or otherwise identify Conestoga Valley, MU or their teachers or administrators at all. The caption does not claim that defendants, all MU employees, engaged in malfeasance or that plaintiff was in any way displeased with their actions. Neither does the caption identify plaintiff except

8

insofar as she is a nameless teacher with a personal gripe against a nameless authority. The caption, taken together with the photograph, merely reflects the undirected and untargeted private complaining of an unidentified teacher. Any "hinting" is so oblique as to be virtually invisible. By no stretch of the imagination did the posting rise to the level of a matter of public concern at the time it was posted.  Plaintiff's claim should be dismissed under the Pickering analysis.

**C.      There Was No Speech or Expressive Conduct**

In any event, because there was no expressive conduct, plaintiff's posting is not protected. The Supreme Court has determined that, while expressive conduct may be protected, "we cannot accept the view that an apparent limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." Montanye v. Wissahickon School Dist., 218 Fed. Appx. 126, 130 (3d Cir. 2007), citing United States v. O'Brien, 391 U.S. 367, 376 (1968).   Cf. Dallas v. Stanglin, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes-for example, walking down the street or meeting one's friends at a shopping mall-but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.").

Rather, to determine whether a particular action or pattern of conduct constitutes speech protected under the First Amendment, the court asks whether "an attempt to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." Montanye, 218 Fed. Appx. at 130,  citing Texas v. Johnson, 491 U.S. 397, 404 (1989).

Thus, in <u>Montanye</u>, <u>supra</u>, the Third Circuit affirmed Judge DuBois's dismissal of a First Amendment claim that plaintiff's "conduct in assisting an at-risk student cope with her emotional and psychological problems does not possess sufficient communicative elements to fall within the protection of the First Amendment." 218 Fed. Appx. at 130. The Third Circuit agreed with the District Court's conclusion that while plaintiff's conduct in scheduling the student's therapy sessions, transporting her to those sessions and attending those sessions may have involved some "kernel of expression," there was no intent to convey any message, let alone a particularized message, supporting special education, and no likelihood that her interactions with K could be "understood" as conveying such a message. <u>Id</u>.[5] <u>See</u> <u>Villegas v. City of Gilroy</u>, 484 F. 3d 1136 (9th Cir. 2007) (motorcycle club members wearing vests adorned with a common insignia was not expressive conduct protected by the First Amendment).

Snyder purports that her posting impugns the motives of Conestoga Valley officials and "symbolizes the rebellious spirit of youth." Snyder Memorandum at 9-10. Whatever poetics Snyder (or her counsel) may imagine about her posting, including the caption, on its face there was no intent to convey any message, let alone a particularized message, and no likelihood that her posting could be "understood" as conveying a

---

[5] It is instructive that in <u>Montanye</u> the Circuit affirmed the District Court's dismissal of a Rehabilitation Act claim because plaintiff failed to allege that she engaged in "protected employee activity." 218 Fed. Appx. at 131.The court wrote that protected activity requires affirmative action in advocating for, or protesting discrimination related to, unlawful conduct by others and cited favorably to <u>Sumner v. U.S. Postal Serv</u>., 899 F.2d 203, 209 (2d Cir.1990) (finding that "protected conduct" contemplates such activity as "making complaints to management," "writing critical letters," "protesting against discrimination," and "expressing support of co-workers"). 218 Fed. Appx. at 131. The Court wrote that "the concept of 'protected activity' at issue here is necessarily limited to, if not speech in the strict sense, at least the sort of expressive conduct which conveys a message." <u>Id</u>.

message.  See MU Memorandum at 32-33.  It is unimaginable that any message would be understood by those viewing it absent explanation (such as that provided at Snyder Memorandum, at 9-10). Where "explanatory speech is necessary [it] is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." Rumsfeld v. FAIR, 126 S. Ct. 1297, 1311 (2006). Frankly, even with an explanation, it is hard to recognize the expression of an idea. It is only a photograph of plaintiff wearing a pirate hat and drinking from a plastic cup. Including the caption in the analysis does not help plaintiff's case. The ranting therein declaimed is vague, unclear and related to personal matters. It does not refer to any school or school personnel by name, position, responsibilities or conduct. It also does not identify plaintiff by name, title or position (although it does offer insight into plaintiff's "current mood" as "dorky").

In fact, plaintiff's contention that the "message resonates with young adults even if MU's teachers and administrator's are incapable of understanding it," Snyder Memorandum at 10, undermines her claim. Activity is not considered "expressive conduct" where no common theme or message is conveyed by the activity or reasonably likely to be understood by those viewing the activity. Thus, in Villegas, 484 F. 3d at 1140, the 9th Circuit Court of Appeals recently affirmed that motorcycle club members wearing vests adorned with a common insignia consisting of a skull with wings on either side and a top hat was not expressive conduct protected by the First Amendment. The Circuit upheld the district court's conclusion that there was no common message conveyed or likely to be understood by the wearing of the insignia. Id.  That the elder generation would not understand Snyder's posting belies her claim that it is expressive activity protected by the First Amendment. It does not convey a particularized message

11

that would be commonly understood.

## II.    PLAINTIFF'S DUE PROCESS CLAIM SHOULD BE DISMISSED

Plaintiff alleges that based on 22 Pa. Code § 12.8 she has a legitimate entitlement to a public university education which gives rise to a protected property interest. Snyder Memorandum at 14.  However, Title 22 Pa. Code, Part I, Subpart A, Chapter 12, in which that section is contained, applies to students in Commonwealth elementary and high schools and not to students in public universities. See 22 Pa. Code § 12.1 (referring to a free and full education in the Commonwealth's public schools for students up to age 21). Regulations applicable to Higher Education in Pennsylvania's public colleges are found at Subpart C, 22 Pa. Code Chapter 31. No such entitlement is found there. Thus, plaintiff has not shown she has any state-law created property interest in her college degree or teacher certification protected by Due Process. See MU Memorandum at 9, et seq.

The First Circuit case of Hennessy v. City of Melrose, 194 F.3d 237 (1st Cir.1999) is instructive. Hennessy claimed that Salem State College ("Salem") failed to accord him procedural due process when it removed him from the teacher certification program. He argued that Salem's denial of an opportunity to obtain teacher certification deprived him of a constitutionally protected property interest that presumably derived from an implied contractual right to continue in that program.  Id. at 249.

The Circuit observed that the theoretical underpinnings of his "gambit" were dubious because the "Supreme Court has not decided whether a student at a state university has a constitutionally protected property interest in continued enrollment." Id. at 249.  See Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 223 (1985) (assuming the existence of such an interest, but leaving the question open);  Board of Curators v.

Horowitz, 435 U.S. 78, 84-85 (1978) (same).   In any case, the claim to such a property

interest is dubious, see Ewing, 474 U.S. at 229 (Powell, J., concurring), and in

Hennessy's situation it seemed especially tenuous because Salem did not expel him, but

merely precluded him from continuing in a particular program.[6]   Out of caution, however,

the Circuit assumed arguendo that Hennessy possessed a constitutionally protected

property interest in completing the teacher certification program.[7]   With the assumption,

as described in MU's  Memorandum, at 9, et seq., the threshold step is to classify the

public university's action as "disciplinary" or "academic."   See Hennessy, at 250.

      Plaintiff insists on transmogrifying her academic failings into behavioral failings

so that she can claim that MU's action were disciplinary in nature and, thus, entitled to

greater due process protections.   Again, Hennessy is persuasive. There, Salem removed

Hennessy from the teacher certification program because he received a failing grade in

his practicum and had not satisfied all the common teaching competencies required for

certification by the State's Department of Education ("DOE"). Id. at 250.   The Circuit

observed these reasons seem quintessentially scholastic. Id. Nonetheless, Hennessy, like

Ms. Snyder, claimed the actions were really disciplinary in nature.   Hennessy referred to

---

[6] Snyder was similarly not expelled. Had she been so, she would not have received any
degree from Millersville.

[7] Snyder relies on Gorman v. University of R.I., 837 F.2d 7, 12 (1st Cir.1988), another
First Circuit case, for the notion that plaintiff has a constitutionally protected interested in
continuing her education. Snyder Memorandum, at 15. Hennessey, however,
distinguished Gorman, writing "We did not mean to suggest, however, that due process is
implicated each time a student at a public school receives a failing grade or is denied
admission to a limited-enrollment class.   Rather, this general statement must be read in
context.   Gorman challenged his disciplinary suspension from a state university … not
his removal from a particular program for academic failings." Hennessy,  194 F.3d at 249
n. 3. Moreover, in the very next sentence of the Gorman opinion, "the panel limited the
import of the quoted passage to cases in which students faced 'expulsion or suspension
from a public educational institution' on disciplinary grounds." Id. citing Gorman, 837 F.
2d at 12.

the excellent grades he had received in his course work up until the second semester of his senior year.  The Circuit observed, however, that proficiency in course work is only one component of the certification process since the practicum constitutes a completely separate component.  Id.  That the appellant had good grades is only marginally relevant. Id.  Cf. Horowitz, 435 U.S. at 95 (Powell, J., concurring) (noting that the plaintiff was dismissed from medical school "because she was as deficient in her clinical work as she was proficient in the 'book-learning' portion of the curriculum").

Hennessy, like Snyder, also received some positive reviews during the early stages of his practicum.   That fact, the Circuit held, failed to negate the inescapable fact that he failed the practicum, the successful completion of which was a prerequisite to certification.  Hennessy,  194 F.3d at 250. Given that failure, from an academic standpoint, Salem could not have recommended him for certification.   Moreover, because the approved methodology for assessing the teaching competencies, set by the State DOE, explicitly requires the certifying institution to evaluate a fledgling teacher's interpersonal skills, Hennessy's inability to communicate effectively with his colleagues at the cooperating school and his unwillingness to work within the prescribed curriculum reasonably could have as much influence on Salem from an academic standpoint as his ability to prepare a lesson plan. Id.  Cf. Horowitz, 435 U.S. at 9, n. 6 (concluding that factors such as "[p]ersonal hygiene and timeliness may be as important ... in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness").

The Court concluded that Salem's faculty considered Hennessy's problems at the cooperating school when adjudging his performance "incomplete" and assigning him

failing grades in various teacher competencies did not transform its academic decision
into a disciplinary one. Hennessy complained that the reasons given for terminating the
practicum involved his conduct, not his competence, and thus were disciplinary in nature.
The complaint was groundless because his conduct had academic significance as "it
spoke volumes about his capacity to function professionally in a public school setting."
Hennessy, 194 F. 3d at 251. Thus, Salem's decision to fail Hennessy rested squarely on
the faculty's academic judgment that he had neither completed the required assignments
nor demonstrated the practical qualities necessary to perform efficaciously as a public
school teacher. Id.  Despite a subjective cast to the decision, it still "fell well within the
sphere of constitutionally permissible academic decision making." Id.

Snyder in her Memorandum invokes not factual allegations but the many legal
conclusions contained in her Amended Complaint, ¶¶ 50-52. Such "bald assertions" or
"legal conclusions" unsupported by factual allegations may be disregarded by the court.
In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997); Morse
v. Lower Merion School District, 132 F.3d 902, 908, 909 (3d Cir. 1997).   The basis for
her claim that she was disciplined is that in its final evaluation MU faulted her
"professionalism" and not her academic skills.[8] Snyder Memorandum at 16, referencing
Amended Complaint, ¶ 51. While Snyder's "professionalism" was certainly called into
question, as described in detail at MU's Memorandum, 15-23, plaintiff failed the student
teaching practicum because of her academic deficiencies during the entire semester and

---

[8] In support of this claim, the Amended Complaint, ¶ 51 refers to Exhibit Q, p. 4 of
Snyder's exhibits. Exhibit Q, however, has only has 3 pages and does not contain the
reference that plaintiff alleges.

not because she violated the MU Code of Conduct.[9]  She was not accused of or sanctioned for misconduct.

As with Hennessy, Snyder was removed from the teacher certification program because she received a failing grade in the practicum at Conestoga Valley and because she had not satisfied the common teaching competencies required for certification by the PDE.  These are quintessentially scholastic reasons.  That Snyder received good grades in other courses and some positive reviews during the early stages of her practicum do not negate the fact that she failed the practicum, the successful completion of which was a prerequisite to a teaching degree, because of poor academic performance that is well documented.  In that situation, from an academic standpoint, MU could not have recommended her for certification.  Moreover, PDE's approved methodology for assessing the teaching competencies explicitly requires the certifying institution to evaluate a fledgling teacher's "Professionalism," MU Memorandum, Exhibit I, at 4.  Snyder's deficient teaching and her unprofessional behavior throughout the semester, see MU Memorandum, Exhibits F, G and K, reasonably influenced MU that she was not qualified to teach.  Cf. Horowitz, 435 U.S. at 9, n. 6.

That MU faculty considered Snyder's problems at the cooperating school when adjudging her "Professionalism" inadequate and assigning her failing grades in teacher competencies did not transform its academic decision into a disciplinary one.  As with Hennessy's complaint that the reasons given for terminating the practicum involved his conduct, not his competence, and thus were disciplinary in nature, Snyder's complaint is

---

[9] The MU Code of Conduct, attached to Amended Complaint as Exhibit W, describes behaviors for which students are disciplined at Millersville. For example, the Code punishes violations of criminal law, striking another person, sexually contacting another without consent, hazing, harassment, theft of property, etc. See § B.

groundless. As the Court wrote of Hennessy, his "conduct had academic significance as it spoke volumes about his capacity to function professionally in a public school setting." Hennessy, 194 F. 3d at 251.  MU's decision to fail Snyder rested only on the faculty's academic judgment that she had not demonstrated the practical qualities necessary to perform effectively as a public school teacher.  This judgment, while involving some subjectivity, is within the sphere of constitutionally permissible academic decision making.   And because the action taken by MU was academic in nature, Snyder was entitled to, and received, the process due with academic actions. See MU Memorandum at 9, et seq.

**III.     MILLERSVILLE UNIVERSITY MAY NOT BE SUED**

**A.     Will v. Michigan Department of State Police Bars the § 1983 Claim**

Millersville University is a Pennsylvania public university. Amended Complaint ¶ 2. See 24 P.S. §§ 20-2001 et seq. Skehan v. State System of Higher Education, 815 F. 2d 244 (3d Cir. 1987). Plaintiff does not respond to MU's argument that, pursuant to Will v. Michigan Department of State Police, 491 U.S. 58, 69-71, & n.10 (1989), it and the individually-named state officials in their official capacities are not considered "persons" amenable to suit for purposes of a damages claim under § 1983. Based on Will alone, the § 1983 claim against defendants may not proceed.

**B.     The Eleventh Amendment Bars the § 1983 Claim**

In addition, the Eleventh Amendment bars plaintiff's "failure to train" and any other § 1983 claims against Millersville University and the individually-named defendants in their official capacity. See MU's Memorandum at 6-9, and n. 4. The only federal statute invoked by Snyder is 42 U.S.C. § 1983, which does not override the

17

Eleventh Amendment. <u>Quern v. Jordan</u>, 440 U.S. 332, 341-42 (1979).  Plaintiff's reliance on <u>Fitzpatrick v. Bitzer</u>, 96 S.Ct. 2666 (1976), and <u>Seminole Tribe of Florida v. Florida</u>, 517 U.S. 44 (1996), which involve other statutes, is misplaced.

In <u>Fitzpatrick</u>, plaintiffs were awarded injunctive relief (and not money damages, as Snyder seeks) and the relief was granted against state officials, and not a governmental entity such as MU.  Under Eleventh Amendment jurisprudence, although state officials may be sued for damages in their individual capacity in certain limited situations, the State and its instrumentalities may not. Moreover, <u>Fitzpatrick</u> was brought pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, <u>et</u> <u>seq.</u>, a statute prohibiting employment discrimination for which the Court held that Congress abrogated Eleventh Amendment immunity.  <u>Fitzpatrick</u> was not a § 1983 action. Snyder, on the other hand, does not bring this action under Title VII and points to no Congressional enactment at issue in which Congress abrogated Eleventh Amendment immunity.

<u>Seminole Tribe of Florida</u> held that the Eleventh Amendment prevents Congress from authorizing suits by Indian tribes against States to enforce legislation enacted pursuant to the Indian Commerce Clause and that <u>Ex Parte Young</u>, 209 U.S. 123 (1908), which permits suits against state officials for continuing violations of federal law, did not permit the plaintiffs' suit against the State's Governor.  It actually supports MU's claim of immunity because the Supreme Court held that the Eleventh Amendment barred an action against the State as well as against the Governor. Snyder does not invoke any federal statute in which Congress abrogated Eleventh Amendment immunity. She only invokes § 1983, which does not trump the Amendment.

**IV.    QUALIFIED IMMUNITY BARS THE § 1983 DAMAGES CLAIM**

**A.    The First Amendment Claim**

Snyder claims that MU concedes that her constitutional rights were violated. Snyder Memorandum at 25. This is wrong as the vast majority of MU's Memorandum was devoted to showing that her constitutional rights were not violated. Plaintiff is also wrong that Killion, supra, applies. Email communication was only tangentially implicated there and the communication giving rise to the student's discipline was a paper copy of the document found in the teacher's lounge. 136 F. Supp. 2d at 448-49.

The critical question in the qualified immunity analysis is whether the state of the law gave these defendants "fair warning," Hope v. Pelzer, 536 U.S. 730, 741 (2002), that their alleged conduct would violate the First Amendment's guarantee of freedom of speech. The answer to that question is no. In June 2005, the district court in Watts, wrote that "[t]here are relatively few cases on how to treat the First Amendment rights of a college or graduate student within the context of an internship, externship, residency or practicum. Those courts facing the issue, however, have ruled that Pickering governs." Watts, 2005 WL 3730879 at * 16 (citations omitted). At that time there was no clearly established law holding that Pickering and progeny did not govern the internet-based activities of student teachers in Snyder's situation.

Moreover, there are no cases from the Supreme Court, the Third Circuit Court of Appeals or its district courts holding that an academic action taken by a Pennsylvania public university of giving a student teacher a failing grade in her teaching practicum and

then not conferring upon her a teaching degree violates the First Amendment.[10] <u>Cf</u>.

<u>Watts</u>, 2005 WL 3730879 at * 9. In 2006 there was no clearly established law that would

have put a reasonable university administrator on notice that Snyder's posting on the

internet (public or private or some other legal status?) that consisted of a nonsense picture

and some personal complaints about some unidentified authority was expressive conduct

or about a matter of public concern. <u>See</u> <u>Badia v. City of Miami</u>, 133 F.3d 1443, 1445

(11th Cir.1998) ( "If it is unclear whether [the speech was] of the kind held to involve a

matter of public concern, then [the defendant's] actions did not violate clearly established

First Amendment rights and he is entitled to qualified immunity.").

As Justice Breyer explained earlier this summer in <u>Morse</u>, at the time of the

confrontation between the student and officials, <u>Tinker v. Des Moines Independent</u>

<u>Community School Dist</u>., 393 U.S. 503, 513 (1969), indicated that school officials could

not prohibit students from wearing an armband in protest of the Vietnam War, where the

conduct at issue did not "materially and substantially disrupt the work and discipline of

the school"; <u>Bethel School Dist. No. 403 v. Fraser</u>, 478 U.S. 675 (1986), indicated that

school officials could restrict a student's freedom to give a  school assembly speech

containing an elaborate sexual metaphor;  and <u>Hazelwood School Dist. v. Kuhlmeier</u>, 484

U.S. 260 (1988), indicated that school officials could restrict student contributions to a

school-sponsored newspaper, even without threat of imminent disruption.  As Justice

Breyer pointed out, "the fact that this Court divides on the constitutional question (and

---

[10]Snyder concedes that the Supreme Court has not applied <u>Goss v. Lopez</u>, 419 U.S. 565,
581 (1975) to public universities. Snyder Memorandum at 15. Under that scenario,
defendants would be entitled to qualified immunity because the law is not clearly
established.

that the majority reverses the Ninth Circuit's constitutional determination) strongly suggests that the answer as to how to apply prior law to these facts was unclear." 127 S.Ct. at 2641.

The courts have described the tests these cases implicate as complex and difficult to apply.  See, e.g., Guiles ex rel. Guiles v. Marineau, 461 F.3d 320, 326 (2d Cir. 2006) ("acknowledge[ing] some lack of clarity in the Supreme Court's student-speech cases," "[i]t is not entirely clear whether Tinker's rule applies to all student speech that is not sponsored by schools, subject to the rule of Fraser, or whether it applies only to political speech or to political viewpoint-based discrimination");[11]  Porter v. Ascension Parish School Board, 393 F. 3d 608, 615 n. 22 (5th Cir. 2004) (reflecting uncertainty as to when courts should apply school-speech precedents); Baxter v. Vigo Cty. School Corp., 26 F.3d 728, 737 (7th Cir. 1994) (pointing out that Fraser "cast some doubt on the extent to which students retain free speech rights in the school setting").  As Justice Breyer, concurring in the judgment in part and dissenting in part in Morse, wrote "Teachers are neither lawyers nor police officers; and the law should not demand that they fully understand the intricacies of our First Amendment jurisprudence." 127 S.Ct. at 2639.

None of these cases or their progeny clearly governs the situation involving Snyder and MU defendants, educators all, are entitled to qualified immunity.

**B.    The Due Process Claim**

Plaintiff does not respond to the claim of qualified immunity on the due process claim except to say that the individual MU defendants are aware of the difference

---

[11] In Guiles, issued in 2006, the Second Circuit wrote, in a student speech case, that considering the depictions of drugs and alcohol mixed with a picture of the President on the student's tee-shirt "are questions of first impression in this Circuit." 461 F.3d at 327.

between academic and disciplinary actions. Snyder Memorandum at 26. That may be true; it is also not relevant to the question of qualified immunity, which requires that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition. . ." Saucier v. Katz, 533 U.S. 194, 201 (2001). Defendants are entitled to qualified immunity if "a reasonable officer could have believed that the challenged conduct was lawful under the circumstances." Blackhawk v. Pennsylvania, 381 F.3d 202, 215 (3d Cir. 2004).

Illustrating the level of specificity with which the constitutional right must be defined, the Saucier Court observed that "the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness . . . is not enough." 533 U.S. at 201-02. Rather, said the Court, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. See Thomas v. Independence Twp., 463 F. 3d 285, 300 (3d Cir. 2006). In Thomas, 463 F. 3d at 300, the Third Circuit explained that the general proposition that "a reasonable official would know that directing or permitting the police to harass a citizen because of his race or ethnicity, through unjustified warrantless searches, intimidation, or otherwise, or participating in a conspiracy to do so, would violate an individual's constitutional rights" is too broad and abstract of a proposition for purposes of applying the qualified immunity analysis. The qualified immunity inquiry must be undertaken in light of the specific context of the case and not as a broad general proposition. Id.  See Brosseau v. Haugen, 125 S.Ct. 596, 599-600 (2004) (not clearly established "in this more particularized sense" that defendant was violating plaintiff's

constitutional right).

Plaintiffs' allegation that MU defendants are liable because they know the difference between academic and disciplinary due process is unduly broad and abstract to impute a constitutional violation to these defendants. Her framing of the qualified immunity inquiry at such an extreme level of abstraction precludes the defense from being able to protect government officials who are immune from the burdens of discovery. See MU Memorandum, at 34-37. As the Supreme Court has admonished, "the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense . . . so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings." Crawford-El v. Britton, 523 U.S. 574, 597-98 (1998).

At bottom, there are no cases from the Supreme Court, the Third Circuit Court of Appeals or its district courts holding that the actions taken by a Pennsylvania public university in this particular context violates the Due Process Clause. To the contrary, the cases make a compelling statement that MU defendants acted properly and legally in all aspects of this matter.

## V.    STATE LAW CLAIMS ARE BARRED

MU stands by its arguments that all of plaintiff's state law claims are barred. First, they are barred because federal courts have no jurisdiction to review state officials' compliance with state law. Pennhurst State School. v. Halderman, 465 U.S. 89, 104-05 (1984) (Supreme Court expressly held that the Eleventh Amendment bars federal courts from ordering state agencies or officials to comply with state law). See Blake v. Papadakos, 953 F. 2d 68, 73 n. 5 (3d Cir. 1992). Accord Allegheny County Sanitary Authority v. USEPA, 732 F. 2d. 1167 (3d Cir. 1984).

Second, MU defendants are protected from all state law claims, including the contract claim, based on state sovereign immunity. See MU Memorandum at 37-40. The General Assembly has waived sovereign immunity for only nine limited categories, MU Memorandum at 37 n. 18, none of which apply here. See 42 Pa. C.S. §§ 8501, 8521-22.

To the extent plaintiff alleges a claim based on a violation of the Pennsylvania Constitution, such claims would also be barred since the Commonwealth, its agencies and its officials and employees acting within scope of duties are also entitled to sovereign immunity with respect to alleged denial of citizen's state constitutional rights. Robinson v. Ridge, 996 F. Supp. 447, 449 (E.D.Pa. 1997), aff'd, 175 F. 3d 1011 (3d Cir. 1999)(Commonwealth employees acting within scope of their employment for the Commonwealth at the time the events at issue occurred have immunity for alleged violations of Pennsylvania Constitution); Faust v. Commonwealth Dep't of Revenue, 592 A. 2d 835, 839, 140 Pa. Cmwlth. 389 (1991), appeal denied, 607 A. 2d 257, 530 Pa. 647 (1992) (State and its employees acting within scope of employment enjoy sovereign immunity for claims based upon the Pennsylvania Constitution and for intentional torts); Shoop v. Dauphin County, 766 F. Supp. 1327 (M.D.Pa. 1991), aff'd, 945 F. 2d 396 (3d Cir. 1991), cert. denied, 502 U.S. 1097 (1992) (state trooper had sovereign immunity from suit with regard to civil rights plaintiff's pendent state law claims of false imprisonment, assault and battery, malicious abuse of process and intentional infliction of emotional distress where trooper acting within scope of his duties); Boone v. Pa. Office of Vocational Rehabilitation, 373 F. Supp. 2d 484 (M.D.Pa. 2005)(sovereign immunity barred claim of intentional infliction of emotional distress against executive director of

division where plaintiff had worked); Kidd v. Comm., 1999 WL 391496, at *11 (E.D. Pa. May 20, 1999), aff'd, 37 Fed. Appx. 588 (3d Cir. 2002).

The only relevant nuance on the state law claims relates to the breach of contract claim (Count VI).[12] The Pennsylvania legislature has created an exception to sovereign immunity in a limited category of breach of contract claim involving the Commonwealth. 62 Pa.C.S. § 1721, et seq. This section confers upon the Pennsylvania Board of Claims exclusive jurisdiction to arbitrate claims arising from certain limited categories of contracts with the Commonwealth identified in 62 Pa.C.S. § 1724. It is, however, obvious from the face of the Amended Complaint that none of the categories delineated in 62 Pa.C.S. § 1724 applies. The claim clearly does not involve a contract entered into by a Commonwealth agency in accordance with 62 Pa.C.S. §§ 1721-1726 and filed with the Board in accordance with 62 Pa.C.S. § 1712.1 (relating to contract controversies); a written agreement executed by a Commonwealth agency and the Office of Attorney General agreeing to arbitrate disputes at the Board; an interest in real property; or a claim in which the Commonwealth is the claimant. Thus, the Board of Claims would not have jurisdiction over plaintiff's contract claim either.[13]

_____

[12] On counsel's printed version of the Amended Complaint, the page containing the contract claim was separated from the rest of the document and, therefore, counsel was not aware of and did not specifically address this issue. Nonetheless, sovereign immunity precludes the contract claim.

[13] Plaintiff claims that Ross v. Penn State University, 445 F. Supp. 147 (M.D.Pa. 1978) supports the argument that the relationship between students and colleges is contractual. Snyder Memorandum at 33. In Ross, however, the plaintiff was a paid graduate student with a written agreement with the University. Id. at 149. At bar, even if there were a contractual relationship, the Pennsylvania Board of Claims would have exclusive jurisdiction to hear the dispute. Ross, a 1978 case, was issued, decades before the present statute, 62 Pa.C.S. § 1721, et seq., which gives the Board of Claims exclusive jurisdiction over contract cases involving the Commonwealth.

Nothing Snyder argues changes the defendants' immunity. Snyder's argument that sovereign immunity does not bar her claims, Snyder Memorandum at 30, seems to confuse Eleventh Amendment immunity from federal claims and state law sovereign immunity from state law claims. The cited federal constitutional amendments and reference to Congress's Article I powers do not abrogate state sovereign immunity. Moreover, Snyder applies the wrong standard in claiming that sovereign immunity does not extend to Girvin, Bray and Prabhu in their individual capacities. Snyder Memorandum at 31. Again, plaintiff seems to confuse the Eleventh Amendment analysis with the sovereign immunity analysis. While the capacity in which a state defendant is sued is relevant for Eleventh Amendment immunity--official versus individual capacity-- see Hafer v. Melo,  U.S. (199), it is not relevant for the question of sovereign immunity. For the latter issue, the question is whether state defendants were acting beyond the scope of their duties. See MU Memorandum at 39 n. 19. In any event, plaintiff does not allege in her Amended Complaint that defendants did not act within the scope of their duties.

One final point about her claims that defendants did not act within the scope of their duties and for infliction of emotional distress. In her Memorandum at 32, plaintiff claims that Girvin and Bray hacked into Snyder's "private website." This is not alleged in the Amended Complaint. Instead, in the Complaint she alleges that Ms. Buffington of Conestoga Valley showed her the "drunken pirate" photograph. Amended Complaint ¶ 29. She also claims in her Memorandum, at 3, that Ms. Reinking of Conestoga Valley "snooped into" her website. There is no factual basis for this claim against MU defendants.

26

**VI.     CONCLUSION**

For these reasons, Commonwealth defendants request that the Amended

Complaint be dismissed with prejudice.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:     s/s Barry N. Kramer
BARRY N. KRAMER
Senior Deputy Attorney General
Identification No. 41624

Susan J. Forney
Chief Deputy Attorney General
Civil Litigation Section

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Telephone: (215) 560-1581
Fax:     (215) 560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

### CERTIFICATE OF SERVICE

I, Barry N. Kramer hereby certify that on September 7, 2007, Reply Memorandum Of
Law In Support Of Millersville University's Motion To Dismiss Amended Complaint has
been filed electronically and is available for viewing and downloading from the Court's
Electronic Case Filing System.  The ECF System's electronic service of the Notice of
Electronic Case Filing constitutes service on all parties who have consented to electronic
service:

> Mark W. Voigt, Esquire
> Plymouth Meeting Executive Campus
> Suite 400
> 600 West Germantown Pike
> Plymouth Meeting, PA  19462
> mwvoigt2@aol.com

BY:    s/s Barry N. Kramer
       BARRY N. KRAMER