IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**ORDER**

AND NOW, this ___ day of ___, 2007, upon consideration of the Motion to Dismiss the Second Amended Complaint of defendants Millersville University, J. Barry Girvin, Dr. Jane S. Bray and Dr. Vilas A. Prabhu, it is hereby ORDERED that the Motion is GRANTED. The Second Amended Complaint is hereby DISMISSED with prejudice.

_____
Diamond, J.

Dockets.Justia.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**MILLERSVILLE DEFENDANTS' MOTION TO
DISMISS SECOND AMENDED COMPLAINT**

Defendants Millersville University, Professor J. Barry Girvin, Dr. Jane S. Bray

and Dr. Vilas A. Prabhu (together "Millersville defendants"), hereby file, pursuant to

Fed. R. Civ. P. 12(b)(1) and (b)(6), this Motion to Dismiss the Second Amended

Complaint, for the following reasons:

1.      The Eleventh Amendment and Will v. Michigan Department of State Police bar

the § 1983 Claims for damages against individual defendants in their official capacities.

2.      Plaintiff fails to state a procedural Due Process claim.

3.      Plaintiff fails to state a First Amendment claim.

4.      Plaintiff request for injunctive relief should be denied.

5.      Qualified Immunity bars the § 1983 damages claim against the individual

defendants in their personal capacities.

6.      The State law claims are barred.

Therefore, Millersville defendants request that this court dismiss plaintiff's Second Amended Complaint with prejudice.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:     s/s Barry N. Kramer
        BARRY N. KRAMER
        Senior Deputy Attorney General
        Identification No. 41624

        Susan J. Forney
        Chief Deputy Attorney General
        Civil Litigation Section

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Tel: (215) 560-1581
Fax: (215) 560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF MILLERSVILLE UNIVERSITY'S
MOTION TO DISMISS SECOND AMENDED COMPLAINT**

## I.      INTRODUCTION

Plaintiff Stacy Snyder, a 2006 graduate of Millersville University, files this

Second Amended Complaint, pursuant to 42 U.S.C. § 1983 and raising supplemental

State law claims, against Millersville University, Professor J. Barry Girvin, Dean of the

School of Education Dr. Jane S. Bray and University Provost Dr. Vilas A. Prabhu

(together "Millersville" or "Commonwealth defendants"). Snyder filed a Complaint and

an Amended Complaint earlier this year. Millersville filed a Motion to Dismiss, which

the Court granted in part on September 17, 2007. In its Order, the Court dismissed the §

1983 claims against Millersville University and, because the claims against the individual

defendants were "extremely unclear," directed that plaintiff amend her pleading so as to

identify with "adequate specificity" the factual allegations against the individual

defendants. Order ¶ 15.

Plaintiff has now filed a Second Amended Complaint ("SAC"), which is merely a

re-hash of the previous two Complaints. Plaintiff fails to add any new factual allegations

against individual defendants or assert new substantive claims. Except for adding some legal conclusions, which may be disregarded; noting that individual defendants were acting within their individual capacity; substituting the name of individual defendants for "Millersville University"; and re-numbering the paragraphs, the SAC is identical to the Amended Complaint.

Plaintiff alleges (1) violation of the First Amendment against individual defendants in their individual capacities, presumably for damages pursuant to § 1983 (Count I); (2) violation of the First Amendment against individual defendants in their official capacities, presumably for injunctive relief pursuant to § 1983 (Count II); (3) violation of the Fifth and Fourteenth Amendments against individual defendants in their individual capacities, presumably for damages pursuant to § 1983 (Count III); (4) violation of the Pennsylvania Public School Code of 1949 and Title 53 of the Pennsylvania Code against individual defendants (Count IV); (5) State law claim of intentional infliction of emotional distress against individual defendants (Count V); and (6) state law claim of breach of contract against Millersville University (Count VI).

In spring-semester 2006, Snyder was engaged in a student teaching clinical at Conestoga Valley High School ("Conestoga Valley"), which she needed to successfully complete in order to receive a Bachelor of Science in Education degree ("B.S.Ed.") from Millersville and her teaching certification from the Pennsylvania Department of Education ("PDE"). During the entire course of the semester Snyder received mixed, and at times highly critical, evaluations regarding her student teaching from her supervising teacher at Conestoga Valley as well as from Professor Girvin, her University internship supervisor. At the end of the semester, after many interactions with school officials about

her unsatisfactory performance in student teaching, plaintiff failed the clinical. She filed

an Academic Appeal to Dr. Bray, who permitted her to graduate with a Bachelor of Arts

degree in English.[1] Seven months later, plaintiff filed an Academic Appeal to the

University Provost, Dr. Prabhu, who denied the appeal. This lawsuit followed.

On the record already generated by plaintiff at this stage of the proceedings,

Millersville defendants are entitled to have the case dismissed because plaintiff fails to

state a claim upon which relief can be granted or judgment entered in their favor as a

matter of law under Fed. R. Civ. P. 56.

## II.    ARGUMENT

### A.    Standard On A Motion To Dismiss

A motion to dismiss should be granted "if, accepting all well pleaded allegations

in the complaint as true, and viewing them in the light most favorable to plaintiff,

plaintiff is not entitled to relief." In re Burlington Coat Factory Sec. Litig., 114 F.3d

1410, 1420 (3d Cir. 1997). See Christopher v. Harbury, 536 U.S. 403, 406 (2002). A

court need not credit either "bald assertions" or "legal conclusions" unsupported by the

factual allegations in a complaint. Id. 114 F.3d at 1429-30. See Morse v. Lower Merion

School District, 132 F.3d 902, 908, 909 (3d Cir. 1997).  If the facts alleged in the

complaint, and inferences and implications reasonably proceeding from them, would not

entitle plaintiff to relief as a matter of law, the complaint should be dismissed. Id.

A Rule 12(b)(1) motion is the proper mechanism for raising the issue of whether

Eleventh Amendment immunity bars federal jurisdiction. Blanciak v. Allegheny Ludlum

---

[1] Plaintiff was never dismissed from the School of Education. She merely failed the
student teaching clinical that is requisite to receiving a B.S.Ed. See Exhibit BB to SAC.

Corp., 77 F.3d 690, 694 n. 2 (3d Cir.1996), citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-100 (1984).

A court may consider "matters of public record, exhibits attached to the complaint, and indisputably authentic documents attached to a motion to dismiss." Delaware Nation v. Pennsylvania, 446 F. 3d 410, 413 at n. 2 (3d Cir. 2006) (citation omitted); Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F. 3d 1380, 1391 (3d Cir. 1994); Pension Benefit Guar. Corp. v. White Consol. Industries, Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). See also Burlington Coat Factory, 114 F.3d at 1426 (courts can consider documents "integral to or explicitly relied upon in the complaint.")

In the attachments to her SAC, plaintiff includes only selected portions of certain documents. Attached to Millersville's Memorandum of Law in Support of Motion to Dismiss the Amended Complaint ("MU Memorandum"), and incorporated herein by reference, pursuant to Fed. R. Civ. P. 10(c), are those complete documents. In addition, defendants attach certain other documents that the court should consider because they are matters of public record or indisputably authentic, such as those penned by plaintiff or referenced in the SAC. Alternatively, where the parties rely on materials not properly considered on a Rule 12(b)(6) motion, the court may consider the motion as one for summary judgment under Rule 56. See Rule 12(b).

**B.    The § 1983 Claims For Damages Against Individual Defendants In Their Official Capacities Are Barred**

Plaintiff again sues the individual defendants in both their official and individual capacities for damages under § 1983. SAC ¶¶ 3-5. Pursuant to the Eleventh Amendment and Will v. Michigan Department of State Police, 491 U.S. 58, 69-71, & n.10 (1989), these state officials and employees may not be sued in their official capacities for

damages under § 1983. See MU Memorandum, at pp. 6-9, MU Reply Memorandum, at 17-18, incorporated herein by reference pursuant to Fed. R. Civ. P. 10 (c).

**C.    Plaintiff Fails To State a Procedural Due Process Claim in Count III**

This case presents the issue of due process requirements in a state university's action against a student for unsatisfactory academic performance.   The Supreme Court discussed the due process rights of students in state operated universities in Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78 (1978), and in Regents of the University of Michigan v. Ewing, 474 U.S. 214 (1985).   Horowitz focused on procedural due process, while the student's claim in Ewing was based on substantive due process.[2]   In both cases the Court expressly assumed, without deciding, the existence of a liberty or property interest but found no basis for holding the universities liable because due process had been satisfied.

The Supreme Court distinguishes between disciplinary and academic dismissals.[3]

---

[2] Plaintiff does not assert a substantive due process claim. This is just as well. In his concurrence in Ewing, Justice Powell noted that in contrast to the procedural due process cases where the protected interests originate under state law, substantive due process rights are created by the federal constitution.   He found that the student's claim bore "little resemblance to the fundamental interests that previously had been viewed as implicitly protected by the Constitution."   474 U.S. at 229-30. A substantive due process violation must "shock the conscience." E.g., County of Sacramento v. Lewis, 523 U.S. 833, 846-47 (1998).   For example, in Dixon v. Alabama State Board of Education, 294 F. 2d 150 (5th Cir.), cert. denied, 368 U.S. 930 (1961),  plaintiffs were African-American students who were expelled from a tax-supported college for seeking to purchase lunch at a publicly owned grill in the basement of the Montgomery, Alabama, county courthouse. Id. at 152 n. 3, 157. The due process requirements developed in the Dixon line of cases have been carefully limited to disciplinary decisions. See Horowitz, 435 U.S. at 88 n. 4. Ms. Snyder's claim hardly rises to the level as the students in Dixon.

[3] The Supreme Court observed in Horowitz, 435 U.S. at 87, that since the issue first arose, state and lower federal courts have recognized that there are distinct differences

Horowitz, 435 U.S. at 90. Courts recognize they are ill-equipped to review the largely subjective academic appraisals of faculty. Id. at 92. Thus, in academic actions taken against a student, a hearing is not necessary to satisfy due process. It suffices if the school informs the student of its dissatisfaction with her academic progress and makes a careful and deliberate decision to take the academic action. Id. at 85.

In Horowitz, a medical student was dismissed for inadequate performance during her clinical rotations. Faculty members had noted that her "performance was below that of her peers in all clinical patient-oriented settings," that she was erratic in her attendance at clinical sessions, and that she lacked a critical concern for personal hygiene. Id. at 80-81. The decision to dismiss the student rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Id. at 89-90. The Court noted that such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Id. at 90. Like the decision of an individual professor as to the proper grade for a student in his course, the "determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decision making." Id. 435 U.S. at 90.

---

between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons.  The Court pointed to Barnard v. Inhabitants of Shelburne, 216 Mass. 19, 102 N.E. 1095 (1913), in which the Massachusetts Supreme Court rejected an argument that school officials must grant a hearing before excluding a student on academic grounds.   "Misconduct is a very different matter from failure to attain a standard of excellence in studies.  A determination as to the fact involves investigation of a quite different kind.   A public hearing may be regarded as helpful to the ascertainment of misconduct and useless or harmful in finding out the truth as to scholarship."  Id., at 22-23, 102 N.E., at 1097.  See Horowitz, 435 U.S. at 87.

Concluding that no hearing was required, the Court observed that the educational process is not by nature adversarial. Instead, it centers on a continuing relationship between faculty and students, "one in which the teacher must occupy many roles-educator, adviser, friend, and, at times, parent-substitute." 435 U.S. at 90 (citation omitted). This is especially true as a student advances through the varying regimes of the educational system, and the instruction becomes both more individualized and more specialized. In an academic setting, informal review and evaluation sessions between student and faculty meet constitutional requirements. Id.

Exactly on point is Hennessey v. City of Melrose, 194 F. 3d 237 (1st Cir. 1999), which demonstrates why Millersville's action was considered academic and not disciplinary. In his senior year appellant was placed at a local public school as part of his program to get a teaching degree and State teaching certification. Issuance of certification hinged on successful completion of the student teaching practicum. Id. at 242. During his student teaching semester, Salem State College ("Salem") determined that his performance was inadequate and assigned him failing grades in various teacher competencies. Salem removed him from the teaching certification program because he (1) received a failing grade in his student teaching practicum; and (2) had not satisfied the common teaching competencies required for certification by the State Department of Education ("DOE"). Id. at 250. The First Circuit wrote that "these reasons seem quintessentially scholastic." Id. at 251.  The Court recognized that plaintiff's conduct while student teaching had "academic significance because it spoke volumes about his capacity to function professionally in a public school setting." Id. Plaintiff was terminated

from the program because of his competence, not his conduct, and entitled to only the due process described in Horowitz. Id.

Nonetheless, Hennessy, like Snyder, complained that the reasons given for terminating the practicum involved his conduct, not his competence, and thus were disciplinary in nature. Hennessy referred to the excellent grades he had received in his course work up until the student teaching practicum. The Circuit observed, however, that proficiency in course work is only one component of the certification process since the practicum constitutes a completely separate component. Id. That appellant had good grades is only marginally relevant. Id. Cf. Horowitz, 435 U.S. at 95 (Powell, J., concurring) (noting that the plaintiff was dismissed from medical school "because she was as deficient in her clinical work as she was proficient in the 'book-learning' portion of the curriculum").

Hennessy, like Snyder, also received some positive reviews during the early stages of his practicum. That fact, the Circuit held, failed to negate the inescapable fact that he failed the practicum, the successful completion of which was a prerequisite to certification. 194 F.3d at 250. Given that failure, from an academic standpoint, Salem could not have recommended him for certification. Moreover, because the approved methodology for assessing the teaching competencies, set by the State DOE, explicitly requirds the certifying institution to evaluate a fledgling teacher's interpersonal skills, Hennessy's inability to communicate effectively with his colleagues at the cooperating school and his unwillingness to work within the prescribed curriculum reasonably could have as much influence on Salem from an academic standpoint as his ability to prepare a lesson plan. Id. Cf. Horowitz, 435 U.S. at 9, n. 6 (concluding that factors such as

"[p]ersonal hygiene and timeliness may be as important ... in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness").

That Salem's faculty considered Hennessy's problems at the cooperating school when adjudging his performance "incomplete" and assigning him failing grades in various teacher competencies did not transform its academic decision into a disciplinary one. Id. at 251. Salem's decision to fail Hennessy rested squarely on the faculty's academic judgment that he had neither completed the required assignments nor demonstrated the practical qualities necessary to perform efficaciously as a public school teacher. Id. Despite a subjective cast, the decision still "fell well within the sphere of constitutionally permissible academic decision making." Id.

In Mauriello v. University of Medicine and Dentistry of New Jersey, 781 F. 2d 46, 50 (3d Cir. 1986), the Third Circuit, interpreting Horowitz, held that "when a student is discharged for academic reasons, an informal faculty evaluation with the student is all that is required." Id. at 51. The Court concluded that the plaintiff's dismissal from the University's Ph.D. program was based on academic not disciplinary grounds. "[I]t was not a case of her being compelled by rule, order, or law of the school to do something and not having done it getting discharged. ... This is not a case of somebody being disruptive in her misconduct, it is not a Goss v. Lopez situation," where students engaged in violent and destructive behavior. 781 F. 2d at 50. The University's inquiry focused on the quality of Mauriello's research and her dedication to academic pursuits, not on any misconduct. Plaintiff made errors in research and University officials had expressed dissatisfaction with the quality of her work and with her attitude. 781 F. 2d at 51.

Noting that in an educational setting, a student bears a heavy burden in persuading the courts to set aside a faculty's judgment of academic performance, it was evident that plaintiff's academic record was a determinative, if not the sole, reason for her dismissal from the program. Id. Mauriello was informed of her academic deficiencies, was given an opportunity to rectify them, and was allowed to present her grievance to the graduate committee. That she was eventually dismissed did not negate the existence of those favorable forms of due process. Id. The Circuit held that "in view of the professional evaluations contained in this record, we cannot say that the dismissal of plaintiff from the doctoral program was "beyond the pale of reasoned academic decision making." Id.[4]

Similarly, in Hankins v. Temple University, 829 F.2d 437 (3d Cir. 1987), a medical student was terminated from a fellowship as a result of academic decisions made by her professors over the course of several months of interaction and observation. She was afforded opportunities to discuss her performance and provided with at least two written evaluations. Her supervisors determined that she did not meet the standards set by the medical school. Id. at 445. Based on Horowitz, Ewing and Mauriello, the Third Circuit affirmed that the student was not denied due process rights simply because she was not afforded an opportunity to plead her case in a formal hearing. Id. See also Manning v. Temple University, 157 Fed.App'x. 509, 514-515, 2005 WL 3288162 (3d

---

[4] In Ewing, the Supreme Court also concluded that the student's dismissal "rested on an academic judgment that is not beyond the pale of reasoned academic decision making when viewed against the background of his entire career at the University." 474 U.S. 225. The Court admonished that when judges are asked to "review the substance of a genuinely academic decision, ... they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." Id.

Cir. 2005) (medical school student provided with due process where she was given fair warning of inadequate performance, presented her position to student promotions committee and permitted to appeal committee's decision to dismiss her to the Dean).

Contrary to plaintiff's allegations, even in disciplinary actions, Goss v. Lopez, 419 U.S. 565 (1975), and progeny do not entitle the student to the full panoply of rights attendant to criminal trials. In Goss, the high school's decision to discipline the students rested on factual conclusions that the individual students had participated in demonstrations that had disrupted classes, attacked a police officer and caused physical damage to school property. Assuming that the Due Process Clause applied, the Supreme Court ruled that the student was entitled only to "some kind of notice" of the charges and "some kind of hearing." 419 U.S. at 579. Holding that oral notice sufficed, the Court ruled that due process is satisfied by an informal "give and take" between the student and the administration that gives the student the opportunity to characterize her conduct and put it in what she deems a proper context. 419 U.S. at 581, 584. This "provide[s] a meaningful hedge against erroneous action." 419 U.S. at 583. Nothing else is required.[5] See Dixon v. Ala. State Bd. of Educ., 294 F.2d at 158-59.

Snyder's conclusion of law that she has a property interest in her college degree or teacher certification protected by the Due Process Clause is tenuous at best. SAC ¶ 91.

---

[5] Plaintiff is wrong about the due process requirements in disciplinary hearings. Even in those situations, the student is not entitled to (1) application of the rules of evidence and rules of civil or criminal procedure; (2) active representation by legal counsel or some other sort of campus advocate; (3) call or cross-examine witnesses; (4) have the university produce some sort of record of the proceedings; (5) a written statement of reasons for a decision against him; (6) an appeal from a school's decision that was reached through constitutional means. See, e.g., Flaim v. Medical College of Ohio, 418 F. 3d 629, 635-36 (6th Cir. 2005).

Because property interests are creatures of state law, <u>Perry v. Sindermann</u>, 408 U.S. 593, 599-603 (1972), plaintiff would have to show that her B.S.Ed. degree was a property interest recognized by Pennsylvania law.  Plaintiff cannot make such a showing. <u>See Board of Regents v. Roth</u>, 408 U.S. 564 (1972) (State had not deprived a teacher of any liberty or property interest in dismissing her from a nontenured position); <u>Bishop v. Wood</u>, 426 U.S. 341 (1976) (upholding dismissal of a policeman without a hearing and rejecting theory that the mere fact of dismissal could amount to a stigma infringing one's liberty).  As Justice Powell wrote in his concurrence in <u>Ewing</u>, the student's "claim to a property right is dubious at best."  474 U.S. at 229-30.

　　　　<u>Hennessy v. City of Melrose,</u> <u>supra</u>, is also instructive on this point. Hennessy claimed that Salem failed to accord him procedural due process when it removed him from the teacher certification program. He argued that Salem's denial of an opportunity to obtain teacher certification deprived him of a constitutionally protected property interest that presumably derived from an implied contractual right to continue in that program. <u>Id</u>. at 249.  The Circuit observed that the theoretical underpinnings of his "gambit" were dubious because the "Supreme Court has not decided whether a student at a state university has a constitutionally protected property interest in continued enrollment." <u>Id</u>. at 249.  <u>See</u> <u>Regents of Univ. of Mich. v. Ewing</u>, 474 U.S. at 223 (assuming existence of such an interest, but leaving the question open); <u>Board of Curators v. Horowitz,</u> 435 U.S. at 84-85 (same).   In any case, Hennessy's claim to a property interest was especially tenuous because Salem did not expel him, but merely

precluded him from continuing in a particular program.[6]  Out of caution, however, the First Circuit assumed <u>arguendo</u> that Hennessy possessed a constitutionally protected property interest in completing the program.  Thus, assuming, but not conceding, that plaintiff has a protected property interest, the threshold step is to classify the public university's action as "disciplinary" or "academic."  194 F. 3d  at 250.

Based on the factual allegations in Snyder's SAC, as opposed to counsel's legal conclusions, it cannot be disputed that the decision to permit plaintiff to graduate with a B.A. in English, instead of her desired B.S.Ed., was a purely academic decision. Millersville admitted plaintiff into its Advanced Professional Studies Program, which required her to complete a student teaching component in order to receive a B.S.Ed.  As with all student teachers, she was provided with a Guide for Student Teaching. MU Memorandum, Exhibit A; SAC Exhibit B. The Guide explains that, according to polices of the PDE, to receive teaching certification in Pennsylvania, a student must satisfactorily complete student teaching. <u>Id</u>. at 10. Each student teacher candidate is evaluated in the categories set forth in the PDE-430 form, which are Planning and Preparation, Classroom Environment, Instructional Delivery and Professionalism. <u>Id</u>. at 18. According to the Guide, each candidate must receive a satisfactory rating in all of the categories listed on the PDE-430 in order to be eligible for certification by the Commonwealth.  <u>Id</u>. at 20. The Guide also provides that "…the Student Teacher needs to maintain the same professional standards expected of the teaching employees of the cooperating school." <u>Id</u>. at 7. In addition, plaintiff was provided with the University's Undergraduate Catalog,

---

[6] Snyder was similarly not expelled. Had she been so, she would not have received any degree from Millersville.

16

which contains information on Academic appeals at the University.  MU Memorandum, Exhibit B; SAC Exhibit AA.

During the spring 2006 semester, plaintiff was a student teacher at Conestoga Valley. SAC ¶ 15. Nicole Reinking was her teacher-advisor and Deann Buffington was her supervisor. Id. Throughout the student teaching semester, plaintiff received feedback, both orally and in writing, from Ms. Reinking and Professor Garvin, the University supervisor, regarding her overall student teaching performance. The evaluation forms document multiple serious concerns at both the mid and end-points of plaintiff's student teaching semester. SAC ¶¶ 16-25.

On March 20, 2006, at the midpoint of the semester, Ms. Reinking, after frequent observations of plaintiff's student teaching, evaluated plaintiff as needing improvement or significant remediation in twelve different areas. Her criticisms included the following:

- "Though Ms. Snyder has had a lesson plan for each day of teaching, many plans were not submitted until the day of the lesson."

- "Many errors were made in daily lessons that were partly due to weak content knowledge and due to a lack of preparation."

- She is failing "to account for struggling students who are clearly not grasping the content during the lesson."

- "Too many students are left behind as a result of ineffective lessons…"

- "She has worked to develop on-task behavior through trial and error; however, frequently, she resorts to talking over the students, twice shouting 'Shut up,' and overall feeling and showing that she is frustrated and not in control."

- "Many students who completed Miss Snyder's earlier units in the course would not, I'm afraid, demonstrate a strong evidence of learning."

MU Memorandum, Exhibit C. <u>See</u> SAC ¶ 18; SAC Exhibit J.

Also at the mid-point of the semester, on March 17, Professor Girvin evaluated plaintiff as needing improvement or significant remediation in twelve areas on the Millersville Student Teaching Mid-Evaluation - English.  MU Memorandum, Exhibit D. <u>See</u> SAC ¶¶ 16-17, 19-20; SAC Exhibit I. Consistent with this, he rated her performance as unsatisfactory in the Classroom Environment category of the mid-placement PDE-430 form. MU Memorandum, Exhibit E; SAC Exhibit K. This equates to failing the practicum, although at mid-semester the PDE-430 is designed to provide the student with feedback and an opportunity to improve. <u>Id</u>. In the Planning/Preparation and Instructional Delivery categories of the mid-placement PDE-430 form, she received only "Satisfactory." <u>Id</u>.

By the end of the semester, Ms. Reinking was quite displeased with plaintiff's student teaching. MU Memorandum, Exhibit F. In a document titled "Unprofessional Behavior/Performance in the Classroom," Ms. Reinking listed some criticisms of her student teaching, including playing a song to students that included profane language; attempting to regain order in the classroom by telling the students to "shut up"; discussing personal matters in front of students; failing to wear appropriate professional attire; and not following the proper chain of command at the school.  Ms. Reinking also

admonished plaintiff to avoid discussions about myspace.com, looking up student online accounts or corresponding with students on the website. Id.[7]

Plaintiff responded to Ms. Reinking's criticisms. Id. Although she denied some of the incidents raised by Ms. Reinking, nonetheless, portraying herself as "naïve" and "inexperienced," she conceded in writing that:

- She played a song for background music which contained profane and inappropriate language.

- She gave an account of her Valentine's Day with her boyfriend, former husband and children that made the students visibly uncomfortable.

- She told the students to "shut up" to regain control of the classroom.

- She dressed inappropriately at least once.

- She posted a "pirate" photograph of herself on her myspace.com website.

On May 4, 2006, she wrote in her "blog":

> First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop that low as to mess with my future. So, bring on the love! I figure a couple of students will actually send me a message when I am no longer their offical (sic) teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)?

Id. SAC Exhibit R. On or about May 8, Ms. Buffington, the Conestoga Valley supervisor, telephoned plaintiff about the pirate picture appearing on plaintiff's myspace.com

---

[7] Plaintiff's lists Ms. Reinking's document in her Self-Executing Discovery Enclosures. MU Memorandum, Exhibit Q.

website. SAC ¶ 26. Ms. Buffington forbade her from entering the school. Id. See MU

Memorandum, Exhibit G.[8]

It should have come as no surprise that plaintiff's final academic evaluations

reflected serious deficiencies in her student teaching. Ms. Reinking's final Student

Teaching Final Evaluation – English, shows unsatisfactory ratings in four of the six

indicators of Professionalism and in two indicators of Preparation. MU Memorandum,

Exhibit H. Her criticisms included the following:

- "In terms of professionalism, Miss Snyder evidenced some aspects of poor

  judgment during the semester, especially in regard to one specific instance….At

  Conestoga Valley High School, a teacher who earns a mark of unsatisfactory for

  professionalism will fail the final evaluation overall…"

- "However, most of Miss Snyder's written and oral communications with students

  and staff contained numerous grammatical and/or content errors, which is a cause

  for concern for an evaluator of a future English teacher. Frequently, in fact, her

  students corrected her during her lessons."

Consistent with the evaluation from Conestoga Valley, the final PDE-430 form

completed by Girvin on May 12, 2006, and required by the Commonwealth for eligibility

for teaching certification, shows an unsatisfactory rating in Professionalism. MU

Memorandum, Exhibit I. See SAC ¶¶ 28-29, 34; SAC Exhibit S. There are eight

---

[8] Ironically, since she is now suing him, in that diatribe against Ms. Reinking, plaintiff
praised Professor Girvin as a "great supervisor. If I wouldn't have had you to receive
guidance and support this semester, I would have been lost! I appreciate all your hard
work and effort." MU Memorandum, Exhibit G.

performance indicators for the Professionalism category and Professor Girvin cited half of the total list as not having been demonstrated, including the following:

- Integrity and ethical behavior, professional conduct as stated in Pennsylvania Code of Professional Practice and Conduct for Educators; and local, state, and federal, laws and regulations

- Effective communication, both oral and written with students, colleagues, paraprofessionals, related service personnel, and administrators.

- Ability to cultivate professional relationships with school colleagues.

- Knowledge of Commonwealth requirements for continuing professional development and licensure.

In addition, Professor Girvin rated her performance in the Professionalism component of the student teaching evaluation as unsatisfactory. MU Memorandum, Exhibit J; SAC Exhibit Q.

On May 11, 2006, plaintiff met with Ms. Buffington, Ms. Reinking and Professor Girvin, to review her final student teaching evaluation. SAC ¶ 30. Ms. Buffington took the lead in criticizing plaintiff's student teaching as "incompetent" and her conduct as "unprofessional." Id. ¶¶30-33. As a result of these deficiencies, plaintiff failed student teaching and was ineligible to receive a B.S.Ed.[9] Thereafter, plaintiff sought an Academic Appeal, pursuant to Millersville's policy, with Dr. Jane Bray, Dean of Millersville's School of Education. Plaintiff submitted additional materials and met with Dr. Bray, who

---

[9] After plaintiff filed this litigation, Conestoga Valley published on its public website (www.cvsd.k12.pa.us) a document entitled "Response to Stacy Snyder Lawsuit." It confirmed many details of plaintiff's poor student teaching performance and described with some particularity interactions between plaintiff and Conestoga Valley personnel about the unprofessional postings on her website. See MU Memorandum, Exhibit K.

denied the appeal. MU Memorandum, Exhibit L. Plaintiff requested, and Dr. Bray

granted, an exception to graduation requirements, which permitted her to graduate in May

2006 with a B.A. in English Literature. MU Memorandum, Exhibit M. See SAC ¶¶ 37-

38; SAC Exhibit T.

On January 27, 2007, plaintiff through counsel requested a hearing pursuant to

Millersville's Academic Appeals Policy. SAC ¶ 57. University Provost Dr. Prabhu

advised counsel he would hear her appeal and that plaintiff should bring documents and

witnesses she would like to present. MU Memorandum, Exhibit P; SAC Exhibits Y and

BB. Plaintiff solicited witnesses for the meeting and accurately characterized the

meeting as an "academic hearing." She expressly recognized that it was "not a

disciplinary hearing." MU Memorandum, Exhibit N. See also MU Memorandum, Exhibit

O (plaintiff's counsel referring to "academic dismissal"). In advance of the meeting,

plaintiff's counsel submitted a Statement of Issues, and lists of Exhibits and Witnesses to

Dr. Prabhu. MU Memorandum, Exhibit O. Dr. Prabhu conducted the Academic Appeal.

MU Memorandum, Exhibit P. He met personally with plaintiff and her attorney and

reviewed the materials she submitted in support of her academic appeal. Id. Drs. Bray

and Judith Wenrich, Student Teaching Coordinator in the School of Education, also

attended the meeting and submitted materials regarding plaintiff's poor student teaching.

Id. After evaluating the evidence, Dr. Prabhu upheld Dr. Bray's determination. Id.

It should be evident from plaintiff's allegations why courts shy away from getting

enmeshed in situations that are essentially divorces in the Groves of Academe. The court

need only note the wide and destructive swath of discovery that plaintiff intends to cut in

this litigation. See Plaintiff's Self Executing Discovery Disclosures. MU Memorandum,

Exhibit Q. Even at this early stage, plaintiff lists 23 witnesses, including multiple

Conestoga Valley and Millersville personnel. It seems that plaintiff intends to engage in a

vendetta against Dr. Bray for allegedly engaging in "censorship and backlash … against

disfavored students." Id. at 2-3. Plaintiff also lists 32 documents, including a photograph

allegedly showing the Bloomsburg University President with "drunken students" holding

up their citation for underage drinking. Id. at 3, 5.

    Courts appreciate that faculty judgment on a student, like the decision of an

individual professor as to a student proper course grade, is inherently more subjective and

evaluative than the typical factual questions presented in a disciplinary decision.  The

determination to take academic action entails expert evaluation of cumulative information

and is not readily adapted to the procedural tools of judicial decision making. Horowitz,

435 U.S. at 90. In academic actions, informal review and evaluation sessions between

student and faculty meet constitutional requirements.

    Millersville took action against plaintiff because she failed student teaching at

Conestoga Valley. Snyder, as the cited cases demonstrate, was the subject of academic

action because of "clinical incompetence," an academic inquiry, and not for disciplinary

reasons. Given that Conestoga Valley terminated its relationship with plaintiff and

forbade her from entering the school to finish her student teaching, SAC ¶ 26; MU

Memorandum, Exhibit G, the successful completion of which was a prerequisite to a

B.S.Ed., it is difficult to see how Millersville, from a purely academic standpoint, could

have awarded her a teaching degree or recommended her for teaching certification. See

Hennessey, 194 F. 3d at 250-51. The issue relates to plaintiff's competence, not her

conduct. Her conduct at Conestoga Valley had academic significance because it spoke to

her capacity to function professionally in a public school setting. Id.

Millersville accorded Snyder's academic failure with appropriate process. During the course of the semester, Ms. Reinking and Professor Garvin repeatedly informed Snyder of and documented their dissatisfaction with her student teaching. She was given opportunities to rectify her deficiencies. At the end of the semester, she met with Ms. Buffington, Ms. Reinking and Professor Girvin to discuss her insufficient improvement during the semester. That semester long poor performance caused her to fail student teaching. Snyder appealed to Dr. Bray pursuant to Millersville's policy on Academic Appeals. She submitted additional documentation and met with Dr. Bray to evaluate the issues. Dr. Bray resolved the complaint by granting her request to graduate with a B.A. SAC Exhibit M. Thereafter, Snyder presented her grievance to the University Provost, conceding that the meeting was an "academic hearing," and not a "disciplinary hearing." In the academic hearing, plaintiff submitted documentary evidence, was permitted to call witnesses, was accompanied by counsel and received a detailed written explanation of the bases for denying her appeal.

Millersville defendants, in consultation with Conestoga Valley officials, considered Snyder's semester-long problems at Conestoga Valley when adjudging her performance unsatisfactory and assigning her a failing grade in the Professionalism aspect of the teacher competencies. Millersville's decision to fail Snyder rested squarely on the faculty's academic judgment that she had neither completed the required assignments nor demonstrated the practical qualities necessary to perform efficaciously as a public school teacher. Plaintiff failed the student teaching practicum because of her

academic deficiencies during the entire semester and not because she violated the MU Code of Conduct.[10]  She was not accused of or sanctioned for misconduct.

Snyder received a failing grade in the practicum at Conestoga Valley and failed to satisfy the common teaching competencies required for certification by the PDE.  These are quintessentially scholastic reasons. That she received good grades in other courses and some positive reviews during the early stages of her practicum do not negate the fact that she failed the practicum because of well documented poor academic performance. From an academic standpoint, MU could not have recommended her for certification. Moreover, PDE's approved methodology for assessing the teaching competencies explicitly requires the certifying institution to evaluate a fledgling teacher's "Professionalism," MU Memorandum, Exhibit I, at 4; SAC Exhibit S. Snyder's deficient teaching and her unprofessional behavior throughout the semester, see MU Memorandum, Exhibits F, G and K, reasonably influenced MU that she was not qualified to teach.  Cf. Horowitz, 435 U.S. at 9, n. 6.

That MU faculty considered Snyder's problems at the cooperating school when adjudging her "Professionalism" inadequate and assigning her failing grades in teacher competencies did not transform its academic decision into a disciplinary one.  As with Hennessy's complaint that the reasons given for terminating the practicum involved his conduct, not his competence, and thus were disciplinary in nature, Snyder's complaint is groundless. See Hennessy, 194 F. 3d at 251.  MU's decision to fail Snyder rested only on the faculty's academic judgment that she had not demonstrated the practical qualities

---

[10] The MU Code of Conduct, attached to SAC as Exhibit W, describes behaviors for which students are disciplined at Millersville. For example, the Code punishes violations of criminal law, striking another person, sexually contacting another without consent, hazing, harassment, theft of property, etc. See § B.

necessary to perform effectively as a public school teacher.  This judgment, while involving some subjectivity, is within the sphere of constitutionally permissible academic decision making.   Because the action taken by MU was academic in nature, Snyder was entitled to, and received, the process due with academic actions.

This record leaves no doubt that plaintiff's academic record--her failure in student teaching at Conestoga Valley--was the determinative, if not the sole, reason for the University action. It cannot be doubted that the University's action was carefully and deliberately considered and processed and that Millersville satisfied due process. Snyder's due process claim should be dismissed.

**D.    Plaintiff's First Amendment Claim Should Be Dismissed**

**1.    Morse v. Frederick Bars Snyder's First Amendment Claim**

Counts I and II allege that defendants impinged upon plaintiff's First Amendment rights for posting the pirate photograph on her website. The claim should be dismissed under the recently announced decision of Morse v. Frederick, 127 S.Ct. 2618 (June 25, 2007), a/k/a the "BONG HiTS 4 JESUS" case. In Morse, a public high school student brought a § 1983 action against his principal and school board, alleging that his First Amendment rights had been violated by a suspension for waving a banner proclaiming "BONG HiTS 4 JESUS" at an off-campus activity. Reversing the United States Court of Appeals for the Ninth Circuit, the Supreme Court held that the school principal did not violate the student's right to free speech by confiscating a banner she reasonably viewed as promoting illegal drug use.

The Supreme Court affirmed that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings,"

26

Morse, 127 S.Ct. at 2622, citing Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986), and that the rights of students "must be 'applied in light of the special characteristics of the school environment.'" Morse, 127 S.Ct. at 2622, quoting Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988).

The Court concluded that, consistent with these principles, schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use. 127 S.Ct. at 2622. While the words on the student's banner, "BONG HiTS 4 JESUS," could be interpreted in many ways ("cryptic," offensive," "amusing," "nonsense"), Id. at 2624-25, the school district's interpretation of the words as promoting illegal drug use "is plainly a reasonable one" because the phrase on the banner could be reasonably understood as advocating the use of illegal drugs. Id. at 2625. Therefore, the school may take appropriate action against the student without offending the First Amendment.  Id. In so holding, the Court re-affirmed the principle that deterring drug use by schoolchildren is an "important-indeed, perhaps compelling" national interest and recognized that drug abuse can cause severe and permanent damage to the health and well-being of young people. Id. at 2628 (citations omitted).

The courts take an equally dim view of alcohol usage in schools. As Justice Stevens recognized in Morse, the effects of alcohol abuse are no less pernicious than the effects of illegal drug use. He wrote that "[g]iven the tragic consequences of teenage alcohol consumption--drinking causes far more fatal accidents than the misuse of marijuana--the school district's interest in deterring teenage alcohol use is at least comparable to its interest in preventing marijuana use." Id. at 2650 (Stevens, J., dissenting). Cf.  Hazelwood School Dist., 484 U.S. at 570 ("A school must also retain the

authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,'" quoting Fraser, 478 U.S. at 683.)

Application of these principles precludes Snyder's First Amendment claim. She alleges that Ms. Buffington, the Conestoga Valley supervisor, showed plaintiff the photograph from Snyder's myspace.com web page that portrays plaintiff wearing a party hat and holding a plastic cup, with the caption of "drunken pirate." SAC ¶¶ 30-31.[11] According to Snyder, Ms. Buffington criticized the photograph as "unprofessional," accused her of incompetence, stated that she should have been removed from student-teaching months earlier and barred her from entering the school. Id. ¶¶ 32-33. Days later, Dean Bray, according to plaintiff, "accused plaintiff of promoting underage drinking through her 'drunken pirate' photo." Id. ¶ 36.[12]

While the "drunken pirate" photograph, with or without the caption could be interpreted in many ways, SAC Exhibit R, Snyder alleges that school officials interpreted it as promoting underage drinking. SAC ¶ 36. Snyder was student teaching minors in a

---

[11] In a radio interview reported in "LancasterOnline," plaintiff admitted that the cup contained alcohol. www.http://local.lancasteronline.com/6/203818. MU Memorandum, Exhibit R.

[12] If the plaintiff's complaint pleads specific facts, those facts, taken as true for purposes of deciding the motion to dismiss, may create a defense to his claim. Gagliardi v. Clark, C.A. No. 06-20, 2006 WL 2847409 at * 4 (W.D.Pa. Sept. 28, 2006); Camero v. Kostos, 253 F.Supp. 331, 338 (D.N.J.1966) (granting motion to dismiss where plaintiff's complaint pled facts demonstrating defendant was subject to immunity). See ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 859 (3d Cir.1994); 5 Allen Wright & Miller, Federal Practice and Procedure § 1226 (3d Ed.2004). Where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck-he has pleaded himself out of court." Jefferson v. Ambroz, 90 F.3d 1291, 1296 (7th Cir.1996).

public high school and was expected to act as a role model.[13]  She concedes she posted

the photograph of herself on her myspace.com website, ¶¶ 30-31, and that her students

had viewed her webpage. MU Memorandum, Exhibit F; SAC Exhibit R. On May 4,

2006, she wrote in her "blog":

> First, Bree said that one of my students was on here looking at my page,
> which is fine. I have nothing to hide. I am over 21, and I don't say anything
> that will hurt me (in the long run). Plus, I don't think that they would stoop
> that low as to mess with my future. So, bring on the love! I figure a couple of
> students will actually send me a message when I am no longer their offical (sic)
> teacher. They keep asking me why I won't apply there. Do you think it would
> hurt me to tell them the real reason (or who the problem was)?

Id.

Ms. Snyder may be "over 21," but the children for whom she had responsibility in

her role as student teacher were not.  The Supreme Court's holding in Morse makes clear

that school officials have a responsibility for their students' welfare and may take steps to

safeguard them from conduct or speech that can reasonably be regarded as glamorizing,

encouraging or making alcohol usage acceptable to minor students.  With respect to

Snyder's posting, the Supreme Court's observation in Morse applies here as well:

"Gibberish is surely a possible interpretation of the words on the banner, but it is not the

only one, and dismissing the banner as meaningless ignores its undeniable reference to

illegal drugs." 127 S.Ct. at 2625.  School officials' interpretation that Snyder's posting

---

[13] As described in Millersville's Guide to Student Teaching, plaintiff was expected "to
maintain the same professional standards expected of the teaching employees of the
cooperating school"; to fulfill as effectively as possible every role of the classroom
teacher ..."; to be well-groomed and appropriately dressed as a member of the teaching
profession and to adhere to the Pennsylvania Code of Professional Ethics."  SAC, Exhibit
B at 7.

was unprofessional and may promote underage drinking "is plainly a reasonable one" and, thus, actions based on that interpretation did not offend the First Amendment.

**2.      Under <u>Pickering</u>, Plaintiff's First Amendment Claim Fails: Her Internet Posting Was Not On A Matter Of Public Concern.**

Counts I and II allege that defendants impinged upon plaintiff's First Amendment rights for posting the pirate photograph on her private website. Plaintiff alleges that she should be treated as a student vis-à-vis defendants and that <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506 (1969), sets the appropriate standard. This is incorrect. Plaintiff's claim falls under <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568 (1968), and <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983), because her status as a student teacher put her in the status of public employee.

<u>Hennessey v. City of Melrose</u>, 194 F. 3d 237 (1st Cir. 1999), involved a college student who failed the teacher certification program when the public elementary school where he had been assigned terminated his student teaching practicum due to the student's religious speech and criticism of the school's curriculum. The First Circuit Court of Appeals analyzed the student's First Amendment claim under the <u>Pickering</u> standard. The Court concluded that appellant's placement as a student teacher at a local public elementary school related to his role as a public university undergraduate. He was not at the elementary school to take the courses offered there and was not in any meaningful sense a pupil of the school. 194 F. 3d at 245. Rather, his position more nearly approximated that of an apprentice, that is, the elementary school relied on him in essentially the same way that it would rely on any teacher-in-training or teacher's aide. <u>Id</u>. He was there to master the rudiments of a profession and, in return, expected to work

with the primary teacher and other school personnel to implement the designated curriculum and to participate in class activities.  Though unpaid, the Circuit concluded, this apprentice-type relationship more closely resembles an employer-employee relationship than a school-pupil relationship. Id. The Circuit held that the employer-employee model furnished the best analogy and that the case law dealing with the First Amendment in the government employment context, rather than the school speech cases, provides the appropriate framework for inquiry.  Id.

In Watts v. Florida International University, 02-60199-CIV, 2005 WL 3730879 (S.D.Fla. 2005), Watts was enrolled in a graduate program in social work at Florida International University ("FIU"). In his last semester he was required to successfully complete a field practicum consisting of a semester-long supervised educational experience in an agency setting designed to provide him with an opportunity to develop and practice social work skills in his area of concentration.  Watts registered for the course, paid his tuition to FIU, and was assigned to complete the practicum at Fair Oaks Hospital under the supervision of an FIU graduate field instructor and advisor and a field instructor for FIU and/or Fair Oaks. Watts was not an employee of Fair Oaks during the practicum and was not paid a salary or provided with any other benefits by Fair Oaks. At all times, he was under the authority of FIU. Id., 2005 WL 3730879 at * 1. Watts was terminated from the practicum and from FIU's graduate program because of inappropriate speech to patients regarding religion.  Id. at * 2.

Watts brought a § 1983 claim alleging violation of his First Amendment under the rubric of student speech cases. The court rejected his argument and concluded that the correct analysis was under the public employment cases. Id. at * 3. The court agreed with

FIU that, despite Watts' student status with FIU, he "was like an apprentice, intern, or extern at Fair Oaks, where he had been placed to get actual field experience. While at Fair Oaks, he was expected to comport himself like those who were on staff in dealing with patients and others, and to abide by the institution's rules and procedures." Id. Thus, Watts' claim was governed by employee speech cases. Id. Because Watts failed to factually allege that his speech was on a matter of public concern, the court dismissed the amended complaint. Id. at * 4.  See Andersen v. McCotter, 100 F.3d 723, 726 (10th Cir.1996) (holding that a student intern, working for college credit in a penitentiary, was properly treated as a public employee rather than as a student in a suit alleging First Amendment violations against the Department of Corrections). See also Smith v. School District of Philadelphia, 158 F. Supp. 2d 599 (E.D.Pa. 2001) (Judge DuBois concluded that a First Amendment retaliation claim of a parent volunteer serving on a public high school evaluation organization should be analyzed under Pickering);  Rivero v. City & County of San Francisco, 316 F.3d 857, 864 (9th Cir.2002) (applying the public concern test in a case involving government retaliation against an independent contractor); Pinard v. Clatskanie S.D., 467 F. 3d 755, 767 n. 16 (9th Cir. 2006) (recognizing that Connick's public concern test has been applied in cases where the relationship between the plaintiff and the government was sufficiently similar to an employment relationship).

At Conestoga Valley, Snyder was expected to comport herself as a staff member in dealing with students, parents and others and to abide by the school's rules and procedures.  Plaintiff's status as a student teacher puts her in the status of public employee comparable to working as an apprentice, intern, or extern at Conestoga Valley, where she had been placed to get actual field experience.  Millersville's Guide to Student

Teaching, MU Memorandum, Exhibit A; SAC Exhibit B, makes clear that plaintiff was placed at Conestoga Valley not to take the courses offered there and that she was not a pupil of the school. Rather, her position paralleled that of an apprentice. Conestoga Valley relied on her in essentially the same way that it would rely on any teacher-in-training or teacher's aide.  She was there to master the fundamentals of the teaching profession and, in return, was expected to work with the primary teacher, Ms. Reinking, and other school personnel, such as Ms. Buffington, to implement the designated curriculum and to participate in class activities. Millersville's Guide to Student Teaching, at 7, provides that

- "…the Student Teacher needs to maintain the same professional standards expected of the teaching employees of the cooperating school";

- "The Student Teacher is urged … to fulfill as effectively as possible every role of the classroom teacher ...”

- "The Student Teacher is expected to be well-groomed and appropriately dressed as a member of the teaching profession and to adhere to the Pennsylvania Code of Professional Ethics."

- "The Coordinator, in consultation with the Cooperating Teacher and the University Supervisor, has authority to change or terminate the Student Teacher's assignment if professional conduct is not maintained";

- "During the semester of student teaching, each Student Teacher is expected to be in the assigned classroom every day the school is in session. The Student Teacher will follow the school calendar and the calendar furnished by the Office of Field Services… Student Teachers are expected to attend in-service meetings, faculty

> meetings and special school events (e.g. Parent-Teacher Conferences, I.E.P.
>
> Conferences, Open Houses)."

Id. Conestoga Valley terminated the relationship and forbade plaintiff from returning to

the school. SAC ¶ 26. As the cited cases reflect, case law dealing with the First

Amendment in government employment, rather than the public school student context,

provides the appropriate legal framework.

Applying public employment cases, to state a § 1983 claim predicated on the First

Amendment plaintiff must show that (1) she was engaged in a protected activity; (2)

defendants' retaliatory action was sufficient to deter a person of ordinary firmness from

exercising her rights; and (3) there was a causal connection between the protected activity

and the retaliatory action. Mount Healthy City Board of Education v. Doyle, 429 U.S.

274, 284-287 (1987). See Green v. Philadelphia Housing Authority, 105 F.3d 882, 885

(3d Cir. 1997).

Plaintiff must first establish that she engaged in an activity protected by the First

Amendment. Connick v. Myers, 461 U.S. 138, 147 (1983). See also Suarez Corp. Indust.

v. McGraw, 202 F.3d 676, 686 (4th Cir. 2000); Green, 105 F.3d at 885. See Pickering,

391 U.S. at 568 (to qualify as a protected activity, plaintiff's conduct must satisfy

balancing test).  The threshold requirement is that the activity must address a matter of

public concern. Connick, 461 U.S. at 146; Swineford v. Snyder County of Pennsylvania,

15 F.3d 1258, 1270 (3d Cir. 1994). See Pickering, 391 U.S. at 568.  To be considered a

matter of public concern, the conduct must relate "to any matter of political, social, or

other concern to the community." Connick, 461 U.S. at 146; Pickering, 391 U.S. at 568;

Swineford, 15 F.3d at 1270.  That, in turn, depends upon the "content, form, and context"

of the activity in question. <u>Connick</u>, 461 U.S. at 147-148; <u>Swineford</u>, 15 F.3d at 1270.  If

the activity in question is purely personal, it is not protected by the First Amendment.

<u>Brennan v. Norton</u>, 350 F.3d 399, 412 (3d Cir. 2003); <u>Swineford</u>, 15 F.3d at 1270, 1273

(First Amendment does not convert private complaints into constitutional cases). <u>See</u> <u>City</u>

<u>of San Diego v. Roe</u>, 125 S.Ct. 521, 525-26 (2004) (to touch upon a matter of public

concern, speech must be of legitimate news interest at the time it is made, i.e., it must be

a subject of general interest and of value and concern to the public).

  Whether speech is a matter of public concern is a question of law for the court.

<u>Brennan</u>, 350 F.3d at 414-416; <u>Green</u>, 105 F.3d at 885.  Even where the presence of

factual disputes would normally preclude the court from ruling as a matter of law,

Supreme Court precedent requires the trial court to do so. <u>Green</u>, 105 F.3d at 887-88. The

court does not reach the second step in the <u>Pickering</u> test, <u>i.e.</u>, causation, if it determines

that the plaintiff did not engage in protected activity. <u>Id.</u> 105 F.3d at 889.

  To evaluate whether plaintiff's internet posting falls within the ambit of matters of

public concern, it is instructive to refer to other cases which raise the issue of whether

speech was held to involve matters of public concern. The content of the speech may

involve a matter of public concern if it attempts "to bring to light actual or potential

wrongdoing or breach of public trust on the part of government officials." <u>Holder v. City</u>

<u>of Allentown</u>, 987 F.2d 188, 195 (3d Cir.1993). <u>See</u> <u>also</u> <u>Connick</u>, 461 U.S. at 148-153

(survey questions circulated by plaintiff assistant district attorney to other employees

concerning office transfer policy, office morale, need for grievance committee and level

of confidence in supervisors involved personal grievance and not a matter of public

concern); <u>Swineford</u>, 15 F.3d at 1271 ("[S]peech disclosing public officials' misfeasance

is protected."); <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 195 (3d Cir.2001) (investigator's speech in connection with his internal investigation of fellow law enforcement officers' alleged buying of previously leased county vehicles at below market price was on matter of public concern). "Disclosing corruption, fraud, and illegality in a government agency is a matter of significant public concern." <u>Feldman v. Phila. Hous. Auth.</u>, 43 F.3d 823, 829 (3d Cir.1994) (citation omitted); <u>Brennan</u>, 350 F.3d at 414-416 (speech regarding asbestos in fire stations was a matter of public concern, although speech concerning the speed at which township purchased uniforms and protective clothing was not).

Plaintiff's internet posting of herself wearing a pirate hat and drinking from a cup does not touch on matters of public concern. The Second Amended Complaint does not allege that her posting concerns a matter of public concern. Her claim fails for that reason alone. <u>See</u> <u>Watts</u>, at * 4. Plaintiff's posting does not concern government malfeasance or corruption. It is just a silly picture taken for plaintiff's and her friends' personal amusement. While there is nothing wrong in that, it beggars the imagination to consider that it touches on the kinds of weighty public matters designated for constitutional protection by the United States Supreme Court.

Plaintiff may suggest that the photograph's caption infers some malfeasance by school officials. Such a penumbra is not at all evident. The caption does not name or otherwise identify Conestoga Valley, MU or their teachers or administrators at all.  The caption does not claim that defendants engaged in malfeasance or that plaintiff was in any way displeased with their actions. Neither does the caption identify plaintiff except insofar as she is a nameless teacher with a personal gripe against a nameless authority. The caption, taken together with the photograph, merely reflects the undirected and

untargeted private complaining of an unidentified teacher. By no stretch of the imagination did the posting rise to the level of a matter of public concern at the time it was posted.  Plaintiff's claim should be dismissed under the <u>Pickering</u> analysis.

### 3.    Under School Speech Cases, Plaintiff Fails To State a Claim Because Her Posting Was Not Expressive Conduct Protected By the First Amendment

Assuming <u>arguendo</u>--but not conceding--that <u>Tinker</u>, applies, plaintiff's claim fails. In three seminal cases, the Supreme Court enunciated the standards for assessing whether a school's restriction of student speech is constitutionally permissible. From this trilogy—<u>Tinker</u>, <u>Bethel School District v. Fraser</u>, and <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260 (1988)--courts have distilled the following precepts:

(1)    Schools have wide discretion to prohibit speech that is less than obscene-to wit, vulgar, lewd, indecent or plainly offensive speech, <u>Fraser</u>, 478 U.S. at 683-85; <u>Hazelwood</u>, 484 U.S. at 272 n. 4;

(2)    If the speech at issue is "school-sponsored," educators may censor student speech so long as the censorship is "reasonably related to legitimate pedagogical concerns," <u>Hazelwood</u>, 484 U.S. at 273; and

(3)    For speech that is neither vulgar, lewd, indecent or plainly offensive under Fraser, nor school-sponsored under <u>Hazelwood</u>, the rule of <u>Tinker</u> applies. Thus, schools may not regulate such student speech unless it would materially and substantially disrupt class work and discipline in the school.   <u>Tinker</u>, 393 U.S. at 513. <u>See</u>, <u>e.g.</u>, <u>Saxe v. State Coll. Area Sch. Dist</u>., 240 F.3d 200, 214 (3d Cir.2001).

The factual permutations that occur in the school freedom of speech cases and the dozens of court decisions spawned therefrom are mind-boggling. For purposes of the

present Motion, however, those conundrums are not pertinent. Unlike the arresting Pennsylvania State Troopers in Egolf v. Witmer, 421 F. Supp. 2d 858, 867 (E.D.Pa. 2006) (thong-clad protestors formed human pyramid) (Diamond, J.) , appeal docketed, No. 06-2193 (3d Cir. April 7, 2006), plaintiff's posting the photograph on her website was not expressive conduct protected by the First Amendment. As the person seeking to engage in allegedly expressive conduct, it is plaintiff's burden to demonstrate that the First Amendment even applies. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, n. 5 (1984).

The courts reject "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." United States v. O'Brien, 391 U.S. 367, 376 (1968).  See Montanye v. Wissahickon School Dist., 218 Fed. Appx. 126, 130 (3d Cir. 2007).   Cf. Dallas v. Stanglin, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes-for example, walking down the street or meeting one's friends at a shopping mall-but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."). "To hold otherwise would be to create a rule that all conduct is presumptively expressive." Clark, 468 U.S. at 293, n. 5.

Expressive conduct is protected by the First Amendment only where "an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it," or if the nature, context and environment of the conduct "was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." Spence v. Washington, 418 U.S. 405, 410-11 (1974) (two-part "particularized message" test).  See Rumsfeld v.

FAIR, 126 S. Ct. 1297, 1310 (2006) (explaining that Supreme Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea…[W]e have extended First Amendment protection only to conduct that is inherently expressive"). "[T]he nature of appellant's activity, combined with the factual context and environment in which it was undertaken" are considered in determining whether the communicative aspects of conduct amount to speech. O'Brien, 391 U.S. at 376.

A sampling of Supreme Court cases on expressive activity gives an idea of the definition of protected activity. The First Amendment shields such acts as marching in Boston's St. Patrick's Day Parade, Hurley v. Irish-American Gay, Lesbian and Bisexual Group, 515 U.S. 557 (1995); saluting a flag (and refusing to do so), West Virginia Bd. of Ed. v. Barnette, 319 U.S. 624, 642 (1943); wearing an armband to protest a war, Tinker, 393 U.S. at 505-506; displaying a red flag, Stromberg v. California, 283 U.S. 359 (1931); "[m]arching, walking or parading" in uniforms displaying the swastika, National Socialist Party of America v. Skokie, 432 U.S. 43 (1977).

Parades, to choose one recent example of expressive activity, are more than "a group of people [who] march from here to there … to reach a destination." Hurley, 515 U.S. at 568. They are, instead, "public dramas of social relations, and in them performers define who can be a social actor and what subjects and ideas are available for communication and consideration." Id. (citation omitted). "Parades are thus a form of expression, not just motion, and the inherent expressiveness of marching to make a point explains our cases involving protest marches." Id. The expressive nature of a parade was central to the Court's holding. See Rumsfeld v. FAIR, 126 S. Ct. at 1309. See, e.g.,

Gregory v. Chicago, 394 U.S. 111 (1969) (procession to express grievances to the city government); Edwards v. South Carolina,  372 U.S. 229 (1963) (petitioners joined in a march of protest and pride, carrying placards and singing The Star Spangled Banner).

      In contrast to the expressive, almost communal, nature of a parade, the Court held that the conduct regulated by the Solomon Amendment that was the subject in Rumsfeld v. Fair, is not inherently expressive. 126 S.Ct. at 1310. Prior to the adoption of the Solomon Amendment's equal-access requirement for military recruiters, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. An observer who saw military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else. The expressive component of a law school's actions is not created by the conduct itself but by the speech that accompanies it. Id. at 1310-1311. The fact that such explanatory speech is necessary is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection under O'Brien. Id. at 1310. If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it. Id.

      Thus, in Montanye, supra, the Third Circuit affirmed Judge DuBois's dismissal of a First Amendment claim that plaintiff's "conduct in assisting an at-risk student cope with her emotional and psychological problems does not possess sufficient communicative elements to fall within the protection of the First Amendment."  218 Fed.

Appx. at 130. The Third Circuit agreed with the District Court's conclusion that while plaintiff's conduct in scheduling the student's therapy sessions, transporting her to those sessions and attending those sessions may have involved some "kernel of expression," there was no intent to convey any message, let alone a particularized message, supporting special education, and no likelihood that her interactions with her student could be "understood" as conveying such a message. Id.

Similarly in Villegas v. City of Gilroy, 484 F. 3d 1136 (9th Cir. 2007), the 9th Circuit Court of Appeals recently affirmed that motorcycle club members wearing vests adorned with a common insignia consisting of a skull with wings on either side and a top hat was not expressive conduct protected by the First Amendment. The Circuit upheld the district court's conclusion that there was no common message conveyed or likely to be understood by the wearing of the insignia. Id. at 1140-41.  See also Northern Indiana Gun & Outdoor Shows, Inc. v. Hedman, 104 F. Supp. 2d 1009, 1013-14 (N.D.Ind. 2000) (patrons having guns at the gun show to repair, show, and sell was not an expressive activity because it did not convey a particular message); Cabrol v. Youngsville, 106 F.3d 101, 109-10 (5th Cir. 1997) (plaintiff continuing to keep chickens in his yard despite new ordinance banning them was not expressive conduct because his actions would not communicate any particular message to viewers).

Plaintiff does not sustain the burden of showing that her internet posting is inherently expressive or an action otherwise protected by the First Amendment. Clark, 468 U.S. at 293, n. 5. It is hard to imagine how the single picture of her wearing a pirate hat and drinking from a plastic cup could conceivably be "sufficiently imbued with elements of communication" or to discern any specific expressive purpose that would

implicate the First Amendment. <u>Spence</u> at 409. Without putting too fine a point on it, plaintiff's picture reflects no expressive purpose and has no point whatsoever.  It does not convey any message--particularized or not--and no message would be understood by those who viewed it absent explanation. Where "explanatory speech is necessary [it] is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." <u>Rumsfeld v. FAIR</u>, 126 S. Ct. at 1311. Even with an explanation, it would be hard to discern any idea plaintiff may have intended to express. It is, after all, merely a photograph of plaintiff wearing a pirate hat and drinking from a plastic cup. Including the caption in the analysis does not help plaintiff's case. The ranting therein declaimed is vague, unclear and related to personal matters. It does not refer to any school or school personnel by name, position, responsibilities or conduct. It also does not identify plaintiff by name, title or position (although it does offer insight into plaintiff's "current mood" as "dorky").

Plaintiff alleges that her www.myspace.com website is "private." SAC ¶ 30. This implies that she never intended school officials or anyone other than select friends or students to view it. This concession undermines any possibility that her posting could be considered an "expressive message," which requires that someone be available to perceive the purported idea or that she intended to convey a particularized message. Like the proverbial tree falling in the empty forest that no one perceives, plaintiff's conduct--her internet posting--does not make any perceptible "noise." It has no relationship or interaction with any receptor in the environment.

Were the posting entitled to First Amendment protection, then anyone--student, government employee, or alleged whistleblower--could point to family photographs

posted on the internet and, in the event of some subsequent adverse academic or

employment action, fabricate a viable constitutional claim. Here, there was no intent to

convey a particularized message and no likelihood that any message would be understood

by anyone who viewed it. The context of the posting--a private website--was not imbued

with elements of communication to warrant First Amendment protection. Surely, the

framers of the First Amendment contemplated something loftier as deserving

constitutional protection than an inert pirate picture signifying nothing.

**E.      Plaintiff's Claim for Injunctive Relief Should be Denied**

Count II is a First Amendment claim under § 1983 against individual defendants

in their official capacities and is presumably for permanent injunctive relief. To obtain a

permanent injunction, a plaintiff must show: (1) actual success on the merits; (2)

irreparable harm to the movant if the injunction is not granted; (3) that granting injunctive

relief will not result in even greater harm to the non-moving party; and (4) that granting

relief will be in the public interest. Shields v. Zuccarini, 254 F. 3d 476, 482 (3d Cir.

2001). Because plaintiff's claim fails on the merits and, for the following reasons,  her

claim fails.


**1.      Snyder Lacks Standing Because She Does Not Allege Any Real
          Or Immediate Threat that she Will be Wronged Again**

Federal injunctive relief against state officials in § 1983 actions is an extreme

remedy. City of Los Angeles v. Lyons, 461 U.S. 95, 112 (1983). To have standing to seek

such relief, the party must show "irreparable injury, a requirement that cannot be met

where there is no showing of any real or immediate threat that the plaintiff will be

wronged again—a 'likelihood of substantial and immediate irreparable injury'" (citation

omitted). Id. at 111. In Lyons, the Supreme Court held that injunctive relief was not warranted where plaintiff could not show that he was realistically threatened by a possible repetition of the choke hold that Los Angeles police had applied to him. Absent such a showing, "Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." Id. See U.S. v. W.T. Grant Co., 345 U.S. 629, 633 (1953) (plaintiff must demonstrate "that there exists some cognizable danger of recurrent violation of [his] legal rights"); U.S. v. Or. State Medical Society, 343 U.S. 326, 333 (1952) ("[t]he sole function of an action for injunction is to forestall future violations"); Wessel v. City of Albuquerque, 299 F. 3d 1186, 1194 (10th Cir. 2002) ("must be "some cognizable danger of recurrent violation."); Wooden v. Board of Regents, 247 F. 3d 1262, 1283 (11th Cir. 2001) (university applicant who had been denied admission under university's past allegedly discriminatory policy, but who was later admitted as a transfer student, lacked standing to challenge current admissions policy); Anderson v. Davila, 125 F. 3d 148, 165 (3d Cir. 1997) (injunction not warranted where government contends it terminated surveillance of plaintiffs).

Here, plaintiff does not, and cannot, allege any real or immediate threat that she will be wronged again by defendants, i.e., that there is any 'likelihood of substantial and immediate irreparable injury." Plaintiff has graduated from Millersville and is not presently enrolled there. It is unlikely that she will ever enroll there again or ever need to face the individual defendants in any situation, let alone a situation comparable to that in which she found herself in May 2006.

2.     **The Eleventh Amendment Bars The Claim Because Plaintiff Does Not Seek Prospective Equitable Relief For Ongoing Violations Of Federal Law Under Ex Parte Young**

Plaintiff sues defendants in their official capacities in order to obtain a federal injunction mandating that defendants confer upon her a B.S.E degree and issuing the necessary documentation so she can obtain her Pennsylvania teaching certification. SAC ¶ 88.  The Eleventh Amendment bars federal jurisdiction over lawsuits against state officials acting in their official capacities when the state is the real party at interest. See Pennhurst State Sch. & Hosp., 465 U.S. at 101-02. It bars suit whether the relief sought is legal or equitable. Papasan v. Allain, 478 U.S. 265 (1986). However, there are three exceptions to Eleventh Amendment state immunity to lawsuits in federal court: (1) Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so through a valid exercise of its power; (2) a state has waived its immunity and consented to suit in federal court; and (3) the plaintiff "seek[s] prospective equitable relief for ongoing violations of federal law ... under the Ex Parte Young doctrine." Seminole Tribe of Fla., 517 U.S. at 55-56; Ex Parte Young, 209 U.S. 123, 159-60 (1908). As described at MU's  Memorandum, at 6-9, and MU's Reply Memorandum at 17-18, neither of the first two exceptions to state immunity applies. The only possible basis for an exception to immunity is pursuant to Ex Parte Young.

Ex Parte Young is a narrow exception, Pennhurst State Sch. & Hosp., 465 U.S. at 102; Sonnleitner v.York, 304 F. 3d 704, 718 (7th Cir. 2002), applying only to allegations of an ongoing violation of federal law, and where the relief sought is prospective and not retrospective. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 294 (1997). See Green v. Mansour, 474 U.S. 64, 68 (1985) (Eleventh Amendment bars notice relief where

no ongoing violation of federal law alleged); Rizzo v. Goode, 423 U.S. 362, 378 (1976) (reversing injunction against Philadelphia Police Department which would have instituted program to handle citizens complaints against police misconduct); Edelman v. Jordan, 415 U.S. 651, 666-68 (1974) (Eleventh Amendment bars award of injunction for past violation of federal law by state officials); Students for Conservative America v. Greenwood, 378 F. 3d 1129 (9th Cir. 2004) (student organization's lawsuit against university seeking a new election was not a request for prospective injunctive relief and was barred); Sonnleitner, 304 F. 3d at 718 (affirming motion to dismiss where allegations against state officials referred to a past rather than ongoing violation of federal law, i.e., that defendants improperly demoted plaintiff without due process). In Verizon Maryland Inc. v. Public Service Commission of Maryland, 122 S.Ct. 1753 (2002), the Supreme Court held that the exception requires a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Id. at 1760 (quotations omitted).

        Snyder fails to allege an ongoing violation of federal law or to seek relief properly characterized as prospective. She claims that in May 2006, because of her internet posting, defendants violated her First Amendment rights by failing to confer upon her a B.S.Ed. degree and by not issuing the necessary documentation for a Pennsylvania teaching certification. She does not allege an ongoing violation of federal law. The alleged violation occurred in May 2006 and has not occurred since.  Plaintiff seeks to re-visit the events of May 2006 and to have defendants replace her B.A. with a B.S.Ed. so that she can obtain certification—all retrospective relief. The remedy she seeks relates to a past rather than an ongoing violation of federal law. Because these allegations do not fit

within the narrow exception of <u>Ex Parte Young</u>, the official capacity claims are barred by the Eleventh Amendment.

**F.      Qualified Immunity Bars the § 1983 Damages Claim**

As argued above, plaintiff's constitutional rights have not been violated. If the court finds otherwise, then defendants are entitled to qualified immunity because a reasonable person would not have believed he was violating clearly established rights. The defense of qualified immunity shields government officials from liability whenever "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>McGreevy v. Stroup</u>, 413 F.3d 359, 364 (3d Cir. 2005), <u>quoting</u> <u>Harlow v. Fitzgerald,</u> 457 U.S. 800, 818 (1982). <u>See</u> <u>Behrens v. Pelletier</u>, 516 U.S. 299, 305 (1996); <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985).

Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." <u>Blackhawk v. Pennsylvania,</u> 381 F.3d 202, 215 (3d Cir. 2004).  It "is an entitlement not to stand trial or face the other burdens of litigation," and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage." <u>Bennett v. Murphy</u>, 274 F.3d 133, 136 (3d Cir. 2002), <u>quoting</u> <u>Mitchell v. Forsyth</u>, 472 U.S. 511 at 526 (1985).  <u>See</u> <u>Wright v. City of Philadelphia</u>, 409 F.3d 595, 599 (3d Cir. 2005).

Regardless of whether the rights at issue are ones that "a reasonable person would have known" or are "clearly established," the court must begin its evaluation of the qualified immunity defense by determining whether any constitutional rights have been violated. <u>Saucier v. Katz,</u> 533 U.S. 194, 201(2001). The court "must next determine whether [that right] was a clearly established one, about which a reasonable person would

have known." McGreevy, 413 F.3d at 364. "Clearly established" means 'some but not precise factual correspondence' between relevant precedents and the conduct at issue," although "officials need not predict the future course of constitutional law." McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Thomas v. Independence Twp., 463 F. 3d 285 (3d Cir. 2006). Defendants are entitled to qualified immunity if "a reasonable officer could have believed that the challenged conduct was lawful under the circumstances." Blackhawk, 381 F.3d at 215.

Courts have generally found the law to be "clearly established" only (1) where the "relevant principles" "apply with obvious clarity to the specific conduct in question"; or (2) where a "closely analogous case" holds the conduct unconstitutional and no "reasonable official could have distinguished" it. Hope v. Pelzer, 536 U.S. 730, 739-40 (2002); Galvin v. Hy, 361 F.3d 1134 (9th Cir. 2004); Paff v. Kaltenbach, 204 F.3d 425, 433 (3d Cir. 2000). The critical question in the qualified immunity analysis is whether the state of the law gave these defendants "fair warning," Hope, 536 U.S. at 741, that their conduct would violate the Constitution.

The question of qualified immunity requires that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition. . ." Saucier, 533 U.S. at 201.  Illustrating the level of specificity with which the constitutional right must be defined, the Saucier Court observed that "the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness . . . is not enough." Id. at 201-02. Rather, said the Court, "[t]he relevant,

dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. See Thomas v. Independence Twp., 463 F. 3d 285, 300 (3d Cir. 2006). In Thomas, 463 F. 3d at 300, the Third Circuit explained that the general proposition that "a reasonable official would know that directing or permitting the police to harass a citizen because of his race or ethnicity, through unjustified warrantless searches, intimidation, or otherwise, or participating in a conspiracy to do so, would violate an individual's constitutional rights" is too broad and abstract of a proposition for purposes of applying the qualified immunity analysis. The qualified immunity inquiry must be undertaken in light of the specific context of the case and not as a broad general proposition. Id.  See Brosseau v. Haugen, 125 S.Ct. 596, 599-600 (2004) (not clearly established "in this more particularized sense" that defendant was violating plaintiff's constitutional right).

   1.    **First Amendment**

       It is not even evident that the school speech cases apply in this case.  Instead, the appropriate legal framework is speech in public employment. In June 2005, the district court in Watts, wrote that "[t]here are relatively few cases on how to treat the First Amendment rights of a college or graduate student within the context of an internship, externship, residency or practicum. Those courts facing the issue, however, have ruled that Pickering governs." Watts, 2005 WL 3730879 at * 16 (citations omitted). One year later, in May 2006, there was still no clearly established law holding that Pickering and progeny did not govern claims alleging First Amendment violations asserted by student teachers. The state of the law did not give these defendants "fair warning" that their alleged conduct would violate the First Amendment.

Even applying school speech cases, defendants are still entitled to qualified immunity. Tinker's general rule that students have free speech that may not be regulated unless disruptive does not advance the analysis. The tests these cases implicate are complex and difficult to apply. "[A]cknowledge[ing] some lack of clarity in the Supreme Court's student-speech cases," the Second Circuit recently announced that "[i]t is not entirely clear whether Tinker's rule applies to all student speech that is not sponsored by schools, subject to the rule of Fraser, or whether it applies only to political speech or to political viewpoint-based discrimination." Guiles v. Marineau, 461 F. 3d 320, 326, 327 (2d Cir. 2006) (observing that considering the depictions of drugs and alcohol mixed with a picture of the President on the student's tee-shirt "are questions of first impression in this Circuit" ); See Porter v. Ascension Parish School Board, 393 F. 3d 608, 615 n. 22 (5th Cir. 2004) (reflecting uncertainty as to when courts should apply school-speech precedents); Baxter v. Vigo Cty. School Corp., 26 F.3d 728, 737 (7th Cir. 1994) (pointing out that Fraser "cast some doubt on the extent to which students retain free speech rights in the school setting").

Earlier this summer in Morse, Justice Breyer, concurring in part and dissenting in part, urged the Court to apply qualified immunity to the facts of that case because of the unsettled state of the case law. He observed that at the time of the confrontation between the student and officials, "[n]one of these cases [Tinker, Fraser and Kuhlmeier] clearly governs the case at hand," 127 S.Ct. at 2641, and that "the fact that this Court divides on the constitutional question (and that the majority reverses the Ninth Circuit's constitutional determination) strongly suggests that the answer as to how to apply prior law to these facts was unclear." Id.

Justice Stevens, dissenting, agreed that <u>Morse</u> may give rise to a fourth "seminal" case in the school speech "trilogy." Joined by Justices Souter and Ginsberg, he wrote that "this case … ends with the Court inventing out of whole cloth a special First Amendment rule permitting the censorship of any student speech that mentions drugs, at least so long as someone could perceive that speech to contain a latent pro-drug message." 127 S.Ct. at 2650. Justice Stevens thought it "unwise to create special rules for speech about drug and alcohol use." <u>Id</u>.

<u>Morse</u> may, indeed, create a new category of school speech cases, one that allows action against student speech that school officials perceive as encouraging alcohol or drug usage. For present purposes, however, the court does not need to confront those particularly vexing and insoluble issues. The court need merely recognize the unsettled state of First Amendment jurisprudence in school speech cases and, in light thereof, confer qualified immunity upon defendants. As Justice Breyer wrote "Teachers are neither lawyers nor police officers; and the law should not demand that they fully understand the intricacies of our First Amendment jurisprudence." 127 S.Ct. at 2639.

Furthermore, in the specific legal context of this case--free speech rights of student teachers on the internet--is a nascent field. There is virtually no case law touching on free speech rights in public schools in cyberspace. Legal research reveals no case pertinent to whether plaintiff's internet posting on her ostensibly private website constitutes expressive speech such that school officials would have any reason to believe the pirate picture falls within the contours of protected activity. The relevant general principles do not apply with obvious clarity to the specific conduct in question and research finds no "closely analogous case" holding defendants' conduct unconstitutional

such that a reasonable official could have believed his conduct was unlawful.

Moreover, there are no cases from the Supreme Court, the Third Circuit Court of Appeals or its district courts holding that an academic action taken by a Pennsylvania public university of giving a student teacher a failing grade in her teaching practicum and then not conferring upon her a teaching degree violates the First Amendment. Cf. Watts, 2005 WL 3730879 at * 9. In 2006 there was no clearly established law that would have put a reasonable university administrator on notice that Snyder's posting on the internet (public or private or some other legal status?) that consisted of a nonsense picture and some personal complaints about some unidentified authority was expressive conduct or about a matter of public concern. See Badia v. City of Miami, 133 F.3d 1443, 1445 (11th Cir.1998) ( "If it is unclear whether [the speech was] of the kind held to involve a matter of public concern, then [the defendant's] actions did not violate clearly established First Amendment rights and he is entitled to qualified immunity.").

### 2.    Due Process

Defendants are also entitled to qualified immunity on the due process claim. The Supreme Court has not yet decided whether a student at a state university has a constitutionally protected property interest in continued enrollment.  Both Ewing, 474 U.S. at 223, and Horowitz, 435 U.S. at 84-85, leave open the question of whether such an interest exists. In any event, the claim to such an interest is dubious. See Ewing, 474 U.S. at 229  (Powell, J., concurring).

Snyder's purported interest is especially tenuous because Millersville did not expel her, but awarded her a B.A. instead of the desired B.S.Ed. It is not clearly established that plaintiff has a protected interest in a B.S.Ed.  On the record, it is clear

that plaintiff was pursuing an academic appeal. She was enrolled in an academic clinical. Supervisors at Conestoga Valley criticized her for poor academic performance. Plaintiff was never accused of misconduct or behavior that was destructive of property or person. Plaintiff pursued an appeal to the Dean pursuant to Millersville's policy on Academic Appeals.  The school action was academic: she received a B.A. and not a B.S.Ed. She was not dismissed from the School of Education or from Millersville. She correctly characterized the meeting with Dr. Prabhu as an "academic hearing," and not as a "disciplinary hearing." Plaintiff was not eligible for a teaching degree only because she failed the student teaching clinical. Given the underlying allegations, it was reasonable for defendants to believe they were not violating clearly established rights. There are no cases from the Supreme Court, the Third Circuit Court of Appeals or its district courts holding that the actions taken by a Pennsylvania public university in this particular context violates the Due Process Clause. To the contrary, the cases make a compelling statement that MU defendants acted properly and legally in all aspects of this matter.

**F.     The State Law Claims Are Barred**

**1.     State Law Claims Are Barred By Sovereign Immunity.**

Plaintiff alleges three claims under State law: (1) violation of the Public School Code of 1949 against individual defendants (Count IV); (2) intentional infliction of emotional distress against individual defendants (Count V); and (3) breach of contract against Millersville University (Count VI). These claims are barred by sovereign immunity.

The constitutionally-based doctrine of sovereign immunity bars damages claims for alleged violations of state law, including intentional misconduct,[14] against the Commonwealth, its agencies and its officials and employees acting within the scope of their duties[15] except where the legislature provides otherwise.[16] 1 Pa. C.S. § 2310. See 42 Pa. C.S. §§ 8501, 8521-22.

The cases supporting this principle are legion. E.g., Boone v. Pa. Office of Vocational Rehabilitation, 373 F. Supp. 2d 484 (M.D.Pa. 2005)(sovereign immunity barred claim of intentional infliction of emotional distress against executive director of division where plaintiff had worked); McGrath v. Johnson, 67 F. Supp. 2d 499, 511 (E.D.

---

[14] The statute distinguishes between the immunity for a Commonwealth employee versus the immunity conferred by statute upon a municipal or other governmental employee. The immunity defense provided by the General Assembly to local agencies and their employees in 42 Pa.C.S. §§ 8541-8564 is lost to local agency employees where their actions constitute a "crime, actual fraud, actual malice or willful misconduct." 42 Pa.C.S. § 8550. See Shoop v. Dauphin County, 766 F. Supp. 1327, 1334 (M.D.Pa. 1991), aff'd, 945 F. 2d 396 (3d Cir. 1991), cert. denied, 502 U.S. 1097 (1992). See also LaFrankie v. Miklich, 618 A.2d 1145, 1149 n. 4 (Pa. Cmwlth.1992)  State employees retain immunity in such situations.

[15] Title 1 Pa. C.S. § 2310 provides in relevant part: "Pursuant to section 11 of Article 1 of the Constitution of Pennsylvania, it is hereby declared to be the intent of the General Assembly that the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit except as the General Assembly shall specifically waive the immunity." See Johnson v. Commonwealth of Pa. DOC, No. 92-5149, 1992 WL 392601, at *1 (E.D. Pa. Dec. 18, 1992).

[16] Sovereign immunity applies to all claims except for nine narrowly enumerated exceptions, none of which apply in this case. The categories are (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property;(4) Commonwealth real estate, highways and sidewalks;(5) potholes; (6) care, custody, or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines. 42 Pa. C.S. § 8522(b).  Tort claims and civil rights actions are not within these narrow exceptions. See Robinson v. Ridge, 996 F. Supp. 447 (E.D.Pa. 1997), aff'd, 175 F. 3d 1011 (3d Cir. 1999)

Pa. 1999), aff'd, 35 Fed. App'x. 357, 2002 WL 1271713 (3d Cir. 2002); Frazier v.

SEPTA, 868 F. Supp 757 (E.D.Pa. 1994) (state agency enjoys sovereign immunity from

claims for damages for intentional torts--fraud and intentional infliction of emotional

distress--and for negligent infliction of emotional distress); Shoop v. Dauphin County,

766 F. Supp. 1327 (M.D.Pa. 1991), aff'd, 945 F. 2d 396 (3d Cir. 1991), cert. denied, 502

U.S. 1097 (1992) (state trooper had sovereign immunity from suit with regard to civil

rights plaintiff's pendent state law claims of false imprisonment, assault and battery,

malicious abuse of process and intentional infliction of emotional distress); Heicklen v.

Hoffman, 761 A. 2d 207, 209 (Pa. Cmwlth. 2000); Ray v. Pennsylvania State Police, 654

A.2d 140 (Pa. Cmwlth Ct. 1995) (state trooper immunity from claims of negligent and

intentional infliction of emotional distress), aff'd, 676 A. 2d 194 (Pa. 1996); Maute v.

Frank, 441 Pa.Super. 401, 657 A.2d 985, 986 (1995) (state prison officials enjoy

sovereign immunity); Pickering v. Sacavage, 164 Pa. Cmwlth. Ct. 117, 642 A.2d 555,

559-60, appeal denied, 652 A.2d 841 (Pa. 1994) (state trooper acting within scope of

duties is protected by sovereign immunity from intentional infliction of emotional

distress and civil conspiracy claims); LaFrankie v. Miklich, 618 A.2d 1145, 1148-49 (Pa.

Cmwlth.1992) (state trooper has immunity for intentional torts--here, false arrest, abuse

of legal process and malicious prosecution--committed within scope of employment);

Faust v. Commonwealth Dep't of Revenue, 592 A. 2d 835, 839, 140 Pa. Cmwlth. 389

(1991), appeal denied, 607 A. 2d 257, 530 Pa. 647 (1992) (State and its employees acting

within scope of employment enjoy sovereign immunity for claims based upon the

Pennsylvania Constitution and for intentional torts); Martz v. SEPTA, 598 A.2d 580

(Pa.Cmwlth. 1991) (immunity for intentional acts of false imprisonment and malicious

prosecution); Yakowicz v. McDermott, 120 Pa. Cmwlth. Ct. 479, 548 A.2d 1330 (1988),

appeal denied, 565 A.2d 1168 (Pa. 1989) (sovereign immunity for defamation and

invasion of privacy).[17]

Plaintiff claims of violation of the Public School Code of 1949[18] and intentional

infliction of emotional distress against individual defendants and claim of breach of

---

[17] Even arguably improper conduct by a Commonwealth employee is within the scope of the employee's duties. Pennsylvania courts look to the general standard set forth in Restatement (Second) of Agency § 228 in determining whether an employee's act was undertaken within the scope of employment. Aliota v. Graham, 984 F.2d 1350, 1358 (3d Cir.), citing Butler v. Flo-Ron Vending Co., 383 Pa.Super. 633, 557 A.2d 730, 736 appeal denied, 523 Pa. 646, 567 A.2d 650 (1989), cert. denied, 114 S.Ct. 68 (1993); Advanced Power Sys. v. Hi-Tech Sys., No. 90 Civ. 7952, 1994 WL 116121, at *3 (E.D.Pa. Mar. 21, 1994). Under § 228, conduct of an employee is within the scope of employment if it is of the kind and nature that the employee is employed to perform; it occurs substantially within authorized time and space limits; and it is actuated, at least in part, by a purpose to serve the employer. Natt v. Labar, 543 A.2d 223, 225 (Pa. Cmwlth. 1988). See Advanced Power Sys. Inc., 1994 WL 116121, at *3. Where Section 228 is satisfied, an employee is considered as working within the scope of employment even if he has committed unlawful acts or acts contrary to orders, policies, procedures or standards "if they are clearly incidental to the master's business." Brumfield, at 381 (corrections officers who lied during the course of an official investigation and lied on false affidavits acted within the scope of their employment. The misconduct was incidental to agency business insofar as supervisors encouraged the officers to make false statements and plaintiffs did not allege that the officers' "conduct was not motivated at least in part by a purpose to serve the" agency). Even unauthorized, intentional or criminal acts may be within the scope of employment. Id.. See Aliota, 984 F.2d at 1358-59 (employee's defamatory statements against another employee were within the scope of employment because the statements, although forbidden or made in a forbidden manner, were made at least in part to serve the employer's purposes). Advanced Power Systems, 1994 WL 116121, at *3-5 (criminal acts were within the scope of employment since they furthered employer's purposes); Butler, 557 A.2d at 736-37 (supervisory employees who planted evidence and falsely accused another employee of a crime acted within the scope of their employment since misconduct was done at least in part to serve the employer).

[18] The Pennsylvania Legislature does provide some exceptions to sovereign immunity in its statutes. See Pennsylvania Human Relations Act, 43 P.S. § 955(a); Whistleblower Law, 43 P.S. § 1423(a); and the Pennsylvania Board of Claims, 62 Pa.C.S. §§ 1721, et seq. (for certain contract claims). The Public School Code does not provide for any exception.

contract against the University do not come within any of the exceptions to sovereign immunity and are barred.

The only nuance on sovereign immunity relates to the breach of contract claim against Millersville. The Pennsylvania legislature has created an exception to sovereign immunity in a limited category of breach of contract claim involving the Commonwealth. 62 Pa.C.S. § 1721, et seq. This section confers upon the Pennsylvania Board of Claims exclusive jurisdiction to arbitrate claims arising from certain limited categories of contracts with the Commonwealth identified in 62 Pa.C.S. § 1724. None of the categories delineated in 62 Pa.C.S. § 1724 applies to plaintiff's allegations. The claim clearly does not involve a contract entered into by a Commonwealth agency in accordance with 62 Pa.C.S. §§ 1721-1726 and filed with the Board in accordance with 62 Pa.C.S. § 1712.1 (relating to contract controversies); a written agreement executed by a Commonwealth agency and the Office of Attorney General agreeing to arbitrate disputes at the Board; an interest in real property; or a claim in which the Commonwealth is the claimant. Thus, the Board of Claims would not have jurisdiction over plaintiff's contract claim either.[19]

---

[19] Plaintiff alleges that Ross v. Penn State University, 445 F. Supp. 147 (M.D.Pa. 1978), SAC ¶ 101, supports the argument that the relationship between students and colleges is contractual. In Ross, however, the plaintiff was a paid graduate student with a written agreement with the University. Id. at 149. At bar, even if there were a contractual relationship, the Pennsylvania Board of Claims would have exclusive jurisdiction to hear the dispute. Ross, a 1978 case, was issued, decades before the present statute, 62 Pa.C.S. § 1721, et seq., which gives the Board of Claims exclusive jurisdiction over contract cases involving the Commonwealth.

**2.   The Pennsylvania School Code Does Not Create a Private Right Of Action**

Plaintiff's claim based on the Pennsylvania School Code ("Code") and its regulations must also fail. The Code does not contain an express right of action and courts agree that it does not contain an implied private right of action to pursue alleged violations of it. In <u>Coreia v. Schuykill County Area Vocational-Technical Sch. Auth.</u>, 2006 WL 1310879, at *11 (M.D. Pa. May 11, 2006), the district court held that a plaintiff does not have a valid cause of action to pursue alleged due process violations of the Code. <u>See</u> <u>Whipple v. Warren County School District</u>, 133 F. Supp. 2d 381, 383 (W.D.Pa. 2000); <u>Agostine v. School District of Philadelpha</u>, 527 A. 2d 193, 196 (Pa. Cmwlth. 1987);  Lindsay <u>v. Thomas</u>, 465 A.2d 122, 124 (Pa. Cmwlth. 1980).

**3.   Under The Eleventh Amendment Federal Courts Have No Jurisdiction To Review State Officials' Compliance With State Law**

The state law claims are barred because federal courts have no jurisdiction to review state officials' compliance with state law; plaintiffs may not rely on the supplemental jurisdiction of a federal court to sue a state official. <u>Pennhurst State School. v. Halderman</u>, 465 U.S. 89, 104-05, 120 (1984) (Supreme Court expressly held that the Eleventh Amendment bars federal courts from ordering state agencies or officials to comply with state law). <u>See</u> <u>Blake v. Papadakos</u>, 953 F. 2d 68, 73 n. 5 (3d Cir. 1992). <u>Accord</u> <u>Allegheny County Sanitary Authority v. USEPA</u>, 732 F. 2d. 1167 (3d Cir. 1984).

III.    **CONCLUSION**

For these reasons, Commonwealth defendants request that the Second Amended

Complaint be dismissed with prejudice.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:    s/s Barry N. Kramer
       BARRY N. KRAMER
       Senior Deputy Attorney General
       Identification No. 41624

       Susan J. Forney
       Chief Deputy Attorney General
       Civil Litigation Section

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Tel:    (215) 560-1581
Fax:    (215) 560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

I, Barry N. Kramer, hereby certify that on October 17, 2007, Millersville University's Motion To Dismiss Second Amended Complaint has been filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System. The ECF System's electronic service of the Notice of Electronic Case Filing constitutes service on all parties who have consented to electronic service:

Mark W. Voigt, Esquire
Plymouth Meeting Executive Campus
Suite 400
600 West Germantown Pike
Plymouth Meeting, PA 19462
mwvoigt2@aol.com


BY:    s/s Barry N. Kramer
         BARRY N. KRAMER