## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 07-1660 |
| | : | |
| MILLERSVILLE UNIVERSITY, J. BARRY | : | JURY TRIAL DEMANDED |
| GIRVIN, DR. JANE S. BRAY, and DR. VILAS | : | |
| A. PRABHU, | : | |
| Defendants | : | |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

I.   **ISSUES PRESENTED**

    A.   **Whether Stacy Properly States a Claim Against Defendants Girvin, Bray and Prabhu ("the Individual Defendants") in Their Individual Capacities Under 42 U.S.C. §1983 and The First and Fourteenth Amendments Since Their Dismissal of Stacy from Millersville University's ("MU's") School of Education Violated Her Right to Freedom of Speech?**

        1.   **Eleventh Amendment Immunity Does Not Apply to Plaintiff's Section 1983 Claims Since Plaintiff Brings Her Action Against the Individual Defendants in their Individual Capacities.**

    B.   **Whether Stacy Properly States a Claim Against the Individual Defendants in their Official Capacities for Injunctive Relief Based on Their Denial of Stacy's Free Speech Right?**

    C.   **Whether the Dismissal of Stacy by the Individual Defendants (in Their Individual Capacities) Without Proper Notice and a Fair Administrative Hearing Violated Stacy's Right to Procedural Due Process Under §1983 and The Fifth and Fourteenth Amendments?**

        1.   **Stacy's Claims Are Not Barred by Qualified Immunity**.

    D.   **Whether the Individual Defendants in Their Individual Capacities Violated the Public School Code by Expelling Stacy, *Inter Alia*, Without**

1

Dockets.Justia.com

> Reasonably Specifying in Advance the Offense and Penalty for Which She Was Held Accountable?

E.      Whether Stacy Properly States a Cause of Action Against the Individual Defendants (in Their Individual Capacities) for Intentional Infliction of Emotional Distress in View of the Outrageous and Extreme Intentional Misconduct they Perpetrated on Her?

F.      Whether Stacy Properly States a Cause of Action Against MU for Breach of Contract in View of MU's Failure to Award Her the B.S.E. Degree She Earned?

SUGGESTED ANSWERS TO ALL THE ABOVE:     YES.

II.      STATEMENT OF FACTS

A.      Factual Background.

The pertinent facts are set forth at length in the Second Amended Complaint ("2AC") of Plaintiff, Stacy Snyder ("Plaintiff" or "Stacy") and are well known to this Honorable Court. Briefly, Stacy overcame a high school pregnancy and single motherhood to two boys to enroll in MU in June, 2002. (2AC, ¶8.) There, she majored in Secondary English Education and enrolled in MU's School of Education, expecting to achieve her lifelong dream of becoming a teacher. Despite working and raising two children alone, Stacy maintained a grade point average of between 3.0 and 3.9. (*Id.*)

During her teacher training, Stacy successfully completed several "field experiences" in area public schools. One supervising teacher, Neil Weidman, lauded Stacy as "exceptionally professional" and predicted she "will become an excellent teacher." (*Id.*, ¶11.) Stacy made the Dean's list at MU, and MU's Dean lauded her as "one of [MU's] finest student scholars." (*Id.*, pp. 12-13.)

Stacy was scheduled to graduate from MU with her teaching degree in May, 2006. As her final requirement, she served as a student teacher at Conestoga Valley High School ("CV"). In his March 17, 2006 "mid evaluation," Stacy's supervisor at MU, J. Barry Girvin, awarded her the highest

mark in ethics. (2AC, ¶17.) Similarly, in her March 20, 2006 "mid evaluation," Nicole Reinking,

Stacy's cooperating teacher, awarded Stacy high marks in "professionalism." (*Id.*, ¶18.)

Admittedly, in their mid evaluations, Reinking and Girvin identified areas in which Stacy

needed remediation. Thereafter, Stacy's teaching performance improved dramatically. On April 3,

2006, Girvin extolled Stacy's "excellent" lesson plan. (*Id.*, ¶20.) In an April 18, 2006 note, Girvin

commended Stacy for her "great improvement in content" and "excellent CIRQL unit planning." (*Id.*,

¶23.) In a May 2, 2006 evaluation summary, Girvin rated Stacy "exemplary" in all areas. (*Id.*, ¶24.)


On or about May 8, 2006, Reinking, without notice or permission, snooped onto Stacy's web

page at www.myspace.com. (*Id.*, ¶29.) There, she discovered a picture of Stacy at a costume party

outside of school hours wearing a party hat and holding a plastic cup. (*Id.*, ¶30.) The photograph

does not show the cup's contents. (*Id.*) Stacy believes the photograph bore the insignia "drunken

pirate." (*Id.*) Importantly, Stacy's web site also contained the following "update:"

> "First, Bree said that one of my students was on here looking at my
> page, which is fine. I have nothing to hide. I am over 21, and I don't
> say anything that will hurt me (in the long run). Plus, I don't think
> that they would stoop that low as to mess with my future. So, bring
> on the love! I figure a couple of students will actually send me a
> message when I am no longer their official teacher. They keep asking
> me why I won't apply there. Do you think it would hurt me to tell
> them the real reason (or who the problem was)?" (*Id.*, ¶30; Exhibit
> "R", p. 2.)

On the afternoon of May 8, 2006, Reinking's supervisor, Deann Buffington, telephoned Stacy

at home. (*Id.*, ¶25.) She advised Stacy that an "issue" had just arisen concerning her

"professionalism" as a teacher. (*Id.*) Buffington then forbade Stacy from returning to CV until

Thursday, May 11, 2006. (*Id.*)

Stacy spoke to Girvin about the matter on May 10, 2006. Girvin explained only that someone delivered a picture of Stacy to Buffington. (2AC, ¶26.) Girvin refused to give Stacy any details, explaining only that she may lose her teaching certificate. (*Id.*)

Also on May 10, 2006, Girvin prepared Stacy's "final evaluation." (*Id.*, ¶27.) He rated Stacy "superior" or "competent" in all areas except "professionalism." (*Id.*) In that area, Girvin deemed Stacy's performance "unsatisfactory," explaining only that she made unspecified "errors in judgment that allegedly violated Pennsylvania's 'Code of Professional Practice and Conduct for Educators.'" (*Id.*)

On May 11, 2006, Stacy met with Girvin, Reinking and Buffington to review her final evaluation. Buffington showed Stacy the "drunken pirate" photograph. (*Id.*, ¶29.) She explained that Stacy's posting the photo, caption and text on her web page was "unprofessional." She asserted that, if any CV students ever viewed the web page, they might find the information offensive. (*Id.*, ¶31.) Buffington mentioned no students who saw the information. (*Id.*)

On or about May 12, 2006, Girvin prepared statewide evaluation form PDE-430 regarding Stacy's performance. (*Id.*, ¶33.) He awarded Stacy passing grades in all areas except "professionalism." There, Girvin deemed Stacy's performance "unsatisfactory," explaining only that Stacy lacked "integrity and ethical behavior." (*Id.*, ¶33.)

On May 12, 2006, Stacy met with Dr. Jane S. Bray, dean of MU's School of Education. (*Id.*, ¶35.) Bray accused Stacy of promoting underage drinking through her "drunken pirate" photo. (*Id.*) Then, without notice or a hearing, Bray stripped Stacy of her teaching degree. (*Id.*) Bray informed Stacy that she graciously would "allow" her to graduate with a Bachelor of Arts ("BA") degree, a rank Stacy had not pursued. (*Id.*, ¶36.) At graduation ceremonies the next day, Stacy received her

B.A. (*Id.*)

Stacy has learned that well-placed representatives of CV advised some or all of the individual defendants that CV would not accept any more MU student teachers if they did not punish Stacy swiftly and severely. (*Id.*, ¶39.) Since her expulsion from MU's School of Education, Stacy has been unable to obtain the teaching certificate she earned. She cannot find work as a teacher. Instead, she supports her two children by toiling as a nanny, a clothing store clerk and a waitress.

**B.    Procedural History**.

On or about April 25, 2007, Stacy (through undersigned counsel) filed a Complaint in this Honorable Court. Prior to any responsive pleading by Defendants, on or about May 13, 2007, Stacy filed a six-count Amended Complaint. Therein, Stacy alleged Defendants violated her right to free speech (Count I) and due process of law (Count II). Stacy further contended MU violated her rights under 42 U.S.C. §1983 by failing to train its employees in protecting the constitutional rights of its students (Count III.)

In Count IV of the Amended Complaint, Stacy contended Defendants' actions violated the Pennsylvania Public School Code of 1949 (the "School Code.") Stacy next alleged the individual Defendants' actions constituted intentional infliction of emotional distress (Count V). Lastly, Stacy contended that, by giving her a BA and not the BSE she earned, MU breached its contract with Stacy (Count VI).

By Order dated September 17, 2007, the Honorable Paul S. Diamond, Judge, granted in part Defendants' Motion to Dismiss. The Judge dismissed with prejudice Plaintiff's claims against MU under §1983. He granted Plaintiff leave to amend her Complaint regarding the §1983 claims against the individual Defendants so her demands were limited to injunctive relief. (Order, ¶13.)

5

The Judge then determined Plaintiff's claims against the individual Defendants in their individual capacity were ambiguous. (*Id.*, ¶14.) He granted Plaintiff 30 days to amend her Complaint against the individual Defendants in their individual capacities with adequate specificity. Finally, the Judge reserved ruling on Defendants' Motion to Dismiss Plaintiff's state law claims pending the filing of a Second Amended Complaint. (*Id.*, ¶16.)

On or about October 12, 2007, Stacy filed a six-count Second Amended Complaint against Defendants. In Count I, Stacy contended the individual Defendants (in their **individual capacities**) violated Stacy's right to freedom of speech by dismissing her for exercising her First Amended free speech rights in posting the "drunken pirate" photo and accompanying caption. (See, e.g., ¶¶74, 76-86.)

Next, Stacy claimed the individual Defendants (in their **official capacities**) violated her First Amendment rights by denying Stacy the BSE she earned and refusing the necessary documentation to the Pennsylvania Department of Education ("PDE") so Stacy can obtain her teaching certificate. (2AC, ¶¶77-78.) In Count III, Stacy contends the individual Defendants (in their individual capacities) violated her Fifth Amendment due process rights by taking away her property interest in a BSE without any meaningful notice or an opportunity to be heard. Stacy also contends the individual Defendants (in their individual capacities) violated the school code by expelling Stacy from MU's School of Education without proper administrative procedures. (Count IV.)

Stacy next alleges the individual Defendants (in their individual capacities) committed intention infliction of emotional distress through their shocking and egregious misconduct. (Count V.) Lastly, Stacy avers MU breached its contract with her by awarding Stacy a BA degree and not the BSE she earned. (Count IV.)

On or about October 17, 2007, Defendants filed a Motion to Dismiss the Second Amended Complaint.  Therein, the Defendants raised the same arguments Your Honor decided earlier.  Essentially, Defendants contend that, regardless of their malfeasance, the Eleventh Amendment and "official immunity" combine to give them absolute power to flaunt the Constitution and the laws of the United States and the Commonwealth of Pennsylvania.  This Memorandum of Law follows.

## III.    ARGUMENT

### Standard of Review

In its liberality, Rule 12(b)(6) erects a powerful presumption against dismissing pleadings for failure to state a cognizable claim for relief.  *Strand v. Diversified Collection Services, Inc.*, 380 F.3d 316 (8th Cir. 2004).  Such dismissals are disfavored and, in view of the "notice pleading" requirements of the Federal Rules of Civil Procedure, are not routinely granted.  *Gregson v. Zurich American Ins. Co.*, 322 F.3d 883, 885 (5th Cir. 2003).  A claim will only be dismissed under Rule 12(b)(6) if it appears beyond doubt that the pleader can prove no set of facts in support of the claim that would entitle him to relief.  *Hishon v. King and Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

A claim will not be dismissed merely because the trial court doubts the pleader's allegations or suspects he or she ultimately will not prevail at trial.  *Oatway v. American Int'l Group, Inc.*, 325 F.3d 184, 187 (3rd Cir. 2003).  Courts are especially hesitant to dismiss at the pleading stage those claims pressing novel legal theories, particularly where it could better examine the claims following development of the facts through discovery.  *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2005)

A. **Stacy Properly States a Claim Against the Individual Defendants in Their Individual Capacities Under 42 U.S.C. §1983 and The First and Fourteenth Amendments Since Their Dismissal of Stacy from MU's School of Education Violated Her Right to Free Speech.**

Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. §1983, imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Shuman, et al. v. Penn Manor Sch. Dist., et al.*, 422 F.3d 141, 146 (3rd Cir. 2005). In this case, it is beyond dispute that the individual defendants were acting under color of state law, specifically 24 P.S. §20-2001-A, *et seq.*, when they deprived Stacy of her BSE degree and teaching certificate.

The First Amendment provides "Congress shall make no law . . . abridging the freedom of speech, . . . ." The Fifteenth Amendment provides, in pertinent part:

**"Section 1"**

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property, without due process of law; . . . ."

\* \* \*

**"Section 5"**

"The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

The touchstone for First Amendment cases in the public school context is *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 21 L.Ed.2d 731, 89 S.Ct. 733 (1969). In *Tinker*, the Supreme Court established that a public school building was not off limits to free speech rights. *See Killion v. Franklin Regional Sch. Dist., et al.*, 136 F. Supp. 2d 446, 452 (W.D. Pa. 2001). In recognizing students' expressive rights, the *Tinker* court imposed a significant burden on

8

the school to justify punishment of speech by demonstrating ". . . that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Tinker*, 393 U.S. 503, 509 (citation omitted).

Since there was little evidence that Tinker's black arm band either actually or potentially disrupted in the school, the *Tinker* court found in favor of the student. (*Id.*) According to the Court, the Constitution required more than an "undifferentiated fear or apprehension of disturbance." (*Id.*, at 508.) Instead, the school must present evidence of a substantial disruption. (*Id.*)

Applying *Tinker*, Federal courts are loathe to find "substantial disruption" when the speech in question occurs off campus, over the internet. For instance, in *Killion*, *supra*, a high school student compiled a "top ten" list on his home computer disparaging the district's athletic director. (*Id.*, 136 F. Supp. 2d 446, 448). The student then e-mailed the list to his friends from his home computer. He never brought the list to school or distributed it on school premises. (*Id.*)

The *Killion* court found the First Amendment protected the student's speech. (*Id.*, pp. 455-456.) In finding no "actual disruption," the *Killion* court rejected the district's argument that the list could ". . . impair the administration's ability to appropriately discipline the students." (*Id.*, p. 456.) The court continued:

> "We cannot accept, without more, that the childish and boorish antics of a minor could impair the administrators' abilities to discipline students and maintain control. Accord *Tinker*, 393 U.S. at 508 ("in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"); *Klein v. Smith*, 635 F. Supp. 1440, 1442 ("the court cannot accept, however heartfelt it may presently be, [that] the future course of the administration of discipline . . . [will] dissolve, willy-nilly, in the face of the digital posturing this splenetic, bad-mannered little boy")." *Killion*, 136 F. Supp. 2d at 456.

In the case at bar, applying the above, the "drunken pirate" photo, caption and text did not substantially disrupt education at either MU or CV. Stacy's speech occurred off campus and was composed on her private, home computer. There is no evidence any students at either CV or MU even saw Stacy's posting. Moreover, Stacy did not produce her posting in connection with any class or school project. *Killion, supra*, citing *Emmett v. Kent Sch. Dist. No. 415*, 92 F. Supp. 2d 1088 (W.D. Wa. 2000). Further, Stacy's speech did not threaten anyone. Although Stacy's criticisms undoubtedly upset certain CV and MU administrators, her comments did not threaten anyone. *Killion* at 455. Accordingly, under the above cases, Stacy's speech enjoys First Amendment protection.

MU next contends Stacy's web posting is not protected speech because it could have offended "the children for whom she had responsibility." (MU Brief, p. 29.) However, school officials may only punish lewd or indecent speech "to make the point to pupils that such speech is wholly inconsistent with the 'fundamental values of public education.'" *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 686-687; *Killion*, 136 F. Supp. 2d at p. 456. Moreover, where the allegedly lewd and obscene speech occurs off school grounds, schools cannot punish the students absent exceptional circumstances. *Killion, supra; Thomas v. Bd. of Educ., Granville Central Sch. Dist.*, 607 F.2d 1043 (2nd Cir. 1979).

In the case at bar, Stacy's speech and expression was neither lewd nor obscene. The photo does not depict the contents of the plastic cup. MU and CV merely concluded from the "drunken pirate" caption that the cup contained alcohol. Even if it did, Stacy was 25 years old when the photo was taken. She broke no laws whatsoever by drinking an alcoholic beverage in her free time.

The individual defendants infantilize the "children" at CV. In reality, the students who,

theoretically, could have seen Stacy's posting are in high school.  It is ridiculous for anyone to pretend that seeing a plastic cup that may or may not contain alcohol would in any way shock them. In fact, in just a year or two, these "children" will be serving in the army, voting and otherwise assuming the responsibilities of adulthood.    If they are unprepared for life in the "marketplace of ideas," then MU and CV have failed miserably in their educational mission.  The Constitution protects Stacy's free speech.

MU next contends Stacy does not enjoy First Amendment protection because the "drunken pirate" photo, caption and text is not "inherently expressive." (MU Brief, pp. 37-43.)  MU claims Stacy's web posting resembles a meaningless parade, "reflect[ing] no expressive purpose and ha[ving] no point whatsoever." (*Id.*, p. 42.)

However, MU's argument ignores the "drunken pirate" caption and the meaningful text accompanying Stacy's photo.  In her commentary, Stacy raises concerns about the improper motives of the individual defendants and other teachers and administrators at CV and MU.  (2AC, Exhibit "R".)  Far from meaningless, her expressions are precisely what the framers of the Constitution sought to protect when the penned the First Amendment.

Even focusing just on the photo, it is well established that symbolic speech enjoys First Amendment protection.  For instance, in *Klein v. Smith*, 635 F. Supp. 1440 (D. Me. 1986), the court struck down the suspension of a student who gave his teacher "the finger" after school hours and off school grounds.  The *Klein* court reasoned ". . . the First Amendment protection of freedom of expression may not be made a casualty of the effort to force feed good manners to the ruffians among us." (*Id.* at 1441-1442.)

In the case at bar, Stacy's photo symbolizes the rebellious spirit of youth.  It underscores the

importance of sucking the marrow of life while one is young, before job, family and other adult responsibilities sap the free spirit.  This message resonates with young adults even if MU's teachers and administrators are incapable of understanding it.  Under the above cases, the "drunken pirate" photo constitutes protected free expression.

MU claims the Supreme Court's recent decision in *Morse v. Frederick*, 127 S.Ct. 2618 (June 25, 2007) supports its summary dismissal of Stacy.  (MU Brief, pp. 26-29.)  However, the facts of *Morse* (the "Bong Hits for Jesus" case) are easily distinguishable from those at hand.  In *Morse*, students displaying an arguably pro-drug use banner at a school function during school hours.  (*Id.*, at p. 2622.)  Here, Stacy posted a photo on her private web page, not out in the open.  She did so outside of school hours.  Also, Stacy's posting arguably refers to the use of alcohol, a completely legal activity for a 25-year-old adult like her.  Moreover, the *Morse* court noted the students displayed the banner in question for the benefit of television cameras covering a high-profile media event.  (*Id.*, p. 2622.)  Here, MU presented no evidence that any students saw Stacy's web posting.

Further, in *Morse*, the school suspended the students in question for eight days pursuant to Board Policy Number 5520, which provides: "The Board specifically prohibits any assembly or public expression that . . . advocates the use of substances that are illegal to minors. . . . ."  (*Id.*, p. 2623.)

Here, neither MU nor CV has policy covering either social alcohol consumption among student teachers or internet postings like Stacy's.  Without any policy, those potentially affected have no advance warning that their behavior may be subject to discipline.  Is a student teacher who has a drink with dinner at a restaurant subject to discharge?  What if a student in her class is in the restaurant?  Clearly, the individual defendants intend to parlay the prevailing climate of fear involving

12

anything remotely attached to drug use into a *carte blanche* to expel students whenever they choose. MU's Motion to Dismiss must fail.

MU then avers Stacy enjoys no free speech rights since her student-teaching assignment at CV magically transformed her, "for all intents and purposes," from a tuition-paying, finals-cramming student into an unpaid "public employee." (MU Brief, pp. 31-34.) This argument, however meritless, presents a question of fact for the jury. Stacy has the right for a judge or jury to decide the nature of her relationship with individual defendants. Since factual questions remain, the Court must deny individual defendants' motion. *See Carino v. Stefan*, 376 F.3d 156, 159 (3rd Cir. 2004).

Initially, it goes without saying that an employment relationship requires an "employee" and an "employer." Here, individual defendants cannot decide whether Stacy was an "employee" of CV or MU. They initially claimed CV was Stacy's "putative employer." (MU original brief, p. 26.) In its present brief, individual defendants cleverly removed that phrase. (MU brief, p. 34.) Individual defendants apparently hope vaguely referring to Stacy is a "public employee" will obscure this fatal flaw.

Assuming *arguendo* that the Court seriously considers MU's claim, the evidence overwhelmingly shows Stacy was not a "public employee" of either CV or MU. Under Pennsylvania law, the relationship between student and university is contractual. *Ross v. Penn State Univ.*, 445 F. Supp. 147, 152 (M.D. Pa. 1978); *Strank v. Mercy Hosp. of Johnstown*, 383 Pa. 54, 117 A.2d 697 (1955). Thus, the Court must look to MU's official publications and policies to determine its legal relationship with Stacy. *Ross, supra*, 445 F. Supp. at p. 152.

In particular, MU publishes *A Guide For Student Teaching* ("the Guide",) which it distributes

to all its student teachers, including Stacy.  (See Exhibit "B" hereto[1]; see also, Prabhu letter to Snyder

dated March 26, 2007, Exhibit "BB" to 2AC, p. 1.)  According to the Guide, student-teaching

assignments are merely an extension of the student's undergraduate experience.  For instance:

> "The overall policies in regard to student teaching are determined by the various teacher education departments, with the approval of the dean of the School of Education [specifically, Bray].  The administration of student teaching is a **joint responsibility of [MU's] coordinator of field services and the education faculty** of the professional education unit."  (Exhibit "B," p. 7 of 25; emphasis added)

The Guide goes on to provide:

> "Assignments for student teaching locations are made by the coordinator **in cooperation with [MU] departmental personnel**, and administrators and teachers in cooperating school districts.  **Student teachers are assigned to cooperating teachers, not to schools or school districts.**  Student teachers are responsible for arranging their own transportation to and from their school assignments."  (*Id.*; emphasis added.)

Importantly, MU considers **the student teacher a guest, not an employee, of the

cooperating school.**  (*Id,* p. 7 of 25)  The Guide mentions nothing about MU's recently invented

employer/ employee relationship.  Rather, MU expects student teachers to continue their education

by "[accepting] every task as a potential learning experience."  MU emphasizes that "receiving

compensation for student teaching is also forbidden," again belying its novel theory.  (*Id.*, p. 9 of 25.)

Individual defendants' proposed "employer/ employee" relationship has other obvious defects.

---

[1] Courts considering Rule 12(b)(6) motions may consider "undisputably authentic documents," provided the authenticity of the documents is not challenged, the documents are attached to the brief and plaintiff's claims are premised on the documents.  *Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144, 145 (3rd Cir. 1997.)  Here, MU makes the Guide available on its website, and Prabhu referred to it as authoritative in his March 26, 2007 letter.  (Exhibit "BB" to the Amended Complaint.)  Thus, MU cannot dispute the Guide's authenticity.  This Honorable Court should consider the Guide in ruling on MU's motion to dismiss.

Does MU or CV maintain workers' compensation insurance for its student-teachers? Is MU and/or CV responsible if a student teacher is involved in an automobile accident in the course and scope of her "duties?" Are student teachers covered by collective bargaining agreements applicable to other "employees?" Of course not.

MU directs the court to *Hennessey v. City of Melrose*, 194 F.3d 237 (1st Cir. 1999), to support its claim. (MU Brief, pp. 30-31.) However, the facts of *Hennessey* are entirely different from those in the case at bar. Initially, the *Hennessey* court only considered whether the **cooperating school** (in this case, CV) violated plaintiff's First Amendment rights by terminating his student teaching assignment. (*Id.*, p. 244.) The court specifically did not address any First Amendment claims plaintiff raised against the individual defendants in their individual capacities. *Id.*

Next, the cooperating school in *Hennessey* contended plaintiff engaged in "erratic behavior" and made numerous improper remarks **during class.** (*Id.*, p. 243.) Here, the "drunken pirate" incident occurred **outside of school**. Therefore, the *Hennessey* court scrutinized plaintiff's allegedly protected speech much more closely than is warranted here.

Further, the court in *Hennessey* found the relationship between **the cooperating school** and the student teacher more closely resembled that of master/apprentice than pupil/school. (*Id.*, p. 245.) Here, Plaintiff brings her claims against the individual defendants in their individual capacities, not the cooperating school.

Moreover, the *Hennessey* court never considered the contractual relationship between the parties. Here, MU's student handbook specifically prohibits the creation of any employer/ employee relationship between the student teacher and the cooperating school. (Exhibit "B," p. 7 of 25.) It emphasizes that student teachers are assigned to cooperating teachers, not to schools or school

15

districts.  (*Id.*)  The Guide stresses that the student teacher is "a representative of the university," not an employee and not an affiliate of the cooperating school.  Lastly, because *Hennessey* is a First Circuit case, its erroneous holding is not binding on this Honorable Court.

MU's reliance on *Watts v. Florida International University*, 02-60199-CIV, 2005 WL 3730879 (S.D. Fla. 2005) is similarly misplaced.  (MU Brief, pp. 31-32.)  Watts is an unpublished opinion from a faraway district court.  It has no precedential or even persuasive value.  Moreover, there is no evidence FIU maintained a student code of conduct like MU's, specifying Stacy's ongoing student/ college relationship there.

Finally, *Watts* relied on violations of "the institutions rules and procedures."  (MU Brief, p. 32.)  Here, neither MU nor CV had any remotely applicable rules and procedures in place.  Since, *Hennessey* and *Watts* are inapplicable to the present case, the court should deny individual defendants' creative attempt to dodge their First Amendment responsibilities.

Assuming *arguendo* that the Court considers her a "public employee" of MU, Stacy still has an actionable First Amendment claim.  To state a §1983 claim under the First Amendment in an employment context, a plaintiff must show (1) she engaged in a protected activity; (2) defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising her rights; and (3) a causal connection between the protected activity and the retaliatory action.  *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 284-287 (1987).  (MU Brief, p. 26.)

Initially, the "drunken pirate" photo, caption and text clearly constitute protected speech.  In the text accompanying her photo, Stacy hints that she decided not to apply for a teaching position at CV because of malfeasance by individual defendants as well as other officials and teachers.  (2AC, Exhibit "R.")  Misconduct in the public schools and universities is a matter of public concern.

16

*Connick v. Myers*, 461 U.S. 138, 147 (1983). Stacy's speech threatens to bring to light potential wrongdoing or breach of public trust by CV and MU officials. *Holder v. City of Allentown*, 987 F.2d 188, 195 (3rd Cir. 1993). Additionally, the Third Circuit has recognized that speech disclosing malfeasance by public officials is protected under the First Amendment. *Swineford v. Snyder County of Penna.*, 15 F.3d 1258, 1270 (3rd Cir. 1994). Thus, the first prong of the §1983 test is satisfied.

Next, individual defendants dismissed Stacy from its School of Education in response to her exercising her First Amendment rights. Stacy now toils at low-paying, menial jobs to support her family. Clearly, the threat of financial ruin and the denial of one's lifelong dream constitutes retaliatory action sufficient to deter a person of ordinary firmness from speaking out against individual defendants. Thus, the second prong of the test is met.

Finally, individual defendants expelled Stacy from the School of Education just days after discovering the photo, caption and text in question. Individual defendants told Stacy they did so because of the photo. Clearly, there is a "causal connection" between the protected activity and the retaliatory action. Accordingly, Stacy meets the third prong. Based on the above, even under MU's "employer/employee" theory, Stacy has stated a cause of action for a First Amendment violation.

1.    **Eleventh Amendment Immunity Does Not Apply to Plaintiff's Section 1983 Claims Since Plaintiff Brings Her Action Against the Individual Defendants in their Individual Capacities.**

Individual defendants claims that, as a state institution, under the Eleventh Amendment, MU is immune from liability even for misconduct that violates the First, Fifth and Fourteenth Amendments. However, Eleventh Amendment immunity does not bar claims against state officials in their individual capacities. For instance, in *Melo, et al. v. Hafer, et al.*, 912 F.2d 628 (Third Circuit 1990), various Plaintiffs sued the auditor general of Pennsylvania and other state officials under 42

17

U.S.C. §1983, alleging their discharge from employment was political and therefore violated their due process and First Amendment rights.  (*Id.*, p. 630.)  Plaintiffs sought, *inter alia*, monetary relief.  (*Id.*)  Defendants moved for summary judgment, contending Plaintiffs' claims were barred by the Eleventh Amendment.  (*Id.*, p. 632.)

The *Melo* court held that the Eleventh Amendment does not bar Plaintiffs' claims for damages against Defendants **in their individual capacities**.  (*Id.*, p. 637.)  Citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the *Melo* court observed:

> "The *Will* court's conclusion that §1983 suits could not be brought against state officials in their official capacity followed from the court's earlier Eleventh Amendment decisions.  Although the *Will* court did not have occasion to consider the status of personal capacity suits against state officials under §1983, we conclude, borrowing the same Eleventh Amendment jurisprudence that the *Will* court looked to, **that because personal capacity suits against state officials are actions against the individual and not the state, state officials sued for damages in their personal capacities are "persons" under §1983 and therefore subject to suit."**  (*Melo*, 912 F.2d at p. 635. [emphasis added])

The *Melo* court went on to find the "Gurley Plaintiffs" explicitly stated their monetary claims were against Hafer in her individual capacity.  (*Id.*, p. 636.)  Moreover, Hafer raised the defense of qualified immunity, which is only available to government officials when they are sued in their personal, not official, capacity.  (*Id.*)  Because of this, the *Melo* court found the "Gurley Plaintiffs" properly stated their claims against Hafer in her individual capacity.  (*Id.*, pp. 635-636.)

The Third Circuit's decision in *Melo* governs the present matter.  Like the "Gurley Plaintiffs" in *Melo*, Stacy explicitly states she seeks monetary damages from the individual Defendants **in their individual capacities**.  (Second Amended Complaint, p. 21.)  The individual Defendants understand they are being sued in their personal capacities as evidenced by their raising the defense of qualified

18

immunity in the Motion to Dismiss.  Indeed, Stacy's Complaint specifies each act done by the individual Defendants in their personal capacities which form the basis for her claims.  (See, e.g., 2AC, ¶¶26-37.)

Further, immunity from suit "is a fundamental aspect of the sovereignty which the states enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the convention **or certain Constitutional amendments**."  *Northern Ins. Co. v. Chatham County*, 547 U.S. 189, 190, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006) (emphasis added.)

In this regard, the Supreme Court has held that the Fourteenth Amendment supersedes the state sovereignty embodied in the Eleventh Amendment.  For instance, in *Fitzpatrick, et al. v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), petitioners, present and retired male employees of the state of Connecticut, sued the State Employees Retirement Commission for back pay pursuant to Congressional legislation enacted under §5 of the Fourteenth Amendment. (*Id.*, p. 453.) The state contended the Eleventh Amended precluded such claims. (*Id.*)

The *Fitzpatrick* court rejected the state's sovereign immunity claim, finding that well-established Constitutional jurisprudence:

> ". . . has sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the states.  The legislation considered in each case was grounded on the expansion of Congress's powers - with the corresponding diminution of state sovereignty - found to be intended by the framers and made part of the Constitution upon the state's ratification of those amendments, . . . .  It is true that none of these previous cases presented the question of the relationship between the Eleventh Amendment and the enforcement power granted to Congress under §5 of the Fourteenth Amendment **but we think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of §5 of the Fourteenth Amendment.**  In

that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority." (*Id.*, pp. 455-456; emphasis added.)

Similarly, in *Seminole Tribe v. Florida, et al.*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Court reaffirmed that states enjoy no sovereign immunity in actions brought under the Fourteenth Amendment:

> "In *Fitzpatrick*, we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal powers struck by the Constitution. We noted that §1 of the Fourteenth Amendment contained prohibitions expressly directed at the states and that §5 of the amendment expressly provided that "the Congress shall have power to enforce, by appropriate legislation, the provision of this article." **We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that §5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that amendment**." (*Id.*, at p. 59; emphasis added.)

The Supreme Court has, on numerous occasions, applied the Bill of Rights with equal force to state and federal action. For instance, in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 657 (1965), the court held the Fifth Amendment's privilege against self-incrimination applied to actions in state court. In reaching this decision, the *Malloy* court cited prior Supreme Court decisions which:

> ". . . [held] immune from state invasion every First Amendment protection for the cherished rights of mind and spirit -- the **freedoms of speech**, press, religion, assembly, association, and petition for redress of grievances." (*Id.* at 1492; emphasis added.)

Citing *Malloy*, in *Siebert v. Missouri*, 542 U.S. 600, 607, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court found:

20

> "[t]he **Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement**--the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." (*Id*., emphasis added.)

Given the above, the individual defendants' absurd argument that they can ignore Stacy's civil rights under the Bill of Rights merely because MU is an arm of a "sovereign state" must fail.

In its original Brief, MU cited numerous cases in which sovereign immunity barred plaintiffs from suing certain arms of Pennsylvania government under various federal statutes. (MU original Brief, pp. 6-9.) For instance, in *O'Hara v. Indiana Univ. of Penna., et al.*, 171 F. Supp.2d 490 (W.D. Pa.), the court held that the Eleventh Amendment bars plaintiff's suit under Title VII of the Civil Rights Act of 1964 against the state university for whom she taught. (*Id.*, at 495.)

However, each of those cases involved Congressional action under its general law-making authority, Article I of the Constitution. None involved actions by Congress pursuant to Section 5 of the Fourteenth Amendment. Moreover, none held the Eleventh Amendment and sovereign immunity barred plaintiffs from suing the state or its administrative arms for Constitutional violations under the Fourteenth Amendment**.** (MU original Brief, pp. 6-9.)

In this regard, the Court in *Seminole Tribe* reasoned:

> "*Fitzpatrick* was based upon a rationale wholly inapplicable to the Interstate Commerce Clause, viz., **that the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution, operated to alter the preexisting balance between state and federal power achieved by Article III and the Eleventh Amendment**." (*Seminole Tribe*, at 1128; emphasis added.)

Here, Stacy's free speech and due process claims rest on the First and Fifth Amendments, respectively, as applied to the states through the Fourteenth Amendment. Under *Fitzpatrick* and

*Seminole Tribe*, sovereign immunity does not apply to these claims.

Abrogation of sovereign immunity here fosters essential public policy concerns. The Bill of Rights sets forth the most fundamental beliefs in American society. The Founding Fathers endured a long and bloody revolutionary war to ensure that all citizens would enjoy both freedom of speech and the right to due process of law. Years later, our nation fought a terrible Civil War to ensure no state could ignore the rights of any of its citizens, black or white, under the Constitution. The Fourteenth Amendment, once and for all, enshrined the primacy of the federal government over the states.

Under the individual defendants' twisted vision of the Constitution, any state agency could ignore the Bill of Rights with impunity. States could restore slavery, enact religious prohibitions, eliminate free speech or seize the life, liberty or property of their disfavored citizens with impunity. Under this view of the Eleventh Amendment, since states enjoy absolute sovereign immunity, no aggrieved citizen could challenge such decisions in State or Federal Court. This Honorable Court should not sanction such a catastrophic result. The Motion to Dismiss should be denied.

**B.    Stacy Properly States a Claim Against the Individual Defendants in their Official Capacities for Injunctive Relief Based on Their Denial of Stacy's Free Speech Right.**

In *Melo*, *supra*, the court held that: " . . . a §1983 claim for reinstatement may be maintained against Hafer in her official capacity . . . ." (*Melo*, 912 F.2d at 637.) Following *Melo*, this Honorable Court, in its September 18, 2007 Decision, stated:

> "Accordingly, with regard to Plaintiff's §1983 claims against Defendants Dr. Jane S. Bray, J. Barry Girvin, and Dr. Vilas A. Prabhu in their official capacities, Plaintiff shall be granted 30 days to amend her request for relief so that it is limited to injunctive relief only." (*Id.*, ¶13.)

22

Stacy followed the court's Order precisely, demanding the individual Defendants, in their official capacities, (1) withdraw Plaintiff's BA and issue her the BSE she earned; and (2) take all necessary steps to ensure PDE issues Plaintiff the initial teaching certificate she deserved. (2AC, p. 21.)

Courts routinely consider reinstatement as an element of injunctive relief. (*See, e.g., Francis v. Joint Force Headquarters National Guard*, 2007 U.S. App. LEXIS 21513 (3rd Cir. September 7, 2007); *Huertas, et al. v. City of Camden, et al.*, 2007 U.S. App. LEXIS 19358 (3rd Cir., August 10, 2007).)

MU erroneously avers Stacy's claim for the injunctive relief of reinstatement is equivalent to a preliminary injunction. (MU Brief, pp. 43-44.) To the contrary, Plaintiff only seeks reinstatement as an equitable remedy at the conclusion of this litigation. Thus, the four-step test for preliminary injunctive relief cited by MU is irrelevant. Plaintiff's claims for reinstatement under *Melo, supra*, should stand.

C.    **The Dismissal of Stacy by the Individual Defendants (in Their Individual Capacities) Without Proper Notice and a Fair Administrative Hearing Violated Stacy's Right to Procedural Due Process Under §1983 and The Fifth and Fourteenth Amendments.**

The Fifth Amendment provides, in pertinent part: "No person shall . . . be deprived of life, liberty or property without due process of law; . . . ." It is well established that students at public schools enjoy a " . . . legitimate entitlement to a public education as a property interest which is protected by the due process clause [of the Constitution] and which may not be taken away for misconduct without adherence to the minimum procedures by that clause." *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725, 733-734 (1975).

23

Under Pennsylvania's Administrative Code, "education is a statutory right and students must be afforded all appropriate elements of due process if they are to be excluded from school." 22 Pa. Code §12.8(a) (2005). Thus, on the basis of state law, Stacy has a legitimate entitlement to her public university education. (*Id.; See also, Bd. of Regents v. Roth*, 408 U.S. 564, 577, 33 L.Ed.2d 548, 92 S.Ct. 2701 (1972) (finding that on the basis of Ohio state law, appellees had a legitimate claim of entitlement to a public education).) *Shuman, et al. v. Penn Manor Sch. Dist., et al.*, 422 F.3d 141 (3rd Cir. 2005).

Admittedly, the Supreme Court has not directly applied *Goss* to public universities. *See Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 88 L.Ed.2d 523, 106 S.Ct. 507 (1985). However, in *Goss*, the Supreme Court observed:

> " . . . The lower federal courts have uniformly held the due process clause applicable to decisions made by tax supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion." *Goss*, 419 U.S. at p. 576, fn. 8.

Absent direct Supreme Court guidance, the Third Circuit has held that a student's dismissal from a public university implicates property rights. For instance, in *Stoller v. Coll. of Medicine*, 562 F. Supp. 403, 412 (M.D. Pa. 1983) *aff'd without opinion*, 727 F.2d 1101 (3rd Cir. 1984), the court upheld plaintiff's constitutionally protected interest in continuing his medical education. Other circuit courts of appeals have reached a similar conclusion. *See, e.g., Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988). Thus, the "property interest" prong is satisfied.

Individual defendants cavalierly dismis any deprivation Stacy endured by its awarding her a BA instead of a BSEd as "virtually nonexistent." However, Stacy suffered a tremendous loss in earning power due to MU's wrongful actions. Rather than teaching America's youth as she trained

to do, Stacy feeds her family by toiling as a waitress and a clothing store clerk. Evidence at trial will establish Stacy's lost earning potential in the hundreds of thousands of dollars. Moreover, she has suffered a tremendous loss of job satisfaction. Clearly, Stacy has met the "deprivation" prong of the §1983 test.[2]

Next, due process usually requires at a minimum that a deprivation of property **be proceeded by** a notice and an opportunity for a hearing appropriate to the nature of the case. *Goss, supra*; *Ross, supra*, at p. 153. The Supreme Court has distinguished between "disciplinary" and "academic" dismissals as follows:

> "Misconduct and failure to attain a standard of scholarship cannot be equated. A hearing may be required to determine charges of misconduct, but a hearing may be useless or harmful in finding out the truth concerning scholarship. There is a clear dichotomy between a student's due process rights in disciplinary dismissals and in academic dismissals." *Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 90, 55 L.Ed.2d 124, 98 S. Ct. 948 (citations omitted).

In the case at bar, individual defendants clearly dismissed Stacy for disciplinary reasons. According to MU's Student Code of Conduct, students are subject to "disciplinary sanction" when, either on or off campus, they allegedly violate MU's "regulations," including a) "violation of federal, state or local law;" b) "allegations of academic dishonesty;" and c) "conduct threatening the welfare of others. (2AC, ¶50.) In its final evaluation, individual defendants faulted only Stacy's "professionalism," not her academic skills. (*Id.*, ¶51.) They went on to allege that Stacy, in some

_____

[2]On or about October 25, 2007, the *Philadelphia Inquirer* published an article detailing the chronic teacher shortage in the School District of Philadelphia. Apparently, the District desperately lacks between 110 and 160 certified teachers. Stacy is ready, willing and able to step in and meet this need. It is deplorable that individual defendants, tasked with training and developing public school teachers, are spending so much taxpayer time and money fighting to preventing Stacy from reaching her goal and fulfilling this critical need.

unspecified way, violated "local, state and federal laws, and regulations." (*Id.*)

Similarly, MU's Student Code of Conduct provides for "disciplinary sanction" against students who "interfere with orderly university operations" engaged in "public drunkenness," or commit "deliberate acts that interfere with the use of university electronic resources." Since by its own definitions, MU dismissed Stacy for "disciplinary reasons," she is entitled to a full disciplinary hearing.

Given the above, MU failed by a wide margin to offer Stacy due process. Initially, a "fundamental requirement of due process is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306 (1950). Here, individual defendants refused to notify Stacy of the reasons for her dismissal until she met with Bray on May 12, 2006. (2AC, ¶35.) Even then, individual defendants did not reveal the identity of Stacy's accuser. They did not even give Stacy a copy of the "drunken pirate" photo caption and text which formed the basis for Stacy's dismissal. *Id.* Since individual defendants failed to meet Constitutional notice requirements, their dismissal of Stacy was improper.

Apart from grossly improper notice, the individual defendants violated Stacy's right to a fair and impartial hearing. In its Student Code of Conduct, MU guarantees all students subject to "disciplinary" action the right to question witnesses, examine evidence and documents presented, introduce witness testimony, testify on their own behalf under oath, consult with an advisor and conduct the hearing "in a timely fashion." (2AC, Exhibit "W," p. 3 of 5.) MU afforded Stacy none of these rights. (*Id.*, ¶¶29-37.)

In its Brief, individual defendants wisely do not claim they provided Stacy with "disciplinary"

due process. Rather, it contends it afforded Stacy sufficient "academic" due process.

In *Ewing*, the court explained: "When judges are asked to review the substance of a **genuinely academic decision**, they should show great respect for the faculty's professional judgment." *Ewing*, 474 U.S. at 225 (emphasis added.) As a result, courts require less stringent procedural requirements in such cases. *See Horowitz*, 435 U.S. at 86.

Initially, whether the Constitution required "disciplinary" or "academic" due process under the facts presented is a question for the jury. The Court should decline to decide this issue as a matter of law as part of a Rule 12(b)(6) Motion.

Regardless, the case at bar does not involve a "genuinely academic decision." Individual defendants treated the "drunken pirate" incident as a "violation of state laws and rules" and a "breach of professionalism." (See, e.g., 2AC, ¶50.) These claims do not require any "expert evaluation of cumulative information" to "[find] out the truth as to [Stacy's] scholarship." *Mauriello v. Univ. of Medicine and Dentistry of New Jersey, et al.*, 781 F.2d 46, 50 (3rd Cir. 1986). Rather, MU's existing student disciplinary procedures, if followed, were more than sufficient to find the truth behind Stacy's dismissal. Individual defendants' rush to dismiss Stacy without resorting to those procedures underscores its willful misconduct as alleged in Stacy's Second Amended Complaint. Thus, the court should deny individual defendants' request to apply the "academic" due process standard.

Even assuming *arguendo* that the Court applies "academic" due process, individual defendants still denied Stacy due process. In *Mauriello*, the court upheld the University's academic dismissal of plaintiff because she:

> " . . . was informed of her academic deficiencies, was given an opportunity to rectify them during a probationary period before being dismissed, and was allowed to present her grievance to the graduate

27

committee." (*Id.*, 781 F.2d at p. 52.)

Similarly, in the unpublished opinion of *Manning v. Temple Univ.*, 157 Fed. Appx. 509, 515; 2005 U.S. App. LEXIS 26483 (3rd Cir. 2005), the Third Circuit upheld plaintiff's academic dismissal since:

> "Manning was given fair warning that she had been placed on probation and was in danger of dismissal. She presented her position to an eight member board, and a vote of that board was required for her dismissal. Manning was also permitted a limited appeal to the dean. . . . All relevant information about Temple's appeals process was contained in the student handbook, which was easily available to Manning." *Manning*, *supra*.

Individual defendants claim they notified Stacy of her academic deficiencies through her mid-term evaluation. (MU Brief, pp. 15-21.)    However, in her mid-term conferences, individual defendants never placed Stacy on probation or otherwise advised her that she would lose her teaching certificate if she did not improve her performance. Rather, the mid-year evaluation identified weaknesses in Stacy's classroom performance, not her "professionalism."  (2AC, Exhibit "K.") Individual defendants encouraged Stacy, explaining that many students struggle in the first half of their internships.

In response, Stacy improved her performance dramatically.  In fact, in his May 2, 2006 evaluation, days before Stacy's ouster, Girvin rated her as "exemplary" in all areas. (*Id.*, Exhibit "P.") Then, in his final form PDE-430, Girvin awarded Stacy passing grades in all "academic" areas.  (*Id.*, Exhibit "S.") The only area in which Girvin failed Stacy was "professionalism," directly resulting from the "drunken pirate" incident.  (*Id.*)  Importantly, in all prior evaluations, MU rated Stacy at least satisfactory in "professionalism."  (*Id.*, Exhibits "D" - "P".)

As the above demonstrates, individual defendants never informed Stacy of any alleged

deficiencies in "professionalism" before dismissing her from the School of Education. They never gave Stacy any opportunity to rectify any poor "professionalism" prior to her dismissal. Before her ouster, individual defendants denied Stacy any meaningful opportunity to present her grievance about her "unprofessionalism" to a graduate committee or other impartial fact finder. *Mauriello* at p. 52.

Next, individual defendants claim they afforded Stacy proper "academic" due process because, eight months later, they allowed Stacy to complain about her mistreatment to Prabhu. (MU Brief, p. 21.) However, public universities must conduct least a preliminary hearing prior to depriving a student of her protected interest, that is, before the expulsion or suspension of a student from school. *Gorman*, 837 F.2d at pp. 12-13. In *Mauriello* and *Manning*, the state universities allowed the unfortunate plaintiff a hearing **before** the academic dismissal.

Here, individual defendants conducted no such preliminary hearing. Stacy's belated hearing before Prabhu afforded her no meaningful due process. Prabhu refused to allow counsel to address him, much less question either Stacy or MU witnesses. (2AC, ¶¶ 57, 64-66.) Individual defendants did did not present Stacy with the evidence it used against her. *Id*. **Individual defendants never considered imposing any lesser punishment on Stacy such as written or oral reprimand, probation, repeating the practical, suspension, etc.** Individual defendants did not keep any transcript of the "hearing," and testimony was not under oath. *Id*. Since individual defendants' "kangaroo court" did not even meet the relaxed standards of "academic" due process, Stacy states a claim under the Fifth and Fourteenth Amendments.

### 1.    Stacy's Claims Are Not Barred by Qualified Immunity.

Individual defendants contend qualified immunity bars Stacy's §1983 damages claims. (MU Brief, pp. 47-53.) In a suit against public officials for alleged Constitutional violations, a court

29

considering qualified immunity must first determine the following:  Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a Constitutional right?  *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). In its brief, MU wisely does not dispute that Stacy's First, Fifth and Fourteenth Amendment claims meet this first prong of the qualified immunity test.

Next, since Plaintiff establishes a Constitutional violation, the court must inquire whether the right was "clearly established." (*Id.*, p. 201.)  In considering this prong, the court must inquire whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted. (*Id.*, p. 202.)

In the case at bar, individual defendants claim Stacy's First Amendment rights were not "clearly established" since "there is virtually no case law to touching on free speech rights in public schools on the internet." (MU Brief, p. 36.)  This is untrue.  *Killion, supra*, addresses this topic in great detail.  Further, in *J.S., a minor v. Bethlehem Area Sch. Dist.*, 757 A.2d 412 (Pa. Cmwlth. 2000), the court affirmed a student's expulsion because he created a website on his home computer entitled "teacher sux."  Beyond internet related free speech, there is a plethora of cases outlining students' rights in free speech cases both on and off campus.  (See First Amendment discussion, *supra*.)

Moreover, Bray and Prabhu hold doctorate degrees, while Girvin has a master's degree.  All individual Defendants are high-ranking officials in a public university.  Any claim that these well-educated professional educators were unaware that all citizens, including Stacy, hold a First Amendment right to free speech is extremely disingenuous.

Individual defendants' claimed qualified immunity against Stacy's due process allegations is

equally meritless.  MU devotes at least a page of its Student Code of Conduct to disciplinary procedures.  (Amended Complaint, Exhibit "S.")  It is laughable to suggest individual defendants were unaware of these requirements.  Indeed, discovery may reveal that one or all of them wrote the Student Code.

MU next contends Bray, Prabhu and Girvin did not know the difference between "disciplinary" due process" and "academic due process."  (MU Brief, pp. 36-37.)  Again, these officials run a multi-million dollar public university.  They are well aware of this basic distinction, yet they chose to ignore it in Stacy's case.  This Honorable Court should hold them accountable for their misdeeds.

Qualified immunity is designed to protect police officers who are often forced to make split second judgments about the amount of force that is necessary in a particular situation.  *Saucier*, 533 U.S. at 204-205.  Here, individual defendants have the State System of Higher Education's general counsel's office as well as the Pennsylvania Office of Attorney General at their disposal.  In fact, experienced attorneys from those powerful agencies have been actively involve in this case from the outset.  If they so desired, Bray, Prabhu and Girvin had plenty of time to consult their attorneys about any Constitutional questions.  Clearly, they either received bad legal advice or chose to ignore counsel altogether in their rush to punish Stacy.

Moreover, qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law."  *Malloy v. Briggs*, 475 U.S. 335, 341, 89 L.Ed.2d 271, 106 S.Ct. 1092 (1986).  Since the individual Defendants fall into one or both of these categories, they are not entitled to hide behind qualified immunity and deny Stacy her day in court.

D.    **The Individual Defendants in Their Individual Capacities Violated the**

**Public School Code by Expelling Stacy, *Inter Alia*, Without Reasonably Specifying in Advance the Offense and Penalty for Which She Was Held Accountable?**

In its Brief, individual defendants admit MU it is a public university under the School Code, 24 P.S. §§20-2001, *et seq.* (MU Brief, p. 7, fn. 3.) As such, individual defendants are bound by the School Code's disciplinary regulations for public universities, which provide, in pertinent part:

> "Subject to the stated authority of the board [of trustees] and the council [of trustees], each [state university] president shall have the following powers and duties:
>
> * * *
>
> (4)    To establish policies and procedures for the admission, **discipline and expulsion** of students which shall be consistent with policies of the board and the local council." 24 P.S. §20-2010-A(4) (emphasis added).

Consistent with this mandate, the legislature provides explicit disciplinary due process requirements for all students in public universities. 22 Pa. Code §505.1, *et seq.* Specifically:

> "Each university president, with trustee approval, shall create rules of student conduct and judicial procedure, consistent with this chapter which shall provide substantive rules **that define with reasonable specificity disciplinary offenses, penalties or sanctions** and procedure guidelines to adjudicate rules offenses." 22 Pa. Code §505.1.

In this case, individual defendants created no policy addressing student internet use, either on or off its campus. (2AC, ¶95(a).) As a result, Stacy had no idea that her posting the "drunken pirate" photo caption and text violated any of MU's rules and regulations. Worse, the lack of a policy allowed individual defendants to choose whatever sanction they wanted against Stacy. **It is outrageous that MU could impose the "death penalty" of denying Stacy her teaching career just days before graduation when either a reprimand or probation would have been the**

32

**appropriate sanction.**   If individual defendants openly created and freely disseminated such a draconian internet usage policy, the MU community would have rebelled against it.   This is a fundamental due process violation.

Individual defendants violated Stacy's due process rights under the Pennsylvania Code in other ways as well.  They failed to publish any student internet rules and regulations in its student handbooks and other publications, in violation of 22 Pa. Code §505.2.  Additionally, the Pennsylvania Code provides procedural guarantees for student disciplinary hearings, guaranteeing students the rights to:

> "(1)   Reasonably specific advanced written notice of charges containing a description of the alleged acts of misconduct, including time, date and place of occurrence and the rules of conduct allegedly violated by the student.
>
>                          * * *
>
> (3)   An opportunity for submission of written, physical and testimonial evidence and for reasonable questioning of witnesses by both parties.
>
>                          * * *
>
> (6)   Maintenance of a written summary or audiotape record of the hearing at university expense, . . . .
>
> (7)   A decision based upon evidence sufficient to make a reasonable person believe that a fact sought to be proved is more likely true than not."  22 Pa. Code §505.3

Additionally, the Pennsylvania Code provides for only limited interim suspensions:

> "The president or a designee may suspend a student from the university, including the student's privilege to enter a university facility or property pending the final disposition of the student's case

if it is determined that the student's continued presence constitutes **an immediate threat of harm to the student, other students, university personnel or university property.** If a student is suspended under these conditions, **a hearing shall be convened within ten working days**, unless extenuating circumstances warrant an extension, in which case a hearing shall be provided at the earliest possible date." (22 Pa. Code §505.9. - emphasis added.)

Here, individual defendants followed none of these procedures. They never published any internet usage guidelines in its student handbooks and other publications. *See* 22 Pa. Code §505.2. Before expelling Stacy from its School of Education, individual defendants never presented Stacy with any remotely specific charges, written or otherwise.

Moreover, Stacy's only course work at MU during the spring semester of 2006 was her internship at CV. By banning Stacy from her internship, individual defendants effectively suspended Stacy from MU without notice or a hearing. Despite this, they never made any determination that Stacy's conduct made her an "immediate threat" in any way whatsoever. 22 Pa. Code §505.9. Likewise, individual defendants never convened the required due process hearing within ten working days.

Lastly, the "disciplinary hearing" individual defendants offered Stacy was grievously inadequate. Individual defendants only reluctantly convened the hearing upon insistence of Stacy's counsel in February, 2007, nine months after Stacy's expulsion. Individual defendants never provided Stacy with any written notice of charges. 22 Pa. Code §505.3(1). Prabhu denied Stacy any opportunity to question witnesses during the hearing. Girvin, Reinking and Buffington never attended the hearing, and Stacy had no chance to compel their testimony.

Further, Prabhu was hardly an "impartial" fact finder, since he took his orders directly from Bray. Individual defendants neither created nor maintained any written summary or audiotape record

34

of the hearing.  As a result, Prabhu's predetermined decision was insufficient to make any reasonable person believe in the credibility of the proceedings.  22 Pa. Code §505.3(1)-(9).  Accordingly, Stacy has stated a cause of action individual defendants under Pennsylvania's Public School Code.

Individual defendants contend Stacy's state law claims, including those brought under the School Code, are barred by sovereign immunity.  (MU Brief, pp. 52-54.)  As discussed *supra*, sovereign immunity does not bar Stacy's claims since they are based upon the First, Fifth and Fourteenth Amendments to the Constitution, not upon Congress' general Article I powers.

Admittedly, in *Lindsay v. Thomas*, 77 Pa. Commw. 171, 465 A.2d 122 (Pa. Cmwlth. 1983), the Pennsylvania Commonwealth Court held the School Code did not provide for a "monetary remedy" based on a defendant's violation thereof.  (*Id.*, at 123.)  Similarly, in *Whipple v. Warren County Sch. Dist.*, 133 F. Supp. 2d (381 W.D. Pa. 2000), the court refused to permit an independent cause of action for "money damages" based on the violation of the School Code.  (*Id.*, at 383; MU Brief, p. 58.)  However, research reveals no cases (nor has MU's counsel cited any) prohibiting courts from ordering the injunctive relief of reinstatement based on a defendant's violation of the School Code.  To this extent, individual defendants' Motion to Dismiss should be denied.

      **E.**      **Stacy Properly States a Cause of Action Against the Individual Defendants (in their Individual Capacities) for Intentional Infliction of Emotional Distress in View of the Outrageous and Extreme Intentional Misconduct they Perpetrated on Her?**

Under Pennsylvania law, defendants commit the tort of intentional inflection of emotion distress ("IIED") by engaging in conduct which is so outrageous in character, and so extreme in degree, that it extended beyond the bounds of decency and is utterly intolerable in a civilized society. *See Cox v. Keystone Carbon Co., et al.*, 861 F.2d 390, 395 (3rd Cir. 1998).

35

In the case at bar, the misconduct committed by individual defendants more than meets this standard. Girvin, Bray and Prabhu expelled Stacy from MU's School of Education after Stacy spent four years less four days pursuing her dream of teaching. They did so in retaliation for Stacy's posting a photograph, caption and text on her private website which, *inter alia*, threatened to expose wrongdoing at either MU or CV. (See Exhibit "A".) Individual defendants acted because officials at CV threatened to bar MU students from student-teaching at CV unless the officials punished Stacy harshly. (2AC, ¶39.)

To protect their personal interests, Girvin, Prabhu and Bray utterly disregarded Stacy's Constitutional rights. They completely ignored the devastating effect of their indefensible actions on Stacy and her family. This is the definition of IIED.

MU correctly observes Pennsylvania's sovereign tort immunity statute, 42 Pa. C.S. §8522(b), bars Stacy's claims against it under intentional infliction of emotional distress. (MU Brief, p. 38.) **However, sovereign tort immunity does not extend to individual defendants in their individual capacities.**

A suit against a governmental official in his personal capacity seeks to impose personal liability upon the official for actions taken under color of state law. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099 (1985). An award of damages against an official in his personal capacity can be executed only against the official's personal assets. (*Id.*) In contrast, official-capacity suits seek to impose liability upon the governmental entity the official represents. (*Id.*)

Importantly, state officials sued in their individual capacities, are "persons" within the meaning of §1983. *Hafer v. Melo*, 502 U.S. 21, 31, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). The Eleventh Amendment does not bar such suits, nor are state officials absolutely immune from personal liability

under §1983 solely by virtue of the "official nature of their acts." (*Id.*)

MU contends Pennsylvania's sovereign immunity statute confers immunity upon individual defendants even in their individual capacities. (MU Brief, pp. 38-39.) However, an employee of a Commonwealth agency only enjoys sovereign immunity against intentional tort claims while acting within the scope of his or her duties. *LaFrankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Cmwlth. 1992). Similarly, the state does not extend immunity to those individuals who commit crimes, actual fraud, actual malice or reckless or willful misconduct, even when acting in the scope of employment. 42 Pa. C.S. §8550. Reckless or wanton misconduct means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. *Evans v. Phila. Transp. Co.*, 418 Pa. 567, 212 A.2d 440 (1965).

In the case at bar, whether the individual defendants meet this standard is a question of fact for the jury. Certainly, a reasonable jury could infer that, by expelling Stacy from MU's School of Education just days before her graduation for personal gain in clear violation of Stacy's Constitutional rights, individual defendants committed an intentional act "of an unreasonable character." *Evans*, 418 Pa. at 574, 212 A.2d at 443. A jury could then infer that the they "acted with a willful disregard of their duties and for the safety and welfare of Stacy. See *Robbins v. Cumberland Co. Children and Youth Services*, 802 A.2d 1239, 1256 (Pa. Cmwlth. 2002) (dissenting opinion).

Moreover, individual Defendants were acting outside the scope of their employment when they snooped into Stacy's private website. Discovery will likely reveal that they hacked into Stacy's web page in their free time, outside of school hours. Nothing in the job descriptions of individual defendants authorizes them to do this. Accordingly, individual defendants are individually liable for

their misdeeds.  Based on the above, Stacy has properly stated a cause of action the individual Defendants for intentional infliction of emotional distress.  The Motion to Dismiss this count should be denied.

> **F.    Stacy Properly States a Cause of Action Against MU for Breach of Contract in View of its Failure to Award Her the B.S.E. Degree She Earned.**

The relationship between Stacy and MU is contractual.  *Ross*, 445 F.Supp. at 152.  In fulfillment of the contract, Stacy attended MU from the fall of 2002 until the spring of 2006.  (Amended Complaint, ¶101(a).)  She paid all required tuition and fees.  (*Id.*)  Stacy performed all her school work in a satisfactory manner, as shown by her Praxis scores, her making the dean's list and her citation by school officials as "one of [MU's] finest scholars."  (*Id.*, Exhibits "A," "E" and "F.")  Stacy also compiled sufficient credits and grades to graduate from MU with a BSED degree.  (*Id.*)

Individual defendants then breached MU's contract with Stacy by violating her civil rights as set forth herein.  (*Id.*, ¶102.)  Individual defendants also violated Stacy's contract by awarding her only a BA degree after Stacy completed all course work and practical exercises necessary to achieve a BSED degree.  (*Id.*)  As a result of MU's breach of contract, Stacy is unable to obtain a teaching certification and work as a teacher either in Pennsylvania or anywhere else.  MU has caused Stacy to suffer lost wages and benefits totaling in the hundreds of thousands of dollars through the duration of her work life.  Even if this Honorable Court limits Stacy's damages to a refund of her prepaid tuition and fees, Stacy's damages are substantial.  Accordingly, Stacy has alleged a cause of action for breach of contact.

MU asserts the Pennsylvania Board of Claims has exclusive jurisdiction over Stacy's contract claims.  (62 Pa. C.S. §1721, *et seq.*; MU Brief, p. 57.)  However, with regard to this Honorable

Court's supplemental jurisdiction, federal law provides:

> (A)  "Except as provided in subsections (b) and ©) or as expressly provided otherwise by federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form a part of the same case or controversy under Article III of the United States Constitution."  28 USCS §1367(a).

In the case at bar, Stacy's contract claims against MU arise out of the individual Defendants' wrongful act of expelling Stacy from the School of Education and awarding her only a BA, not a BSE.  Clearly, Stacy's contract claims and the constitutional violations are part of the "same case or controversy."  Thus, this Honorable Court has supplemental jurisdiction over Stacy's contract claims.  Also, in the interest of judicial economy, the court should consider all of Stacy's claims in this forum.

Even if this Honorable Court finds it lacks jurisdiction over Stacy's contract claims, Pa. R.Civ.P. 213(f) provides for the transfer of those claims to the Board of Claims for further action. *Employers Ins. of Wausau v. Commw. of Penna., Dept. of Transp.*, 581 Pa. 381, 389, 865 A.2d 825, 830 (Pa. 2005).

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff, Stacy Snyder, respectfully requests this Honorable Court **DENY** individual defendants' Motion to Dismiss her Second Amended Complaint.

Dated: <u>10/31/07</u>                      Respectfully submitted,

                              **LAW OFFICE OF MARK W. VOIGT**

                       BY:    <u>*/s/ Mark W. Voigt*</u>
                              **MARK W. VOIGT, ESQUIRE**
                              Attorney I.D. No. 64387

39

Validation of Signature Code: MWV6003
Plymouth Meeting Executive Campus, Suite 400
600 West Germantown Pike
Plymouth Meeting, PA 19462
(610) 940-1709
(Attorney for Plaintiff, Stacy Snyder)