IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


STACY SNYDER,                          :        CIVIL ACTION
                                       :
        Plaintiff,                     :
                                       :
        v.                             :
                                       :
MILLERSVILLE UNIVERSITY,               :
et al.                                 :        07-1660
                                       :
        Defendants.                    :


**ORDER**


        AND NOW, this   day of       , 2008, upon consideration of the Motion for

Summary Judgment of defendants J. Barry Girvin, Beverly Schneller, Judith Wenrich,

Jane S. Bray and Vilas A. Prabhu, it is hereby ORDERED that the Motion is GRANTED.

The case is hereby DISMISSED with prejudice.


                                       _____
                                       Diamond, J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Barry Girvin, Beverly Schneller, Judith Wenrich, Jane Bray and Vilas Prabhu, hereby file, pursuant to Fed. R. Civ. P. 56, a motion for summary judgment and request that the case be dismissed as a matter of law, for the following reasons:

1       Defendants are entitled to judgment as a matter of law.

2.      Qualified immunity bars the § 1983 damages claim against defendants in their personal capacities.

3.      Plaintiff is not entitled to injunctive relief as a matter of law.

Therefore, defendants request that this court grant judgment in their favor.

THOMAS W. CORBETT, JR.
ATTORNEY GENERAL

BY:     s/s Barry N. Kramer
BARRY N. KRAMER
Senior Deputy Attorney General

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Tel: (215) 560-1581
Fax: (215) 560-1031

STACY SNYDER,                          :       CIVIL ACTION
                                       :
        Plaintiff,                     :
                                       :
        v.                             :
                                       :
MILLERSVILLE UNIVERSITY,               :
et al.                                 :       07-1660
                                       :
        Defendants.                    :


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT


## I.      INTRODUCTION

Snyder, a 2006 graduate of Millersville University ("MU"), sues MU employees Professor J. Barry Girvin, Professor Beverly Schneller,  Professor Judith Wenrich; Dean of the School of Education Dr. Jane S. Bray; and Provost Dr. Vilas A. Prabhu. The only claim remaining is a 42 U.S.C. § 1983 First Amendment claim against defendants in their individual capacities for damages and a claim, presumably in their official capacities, for injunctive relief.  Because there is no dispute of material fact, defendants are entitled to judgment as a matter of law pursuant to Fed. R. Civ. P. 56.

## II.     ARGUMENT

## A.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding the motion, a judge "must

ask himself not whether he thinks the evidence unmistakably favors one side or the other, but whether a fair-minded jury would return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). While the court views the evidence in a light most favorable to a non-moving party, it should only accept reasonable inferences. 477 U.S. at 252. Plaintiff must offer specific facts contradicting the facts averred by defendants. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990). See Anderson, 477 U.S. at 257 (plaintiff "must present affirmative evidence to defeat a properly supported motion for summary judgment.").

**B.      Undisputed Facts**

In spring semester 2006, Snyder, who hoped to receive a Bachelor of Science in Education degree ("B.S.Ed.") from MU, was a student teacher at Conestoga Valley High School ("Conestoga Valley" or "CV"). Pursuant to MU's Academic polices, to receive a B.S.Ed. a candidate must satisfactorily complete student teaching. Declaration of Judith Wenrich, Exhibit A, hereto, ¶ 5 ("Wenrich"). Pursuant to Pennsylvania Department of Education ("PDE") policies, to receive initial teaching certification, a candidate must satisfactorily complete student teaching by passing all four categories in form PDE-430: Planning and Preparation, Classroom Environment, Instructional Delivery and Professionalism. Wenrich ¶ 6. See MU Guide for Student Teaching ("MU Guide"), Exhibit B, hereto, at 9, 18-20. Plaintiff was provided with the MU Guide. Stacy Snyder deposition at 42, Exhibit C, hereto ("Snyder").

While student teaching, Snyder was subject to Conestoga Valley's rules and regulations. Snyder at 40-41; Barry Girvin deposition at 20-22; Exhibit D, hereto

("Girvin"). See also Exhibit C-1; Exhibit B at 10 ("Responsibilities of the Student Teacher").[1] For example, she was required "to maintain the same professional standards expected of the teaching employees of the cooperating school" and "to fulfill as effectively as possible every role of the classroom teacher ..." Exhibit B at 7, 10. Nicole Reinking was assigned as plaintiff's cooperating teacher; Deann Buffington, CV's Communications Department Chair, was Reinking's supervisor. Deposition of Deann Buffington, Exhibit E, hereto, at 7-8 ("Buffington"); Snyder at 39, 70. For the first weeks of the semester, Snyder observed Reinking's twelfth grade English classes. Snyder at 75; Deposition of Nicole Reinking at 40-42, Exhibit F, hereto ("Reinking"). Thereafter, she gradually assumed increasing responsibility for teaching. Snyder 81; Reinking 42-44. While Snyder was teaching, Reinking was observing. Snyder at 82. They would discuss Snyder's teaching on a daily basis. Snyder at 82-83, 90; Reinking 45-47, 50-51, 62, 96.

Throughout the semester, Reinking had serious criticisms of Snyder's teaching that she communicated to her.[2] Snyder at 89-92; Reinking at 60-61, 79-80. She observed that plaintiff lacked subject matter knowledge, Snyder at 95, Reinking at 26-32, 55-59, 68-71, 78-79, 93, 123-124; despite having an annotated "teacher's edition," Snyder at 77, plaintiff did not understand the content she was teaching, Reinking at 64-65, 103-105; her

---

[1] Many of the exhibits used in this memorandum are attached as exhibits to Snyder's deposition, Exhibit C, hereto. The exhibit's designation used in the deposition will be used herein as well, e.g., C-1, C-2, etc.

[2] Plaintiff may purport that her internships with teachers Neil Weidman and Sue Fetterolf, which preceded her student teaching at Conestoga Valley, reflect she is a competent teacher. This would be a misleading assertion. Her internship with Weidman only involved plaintiff's one-on-one work once a week with one special needs student. She had no responsibility for developing a curriculum for the student or for teaching other students. Snyder at 59-65. With Fetterolf's class, plaintiff simply had to be in the classroom for a total of 35-40 hours. The assignment involved observing Fetterolf although she was permitted to teach two mini-lessons. Snyder 65-69; Girvin at 45-51.

grammar and spelling were deficient, Snyder at 96, 99, 114-115, Reinking 32-37, 55-56, 63, 66, 79-80, 123-124; students did not understand what she was teaching, Snyder at 100-101, Reinking at 71, 84, 91, 109-111; she was not challenging the students, Snyder at 107, Reinking at 81; she was not submitting lesson plans on time, Snyder at 115, Reinking at 62-63, 80, 93, 100-101; she was not able to manage the students, Reinking at 63-64, 66, 84-87, 94-96, 102, 106, 111-115, 122, 125-126; she deviated from the lesson plan, Snyder at 113, Reinking at 116. Reinking frequently offered her assistance although plaintiff did not take her up on the offers. Reinking at 59-60, 68. Parents complained to Reinking about Snyder's teaching. Reinking at 129-130.

Throughout the semester, Reinking also raised multiple concerns about plaintiff's professionalism. <u>See</u> Exhibit C-13. For example, Snyder told the class to "shut up," Snyder at 94-95, 104, 110, 112; Reinking at 77-78. She did not react when a student told another student to "shut the hell up," Snyder at 106; Reinking at 97, or when students discussed weekend behavior involving drugs and drinking in the classroom. Reinking at 97-98. On another occasion, plaintiff played a song as background music that Snyder had not previewed and contained the phrases "a badass mother G.I. Joe" and "kiss my ass goodbye." Snyder at 97-98; Reinking at 74-77; Exhibit C-14 (song's lyrics). Snyder ignored protocol by asking another CV employee, not Reinking, for a key to Reinking's classroom, Snyder at 98-99; Reinking at 89-90; and by asking Buffington if she could remain at CV after the semester ended. Buffington at 21-23. Plaintiff also maligned Reinking to her students after the mid-term evaluation. Buffington at 24, 79. Reinking brought these concerns to Buffington's and Girvin's attention throughout the semester.

Reinking at 105-107, 118-119; Buffington at 20-31, 51, 59-62, 68-71. She told Buffington of these problems on almost a daily basis. Buffington at 20, 29.

Girvin was Snyder's MU supervisor while she was student teaching at CV. Snyder at 119. He observed Snyder's teaching several times during the semester. Snyder at 119; Girvin at 72, 76-77, 90-91, 108-109, 112. Girvin raised similar criticisms as Reinking and shared his observations with plaintiff. Snyder at 122-123; Girvin at 72-73, 76-79, 92-96, 102-103, 112-114. He noted that plaintiff's teaching was superficial and that she lacked subject matter knowledge. Snyder at 125; Girvin at 77.[3] See Exhibit C-4.[4] He observed that she failed to plan the lessons properly and was not able to control the class. Snyder at 127-128; Girvin at 78-79. He criticized her professionalism and her inability to maintain proper boundaries with the students. Girvin at 128-131, 154-159, 176. She was also behind on her student teaching obligations to Girvin. Girvin at 74-75. He considered reducing her teaching schedule or pulling her from student teaching. Girvin at 80-82, 102-103. See Exhibit C-4 (March 1, 2006 note).

Snyder concedes she lacked sufficient content knowledge of the course she was teaching. Snyder at 85-86, 92-95, 99, 114, 148; Reinking at 24-25, 37. She also concedes she was not able to manage the students, who were sleeping, talking and being disruptive. Snyder at 86-93, 102-104, 108-118. Many refused to do the homework she assigned. Snyder at 87. Acknowledging her mistakes, she apologized for playing the song with the

---

[3] Plaintiff may contend that her CIRQL project, for which Girvin praised her work, reflects her competence as a teacher. Again, this would be misleading. Girvin merely graded plaintiff's written work relating to her shadowing of a teacher, teacher interview, lesson plan overview and student writing. Plaintiff's actual teaching of a lesson plan was not graded in the CIRQL project. Girvin at 43-44, 120-123.

[4] For example, note Girvin's observations on March 1, 2006 and April 7, 2006, which are included in Exhibit C-4. Plaintiff agrees with Girvin's criticisms. Snyder at 127-130.

improper lyrics, Snyder at 207, for telling the students personal information, Snyder at 209-210, and, at the end of the semester, for her behavior in general. Exhibit C-16.

Snyder found Reinking's mentoring helpful and appreciated that Reinking sought to assist her. Snyder at 86-85, 92-95, 99, 114, 148, 120-121. Plaintiff never complained to Girvin about Reinking until May 9, 2006 when she complained that there was less communication between the two. Exhibit C-15. Her only other complaint, which she never shared with Girvin, is that after March she felt that Reinking did not sufficiently reassure her. Snyder at 84-85, 120-122, 130-137, 222-223; Girvin at 180-181. Girvin was consistently helpful throughout the semester. Snyder at 119-120, 130, 134-135.

At the semester midpoint, consistent with the deficiencies they brought to plaintiff's attention, Reinking and Girvin formally evaluated her as needing significant remediation in multiple different areas. Exhibits C-5 and C-6. See Reinking at 131-137. Girvin also rated her performance as unsatisfactory in the mid-placement PDE-430 form that is mandated by the PDE. Exhibit C-7; Girvin at 92-102. This rating equates to failing student teaching although at mid-semester the PDE-430 is designed to provide the student with feedback and an opportunity to improve. Reinking at 119-120; Declaration of Jane Bray, ¶ 5, Exhibit G, hereto ("Bray"). Snyder acknowledges that her performance was unsatisfactory and that Reinking's and Girvin's criticisms were valid. Snyder at 124-128, 137-142, 147-148, 155-157. She acknowledges a "disconnect" between her self-assessment, Exhibit C-8, hereto, and Reinking's and Girvin's evaluations. Snyder at 147-148. Snyder's inadequate performance continued throughout the semester. Snyder at 155-156. E.g., n. 4, supra. While plaintiff showed some improvement in teaching, her

unprofessional conduct and inability to maintain appropriate teacher-student boundaries remained a serious deficiency throughout the semester.

Thus, pursuant to a directive from Kim Seldomridge, School District Director of Business and Administrative Services, Buffington directed Reinking to prepare a litany of plaintiff's unprofessional behavior. Buffington at 36-39, 58-59. In a document titled "Unprofessional Behavior/Performance in the Classroom," Reinking notes, among other things, that she had admonished plaintiff to avoid discussions about myspace, to avoid looking up student online accounts or corresponding with students on the website. Exhibit C-13; Reinking at 137-138, 151-168.

Plaintiff, in response to Reinking's criticisms and, portraying herself as "naïve" and "inexperienced," concedes that most of these incidents occurred. Exhibit C-14. See Snyder at 184, 207-210, 216. Although plaintiff denies that Reinking warned her about having a website, she admits having been forewarned at MU about maintaining personal websites and specifically advised that one student had been removed from a student teaching placement because of such a website. Snyder at 210-211; Girvin at 135, 178-179. Snyder acknowledges opening the myspace account months before she started student teaching and that it was open while she was student teaching. Snyder at 167. See Exhibit C-14. She concedes she posted the "drunken pirate" photograph on her myspace website and condoned that at least one student had viewed her website. Snyder at 186, 212. She admits the cup contained alcohol. Snyder at 184. On May 4, 2006, she wrote on her myspace "blog":

> First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop

that low as to mess with my future. So, bring on the love! I figure a couple of students will actually send me a message when I am no longer their offical (sic) teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)?

Exhibit C-10. <u>See</u> Snyder at 182-184.

Several days later, at Seldomridge's direction, Buffington telephoned plaintiff and forbade her from entering CV until the final evaluation. Buffington at 36-39, 49-50, 55-56; Snyder at 195. Defendants were not involved in that decision; Buffington advised Girvin of CV's action. Girvin at 141, 195-196; Buffington at 55. On May 11, plaintiff met with Buffington, Reinking and Girvin. Buffington criticized plaintiff's student teaching as "incompetent," her level of knowledge as inadequate and her conduct as "unprofessional" and showed her the posting (Exhibit C-10). Snyder at 158-163, 183; Girvin at 141, 195-197; Buffington at 51-52. The posting in Exhibit C-10 is the sole posting that Buffington showed to plaintiff. Snyder at 160-166; Buffington at 34-35. Buffington believed the posting was inappropriate on many levels. Buffington at 44-49. Plaintiff speculates that Buffington's decision to bar her from the school was based on this posting, Snyder at 183, when, in fact, CV's action was based upon plaintiff's unprofessional behavior throughout the semester. Buffington at 37-43.

This internet posting is the sole basis for Snyder's contention that she was improperly denied a B.S.Ed. degree. Snyder at 160-166, 183. She testifies that the posting is ambiguous and that Girvin and Reinking "misinterpreted" it by believing the reference "Do you think it would hurt me to tell them the real reason (or who the problem was)?" was about Reinking when, according to Snyder, the reference was to herself. Snyder at 164, 167-168, 173, 192, 211. She concedes that Reinking and Girvin reasonably understood the text to be about Reinking and acknowledges that CV, MU and their

personnel are not referenced therein. Snyder at 211-212, 241-242. Buffington, Reinking and Girvin believe the negative text references are to Reinking and to CV. Reinking at 157-158, 192; Girvin at 135, 177-180; Buffington 46-49.  She testified that the phrase "I don't think that they would stoop so low as to mess with my future" refers to her students, Snyder at 188-189, which "was just a general thought that I had at the moment." Snyder at 188-189. She does not know why she wrote or what she meant by "I don't say anything that will hurt me (in the long run)." Snyder at 187.

Snyder testifies that she intended the posting to be "personal and private" and contained her "personal thoughts and opinions." Snyder at 185-186, 248. See Third Amended Complaint ¶¶ 28, 29, 39, 56-57. She uses the website as a personal "diary," Snyder at 162, and "as a way for [her] to communicate with [her] other friends who are mothers or that don't have a lot of time to meet with [her] one on one and [she] doesn't have time to meet with them one on one, and it was our way of communicating back and forth." Snyder at 185. She never intended for anyone other than her immediate girlfriends to see her website. Snyder at 185, 214. She asserts that the posting was not intended for CV teachers or students to view, Snyder at 214, although she agrees--and condones--that at least one of her high school students viewed her website. Snyder at 186, 212.

Plaintiff's final evaluations reflected serious deficiencies in her student teaching. Reinking rated her as unsatisfactory in four of the six indicators of Professionalism and in two indicators of Preparation. Exhibit C-9; Reinking at 178-182. The final PDE-430 form completed by Girvin and required by the PDE for eligibility for initial teaching certification reflects an unsatisfactory rating in Professionalism. Exhibit C-18. In

addition, he rated her as unsatisfactory in the Professionalism component of the MU student teaching evaluation. Exhibit C-12.

Girvin's sole function was to evaluate and grade plaintiff's student teaching. Girvin at 125-128, 150, 159, 197, 207. <u>See</u> Declaration of Barry Girvin, ¶ 1, Exhibit H, hereto ("Girvin Declaration"). He considered her performance during the entire semester in determining that she should not pass, Girvin at 48-51, although he relied on Reinking's daily observations of plaintiff's work as well. Girvin at 128-131, 140-141, 182-183, 195. <u>See</u> Girvin Declaration ¶¶ 2-3. For Girvin, the decisive factors were that she was barred from entering CV and that the email she sent to him on May 9 blamed Reinking for her own failures. Girvin at 135-136, 177-181, 187; Girvin Declaration ¶¶ 4-5; Snyder at 218. The "drunken pirate" picture played no role in his decision to rate her professionalism as unsatisfactory.[5] Even had it not come to his attention, plaintiff would not have passed because of her unprofessional actions throughout the semester, because CV barred her from the school, and because of the May 9, 2006, email shifting blame to Reinking. Girvin Declaration ¶¶ 6-7. Although Reinking failed plaintiff and she did not complete the semester at CV, Girvin permitted her to withdraw so that her academic transcript would not reflect a failure. Snyder at 57-58; Girvin at 202-204; Girvin Declaration ¶ 7.

On or about May 12, 2006, plaintiff went to Dr. Judith Wenrich, MU Coordinator for Student Teaching, to assess her options. Wenrich learned that plaintiff had been barred from Conestoga Valley and that she had not passed student teaching. Wenrich ¶¶

---

[5] Contrary to plaintiff's unsupported allegations, Buffington never threatened that Conestoga Valley would not permit future MU students to student teach there if MU did not take punitive action towards plaintiff. Buffington at 53. Since spring 2006, CV has continued to host MU student teachers. Buffington at 11-12, 17, 78-79. Defendants had no concern that CV would not host future MU student teachers. Wenrich ¶ 12; Bray, ¶ 8; Girvin Declaration ¶ 8.

1-4. Because plaintiff had not passed student teaching, pursuant to MU's academic requirements, she was not eligible to receive a B.S.Ed. Wenrich ¶¶ 5, 7.[6] In considering plaintiff's options, Wenrich reviewed plaintiff's documented unsatisfactory student teaching performance. Wenrich ¶ 8. See Snyder at 232-237. Wenrich was primarily concerned that CV had barred her from entering the school. In the past, other students who have been barred from entering schools have also not passed student teaching. Wenrich ¶ 9; Bray ¶ 9.[7] Plaintiff's internet posting did not play any role in Wenrich's decision to not recommend plaintiff for a B.S.Ed. Wenrich ¶ 10. See Snyder at 170 (Snyder does not know if Wenrich saw the posting).

Wenrich referred plaintiff to Dr. Beverly Schneller, Chair of MU's English Department, to see if plaintiff could receive a B.A. since she was not eligible for a B.S.Ed. Wenrich ¶ 13; Deposition of Beverly Schneller, at 9, Exhibit I, hereto ("Schneller"). Plaintiff met with Schneller and requested an exception to graduation requirements so that she could graduate with a B.A. in English. Exhibit C-17; Schneller, at 38-42, 45-46, 69. Schneller never saw and did not consider plaintiff's internet posting. Schneller at 32-33, 48-49, 53-54, 87-88. See Snyder at 172, 246 (Snyder does not know if Schneller saw the posting).

Plaintiff took an academic appeal of the denial of the B.S.Ed. to Dean Bray. She presented written materials and argued that she should pass student teaching and receive

[6] Wenrich, Bray and Buffington had no role whatsoever in the preparation of Reinking's or Girvin's evaluations. Wenrich ¶ 8; Bray ¶ 5; Buffington at 40, 43.

[7] It is not unusual for students to have difficulties with their student teaching and to voluntarily withdraw or be removed by the school district. Since fall semester 2005, five Millersville students have voluntarily withdrawn from their student teaching placement; seven were removed by the school district; and nine did not successfully complete student teaching for a variety of reasons. Bray ¶ 9. See Buffington at 55.

a B.S.Ed. Bray ¶¶ 1-3. Bray reviewed the materials, and discussed Snyder's student teaching performance with Girvin and Wenrich. Bray ¶¶ 4-5. Bray learned that plaintiff had failed both the mid-term and final PDE-430. Snyder at 217-218, 235-236; Bray ¶ 5. She was particularly concerned that CV administrators had barred plaintiff from the school. Bray ¶ 6. Plaintiff's posting play no role in Bray's decision to deny the appeal. Bray ¶ 7. See Snyder at 168-170 (does not know if Bray saw the posting).

In February 2007, pursuant to MU's Academic Appeals Policy, plaintiff appealed the denial of the B.S.Ed. to the Provost. Prabhu declaration, ¶¶ 1-2, Exhibit J, hereto ("Prabhu"). After evaluating the evidence, Prabhu denied her appeal because the evidence showed, among other things, that she failed to satisfy the University academic requirements for student teaching. Prabhu ¶ 3. Plaintiff's internet posting played no role in his decision. At that time, he had not even seen a copy of the posting. Prabhu ¶ 4. See Snyder at 246-247 (Snyder does not know if Prabhu saw the posting).

**C.      Plaintiff's First Amendment Claim Fails as a Matter of Law**

**1.      Plaintiff's Internet Posting Was Not Constitutionally Protected Because It Fails The Two-Part Particularized Message Test And Was Not of Public Concern**

To state a § 1983 claim predicated on the First Amendment, plaintiff must show that her activity was protected by the First Amendment and that the activity was a motivating factor in the alleged retaliation. Azzaro v. County of Allegheny, 110 F.3d 968, 975 (3d Cir.1997). The Third Circuit has applied an almost identical test in cases involving First Amendment claims brought by a non-employee against a public entity. Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir.2003), involved a citizen's First Amendment against state officers after he lodged complaints against them. See

Feldman v. Comm. College of Allegheny, 85 Fed. Appx. 821, 2004 WL 50784 (3d Cir. 2004) (college student alleged retaliation by college administrators). Even if the court concludes that plaintiff engaged in protected activity, defendants escape liability if they would have acted the same absent the protected activity. Baldassare v. New Jersey, 250 F.3d 188, 194 (3d Cir. 2001). See Mount Healthy City Board of Ed. v. Doyle, 429 U.S. 274, 284-287 (1987); Ambrose v. Twp. of Robinson, 303 F.3d 488, 493 (3d Cir.2002).

A plaintiff invoking the First Amendment must demonstrate that her activity is protected. See Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n. 5 (1984). This is a question of law for the court. Green v. Philadelphia Housing Authority, 105 F.3d 882, 885-88 (3d Cir. 1997); Watters v. City of Philadelphia, 55 F. 3d 886, 892 (3d Cir. 1995). If the court determines that plaintiff did not engage in protected activity, the inquiry ends and the court must decide in defendants' favor. Id. 105 F.3d at 889.

Plaintiff's "drunken pirate" posting, the sole basis for her claim, is not protected by the First Amendment. Such protection is available only where "an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it." Spence v. Washington, 418 U.S. 405, 410-11 (1974). The Supreme Court has "rejected the view that conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea…[W]e have extended First Amendment protection only to conduct that is inherently expressive." Rumsfeld v. FAIR, 547 U.S. 47, 65-66 (2006); United States v. O'Brien, 391 U.S. 367, 376 (1968). "To hold otherwise would be to create a rule that all conduct is presumptively expressive." Clark, 468 U.S. at 293, n. 5. "It is possible to find some kernel of expression in almost every activity a person undertakes-for example, walking

down the street or meeting one's friends at a shopping mall-but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." <u>City of Dallas v. Stanglin</u>, 490 U.S. 19, 24-25 (1989).

The Supreme Court held that military recruiting regulated by the Solomon Amendment that was the subject in <u>Rumsfeld v. Fair</u>, was held not expressive. 126 S.Ct. at 1310. Prior to the adoption of the Solomon Amendment's equal-access requirement for military recruiters, law schools "expressed" their disagreement with the military by treating military recruiters differently from other recruiters. But these actions were expressive only because the law schools accompanied their conduct with speech explaining it. An observer who saw military recruiters interviewing away from the law school location would have no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else. The Court concluded that the expressive component of a law school's actions was not created by the conduct itself but by the speech that accompanies it and the fact that explanatory speech is necessary is strong evidence that the conduct at issue was not so inherently expressive that it warrants constitutional protection. <u>Id</u>. at 1310-11. If combining speech and conduct sufficed to create expressive conduct, a party could always transform conduct into "speech" simply by talking about it. <u>Id</u>

Cases in the school context also require that plaintiff satisfy the two-part particularized message test. In <u>Montanye v. Wissahickon School Dist</u>., 218 Fed. Appx. 126, 130 (3d Cir. 2007), the Third Circuit affirmed dismissal of a school teacher's claim that her "conduct in assisting an at-risk student cope with her emotional and

psychological problems does not possess sufficient communicative elements to fall within the protection of the First Amendment." 218 Fed. Appx. at 130. The Court agreed that while plaintiff's conduct in scheduling the student's therapy sessions, transporting her to those sessions and attending those sessions may have involved some "kernel of expression," there was no intent to convey any message, let alone a particularized message, supporting special education, and no likelihood that her interactions with her student could be "understood" as conveying such a message. Id.

In Blau v. Fort Thomas Public S.D., 401 F.3d 381 (6th Cir. 2003), the Sixth Circuit rejected parents' challenge to their daughter's middle school dress code because

> the First Amendment does not protect such vague and attenuated notions of expression-namely, self-expression through any and all clothing that a 12-year old may wish to wear on a given day. . . . [T]he claimant at a minimum must show that the desired conduct (e.g., the desired clothing) can fairly be described as imbued with elements of communication, which conveys a particularized message that will be understood by those who view it.

401 F.3d at 390 (citations and internal quotation marks omitted).

In Brandt v. Board of Education of the City of Chicago, 480 F.3d 460 (7th Cir. 2007), plaintiff eighth-grade students wore a t-shirt imprinted with words to protest selection of another t-shirt as the class t-shirt. The Seventh Circuit held that the t-shirts and the opinions expressed thereon themselves are not protected speech:

> Self-expression is not to be equated to the expression of ideas or opinions and thus to participation in the intellectual marketplace….But the picture and the few words imprinted on the Brandt T-shirt are no more expressive of an idea or opinion that the First Amendment might be thought to protect than a young child's talentless infantile drawing which Brandt's design successfully mimics. Otherwise every T-shirt that was not all white with no design or words, with not even the manufacturer's logo or the owner's name tag, would be protected by the First Amendment, and schools could not impose dress codes or require uniforms

without violating the free speech of the students, a proposition sensibly rejected in the Blau case.

480 F.3d at 465-66. See Stephenson v. Davenport Cmty. S.D., 110 F. 3d 1303, 1307 n. 4 (8th Cir. 1997) (student's tattoo was "nothing more than self-expression" and as such was not imbued with First Amendment protections). Cf. Villegas v. City of Gilroy, 484 F. 3d 1136, 1140 (9th Cir. 2007) (motorcycle club members wearing vests adorned with a common insignia was not protected by the First Amendment. The Circuit upheld the district court's conclusion that there was no common message conveyed or likely to be understood by the wearing of the insignia).

In addition to the particularized message test, there must also be some matter of public concern expressed. The First Amendment does not protect every utterance that a person speaks or writes; the core purpose of the free speech clause is to protect public truthful speech on matters of public concern. Bartnicki v.Vopper, 532 U.S. 514, 533-34 (2001). It does not protect private activity asserting private interests. See City of Dallas, 490 U.S. at 24-25; Connick v. Myers, 461 U.S. 138, 146, 148-153 (1983) (personal grievances and complaints about employment do not constitute speech about matters of public concern that are protected but are matters more immediately concerned with the speaker's self-interest); Swineford v. Snyder Cty of Pa., 15 F.3d 1258, 1270, 1273 (3d Cir. 1994) (First Amendment does not convert private complaints into constitutional cases). In Feldman, 85 Fed. Appx. At 824, the Third Circuit held that Tinker is factually inapposite and rejected a college student's claim that college administrators violated his First Amendment rights by subjecting him to arrest in retaliation for his statements to the College's president in which he alleged racial and religious discrimination in restricting his use of the computer lab because his conflict was merely a private dispute.

Even in the archetypal school speech cases, plaintiff must show she intended to publicly express an idea on a matter of public concern; this typically involves some protest or advocacy. <u>Tinker v. Des Moines Independent Community School District</u>, 393 U.S. 503, 510 (1969), involved public high school students who were suspended because they challenged a prior restraint on expressive conduct by wearing black armbands "to exhibit their disapproval of the Vietnam hostilities and their advocacy of a truce, to make their views known, and, by their example, to influence others to adopt them." <u>Id</u>. at 521. The Court noted that the "a particular symbol – black armbands worn to exhibit opposition to this Nation's involvement in Vietnam – was singled out for prohibition." <u>Id</u>. at 510-11.

<u>Morse v. Frederick</u>, 127 S.Ct. 2618 (June 25, 2007), is instructive. A public high school student brought a § 1983 action against school officials alleging that his First Amendment rights had been violated by a suspension for waving a banner proclaiming "BONG HiTS 4 JESUS" at an off-campus activity. Reversing the United States Court of Appeals for the Ninth Circuit, the Supreme Court held that the school principal did not violate the student's right to free speech by confiscating a banner she reasonably viewed as promoting illegal drug use. The Court held that the activity promoted illegal drug use and was not political speech: "Contrary to the dissent's suggestion . . . this is plainly not a case about political debate over the criminalization of drug use or possession." <u>Id</u>. 127 S. Ct. at 2625. The Court distinguished <u>Tinker</u> by observing that political speech "is at the core of what the First Amendment is designed to protect." <u>Id</u>. at 2626 (citation omitted). <u>See</u> <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260 (1988) (staff members of high school newspaper challenged censorship of certain articles in school newspaper,

including an article describing school students' experiences with pregnancy and another article discussing the impact of divorce on students at the school).

Plaintiff does not sustain the burden of showing that her posting meets the particularized message test or the public concern element. A single picture of an unidentified female wearing a pirate hat and drinking from a plastic cup could not conceivably be "sufficiently imbued with elements of communication" or to discern any expressive purpose that would implicate the First Amendment. It lacks an "expressive message," which requires that plaintiff intended to convey a particularized message and that someone readily understand the purported message. It does not convey a message and no message would be readily understood by those who viewed. Without putting too fine a point on it, the picture reflects no expressive purpose and has no point. Reading a message into this vacuous photograph would erase the requirement that expressive conduct have an identifiable message and would depreciate the First Amendment in cases in which a particularized message does exist. See Blau, 401 F. 3d at 389.

Including the text of plaintiff's blog in the analysis does not further her case. Like the language displayed in the Morse banner, the jabberwocky declaimed therein is meaningless and ambiguous. On its face, the posting does not refer to any school or school personnel by name, position, location, responsibilities or conduct. It does not even identify plaintiff by name, title or position (although it does offer insight into her "current mood" as "dorky"). It contains no hint of protest or advocacy; political speech would entail reading specific information into the picture --places, persons, ideas--that is absent. No viewer has any basis to discern a message. Plaintiff concedes as much.

She testified that the blog references are to her students ("I don't think that they would stoop that low as to mess with my future") and to herself ("Do you think it would hurt me to tell them the real reason (or who the problem was)?"). However, even this is not self-evident from the posting. Girvin, Reinking and Buffington believe the references are to Reinking and CV. Even with explanation, given the paucity of detail it is hard to discern an idea that plaintiff may have intended to express. Where "explanatory speech is necessary [it] is strong evidence that the conduct at issue here is not so inherently expressive that it warrants protection." Rumsfeld, 547 U.S. at 66. A viewer of the posting would have no way of knowing plaintiff's identity, that she was enrolled at MU, was a student teacher at CV or that she was upset about the actions of any particular school or school personnel.

Notwithstanding her testimony, she may now attempt to argue that the posting constituted protected comment on a matter of public concern, that is, the reasons she did not apply for a teaching position at CV. However, no such "message" is evident from the posting. As noted, the posting fails to refer to CV, MU or any person associated with any school or any event. The posting lacks reference to any place, event or person (except for the anonymous "Bree"). Plaintiff acknowledges that there is no reference in the posting to MU or CV or any person associated with either school and that the reference to "the real reason (or who the problem was)?" is to herself. The posting is not a grievance or complaint about any school, person or event associated with any school.

Further, the posting relates to purely personal matters. Plaintiff acknowledges that her myspace.com website is "private." She never intended school officials or anyone other than select girlfriends to view it. This concession undermines any

possibility that her posting could be considered public speech on a matter of public concern. It was completely private speech relating to private interests. Plaintiff's own testimony--she uses the website to communicate with her girlfriends who are mothers when they lack time to socialize--creates the parallel between her posting and the activity described by the Supreme Court--meeting friends at a shopping mall or chatting on the telephone--that is not included within the protection of the First Amendment. See City of Dallas, 490 U.S. at 25.  Plaintiff's private references are no more protected than the survey questions circulated by the assistant district attorney concerning internal office matters as described in Connick v. Myers, 461 U.S. 138, 146, 148-153 (1983) or the school age clothing referenced in Blau, 401 F.3d at 390 and Brandt, 480 F. 3d at 465-66. Like the proverbial tree falling in the empty forest that no one hears, plaintiff's posting does not make any perceptible "noise" that would be understood by a viewer. The posting is completely self-referential and not constitutionally protected.

Were plaintiff's posting entitled to First Amendment protection, then anyone--student, government employee or putative whistleblower--could point to personal photographs and blogs posted on the internet and, in the event of some subsequent adverse academic or employment action, fabricate a viable constitutional claim. Here, there was no intent to convey a particularized message and no likelihood that any message would be understood by anyone who viewed it. The context of the posting--a private website--was not imbued with elements of communication, has no public interest and does not warrant First Amendment protection. Surely, the framers of the First Amendment contemplated something loftier as deserving constitutional protection than an inert pirate picture void of sound or fury, signifying nothing.

**2.      IN THE ALTERNATIVE, Plaintiff's Status As A Student Teacher Puts Her In The Status Of Public Employee For First Amendment Purposes And She Fails To Show The Posting Addressed A Matter Of Public Concern**

Plaintiff wrongly asserts that she should be treated as a student and that Tinker sets the appropriate standard. Her status as a student teacher puts her for present purposes in the status of public employee and her claim falls under Pickering v. Board of Education, 391 U.S. 563, 568 (1968), and Connick v. Myers, 461 U.S. 138, 146 (1983).

Cases in which a college student invokes First Amendment rights have concluded that the public employment standard, rather than the school speech cases, provides the appropriate framework for inquiry. Recently, in an identical situation, the Eleventh Circuit Court of Appeals affirmed the district court's holding that the public employee analysis applied. In Watts v. Florida International University, 495 F. 3d 1289 (11th Cir. 2007), plaintiff was enrolled in a graduate program in social work at Florida International University ("FIU"). In his last semester he was required to successfully complete a field practicum consisting of a semester-long supervised educational experience in an agency setting designed to provide him with an opportunity to develop and practice social work skills in his area of concentration.  Watts registered for the course, paid his tuition to FIU, and was assigned to complete the practicum at Fair Oaks Hospital under the supervision of an FIU graduate field instructor and advisor. Watts was not paid a salary or provided any benefits by Fair Oaks. At all times, he was under the authority of FIU. Id. at 1292-93. He was terminated from the practicum and from FIU's graduate program because of inappropriate speech to patients regarding religion.  Id.

Watts brought a § 1983 claim under the student speech cases. The Court held that despite Watts' student status with FIU, his status was like an apprentice or intern at Fair

Oaks, where he had been placed to get actual field experience. While at Fair Oaks, he was expected to comport himself as an employee in dealing with patients and others and to abide by the institution's rules and procedures. The Circuit held that Watts' claim was governed by employee speech cases. Because his speech was not on a matter of public concern, his claim was dismissed. 495 F. 3d at 1293-1294.

Similarly, <u>Hennessy v. City of Melrose</u>, 194 F. 3d 237 (1st Cir. 1999), involved a college student who failed the teacher certification program when the public elementary school where he had been assigned terminated his student teaching practicum due to the student's religious speech and criticism of the school's curriculum. The First Circuit Court of Appeals analyzed the student's First Amendment claim under the <u>Pickering</u> standard. The Court concluded that appellant's placement as a student teacher at a local public elementary school related to his role as a public university undergraduate. He was not at the elementary school to take the courses offered there and was not in any meaningful sense a pupil of the school. 194 F. 3d at 245. His position approximated that of an unpaid apprentice, that is, the elementary school relied on him in essentially the same way that it would rely on any teacher-in-training or teacher's aide. <u>Id</u>. He was there to master the rudiments of a profession and, in return, expected to work with school personnel to implement the designated curriculum and to participate in class activities. The apprentice-type relationship resembled an employer-employee relationship more than a school-pupil relationship. <u>Id</u>.

In <u>Feldman</u>, 85 Fed. Appx. at 824, the Third Circuit rejected the <u>Tinker</u> analysis as factually inapposite and affirmed the district court's holding that a college student's claim that College administrators retaliated against him for his statements to the

College's president in which he alleged racial and religious discrimination did not involve a "matter of public concern" but was "merely a private dispute arising from a disagreement over the College's computer lab policies." Id. See Andersen v. McCotter, 100 F.3d 723, 726 (10th Cir.1996) (student intern working for college credit in a penitentiary properly treated as a public employee not as a student in a suit alleging First Amendment violations). Cf. Pinard v. Clatskanie S.D., 467 F. 3d 755, 767 n. 16 (9th Cir. 2006) (recognizing that public concern test has been applied in cases where the relationship between the plaintiff and the government was sufficiently similar to an employment relationship); Rivero v. City & County of San Francisco, 316 F.3d 857, 864 (9th Cir.2002) (applying public employee standard in case alleging government retaliation against independent contractor); Smith v. School District of Philadelphia, 158 F. Supp. 2d 599 (E.D.Pa. 2001) (First Amendment claim of parent volunteer serving on a public high school evaluation organization should be analyzed under Pickering).

Under the public employment standard, the first prong requires plaintiff to show that she was engaged in a protected activity, which requires her to show that the activity addressed a matter of public concern. Speech that is personal in nature, such as mundane employee grievances, is not protected. Connick, 461 U.S. at 146-153 (survey questions circulated by plaintiff assistant district attorney to other employees concerning office transfer policy, office morale, need for grievance committee and level of confidence in supervisors involved personal grievance and was not a matter of public concern). See Feldman, 85 Fed. Appx. at 824; Brennan v. Norton, 350 F.3d 399, 412-416 (3d Cir. 2003) (speech concerning the speed at which township purchased uniforms and protective clothing was not protected); Sanguigni v. Pittsburgh Bd. of Public Education,

968 F. 2d 393, 399 (3d Cir. 1992) (no public concern expression in a school teacher's statements made in high school newsletter critical of the low morale of the teachers at her public school); Gaj v. USPS, 800 F. 2d 64, 67 (3d Cir. 1986) (employee's complaints about safety matters and working conditions did not relate to matters of public concern because the complaints were made to protect the interests of the complaining employee only). Whether speech is a matter of public concern is a question of law for the court. Green, 105 F.3d at 885. Even where the presence of factual disputes would normally preclude the court from ruling as a matter of law, Supreme Court precedent requires the trial court to do so. Id., 105 F.3d at 887-88.

CV's relationship with plaintiff more closely paralleled an employment relationship than that of a pupil-teacher. As with teachers, student teachers must first be approved by the School Board, Deposition of Superintendent Gerald Huesken at 24-26, Exhibit K, hereto ("Huesken"), and pass background checks. Huesken at 27-30. As a student teacher, plaintiff was expected to adhere to Conestoga Valley's rules and regulations and to comport herself as an employee, not as a student, in relating to CV teachers, students, parents and administrators. Exhibit C-1; Buffington at 16; Huesken at 49, 61-62. Student teachers are giving staff parking permits and identification cards. Huesken at 51-52. She was placed at Conestoga Valley not to take courses offered there and was not a pupil at the school in any sense. Huesken at 49, 53-54, 61-62. Her position paralleled that of an apprentice or teacher-in-training and CV relied on her in the same way that it would rely on any teacher-in-training or teacher's aide. Huesken at 18-19, 49, 53-54. She was at CV to master the fundamentals of the teaching profession and, in return, was expected to work with the cooperating teacher and other school personnel to

implement the curriculum and to participate in class activities. See Girvin at 20-22; Buffington at 14-16.

Plaintiff was expected to be in the assigned classroom every day the school was in session, Buffington at 12; to follow the school calendar and, specifically, Reinking's schedule, Buffington at 12-13; to attend in-service meetings, faculty meetings and special school events (e.g. parent-teacher conferences, faculty and department meetings I.E.P. meetings, Open Houses). See MU Guide at 7; Reinking at 17-19; Buffington at 13. She was expected to evaluate student performance and assign grades that appeared in the student's report cards. Reinking at 92. While teaching, her functions and responsibilities were the same as a full-time teacher. Buffington at 16. Plaintiff developed the lesson plans she taught, Snyder at 80-81, and for all intents and purposes was the teacher. Snyder 80-82, 88, 150. She says the students considered her, not Reinking, as their teacher, Snyder at 190 and that she considered herself their "offical teacher" (sic). Exhibit C-10. During the semester, plaintiff took over all the teaching responsibilities for the literature class of another CV teacher and was the sole teacher in that class. Snyder at 150-155. Given a student teacher's responsibilities towards her students and that she and the students considered her, not Reinking, as the teacher, the only sensible conclusion is that case law dealing with the First Amendment in government employment provides the appropriate legal framework. It would be nonsensical to evaluate her claim as if she were a pupil herself at Conestoga Valley.

Plaintiff's internet posting does not touch on matters of public concern. She concedes that her posting does not concern government malfeasance or corruption. She admits is it wholly self-referential and was taken and posted for plaintiff's and her

girlfriends' personal use. While there is nothing wrong in that, it does not constitute the

kind of public matters intended for constitutional protection. On its face, the posting does

not imply malfeasance by school officials. It does not name or otherwise identify

Conestoga Valley, MU or their teachers or administrators, claim that anyone engaged in

malfeasance or that plaintiff was in any way displeased with either school's actions.

According to plaintiff, the "They" in the text that plaintiff believes won't "stoop so low

as to mess with my future" are not even school personnel; "They" are her students.

Additionally, the "real reason" that plaintiff says she "won't apply there" (wherever

"there" is) is herself. The posting does not even identify plaintiff except insofar as she is

a nameless employee with a vague, personal gripe. The posting merely reflects the

undirected and untargeted private musings of an unidentified person.[8]

3.      **Even If The Court Concludes That Plaintiff's Posting Constitutes Protected Activity, Defendants Escape Liability Because They Would Have Acted The Same Even Had She Not Posted On The Internet**

Throughout the semester Snyder received highly critical evaluations regarding

her student teaching and unprofessional actions from Reinking and Girvin. Buffington

testifies that plaintiff was directed not to return to CV because of her unprofessional

behavior--a decision not involving defendants.  To Buffington, the posting was merely

the culmination of a disastrous semester. Buffington at 68-72.[9] Plaintiff did not finish the

---

[8] Plaintiff may assert that the media attention subsequent to her lawsuit reflects a matter of public concern. This would be a specious argument. The interest was generated only after the federal litigation was filed and plaintiff and her counsel took to the airwaves and the blogosphere.

[9] In response to plaintiff's "apology letter" Buffington wrote that "I need to state that this young woman, in my opinion, should not pass student teaching. Nicole Reinking has coped with a great deal this semester, and I have served as a confidante and advisor. Stacy's content knowledge, as is obvious from the numerous errors in this memo and letter, because of her lack of knowledge about the English language, is one factor. In

semester at CV and did not pass student teaching. Therefore, pursuant to MU's Academic

polices, she was not eligible to receive a B.S.Ed. or, pursuant to PDE regulations, to

receive teaching certification.

No evidence shows that the posting made a difference in defendants' actions.

Plaintiff's barely competent teaching and unprofessional behavior were the determinate

factors in Girvin's decision to not award her a passing grade. Because plaintiff did not

pass student teaching, Wenrich could not recommend her for a B.S.Ed. degree. Finally,

there is no evidence that Prabhu and Schneller had even seen the posting until the lawsuit

was filed in spring 2007.  This record leaves no doubt that plaintiff's academic record--

her failure in student teaching and unprofessional behavior culminating in CV's barring

her from the school--were the determinative, if not the sole, reasons for MU's action.

### 4.    IN THE ALTERNATIVE, <u>Morse v. Frederick</u> Bars the Claim Because Plaintiff's Posting Promotes Underage Drinking

In the alternative, plaintiff's claim should be dismissed under <u>Morse v. Frederick</u>,

<u>supra</u>. Because it promotes underage drinking, school authorities were entitled to take

action. In <u>Morse</u>, the Supreme Court observed that "the constitutional rights of students

in public school are not automatically coextensive with the rights of adults in other

settings," <u>Morse</u>, 127 S.Ct. at 2622 (citation omitted), and that the rights of students

"must be 'applied in light of the special characteristics of the school environment.'"

<u>Morse</u>, 127 S.Ct. at 2622 ((citation omitted). The Court concluded that, consistent with

these principles, schools may take steps to safeguard those entrusted to their care from

speech that can reasonably be regarded as encouraging illegal drug use. <u>Id</u>. While the

---

addition, her lack of professionalism, throughout her stay and most recently with her
inappropriate actions, is another factor." Buffington, Exhibit 4.

words on the student's banner, "BONG HiTS 4 JESUS," could be interpreted in many ways ("cryptic," offensive," "amusing," "nonsense"), Id. at 2624-25, the district's interpretation of the words as promoting illegal drug use "is plainly a reasonable one" because the phrase could be reasonably understood as advocating the use of illegal drugs. Id. at 2625. Therefore, the school may take appropriate action against the student without offending the First Amendment.  Id. The Court re-affirmed the principle that deterring drug use by schoolchildren is an "important-indeed, perhaps compelling" national interest and recognized that drug abuse can damage the health and well-being of young people. Id. at 2628 (citations omitted).

The courts take an equally dim view of alcohol usage in schools. As Justice Stevens recognized in Morse, the effects of alcohol abuse are no less pernicious than the effects of illegal drug use. He wrote that "[g]iven the tragic consequences of teenage alcohol consumption--drinking causes far more fatal accidents than the misuse of marijuana--the school district's interest in deterring teenage alcohol use is at least comparable to its interest in preventing marijuana use." Id. at 2650 (Stevens, J., dissenting). Cf.  Hazelwood School Dist., 484 U.S. at 570 ("A school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with 'the shared values of a civilized social order,'" quoting Fraser, 478 U.S. at 683.)

Application of these principles precludes Snyder's First Amendment claim. Assuming arguendo, for purposes of the present motion only, plaintiff alleges that Buffington criticized the posting photograph as "unprofessional" and barred her from entering the school. During the following days, according to plaintiff, Bray, Wenrich and

Girvin "accused Plaintiff of promoting underage drinking through her 'drunken pirate' photo." Third Amended Complaint ¶¶ 45, 50. <u>See</u> Snyder at 244. <u>See</u> Reinking at 161.

While the posting could be interpreted in many ways, plaintiff asserts that school officials interpreted it as promoting underage drinking. <u>Id</u>.  Snyder was student teaching minors in a public high school and was expected to act as a role model and comport herself as a professional. She concedes she posted the photograph of herself and text on her myspace website and that her students viewed her webpage. Plaintiff may be "over 21," but the students for whom she had responsibility were not.  The Court's holding in <u>Morse</u> makes clear that school officials have a responsibility for their students' welfare and may take steps to safeguard them from conduct or speech that can reasonably be regarded as glamorizing, encouraging or making alcohol usage acceptable to minor students.  With respect to Snyder's posting, the Supreme Court's observation in <u>Morse</u> applies here as well: "Gibberish is surely a possible interpretation of the words on the banner, but it is not the only one, and dismissing the banner as meaningless ignores its undeniable reference to illegal drugs." 127 S.Ct. at 2625.  School officials' interpretation that Snyder's posting was unprofessional and may promote underage drinking "is plainly a reasonable one" and, thus, actions based on that interpretation do not offend the First Amendment.

**D.      Qualified Immunity Bars the § 1983 Damages Claim**

If the court finds that plaintiff's constitutional rights have been violated, then defendants are entitled to qualified immunity in the damages claim because a reasonable person would not have believed he was violating clearly established rights. The defense of qualified immunity shields government officials from liability whenever "their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005) (citations omitted). Qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law." Blackhawk v. PA., 381 F.3d 202, 215 (3d Cir. 2004). It "is an entitlement not to stand trial or face the other burdens of litigation." Bennett v. Murphy, 274 F.3d 133, 136 (3d Cir. 2002).

Regardless of whether the rights at issue are ones that "a reasonable person would have known" or are "clearly established," the court must begin its evaluation of the qualified immunity defense by determining whether any constitutional rights have been violated. Saucier v. Katz, 533 U.S. 194, 201 (2001). The court "must next determine whether [that right] was a clearly established one, about which a reasonable person would have known." McGreevy, 413 F.3d at 364. "Clearly established" means 'some but not precise factual correspondence' between relevant precedents and the conduct at issue," although "officials need not predict the future course of constitutional law." McLaughlin v. Watson, 271 F.3d 566, 571 (3d Cir. 2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Thomas v. Independence Twp., 463 F. 3d 285 (3d Cir. 2006). Defendants are entitled to qualified immunity if "a reasonable officer could have believed that the challenged conduct was lawful under the circumstances." Blackhawk, 381 F.3d at 215.

Courts have found the law to be "clearly established" only (1) where the "relevant principles" "apply with obvious clarity to the specific conduct in question" or (2) where a "closely analogous case" holds the conduct unconstitutional and no "reasonable official

could have distinguished" it. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739-40 (2002); <u>Paff v. Kaltenbach</u>, 204 F.3d 425, 433 (3d Cir. 2000). The critical question in the qualified immunity analysis is whether the state of the law gave these defendants "fair warning," <u>Hope</u>, 536 U.S. at 741, that their conduct would violate the Constitution.  The question of qualified immunity requires that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition. . ." <u>Saucier</u>, 533 U.S. at 201-202.  <u>See</u> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004) (not clearly established "in this more particularized sense" that defendant was violating plaintiff's rights).

All the case law supports defendants' position that plaintiff's posting is not protected by the First Amendment because it is a private, vague and ambiguous posting with no "message" and no public interest. Although plaintiff will contend that <u>Tinker</u> and progeny apply, defendants are not able to locate an analogous case in which the school speech cases apply.  In fact, all the cases reflect that the appropriate legal framework is the public employment cases. In June 2005, the district court in <u>Watts</u>, wrote that "[t]here are relatively few cases on how to treat the First Amendment rights of a college or graduate student within the context of an internship, externship, residency or practicum. Those courts facing the issue, however, have ruled that <u>Pickering</u> governs." <u>Watts</u>, 2005 WL 3730879 at * 16 (citations omitted). One year later, in May 2006, there was still no clearly established law holding that <u>Pickering</u> and progeny did not govern claims alleging First Amendment violations asserted by student teachers. The state of the law did not give defendants "fair warning" that their conduct would violate the First Amendment.

In any event, <u>Tinker's</u> general rule that students have free speech that may not be regulated unless disruptive does not advance the analysis. The tests these cases implicate

are complex and difficult to apply. "[A]cknowledge[ing] some lack of clarity in the Supreme Court's student-speech cases," the Second Circuit observed in 2006 that "[i]t is not entirely clear whether <u>Tinker's</u> rule applies to all student speech that is not sponsored by schools, subject to the rule of <u>Fraser</u>, or whether it applies only to political speech or to political viewpoint-based discrimination." <u>Guiles v. Marineau</u>, 461 F. 3d 320, 326, 327 (2d Cir. 2006) (observing that considering the depictions of drugs and alcohol mixed with a picture of the President on the student's tee-shirt "are questions of first impression in this Circuit" );  <u>Porter v. Ascension Parish School Bd.</u>, 393 F. 3d 608, 615 n. 22 (5th Cir. 2004) (reflecting uncertainty as to when courts should apply school-speech precedents).

Last summer in <u>Morse</u>, Justice Breyer, concurring in part and dissenting in part, urged the Court to apply qualified immunity to the facts of that case because of the unsettled state of the case law. He observed that at the time of the confrontation between the student and officials, "[n]one of these cases [<u>Tinker</u>, <u>Fraser</u> and <u>Kuhlmeier</u>] clearly governs the case at hand," 127 S.Ct. at 2641, and that "the fact that this Court divides on the constitutional question (and that the majority reverses the Ninth Circuit's constitutional determination) strongly suggests that the answer as to how to apply prior law to these facts was unclear." <u>Id</u>.  The lack of clarity of the state of the law was further evidenced in Justice Stevens' dissent in <u>Morse</u>, where he argued that <u>Morse</u> may give rise to a fourth "seminal" case in the school speech "trilogy."  Joined by Justices Souter and Ginsberg, he wrote that "this case … ends with the Court inventing out of whole cloth a special First Amendment rule permitting the censorship of any student speech that mentions drugs, at least so long as someone could perceive that speech to contain a latent pro-drug message."  127 S.Ct. at 2650.

*Morse* may create a new category of school speech cases, one that allows action against student speech that school officials perceive as encouraging alcohol or drug usage. For present purposes, however, the court need not confront those vexing and insoluble issues. The court need merely recognize the unsettled state of First Amendment jurisprudence in these cases and confer qualified immunity upon defendants. As Justice Breyer wrote "Teachers are neither lawyers nor police officers; and the law should not demand that they fully understand the intricacies of our First Amendment jurisprudence." 127 S.Ct. at 2639.

Furthermore, in the specific legal context of this case--free speech rights of student teachers on the internet--there is no applicable case law. Research reveals no case pertinent to whether plaintiff's internet posting on her private website constitutes expressive speech such that school officials would have any reason to believe the posting falls within the contours of protected activity. The relevant general principles do not apply with obvious clarity to the specific conduct in question and research finds no "closely analogous case" holding defendants' conduct unconstitutional such that a reasonable official could have believed his conduct was unlawful.

Moreover, no cases from the Supreme Court, the Third Circuit Court of Appeals or its district courts hold that an academic action taken by a Pennsylvania public university of giving a student teacher a failing grade in her teaching practicum and then not conferring upon her a teaching degree violates the First Amendment. Cf. Watts, 2005 WL 3730879 at * 9. In 2006 there was no clearly established law that would have put a reasonable university administrator on notice that Snyder's posting on the internet that consisted of a nonsense picture and some personal complaints about some unidentified

authority was expressive conduct or on a matter of public concern. See Badia v. City of Miami, 133 F.3d 1443, 1445 (11th Cir.1998) ( "If it is unclear whether [the speech was] of the kind held to involve a matter of public concern, then [the defendant's] actions did not violate clearly established First Amendment rights and he is entitled to qualified immunity.").

**E.  Plaintiff's Claim for Injunctive Relief Should be Denied**

Plaintiff requests that the court order defendants to confer upon her a B.S.Ed and to process the paperwork for initial teaching certification. To obtain a permanent injunction, she must show: (1) actual success on the merits; (2) irreparable harm to the movant if the injunction is not granted; (3) that granting injunctive relief will not result in even greater harm to the non-moving party; and (4) that granting relief will be in the public interest. Shields v. Zuccarini, 254 F. 3d 476, 482 (3d Cir. 2001). Because plaintiff's claim fails on the merits and, for the following reasons, her request for injunctive relief also fails.[10]

**1.  Snyder Lacks Standing Because There Is No Real
    Or Immediate Threat That She Will Be Wronged Again**

Federal injunctive relief against state officials in § 1983 actions is an extreme remedy. City of Los Angeles v. Lyons, 461 U.S. 95, 112 (1983). To have standing to seek such relief, the party must show "irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be

---

[10] Separate and apart from these arguments, the court should consider plaintiff's incompetent and unprofessional behavior as a student teacher repeatedly observed and documented by professionals at CV and MU. While not subject to a quantitative analysis, the potential harm to students who would encounter plaintiff as a teacher must be considered.

wronged again—a 'likelihood of substantial and immediate irreparable injury'" (citation omitted). Id. at 111. In Lyons, the Supreme Court held that injunctive relief was not warranted where plaintiff could not show that he was realistically threatened by a possible repetition of the choke hold that Los Angeles police had applied to him.  Absent such a showing, "Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional." Id. See U.S. v. W.T. Grant Co., 345 U.S. 629, 633 (1953) (plaintiff must demonstrate "that there exists some cognizable danger of recurrent violation of [his] legal rights"); U.S. v. Or. State Medical Society, 343 U.S. 326, 333 (1952) ("[t]he sole function of an action for injunction is to forestall future violations"); Wessel v. City of Albuquerque, 299 F. 3d 1186, 1194 (10th Cir. 2002) ("must be "some cognizable danger of recurrent violation."); Wooden v. Board of Regents, 247 F. 3d 1262, 1283 (11th Cir. 2001) (university applicant who had been denied admission under university's past allegedly discriminatory policy, but who was later admitted as a transfer student, lacked standing to challenge current admissions policy); Anderson v. Davila, 125 F. 3d 148, 165 (3d Cir. 1997) (injunction not warranted where government contends it terminated surveillance of plaintiffs).

Here, plaintiff does not, and cannot, allege any real or immediate threat that she will be wronged again by defendants, i.e., that there is any 'likelihood of substantial and immediate irreparable injury." Plaintiff has graduated from Millersville and is not presently enrolled there. It is unlikely that she will ever enroll there again or ever need to face the individual defendants in any situation, let alone a situation comparable to that in which she found herself in May 2006.

2.    **The Eleventh Amendment Bars the Claim Because Plaintiff Does Not Seek Prospective Equitable Relief for Ongoing Violations of Federal Law Under Ex Parte Young**

Plaintiff sues defendants in their official capacities in order to obtain a federal injunction mandating that defendants confer upon her a B.S.E degree and issuing the necessary documentation so she can obtain her Pennsylvania teaching certification.[11] The Eleventh Amendment bars federal jurisdiction over lawsuits against state officials acting in their official capacities when the state is the real party at interest. See Pennhurst State Sch. & Hosp., 465 U.S. at 101-02. It bars suit whether the relief sought is legal or equitable. Papasan v. Allain, 478 U.S. 265 (1986).

There are three exceptions to Eleventh Amendment state immunity to lawsuits in federal court: (1) Congress has abrogated the state's immunity from suit through an unequivocal expression of its intent to do so through a valid exercise of its power; (2) a state has waived its immunity and consented to suit in federal court; and (3) the plaintiff "seek[s] prospective equitable relief for ongoing violations of federal law ... under the Ex Parte Young doctrine." Seminole Tribe of Fla. v. Florida, 517 U.S. at 44, 55-56; Ex Parte Young, 209 U.S. 123, 159-60 (1908). As found by the Court in ruling on MU's Motion to Dismiss to Complaint, neither of the first two exceptions to state immunity applies. The only possible basis for an exception to immunity is pursuant to Ex Parte Young. In Verizon Maryland Inc. v. Public Service Commission of Maryland, 535 U.S. 635 (2002),

---

[11] Of course, claims for equitable relief against State officials in their individual capacities are barred. The "[t]he sole function of an action for injunction is to forestall future violations." U.S. v. Or. State Medical Society, 343 U.S. 326, 333 (1952). Granting equitable relief against Commonwealth defendants in their individual capacities would not prevent future violations since those violations would occur as a result of action by Commonwealth defendants in their official capacities only. See Spicer v. Hilton, 618 F. 2d 232, 241 (3d Cir. 1980).

the Supreme Court held that the exception requires a "straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Id. at 645 (quotations omitted).

Ex Parte Young is a narrow exception, Pennhurst State Sch. & Hosp., 465 U.S. at 102, applying only to allegations of an ongoing violation of federal law, and where the relief sought is prospective and not retrospective. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 294 (1997). See Green v. Mansour, 474 U.S. 64, 68 (1985) (Eleventh Amendment bars notice relief where no ongoing violation of federal law alleged); Rizzo v. Goode, 423 U.S. 362, 378 (1976) (reversing injunction against Philadelphia Police Department which would have instituted program to handle citizens complaints against police misconduct); Edelman v. Jordan, 415 U.S. 651, 666-68 (1974) (Eleventh Amendment bars award of injunction for past violation of federal law by state officials); Students for Conservative America v. Greenwood, 378 F. 3d 1129 (9th Cir. 2004) (student organization's lawsuit against university seeking a new election was not a request for prospective injunctive relief and was barred); Sonnleitner v.York, 304 F. 3d 704, 718 (7th Cir. 2002) (affirming motion to dismiss where allegations against state officials referred to a past rather than ongoing violation of federal law, i.e., that defendants improperly demoted plaintiff without due process).

Snyder fails to allege an ongoing violation of federal law or to seek relief properly characterized as prospective. She claims that in May 2006, because of her posting, defendants violated her rights by failing to confer upon her a B.S.Ed. degree and by not issuing the necessary documentation for teaching certification. She does not allege an

ongoing violation of federal law. The alleged violation occurred in May 2006 and has not

occurred since.  Plaintiff seeks to re-visit the events of May 2006 and to have defendants

replace her B.A. with a B.S.Ed. so that she can obtain certification—all retrospective

relief. The remedy she seeks relates to a past rather than an ongoing violation of federal

law. Because these allegations do not fit within the narrow exception of <u>Ex Parte Young</u>,

the official capacity claims are barred by the Eleventh Amendment.


**III.     CONCLUSION**

      For these reasons, defendants request that the court grant judgment as a matter of

law in their favor.

                                 THOMAS W. CORBETT, JR.
                                 ATTORNEY GENERAL


BY:    <u>s/s Barry N. Kramer              </u>
           BARRY N. KRAMER
           Senior Deputy Attorney General
           Identification No. 41624

           Susan J. Forney
           Chief Deputy Attorney General
           Civil Litigation Section

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Tel:     (215) 560-1581
Fax:    (215) 560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STACY SNYDER,                    :          CIVIL ACTION
                                 :
        Plaintiff,               :
                                 :
        v.                       :
                                 :
MILLERSVILLE UNIVERSITY,         :
et al.                           :          07-1660
                                 :
        Defendants.              :

## CERTIFICATE OF SERVICE

I, Barry N. Kramer, hereby certify that on April 11, 2008, Defendants' Motion for Summary Judgment has been filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System. The ECF System's electronic service of the Notice of Electronic Case Filing constitutes service on all parties who have consented to electronic service:

        Mark W. Voigt, Esquire
        Plymouth Meeting Executive Campus
        Suite 400
        600 West Germantown Pike
        Plymouth Meeting, PA  19462

                        BY:     s/s Barry N. Kramer
                                BARRY N. KRAMER