IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

## EXHIBITS TO MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A      Declaration of Judith Wenrich (Wenrich")
B      Millersville Guide to Student Teaching ("MU Guide")
C      Deposition of Stacy Snyder ("Snyder")

- C-1    Plaintiff Background Information

C-2    Residence Changes
- C-3    Reinking notes during semester
- C-4    Girvin notes during semester
- C-5    Reinking mid-term evaluation of plaintiff
- C-6    Girvin's mid-term evaluation of plaintiff
- C-7    Girvin's mid-term PDE-430 of plaintiff
- C-8    Plaintiff's mid-term self-assessment
- C-9    Reinking final evaluation of plaintiff
- C-10   "Drunken pirate" picture and text
- C-11   Picture
- C-12   Girvin's final evaluation of plaintiff
- C-13   "Unprofessional Behavior/Performance in the Classroom"
- C-14   Plaintiff's response to Ex. C-13
- C-15   Plaintiff's May 9, 2006 e-mail to Girvin
- C-16   Plaintiff's "apology letter"
- C-17   Plaintiff's "request for exception to graduation requirements"
- C-18   Girvin's final PDE-430 of plaintiff

D      Deposition of Barry Girvin ("Girvin")

E      Deposition of Deann Buffington ("Buffington")

F      Deposition of Nicole Reinking ("Reinking")

G      Declaration of Jane Bray ("Bray")

H      Declaration of Barry Girvin ("Girvin Declaration")

I      Deposition of Beverly Schneller ("Schneller")

J      Declaration of Vilas Prabhu ("Prabhu")

K      Deposition of Gerald Huesken ("Huesken")

**EXHIBIT A**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| STACY SNYDER, | : | CIVIL ACTION |
|---|---|---|
| Plaintiff, | : | |
| v. | : | |
| MILLERSVILLE UNIVERSITY, et al. | : | 07-1660 |
| Defendants. | : | |

### Declaration

I, Judith Wenrich hereby declare as follows:

1.      I am employed at Millersville University as Department Chair in Elementary and Early Childhood Education. I am also the Coordinator for Student Teaching and for Early Field Experiences. In May 2006, I was Department Chair in Elementary and Early Childhood Education and the Coordinator for Student Teaching

2.      In these capacities, among other responsibilities, I work with school districts to oversee placement of student teachers for secondary, elementary and special education. I am also responsible for planning orientation meetings for student teachers who will begin student teaching.

3.      On or about May 12, 2006, Stacy Snyder came to see me in my capacity as Coordinator for Student Teaching. I had never met her before.

4.      Ms. Snyder advised me that she had been removed from Conestoga Valley High School, where she had been student teaching. I also learned that she had not passed student teaching.

5.      Because she had not passed student teaching, pursuant to Millersville academic requirements, she was not eligible to receive a B.S.Ed. from Millersville.

6.      Pursuant to Pennsylvania Department of Education ("PDE") policies, to receive initial teaching certification, a student must satisfactorily complete student teaching by passing all four categories in form PDE-430: Planning and Preparation, Classroom Environment, Instructional Delivery and Professionalism. Because Ms. Snyder had not passed student teaching, she was not eligible to receive initial teaching certification from PDE.

7.     Because of Millersville's academic requirements, I was not able to recommend her as eligible to receive a B.S.Ed. from Millersville.

8.     In considering Ms. Snyder's options when she came to my office in May 2006, I reviewed her student teaching performance during the entire semester at Conestoga Valley High School. I reviewed Nicole Reinking's mid-term and final evaluations and her written observations of Ms. Snyder made during the semester, Barry Girvin's mid-term and final evaluations (both the Millersville evaluations and the PDE-430) and his written observations of plaintiff made during the semester. These documents indicated plaintiff's unsatisfactory performance as a student teacher. I had no role whatsoever in the preparation of any of these evaluations.

9.     I was concerned that Conestoga Valley administrators had barred Ms. Snyder from entering the school except for the final conference. In the past, other students who have been barred from entering the cooperating school have also not passed student teaching.

10.     Plaintiff's internet posting, the so-called "drunken pirate" picture and accompanying text did not play any role in my decision.

12.     I had no concern that if we did not take action towards Ms. Snyder that Conestoga Valley would not permit future Millersville students to student teach there.

13.     After Ms. Snyder and I spoke, I referred her to Dr. Beverly Schneller, who is Chair of Millersville's English Department to see if it could be arranged that Ms. Snyder receive a B.A.

I declare under penalty of perjury that the foregoing facts are true and correct.

Millersville, PA

DATED:
    4|7|08

Judith Wearich

**EXHIBIT B**

# MILLERSVILLE
## UNIVERSITY

## A GUIDE FOR
## STUDENT TEACHING

### OFFICE OF FIELD SERVICES
### MILLERSVILLE UNIVERSITY

**P. O. BOX 1002**
**MILLERSVILLE, PA 17551-0302**
**(717) 871-5752**

Revised, Summer 2005

P.O. Box 1002
Millersville PA 17551-0302
www.millersville.edu



MILLERSVILLE
U N I V E R S I T Y

*Find Your Future. Here.*

Dean of Education
717-872-3379
FAX: 717-872-3856

January 18, 2006

*Dear Millersville University Cooperating Teacher:*

I would like to take this opportunity to thank you for your willingness to assist Millersville University by serving in the most critical position of a cooperating teacher in the preparation of new teachers. Your role as a cooperating teacher is highly valued by all at Millersville University; however, too often and unintentionally, we are remiss in showing our profuse appreciation for your work. The most significant semester of our teacher preparation programs is successful because of your willingness to share your time, your expertise and your focus for supporting a great profession.

Enclosed, you will locate two items that I hope you will be able to review with your student teachers. The first is a revised schedule for the Spring 2006 student teaching semester. Of special note, the student teaching interviewing session date was changed from the earlier schedule that you received. The opportunity for our teacher candidates to hear about the important skill of interviewing is first detailed in a large group presentation by one of our local superintendents, Mr. Don Stewart. His presentation is followed by placing our teacher candidates into smaller sections according to disciplines. Mock interviews are conducted in these smaller sessions by local principals and curriculum supervisors. We are pleased to offer the interviewing session once again to all of our teacher candidates.

The second enclosure is a quick snapshot of our conceptual framework entitled *Communities of Learners.* This framework is the result of two years of work that involved faculty at the university, teacher candidates and practicing teachers and principals in the field. The main elements of our framework are the three themes you see listed on the enclosed card. Please feel free to discuss the themes with your student teacher. You are also encouraged to reference the themes in your written observations of your student teacher. Finally, if you are interested in viewing the entire framework, you may visit the School of Education web site at http://muweb.millersville.edu/~deaneduc/ where you can locate the framework on the left side under the heading of Professional Education Unit Information.

I would like to thank you again for sharing your expertise in the development of new teachers for our PK-12 students. Should you have questions, issues or concerns during this semester or at any other time, please do not hesitate to contact me directly or the university supervisor who is working with you.

With appreciation,

Dr. Jane S. Bray
Dean, School of Education

/cjs

*Celebrating 150 years of tradition and innovation*
A Member of Pennsylvania's State System of Higher Education

# TABLE OF CONTENTS

Quick Reference.........................................................................................................................……….4

Professional Education Unit - Conceptual Framework .................................................................5

Professional Education Unit - Mission and Vision Statements ......................................................5

Student Teaching Policies and Procedures ....................................................................................7

Certification Requirements .............................................................................................................9

Responsibilities of the:
     Student Teacher .................................................................................................................10
     Cooperating Teacher...........................................................................................................11
     University Supervisor .........................................................................................................12

Teaching & Classroom Management...............................................................................................13

Planning for Instruction ..................................................................................................................14

Evaluation of Student Teaching.......................................................................................................15

Pennsylvania Statewide Evaluation Form (PDE 430) - Instructions .............................................16

Pennsylvania Statewide Evaluation Form (PDE 430) - Form .......................................................19


Appendices
     A) Student Teaching Absence Form................................................................................24
     B) Pennsylvania Code of Professional Ethics.................................................................25

# QUICK REFERENCE

## WHAT TO DO IN CASE OF:

| | |
|---|---|
| SITUATION: | **Illness or family emergencies** such as illness in family, funeral, etc. |
| CALL: | Cooperating Teacher **and** University Supervisor. |
| ACTION: | Follow the instructions on Pages 7 and 8 under 'Attendance of Student Teachers'. |

| | |
|---|---|
| SITUATION: | **Anticipated absences** such as job interview, observations in other schools. |
| ACTION: | Follow the instructions on Pages 7 and 8 under 'Attendance of Student Teachers'. |

| | |
|---|---|
| SITUATION: | **In-Service Days or Meeting.** |
| ACTION: | Attend if district permits or make arrangements with your cooperating teacher to work in the classroom. |

| | |
|---|---|
| SITUATION: | **Inclement weather conditions** which impede travel. |
| ACTION: | Listen to radio or TV reports which announce whether or not your assigned school district is open or delayed. Follow your district's schedule. |

## IMPORTANT PHONE NUMBERS AND E-MAIL ADDRESSES

| | | |
|---|---|---|
| Student Teaching Office | 871-5752 | student.teaching@millersville.edu |
| Student Teaching Fax | 871-2034 | |
| University Supervisor #1 | | |
| University Supervisor #2 | | |
| Cooperating Teacher #1 | | |
| Cooperating Teacher #2 | | |
| School Office #1 | | |
| School Office #2 | | |

**NOTE**: Numbers must be obtained from the University Supervisors, Cooperating Teachers, and Schools. ALWAYS check with your Cooperating Teacher and University Supervisor regarding proper procedure and permission to call the person at home.

# Student Teaching Website.......www.millersville.edu/~stutch

## AFFIRMATIVE ACTION STATEMENT

Millersville University is an Equal Opportunity/Affirmative Action institution. Coordinators: Services for Students with Disabilities - Mrs. Sherlynn Bessick, Director, Office of Learning Services, Lyle Hall, 717-872-3178; Title VI and Title IX - Ms. Patricia Hopson-Shelton, Assistant to the President for Social Equity and Diversity, Delaware House,717-872-3787; ADA Coordinator - Mr. Dale McCloud, Associate Vice President for Human Resources, Dilworth Building, 717-872-3017.

A Member of the Pennsylvania State System of Higher Education.

# PROFESSIONAL EDUCATION UNIT

## CONCEPTUAL FRAMEWORK - ABSTRACT

*All members of the Millersville University Professional Education Unit will create learning communities of inquiry and action, focus on students, and demonstrate exemplary professional practices.*

| | |
|---|---|
| **Learning Communities of Inquiry and Action** | We will engage in learning communities in which reflection, collaboration, lifelong learning, and habits of mind are developed and nurtured. |
| **Focus on Students** | We will balance knowledge and the principles and concepts delineated in professional and state standards with an appreciation of all students' individuality, diversity, and cultures. |
| **Exemplary Professional Practices** | We will demonstrate the knowledge, skills and dispositions of exemplary professionals. We will have strong competence in our content knowledge, pedagogical content knowledge and skills as delineated in professional, state, and institutional standards. We will demonstrate professional dispositions or standards of conduct, will be supportive of students, families, and the school and community and will serve as catalysts for positive and responsible change. |

To view the full text of the Conceptual Framework, visit the School of Education webpage at **http://muweb.millersville.edu/~deaneduc/**.

NOTE: The term *Students* in this document and the Mission and Vision Statement refer to school-age (pre-school to grade 12) students.

5

# PROFESSIONAL EDUCATION UNIT

## MISSION STATEMENT

The Professional Education Unit (PEU) is committed to the preparation and continuing development of education professionals (e.g., teachers, school leaders, and professional support personnel). The core of basic preparation includes a steadfast commitment to a liberal-arts based education, a strong knowledge of pedagogy and content, provision of ample field experiences, and the development of dispositions befitting an education professional. The PEU is committed to providing the Commonwealth of Pennsylvania and its students with professionals who are able to assume their roles and responsibilities as educators in a diverse and technologically complex society; who are able to understand and appreciate students as individuals; who develop habits of mind that support inquiry, reflection, and collaboration; and who demonstrate professional standards of conduct including a strong sense of ethics and the motivation to seek opportunities that foster professional and personal growth. The PEU is committed to serve as a resource for the communities in the region through the application of scholarship efforts and service.

## VISION STATEMENT

We envision the Professional Education Unit (PEU) at Millersville University to be exemplary in the preparation of education professionals who recognize, respect, and respond to the promise of every child, seek to better the lives of individuals in a changing and complex society, and improve society through the education process. We envision generations of learners within the community, where PEU faculty and school partners support and guide future education professionals; where new education professionals support and guide their P-12 students and become partners in the preparation of future educators; and where, subsequently, their students become responsible, valued, and giving members of the community.

Adopted, 2005

6

# STUDENT TEACHING POLICIES AND PROCEDURES

The overall policies in regard to student teaching are determined by the various teacher education departments, with the approval of the Dean of the School of Education. The administration of student teaching is a joint responsibility of the Coordinator of Field Services and the education faculty of the Professional Educational Unit.

## Assignment of Student Teachers

Assignments for student teaching locations are made by the Coordinator in cooperation with university departmental personnel, and administrators and teachers in cooperating school districts. Student Teachers are assigned to Cooperating Teachers, not to schools or school districts. Student Teachers are responsible for arranging their own transportation to and from their school assignment.

## Time Element in Student Teaching

Student teaching typically occurs during a student's seventh or eighth semester. The choice of semester is determined by: number of credits completed and departmental recommendation; satisfactory completion of all Advanced Professional Studies requirements; completion of all professional education courses (see University catalog); time of graduation; and the availability of Cooperating Teachers and University Supervisors. The Student Teacher is required to follow the school's daily schedule unless otherwise noted on the Millersville University Student Teaching calendar.

## Professional Conduct

The Student Teacher is a guest of the cooperating school. As a future member of the teaching profession, the Student Teacher needs to maintain the same professional standards expected of the teaching employees of the cooperating school. The Student Teacher is recognized as a representative of the University by the students, faculty, and community to which he/she is assigned.

The Student Teacher is urged to accept every task as a potential learning experience, to fulfill as effectively as possible every role of the classroom teacher, and to develop his/her own educational philosophy which will be consistent with the principles of a democratic society.

The Student Teacher is expected to be well-groomed and appropriately dressed as a member of the teaching profession and to adhere to the Pennsylvania Code of Professional Ethics. (Appendix B)

The Student Teacher must continue to adhere to the MU Student Code of Conduct throughout his/her field experience. The code is on the Millersville website, search: Student Handbook/Policies/Student Code of Conduct.

The Coordinator, in consultation with the Cooperating Teacher and the University Supervisor, has the authority to change or terminate the Student Teacher's assignment if professional conduct is not maintained.

## Additional Responsibilities Beyond Teaching

Student Teachers are urged not to take any courses during the semester in which they student teach. Under no circumstances may more than one course be taken. Student Teachers are also urged to reduce and/or eliminate their involvement in campus activities and outside employment. IN NO WAY SHOULD EITHER ACTIVITIES OR WORK INTERFERE WITH THE STUDENT TEACHER'S RESPONSIBILITIES TO HIS/HER TEACHING ASSIGNMENT.

## Attendance of Student Teachers

During the semester of student teaching, each Student Teacher is expected to be in the assigned classroom every day the school is in session. The Student Teacher will follow the school calendar and the calendar furnished by the Office of Field Services. Any exceptions to the school district or student teaching calendars will be announced to all students and Cooperating Teachers uniformly. Student Teachers are expected to attend in-service meetings, faculty meetings, and special school events (e.g. Parent-Teacher Conferences, I.E.P. Conferences, Open Houses).

IF YOU ARE ABSENT FOR ANY REASON, IT IS YOUR RESPONSIBILITY TO MAKE SURE YOUR COOPERATING TEACHER HAS ANY PLANS AND TEACHING MATERIALS/MANUALS NEEDED TO OPERATE THAT CLASS DURING YOUR ABSENCE.

1. If ill, call your Cooperating Teacher and University Supervisor.
2. If an emergency arises, contact your Cooperating Teacher and University Supervisor. (cont.)

3. No unexcused absences are permitted during the semester of student teaching. University Supervisors may require make-up time in instances of excessive absences, regardless of cause. A Cooperating Teacher should call the University Supervisor immediately if a Student Teacher does not report that day.
4. Any Student Teacher who finds it necessary to be excused for reasons other than emergencies (job interviews are the most frequent) must receive permission from his/her Cooperating Teacher and University Supervisor by completing the absentee form (Appendix A) and submitting it to the Office of Field Experiences.
5. If inclement weather conditions (e.g., snow) exist, listen to radio/television reports and follow the district's schedule. Do not call your school.

## Use of Student Teachers as Substitute Teachers

"A substitute teacher must hold a valid Pennsylvania certificate to teach in Pennsylvania public schools. Since Student Teachers normally do not hold a valid certificate, their assignments as substitute teachers violate the school code. Those teacher educators involved with student teaching should advise Student Teachers to avoid substitute teacher assignments, as they may find themselves in legal jeopardy." Pennsylvania Department of Education Memo 14, dated July 1975.

If a Cooperating Teacher becomes ill and the principal of the school asks a Student Teacher to cover the class for up to one hour, under the supervision of another teacher, until a substitute arrives, that brief substitution would not appear to break the law. Compensation for substitution is forbidden.

If a Cooperating Teacher is absent, a qualified substitute teacher will be assigned to his/her duties. When a substitute is in the classroom, the Student Teacher should not be given responsibility in addition to that which he/she has already assumed at that stage in the student teaching assignment. For example, if a Student Teacher is responsible for about one-third of the schedule, the substitute should not tell the Student Teacher to "take over the full load."

Under no circumstances should a Student Teacher be assigned as a substitute teacher to cover another teacher's classroom schedule or lunch, hall, bus, study hall, or recess duty.

University policy prohibits the release of the Student Teacher to accept a teaching position prior to successful completion of his/her student teaching. Receiving compensation for student teaching is also forbidden.

## Solo Teaching

Student teaching is a developmental process in which the student teacher gradually assumes increasing classroom responsibilities, leading to an eventual "solo" experience. The decision on how and when to increase a Student Teacher's classroom responsibilities is a JOINT DECISION, involving all three key participants - the Cooperating Teacher, the Student Teacher, and the University Supervisor. Likewise, the decision when to begin and end the "solo" portion of the assignment is a JOINT DECISION by these three participants. It is the University's expectation that all three individuals will develop effective communication channels so these decisions can be made with careful deliberation.

## Disruption in Schools

The policy of Millersville University in disruptive situations, i.e., strikes by professional employees or students, is to remove Student Teachers from their assignments at the discretion of the Coordinator. The Student Teachers will not return until the operation of school is resumed on a normal basis. Should the period of disruption become extensive, the Coordinator may reassign the Student Teachers to other locations.

## Transporting Students

No Student Teacher should transport any school students in any vehicle. This prohibition extends to field trips and overnight trips (which the Student Teacher should only attend if accompanied by the Cooperating Teacher).

# CERTIFICATION REQUIREMENTS

In order to receive an initial teaching certificate in Pennsylvania, a Millersville University candidate must...

1. Complete all requirements of an approved Millersville University education program, including those for admission into Advanced Professional Studies (APS).

2. Complete the program with a cumulative Millersville University GPA of 3.0*.

3. Satisfactorily complete student teaching.

4. Earn a Bachelor's Degree or higher.

5. Pass all required PRAXIS examinations and have the scores submitted by ETS to Millersville University.

6. Complete an application for certification and submit it, with money order or *certified* check, to the Certification Office in the School of Education at least 8 weeks before program completion.

Once passing PRAXIS scores are received and 'Degree is Conferred' by the Registrar's Office, the MU Certification Office will submit the application to Harrisburg.

*The Bureau of Teacher Preparation and Certification, Harrisburg, PA* will send the teaching certificate directly to the candidate approximately 6 weeks later.

Before receiving the teaching certificate, a successful candidate who: [1] submits a DAR's that states "ALL REQUIREMENTS HAVE BEEN MET" and [2] has had all PRAXIS exam passing scores submitted to MU may obtain a verification letter from the MU Certification Office for *substitute teaching purposes only.*

The candidate must complete the 'Request for Verification' form, attach a final DAR's, and submit it to the Certification Office after the last day of the semester.

*This cumulative grade point average is aligned with Title 22 Chapter 354 for Pennsylvania and is established at the time of the Candidate's admission to Advanced Professional Studies (APS).
  a. Academic Year 2003 and after: 3.0 GPA
  b. Academic Year 2002-2003: 2.8 GPA
  c. Academic Year 2001-2002: 2.6 GPA

C. Ridley & D. Groff, 6-7-05

# FOR STUDENT TEACHING REQUIREMENTS REFER TO YOUR DISCIPLINE-SPECIFIC SUPPLEMENT

# RESPONSIBILITIES OF THE STUDENT TEACHER

*It is the Student Teacher's responsibility to become part of the Community of Learners in the school.*

## Professional Interactions

Demonstration of Professional Dispositions

- Show enthusiasm for teaching, initiative and drive for best performance.
- Present a professional appearance and a high quality of verbal and written communication.
- Exemplify punctuality, thorough preparation, confidentiality, and ongoing personal learning.

Orientation to the school

- Adhere to faculty regulations: school day, dress code, use of equipment, parking, and emergency procedures.
- Meet school staff: principal, secretary, grade-level and support teachers, support staff.
- Locate all special services within the school.
- Learn all procedures for daily activities: school, classroom, and laboratory safety rules, school records, managements systems, and access to services.

Open Communication

- Have daily conversations with your Cooperating Teacher about instructional procedures, curricular issues, classroom management, and student characteristics and performance.
- Maintain frequent verbal and written communication with University Supervisor.
- Have effective interaction with all professionals and support staff to enhance the educational process for your students.

## Preparation

Daily Planning

- Prepare lesson plans several days in advance, and have them approved by your Cooperating Teacher.
- Base instruction on state and local standards and established curriculum or individualized plans.

Comprehensiveness

- Construct plans based on most current pedagogy and technology.
- Have all materials organized and easy to retrieve.

## Teaching

Take teaching responsibility early in the assignment

- Follow your Cooperating Teacher's lead in performing instructional practices.
- Volunteer to assume teaching tasks for individuals and small groups early in the assignment.
- Gradually increase teaching duties until you are totally responsible for daily instruction.
- Use current, research-based, and innovative methodologies.
- Research educational journals and other media in order to enhance lesson content and methodology.
- Follow a well-designed plan for lesson structure, student activities, and evaluation procedures.
- Adapt methodology to meet diverse student learning styles and special needs.
- Integrate technology into all phases of planning, teaching, and assessment.
- Perform formative and summative assessments throughout the instructional process.
- As your confidence increases, try unique and innovative teaching procedures.

## Student Interactions

Build student rapport

- Learn students' names, learning styles, special needs and effective grouping practices.
- Support students with self-management and by setting clear expectations.
- Honor student individuality, diversity, linguistic and cultural factors.

Build family rapport

- Show respect to all families and significant individuals important to your students.
- Involve parents through on-going communication, in exchanging information, and by seeking sincere input.

10

# RESPONSIBILITIES OF THE COOPERATING TEACHER

## Before the Student Teacher arrives

- Inform the students, parents, and building personnel of the Student Teacher's arrival.
- Collect district, building, classroom, and curricular materials for the Student Teacher.
- Provide a work and storage space.
- Develop a tentative schedule that will enable the Student Teacher to gradually assume teaching and other responsibilities.

## Orientation

- Introduce the Student Teacher to the principal and all significant personnel within the building.
- Share gathered materials including classroom management and evaluation systems.
- Discuss expectations, building regulations, and use of building and classroom equipment.
- Formalize the Student Teacher's schedule with input from the University Supervisor and Student Teacher

## Modeling, assistance and observation

- Explain developmental and unique learning characteristics of your students.
- Model instructional procedures and encourage discussion about pedagogy.
- Provide opportunities for the Student Teacher to observe your teaching, parent conferences if appropriate, and instructional support procedures.
- Provide opportunities for the Student Teacher to collaborate with personnel responsible for supporting students with special needs and those who are linguistically and/or culturally diverse.
- Confer with your Student Teacher on a daily basis and frequently provide written and verbal feedback.
- Interact with the University Supervisor when he/she visits and by phone or e-mail whenever successes and concerns arise.
- Complete an MU Mid-Placement Student Teaching Formative Evaluation, and an MU Student Teaching Final Evaluation. Only the MU Student Teaching Final Evaluation is submitted to the University Supervisor to be delivered to the Field Services Office and placed into the student's permanent file.

## Important factors about pre-service teaching

- Remember that student teaching is a formative process in which the teacher candidate will steadily gain proficiency.
- Offer the Student Teacher increased opportunities to acquire responsibility.
- Assist the Student Teacher in developing lessons, seeking resources, and managing student behavior.
- Encourage creative and unique teaching techniques.
- Confer with the University Supervisor on an ongoing basis and before completing the mid-term and final evaluations.

# RESPONSIBILITIES OF THE UNIVERSITY SUPERVISOR

## To the Cooperating Teacher

- Explain the Conceptual Framework, university policies, and the evaluation process.
- Serve as an ambassador promoting university goals and procedures with the Cooperating Teacher and the Student Teacher.
- Provide leadership to initiate and maintain the professional relationship between the School, University, and the Student Teacher.
- Communicate frequently with the Cooperating Teacher concerning Student Teacher progress and inform the Coordinator of Field Services of any concerns.

## To the Student Teacher

- Meet prior to the beginning of the assignment, fully explain the role and responsibilities of the Student Teacher and conduct periodic seminars, as needed, to enhance the student teaching experience.
- Encourage ongoing professional dialogue with the Cooperating Teacher.
- Observe the Student Teacher in a variety of classes/subjects a minimum of three times in a half semester or six times in a full-semester assignment.
- Provide advice and resource recommendations to promote effective teaching practices.
- Provide written and verbal feedback on each observation and be available for additional communications throughout the assignment.
- Provide honest, tactful, and constructive praise and criticism of the Student Teacher's performance.
- Complete evaluations as listed below and submit a final grade for the Student Teacher.
  - For a **half-semester assignment**: complete an MU Mid-Placement Student Teaching Formative Evaluation, an MU Student Teaching Final Evaluation, and one PDE 430 evaluation.
  - For a **full-semester assignment**: complete an MU Mid-Placement Student Teaching Formative Evaluation, a mid-assignment PDE 430 evaluation, an MU Student Teaching Final Evaluation, and a final PDE 430 evaluation.

# TEACHING AND CLASSROOM MANAGEMENT

The goal of effective classroom management is to provide positive supports so that each student may fully participate as a responsible and valued member of your learning community. To attain this goal, the Student Teacher should observe and work with the Cooperating Teacher's classroom and laboratory standards to identify appropriate plans and professional practices for his or her own teaching experiences. As you work toward attaining this management goal, you are demonstrating our conceptual framework themes: learning communities of inquiry and action, focus on students, and exemplary professional practices; and helping us to fulfill our mission.

To assist you in developing your teaching management skills, consider the following:

- Define and explain expectations.
- Let your students know when they are meeting your academic or behavior expectations.
- Use prompts, cues and reminders to assist your students to support them in meeting the standards.
- Consider the physical classroom arrangement and the impact this may have on student learning and student behavior. Make certain:
    - o All students can see instructional areas
    - o Materials are accessible
    - o Students are seated away from distracters
- Set management standards for your lessons using student input as appropriate.
    - o Phrase the standards as positives.
    - o Post the standards and review them regularly with your students.
- Focus upon your professional delivery.
    - o Maintain an even and well modulated voice.
    - o Avoid 'Do you want to…?' questions if students do not have an option.
    - o Use pauses and dramatic delivery to get students' attention or emphasize information.
    - o Deliver directions as polite declarative statements, not as hesitant interrogatives.
- Develop management plans (for groupings, material dissemination, transition times, etc.) concurrent with your lesson plans. Resorting to management plans after a lesson doesn't go smoothly is not proactive or supportive.
- Establish positive connections by using your students' names during classroom interactions.
- Identify and respect the individual needs and differences of all of your students.
- Be consistent.
- Involve all of your students in active learning as appropriate.
- Eliminate threats, promises, and bluffs from your teaching management repertoire.
- Continuously attempt to stretch your teaching management skills repertoire.
    - o Attend to positives and try ignoring inappropriate or challenging behaviors.
    - o Reflect upon and identify positive strengths in each of your students on an ongoing basis.

C. Ridley & L. West, 5-18-05

13

# PLANNING FOR INSTRUCTION

Planning is an absolute necessity for any teacher to accomplish the professional aspect of teaching. NO ATTEMPT AT TEACHING SHOULD BE MADE WITHOUT PROPER PLANNING. To plan effectively, a teacher must be aware of all aspects of a curriculum. Student Teachers, while not responsible for an entire year's curriculum, should be introduced to the scope and sequence of a year's work.

It is important that the University Supervisor and the Student Teacher discuss the appropriate lesson plan format for each particular Student Teacher. Refer to the discipline-specific supplement to acquire the specific formats suggested in your program.

Typically, lesson plans include the following (or similar) components:
- Goal and State or District Standards
- Lesson Objectives
- Materials and Resources
- Procedures, including:
  - Introduction
  - Teacher Instructional Methods
  - Student Activities
  - Special Adaptations to Meet Individual Needs
  - Closure
- Methods for assessing and documenting student performance.
- Self-Reflection.

## Instructional Unit Planning, Teacher Work Sample, CIRQL Project

Instructional unit planning provides an opportunity to use professional skills in designing, assessing, and reflecting upon instruction in a particular subject area. Student Teachers are responsible for organizing a series of learning activities to accomplish instructional unit planning in a particular subject area.

## EVALUATION OF STUDENT TEACHING

### Each discipline has its own student teaching evaluation form.

The student teaching evaluation form has components that are consistent with all disciplines and those that are specific to each discipline. Common elements across disciplines are the following:

1. Specific emphasis on Professionalism, Preparation, Teaching Performance, and Effect on Student Learning.

2. Criteria focus on Knowledge, Skills, and Dispositions under each area.

3. A common rating scale described below.

### Rating Scale for the Millersville Mid-Placement Student Teaching Formative Evaluation

G = GOOD progress evidenced. You are building a sound foundation. Continued on-going development is expected.

R = REASONABLE progress evidenced. Continued on-going development is expected.

A = ADDITIONAL attention needed. Seek additional feedback and improvement in this area.

N = NEEDS significant remediation. There is need to develop specific plans for improvement and to demonstrate significant improvements in this area.

L = LIMITED opportunity to demonstrate this point.

## Please refer to the discipline-specific form for your major.

Each discipline has a student teaching evaluation form that includes items relevant to the Professional Education Unit and items specific to the major. The forms are contained in the supplements related to each area. Fall 2005 is the first semester the forms will be used. Student Teachers are encouraged to discuss the new evaluation forms with the University Supervisor.

# The PDE 430 is completed ONLY by the University Supervisor



Using the
Pennsylvania Statewide Evaluation Form for Student Professional Knowledge and Practice–
Pennsylvania Department of Education—PDE-430

## HEADING AND SIGNATURE PAGE

1. The heading of the evaluation form contains biographical information regarding the Student Teacher/candidate being evaluated and the evaluation period.

2. The subjects being taught and the grade level should be clearly listed.

3. Write the date on which the conference was held between the Student Teacher/candidate and the evaluator on the signature page of the PDE-430 form.

4. Clearly state the school year and the term in the appropriate place on the signature page.

## CATEGORIES OF EVALUATION

1. PDE 430 has 4 major categories addressing evaluation of Student Teacher/candidate:
     i. Category I- Planning and Preparation
     ii. Category II- Classroom Environment
     iii. Category III-Instructional Delivery
     iv. Category IV-Professionalism

   Each category has Student Teacher/candidate performance indicators that support the category's evaluation on a continuum from Exemplary through Unsatisfactory. The "Student Teacher/Candidate's Performance Appropriately Demonstrates" indicators are the criteria for the evaluation. Both the evaluator and the Student Teacher/candidate must be aware of the performance indicators being used in the evaluation before the evaluation takes place.

2. Each PDE 430 Category, I through IV, includes an explanation of the various aspects of teaching that aid in the further definition of the category.

## LEVELS OF PROFICIENCY IN THE CATEGORIES

1. The categories presented on the PDE 430 provide knowledge, to the evaluator and the Student Teacher/candidate, of performance expectations and the required levels of proficiency for each category. The category's results, are evaluated through the review of the defined "Student Teacher/Candidate's Performance Demonstrates" indicators in each of the four categories.

2. The Student Teacher/candidate's demonstrated performance indicators in each category should be checked or highlighted in a manner to assist the evaluator in determining the appropriate level of proficiency. *The judgment of the performance for the rating of any category is based on:*

16

- *the rater's overall evaluation of performance in each category and*
- *is not dependent on seeing each single performance indicator demonstrated successfully in order to receive a high level evaluation.*

## SOURCES OF EVIDENCE

1. The sources of evidence, gathered by the Student Teacher/candidate and the evaluator, should be considered by the evaluator to make a judgment about the Student Teacher/candidate's performance/level of proficiency.

2. It is also the responsibility of the Student Teacher/candidate to ensure the availability of evidence required for each of the categories evaluated. The evaluator and the Student Teacher/candidate will share the sources at the conference date. The evaluator will mark, on the form next to the source of evidence, pertinent pieces of evidence that were reviewed during the evaluation of a Student Teacher/candidate's performance/level of proficiency.

3. Since the evaluation form serves as a recordkeeping device in support of the recommendation for a successful performance assessment, it is important that the evaluator specify, next to the source of evidence, any evidence considered so that the Student Teacher, and other administrators reviewing the form, may have a sense of what was used to arrive at a judgment on the level of proficiency.

4. Sources of evidence should have, where appropriate, written dates that the source of evidence occurred: for example, the date of the planning document or dates of classroom observations/visits. Types of evidence reviewed can be listed as well as titles, for example, Back-to-School Night presentation. It should include the number of sources; for example if seven pieces of student work were collected for a particular source of evidence, that number should be included.

5. The space following each source of evidence allows an evaluator to document the important source(s) that were considered and captures the essential information about the source. If further space is required, an additional sheet may be attached.

## JUSTIFICATION FOR EVALUTION

1. After reviewing the results of the Student Teacher/candidate's performance indicators in each category, and the pertinent sources of evidence, the assessor will make a judgment for each category on the PDE 430. The appropriate box is then checked.

2. This is a key section as it provides the Student Teacher with a clear understanding of the evaluator's decision based on observations and other specific sources of evidence. This section also provides further explanation of why the Student Teacher is receiving a particular rating for the category. The evaluator's comments help to focus the Student Teacher on his/her specific strengths and areas for improvement. It is important to write statements that are clear, consistent, and specify key areas for improvement, if required.

The justification section may be expanded to whatever length the rater feels necessary to help the Student Teacher/candidate understand the rating, the reasons for it and steps that can be taken to improve performance, whenever required.

## EVALUATION

1. The evaluation/signature page of the PDE 430 includes the school year and term during which the observation occurred. An appropriate overall judgment of the Student Teacher/candidate's demonstrated performance will be made and checked, resulting in either a particular level of proficiency.

2. The signature of the evaluator, usually the Student Teacher/candidate's supervisor, must be included. In addition, the signature of the Student Teacher/candidate and the appropriate signature dates must also be included. The Student Teacher/candidate does not have to agree with the judgments or statements of the evaluator in order to sign the form. The Student Teacher/candidate is obligated to sign the form once the evaluator has shared the

17

contents of the form with the Student Teacher/candidate. Student Teacher/candidate may annotate the form with "I disagree with this rating."

3. The Overall Justification for Evaluation section should specify any key areas for improvement, when used for the first assessment, and provide the Student Teacher with a clear understanding of the evaluator's overall judgment of the their performance. All written sections may be expanded in size in order to fully express the observations and recommendations to the Student Teacher/candidate. Additional pages may be added if necessary.

*The level of proficiency indicated in each of the 4 categories were added to determine an overall rating/level of proficiency for the entire PDE 430 form and the single rating period. At least a satisfactory rating must have been achieved in each of the 4 categories.*

*The certifying officer must now verify that the candidate has achieved at least a satisfactory rating on the PDE 430 by so indicating on the PDE 338C, College/University Verification Form, which is used to recommend a candidate to the Commonwealth for certification.*

## GENERAL REQUIREMENTS

1. Each Student Teacher/candidate must be observed and evaluated using the PDE 430 a minimum of two times during their student teaching experience--once at the midpoint, and once at the end. Note that this is a minimum number of times and further evaluations may be completed, as the college/university desires. For example, if a candidate has two separate student teaching assignments, they may be observed at the midpoint and end of each assignment.

2. All evaluations with the PDE 430 are considered to be formative with the exception of the final one, which is considered to be the summative evaluation. All others are used in order to give the Student Teacher/candidate an opportunity to correct or improve any deficiencies.

   The PDE 430 assessment instrument must be used a minimum of two times. A satisfactory rating (1) in each of the 4 categories, resulting in *a minimum total of at least (4) points, must be achieved on the final summative rating* to favorably complete the overall assessment. Note that all categories must have achieved at least a satisfactory rating in all cases.

3. A copy of the PDE 430 is kept in the Student Teacher/candidate's college file. Student Teacher/candidate's should have a copy of their completed PDE-430. However, copies of the PDE 430 should not be provided by the college to outside agencies, prospective employers, or other individuals, in any situation, as this in an internal document. The PDE 430 is a confidential document. Copies of the PDE 430 will be reviewed during state major program reviews.

<div align="center">

Division of Teacher Education
717-787-3470
Bureau of Teacher Certification
and Preparation
Pennsylvania Department of Education

(8/1/03)

</div>

## Pennsylvania Statewide Evaluation Form for Student Professional Knowledge and Practice

| Student's Last Name | First | Middle | Social Security Number |
| --- | --- | --- | --- |

Subject(s) Taught                                                                                       Grade Level

**This form is to serve as a permanent record of a Student Teacher's professional performance evaluation during a specific time period based on specific criteria. This form must be used at least twice during the 12-week (minimum) student teaching experience.**

---

### PERFORMANCE EVALUATION

**Directions: Examine all sources of evidence provided by the Student Teacher and bear in mind the aspects of teaching for each of the four categories used in this form. Check the appropriate aspects of student teaching, and indicate the sources of evidence used to determine the evaluation of the results in each category. Assign an evaluation for each of the four categories and then assign an overall evaluation of performance. Sign the form and gain the signature of the Student Teacher.**

Category I: Planning and Preparation–Student Teacher demonstrates thorough knowledge of content and pedagogical skills in planning and preparation Student Teacher makes plans and sets goals based on the content to be taught/learned, their knowledge of assigned students and their instructional content.
Alignment: 354.33 (1)(i)(A), (B), (C), (G), (H)

Student Teacher's performance appropriately demonstrates:
1. Knowledge of content
2. Knowledge of pedagogy
3. Knowledge of Pennsylvania's K-12 Academic Standards
4. Knowledge of students and how to use this knowledge to impart instruction
5. Use of resources, materials, or technology available through the school or district
6. Instructional goals that show a recognizable sequence with adaptations or individual student needs
7. Assessment of student learning aligned to the instructional goals and adapted as required for student needs
8. Use of educational psychological principles/theories in the construction of lesson plans and setting instructional goals

Sources of Evidence (Check all that apply and include dates, types/titles and number)

❑ Lesson/Unit Plans _____          ❑ Student Teacher Interviews _____

❑ Resources/Materials/Technology _____          ❑ Classroom Observations _____

❑ Assessment Materials _____          ❑ Resource Documents _____

❑ Information about Students _____          ❑ Other _____

| Category | Exemplary 3 Points | Superior 2 Points | Satisfactory 1 Point | Unsatisfactory 0 Points |
| --- | --- | --- | --- | --- |
| Criteria for Rating | The candidate *consistently* and *thoroughly* demonstrates indicators of performance. | The candidate *usually* and *extensively* demonstrates indicators of performance. | The candidate *sometimes* and *adequately* demonstrates indicators of performance. | The candidate *rarely* or *never* and *inappropriately or superficially* demonstrates indicators of performance. |
| Rating (indicate ✓) | | | | |
| Justification for Evaluation | | | | |

Student's Last Name      First      Middle      Social Security Number

**Category II: Classroom Environment—Student Teacher establishes and maintains an equitable environment for learning, in which students feel safe, valued and respected, by instituting routines and by setting clear expectations for student behavior.**
Alignment: 354.33. (1)(i)(E), (B)

Student Teacher's performance appropriately demonstrates:
1. Expectations for student achievement with value placed on the quality of student work
2. Attention to equitable learning opportunities for students
3. Appropriate interactions between teacher and students and among students
4. Effective classroom routines and procedures resulting in little or no loss of instructional time
5. Clear standards of conduct and effective management of student behavior
6. Appropriate attention given to safety in the classroom to the extent that it is under the control of the Student Teacher
7. Ability to establish and maintain rapport with students

Sources of Evidence (Check all that apply and include dates, types/titles and number)

❑ Classroom Observations _____    ❑ Visual Technology _____

❑ Informal Observations/Visits _____    ❑ Resources/Materials/Technology/Space _____

❑ Student Teacher Interviews _____    ❑ Other _____

| Category | Exemplary 3 Points | Superior 2 Points | Satisfactory 1 Point | Unsatisfactory 0 Points |
|---|---|---|---|---|
| **Criteria for Rating** | The candidate *consistently* and *thoroughly* demonstrates indicators of performance. | The candidate *usually* and *extensively* demonstrates indicators of performance. | The candidate *sometimes* and *adequately* demonstrates indicators of performance. | The candidate *rarely* or *never* and *inappropriately* or *superficially* demonstrates indicators of performance. |
| **Rating** (indicate ✓) | | | | |

**Justification for Evaluation**

PDE 430

20

| Student's Last Name | First | Middle | | Social Security Number |

**Category III: Student Teacher, through knowledge of content and their pedagogy and skill in delivering instruction engages in learning by using a variety of instructional strategies.**
**Alignment: 354.33 (1) (i) (D), (F), (G)**

Student Teacher's performance appropriately demonstrates:

1. Knowledge of content and pedagogical theory through their instructional delivery
2. Instructional goals reflecting Pennsylvania K-12 standards
3. Communication of procedures and clear expectations of content
4. Instructional goals that show a recognizable sequence, clear student expectations, and adaptations for individual student needs
5. Use of questioning and discussion strategies that encourage many students to participate
6. Engagement of students in learning and adequate pacing of instruction
7. Feedback to students on their learning
8. Use of informal and formal assessments to meet learning goals and to monitor student learning
9. Flexibility and responsiveness in meeting the learning needs of students
10. Integration of disciplines within the educational curriculum

**Sources of Evidence** (Check all that apply and include dates, types/titles and number)

☐ Classroom Observations _____     ☐ Student Assignment Sheets _____

☐ Informal Observations/Visits _____     ☐ Student Work _____

☐ Assessment Materials _____     ☐ Instructional Resources/Materials/Technology _____

☐ Student Teacher Interviews _____     ☐ Other _____

| Category | Exemplary 3 Points | Superior 2 Points | Satisfactory 1 Point | Unsatisfactory 0 Points |
|---|---|---|---|---|
| **Criteria for Rating** | The candidate *consistently* and *thoroughly* demonstrates indicators of performance. | The candidate *usually* and *extensively* demonstrates indicators of performance. | The candidate *sometimes* and *adequately* demonstrates indicators of performance. | The candidate *rarely* or *never* and *inappropriately* or *superficially* demonstrates indicators of performance. |
| **Rating** (indicate ✓) | | | | |

**Justification for Evaluation**

| Student's Last Name | First | Middle | Social Security Number |

**Category IV--Student Teacher demonstrates qualities that characterize a professional person in aspects that occur in and beyond the classroom/building.**
Alignment: 354.33 (1) (*i*) (I), (J)

Student Teacher's performance appropriately demonstrates:

1. Knowledge of school and district procedures and regulations related to attendance, punctuality and the like
2. Knowledge of school or district requirements for maintaining accurate records and communicating with faculty
3. Knowledge of school and/or district events
4. Knowledge of district or college's professional growth and development activities
5. Integrity and ethical behavior, professional conduct as stated in Pennsylvania Code of Professional Practice and Conduct for Educators; and local state, and federal laws and regulations
6. Effective communication, both oral and written, with students, colleagues, paraprofessionals, related service personnel, and administrators
7. Ability to cultivate professional relationships with school colleagues
8. Knowledge of Commonwealth requirements for continuing professional development and licensure

**Sources of Evidence** (Check all that apply and include dates, types/titles and number)

❑ Classroom Observations _____

❑ Informal Observations/Visits _____

❑ Assessment Materials _____

❑ Student Teacher Interviews _____

❑ Written Documentation _____

❑ Student Assignment Sheets _____

❑ Student Work _____

❑ Instructional Resources/Materials/Technology _____

❑ Other _____

| Category | Exemplary 3 Points | Superior 2 Points | Satisfactory 1 Point | Unsatisfactory 0 Points |
|---|---|---|---|---|
| **Criteria for Rating** | The candidate *consistently* and *thoroughly* demonstrates indicators of performance. | The candidate *usually* and *extensively* demonstrates indicators of performance. | The candidate *sometimes* and *adequately* demonstrates indicators of performance. | The candidate *rarely* or *never* and *inappropriately* or *superficially* demonstrates indicators of performance. |
| **Rating** (indicate ✓) | | | | |

**Justification for Evaluation**

| Overall Rating | | | | |
|---|---|---|---|---|
| Category | Exemplary Minimum of 12 Points | Superior Minimum of 8 Points | Satisfactory Minimum of 4 Points | Unsatisfactory Less than 4 Points |
| Criteria for Rating | The candidate *consistently* and *thoroughly* demonstrates indicators of performance. | The candidate *usually* and *extensively* demonstrates indicators of performance. | The candidate *sometimes* and *adequately* demonstrates indicators of performance. | The candidate *rarely* or *never* and *inappropriately* or *superficially* demonstrates indicators of performance. |
| Rating (indicate ✓) | | | | |

Note: Candidates must achieve at least a satisfactory rating of 4 Points or above.

Justification for overall rating:

PDE 430

| Student's Last Name | First | Middle | Social Security Number |
|---|---|---|---|

District/IU                    School

Interview/Conference Date _____

School Year _____ Term_____

**Required Signatures:**

Supervisor/Evaluator_____          Date:_____

Student Teacher _____          Date:_____

## Appendix A

## STUDENT TEACHING ABSENCE

I am requesting permission to be excused from student teaching for the dates and reasons described at the end of this request. I understand that I may be asked to make-up these dates/times at the end of my assignment in order to complete my student teaching obligation. I also understand that this request must be approved by my co-op, supervisor, and the Field Services Office. Failure to receive permission from all individuals will result in the request being denied.

Student Teacher: _____ Phone number: _____

Dates of expected absence: _____

Reason for absence: _____

_____

_____
Student Teacher signature / Date

☐ Please indicate the total number of absences to date, including this one.

☐ Approved ☐ Denied ☐ Approved ☐ Denied

_____ _____
Cooperating Teacher University Supervisor

☐ Approved ☐ Denied

_____
Coordinator Field Services

Except in the case of illness, or an emergency, this form must be on file in the
Field Services Office 5 days prior to the requested absence.

24

# Appendix B

## PENNSYLVANIA'S CODE OF PROFESSIONAL PRACTICE AND CONDUCT FOR EDUCATORS

### Section 1. Mission

The Professional Standards and Practices Commission is committed to providing leadership for improving the quality of education in this Commonwealth by establishing high standards for preparation, certification, practice and ethical conduct in the teaching profession

### Section 2. Introduction

(a) Professional conduct defines interactions between the individual educator and students, the employing agencies and other professionals. Generally, the responsibility for professional conduct rests with the individual professional educator. However, in this Commonwealth, a Code of Professional Practice and Conduct (Code) for certificated educators is required by statute and violation of specified sections of the Code may constitute a basis for public or private reprimand. Violations of the Code may also be used as supporting evidence, though may not constitute an independent basis, for the suspension or revocation of a certificate. The Professional Standards and Practices Commission (PSPC) was charged by the act of December 12, 1973 (P.L. 397, No. 141) (24P.S. §§ 12-1251 – 12-1268), known as the Teacher Certification Law, with adopting a Code by July 1, 1991. See 24 P.S. § 12-1255(a)(10).

(b) This chapter makes explicit the values of the education profession. When individuals become educators in this Commonwealth, they make a moral commitment to uphold these values.

### Section 3. Purpose

(a) Professional educators in this Commonwealth believe that the quality of their services directly influences the Nation and its citizens. Professional educators recognize their obligation to provide services and to conduct themselves in a manner which places the highest esteem on human rights and dignity. Professional educators seek to ensure that every student receives the highest quality of service and that every professional maintains a high level of competence from entry through ongoing professional development. Professional educators are responsible for the development of sound educational policy and obligated to implement that policy and its programs to the public.

(b) Professional educators recognize their primary responsibility to the student and the development of the student's potential. Central to that development is the professional educator's valuing the worth and dignity of every person, student and colleague alike; the pursuit of truth; devotion to excellence; acquisition of knowledge; and democratic principles. To those ends, the educator engages in continuing professional development and keeps current with research and technology. Educators encourage and support the use of resources that best serve the interests and needs of students. Within the context of professional excellence, the educator and student together explore the challenge and the dignity of the human experience.

### Section 4. Practices

(a) Professional practices are behaviors and attitudes that are based on a set of values that the professional education community believes and accepts. These values are evidenced by the professional educator's conduct toward students and colleagues, and the educator's employer and community. When teacher candidates become professional educators in this Commonwealth, they are expected to abide by this section

(b) Professional educators are expected to abide by the following:

(1) Professional educators shall abide by the Public School Code of 1949 (24 P.S. §§ 1-101 – 27-2702), other school laws of the Commonwealth, sections 1201(a)(1), (2) and (4) and (b)(1), (2) and (4) of the Public Employee Relations Act (43 P.S. §§ 1101.1201(a)(1), (2) and (4) and (b)(1), (2), and (4) and this chapter.

(2) Professional educators shall be prepared, and legally certified, in their areas of assignment. Educators may not be assigned or willingly accept assignments they are not certified to fulfill. Educators may be assigned to or accept assignments outside their certification area on a temporary, short-term, emergency basis. Examples: a teacher certified in English filling in a class period for a physical education teacher who has that day become ill; a substitute teacher certified in elementary education employed as a librarian for several days until the district can locate and employ a permanent substitute teacher certified in library science.

(3) Professional educators shall maintain high levels of competence throughout their careers.

(4) Professional educators shall exhibit consistent and equitable treatment of students, fellow educators and parents. They shall respect the civil rights of all and not discriminate on the basis of race, national or ethnic origin, culture, religion, sex or sexual orientation, marital status, age, political beliefs, socioeconomic status, disabling condition or vocational interest. This list of bases or discrimination is not all-inclusive.

(5) Professional educators shall accept the value of diversity in educational practice. Diversity requires educators to have a range of methodologies and to request the necessary tools for effective teaching and learning.

(6) Professional educators shall impart to their students principles of good citizenship and societal responsibility.

(7) Professional educators shall exhibit acceptable and professional language and communication skills. Their verbal and written communications with parents, students and staff shall reflect sensitivity to the fundamental human rights of dignity, privacy and respect.

(8) Professional educators shall be open-minded, knowledgeable and use appropriate judgment and communication skills when responding to an issue within the educational environment.

(9) Professional educators shall keeping confidence information obtained in confidence in the course of professional service unless required to be disclosed by law or by clear and compelling professional necessity as determined by the professional educator.

(10) Professional educators shall exert reasonable effort to protect the student from conditions which interfere with learning or are harmful to the student's health and safety.

## Section 5. Conduct

Individual professional conduct reflects upon the practices, values, integrity and reputation of the profession. Violation of §§ 235.6-235.11 may constitute an independent basis for private or public reprimand, and may be used as supporting evidence in cases of certification suspension and revocation.

## Section 6: Legal obligations

(a) The professional educator may not engage in conduct prohibited by the act of December 12, 1973 (P.L. 397, No. 141) (24 P.S. §§12-1251-12-1268), known as the Teacher Certification Law.

(b) The professional educator may not engage in conduct prohibited by:

(1) The Public School code of 1949 (24 P.S. §§ 1-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) and other laws relating to the schools or the education of children.

(2) The applicable laws of the Commonwealth establishing ethics of public officials and public employees, including the act of October 4, 1978 (P.L. 883, No. 170) (65 P.S. §§ 401-413), known as the Public Official and Employee Ethics Law.

(c) Violation of subsection (b) shall have been found to exist by an agency of proper jurisdiction to be considered an independent basis for discipline.

## Section 7. Certification

The professional educator may not:

(1) Accept employment, when not properly certificated, in a position for which certification is required.

(2) Assist entry into or continuance in the education profession of an unqualified person.

(3) Employ, or recommend for employment, a person who is not certificated appropriately for the position.

## Section 8. Civil Rights

The professional educator may not:

(1) Discriminate on the basis of race, National or ethnic origin, culture, religion, sex or sexual orientation, marital status, age, political beliefs, socioeconomic status; disabling condition or vocational interest against a student or fellow professional. This list of bases of discrimination is not all-inclusive. This discrimination shall be found to exist by an agency of proper jurisdiction to be considered an independent basis for discipline.

(2) Interfere with a student's or colleague's exercise of political and civil rights and responsibilities.

### Section 9. Improper personal or financial gain

(1) Accept gratuities, gifts or favors that might impair or appear to impair professional judgment.

(2) Exploit a professional relationship for personal gain or advantage.

### Section 10. Relationships with students

The professional educator may not:

(1) Knowingly and intentionally distort or misrepresent evaluations of students.

(2) Knowingly and intentionally misrepresent subject matter or curriculum.

(3) Sexually harass or engage in sexual relationships with students.

(4) Knowingly and intentionally withhold evidence from the proper authorities about violations of the legal obligations as defined within this section

### Section 11. Professional relationships

The professional educator may not:

(1) Knowingly and intentionally deny or impede a colleague in the exercise or enjoyment of a professional right or privilege in being an educator.

(2) Knowingly and intentionally distort evaluations of colleagues.

(3) Sexually harass a fellow employee.

(4) Use coercive means or promise special treatment to influence professional decisions of colleagues.

(5) Threaten, coerce or discriminate against a colleague who in good faith reports or discloses to a governing agency actual or suspected violations of law, agency regulations or standards.

**EXHIBIT C**

1      IN THE UNITED STATES DISTRICT COURT

       FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2                        * * *

3

       STACY SNYDER,                    : CIVIL ACTION

4                                       :

                  Plaintiff             :

5                                       :

                  vs.                   :

6                                       :

       MILLERSVILLE UNIVERSITY, J.      :

7      BARRY GIRVIN, DR. JANE S.        :

       BRAY, and DR. VILAS A.           :

8      PRABHU, in their individual      :

       and official capacities; and    :

9      DR. JUDITH WENRICH and DR.       :

       BEVERLY SCHNELLER,               :

10                Defendants         : NO. 07-1660

11                       * * *

12             Oral deposition of STACY SNYDER, taken at

13     the office of MARK W. VOIGT, ESQUIRE, Plymouth Meeting

14     Executive Campus, 600 West Germantown Pike, Suite 400,

15     Plymouth Meeting, Pennsylvania, 19462, on Wednesday,

16     March 12, 2008, beginning at approximately 9:40 a.m.,

17     before Krista L. Schultz, Registered Professional

18     Reporter and Notary Public.

19

20

21                       * * *

22             PRECISION REPORTING, INC.

               230 South Broad Street - 3rd Floor

23                  Philadelphia, PA  19102

                     (215) 731-9847

24                   1-800-528-3060

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

APPEARANCES:

MARK W. VOIGT, ESQUIRE
Plymouth Meeting Executive Campus
600 West Germantown Pike
Suite 400
Plymouth Meeting, Pennsylvania 19462
-- Representing the Plaintiff

BARRY N. KRAMER, ESQUIRE
SENIOR DEPUTY ATTORNEY GENERAL
OFFICE OF ATTORNEY GENERAL
Litigation Section
21 South 12th Street, 3rd Floor
Philadelphia, Pennsylvania 19107
-- Representing the Defendants

- - -

(It is hereby stipulated by and between counsel for the respective parties that signing, sealing, certification and filing are waived, and that all objections, except as to the form of the question, are reserved until the time of trial.)

- - -

STACY SNYDER, after having been first duly sworn or affirmed, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MR. KRAMER:
Q. Good morning, Ms. Snyder. My name is Barry Kramer. Good to see you again. This morning I will be taking your deposition in the lawsuit captioned Stacy Snyder versus Millersville University, et al. Have you ever had your deposition taken --
A. No.
Q. -- before?
Let me give you a couple of ground rules. These are very basic rules that lawyers give at the

beginning of these things.
As you know, you're under oath and you're required to tell the truth. Your answers need to be verbal, meaning you need to verbalize and say yes or no or maybe, because the court reporter, however proficient, can't transcribe a nod or a shake of the head.
A. Okay.
Q. If you don't understand a question, please just tell me, I will repeat it, try to make it more clear. My assumption is that if you answer the question, you're answering the question that I'm asking and that you are answering the question fully and completely. Do you understand that?
A. I understand.
Q. If at any time you need to take a break, please let us know, and we can go off the record and we can take a break. You can talk to Mr. Voigt, your counsel, at any time, except if there's a question pending. Do you understand that?
A. Yes.
Q. Okay. And I think that's probably about all. Do you have any questions before we start?
A. No.

Q. Okay. I hope to have this done by lunchtime.
A. Okay.
Q. If you would please describe for me generally your employment since, say, January 2006.
A. Starting in January 2006 I was unemployed. I gave up all employment to focus on my student teaching. That was until May 2006. I began employment at Hildebrandt Learning Centers as a regional substitute teacher.
Q. Okay.
A. That employment --
Q. And what was that place called?
A. Hildebrandt Learning Centers.
Q. Okay. And what was -- what did that involve?
A. I was a regional substitute teacher. I was responsible for the care of infants through 5th grade. I would do various tasks, anything from feeding and changing infants to being responsible for daily lesson plans for 5th grade students with -- up to 5th grade students at Pequea Valley School District.
Q. Okay. When did that start?
A. That started in May of 2006.
Q. All right. Were you working as a Tupperware

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 6

1  consultant before that?
2      A.    No. I quit that to focus on my student
3  teaching.
4      Q.    Okay. So at Hildebrandt, what town was that in?
5      A.    They actually have various centers across
6  Lancaster County. My main center was at F and M
7  College.
8      Q.    Franklin and Marshall College?
9      A.    Yes.
10     Q.    And how many hours a week was that?
11     A.    30.
12     Q.    Okay. And what did they pay you per hour?
13     A.    $9.
14     Q.    All right. And you worked 30 hours a week,
15 approximately?
16     A.    30 to 40 hours. 40 hours was pushing it,
17 due to my child care situation, but normally it was
18 around 30 hours a week. Started at 7:30 in the
19 morning.
20     Q.    And are you still working at -- for Hildebrandt
21 Learning Center?
22     A.    No.
23     Q.    When did you stop working for them?
24     A.    November of 2006.

Page 7

1      Q.    Okay. Why did you stop working for them?
2      A.    Two reasons: One, my situation with my
3  finances, they only could pay me $9 an hour, I needed
4  more money than that; and they could not provide me
5  medical benefits.
6      Q.    All right.
7      A.    That I could afford.
8      Q.    Okay. So from, say, May '06 to November --
9  November '06, that was the only paying job you had --
10     A.    Yes.
11     Q.    -- the one at Hildebrandt?
12           How about after Hildebrandt?
13     A.    After Hildebrandt, it was December, around
14 that time I began working at my part-time job. I did
15 clothing sales, and that didn't really help pay the
16 bills. I needed to find something more than that. So
17 I began working as a nanny for the Kramer family in
18 January of 2007. There was a lapse there.
19     Q.    Let me stop you.
20     A.    Okay.
21     Q.    Selling clothing, was that at Geoffrey Beene --
22     A.    Yes.
23     Q.    -- in Lancaster?
24     A.    Yes. I went there for a short period of

Page 8

1  time, but my main responsibility started there in
2  June.
3      Q.    Of what year?
4      A.    June 2006.
5      Q.    All right.
6      A.    It was periodically off and on, maybe a
7  few hours a week, but it wasn't a consistent job where
8  I was working long, long hours until 2007.
9      Q.    When in 2007?
10     A.    During the summer.
11     Q.    And why was it not a more consistent schedule?
12     A.    It was a lot of weekend work, and I have
13 my children every other weekend. So I could not work
14 the hours that they needed me to every week. I had a
15 responsibility to watch my children. The hours
16 increased in 2007 after the Kramer family had to let
17 me go due to their own financial situation. They
18 couldn't pay me the amount that they were paying me
19 per week.
20     Q.    Okay. How much were you making per hour at
21 Geoffrey Beene?
22     A.    That was $7.50 and increased to $8 an
23 hour.
24     Q.    How many hours a week were you working there at

Page 9

1  Geoffrey Beene?
2      A.    In 2006 or 2007?
3      Q.    Well, 2006.
4      A.    Maybe ten -- maybe ten hours every other
5  week. It was very, very small. It was just for extra
6  spending money.
7      Q.    All right. And how about in 2007, how many
8  hours a week did you work at Geoffrey Beene?
9      A.    It could be up to 30 or 35.
10     Q.    All right.
11     A.    And that was an unusual week. My schedule
12 was based around my sons' summer camp. They're in a
13 therapeutic summer camp. So I had to work around the
14 hours that they were there.
15     Q.    All right. And you began working for the Kramer
16 family in Lititz as a nanny when?
17     A.    January 2007.
18     Q.    Okay. And you worked with them through when?
19     A.    May 2007. Unfortunately, they were having
20 problems with their income and their taxes, and they
21 could not afford to pay me anymore, like I said.
22     Q.    All right. Why did you leave the Geoffrey Beene
23 position?
24     A.    I got my full-time job that I'm at now.

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 10

1  Q. Okay. And that is where?
2      A. That is at Arnold Printing Company, and is
3  also coupled with Lancaster Reprographics. It's two
4  companies. I work for the Arnold Printing Company
5  side. And I've worked there since August of 2007.
6  Q. Okay. Full-time at the Arnold Printing Company
7  for you is 40 hours a week?
8      A. No. It's considered part-time. I only
9  can work -- I work 30 to 35 max.
10 Q. Okay.
11     A. Once again, due to my living conditions
12 and my children and having to be home when they get
13 home from school, in most cases.
14 Q. If you -- if you wanted to work full-time at
15 Arnold, could you?
16     A. Not at this point.
17 Q. And that's because why?
18     A. My -- just regulations mandated by my
19 boss.
20 Q. I see. Do you -- all right. I guess my point
21 is, if you didn't have to worry about your children's
22 needs, could you work a full-time --
23     A. I could work 38 hours.
24     MR. VOIGT: Wait till the question's done.

Page 11

1      THE WITNESS: Sorry.
2  BY MR. KRAMER:
3  Q. And I forgot to tell you, you need to let me
4  finish, because --
5      A. Sorry.
6  Q. Well, we talk over each other, but we shouldn't
7  do that.
8      I'm sorry, you were saying -- if it
9  weren't for your children, who you need to care for,
10 could you work full-time at Arnold?
11     A. 38 or 39 hours a week, I could do that, as
12 long as I'm not working 40 or over 40 hours.
13 Q. Okay. And that's because of regulations?
14     A. Yes.
15 Q. All right. You also work as a waitress at
16 Ephrata?
17     A. Ephrata Legion.
18 Q. Okay. And what is that?
19     A. It's the American Legion. I work as a
20 waitress or a bartender. Most cases I work a Thursday
21 night shift as a bartender. Friday nights, if they
22 need me, I work as a waitress.
23 Q. Okay.
24     A. Saturday nights I will either waitress or

Page 12

1  bartend events, weddings, retirements.
2  Q. Okay. It's kind of a catering hall, as opposed
3  to a restaurant, or both?
4      A. It is a restaurant and we have a banquet
5  hall for events.
6  Q. Okay.
7      A. Just like any other Legion across America.
8  Q. Right. All right. You work at the American
9  Legion how many hours a week, approximately?
10     A. Approximately 15 hours.
11 Q. Is that pretty consistent over the course of --
12     A. It does die down around the holidays and
13 when the weather is bad. A lot of our clientele are
14 elderly and they -- we do not have a lot of business
15 during the times where there's snow.
16 Q. Okay. What's your hourly pay at Arnold
17 Printing?
18     A. Arnold Printing, it's $9.
19 Q. Okay. And from the American Legion job, between
20 salary and wages, how much do you take home -- salary
21 and tips, about how much do you take home each week?
22     A. Tips vary depending on how busy it is or
23 the type of event that it is. My hourly rate is $2.83
24 for a waitress, and for bartending it's $5.50 an hour.

Page 13

1  Q. All right. Generally, how much do you take home
2  at the end of a week from the American Legion job?
3      A. My -- can I base it on every two weeks?
4  Q. Yeah, absolutely.
5      A. Okay. My bimonthly check is normally
6  around $90 for my hourly rate. Approximately $100 a
7  week in tips. And that is on a good week.
8  Q. I understand. The American Legion guys may not
9  be good tippers.
10     Let's talk about the period right before
11 May 1st, '06.
12     A. Okay.
13 Q. You're doing student teaching at Conestoga
14 Valley?
15     A. Yes.
16 Q. And you were not employed otherwise? That is,
17 you weren't working for pay anyplace --
18     A. No.
19 Q. -- during that period? Okay.
20     As of May 1st, '06, and the period, you
21 know, right before that, so we'll call it, I guess,
22 spring semester '06 --
23     A. Okay.
24 Q. -- had you looked for a job in teaching?

Page 14

1    A.    Yes.
2    Q.    Okay. Where had you looked?
3        A.    Several places. I applied at Hildebrandt.
4    I know that that wasn't an official teaching position,
5    but I wanted to work someplace over the summer as
6    well. Hildebrandt was one of my choices, as well as
7    Conestoga Valley High School, McCaskey, or Lancaster
8    School District, School District of Lancaster.
9    Q.    Right.
10        A.    I applied at some high schools and middle
11    schools in York County, as well as Berks County.
12    Wilson School District, York City School District. I
13    applied at Lampeter-Strasburg School District and a
14    couple other schools in Lancaster County as well.
15    Q.    Okay.
16        A.    There was probably a list of about 15 to
17    20 schools.
18    Q.    Okay. Did you have any interviews at any of
19    these school districts?
20        A.    Unfortunately, I received calls for
21    interviews from at least five to ten school districts.
22    I had to turn them down due to my situation.
23    Q.    Your situation being what?
24        A.    The situation with Millersville and that

Page 15

1    my certification was no longer available.
2    Q.    Okay. Did you get -- did you get calls for
3    interviews before May 1st, '06?
4        A.    Most of the interviews or the calls for
5    the interviews were after graduation. I received one
6    to two phone calls prior and I told them that I would
7    be graduating in May, May 13th, and that I would have
8    my certification at that time, and they said they
9    would be calling me back to set up an interview.
10    Q.    Okay. Which schools called you for interviews,
11    which school districts called you for interviews?
12        A.    L-S School District.
13    Q.    Is that Lampeter-Strasburg?
14        A.    Yes.
15    Q.    That's your alma mater?
16        A.    Yes.
17    Q.    Okay. Who else?
18        A.    They had called me. The School District
19    of Lancaster called me, and I can remember two or
20    three other school districts, and I would have that
21    documentation -- if I had that documentation in front
22    of me I could give you the names. I don't know it off
23    the top of my head. Sorry.
24    Q.    So you got calls for interviews from

Page 16

1    Lampeter-Strasburg, Lancaster and two or three other
2    school districts?
3        A.    Yes.
4    Q.    Okay.
5        A.    But like I said, most of them were after
6    the graduation date.
7    Q.    I understand. I see. I saw from some papers
8    that you have an interest in business administration?
9        A.    Yes.
10    Q.    And describe that for me. Where does that come
11    from?
12        A.    Well, it actually started in high school.
13    Sorry I'm saying "Um" so much.
14    Q.    That's okay.
15        A.    I had an interest in marketing and sales.
16    I took the vocational program that they had while I
17    was a senior.
18    Q.    At high school or college?
19        A.    In high school, through Lancaster County
20    Vocational Technical School, and it was for marketing
21    and sales. So I've always had some type of interest
22    in business. I was planning on going for my Master's
23    in business administration and education. I wanted to
24    further that knowledge of business. But I've always

Page 17

1    had an interest in it, even in high school.
2    Q.    Okay. Have you taken any steps to look into an
3    MBA program someplace?
4        A.    Yes, I did look online for dual Master's
5    programs, what they have available, if it's
6    accredited, as far as the university is accredited,
7    and I found interest in Kaplan University and
8    University of Arizona.
9    Q.    Okay. And where are you in pursuing that
10    interest?
11        A.    I'm at a standstill as of right now,
12    because of my situation. I wanted to do the dual
13    Master's program, so I'm waiting to have my Bachelor's
14    of education before I can go further.
15    Q.    All right. Is there something -- can you pursue
16    a dual degree in -- strike that.
17        When you say you wanted a dual degree,
18    you're referring to the MBA and --
19        A.    Elementary education.
20    Q.    All right. Are you saying that you're
21    interested in pursuing further studies in elementary
22    education? I just don't understand what you're
23    telling me.
24        A.    Before my graduation in May 2006 I had

PRECISION REPORTING, INC. (215) 731-9847

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

| | Page 18 | | Page 20 |
|---|---|---|---|
| 1 | contacted Millersville concerning a post baccalaureate | 1 | on for a Master's in education. |
| 2 | program for elementary education. It was an interest | 2 | Q. I see. Okay. I also saw that you have an |
| 3 | of mine to pursue elementary education, to have | 3 | interest in physical therapy as a career? |
| 4 | certification from kindergarten through 12th grade. | 4 | A. Yes. |
| 5 | Q. All right. Elementary education is grades what | 5 | Q. What's that? |
| 6 | to what? | 6 | A. I had a surgery on my knee in October. |
| 7 | A. 12 (sic) through 6 or 7th, depending on | 7 | Q. Of what year? |
| 8 | the school district. | 8 | A. Last year, 2007, and I went through the |
| 9 | Q. Elementary education. | 9 | program with Orthopedic Associates of Lancaster. |
| 10 | A. Elementary. | 10 | Q. On your own knee? |
| 11 | Q. Grade -- I'm sorry, elementary education refers | 11 | A. On my own knee. And went to the physical |
| 12 | to grades 1 through -- because I thought there was a | 12 | therapist there. I found an interest in pursuing that |
| 13 | difference between elementary education certification | 13 | possibly. I have wanted -- I've always wanted to help |
| 14 | and secondary. | 14 | people. That's why I wanted to become a teacher. |
| 15 | A. There is a -- there is a clear difference. | 15 | Since this has come to a halt, I wanted to find |
| 16 | Q. Okay. | 16 | another area in which I could help people, and I found |
| 17 | A. Secondary education is 7th through 12th | 17 | interest in the physical therapy. |
| 18 | grade. | 18 | I contacted Central Pennsylvania College. |
| 19 | Q. Okay. | 19 | It's the closest university that does the physical |
| 20 | A. Elementary education is kindergarten, in | 20 | therapy assistant program. I was actually accepted |
| 21 | most cases it includes kindergarten, through 6th or | 21 | there. I received a phone call from them. |
| 22 | 7th grade. | 22 | Unfortunately, I had put it on hold, because of the |
| 23 | Q. Okay. Got it. | 23 | court case. They have an opening for me in December |
| 24 | A. Depending on the school district. Some | 24 | if I would like to start at that point, but I will |

| | Page 19 | | Page 21 |
|---|---|---|---|
| 1 | school districts start their middle school at 6th | 1 | have to pay for it financially as well. |
| 2 | grade, some start it at 7th grade. | 2 | Q. So how has the court case stopped you from |
| 3 | Q. Who did you speak with at Millersville to get | 3 | entering that program? |
| 4 | more information about a degree in elementary | 4 | A. If I would start the classes, it would |
| 5 | education? | 5 | have started prior to the trial. And unfortunately, I |
| 6 | A. Dr. Wenrich. | 6 | am very gung-ho about putting all my effort into my |
| 7 | Q. And when did you speak with her about that? | 7 | work, and I would hate to stop for a week to two weeks |
| 8 | A. In May of 2006, I spoke with her a few | 8 | in the semester, in the middle of a semester, and tell |
| 9 | weeks before graduation to see if there was a post | 9 | all of my professors that I couldn't come to class due |
| 10 | baccalaureate program and what my options were. After | 10 | to a trial. So I would rather wait until after the |
| 11 | the incident occurred, I asked her if it was possible | 11 | trial is over that I'll be able to put forth a full |
| 12 | for me to still take elementary education courses at | 12 | effort to my classes and to my professors. |
| 13 | Millersville, and my answer was no. | 13 | Q. How would you afford the program at Central PA |
| 14 | Q. She said no? | 14 | College? |
| 15 | A. Yes. | 15 | A. They have financial aid. Unfortunately, |
| 16 | Q. All right. With respect -- so you're not | 16 | it would entail more student loans. I have been |
| 17 | looking at an MBA program now, because you're just | 17 | approved to have loans for each semester, and I can |
| 18 | waiting to see what -- | 18 | continue my loans up to $40,000. |
| 19 | A. I did look. I have schools that I would | 19 | Q. Okay. |
| 20 | like to go to. Unfortunately, due to my financial | 20 | A. That's above and beyond what I already owe |
| 21 | circumstance and the circumstance with the | 21 | Millersville. |
| 22 | certification, I cannot go further with the process, | 22 | Q. Okay. The program at Central PA College is an |
| 23 | especially in the education portion of the process. | 23 | Associate's degree? |
| 24 | You need a Bachelor's of education before you can go | 24 | A. Yes. |

6 (Pages 18 to 21)

| Page 22 | Page 24 |
|---|---|
| 1 Q. Is it a two-year program? | 1 A. Approximately 20,000. |
| 2 A. It is a two-year program; however, with my | 2 Q. And how much do you owe Millersville? |
| 3 prior knowledge and my prior classes, I can transfer | 3 A. Approximately 15,000. |
| 4 38 credits, I believe. So the program actually would | 4 Q. Okay. And those are separate loans? |
| 5 be a year or less for me. | 5 A. Yes. One is for unsubsidized Stafford, I |
| 6 Q. A year of full-time -- | 6 believe, and the regular Federal loan's with Chase. |
| 7 A. Yes. | 7 Q. Okay. Have you, at this point, decided which of |
| 8 Q. -- schooling? | 8 these professional interests you're gonna pursue? |
| 9 A. Yes. I would have to stop work. | 9 A. I would still like to pursue the education |
| 10 Q. And how much -- given that you can waive, it | 10 with the business administration. That's never left |
| 11 seems, a lot of the credits, how many courses or | 11 my mind. I would still like to do that to this day. |
| 12 credits would you need for this AA in physical | 12 Unfortunately, I can't without the Bachelor's of |
| 13 therapy? | 13 education. If all falls through, I would still pursue |
| 14 A. It's a 120-course -- | 14 the healthcare or the physical therapy, because I |
| 15 Q. Credit? | 15 would like to do something professional in which I'm |
| 16 A. Credit. 40 credits would be taken off. | 16 helping people. |
| 17 It's approximately 60 to 80 credits that I would have | 17 Q. You referred to healthcare. Is that separate |
| 18 to take, from my understanding. | 18 from the physical therapy? |
| 19 Q. And each course is three credits? | 19 A. No. |
| 20 A. Yes. | 20 Q. Okay. |
| 21 Q. Okay. | 21 A. I consider physical therapy part of |
| 22 A. And their -- their classes are set up | 22 healthcare. |
| 23 differently than Millersville, than a four-year | 23 Q. Okay. How's your knee? |
| 24 university. They have, I believe, seven weeks on, two | 24 A. Okay. |

| Page 23 | Page 25 |
|---|---|
| 1 weeks off. It might be eight weeks on, two weeks off. | 1 Q. At any time since May 2006 did you apply to any |
| 2 And their class structure is different. While I would | 2 private schools for a job? |
| 3 be at Millersville taking 15 to 18 credits, for them 9 | 3 A. No, I have not. And that's due to |
| 4 to 12 credits would be the normal workload. | 4 personal beliefs. |
| 5 Q. How much in student loans would you need to take | 5 Q. Explain. |
| 6 to pursue this program at Central PA College? If you | 6 A. Most private schools around our region are |
| 7 know. | 7 religious schools, and I feel that personally, I'm |
| 8 A. I cannot answer that off the top of my | 8 Catholic, and I wouldn't feel comfortable teaching |
| 9 head, unfortunately. It was figured to be | 9 another religion. |
| 10 approximately 15,000, at least. | 10 Q. Okay. Have you applied to any charter schools |
| 11 Q. Okay. You presently -- you said you presently | 11 for a teaching job since May of 2006? |
| 12 have student loans to Millersville. | 12 A. The only charter school available around |
| 13 A. I have student loans through Chase Bank, | 13 the region is La Academia Charter School, where I had |
| 14 which are on deferment due to my financial situation, | 14 a placement. |
| 15 unfortunately. In addition to the student loans with | 15 Q. Could you spell that? |
| 16 Chase, I have student loans through Millersville | 16 A. La, L-A, Academia, A-C-A-D-M-I-A (sic). |
| 17 University, and I have been unable to pay them. I'm | 17 Q. Okay. |
| 18 in the process of re-signing with a company to put | 18 A. And that is through the School District of |
| 19 them on deferment as well. | 19 Lancaster. They're a charter school that is coupled |
| 20 Q. What's your -- and all of these loans are from | 20 with the School District of Lancaster. All of their |
| 21 your undergraduate degree? | 21 teachers actually have certification as well. |
| 22 A. Absolutely, yes. | 22 Q. Do you need certification from the Commonwealth |
| 23 Q. How much do you owe Chase at this point, | 23 to teach at a private school, as far as you know? |
| 24 approximately? | 24 A. My understanding, no. |

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

1 Q. Do you need certification from the Commonwealth
2 to teach at a charter school?
3 A. The charter schools around the County,
4 yes.
5 Q. How about -- and that's just the one school, the
6 La Academia?
7 A. I'm unaware of any other charter schools
8 in the area.
9 Q. Have you looked outside the -- your immediate
10 Lancaster area to -- into charter schools?
11 A. No, because I'm unwilling or unable to
12 relocate, due to my children and my circumstance.
13 Q. Okay. And your kids are how old?
14 A. Kyle is ten years old, and Ian is nine
15 years old.
16 Q. And they're in, I think you said, special -- are
17 they in special schools, or they're in public schools?
18 A. No, they are in the regular school
19 district, the regular school district in regular
20 schools, or regular setting, classroom setting. They
21 don't have any special needs teaching provided for
22 them.
23 Q. Okay.
24 A. They're able to maintain in the school.

1 Q. So neither child is an IEP, in other words?
2 A. Kyle had an IEP last year.
3 Q. Okay.
4 A. It was not transferred over this year.
5 Q. Okay. Did you make any attempts, since May '06,
6 to get certification other than through Millersville?
7 MR. VOIGT: I'm going to object. Do you
8 understand the question?
9 MR. KRAMER: If you don't -- again, if you
10 don't understand the question, let me know.
11 MR. VOIGT: You can answer over my
12 objection, but --
13 MR. KRAMER: Yeah, but -- off the record.
14 - - -
15 (Whereupon, a discussion was held off the
16 record.)
17 - - -
18 BY MR. KRAMER:
19 Q. Other than this litigation, have you made any
20 attempts to get certification?
21 A. No.
22 Q. Have you looked into trying to get
23 certification?
24 A. Yes, and financially I cannot afford it.

1 Q. Okay. What have you looked at? What routes are
2 available that you've looked at?
3 A. Other sister schools down in Bloomsburg or
4 Shippensburg. Other sister universities.
5 Unfortunately, I would have to transfer credits. Not
6 all of them would transfer. I would have to take
7 additional credits, I would have to take my student
8 teacher placement over again, and I would have to
9 commute to those sister universities. Unfortunately,
10 I cannot afford to do that.
11 Q. Okay. Bloomsburg and what other school?
12 A. Shippensburg. And those are all personal
13 research I did on my own off the website.
14 Q. Okay. And where was Bloomsburg located
15 vis-a-vis where you live?
16 A. Ship --
17 Q. Where are they located?
18 A. Shippensburg is to the west, I believe,
19 and Bloomsburg is to -- I'm sorry, Shippensburg's to
20 the east, Bloomsburg's to the west.
21 Q. And about how far is Bloomsburg University from
22 where you live?
23 A. Both universities are at least an hour
24 away.

1 Q. How many miles, if you know?
2 A. I can't answer that.
3 Q. Okay. Who did you speak with at Bloomsburg, if
4 anybody?
5 A. I -- it was all personal research off the
6 website.
7 Q. All right. Did you call anybody at Bloomsburg
8 to find out if you could get certification through
9 them?
10 A. No. No.
11 Q. Did you call anybody at Shippensburg to see if
12 you could get certification through them?
13 A. No.
14 Q. All right. There is a program that I learned of
15 in this court case called ABCTE. Have you heard of
16 them before?
17 A. Through the litigation, yes.
18 Q. Okay. And what's your understanding of what
19 ABCTE does?
20 A. ABCTE allows graduates of a university,
21 normally with a Bachelor's, but it could be with a
22 Master's, that want to restart or reform their area of
23 expertise, they want to receive certification in an
24 area, which they would become a teacher. They go

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

| Page 30 | Page 32 |
|---|---|
| 1 through their program. A lot of the work is | 1 light, it would have been very hard for me, even with |
| 2 individual work. You do receive a mentor, and you | 2 a temporary teaching certificate, to obtain my own |
| 3 have to go through the program, complete every aspect | 3 position within a school district within that year |
| 4 of it to receive certification. | 4 time. All of the other parts of the program had to be |
| 5 Q. Okay. And you did -- you learned about ABC -- | 5 completed after you obtained a position at a school |
| 6 you did research about ABCTE on the internet? | 6 district. |
| 7 A. Yes. | 7 Q. You referred to the media attention as sort of a |
| 8 Q. Did you call anybody at ABCTE to get | 8 barrier. What do you refer to? |
| 9 information? | 9 A. The whole litigation, the case, was |
| 10 A. I called an individual from PDE, | 10 brought and picked up by different areas of the media |
| 11 Pennsylvania Department of Education, as well as an | 11 in my area. Some I had no control over. And some of |
| 12 individual from ABCTE. I do not have their names off | 12 the schools in the area frowned upon that. Due to |
| 13 the top. | 13 Millersville trying to obtain me a position to redo |
| 14 Q. Okay. And what did the person from PDE state to | 14 student teaching, it was obvious. |
| 15 you? Do you remember? | 15 Q. I didn't -- to? |
| 16 A. I asked them a question concerning the | 16 A. Redo the student teaching placement. |
| 17 one-year-long temporary teaching certificate. I | 17 Q. Okay. Well, how do you know that, is my |
| 18 wanted more information concerning the temporary | 18 question. How do you know that it was -- that the |
| 19 teaching certificate that you would receive from ABCTE | 19 media attention caused school districts not to want to |
| 20 from after passing the test, and that is what I called | 20 have you as a student teacher? That's what I want to |
| 21 them concerning that aspect of the program. | 21 know. |
| 22 Q. And what did the person tell you? | 22 A. I guess it was my own -- my own belief |
| 23 A. The temporary teaching certificate is | 23 that that would be a barrier. |
| 24 valid one time in your lifetime and is valid for one | 24 Q. Okay. Did you yourself contact any school |

| Page 31 | Page 33 |
|---|---|
| 1 year. And they told me that there's no guarantee that | 1 districts to see if they would take you as a student |
| 2 you can find a teaching position within that year. If | 2 teacher? |
| 3 the teaching certificate expires, you have no other | 3 A. No. |
| 4 options. | 4 Q. Okay. So explain to me, then, the -- you spoke |
| 5 Q. All right. And the person from ABCTE that you | 5 to the media at least a few times, because we have |
| 6 spoke with, what did that person tell you? | 6 media articles. |
| 7 A. I spoke with them about the actual | 7 A. Yes. |
| 8 program, what happens when the mentors come into town. | 8 Q. Did you turn any interviews down? |
| 9 That was a question of mine. There's actually a | 9 A. Yes. |
| 10 mentor that flies in, what happens at that point, what | 10 Q. Okay. How many or from whom? |
| 11 type of mentoring do they do. And financially I would | 11 A. Approximately 20. And that's minimal. |
| 12 be responsible for bringing that mentor in, giving | 12 Q. Okay. How many media outlets did you speak |
| 13 them a place to stay, and all of the financial | 13 with? |
| 14 requirements. | 14 A. Television, radio and newspaper. |
| 15 As far as the objectives of the program, | 15 Q. Okay. Do you remember how many interviews you |
| 16 it was very clear, cut and dry on the website. I | 16 gave? |
| 17 didn't have to ask too many questions above and beyond | 17 A. No. |
| 18 what it states on the website. | 18 Q. More than ten? |
| 19 Q. Okay. Why did you -- I presume you decided not | 19 A. It was cumbersome. It was overwhelming. |
| 20 to pursue the ABCTE option? | 20 And I turned them down, because it was interfering |
| 21 A. Correct. | 21 with my life. |
| 22 Q. Why is that? | 22 Q. The media interviews were interfering with -- |
| 23 A. With my situation, where I'm at with the | 23 how so? |
| 24 court case, the media attention that was brought to | 24 A. I had media contacting my -- my parents' |

Page 34

1  home, my neighbors' homes, showing up at my front door
2  when I'm trying to be a parent and a worker. And so
3  the original media attention was not even -- it wasn't
4  a conversation between myself and somebody else. The
5  original media attention started from the docket that
6  they picked up, unfortunately. I had nothing to do
7  with it.
8  Q. Would you say you gave more than ten interviews
9  after the lawsuit was filed?
10  A. Yes.
11  Q. More than 20?
12  A. I can't verify that. No, I wouldn't
13  believe so.
14  Q. Okay. Somewhere between ten and 20 interviews
15  you gave?
16  A. Yes.
17  Q. You were interviewed for TV on this?
18  A. Yeah.
19  Q. What TV programs or stations?
20  A. Like the local stations in my area,
21  channel 5, channel 7, channel 9.
22  Q. Any national?
23  A. CNN.
24  Q. Okay. How about on the radio, did you give any

Page 35

1  radio interviews?
2  A. FM 97.
3  Q. Is this a local station?
4  A. Yes.
5  Q. Did you give any interviews on any national
6  radio station?
7  A. Fox. And that was it, as far as the radio
8  was concerned.
9  Q. Okay. Did you give any other interviews to
10  other media outlets?
11  A. Lancaster New Era or Lancaster newspapers
12  contacted me first, and they saw the docket article on
13  Court TV. And that's how it all started.
14  Q. Okay.
15  A. They stated that they would publish any
16  article with or without talking to me.
17  Q. Okay.
18  A. So it snowballed with or without me
19  talking to the media.
20  Q. Okay. You don't have any -- is it correct you
21  don't have any direct knowledge from personal
22  conversations that a school district wouldn't be
23  interested in hiring you or retaining you as a student
24  teacher because of these interviews?

Page 36

1  A. From litigation and from things that
2  transpired through litigation, that was my
3  understanding, that the school districts would not
4  hire me, due to the attention from the media and from
5  the students viewing the media and what their
6  interaction would be -- or I'm sorry, their
7  interaction would be with me or concerning the case in
8  general.
9  Q. Okay. And in other words, my assumption is, and
10  tell me if I'm wrong, is that we tried to settle the
11  case, Millersville made some phone calls, Millersville
12  reported back to me, and I told Mr. Voigt that
13  information. Is that what you're basing this on?
14  A. Yes.
15  Q. Okay. Any other information you have about the
16  perception of other school districts?
17  A. No.
18  Q. Okay. Since --
19  MR. VOIGT: Before we get started, do you
20  mind if we take a short break?
21  - - -
22  (Brief recess.)
23  - - -
24  BY MR. KRAMER:

Page 37

1  Q. Ms. Snyder, if you look at the first document
2  called Student Teaching Background Information.
3  A. Yes.
4  Q. And we're going to call this Snyder-1.
5  A. Okay.
6  Q. When did you fill this out?
7  A. All students were required to fill it out
8  before student teaching. We were required to fill it
9  out before we would obtain our placement or our
10  teacher, to give them more information about our
11  background as a person and then our areas of
12  education.
13  Q. Okay. And this is a Millersville document?
14  A. Yes.
15  Q. Okay. It's not a Conestoga Valley document?
16  A. No.
17  Q. And is everything on here true?
18  A. Except for the Tupperware consultant.
19  Q. Okay.
20  A. That didn't happen. Everything else is
21  correct.
22  Q. Okay. At the bottom of the first page, and
23  again, this is because of my ignorance of education,
24  you wanted to be a secondary education English,

10 (Pages 34 to 37)

Page 38

1 language arts or reading teacher in 7th or 8th grade?
2    A.    Yes.
3    Q.    The student teaching you were doing at Conestoga
4 Valley was in second --
5    A.    12th. I'm sorry.
6    Q.    -- secondary education English, right?
7    A.    Yes.
8    Q.    Is that different than language arts?  Is it a
9 different -- I just don't understand.
10    A.    Okay.  In the -- in secondary education
11 English you can obtain a position 7th through 12th
12 grade.  It can be considered a language arts
13 classroom, an English classroom or a reading
14 classroom.  Most reading positions, however, you need
15 reading expertise, normally a Master's in reading.
16    Q.    Okay.  Go ahead.
17    A.    Some of the school districts call their
18 classrooms language arts, as opposed to English.
19    Q.    Okay.
20    A.    Some of the school districts, instead of
21 saying an English 12, they will call it British
22 literature.  Depends on the school district and how
23 they want to pronounce -- or name or classify.
24    Q.    Okay.  That's really the semantics of a given

Page 39

1 school district, what they would call it?
2    A.    Yes.  Yes.
3    Q.    In fact, I think at Conestoga Valley they call
4 it communications?
5    A.    Yes.
6    Q.    Ms. Buffington was chair of the communications
7 department --
8    A.    Right.
9    Q.    -- as opposed to chair of an English department?
10    A.    Correct.
11    Q.    Okay.  And you were interested in 7th or 8th
12 grade --
13    A.    Yes.
14    Q.    -- at that point?
15          Was 7th or -- was student teaching at a
16 7th or 8th grade position your preferred student
17 teaching assignment?
18    A.    Yes.
19    Q.    Why didn't you get that?
20    A.    I'm not sure.
21    Q.    Okay.  And is that still your preference, to
22 teach, I guess --
23    A.    Yes.
24    Q.    -- I think of that as middle school?

Page 40

1    A.    Yes, that was -- and my main preference
2 for that area in my student teaching was highly due to
3 my previous experience.  All of my past experiences
4 were with the higher levels or the higher grades of
5 secondary education.
6    Q.    Meaning 10th, 11th, 12th?
7    A.    10th -- yes, high school experience, and I
8 really wanted to dig my hands into middle school and
9 middle school experience.  That's why my preference
10 was 7th and 8th grade, so I had a better variety or
11 umbrella of experience.
12    Q.    If you had your choice, what age or what grade
13 would you teach as an English teacher?
14    A.    Like I said, 7th or 8th.  My choice
15 between the two, probably 8th grade.
16    Q.    Okay.  Shew.
17    A.    That's exactly what my parents said.
18    Q.    Just turn to the last page.
19    A.    Okay.
20    Q.    Could you confirm that's your signature at the
21 bottom of the page?
22    A.    Yes.
23    Q.    Did you read -- it says here "Please read and
24 sign:  I understand that as a student teacher I am

Page 41

1 representing Millersville University and am a guest in
2 the host school.  I understand that I am subject to
3 the rules and regulations of the school district to
4 which I am assigned."
5          Did you ever inquire as to the rules and
6 regulations of Conestoga Valley?
7    A.    They were never provided to me.
8    Q.    Okay.  Did you make any inquiries to find out
9 what they were?
10    A.    I was under the impression that they would
11 be the same rules and regulations which they referred
12 to in the orientation meeting.
13    Q.    Okay.
14    A.    That it would be an envelope for all
15 school districts, maintain your professionalism, have
16 proper attire.  The basic guidelines that they give
17 you.
18    Q.    The usual stuff.
19    A.    Yes.
20    Q.    Well, let's -- just so I can clarify, you went
21 to an orientation meeting in January '06, correct, at
22 Millersville?
23    A.    Yes.
24    Q.    Okay.  And did they give you -- they gave you

11 (Pages 38 to 41)

Page 42

1 some documents at that meeting?
2 A. They gave us a packet of documents that
3 would assist us in our student teaching, possible
4 ideas, things that we might run into as far as a
5 teacher in a classroom, and things that would help us
6 maintain or complete our portfolios.
7 Q. Do you remember what that document was called,
8 that document --
9 A. Oh, there were various documents in that
10 pile. A lot of the documents were personal opinions
11 of other professionals in education.
12 Q. Okay. Was that the Millersville University
13 Guide for Student Teaching? (Indicating.)
14 A. That was one of the documents in the
15 packet.
16 Q. Okay. At any point did you receive a version of
17 this document, this is -- the one I have is dated
18 September 2007, called Conestoga Valley School
19 District Professional Handbook? (Indicating.)
20 A. No.
21 Q. You never received any version of this from
22 Conestoga Valley?
23 A. No.
24 Q. Okay. Did you ever receive from Conestoga

Page 43

1 Valley this document, the Conestoga Valley School
2 District Administrative Hiring Manual for Professional
3 Employees Adapted Through "Teacher of the Future" for
4 NCLB Standards? Did you ever receive that document?
5 (Indicating.)
6 A. Nope.
7 Q. Okay. Did Conestoga Valley, as opposed to
8 Millersville, ever give you any documents,
9 administrative documents?
10 A. No.
11 Q. Did Conestoga Valley ever give you any documents
12 reflecting the District's rules and regulations?
13 A. No.
14 Q. So your understanding, while student teaching,
15 was that the Millersville Guide for Student Teaching
16 was sort of what governed your behavior, as it were?
17 A. Correct.
18 Q. Okay. All right. Did Nicole Reinking or Deann
19 Buffington ever give you any papers, documents
20 reflecting any rules and regulations from the school,
21 from the high school?
22 A. Not rules and regulations, no.
23 Q. Okay. What kinds of papers did they give you?
24 A. Deann Buffington did not give me anything.

Page 44

1 Nicole Reinking gave me documents that would assist me
2 in class --
3 Q. Okay.
4 A. -- a grammar book, past documents that she
5 used for tests and quizzes. Things like that.
6 Q. So she gave you the teaching materials that you
7 would need?
8 A. Yeah, exactly.
9 Q. Okay. You can move that over.
10 Just look at the second page. This is a
11 note to you from Kim?
12 A. Yes.
13 Q. Who is --
14 A. Kimberly McCollum-Clark was an advisor.
15 She was also --
16 Q. From Millersville?
17 A. From Millersville. She was my English
18 advisor, as well as a professor that I had for years.
19 And she transitioned with me throughout the whole
20 process, the English process. I had her starting in
21 sophomore to junior year, and that continued on until
22 my final class before student teaching.
23 Q. So she was your faculty advisor at Millersville?
24 A. Faculty advisor and college teacher, you

Page 45

1 know, professor.
2 Q. What's the context of this document? I mean,
3 why did she write it, if you know?
4 A. We had a -- in the English 485 class we
5 had to make up a portfolio. It was required. One
6 part of the portfolio was a self-evaluation. It was
7 of our professional behavior, disposition, how we felt
8 about ourselves as a teacher. And this was her
9 response to my portfolio and what I said about my
10 professional behavior.
11 Q. Did you respond to her note?
12 A. No. This was handed to me along with my
13 portfolio and my grade.
14 Q. Okay. I see. This was part of this course,
15 English 485?
16 A. Yes.
17 Q. Okay.
18 A. She gave a personal response to all
19 students.
20 Q. I understand. Okay. Turn to the next -- and
21 we're going to call this Snyder-2.
22         - - -
23         (Whereupon, Exhibit Snyder-1 was marked
24         for identification.)

12 (Pages 42 to 45)

| | Page 46 | | Page 48 |
|---|---|---|---|
| 1 | - - - | 1 | Q. Okay. At the time your -- the degree you were |
| 2 | BY MR. KRAMER: | 2 | aiming for was a Bachelor of Science? |
| 3 | Q. Okay. Turn to the next documents, which we'll | 3 | A. Yes. |
| 4 | mark as Snyder-2. These documents are all called | 4 | Q. You wanted to change that to a Bachelor's of |
| 5 | Academic Major Form, except for the last few pages. | 5 | English -- a Bachelor of Arts in English? |
| 6 | Explain to me what the first page is. | 6 | A. Yes. |
| 7 | A. Originally I was a nuclear medicine | 7 | Q. What caused you to do that? |
| 8 | biology major. | 8 | A. I was struggling with my studies in |
| 9 | Q. What is nuclear medicine? | 9 | biology. Biology is one of the hardest majors at |
| 10 | A. Well, it's the study of medicine in the | 10 | Millersville, and any person can tell you that. |
| 11 | form of nuclear physics, if you want to do any type of | 11 | Unfortunately, with two children I could not study the |
| 12 | cancer research, which was ultimately my goal. My | 12 | amount that I needed to, and the next viable option |
| 13 | grandfather, unfortunately, died of cancer and I | 13 | for me was English. I had a class with a professor, I |
| 14 | originally wanted to work with cancer patients. | 14 | had gone through the entire class, and she wrote a |
| 15 | Q. Okay. | 15 | letter to me, which unfortunately I don't have |
| 16 | A. And nuclear medicine is the study of | 16 | anymore, stating that I would be a very good candidate |
| 17 | cancer through nuclear medicine. It's an option of | 17 | for the English department. That is why I switched to |
| 18 | the biology. You could have chemistry as another | 18 | that area. |
| 19 | option or another minor. That was just my expertise | 19 | Q. And who was that professor? Her name, his name. |
| 20 | or my preference. | 20 | A. She's deceased now. I can't think of her |
| 21 | Q. So at the time in, this is from spring 2003, | 21 | name. I'm sorry. |
| 22 | your major was biology? | 22 | Q. Okay. And it says to the right of that "Print |
| 23 | A. Up until that point, yes. | 23 | Journalism" as an option? |
| 24 | Q. And this was your sophomore year? | 24 | A. Yes. |

| | Page 47 | | Page 49 |
|---|---|---|---|
| 1 | A. 2003. I started summer 2002. This was | 1 | Q. And how did that play into this? |
| 2 | going to be changed summer of 2003. So it would be | 2 | A. When you're an English major with a |
| 3 | the end of my freshman year. | 3 | Bachelor of Arts, you need an option or a minor, and |
| 4 | Q. All right. And it says "Option," nuclear | 4 | they have several different options, writing, print |
| 5 | medicine. Does that mean nuclear medicine is a minor? | 5 | journalism. You could actually have a category in |
| 6 | A. It's not a minor. It's -- if you're | 6 | which you have an expertise, like women writers. But |
| 7 | looking in a hierarchy, it's what's underneath the | 7 | I decided to go with print journalism and see how that |
| 8 | minor. It's an option that's coupled with your major, | 8 | went, see if I had an interest in it, writing for the |
| 9 | but it's not enough credits for a minor. | 9 | newspaper or becoming an editor of a paper. |
| 10 | Q. Okay. | 10 | Q. Okay. Were you considering a career in |
| 11 | A. Or they do not have the minor available at | 11 | journalism at that point? |
| 12 | the college. | 12 | A. Yes. |
| 13 | Q. Got it. Okay. That's certainly different from | 13 | Q. Okay. At the bottom, whose -- it looks like |
| 14 | when I went to school. | 14 | John Hoover under number II? |
| 15 | What were you -- were you planning on a | 15 | A. That was my advisor in biology. |
| 16 | specific career in mind in which you would use | 16 | Q. So since you were changing your major you had to |
| 17 | biology, you know, slash, nuclear medicine at the time | 17 | get a new advisor? |
| 18 | A. Cancer research. | 18 | A. Right. |
| 19 | Q. Okay. Would you have needed additional degrees | 19 | Q. Okay. And that was Dr. Paul Belgrade, who was |
| 20 | above the Bachelor of Science to get that? | 20 | assigned as your advisor? |
| 21 | A. Possibly, depending on the level. If I | 21 | A. Correct. |
| 22 | wanted to work with patients and -- the chemo | 22 | Q. Okay. Beverly Schneller signed off. Who's |
| 23 | patients, no. But if I wanted to be a doctor to do | 23 | Beverly Schneller? |
| 24 | research, yes, obviously. | 24 | A. Beverly Schneller is the chair of the |

13 (Pages 46 to 49)

| Page 50 | Page 52 |
|---|---|
| 1 English department at Millersville University. | 1 leave. |
| 2 Q. And her signature, I presume, was a requirement | 2 Q. All right. It says here at the top current |
| 3 to change majors? | 3 degree is BA? |
| 4 A. Yes. | 4 A. Yes, which I don't understand. |
| 5 Q. Okay. Go to the next page. What is this page? | 5 Q. So that's wrong? |
| 6 A. I wanted to transfer from a BA to a | 6 A. I believe, yes. |
| 7 Bachelor of Secondary Education. After more soul | 7 Q. Okay. But your major was still in English with |
| 8 searching and research I decided, in fact, that I did | 8 an option in print journalism? |
| 9 want to become a teacher. And after a lot of | 9 A. Yeah. |
| 10 conversations with my advisors and my professors, it | 10 Q. Okay. Next page, what is this document? |
| 11 led me to that decision. | 11 A. I changed advisors again, not on my |
| 12 Q. Okay. Under number I it says "Current Degree," | 12 choice, but Dr. Karnicky went to a different college, |
| 13 BS, and the E is, the letter E, is in bold. | 13 and my new advisor was Kim McCollum-Clark, which is at |
| 14 A. I believe Beverly Schneller wrote that. | 14 the bottom. |
| 15 Q. Okay. | 15 Q. This one, this document, says received |
| 16 A. Because it's the same handwriting. | 16 June 24th, 2004. This lists your current degree as a |
| 17 Q. Okay. | 17 BA? |
| 18 A. After I fill out this form and I hand it | 18 A. BSE. That's why I'm saying I don't |
| 19 to my advisor, I really don't see it after that point. | 19 understand the third document, where it says BA. I |
| 20 Q. Okay. And because you needed a new advisor, | 20 think I was entirely -- I think I was continuing my BA |
| 21 also, was that part of Millersville's protocol? | 21 until this point, because it says I wish to change my |
| 22 A. When you -- yes. In an English | 22 major to a BSE. So from summer '04 I was a BSE major. |
| 23 department, or in the English department, when you are | 23 Q. Look at -- I think we may be looking at |
| 24 a Bachelor of Arts you have different advisors than | 24 different documents, because the document I have -- |

| Page 51 | Page 53 |
|---|---|
| 1 you would if you're a Bachelor of Secondary Education. | 1 look at this. Received June 24th, 2004, has your |
| 2 Q. Okay. | 2 current degree as a BA. (Indicating.) |
| 3 A. Because you need a professor that's not | 3 A. Correct. |
| 4 only tailoring to students that are English-bound, but | 4 Q. Do you have that document? |
| 5 also education-bound. | 5 A. Yeah. |
| 6 Q. And so your new advisor was -- I can't pronounce | 6 Q. Okay. |
| 7 that. | 7 A. That's what I'm saying. And it says I |
| 8 A. Dr. Masciale-Walmer. | 8 wish to change my major to a Bachelor of Secondary |
| 9 Q. Okay. And what was her expertise? I'm assuming | 9 Education. |
| 10 it's a female. | 10 Q. Okay. So that's incorrect, or you don't know |
| 11 A. Yes. English education. | 11 why that's the -- |
| 12 Q. Okay. You still had the option of print | 12 A. No, that is correct. The previous sheet |
| 13 journalism. Why is that? | 13 with the BSE, that is incorrect. |
| 14 A. I wanted to teach print journalism to | 14 Q. I see. |
| 15 secondary education students. | 15 A. That's what I'm saying. |
| 16 Q. All right. | 16 Q. So at that point you were still going for a BA? |
| 17 A. Be in charge of the yearbook or the school | 17 A. Correct. |
| 18 newspaper. | 18 Q. Not a BSE? |
| 19 Q. Okay. Next page. This one, at the very bottom, | 19 A. Yes. |
| 20 signed by Beverly Schneller, dated 11/14/03. What is | 20 Q. Okay. Got it. And here it has journalism as a |
| 21 this document? | 21 minor, no longer as an option. Do you see that? |
| 22 A. My advisor changed to Dr. Karnicky. | 22 A. Right. |
| 23 Q. Why is that? | 23 Q. What is that? |
| 24 A. Dr. Masciale-Walmer went on maternity | 24 A. Well, I wrote "Minor." |

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 54

1　Q. What does that mean?
2　　A. I was under the impression the entire time
3　that it was a minor, not an option. So I crossed that
4　off and wrote "Minor."
5　Q. For a minor you would need additional --
6　　A. Credits.
7　Q. -- credits --
8　　A. Correct.
9　Q. -- than for an option?
10　　A. Correct. They did have the journalism
11　minor and they did have the journalism option.
12　Q. Okay. Your degree at this point, in June '04,
13　had you received this degree it would have said you're
14　awarded a Bachelor of Arts, right?
15　　A. Yes.
16　Q. Would it have also said a Bachelor of Arts in
17　English with a minor in journalism? I mean, how does
18　that --
19　　A. I don't know how they print the diplomas
20　for the students with a major and a minor. It would
21　be my impression that they would have the minor listed
22　on the diploma; however, I'm not 100 percent aware of
23　what they do in those circumstances.
24　Q. So at this point, in June '04, your current

Page 55

1　degree, the degree you're aiming for, is a Bachelor of
2　Arts, right?
3　　A. Correct.
4　Q. In English?
5　　A. Correct.
6　Q. With a minor in journalism?
7　　A. Correct.
8　Q. And that's because what you were hoping to do
9　was teach journalism to high school kids?
10　　A. Correct.
11　Q. Okay.
12　　A. And then it switched.
13　Q. Right, then it switches. And on the same
14　document, I want to change my major to BSE in English,
15　and this is in the summer of '04?
16　　A. Yes.
17　Q. The S stands for -- what does the S stand for?
18　　A. Secondary.
19　Q. Okay. Did you have to change advisors as well?
20　　A. It could be science or secondary. It was
21　my impression that it was Bachelor of Secondary
22　Education.
23　Q. Okay. And at that point your current advisor
24　was Karnicky still?

Page 56

1　　A. Yes.
2　Q. Okay. But I see at the bottom you're getting a
3　new advisor?
4　　A. Yes.
5　Q. This is K. McCollum-Clark?
6　　A. Yeah, Kimberly McCollum-Clark.
7　Q. And she's the person who wrote that note that we
8　talked about a couple minutes ago?
9　　A. Yes.
10　Q. Okay. Was Ms. McCollum-Clark your advisor from
11　this point through graduation?
12　　A. Yes, the last two years.
13　Q. Okay. The next page, okay, this is from May
14　'06. This document, it appears, is an important -- is
15　related to, you know, Millersville's actions and your
16　actions, you know, at the end of your teaching,
17　student teaching, right?
18　　A. Correct.
19　Q. Is any of this --
20　　A. I never saw this document before.
21　Q. So none of this is your handwriting?
22　　A. No.
23　Q. Okay. And you never saw this document at all
24　ever?

Page 57

1　　A. No.
2　Q. Okay. Go to the next page, which is -- actually
3　states "Courses by Terms." And just go to the third
4　-- page 3 of 3.
5　　A. Okay.
6　Q. At the very bottom it has your courses for
7　spring '06.
8　　A. Yes.
9　Q. Second -- second item is EDEN 461, section 3B,
10　student teaching in English, right?
11　　A. Yes.
12　Q. And that -- and Girvin was your Millersville
13　supervisor for that?
14　　A. Correct.
15　Q. Okay. The grade is W. What does that mean?
16　　A. Withdraw.
17　Q. Okay. Is that what you understand is what
18　happened in that course officially?
19　　A. They gave me a withdraw.
20　Q. Do you know why they gave you a withdraw, as
21　opposed to a failure?
22　　A. My understanding is if the school district
23　gives you an unsatisfactory, the college gives you an
24　unsatisfactory, and then you -- a withdraw is given to

15 (Pages 54 to 57)

Page 58

1  you.
2  Q.  Okay.
3     A.  Not an F.
4  Q.  Correct.  After that it says "Non-Ge."  What
5  does that mean?
6     A.  Non-general education.
7  Q.  Okay.  Last page, this is "View Student
8  Schedule," May 3rd, '07.  What is this document?  Why
9  does it exist, if you know?
10    A.  I don't know who brought it up.  I'm
11 really unsure why it's in here.
12 Q.  Because you weren't enrolled at Millersville in
13 May '07, right?
14    A.  May '07, no.
15 Q.  Okay.
16    A.  This is May '06.  From the classes that
17 are listed here, this is what I had for my -- I'm
18 sorry, not May 2006.  It was a previous -- previous
19 semester.
20 Q.  Was there one semester at Millersville in which
21 you took the five courses listed here?
22    A.  Yes.
23 Q.  Do you know what semester that was?
24    A.  Right here, fall 2005.

Page 59

1  Q.  Okay.  Thanks.
2     A.  Actually, I'm sorry, no, it was prior to
3  that.
4  Q.  I just didn't know what this document was.
5     A.  I have no idea why it's in there.
6  Q.  All right.
7     A.  It would be spring 2005.  I apologize.
8  Q.  Okay.  Okay.  We're done with Snyder-2.
9             - - -
10        (Whereupon, Exhibit Snyder-2 was marked
11     for identification.)
12             - - -
13 BY MR. KRAMER:
14 Q.  Now, at some point you did some kind of
15 internship with a Mr. Weidman at Garden Spot High
16 School?
17    A.  Correct.
18 Q.  When was that?
19    A.  That was the semester prior to student
20 teaching.  It was approximately September 2005 to, I
21 want to say November to December 2005.  I was in there
22 periodically per week to work with a student with
23 special needs.
24 Q.  Okay.  That was a -- an Action Research Project?

Page 60

1     A.  Correct.
2  Q.  What does that mean?
3     A.  Action Research Project is a project in
4  which you're researching a student that has problems
5  with his or her writing.  My student had dysgraphia.
6  Q.  What's that?
7     A.  Dysgraphia is a disorder in which the
8  mental thoughts can't get to the paper through the
9  handwriting of the student.  My student that I had
10 unfortunately had trouble putting the pen to the paper
11 and getting the thoughts down on the paper.  His
12 handwriting looked like that of a 4th grade student.
13 Q.  And how old was the kid?
14    A.  He was a freshman.
15 Q.  In high school?
16    A.  In high school.
17 Q.  Okay.
18    A.  And unfortunately, some students have
19 these problem.  He did not have an IEP.  I was working
20 with Neil Weidman, who was not only my professor, but
21 the high school teacher that was teaching the student.
22 We were working with him to help him get his thoughts
23 on the paper, finding an easier way for him to
24 communicate and to -- and he'll have better grades in

Page 61

1  the class.  So that was my project with Neil.
2  Q.  Okay.  So for those -- really the fall of 2005,
3  you worked with this one student?
4     A.  Yes.
5  Q.  And what did your work with him entail?  What
6  did you do with him?
7     A.  I first researched him.
8  Q.  As a person?
9     A.  As a person, as a student, researched his
10 work, researched dysgraphia or other problems based on
11 what I saw in his writing.  The next step after that
12 is actually implementing a plan with him.  We'll say
13 Tom was his name, because I can't say his name.
14    "Tom, I think these issues are going on.
15 I'm going to work with you to help you get better
16 grades in English, to help you succeed."  And I worked
17 with him.  I actually had to learn a lot about him as
18 a person to help him as a writer.  So that was the
19 process.
20    And that was the whole point of the Action
21 Research Project, to -- basically a scientific method.
22 You have a hypothesis, what is wrong with the student
23 or what is wrong with the writing of the student and
24 how can I change it, and you come to a conclusion at

16 (Pages 58 to 61)

| Page 62 | Page 64 |
|---|---|
| 1 the very end. | 1 him an assignment, a paper, and then I would help him |
| 2 Q. Okay. And did you have to write a paper about | 2 with that paper. |
| 3 this? | 3 Q. Okay. So, in fact, you were a private teacher |
| 4 A. Yes, approximately 40 pages. | 4 for this boy for those hours that you were there? |
| 5 Q. Okay. Did you help the kid? | 5 A. Tutor. |
| 6 A. Yes. | 6 Q. Tutor. |
| 7 Q. Okay. Do you -- | 7 A. Yes. |
| 8 A. Mr. Weidman talked to the guidance | 8 Q. Okay. At any time at Garden Spot High School, |
| 9 department, and his parents tried to get him an IEP to | 9 with Neil Weidman, did you ever need to teach the |
| 10 help him out afterwards. I had no part in that, | 10 entire class anything? |
| 11 because he wasn't my official student. | 11 A. No. |
| 12 Q. Right. That must have been pretty satisfying to | 12 Q. Okay. |
| 13 help him. | 13 A. There were periods of time that we were |
| 14 A. It was one of the biggest experiences, | 14 with the entire class, and then what would happen is |
| 15 yes. | 15 myself and the two other students that came up to his |
| 16 Q. How many hours a week did you work with this | 16 classroom, we would kind of branch off with our |
| 17 boy? | 17 students when they were doing their individual work. |
| 18 A. Prob -- approximately three to five hours. | 18 Q. So most of your work with Tom, this boy, took |
| 19 Unfortunately, it was in the middle of a semester | 19 place outside of the regular classroom? |
| 20 where I had a large workload. I believe I was taking | 20 A. It was inside the regular classroom, but |
| 21 18 credits that semester while working and helping him | 21 just separated. |
| 22 individually, and I also had my junior block | 22 Q. Okay. Sort of in the corner? |
| 23 placement. | 23 A. Yeah. |
| 24 Q. What's junior block placement? | 24 Q. Okay. And did you spend any time at all working |

| Page 63 | Page 65 |
|---|---|
| 1 A. Junior block placement is the teaching | 1 with the other kids in the class? |
| 2 before student teaching, in which you go into a | 2 A. Sometimes, yes. |
| 3 school. At that time I was in L-S School District, | 3 Q. How so? |
| 4 Sue Fetterolf's classroom. | 4 A. Walking around the classroom, making sure |
| 5 Q. Okay. That's my next area. Were you doing your | 5 that they're doing the work, asking them questions, |
| 6 work in Neil Weidman's class at the same time you were | 6 "Well, what do you think about this idea? How does it |
| 7 working in Sue Fetterolf's class, or Fetterolf came | 7 connect to your story?" Basic grammar corrections on |
| 8 after? | 8 papers. Not that I was doing what a student teacher |
| 9 A. Fetterolf was directly after that. The | 9 would do or what a regular classroom teacher would do, |
| 10 two times did lapse a little bit. My meetings with | 10 but basically helping out, trying to gain a grasp of |
| 11 Fetterolf before my placement and some of the time | 11 the classroom in general and the students in general. |
| 12 that I was in Neil's classroom did overlap. | 12 Q. Okay. So in other words, while -- it sounds |
| 13 Q. Okay. | 13 like while, you know, while the students are working |
| 14 A. I was finishing the project and starting | 14 on a project at the same time, you'd walk around as |
| 15 the placement. | 15 a -- |
| 16 Q. Okay. Did you have any responsibility for | 16 A. Like a classroom aide. |
| 17 curriculum in your Action Research Project with this | 17 Q. Okay. |
| 18 boy? | 18 A. Yes. |
| 19 A. I had to find documents that would help | 19 Q. And your work with Mr. Weidman ended |
| 20 him. One of the documents was a brainstorming | 20 November '05, approximately? |
| 21 worksheet. I had him brainstorm his ideas to help him | 21 A. Yes. |
| 22 get the thoughts on the paper. Just various things | 22 Q. And when did you start working with Sue |
| 23 like that. I wasn't in charge of the work that he | 23 Fetterolf? |
| 24 had. That was Neil's responsibility. Neil would give | 24 A. About the same time, October, November. I |

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

| Page 66 | Page 68 |
|---|---|

Page 66

1 mean, like I said, there was a period of transition.
2 I know that I finished with Sue's class prior to
3 winter break.
4 Q. And when is winter break?
5 A. Our winter break is in the middle of
6 December. Their winter break was right before
7 Christmas.
8 Q. So you worked -- and did you start with Sue's
9 class early November, late November? How many weeks
10 did you work in Sue's class?
11 A. It wasn't the amount of weeks. It was the
12 amount of hours. We had to be in the classroom 35 to
13 40 hours.
14 Q. Total?
15 A. Total.
16 Q. I see.
17 A. So it was the amount of hours that you
18 were in the classroom for junior block. It wasn't the
19 amount of weeks that you were in for student teaching.
20 Q. Okay.
21 A. That's the main difference.
22 Q. Okay.
23 A. It's kind of like a building block to get
24 you to student teaching.

Page 68

1 not teach the whole section or semester. It was just
2 one small part of her whole session with them.
3 Q. So if I understand this, Sue Fetterolf had the
4 responsibility for planning and developing the
5 particular lesson and she then had you implement a
6 portion of her curriculum?
7 A. She had the curriculum set up. She showed
8 me her schedule. I chose which part or which
9 section --
10 Q. I see.
11 A. -- I would like to teach. I gave her my
12 lesson plan, what I was planning on doing with the
13 students, she okayed that. After that point, I taught
14 that lesson to the students.
15 Q. Okay. And each mini lesson is how long?
16 A. It was one to two class periods.
17 Q. Okay. And a class period is 60 minutes?
18 A. They had block scheduling, so it was
19 approximately an hour and a half. Hour, 15 minutes,
20 hour and a half, depending on the school.
21 Q. Okay. And you did two of those for Sue?
22 A. Yeah, well, two for the one class, which
23 is SAT prep. The other class was English 10, 10th
24 grade. They were working with concepts by Benjamin

Page 67

1 Q. Sure. And what did you do in Sue Fetterolf's
2 class?
3 A. I was in charge or -- I shouldn't say "in
4 charge," but responsible for two different classes.
5 She had English 10 and then she --
6 Q. 10th grade?
7 A. Yes.
8 Q. Okay.
9 A. And then she had an SAT prep class, which
10 was more 11th grade students. There were no seniors.
11 And I went into the classroom several times, I
12 observed her a lot, and then I taught two or three
13 mini lessons, and that was my time there.
14 Q. Okay. What's a mini lesson?
15 A. Not a full concrete section of learning.
16 It's one lesson that's coupled with what the teacher
17 is also teaching. They were going through different
18 books in SAT prep. They had to read Huckleberry Finn,
19 for example. Another book they had to read was Black
20 Boy. So I had to teach a section of Black Boy to the
21 students.
22 Q. I see.
23 A. And connect it to their lives. Or at
24 least that's what I did within my mini lesson. I did

Page 69

1 Franklin. So I taught them about Benjamin Franklin
2 and taught them about his expertise in English, how he
3 owned a printing press, and we played Jeopardy to prep
4 them for -- prep them for a test that they were
5 having. So that was my expertise in that.
6 Q. All right. You went, as I understand it, then,
7 in January '06, January 16th and 17th, to a student
8 teacher meeting at Millersville?
9 A. Correct.
10 MR. VOIGT: This might be a good time to
11 take a short break.
12 MR. KRAMER: Absolutely. I was thinking
13 the same thing.
14 - - -
15 (Brief recess.)
16 - - -
17 BY MR. KRAMER:
18 Q. Let's now talk about Reinking and your student
19 teaching semester. Tell me what happened. You had
20 this, what appears to be a two-day student teaching
21 seminar at Millersville. What was that about?
22 A. I actually met -- or hold on one second.
23 Q. Yes.
24 A. Are you questioning the seminar or are you

| | Page 70 | | Page 72 |
|---|---|---|---|
| 1 | questioning my experience with Reinking. | 1 | class of teaching, and then the last few weeks of |
| 2 | Q. I'm using the seminar as a segue to Reinking. | 2 | teaching or the teaching experience I would be |
| 3 | A. Okay. | 3 | observing again. |
| 4 | Q. So tell me about Reinking? | 4 | Q. Okay. And that's the way it's supposed to work |
| 5 | A. I wanted to clarify that. | 5 | for all the student teachers, correct? |
| 6 | MR. VOIGT: I'm going to object to the | 6 | A. Correct. |
| 7 | question. "Tell me about Reinking"? Be a | 7 | Q. So you and Reinking met sometime in early |
| 8 | little more specific. | 8 | January '06? |
| 9 | BY MR. KRAMER: | 9 | A. Yes. |
| 10 | Q. How did you first meet Reinking, when did you | 10 | Q. Where did you meet? |
| 11 | meet her? | 11 | A. In -- there's a small room in the |
| 12 | A. I was introduced -- well, I was told that | 12 | communications department and -- it's a small |
| 13 | Reinking would be my student teacher. We actually | 13 | lunchroom. |
| 14 | have to contact our student teachers. That's one of | 14 | Q. At Conestoga Valley? |
| 15 | our respon -- I'm sorry, our cooperating teacher. | 15 | A. At Conestoga Valley. We met in the small |
| 16 | That's one of our responsibilities -- | 16 | meeting room. She went over the types of documents, |
| 17 | Q. Okay. | 17 | books, publications, small -- short stories, anything |
| 18 | A. -- as a student teacher. We have to | 18 | that I would have to be responsible for teaching that |
| 19 | contact them, set up an initial meeting with them. My | 19 | I would need to read. I had very little prior |
| 20 | initial meeting with Reinking took place before the | 20 | knowledge in British literature before the teaching |
| 21 | semester began. It actually took place before the | 21 | experience, so there were a lot of things that I |
| 22 | seminar. | 22 | needed to read and prep myself on. |
| 23 | Q. Seminar, meaning in mid January -- | 23 | Q. Such as? |
| 24 | A. Yes. | 24 | A. I never read The Seafarer, and I had to |

| | Page 71 | | Page 73 |
|---|---|---|---|
| 1 | Q. -- that seminar? | 1 | read that. I had to teach Hamlet and Macbeth, which I |
| 2 | A. Before the seminar in mid January at | 2 | was fine on, I read those things in Shakespeare class; |
| 3 | Millersville. I met with her concerning my background | 3 | however, a large portion of the course was a poetry |
| 4 | with British literature, what her curriculum entailed, | 4 | course, a poetry unit, involving a lot of English and |
| 5 | her process with the curriculum, how many weeks she | 5 | British poetry that I never had experience with |
| 6 | normally spent on each thing, what my responsibilities | 6 | before. So I had to read through that poetry, figure |
| 7 | would be in the classroom, what I wanted to start off | 7 | out the meaning of the poem, so I was able to teach it |
| 8 | doing. | 8 | to the student. |
| 9 | And it was her first student teaching | 9 | During that meeting we went over vaguely |
| 10 | experience, as well as mine. It was her first time | 10 | what I would be doing that semester. It started off |
| 11 | being a cooperating teacher and first time myself | 11 | right away with me going into a poetry unit with her |
| 12 | being a student teacher. So she was aware of the | 12 | at week three, after observing her for two weeks. |
| 13 | process. I was aware of the process as far as how | 13 | Q. Okay. |
| 14 | many weeks you're supposed to spend, and you're | 14 | A. And I basically would take on the classes |
| 15 | supposed to build up teaching all the classes and | 15 | and bump back down. That was the impression at that |
| 16 | you're supposed to bump yourself back down. | 16 | meeting. |
| 17 | Q. What does that mean, build yourself up, bump | 17 | Q. Let's go back. So you met at Conestoga Valley |
| 18 | yourself back down? | 18 | in this little room. How long did you meet for? An |
| 19 | A. You're supposed to start off with one | 19 | hour, half hour? |
| 20 | class after a period of time of not teaching, of | 20 | A. Yeah, approximately an hour. Not too |
| 21 | observing your teacher. You're supposed to bump up to | 21 | long. |
| 22 | the next level, take on all of the classes that are | 22 | Q. Okay. This was a meet and greet, basically, an |
| 23 | available, in my case it would be three classes, bump | 23 | introduction -- |
| 24 | myself back down to two, bump myself back down to one | 24 | A. Correct. |

Page 74

1  Q. -- to each other?
2     A.   Correct.
3  Q. So when did you first then go to Conestoga
4  Valley to actually attend her class?
5     A.   I went and observed in her classroom.
6  Unfortunately, the semesters didn't match up with the
7  student teaching experience. The second semester for
8  Conestoga Valley ended a little bit after I started my
9  student teaching placement. So it was a good time for
10 me to observe Nicole in the classroom; however, it was
11 with students that were not going to be my students.
12 Q. Okay. The Conestoga Valley first semester ended
13 sometime mid January or end of January?
14    A.   No, second semester.
15 Q. Second semester?
16    A.   Yes, ended mid January.
17 Q. Okay.
18    A.   And then they had their midterms.
19 Q. Okay.
20    A.   Midterm finals.
21 Q. Right.
22    A.   And then the third semester started up
23 shortly after that, the third semester, and then a
24 fourth semester, which was not finished by the time I

Page 75

1  left.
2  Q. All right.
3     A.   Their fourth semester would have ended
4  right before graduation.
5  Q. Their fourth semester ends in June,
6  approximately?
7     A.   Yeah, approximately June, because they
8  were seniors. So whenever -- yeah, whenever their
9  graduation preparation occurred, that's when they
10 stopped with their classes.
11 Q. So you observed her teaching a class for a
12 couple weeks. What dates, when to when,
13 approximately?
14    A.   Approximately the middle of January,
15 probably around the 20th sometime, to the beginning of
16 the third semester. I don't have that date off the
17 top of my head. Before February 1st.
18 Q. Okay. That's my question.
19       And when -- when you're finished
20 observing, and we'll say approximately February 1st,
21 you went into her class -- you were in her classroom.
22 What were you supposed to do at that point?
23    A.   I began teaching the poetry unit.
24 Q. And was this a -- was this poetry that you had

Page 76

1  been familiar with before?
2     A.   No. This was the poetry that I had to
3  research and read and understand and decipher on my
4  own before teaching the students.
5  Q. Okay. Is this The Seafarer or --
6     A.   The Seafarer is -- no, that's a short
7  story.
8  Q. All right. So what are you -- what poetry?
9  Sort of what are you talking about there? And I'm not
10 testing you. I just want to get of sense of what
11 you --
12    A.   No, like elegies, short poems. Gray was a
13 poet, an English poet. Just different types of poets
14 and their poetry that was most famous that the
15 students could either connect with or they would have
16 in college.
17 Q. And the poetry section, whose curriculum was it?
18 Was it the school's curriculum and you just -- I mean,
19 you didn't develop that curriculum, did you?
20    A.   I worked off of Nicole's, Nicole
21 Reinking's, curriculum at that point.
22 Q. Okay. And was there a book that the kids used?
23    A.   Yes, they had an English textbook.
24 Q. Okay.

Page 77

1     A.   And the poems were in the English
2  textbook. If it was a poem that wasn't in the English
3  textbooks, it was few and far between. Most of the
4  poems that we used were right there in front of them
5  in the book.
6  Q. Did you have a special teacher's edition?
7     A.   Yes.
8  Q. And what makes it special?
9     A.   There's annotated text. There's things on
10 the side. I mean, you know, you have the regular page
11 and then there was a margin on the side with notes,
12 cues you could give your students or, you know, this
13 is what this means. Like was actually telling the
14 teacher what it meant, so they could pass it on to the
15 students. Things like that.
16 Q. Oh, man. Okay. You taught this poetry unit?
17 It's a unit? Is that how you --
18    A.   Yes. Yeah. Two weeks.
19 Q. Okay. For two weeks to which class or which
20 block?
21    A.   There was second and third block that I
22 taught the poetry unit to. In the third marking
23 period the first block was a prep period, which I
24 would get my notes together, make copies, whatever I

Page 78

1  needed to do to teach the other lessons. Fourth --
2  fourth block in marking period three was a creative
3  writing course that essentially Nicole was responsible
4  for.
5  Q.  The kids you were teaching were in what grade?
6  A.  12th.
7  Q.  Okay. Did you teach any 9th graders at
8  Conestoga Valley?
9  A.  There was -- believe it or not, there was
10  a 9th grader who was advanced, and she was in -- she
11  was in the advanced composition course, which was in
12  fourth marking period for me.
13  Q.  Okay. So this 9th grader was taking classes
14  with 12th graders?
15  A.  Yeah, an advanced composition course.
16  Q.  Was she the only --
17  A.  I'm sorry, she was a 10th grader.
18  Q.  10th grader.
19  A.  The 9th grade students -- let me go back
20  to the cumulative project I did with Weidman. The --
21  I called it, for my students, the Writing Partners
22  Project. Basically my seniors and then my 10th grade
23  student were coupled with the 9th grade students --
24  Q.  Okay.

Page 79

1  A.  -- in Ms. Clark's class, which was right
2  beside us.
3  Q.  I see.
4  A.  They assisted and worked with 9th grade
5  students to help them with their writing if they had a
6  writing problem. Basically what I did in Neil's class
7  with his student I had my seniors do in the advanced
8  composition class with the 9th grade students.
9  Q.  Okay.
10  A.  It was very enriching, because not only
11  were they learning something about writing, my 12th
12  graders and my 10th grader, but they were also able to
13  see the problems in the 9th grade writing and decipher
14  them.
15  Q.  And what was -- what, if anything, was Nicole
16  Reinking's involvement in that, that you just
17  described?
18  A.  Nothing.
19  Q.  Okay.
20  A.  That was the --
21  Q.  That was separate?
22  A.  Yeah, that was the unit I planned on my
23  own.
24  Q.  Okay. And that was separate and apart from your

Page 80

1  student teaching at Conestoga Valley in which Reinking
2  was your co-op?
3  A.  No, it was part of that.
4  Q.  Okay.
5  A.  It was just one of the classes and one of
6  the things I did in the classes.
7  Q.  I see. Okay.
8  A.  The only unit that Nicole had control
9  over, if you can say "control," but it was her
10  curriculum, was the poetry unit. I developed lesson
11  plans based on her curriculum. And the only other
12  separate responsibility that she took part in was the
13  research project.
14  Q.  Okay.
15  A.  The research paper that the seniors have
16  to complete, Nicole took care of that completely. I
17  did not have any part in that.
18  Q.  Okay. When teaching this unit on poetry, would
19  you teach the entire block, meaning 80 to 90 minutes?
20  A.  Most instances yes. There were times that
21  Nicole got up there and taught a little bit, short
22  period of time, or she introduced the class into a
23  poem. The last part, or the main part, of the unit
24  was the students took the responsibility. The

Page 81

1  students had to evaluate a poem, decipher a poem,
2  interpret the poem, and then teach it to the class.
3  So a lot of that unit were the students teaching the
4  students.
5  Q.  I see.
6  A.  To grab the poem, understand the poem for
7  what it was worth. Now, if they were totally
8  incorrect, then Nicole or myself would step in and say
9  "Now, wait." Yeah, which did happen, unfortunately,
10  but...
11  Q.  And so, but what was your -- what were your
12  responsibilities, then, with respect to the poetry
13  unit?
14  A.  I would teach them poems.
15  Q.  For a certain period of time in the class?
16  A.  Right.
17  Q.  Okay.
18  A.  I would pair the students up to give them
19  the projects. I would give them not only their
20  partner, but I would give them the poem that they were
21  responsible for.
22  Q.  Right.
23  A.  I gave them -- I came up with lesson plans
24  for that unit, and then we followed those lesson

21 (Pages 78 to 81)

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 82

1 plans.
2 Q. And while you were teaching -- while you were in
3 front of the class teaching, what would Nicole
4 Reinking be doing generally?
5 A. Most of the time, at that point, she would
6 be in the back of the classroom.
7 Q. Okay. She's observing?
8 A. Or -- yeah. Like her desk was back here
9 at that point. (Indicating.)
10 Q. Okay. During the poetry unit, I mean, any
11 student teacher's learning how to be a teacher.
12 That's why you're a student teacher. Describe your
13 interactions, if any, with Reinking either before or
14 after class.
15 A. At that point in the semester we would
16 meet, have conversations about not only the lesson
17 plans, but since I wasn't totally familiar with the
18 context, you know --
19 Q. With the British poetry?
20 A. -- with the poetry, I talked to her about,
21 you know, "Well, what do you think this means, this
22 poetry means?" Because a lot of the things we were
23 teaching were ambiguous, it did have different
24 meanings, but I needed to know what meaning she wanted

Page 83

1 me to teach the class.
2 Q. All right.
3 A. We met after -- you know, after class
4 sometimes. But most of the time if we would talk we
5 would talk in the prep period, first block prep
6 period --
7 Q. Okay.
8 A. -- before we had the classes. I was
9 responsible for giving her, you know, lesson plans or
10 at least an idea of what I was doing that day.
11 Q. Okay.
12 A. And we would talk about it at that time.
13 Q. All right. So first period, first block for
14 each of you was free?
15 A. Yes.
16 Q. All right.
17 A. Second block was non-traditional, or
18 non-college-bound, students.
19 Q. Okay.
20 A. Third block was college-bound students.
21 Q. Okay.
22 A. And then in her fourth block period was
23 college-bound students.
24 Q. And what would you do during fourth period?

Page 84

1 A. Observe or --
2 Q. Observe Nicole Reinking?
3 A. Yeah, or prep for the next day.
4 Either/or. It wasn't every day I was doing the same
5 thing. I had different things to do. Now, that was
6 in third marking period. Fourth marking period --
7 Q. Well, let's --
8 A. Okay. Okay.
9 Q. You'll get ahead of me.
10 A. Okay. Sorry.
11 Q. In the first block, 80 to 90 minutes long, if I
12 understand, how much time -- would you and she spend
13 typically the entire time discussing your --
14 A. No, not the entire time.
15 Q. Okay. How much time would you and she talk?
16 A. It depended on how many questions I had.
17 Anywhere from 15 minutes to 45 minutes. It wouldn't
18 be more than an hour that we would spend talking. And
19 the times that we spent 45 minutes, it would be about
20 numerous things, it wouldn't be about just one thing.
21 We would be talking about several poems or things that
22 I needed to prepare for for the following units.
23 Various things we talked about.
24 Q. Did you find her helpful?

Page 85

1 A. At that point, yes.
2 Q. At some point did you find her not helpful?
3 A. Yes.
4 Q. Okay.
5 A. Which I talked to Mr. Girvin about.
6 Q. Okay. Just tell me when you spoke to Mr. Girvin
7 about her not being helpful, in terms of the
8 chronology of --
9 A. It was right after -- it was about, I want
10 to say, a week to two weeks after midterm, after the
11 midterm evaluation.
12 Q. Okay. So end of March?
13 A. Yeah.
14 Q. Okay. Before the midterm evaluation, and just
15 generally, so we're talking about really February 1st,
16 more or less, to mid March --
17 A. Okay.
18 Q. -- describe your interactions with her on a
19 daily basis. You talked about first period. How did
20 you find her, at that point in time, helpful? What
21 was she doing to help you as a teacher?
22 A. Well, I didn't understand -- or I
23 shouldn't say "understand." I didn't have the
24 experience with the British literature in college. A

|  | Page 86 |  | Page 88 |
|---|---|---|---|
| 1 | lot of the documents I would ask her, you know, "Your | 1 | after my midterm evaluation I transitioned into the |
| 2 | experience reading this, what interpretation did you | 2 | teacher, quote, unquote, the teacher, and having a lot |
| 3 | get?" "I have to read this. When do I have to read | 3 | more involvement with the parents to enforce these |
| 4 | it by?" Asking her a lot of questions that would help | 4 | rules in class. |
| 5 | me with preparation. | 5 | Q. Okay. What is -- what does that mean, you |
| 6 | Q. About the substance of what you were teaching? | 6 | transitioned to becoming the teacher? What does that |
| 7 | A. Correct. | 7 | mean, in terms of on a daily basis, how did it change? |
| 8 | Q. Okay. | 8 | A. Yeah. I was -- you know, I was always the |
| 9 | A. On the other part, I was -- I will -- | 9 | teacher, but I didn't have the respect from the |
| 10 | won't deny I was having some problems with getting the | 10 | students. I didn't have the rules set down the way I |
| 11 | class under control, especially second block, the | 11 | should properly. And that was part of my classroom |
| 12 | non-traditional students, or providing them with | 12 | preparation. And I was having a lot of issues with |
| 13 | motivation. So I talked to her about that, how can I | 13 | that. |
| 14 | become a better teacher to motivate them, keep them | 14 | So with the midterm evaluation I saw, you |
| 15 | from not sleeping, keep them from not talking, those | 15 | know, I really need to make a change. I don't want an |
| 16 | type situations. | 16 | unsatisfactory at the end of this year. So I |
| 17 | Q. Okay. | 17 | transitioned to more forceful rules, enforcing |
| 18 | A. Because I was getting frustrated, in that | 18 | detentions, calling parents, setting a ground line for |
| 19 | first part of the semester, that I wasn't grasping | 19 | the students, and if they didn't adhere to it there |
| 20 | them like I should. I had wanted to grasp them | 20 | was -- there were consequences, so... |
| 21 | better, teach them better, have them listen to me and | 21 | Q. Okay. If you turn to the next set of documents. |
| 22 | respect me. | 22 | These are the documents. (Indicating.) |
| 23 | Q. Okay. You're saying the students were sort of | 23 | A. Okay. |
| 24 | acting out, they were sleeping, they were talking. | 24 | Q. We're going to call this Snyder-3. If you would |

|  | Page 87 |  | Page 89 |
|---|---|---|---|
| 1 | Was that -- was that upsetting to you? | 1 | take a look at these documents, just look at them |
| 2 | A. I think it was upsetting to me and Nicole. | 2 | briefly. |
| 3 | Q. Okay. And what else, if anything, were the | 3 | A. Mm-hmm. |
| 4 | students doing? | 4 | Q. Have you seen these before? |
| 5 | A. No, it was just basically the talking, | 5 | A. Yes. |
| 6 | periodic sleeping, motivation for them to do their | 6 | Q. Okay. When did you see these before? |
| 7 | work either in class or outside of class. I would | 7 | A. From Mark. |
| 8 | give homework assignments, and a lot of the time the | 8 | Q. Okay. Did you see any of these documents -- |
| 9 | second block students, or the non-traditional | 9 | A. And when she wrote -- after she wrote |
| 10 | students, would refuse to do their homework at home. | 10 | them. |
| 11 | Q. Okay. | 11 | Q. Okay. That was my question. |
| 12 | A. And that's one of the problems with | 12 | A. Most of them, I should say. |
| 13 | teaching seniors, they have senioritis and they really | 13 | Q. All right. |
| 14 | don't care. | 14 | A. The last few in the packet, like where |
| 15 | Q. Okay. | 15 | there are not a whole bunch of notes, but there are |
| 16 | A. Unfortunately. | 16 | notes, especially this last page, I did not see. |
| 17 | Q. How about with respect to the third block? | 17 | Q. Okay. Well, let's -- these documents are |
| 18 | A. Third block, you know, there were still | 18 | numbered at the bottom, actually, CVSD, starting with |
| 19 | some students that were not motivated, still some | 19 | 206. |
| 20 | students that were sleeping. I actually had one | 20 | A. Okay. |
| 21 | student in particular that would try to sleep on a | 21 | Q. Just go through this and tell me which ones you |
| 22 | regular basis in class. | 22 | saw with Nicole Reinking. |
| 23 | So I -- you know, I did have those | 23 | A. (Pause.) I did not see 214. |
| 24 | problems the first half of the semester. And then | 24 | Q. Okay. But you saw -- did you see, with Nicole |

23 (Pages 86 to 89)

| | Page 90 | | Page 92 |
|---|---|---|---|
| 1 | Reinking, 206 through 213? | 1 | Q. So in other words, she would give you the notes |
| 2 | A. Yes. | 2 | the next morning, when you were in prep session? |
| 3 | Q. All right. | 3 | A. Right. |
| 4 | A. I cannot recall 215. Doesn't mean she | 4 | Q. And that's when you would discuss them? |
| 5 | didn't show it to me. | 5 | A. Right. |
| 6 | Q. Okay. | 6 | Q. Okay. |
| 7 | A. 218 I did not see, 219 and 220. | 7 | A. For the notes she gave me. |
| 8 | Q. You did or did not see 219 and 220? | 8 | Q. Yes, right, I understand. |
| 9 | A. And 222. I do not remember seeing -- I | 9 | A. Okay. |
| 10 | don't recall seeing these. | 10 | Q. We're only talking about the notes -- obviously, |
| 11 | Q. At the time? | 11 | if you didn't have it and she didn't give it to you, |
| 12 | A. At the time. The other documents, I can | 12 | then you didn't discuss that particular page. |
| 13 | vividly recall her showing me her notes or even | 13 | Was she -- and we're talking now about the |
| 14 | handing me her notes as a reference. | 14 | period when you're just starting, February 1st through |
| 15 | Q. Okay. How about 253? I'm sorry. | 15 | mid-evaluation, mid March. March 20th, actually. |
| 16 | A. No. | 16 | What criticisms did she -- what criticisms of your |
| 17 | Q. All right. The ones that you did see, let's | 17 | performance did she have for you? |
| 18 | talk about those. How would she show these to you? | 18 | A. Some of the poems I didn't completely |
| 19 | A. We would have a meeting, like I said, | 19 | understand, and I had a problem when the students |
| 20 | normally during prep period, because the period of | 20 | would ask me a question. Obviously, because I never |
| 21 | time in between block 2 to block 3 and then block 3 to | 21 | had any type of education on the subject before, so I |
| 22 | block 4 was very small. It was only about five | 22 | was kind of teaching myself as I went along, or she |
| 23 | minutes. So we didn't have a lot of time to talk. So | 23 | was teaching me. So if I really had a problem |
| 24 | we would sit down separately. | 24 | grasping a concept of a poem, she would take me aside |

| | Page 91 | | Page 93 |
|---|---|---|---|
| 1 | And the notes that she took here minute by | 1 | afterwards and say, well, this is what it really |
| 2 | minute were a little bit different than the glows and | 2 | meant. |
| 3 | the grows. That's what we would focus on. | 3 | Q. Was she helpful in that respect, in teaching you |
| 4 | Q. You and she -- you would focus and discuss with | 4 | the poetry? |
| 5 | her the minute by minute? | 5 | A. In the poetry, yes. |
| 6 | A. No, we would not focus on the minute by | 6 | Q. Okay. |
| 7 | minute; however, we would focus on the glows and | 7 | A. Can you -- can you ask me the question |
| 8 | grows. | 8 | again? I don't remember the question. I'm sorry. |
| 9 | Q. Okay. The more general observations? | 9 | Q. Yeah, talking about the first half of the |
| 10 | A. Yes, what I needed to work on and what was | 10 | semester, as it were, for you, February 1st, |
| 11 | great at the time, and -- but that's what we did per | 11 | approximately, to mid March, what criticisms of hers |
| 12 | class. Now, if there was an issue with the students | 12 | did she share with you? |
| 13 | sleeping that she wrote that down in the minute by | 13 | A. Those criticisms, as well as gaining |
| 14 | minute notes, she would tell me about that. Or, for | 14 | control of the students. That was -- the biggest |
| 15 | instance, this fire drill on the first page -- | 15 | thing in the first half of the semester was I never |
| 16 | Q. Right. | 16 | had an experience with students that did not listen, |
| 17 | A. -- it says it went off twice and I kept | 17 | and I was having trouble gaining that respect, having |
| 18 | going. You know, she would say, you know, you did a | 18 | them motivated to stay awake, making sure they did |
| 19 | good job with that. | 19 | their work. Not only did they -- making it aware that |
| 20 | Q. All right. | 20 | they understood the concepts, but above and beyond |
| 21 | A. Basic, general things. | 21 | that, were they even listening to me to understand the |
| 22 | Q. She would give you these notes at what point in | 22 | concepts. |
| 23 | the day? | 23 | Q. Okay. |
| 24 | A. Not after the class. When we talked. | 24 | A. So those types of things she took me |

Page 94

1  aside. There was an instance where I said "Shut up"
2  to the students one time, and she took me aside
3  afterwards, it's in her notes, and she said, you know,
4  you can't do that, because they have all the control
5  and they know that they have all the control if you
6  say something like that to them. So after that point,
7  you know, it wasn't an issue.
8      Those type of things she said to the side,
9  when we were in our prep period, so none of the
10 students were around.
11 Q. Okay. She -- I note she said, Nicole said, that
12 you said "Shut up" on at least one occasion to the
13 students.
14 A. Yes, it was my second block class.
15 Q. Okay. Let me ask the question.
16 A. Okay.
17 Q. Do you recall saying "Shut up" to the students
18 more than one time?
19 A. No.
20 Q. Okay. Just the one time, then?
21 A. The one time in my second block class.
22 And unfortunately, the second block class and the
23 third block class, some of them are friends, and it
24 got around that I said "Shut up" to the second block

Page 95

1  class. So the third block class mentioned something
2  to me about it.
3  Q. What did they say?
4  A. "You said 'Shut up' to the students. Can
5  we say 'Shut up'?" And, you know, those basic type of
6  things that obviously seniors are gonna joke around
7  with you about to try to take it to their advantage.
8  And I actually made it a classroom rule. It was on
9  the -- I made 12 rules, and one of the rules was we
10 will not say "Shut up" in class.
11 Q. Okay. Did she -- did Nicole Reinking offer you
12 additional -- what kind of assistance did she offer to
13 you during the first half of the semester that we're
14 talking about?
15 A. Like I said, the books to help me along
16 with the class. She actually had a drawer full of
17 handouts, and she said, "Maybe some of these will be
18 useful to you." She said if I never -- if I was in a
19 position where I didn't understand something, that she
20 could step in and teach the students, so they would be
21 understanding of the subject and that I wouldn't have
22 to kind of dilly dally around the issue.
23 Q. Okay.
24 A. Or avoid the issue. So those were the

Page 96

1  type of things that she did.
2  Q. Did she raise concerns about your use of
3  language, your grammar, in class?
4  A. She did during the midterm pla -- I mean,
5  I'm sorry, midterm evaluation, but not too much
6  throughout. I mean, she would say, "Hey, do you know
7  during that DOLA exercise you forgot a comma," or "You
8  didn't explain this properly." And she would say very
9  basic, once-sentence comments to me. Not, hey, let's
10 sit down, we really have to talk about your
11 performance. That didn't happen until midterm --
12 Q. Okay.
13 A. -- evaluation.
14 Q. And DOLA stands for?
15 A. · Daily oral language.
16 Q. And what does that entail?
17 A. Basically the students, my son does this
18 in 5th grade, but the students receive one to two
19 sentences in which they have to change the grammar or
20 even put a capitalization or -- you know, capitalize
21 the first letter of the sentence and put a period at
22 the end.
23 Q. So there's a sentence that you use an overhead,
24 put it on the board?

Page 97

1  A. There's either an overhead or I would
2  write it on the board.
3  Q. Okay.
4  A. They would have two sentences in which
5  they would have to correct all the mistakes.
6  Q. In other words, you're writing -- purposely
7  you're making a mistake or two --
8  A. Right.
9  Q. -- in the exercise, and they're supposed to fix
10 it?
11 A. Right.
12 Q. And does that involve the whole class, you
13 know --
14 A. Yes.
15 Q. Okay. Any other criticisms, criticism, that she
16 discussed with you the first several weeks of the --
17 A. The only other thing that I can think of
18 -- well, two other things. I was helping out with her
19 fourth block class, creative writing, I wasn't
20 actually teaching the class, and I had them do a
21 journal entry, and I played music in the background.
22 And, unfortunately, the one song had the word "ass" in
23 it, and that was something that she took me aside
24 afterwards and said, "Hey, listen, you have to be more

Page 98

1  concerned about those things. You can't play music
2  with that type of language." So from that point on I
3  only had CDs that I reviewed beforehand, or previewed
4  beforehand, to make sure there were no swear words.
5        The only other thing was a lot of the
6  times I would get to the classroom at 7 o'clock to
7  do --
8  Q.  In the morning?
9        A.    In the morning, to do prep, and the
10  classroom was locked.  And I -- there was no way for
11  me to get in except to find a janitor or to have
12  another teacher open the classroom for me.  So I had
13  mentioned something at one point "Do the student
14  teachers get keys so they can get into the classrooms
15  first thing in the morning?
16  Q.  You asked Reinking?
17        A.    No, I did not.  That was the problem, I
18  did not ask Reinking.  I asked one of the teachers or
19  the janitor.  I can't remember which.  But I did ask
20  them that.  Nicole said that was not using the proper
21  chain of command.  Obviously, the answer was no, that
22  the student teachers didn't get keys, which I was
23  unaware of, but that I didn't use the proper chain of
24  command, that I needed to ask her that one on one.

Page 99

1  Q.  For a key?
2        A.    For a key or anything like that.  And so
3  they were the only other two things that I think were
4  major that she ever said to me.
5  Q.  Okay.  Did she raise concerns about your
6  spelling?
7        A.    She said -- she asked me if I was a strong
8  speller, and I told her, unfortunately, I was not.
9  And that's when she passed on the grammar spelling
10  book to me.
11  Q.  Okay.
12        A.    And I told her that has always been an
13  issue.  And I think that comes down to my
14  hyperactivity and my attention deficit that I have,
15  and it's just that I can't really sometimes focus or
16  I'm moving so quickly with my hyperactivity that I
17  misspell words.  And she did say, you know, you have
18  to be more careful of those things, especially if it's
19  a handout that the whole class is getting.  Things
20  like that.
21  Q.  Do you take medication for your hyperactivity?
22        A.    No, not right now.
23  Q.  At some point did you?
24        A.    Yes.

Page 100

1  Q.  When was that?
2        A.    I took Strattera for my hyperactivity.
3  It's just...
4  Q.  When?  Like what year or years?
5        A.    Oh, I took it prior to student teaching
6  and after student teaching, but my insurance got
7  dropped, so I haven't been taking it now.  So I can't
8  afford it.
9  Q.  You were not taking it during student teaching?
10        A.    No, it wasn't -- my attention deficit, I
11  normally can keep it under control without medicine.
12  But with 18 credits in a semester and working and my
13  children, it came to be a problem.
14  Q.  Okay.
15        A.    And since this has all taken place, my
16  anxiety has fueled my hyperactivity.  So at periods of
17  time I needed to take it for a period of time.
18  Q.  Okay.
19        A.    But normally I can keep it under control
20  on my own.
21  Q.  Okay.  Did Reinking raise concerns with you that
22  the kids weren't -- that the kids weren't
23  understanding what you were trying to teach?
24        A.    She said some -- it seemed like some of

Page 101

1  the second block students did not understand the
2  material, that I might want to go over it again.  But
3  that was a general concern that she said anybody
4  teaching a second block class might have those issues.
5  Q.  Okay.  And why is that?  Because these are
6  non-traditional students?
7        A.    Yeah.
8  Q.  Okay.
9        A.    They're not -- I mean, that wasn't like an
10  exact quote from her, but it was a general -- a
11  general idea that was given.
12  Q.  Okay.  In other words, the third class, the
13  college prep kids --
14        A.    They're going to be more understanding of
15  these concepts, as opposed to the non-traditional
16  students.
17  Q.  Okay.
18        A.    Who really haven't had an interaction with
19  this type of material before.
20  Q.  Okay.  All right.  The second block,
21  non-traditional students, are those the kind of kids
22  who generally are probably not going to go to college,
23  they'll --
24        A.    Correct.

26 (Pages 98 to 101)

Page 102

1  Q. -- get a job wherever they get it, correct?
2      A.  Correct.
3  Q.  Okay. Just to understand.
4          Go to CVSD-212.
5      A.  Okay.
6  Q.  Is this one of the pages that she gave to you
7  to --
8      A.  Yes.
9  Q.  -- look at?
10          Did you and she discuss what's on this
11  page?
12      A.  Yes.
13  Q.  Describe For me your discussion with her, to the
14  extent you can remember. I know this was a long time
15  ago.
16      A.  I have to look over it.
17  Q.  Oh, yeah, absolutely.
18      A.  (Pause.) I can remember her being
19  frustrated, because the students, even though they
20  were understanding some of the concepts, there was so
21  much talking that not all of the students could
22  understand.
23          The handful of students that were in that
24  class that were really trying hard, that really wanted

Page 103

1  to succeed, couldn't hear or couldn't grasp the
2  concepts, because the other five students were
3  talking. And she was really frustrated, because she
4  knew I was trying and that they weren't listening.
5  And I remember that part of the conversation
6  distinctly.
7  Q.  Okay.
8      A.  Yeah, I mean, basically that's the only
9  thing I can remember off the top of my head about that
10  conversation. I know that -- I mean, what it says
11  here I can -- I can read it, but I can't remember the
12  actual conversation.
13  Q.  Got it. In the margin on the left it says, in
14  quotes, I hope you give the speaker more respect than
15  you give me, end quotes. What is that?
16      A.  There was a period of time, before my
17  midterm placement, where I felt that I had no respect
18  from the students. And there was a speaker coming in
19  to talk to them from Bradley Academy, to talk to the
20  students about that as a possible experience for them.
21  They could go to Bradley Academy for whatever reasons,
22  graphic arts or --
23  Q.  What is Bradley Academy?
24      A.  It's a college.

Page 104

1  Q.  Oh, okay.
2      A.  And we had a speaker coming into both
3  second and third block class to talk to them, to
4  explain to them, you know, what your options are. "If
5  you're interested, you can take a postcard and send it
6  back to us." But I said that to them the day before
7  the speaker came in, you know, "I hope you give the
8  speaker more respect than you give me." I was trying
9  to get across to them that it seems like they give me
10  no respect.
11  Q.  Okay. And did these students respond to that
12  comment when you made it?
13      A.  Not that I remember.
14  Q.  Okay. Go to the next page, 213. At the top it
15  says "We've discussed: 1. Shut up; 2. Parent
16  follow-ups; 3. Chain of command; 4. Block activities."
17  Do you remember any of that discussion about any of
18  those four items?
19      A.  Yeah, the "Shut up" was when I said "Shut
20  up" in class and she said that I'm not getting the
21  respect from the students.
22  Q.  Okay.
23      A.  "Parent follow-ups," I was having trouble
24  with -- if I was having trouble with the students in

Page 105

1  the classroom, following up with the parents, telling
2  them what the problem was.
3  Q.  Okay.
4      A.  I was very nervous about contacting the
5  parents, and it was something that I had to work
6  through, and I changed the second half.
7          "Chain of command," obviously what I told
8  you about the key.
9  Q.  Right, right, right, right.
10      A.  And "Block activities," I'm not quite sure
11  what that's there for.
12  Q.  Okay.
13      A.  It might be that I need to get more
14  involved in block activities or have activities for
15  them during the block period. Sometimes when we had
16  prep period we had students in the classroom. So
17  activities for them while they were in the classroom,
18  not just having them sit there and do nothing.
19  Q.  Okay. On the bottom, on the left, it says, in
20  quotes, Shouldn't be just one person doing all the
21  work, end quotes. Do you recall what that refers to?
22      A.  It might refer to group work, that I was
23  telling them that one student might not be doing all
24  the work. I can't say for sure.

27 (Pages 102 to 105)

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 106

1  Q.  I mean, if you don't remember --
2      A.  No.
3  Q.  -- just say you don't remember.
4      A.  I don't remember.
5  Q.  Okay. That's fine.
6          It seems to me, correct me if I'm wrong,
7  that most of her criticisms so far you understood and
8  accepted?
9      A.  Yes.
10  Q.  Okay. At the bottom of the page, the second
11  item, it says "Language," quote, Shut the hell up, end
12  quote. And "you" -- crossed out "Stacy" -- "didn't
13  address it at all." Do you know what that refers to?
14      A.  One student said it to another student.
15  Q.  Okay. Did you hear the person, the student, say
16  that?
17      A.  I don't remember.
18  Q.  Okay. Did you and Reinking discuss that?
19      A.  Yes. That's why it was one of the rules
20  after the second half.
21  Q.  Okay. Did you and she discuss her concerns that
22  the students in block 3 and perhaps block 2 weren't
23  feeling challenged?
24      A.  Block 3, that they might not be

Page 107

1  challenged.
2  Q.  Describe that.
3      A.  Two or three of the students that were in
4  block 3 were advanced, Honor Society advanced.
5  Q.  Okay.
6      A.  And she felt that maybe I needed to add a
7  little bit more work for those particular students,
8  that I needed to challenge them a little bit more, or
9  ask different questions where I was making them think
10  a little bit more than who is the character. Instead
11  of asking who is the character, well, what impact do
12  you think that character had on this or what role did
13  they have in the whole theme of the play or -- where I
14  was challenging them a little bit more, it wasn't a
15  surface question. And that's what they wanted me to
16  do with third block.
17  Q.  Okay. Was she right about that? Was Reinking
18  right that maybe they weren't being challenged enough?
19      A.  Yes. I actually talked to a few of the
20  students and I said, "If you want extra work, I don't
21  have a problem giving that to you, so you're not
22  bored."
23  Q.  Okay.
24      A.  I asked them various things, because I

Page 108

1  really wanted to help the students learn --
2  Q.  Right.
3      A.  -- and understand the material.
4  Q.  Go on to page 218. Had you seen this --
5      A.  No.
6  Q.  -- document before?
7      A.  No.
8  Q.  All right. Just take a look at it, please.
9      A.  (Pause.) Okay.
10  Q.  And let me just draw your attention to a couple
11  of the items.
12      A.  Okay.
13  Q.  Under 9:40, that time, sort of the center of the
14  page, it says you're circulating around the room,
15  that's good, but still talking around the room, and
16  Justin, Bree, David talking the entire time. Is that
17  true, false? Do you remember?
18      A.  It was probably true with that class.
19  Unfortunately, Justin had dropped out halfway through
20  the class.
21  Q.  Dropped out of school?
22      A.  Just stopped coming to class. Bree was a
23  very, very hard student. She was female. And then
24  David was a hard male, but then I got control over him

Page 109

1  in the second half. I was very surprised he did a
2  turnaround. But Bree did challenge me the entire
3  time. And at that point they were -- they would talk
4  a lot, and they would try to push me as far as they
5  could. So I wouldn't doubt that that was correct.
6  Q.  In the picture that you posted on the internet
7  that we'll talk about later, you refer to a Bree.
8      A.  That is Brianne, my best friend.
9  Q.  Okay. That's not -- is that this Bree?
10      A.  No.
11  Q.  It's not that Bree?
12      A.  No.
13  Q.  All right.
14      A.  There's a Brianne who is my student,
15  Brianne Seminelli (ph), and then Brianne Dever, who is
16  my best friend.
17  Q.  She's not one of your students, I take it.
18      A.  Correct. Correct.
19  Q.  It says, a couple lines below that, students are
20  rebelling. "This is hard." Do you know what that
21  means?
22      A.  Maybe hard for her to watch?
23  Q.  Okay.
24      A.  I'm not sure.

28 (Pages 106 to 109)

Page 110

1 Q. Was it your sense that the students were
2 rebelling in block 2?
3 A. I think they were trying to push their
4 limits.
5 Q. Okay.
6 A. Not so rebelling from what I said, but
7 seeing how far they could push the student teacher.
8 Q. Did they get to you? Did they get under your
9 skin and --
10 A. Especially when I said "Shut up," that day
11 was probably the worst, and it was a learning lesson
12 for me. But I think every teacher probably gets in
13 that position where they get so frustrated that it
14 happens.
15 Q. Okay. At the very bottom it says -- well, the
16 bottom right, "The kids just shout out and it's
17 chaos." Would you agree with that?
18 A. That was her personal opinion of it.
19 Q. Right. I'm asking your opinion.
20 A. I think at a point they started raising
21 their hands, because I made it an issue, "Start
22 raising your hands." And I said it so many times that
23 they started doing it.
24 I wouldn't -- I wouldn't even answer the

Page 111

1 people that spoke out. If they started talking, "I
2 didn't see your hand raised," you know, and I would
3 stop, and I would actually call on the people that had
4 their hand raised. And a lot of the times it was the
5 same students that would raise their hands, but they
6 actually showed respect and raised their hands.
7 Q. Okay.
8 A. So I actually ignored -- started ignoring
9 the students that would just burst out.
10 Q. But before you started enforcing those very
11 appropriate rules, at times was it chaos in the
12 classroom, as she writes here?
13 A. It could have been considered chaos. It
14 wasn't out of control, but they would -- they would
15 say, well, this is the answer, and I would "You have
16 to raise your hand." I don't know if that's what they
17 were used to in other classes. I can't determine why
18 they were like that.
19 Q. That must have been frustrating, though?
20 A. Yes.
21 Q. Go to the next page, 219. Did you see this one
22 at the time?
23 A. No.
24 Q. Okay. Well, look at it, and I'm going to focus

Page 112

1 your attention on a couple of things. (Pause.) Under
2 10:27, "Someone is talking, give her respect, and the
3 students just keep talking."
4 A. I said, "Someone is talking, give her
5 respect."
6 Q. Yeah, what -- what does this mean?
7 A. I asked what the theme of the poem was,
8 someone was answering, and somebody else was talking
9 above the person that was answering the question.
10 Q. Okay. Okay. And Reinking said, but the
11 students just kept talking. Is that true?
12 A. Yeah.
13 Q. At 10:29, "Packing up already." Was that not a
14 good -- was that a criticism, as far as you could
15 tell? What time did class end?
16 A. 10:35.
17 Q. Okay.
18 A. There could have been a reason for that.
19 I'm not sure.
20 Q. You don't remember?
21 A. No, I don't remember.
22 Q. Below that it says you lost a student's test and
23 the attendance roster. Is that true?
24 A. That was brought up to me, the student's

Page 113

1 test, but I never lost the attendance roster. And
2 then I didn't lose the student's test. I misplaced
3 it. That person never had to retake the test.
4 Q. Okay. So you found the test and --
5 A. Yes.
6 Q. -- marked it?
7 MR. VOIGT: I'm sorry, I don't know if the
8 court reporter caught the end. Speak up.
9 THE WITNESS: Oh, sorry.
10 MR. VOIGT: Did you find that test?
11 THE WITNESS: Yes.
12 BY MR. KRAMER:
13 Q. Below that it says "Did not follow lesson plan."
14 Is that true, if you remember?
15 A. I don't remember. But there were times
16 that I had to deviate away from the lesson plan,
17 because you couldn't go concrete minute by minute
18 exactly to what the lesson plan said, because things
19 happened or the students had extra questions. Most of
20 the time I tried to stick to it.
21 Q. Okay. Go to page 222. Have you seen this one
22 before?
23 A. No.
24 Q. Okay. Look at it, and I'll ask you a couple

29 (Pages 110 to 113)

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 114

1  questions. (Pause.) "Sir G, discussion ended at
2  10:40; Stacy needed text to discuss." Do you know
3  what that refers to?
4     A.   It's Sir Gawain, and I needed a text to
5  discuss it. It was one of those things I had no
6  experience with before, another short story that I had
7  no experience with before. So I needed the text to
8  look back on to make sure that I was telling them the
9  right information. It's nothing that I had memorized.
10 Unfortunately, there was no way for me to memorize it
11 in that short period of time, because I was prepping
12 every day for the next lesson. So that I needed the
13 text in front of me to discuss it with the class.
14    Q.   What is Sir Gawain?
15    A.   Sir Gawain and the Green Knight. It was a
16 story about two men -- basically test of courage.
17    Q.   I mean, is it British literature?
18    A.   Yes.
19    Q.   Okay. I'm not -- I'm not testing you.
20    A.   No, no, no. No, no, no. That's okay.
21 That's okay.
22    Q.   Okay. I just -- what is it, that's -- okay.
23    A.   Okay.
24    Q.   Below that, "Errors on PP."

Page 115

1     A.   PowerPoint.
2     Q.   PowerPoint.
3          Do you recall, and she says "'evolving'
4  should be 'involving', slide 3 quotations around poem
5  titles, Kourtney caught the error," that was good. Do
6  you remember those? I mean, is that correct? You
7  don't remember?
8     A.   I don't remember.
9     Q.   Okay.
10    A.   It could have happened.
11    Q.   Okay. Was part of your requirement to get the
12 lesson plan to her before class?
13    A.   Yes.
14    Q.   Did you often not -- were you often not able to
15 do that?
16    A.   It was -- the problem was, before midterm
17 placement, that I was actually getting her the lesson
18 plans the day before. So I was working on it two
19 nights for, you know, the next day. I was working on
20 it Monday, handing it in on Tuesday for a Wednesday
21 class.
22    Q.   All right.
23    A.   And that was an issue. She wanted it
24 before that. So I made it a point, after midterm

Page 116

1  evaluation, to start handing it in before, like a week
2  before, three days before, that she had time to look
3  it over to give me any suggestions or to say, no, you
4  can't do this.
5     Q.   Okay. Were you also supposed to give a lesson
6  plan at certain times to Barry Girvin?
7     A.   Yes.
8     Q.   And how frequently? Every lesson or only when
9  he was going to come observe?
10    A.   It was every lesson for the unit that I
11 taught, which was Shakespeare; however, prior to that,
12 only when he came to observe the classroom.
13    Q.   Okay. And the Shakespeare, that was -- was that
14 the circle project on Macbeth?
15    A.   Yes.
16    Q.   Okay. Page 253, last page of this packet, have
17 you seen this before?
18    A.   No. This is one I just kind of looked at
19 and shook my head the first time I saw it. I never
20 saw it.
21    Q.   Well, when was the first time you saw it?
22    A.   When I saw the packet from Mark.
23    Q.   Okay.
24    A.   But I never saw it from Nicole.

Page 117

1     Q.   I see. Well, this is dated April 5th. At the
2  bottom it has several "grows," many students sleeping,
3  not sitting in assigned class -- assigned seats. Was
4  that right, is she wrong? Do you remember?
5     A.   A lot of times we were doing group work at
6  that point, so they weren't assigned -- they had an
7  assigned seat, but I would move them periodically. So
8  if they were out of their assigned seats, that would
9  make sense to me.
10         Students sleeping, I mean, I had issues
11 with students sleeping the whole entire time I was
12 there, and I tried to do things to reenforce the
13 importance of them staying awake. My one student
14 Meshi, in my third block class, consistently tried to
15 sleep through class, and he was one of my traditional
16 students. Not saying that a traditional student
17 wouldn't do it above a non-traditional, but I had more
18 of an issue with the non-traditional students. But I
19 actually started to tally, how many days can Meshi
20 stay awake to get a pizza party. And that was my
21 incentive. So he would stay awake to actually pay
22 attention in class. And you know what, it started
23 working. So I tried. You know, it was hard.
24    Q.   Okay. Finally, at the bottom it says "Still

Page 118

1 letting the students tell you what to do." Was that a
2 problem still?
3     A.    I didn't really have issues with the
4 students telling me what to do after midterm, because
5 I really strictly enforced my policies that I had with
6 them.
7         MR. KRAMER: Okay. This is Snyder-3.
8         MR. VOIGT: Barry, let's take a short
9 break.
10        MR. KRAMER: Okay.
11            - - -
12        (Whereupon, Exhibit Snyder-3 was marked
13 for identification.)
14            - - -
15        (Brief recess.)
16            - - -
17        MR. KRAMER: Go to the next document.
18 This is Snyder-4.
19            - - -
20        (Whereupon, Exhibit Snyder-4 was marked
21 for identification.)
22            - - -
23 BY MR. KRAMER:
24 Q.   These are Barry Girvin's observations.

Page 119

1     A.    Yes.
2 Q.   Tell me what his involvement in your student
3 teaching was. What did he do?
4     A.    Mr. Girvin guided me. That's the best
5 word, guided me through the process. He observed me
6 at periods of time. He had to observe me so many
7 times, and I can't remember off the top of my head,
8 but he had to observe me so many times throughout the
9 semester, my semester at Millersville, to observe me
10 to see if I was doing things correctly.
11        Based on those observations and things
12 that Nicole Reinking had told him, they made a final
13 determination for my midterm evaluation, my final
14 evaluation, and then the PDE form. He observed me,
15 gave me the grows and glows, things that I needed to
16 work on, just like Nicole did, but he did it on a
17 higher level as far as this wasn't his first
18 experience. So he could compare me with other student
19 teachers that he had in the past or his own teaching
20 style when he was a teacher. So he had that
21 experience.
22        Other than this, I did call him on
23 occasion to talk to him to get advice, to confide in
24 him about stuff that -- problems that I was having.

Page 120

1 Normal things that you would do with an advisor.
2 Q.   Okay. You said, at the beginning of the
3 deposition, you said at one point Nicole Reinking
4 stopped being helpful --
5     A.    Yes.
6 Q.   -- to you in class.
7     A.    It seemed that way, yes.
8 Q.   Okay.
9     A.    Or it was that way -- it felt that way to
10 me.
11 Q.   Okay.
12    A.    That would be a...
13 Q.   Before that happened -- it sounds like a bit
14 after the midterm evaluations that, in your
15 perception, she stopped being helpful. Is it correct,
16 then, that, again, from February 1st, say, the midterm
17 evaluations, she seemed to be really trying to help
18 you become a better teacher?
19    A.    Yeah. Yes.
20 Q.   Okay. Do you have any criticisms of her during
21 that time period?
22        MR. VOIGT: Objection. What time period
23 are you talking about?
24 BY MR. KRAMER:

Page 121

1 Q.   February 1st through mid March.
2     A.    As a person?
3 Q.   As a person, as a co-op.
4     A.    I didn't really have any interaction with
5 her personally, outside of the school.
6 Q.   But, I mean, personally, I mean, obviously you
7 were meeting only in school, but was she acting
8 professionally with you? That's really all that I
9 mean.
10    A.    Yes.
11 Q.   Okay. And you have no -- and you don't have any
12 criticisms of her during that time period?
13    A.    No. She did help me answer questions that
14 I had, gave me -- provided me resources, talked to
15 Mr. Girvin and myself as a group when we would go over
16 his documents.
17 Q.   Okay. Again, in the period before, say, March
18 20th, I'm going to choose that as the time, at any
19 time -- in that period, at any time did you relate to
20 Girvin your observations and impressions of Reinking?
21    A.    Girvin might have asked me how things were
22 going, and I said fine.
23 Q.   Okay.
24    A.    Basic, general talk.

31 (Pages 118 to 121)

| | Page 122 | | | Page 124 |
|---|---|---|---|---|
| 1 | Q. Because things were -- I mean, they were going, | 1 | A. Yes. |
| 2 | you know -- | 2 | Q. In these pages he has some criticisms, some |
| 3 | A. Yes. | 3 | compliments, observations. Anything here that you |
| 4 | Q. -- they were going okay? | 4 | disagree with? |
| 5 | Snyder-4 are Girvin's observations. It | 5 | MR. VOIGT: Objection. Anything where |
| 6 | appears that he came to observe you in class, based on | 6 | exactly? |
| 7 | these, about eight times. Would you say that's right? | 7 | MR. KRAMER: Anything in these documents. |
| 8 | And look at the documents and tell me if that's right. | 8 | MR. VOIGT: The whole document? |
| 9 | A. Yes. | 9 | MR. KRAMER: Anything in these evaluations |
| 10 | Q. Tell me how he and you would use these | 10 | that you disagree with? |
| 11 | evaluations. | 11 | MR. VOIGT: I think that's an overbroad |
| 12 | A. If there was time after a class period, if | 12 | question. I mean... |
| 13 | I would have a prep period, he would meet with me | 13 | BY MR. KRAMER: |
| 14 | afterwards; or if there wasn't time, he would meet me | 14 | Q. We can certainly do it page by page, if you |
| 15 | the day afterwards or another period during the week, | 15 | prefer. But you've got these documents, you've read |
| 16 | to go over what he observed. Most of the time it | 16 | them, you've seen them. |
| 17 | wasn't right afterwards, because he had to prepare | 17 | A. Most of the things that he said I would |
| 18 | these documents. He might have provided me some | 18 | agree upon. I would have to read over them to give a |
| 19 | feedback, like you want to work on this a little bit, | 19 | definite answer for every single statement and every |
| 20 | but most of the time we would meet at a later time to | 20 | single page, but most of the time he was right on. |
| 21 | go over what these forms said and what he observed the | 21 | Like the glows and grows, things I needed |
| 22 | whole class period. | 22 | to work on, he definitely pointed out that I went from |
| 23 | Q. Was Reinking involved in those discussions? | 23 | one end of the spectrum to the other as far as my |
| 24 | A. Yes. | 24 | change with the students and the problems that I was |

| | Page 123 | | | Page 125 |
|---|---|---|---|---|
| 1 | Q. All -- every time? | 1 | having at the beginning of the semester, in January, |
| 2 | A. Most of them. Not all of them, most of | 2 | to how I was in May, that I definitely did change with |
| 3 | them. | 3 | my classroom performance and my interaction with the |
| 4 | Q. Okay. Do you know, did he come to observe you | 4 | students. And he -- you know, he states that in these |
| 5 | on times other than these eight times on which he has | 5 | documents. |
| 6 | an evaluation page? | 6 | Q. Okay. |
| 7 | A. No. Most of the time I think it was -- I | 7 | A. So the red flags were red flags for any |
| 8 | think he had to have a document for every time he was | 8 | teacher, probably. |
| 9 | there, and I believe it was only the eight times. The | 9 | Q. And what is a red flag? |
| 10 | only other times that weren't documented with these | 10 | A. Well, I mean, just in this first part |
| 11 | forms were the midterm evaluation and the final | 11 | here, "Students were not set well for this approach. |
| 12 | evaluation. | 12 | There were 'how' and 'what' questions about |
| 13 | Q. Okay. Those were additional meetings? | 13 | note-taking." This is going back to I didn't ask them |
| 14 | A. Yes. | 14 | deeper questions where they had to think about the |
| 15 | Q. Okay. | 15 | material deeper than who or what, the basic -- |
| 16 | A. Now, he did meet me one time outside of | 16 | Q. I see. |
| 17 | class to give me documents that I had to grade, and | 17 | A. The basic line. |
| 18 | that was after I was asked not to come back to the | 18 | Q. And red flags are just warnings, concerns? |
| 19 | school. Another time he met with me to go over an | 19 | A. Yeah, it's a concern for him. |
| 20 | item for the portfolio. | 20 | Q. Okay. Go to the second page. |
| 21 | Q. Would he give you a copy of these evaluations? | 21 | A. Okay. |
| 22 | A. Yes. I actually own a copy of all of | 22 | Q. The time is 1:28, it's says "Stops to wake a |
| 23 | these. | 23 | student (will squirt a student with water)." What's |
| 24 | Q. So you've seen all of these before? | 24 | that refer to? |

Page 126

1     A.   This is an observation page, and none of
2 these were handed in to anybody until after I appealed
3 Dr. Bray's decision, and then I handed them to
4 Dr. Bray; however, what these are, all of these
5 documents -- well, this page --
6    Q.   Right.
7     A.   -- is an observation that I made of
8 another teacher, Mr. Carly. That was a teacher right
9 across the hall from Nicole Reinking's classroom.
10      I had to observe middle school teachers
11 and high school teachers, write down -- and how I did
12 it, instead of filling out every little part of their
13 documentation form, because it was an optional process
14 of how you wanted to observe the class, but I took a
15 minute-by-minute telling of what the teachers did. So
16 at this point, at 1:28 in the afternoon, Mr. Carly,
17 the teacher, he stops to wake a student. And what
18 does he do? He said he'll squirt them with a water
19 bottle.
20    Q.   Are you saying that this teacher, Carly,
21 squirted the student with the water bottle?
22     A.   "Will squirt a student with water" if
23 they're sleeping.
24    Q.   But you didn't see him do that?

Page 127

1     A.   I can't remember. But "Will squirt a
2 student with water" implies that he either said that
3 he'll squirt a student with water or that he was
4 picking up a bottle to squirt a student with water.
5    Q.   Okay. Whose -- is this your handwriting or
6 Girvin's handwriting on this page?
7     A.   It's my handwriting. And then I wrote
8 "Barry Girvin" for my supervisor.
9    Q.   I see.
10     A.   I had to document somehow, while I was
11 observing the classrooms, what they were doing and my
12 impression, just to get a better understanding of how
13 different teachers operate in the classroom.
14    Q.   Okay. So everything on this page is your
15 handwriting --
16     A.   Yeah.
17    Q.   -- is that right? Okay.
18     A.   And I was rushing, because I was writing a
19 lot of notes minute by minute, but...
20    Q.   Okay. Go to CVSD 223. Just take a look at
21 that.
22     A.   Okay.
23    Q.   And just let me know if there are any of his
24 observations that you disagree with.

Page 128

1     A.   (Pause.) I agree.
2    Q.   Okay. During your student teaching semester,
3 Girvin was taking some notes and Reinking was taking
4 some notes. Were you taking any notes for yourself
5 about the classes that you were teaching?
6     A.   Yes. These are some of the notes on this
7 first page here. When we would meet I would write
8 notes here or on a separate page. (Indicating.)
9      I didn't necessarily save the documents to
10 this day, but I wrote a lot of notes of what Nicole
11 expected of me or what Mr. Girvin expected of me in
12 the classroom or what to do outside of class, when
13 things were due.
14    Q.   Okay.
15     A.   So I would really keep my head on
16 straight.
17    Q.   Okay. So the notes you were taking were the
18 kind of notes on page one. Is that your handwriting
19 on the side?
20     A.   Yes.
21    Q.   And how about at the bottom?
22     A.   No, that's Mr. Girvin's.
23    Q.   Okay. Are there any notes that you still have
24 in your possession, that you're aware of haven't been

Page 129

1 turned over to your attorney?
2     A.   They might be in my lesson plans in my
3 portfolio.
4    Q.   Okay.
5     A.   On the --
6      THE WITNESS: Is that my portfolio there?
7      MR. VOIGT: No, those are the documents I
8 gave you --
9      THE WITNESS: Okay.
10      MR. VOIGT: They're the exhibits.
11      THE WITNESS: Okay.
12      In my portfolio that I handed in for final
13 evaluation that Mr. Girvin evaluated, I might
14 have notes on my lesson plans.
15 BY MR. KRAMER:
16    Q.   Okay. But that would be about, you know, the
17 substance of what you were teaching, correct?
18     A.   What I'm teaching, what was -- you know,
19 after Nicole viewed the lesson plan, what I needed to
20 change. If I needed to alter the time, add something
21 from the previous lesson, or if there was -- it was
22 something with the students and their behavior or if
23 they didn't understand something, how I might change
24 it quickly to interpret --

Page 130

1  Q.  Got it.
2      A.  -- or have better interpretation.
3  Q.  All right. Finally, go to the last page --
4  sorry second-to-the-last page. This is dated 4/7/06.
5  And these seem to be Girvin's notes. If you would
6  take a look at that and let me know if you agree or
7  disagree with what's there.
8      A.  (Pause.) Yep, I agree.
9  Q.  Okay. Throughout the semester was Girvin
10 uniformly helpful?
11     A.  Yes.
12 Q.  Was there any time that he was not helpful?
13     A.  Are you implying --
14 Q.  I'm not -- I'm just asking your sense of whether
15 he was supporting you, helping.
16     A.  You mean prior to the incident?
17 Q.  Before -- yes, before May 1st.
18     A.  Yes.
19 Q.  He was cooperative, he was fine, he was helpful?
20     A.  Yes.
21 Q.  All right. At some point you said you perceived
22 Nicole Reinking as becoming not helpful. Describe
23 what you mean, what you meant by that.
24     A.  There would be times in class where I

Page 131

1  would -- I would want reassurance I was doing
2  something right, that went well, and that I would ask
3  her for her opinion; or I'm having an issue
4  understanding a student or motivating a student. I
5  would ask her a question and ask for her feedback, and
6  then it would -- the whole question would be
7  re-instated (sic) by Nicole, "Well, what would" --
8  "What would you do if this was your classroom?" And I
9  feel like I would be getting a question back to a
10 question, instead of a response that would help me.
11         And I was not confused with the behavior,
12 but the whole purpose of student teaching is to learn
13 from a teacher. And after midterm, I almost felt like
14 maybe she felt that this is my time to shine and she
15 didn't want to help me anymore. I talked to
16 Mr. Girvin about this issue. I said I really need
17 that communication with her to make sure I'm doing
18 things properly. I felt like there wasn't an open
19 communication there. And this is the only thing I
20 asked Girvin about.
21 Q.  Okay. Throughout, you know -- your last day in
22 Conestoga Valley was May 5th, approximately, May 6th?
23     A.  Let me see here. The 8th, Monday the 8th.
24         MR. VOIGT: Okay. Let me just go off the

Page 132

1  record.
2              - - -
3          (Whereupon, a discussion was held off the
4  record.)
5              - - -
6          THE WITNESS: It was the Monday prior to
7  graduation, which was May 13th.
8          MR. KRAMER: That's fine.
9          MR. VOIGT: Okay.
10         MR. KRAMER: I'm not fixated on the date.
11 You know, the date is whatever the documents say
12 it is.
13 BY MR. KRAMER:
14 Q.  Okay. Before you weren't allowed -- before the
15 time when you weren't allowed back in Conestoga
16 Valley, had you -- had you still been meeting with
17 Nicole most mornings first period?
18     A.  No.
19 Q.  Okay. When did that stop?
20     A.  In between the time that I had my midterm
21 evaluation and when I started my circle project, my
22 project with the students where I took my full load
23 on.
24 Q.  Okay. And that was in April sometime, the

Page 133

1  Circle Project?
2      A.  I believe.
3  Q.  Was -- should Reinking have been meeting with
4  you during that first period while you were doing the
5  Circle Project, or was that not really her
6  responsibility anymore?
7      A.  It was my impression that the cooperating
8  teacher was supposed to meet with you consistently the
9  entire time and give you feedback the entire time;
10 however, when you're teaching your full load, the
11 cooperating teacher doesn't have to be in the
12 classroom at all times.
13 Q.  Okay.
14     A.  I mean, it's not your classroom, but you
15 have to act like it's your classroom.
16 Q.  Okay.
17     A.  A lot of the times, you know, she wasn't
18 in the classroom, and that was fine, but when I asked
19 her questions afterwards I would have liked an answer
20 from her giving me some type of explanation or
21 something I could work off of, and I didn't even get
22 that from her. So the communication wasn't there when
23 I needed it to be.
24 Q.  Okay. Were you still meeting with her on a

34 (Pages 130 to 133)

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 134

1  regular basis before, you know, May 5th, 2006?
2        A.    If it was maybe five minutes a day.
3  Q.    All right.
4        A.    Very small amounts of time that I would
5  spend with her.
6  Q.    All right. And how were you spending your --
7  strike that.
8        Let's move on. How about with Girvin? We
9  have the evaluations that he did, and you met each
10 time he did a written evaluation. Did you meet with
11 him any other times?
12       A.    Just one time about the portfolio. I
13 contacted him other times via e-mail to ask him
14 questions concerning the portfolio. There were things
15 that Mr. Girvin required, or I should say Millersville
16 University required, that Girvin had to follow through
17 with, things that we had to have in our portfolios.
18 The observations were one part of that, that I had to
19 observe people and --
20 Q.    Is that the shadowing?
21       A.    Yes.
22 Q.    Okay.
23       A.    Well, shadowing students, and then we had
24 to do the observation of the teachers.

Page 135

1  Q.    All right.
2        A.    So I talked to him various times over
3  e-mail correspondence, where I asked him questions
4  concerning the portfolio.
5  Q.    Okay.
6        A.    But not technically about the classroom
7  itself.
8  Q.    At any time did your interactions with him stop?
9        A.    No.
10 Q.    Okay.
11       A.    The last interaction that I had with him
12 was the day before graduation.
13 Q.    But he was, up until you graduated, he was
14 available to discuss with you whatever you needed to
15 discuss?
16       A.    Yeah.
17 Q.    Okay. When did you first complain to Barry
18 Girvin about Nicole Reinking?
19       A.    It was only one time. It was very brief.
20 I talked to him on the phone. I was having a lot of
21 trouble even getting the nerve to ask -- to talk to
22 Mr. Girvin. I actually talked to my parents prior to
23 it, a couple of times, saying "Should I even say
24 something? I'm afraid that it might hurt my

Page 136

1  relationship with someone," and I didn't want that to
2  happen.
3  Q.    "Someone" meaning?
4        A.    Anyone. I have a fear of upsetting
5  people, and I don't like doing that. So I was afraid
6  to speak up at first, and my parents said, "You know
7  what, you need to speak up. If there's no
8  communication, that's not a good thing."
9        So I finally spoke to Mr. Girvin over the
10 phone. I said, "I would like the communication to be
11 better. I'm not feeling that I'm getting any feedback
12 from her." And he said --
13 Q.    Reinking?
14       A.    Reinking. And Mr. Girvin said that he
15 would speak to her. I said, "Well, are you going to
16 mention my name?" And she -- he said, "No, I'm not
17 going to mention your name. I will just ask her basic
18 questions and make sure that the communication's
19 open." End of -- end of the complaint.
20 Q.    Do you know if he spoke with her about that?
21       A.    I was under the impression that he did. I
22 don't know.
23 Q.    Did -- and this is sometime after the
24 mid-evaluations?

Page 137

1        A.    Correct.
2  Q.    All right. Did her -- did the communication
3  between the two of you change at that point?
4        A.    Not really.
5  Q.    Okay. Let's talk about the midterm evaluations.
6        A.    Okay.
7  Q.    It's the next one. First is Reinking.
8        MR. KRAMER: Snyder -- what are wer up to?
9              - - -
10       (Whereupon, Exhibit Snyder-5 was marked
11 for identification.)
12             - - -
13 BY MR. KRAMER:
14 Q.    Have you seen this document before, Ms. Snyder?
15       A.    Yes.
16 Q.    Okay. And approximately when did you see it?
17       A.    On the date of the evaluation, the 20th.
18 Q.    All right. Explain to me who was in the room.
19       A.    Mr. Girvin, Nicole Reinking and myself.
20 Q.    Okay. And just how -- what happened? Tell me
21 how you got into the conversation.
22       A.    Well, it was -- we scheduled the date for
23 the midterm evaluation. So we all sat together. You
24 know, had a U-shape with the desks, and we -- everyone

| | Page 138 | | Page 140 |
|---|---|---|---|
| 1 | had a copy of everyone else's evaluation. So I had a | 1 | - - - |
| 2 | copy of my own evaluation on myself, Nicole Reinking's | 2 | (Whereupon, Exhibit Snyder-6 was marked |
| 3 | and Mr. Girvin's. | 3 | for identification.) |
| 4 | And Mr. Girvin spoke after Nicole. Nicole | 4 | - - - |
| 5 | spoke, went through her evaluation, the positives and | 5 | BY MR. KRAMER: |
| 6 | negatives; Mr. Girvin went over his evaluation, the | 6 | Q. He gave you this at the March 20th meeting? |
| 7 | positives, the negatives; I got to speak, ask my | 7 | A. Yes. |
| 8 | questions, reflect on anything that they said, and | 8 | Q. And I really want to know the same questions. |
| 9 | that was the end of the evaluation. | 9 | He -- you know, he has comments, some good, some bad. |
| 10 | Q. Okay. Was it a pretty open conversation? | 10 | A. Correct. |
| 11 | A. Yes. | 11 | Q. Did you essentially agree with him and his |
| 12 | Q. Do you remember what you said about Girvin's | 12 | comments on these pages? |
| 13 | evaluation? About Girvin's evaluation, what you said | 13 | A. Yes. |
| 14 | in response to his evaluation or -- I'm sorry, and | 14 | Q. Okay. Did you dispute anything with him? |
| 15 | Reinking's evaluation. That's what I'm getting at, | 15 | A. A few of the things that I needed to hand |
| 16 | really. | 16 | in for my portfolio were not completed yet, and I did |
| 17 | A. I'm very critical on myself and I listen | 17 | mention to Mr. Girvin that I felt that I was kind of |
| 18 | to the good things, but I was really focusing on the | 18 | thrown into the teaching instead of given the time at |
| 19 | negative things that I needed to work on. So my | 19 | the beginning of the semester to get the items done |
| 20 | response was that I'll make a change in those areas. | 20 | for my portfolio. We had discussed and agreed that |
| 21 | Q. Okay. | 21 | while Nicole Reinking was teaching the research paper, |
| 22 | A. That was my initial response to everything | 22 | at that point is when I would take the time to step |
| 23 | that Nicole Reinking and Barry Girvin said -- | 23 | back and get those things completed. |
| 24 | Q. Okay. | 24 | Q. Okay. |

| | Page 139 | | Page 141 |
|---|---|---|---|
| 1 | A. -- was that I need to change, and I'm | 1 | A. You know, "Shadowing," question -- you |
| 2 | going to make these changes. | 2 | know, question mark. "Student with exceptional |
| 3 | Q. Okay. Looking just at Reinking's evaluation, | 3 | needs?" That's what he's questioning, where are these |
| 4 | did you, at the time, dispute any of her grades or | 4 | things, why aren't they done. So I did make it a |
| 5 | findings or conclusions? | 5 | point to say, hey, I need time to do these things. I |
| 6 | A. She was very hard on my classroom | 6 | cannot be in the classroom teaching and then complete |
| 7 | participation, or my classroom management. And since | 7 | these things with students or with teachers at the |
| 8 | she was teaching for five years, I took what she said | 8 | same time. |
| 9 | wholeheartedly into consideration, that maybe I'm not | 9 | Q. Okay. So the concerns he raised were |
| 10 | as good as I thought I was and I have a lot to learn, | 10 | legitimate, you felt you needed more time? |
| 11 | and I need to make these changes. | 11 | A. Yes. |
| 12 | Q. Okay. | 12 | Q. Okay. Let's go on to the next, which we're |
| 13 | A. So... | 13 | going to call Snyder-7. This is the Pennsylvania |
| 14 | Q. And did you tell them that, or that was you were | 14 | Statewide Evaluation Form for Student Professional |
| 15 | just thinking that at that time? | 15 | Knowledge and Practice, affectionately known as the |
| 16 | A. That was my thinking. I did tell them | 16 | PDE-430. |
| 17 | that I would change the problems; however, I was | 17 | A. Yes. |
| 18 | thinking inside my head, you know, Mr. Girvin was | 18 | Q. Again, the same questions, did you dispute |
| 19 | teaching for 20-plus years, Nicole's been in the | 19 | anything that he was saying, did you discuss it, or |
| 20 | classroom for five years, I need to listen to what | 20 | have we already -- we've already gone through this? |
| 21 | they say if I'm going to be a good teacher. | 21 | A. Basically this is the same as the final -- |
| 22 | Q. Okay. Go next to the next document, which is | 22 | I mean the midterm evaluation, except it's processed |
| 23 | Girvin's midterm evaluation. Call this Snyder-6. | 23 | differently. I had an unsatisfactory in my classroom |
| 24 | Take a look at that, please. | 24 | environment, which is the area that I needed to work |

1  on the most. Everything else I had a satisfactory
2  rating or a superior rating. It made sense to me that
3  that was the area I needed to work on, because that's
4  where I was having the most problems. So I totally
5  agreed with them that I would have to change that
6  area.
7        - - -
8        (Whereupon, Exhibit Snyder-7 was marked
9        for identification.)
10       - - -
11 BY MR. KRAMER:
12 Q.  Do you know how the midterm PDE-430 is used?
13    A.  I know that it is not handed in for
14 certification purposes. It is basically used to
15 tailor what you're doing. They don't hand this in to
16 the Pennsylvania Department of Education, the final
17 evaluation is the only thing handed to the
18 Pennsylvania Department of Education; however, this
19 can be used to determine other circumstances.
20       For example, I know that Dr. Bray had
21 looked at this for my appeal meeting. She did look at
22 this document and she saw that I had an unsatisfactory
23 in the one area. It can be used for various things.
24 But as a document of resource, it's not a

1  documentation for processing purposes.
2  Q.  Okay. For processing your certification?
3     A.  Yes.
4  Q.  Okay. The midterm evaluations, the one by
5  Girvin, the one by Reinking and the other one by
6  Girvin, the PDE-430 --
7     A.  Correct.
8  Q.  -- are they used at all in trying to find a job?
9     A.  No.
10 Q.  Okay. Do you know if school districts require
11 any of these three midterm evaluations to be submitted
12 with your job application or at some point when you're
13 looking for a job?
14    A.  I do not know that.
15 Q.  Okay.
16    A.  I know that if you have an -- I was
17 informed of this by Mr. Girvin, if you do have an
18 unsatisfactory in an area, that will make a profound
19 impact whether you get a job or not. That was -- he
20 informed me of that.
21 Q.  Okay.
22    A.  That if you do have an unsatisfactory in
23 an area or all satisfactories, you're gonna have less
24 of a chance of getting a job, as compared to if you

1  had all superiors or all exemplaries.
2        MR. VOIGT:  Are you talking about the
3     midterm evaluation?
4        MR. KRAMER:  Yeah, that's -- we're talking
5     about just the midterm.
6        THE WITNESS:  All --
7  BY MR. KRAMER:
8  Q.  Okay. But you're also saying the final
9  evaluation as well?
10    A.  All evaluations, yes.
11 Q.  Okay. But how -- if all the evaluations, the
12 midterm and the final evaluations, how are -- how do
13 they affect whether you get a job or not, based on
14 what you understand?
15    A.  The midterm not as much as the final
16 evaluation. The final evaluation is the key. If you
17 have an unsatisfactory or all satisfactory ratings, as
18 opposed to superior ratings, it shows that you don't
19 grasp the concepts as much as if you had -- let me
20 rephrase that. If you have all satisfactory ratings,
21 you grasp the concept less or have worse performance
22 than if you have all exemplary or superior ratings.
23 Q.  I see.
24    A.  So if -- a school district would say this

1  teacher has all satisfactory ratings, but this teacher
2  has all exemplary ratings, we're gonna go based upon
3  the better ratings.
4  Q.  And how --
5     A.  That's the impression that we were given.
6  Q.  And how do the school districts get a hold of
7  these documents, these midterm and final evaluations?
8     A.  I don't know.
9  Q.  Okay. You referred a couple of times to your
10 portfolio. What is that?
11    A.  Portfolio is a document, well, a whole
12 bunch of documents that were placed together, for
13 Girvin to evaluate; shadowing of students, we had
14 requirements where we had to -- I had to interview
15 Nicole Reinking about certain issues, and then I had
16 to write my own responses and kind of compare and
17 contrast them, the observations of the other teachers,
18 what what feel I did get, what --
19 Q.  Okay.
20    A.  -- was my grasp of those situations, in
21 addition to my circle project. That is the core, the
22 main part of it.
23       Not only my lesson plans, but the project
24 itself, which basically it was, I don't know if you've

37 (Pages 142 to 145)

Page 146

1  ever seen a lesson plan, but it's all the lesson plans
2  together --
3  Q. For the whole semester?
4      A. -- for the whole semester, in addition to
5  your original template, which includes the
6  Pennsylvania Department of Education, their rules and
7  standards, how you're including them in the lesson
8  plans, what you're doing with the students and for the
9  students within this whole semester or this whole
10 lesson and unit --
11 Q. Okay.
12     A. -- to enrich them. And you have to go
13 through -- it's basically a 20-page paper before the
14 lesson plans.
15 Q. So your portfolio, then, refers really to all
16 the documents which reflect your work during your
17 student teaching semester, it sounds like.
18     A. During my full load.
19 Q. Yes.
20     A. Yes, during my full load, yes.
21 Q. Okay.
22     A. Not prior to.
23 Q. Right, but just -- okay. I understand.
24     Let's go to the next document, Snyder-8.

Page 147

1  This was your evaluation, your self-evaluation.
2      A. Yes.
3  Q. Did you and Mr. Girvin and Ms. Reinking discuss
4  your self-evaluation at this time?
5      A. Yes. I rated myself, I don't want to say
6  highly, but higher than they did in certain areas, and
7  that was a concern of them. I had in my mind that
8  even though I was having these problems, that every
9  teacher has problems and there are things that I need
10 to work through.
11     And after reading my documents and
12 comparing it to their ratings, they kind of opened my
13 eyes a little bit more as an epiphany for me, and I
14 noticed, you know, hey, there are areas that I need to
15 work on a little bit more and take a little bit more
16 seriously as far as classroom management is concerned.
17 And that was the main communication that we had
18 concerning my document, that, you know, "We have an N
19 here and you have a G. There's something wrong. Do
20 you notice the difference about what we're saying,
21 compared to what you're saying?" And that was the
22 discussion.
23 Q. Were their evaluations surprising to you?
24     A. No. They were critical, which I think

Page 148

1  they needed to be.
2  Q. Right. Were you surprised by what they wrote
3  and by what they said?
4      A. In some areas I did as far as -- I'd have
5  to find the page.
6  Q. Okay.
7      A. I know that both of them gave me an N in
8  one of the areas of knowledge, and I was taken back by
9  that, because I had no prior experience with British
10 literature. This was my first time and I felt that
11 even though I -- you know, I was trying my hardest and
12 that I didn't have a clear knowledge of it, but that's
13 only because I had no experience with it before. If I
14 was teaching American literature, that would have been
15 different, because I -- all of my classes or most of
16 my workload was concerning American literature.
17     However, I took to heart what they said, I
18 put my head in the books a little bit more, deeper
19 than I already was, and tried my -- tried my best the
20 second half.
21 Q. Okay.
22     A. That's all I could do.
23     MR. KRAMER: That's 8.
24     MR. VOIGT: Off the record a second.

Page 149

1              - - -
2              (Whereupon, Exhibit Snyder-8 was marked
3          for identification.)
4              - - -
5              (Whereupon, a lunch recess was taken.)
6              - - -
7  BY MR. KRAMER:
8  Q. We're back, Ms. Snyder.
9      A. Yes.
10 Q. Are you aware if, during the period between
11 February 1st to, say, your mid-evaluation, Reinking
12 was communicating to Girvin her observations of your
13 student teaching performance?
14     A. Individually? I'm not aware of that.
15 Q. Okay. I mean, you don't have any knowledge
16 whether she was telling him what was going on in the
17 classroom or not? You don't know?
18     A. I have no idea, no. I know that she
19 talked with -- to him with me in the room. But other
20 than that, I have no idea.
21 Q. Okay. So the times that he would come in to do
22 his observation, the next day or the day after the
23 three of you would talk about your student teaching?
24     A. Correct.

Page 150

1  Q. Okay. You said that after the mid-evaluation
2  the communication between you and Reinking decreased.
3  Did you ever tell her that was your observation?
4     A. No. That's why I went to Girvin. I
5  didn't want to upset her, and I didn't know if that
6  was in my place to say something to her like that,
7  since she was my cooperating teacher, which means we
8  were supposed to be working together.
9  Q. Right.
10    A. However, as far as something like that's
11 concerned, I felt I needed to go to my supervisor
12 about it.
13 Q. Okay. Now, after the midterm evaluation,
14 explain to me generally if your duties changed, from
15 before the mid-evaluation, as a student teacher.
16    A. They increased -- or they did change. My
17 class amounts increased. I went from two classes to
18 three classes, and I taught first, second and third
19 block. There was a teacher, Mr. Hentzel, that was
20 across the hall from us, that asked Nicole, who in
21 turn asked me, if I would pick up his one class, his
22 morning class first period, so I could go -- so he
23 could go do some work with the guidance department.
24 Q. And what grade was that?

Page 151

1     A. That was 12th grade as well. It was the
2  same class as third block, the traditional British
3  literature; however, it was a first block class from a
4  different teacher. So I had two blocks of traditional
5  British literature on the other sides of the second
6  block class, which was the non-traditional British
7  literature.
8  Q. Mr. Hentzel was the teacher of that class?
9     A. Yes.
10 Q. Did he have any responsibility for interacting
11 with you, teaching you, supervising you?
12    A. No. He gave me a class -- he gave me a
13 class roster.
14 Q. Okay. Did Mrs. Reinking ever come and observe
15 you in that class?
16    A. She was there in the morning. So
17 sometimes she was in the classroom, but not always.
18 It wasn't her responsibility to observe me. I mean,
19 it was her responsibility to observe me, but not
20 necessarily to observe each individual class. Just in
21 general.
22 Q. Okay. Other than yourself, in teaching
23 Mr. Hentzel's class, were there any other grownups,
24 typically?

Page 152

1     A. No. No.
2  Q. Okay. So you would have the class to yourself
3  as the teacher?
4     A. Yes.
5  Q. Okay. And what unit were you teaching the kids
6  in Mr. Hentzel's class?
7     A. British literature.
8  Q. Was it -- go ahead.
9     A. I was going to add, after the situation
10 occurred, Mrs. Reinking did have to teach those first
11 block students, Mr. Hentzel's class.
12 Q. And "situation" meaning?
13    A. Removal from the school.
14 Q. Okay.
15    A. Yeah.
16 Q. So in other words, after --
17    A. May.
18 Q. -- May 8th --
19    A. Yeah.
20 Q. -- Reinking then had to teach Hentzel's first
21 block class?
22    A. Correct.
23 Q. Okay. From mid-evaluation through the end of
24 your time at Conestoga Valley, you would meet with

Page 153

1  Reinking, I think you said, not as frequently as
2  before?
3     A. Yeah, periodically. Maybe five minutes a
4  day. If there was an issue, maybe 15 minutes. So it
5  decreased at least half of the amount of time.
6  Q. But you -- there was no regularly scheduled
7  meeting time --
8     A. No.
9  Q. -- between the two of you?
10    A. No.
11 Q. Okay. All right. I take it, then, you had
12 literally full responsibility for Mr. Hentzel's class,
13 to teach just Hentzel's class just at that point,
14 right?
15    A. And second and third block.
16 Q. Okay. And that was -- in addition, you had full
17 responsibility for blocks 1, 2 and 3?
18    A. Correct.
19 Q. Okay. Blocks 1 and 3 were the British
20 literature and block -- with the --
21    A. Traditional.
22 Q. -- traditional students, and block 2 with the
23 non-traditional students?
24    A. Correct.

39 (Pages 150 to 153)

Page 154

1  Q. Was the curriculum in Hentzel's class the same
2  as in the block 3 class?
3  A. Yes.
4  Q. And generally what period of time were you --
5  what were you teaching substantively? Were you
6  teaching them poetry, writing? What were you teaching
7  them?
8  A. It started as a poetry unit, it worked
9  into different periods of time of British literature
10 up until modern day literature. But a majority of the
11 work was surrounded around Shakespeare, Chaucer, that
12 area.
13 Q. You were, then -- for those classes, then, you
14 were responsible for taking -- what were you
15 responsible for in terms of curriculum, teaching?
16 Break it down for me.
17 A. Okay. I was in charge of, or responsible,
18 for student welfare, first and foremost, and their
19 learning. So I had to make sure I maintained a safe
20 learning environment for the students, one in which
21 they were being challenged, but not challenged too
22 much, that they were grasping the material, and I had
23 to find that out through various assessments.
24      And they were my main responsibility. I

Page 156

1  May 8th on your teaching?
2  A. Somewhat, but not a lot.
3  Q. Okay.
4  A. And the information that she did give me,
5  critiques of my lesson plans or giving me a better
6  understanding of the subject matter if I didn't
7  understand one part over another, basically they were
8  her only concerns; making sure that I got the students
9  to understand the subject matter and that -- so when
10 finals came, that they didn't bomb the finals.
11 Q. During that period of time were you getting
12 feedback from Barry Girvin?
13 A. Yes.
14 Q. All right. And how often would you and he
15 discuss --
16 A. Whenever he came in to observe.
17 Q. Okay.
18 A. And he gave me feedback after he read my
19 lesson plans for the week.
20 Q. How regular was the feedback from Barry Girvin?
21 A. Weekly or twice a week.
22 Q. Was Girvin generally on point in his criticisms?
23 A. Yes, for the most part, because most of
24 his criticisms had to do with classroom environment

Page 155

1  mean, those two things, you know, entail a lot;
2  maintaining a safe classroom and making sure they
3  understand the work.
4  Q. Okay. In blocks 2 and 3, Reinking's students,
5  when you were teaching Reinking's students in blocks 2
6  and 3 was she in the room? Reinking, was she in the
7  room?
8  A. Not all of the time.
9  Q. Most of the time?
10 A. A quarter to half the time maybe.
11 Q. Okay. Was Hentzel ever in the room when you
12 were teaching his classes?
13 A. No. Mainly because Reinking and I agreed
14 to take his class over, so he didn't have the
15 responsibility of being there.
16 Q. Okay. All right.
17 A. I do want to add, the students that I
18 helped with the writing research project, that was
19 actually in semester three, not semester four.
20 Q. Okay.
21 A. I didn't want to confuse you with that.
22 Q. All right. Okay. I think I got that.
23      How were -- were you getting feedback from
24 Reinking from the mid-evaluation point through, say,

Page 157

1  prior to midterm placement, and then as they came
2  toward the end of the semester he gave me less and
3  less and less criticism and there were more and more
4  and more positive critiques.
5  Q. Okay. But I'm now talking about the time from
6  the midterm evaluation through May 8th.
7  A. Yeah, midterm evaluation to May 8th he
8  continued on -- like I said, he had less grows and
9  more glows. Because they call it glows and grows.
10 Q. Okay. Reinking's observations during that same
11 period, they were -- was she generally on point? Did
12 you agree with what -- her observations on your
13 performance?
14 A. She didn't give me much feedback. See,
15 that was the -- that's the problem right there, there
16 wasn't enough feedback for me to agree or disagree
17 with her.
18 Q. Okay. Did you go to anybody other than your
19 parents and to Girvin and complain about what you
20 perceived as Reinking's -- the less feedback that
21 Reinking was giving you?
22 A. No.
23 Q. Okay. Let's talk about the final evaluations.
24 A. Okay.

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

1    Q.  First we'll do Reinking's evaluation.  Have you
2    seen this before?
3        A.  Yes.
4    Q.  And when did you see it?
5        A.  The date of the final evaluation, on the
6    11th.
7    Q.  Okay.  On the 11th did you, Reinking and Girvin
8    all meet to discuss the final evaluations?
9        A.  Well, I was tailored into the school and I
10   had to sit in that conference room where I first met
11   Nicole, the side teacher room, and -- Buffington
12   actually brought me back to that room, and I was
13   sitting there.  I had to wait until all my students
14   left.  And then I originally met with Buffington,
15   Girvin and Reinking.
16   Q.  Okay.  So the meeting that you referred to in
17   your Complaint in which Buffington criticized you,
18   that was the same meeting at which --
19       A.  The final --
20   Q.  -- at which the final -- that's okay -- at which
21   the final evaluations were discussed?
22       A.  Yes.
23   Q.  Okay.
24       A.  Buffington left after she talked to me,

1    and then Girvin and Reinking and myself met like we
2    always did.
3    Q.  Okay.
4        A.  The three of us together.
5    Q.  Got it.  Well, tell me about that meeting.  You
6    said Girvin escorted you?  Who escorted you to the
7    room?
8        A.  I just said Buffington, but it was Girvin.
9    He escorted me down to the side room.  They waited
10   until the students left, and they actually had the
11   students go the opposite way from where I was sitting,
12   so they wouldn't see me.
13   Q.  Who told you that?
14       A.  I was told that.
15   Q.  Who told you?
16       A.  So -- Girvin.
17   Q.  Okay.
18       A.  So the students couldn't have any
19   interaction with me.  Because they didn't see me that
20   whole week, so I'm under the impression they felt that
21   the students would try to talk to me and ask me why I
22   haven't been there if they saw me.
23           After the classroom left --
24   Q.  I'm sorry, is this at the end of the day?

1        A.  Yes, fourth period.
2    Q.  Okay.
3        A.  They escorted me down to the room, it was
4    Buffington, Girvin, Reinking, and then I was sitting
5    across from all of them.  And Buffington continued to
6    say that I --
7    Q.  Tell me what she said.  Sorry.  To the best of
8    your recollection, what did Buffington say?
9        A.  "Did you ever see this?"  And then she
10   shows me the picture and the caption.  And I said,
11   "Yes."  And she continued to say how that was
12   unprofessional, that I was incompetent as a teacher,
13   because I didn't display certain knowledge that an
14   English teacher should display.
15           After that, she said that she felt my
16   apology letter was not sincere.  At that point I got
17   really upset, and I said to her "I wrote this apology
18   letter when I was bawling my eyes out."  I said, "I've
19   been crying for the past three days.  I haven't been
20   able to spend any time with my children, eat or
21   sleep."  I said, "If that's not sincere, I don't know
22   what is."  And she said, "I'm sorry."
23           And then she said that she felt I needed
24   more education, and I said I was planning on

1    continuing my education anyways, and she said she did
2    not know that.  And she got up after that and left the
3    classroom.
4    Q.  While she was talking -- while Buffington was
5    talking, did Girvin and Reinking say anything?
6        A.  No.
7    Q.  The -- you say that Buffington showed you a
8    document.  Is this the document that she showed you?
9    (Indicating.)
10       A.  She did not show me the document with the
11   -- with the blog.
12   Q.  With the text?
13       A.  This is something totally different.
14   These are two different documents that are put
15   together.  (Indicating.)
16           The picture -- the picture and the
17   caption, which was "Drunken pirate," was one document.
18   This other caption from Thursday, May 4th, down at the
19   bottom here, was an actual blog that I wrote on my
20   website.  (Indicating.)
21   Q.  I see.
22       A.  So that was a separate document.  She
23   showed me the picture with the caption.
24   Q.  Okay.  So let's --

| Page 162 | Page 164 |
|---|---|
| 1    A.  Which it was that picture, but there was a | 1    A.  I'm sorry. I was aware that they viewed |
| 2  caption underneath. | 2  that blog and that the blog and the picture were the |
| 3  Q.  Okay. Is this the picture that she showed you? | 3  problem, but she just showed me the picture. |
| 4  (Indicating.) | 4  Q.  Okay. And when you refer to "the blog," you're |
| 5    A.  No. That picture. (Indicating.) | 5  referring to this text on Snyder-10? |
| 6  Q.  Okay. So let's -- let's mark that, then. | 6    A.  Yes. |
| 7    A.  Except there was a caption underneath. | 7  Q.  Okay. |
| 8  Underneath all the pictures there are captions | 8    A.  Because it was misinterpreted. |
| 9  underneath the pictures. | 9  Q.  All right. How do you know that they viewed |
| 10  Q.  Is that a blog? | 10  this blog, or text, that's on Snyder-10? |
| 11    A.  No. | 11    A.  After my final evaluation Nicole Reinking |
| 12  Q.  Okay. Sorry. | 12  said to me "I don't care what you say. I know you're |
| 13    A.  The text, that "Thursday" to the bottom of | 13  lying to me, that that text was about me." I told her |
| 14  the page, that's a blog. | 14  the entire time, including up until this day, that |
| 15  Q.  Okay. | 15  this text has nothing to do with Nicole, and she said |
| 16    A.  It's basically a diary entry. | 16  she didn't believe me. I know that's just one of the |
| 17  Q.  All right. So let me get this straight. First, | 17  ways that they saw the text, but I was informed by |
| 18  let's mark this as Snyder -- what are we up to -- 10. | 18  Mr. Girvin as well that they viewed the blog text. |
| 19  Buffington showed you the picture. And | 19  Q.  And "the blog text" meaning this text on |
| 20  it's actually in front of you if you want to look at | 20  Snyder-10? |
| 21  it. It's after the evaluations. | 21    A.  Correct. |
| 22  Buffington showed you, in that May 11th | 22  Q.  All right. Do you know if -- how do you know |
| 23  meeting, this picture that's on Snyder-10, correct? | 23  that Girvin viewed the text on Snyder-10? |
| 24    A.  Correct. | 24    A.  I don't know how he viewed it. I know |

| Page 163 | Page 165 |
|---|---|
| 1  Q.  All right. Underneath it it had the caption | 1  that he did view it. |
| 2  "Drunken pirate"? | 2  Q.  Well, how do you know that? How do you know |
| 3    A.  Right. | 3  that he had seen this text? |
| 4  Q.  Right. Was there anything else on the page that | 4    A.  He said that he knows -- he understood |
| 5  Buffington showed you at that meeting? | 5  what was in question, that it was the picture with the |
| 6    A.  No. | 6  caption and the blog. |
| 7  Q.  All right. Okay. Then what other -- I don't | 7  Q.  Okay. And -- |
| 8  know -- and you'll excuse me, I'm not familiar with | 8    A.  It was my understanding that if he knew |
| 9  MySpace or blogs, so bear with me. | 9  what was in question, that he viewed it himself. |
| 10  Buffington, did Buffington show you any | 10  Q.  But you don't know that he ever actually saw the |
| 11  other postings from your website in that meeting? | 11  text on Snyder-10? |
| 12  MR. VOIGT: Other than the blog? | 12    A.  I don't know if he saw the text on |
| 13  MR. KRAMER: Well, that's what I want to | 13  Snyder-10, but I know that he viewed the picture. |
| 14  -- she showed -- Buffington showed her this | 14  Q.  The picture on Snyder-10? |
| 15  picture. | 15    A.  Right, because it was shown to everybody. |
| 16  THE WITNESS: Yes. | 16  Q.  Okay. At the meeting on May 11th with |
| 17  BY MR. KRAMER: | 17  Buffington, Girvin, you, and Reinking. Okay. |
| 18  Q.  Did Buffington show you any text at that | 18  This picture, do you know if this picture |
| 19  meeting? | 19  plays in this litigation at all? (Indicating.) |
| 20    A.  Other than the caption underneath the | 20  MR. VOIGT: Do you want to mark that |
| 21  picture, no. | 21  picture? |
| 22  Q.  Okay. Buff -- | 22  MR. KRAMER: Well, because if it doesn't |
| 23    A.  I was -- | 23  -- I mean, we can. Call this Snyder-11. |
| 24  Q.  Okay. | 24  THE WITNESS: That picture was one of the |

|  | Page 166 |
|---|---|
| 1 | other pictures on the website. And when the |
| 2 | media attention hit, that's the picture that was |
| 3 | used. |
| 4 | BY MR. KRAMER: |
| 5 | Q. Okay. But as far as you know, the folks at |
| 6 | Millersville and Conestoga Valley never looked at this |
| 7 | picture, Snyder-11? |
| 8 | A. No, they used that picture. (Indicating.) |
| 9 | Q. The one in Snyder-10? |
| 10 | A. Yes. |
| 11 | Q. All right. How do you know that Buffington saw |
| 12 | the text on Snyder-10? |
| 13 | A. It was made aware -- made aware to me by |
| 14 | Girvin that they viewed not only the text, but the |
| 15 | picture. |
| 16 | Q. Okay. Well, I'm just talking about the text |
| 17 | now. What did Girvin say to you? |
| 18 | A. I asked him what is -- why is my |
| 19 | professionalism in question, and at first he couldn't |
| 20 | give me any answers. |
| 21 | Q. And when did you -- |
| 22 | A. That was on Monday. |
| 23 | Q. On the telephone? |
| 24 | A. Yes. I called him right after I talked to |

|  | Page 167 |
|---|---|
| 1 | Mrs. Buffington. |
| 2 | Q. Okay. |
| 3 | A. On Tuesday he gave me more information, |
| 4 | and he said that the text and the picture is in |
| 5 | question. That picture and that text were given to |
| 6 | Mrs. Buffington by Nicole Reinking. |
| 7 | Q. How do you know that? |
| 8 | A. I was told that. That's what I was told |
| 9 | in that conversation. |
| 10 | Q. And Girvin told you that? |
| 11 | A. Yes. At that time I said, "Is it my" -- |
| 12 | "Is it in my best interest to get rid of my MySpace |
| 13 | account?" And he said, "Yes, it looks that way." |
| 14 | Q. All right. |
| 15 | A. And so I got rid of my account. |
| 16 | Q. When did you open the account? |
| 17 | A. Months before student teaching. I |
| 18 | actually believe I had the account while I was in Sue |
| 19 | Fetterolf's classroom and Neil Weidman's classroom. |
| 20 | Q. Okay. You may have answered this, how do you |
| 21 | know that Reinking viewed the text on Snyder-10? |
| 22 | A. She told me she did. |
| 23 | Q. Okay. |
| 24 | A. And she told me that she didn't believe |

|  | Page 168 |
|---|---|
| 1 | what the text said. |
| 2 | Q. Okay. And she told you that at the May 11th |
| 3 | meeting? |
| 4 | A. Yes. |
| 5 | Q. Why do you know -- why do you believe that Jane |
| 6 | Bray saw this text? |
| 7 | A. I don't believe Jane Bray saw this text |
| 8 | until my -- I figured she had to have seen the text, |
| 9 | because she essentially decided whether I would get my |
| 10 | degree, or she signed the paperwork whether I would |
| 11 | get my degree or not. Dr. Wenrich gave me the |
| 12 | impression that she was in charge -- |
| 13 | Q. "She" meaning? |
| 14 | A. Wenrich was in charge of the meetings, |
| 15 | because Dr. Bray was ill, but that the ultimate |
| 16 | decision would come from Dr. Bray. |
| 17 | Q. I see. |
| 18 | A. So for her to make that type of decision |
| 19 | whether to take someone's degree away or not, they |
| 20 | would have to see all of the context on everything |
| 21 | that's in question. |
| 22 | Q. Okay. |
| 23 | A. And I know that Buffington had forwarded |
| 24 | this to Millersville. |

|  | Page 169 |
|---|---|
| 1 | Q. Had forwarded this, "this" meaning what? |
| 2 | A. Snyder-10. |
| 3 | Q. 10, the photograph and the text Buffington |
| 4 | forwarded to Millersville? |
| 5 | A. I believe so. |
| 6 | Q. Okay. |
| 7 | A. I don't know if it was coupled together as |
| 8 | it is on this page, but I know that both things were |
| 9 | sent to Millersville. |
| 10 | Q. How do you know that? |
| 11 | A. Because I was confronted about it on, not |
| 12 | only in the meeting on the 11th, but the meeting on |
| 13 | the 12th at Millersville. |
| 14 | Q. Okay. And the meeting on the 12th was with |
| 15 | whom? |
| 16 | A. Wenrich and Girvin. |
| 17 | Q. All right. But my question is, I may be |
| 18 | skipping a step here, but how -- you don't know, then, |
| 19 | or do you know, that Dr. Bray actually viewed this |
| 20 | text on Snyder-10 at any time? |
| 21 | MR. VOIGT: Objection. She asked that -- |
| 22 | she answered that a few minutes ago. |
| 23 | MR. KRAMER: Well, she didn't quite give |
| 24 | me a direct answer. |

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 170

1 BY MR. KRAMER:
2 Q. Do you know that Bray actually viewed this text?
3 A. Not before the appeal meeting. l don't
4 know if she did or she did not.
5 Q. Okay. How about Dr. Wenrich, do you know if she
6 ever viewed this text?
7 A. It was -- it was forwarded to her from CV,
8 so she would have had to have read it, unless she just
9 took the paper and put it to the side after it came
10 out of the fax machine.
11 Q. Well, who -- was it e-mailed or faxed?
12 A. Well, this says "Fax" at the top.
13 Q. Okay.
14 A. And that might have been at a later date,
15 but that's why I said "Fax."
16 Q. Okay. Well, it's dated 5/9.
17 A. Yeah.
18 Q. But my question really is, somebody faxed this
19 document, you're saying, to Millersville?
20 A. Correct.
21 Q. Do you know who did -- do you know who faxed the
22 document to Millersville, Snyder-10?
23 A. Like I said, I don't know if it was in its
24 format as Snyder-10. It could have been the picture

Page 171

1 and the caption, and then the blog separate, it could
2 be two different documents; however, that information
3 was sent by Buffington to Millersville.
4 Q. All right. At Millersville do you have any
5 direct knowledge -- strike that.
6 Do you have any direct knowledge of which
7 of the defendants at Millersville actually saw the
8 picture, the top of Snyder-10?
9 A. I know that they all have viewed this
10 after the appeal meeting. Before that, I'm not sure
11 exactly who viewed it.
12 Q. Okay.
13 A. But I know after the meeting they all
14 viewed it, because I brought it to the appeal meeting
15 and showed them.
16 Q. Okay. And which appeal meeting?
17 A. The first one after graduation.
18 Q. The one with Bray and Wenrich?
19 A. Correct.
20 Q. Okay. To that appeal meeting did you also bring
21 this text?
22 A. Yes, it was in this... (Indicating.)
23 Q. It was in this format?
24 A. Yes.

Page 172

1 Q. Okay. And did you show it to Bray and Wenrich?
2 A. Yeah, they had a copy of it. They're the
3 ones that showed it to me.
4 Q. Okay. In the same format?
5 A. Correct.
6 Q. Okay. How about --
7 A. I didn't bring it to them, they brought it
8 -- they -- Dr. Bray took the paper and went like this
9 and showed me it. Like that. So they had it in their
10 possession before that. (Indicating.)
11 Q. Okay. How about Schneller, you had a meeting
12 with her one of those days?
13 A. The 12th, on Friday the 12th, before
14 graduation.
15 Q. Okay. Did she have with her a copy, that you
16 saw, of the picture?
17 A. Not a copy that I saw.
18 Q. Did she have with you a copy of -- did she have
19 with her a copy of the text?
20 A. Not that I saw.
21 Q. So you -- do you know if Schneller ever saw
22 either the text or the picture --
23 A. I don't know.
24 Q. -- from Snyder-10? Okay.

Page 173

1 MR. VOIGT: Wait until the question's
2 done.
3 THE WITNESS: I'm sorry.
4 BY MR. KRAMER:
5 Q. Okay. Let's go back and finish with Snyder-9.
6 This is Reinking's evaluation. This is May 11th.
7 After Buffington leaves the room --
8 A. Correct.
9 Q. -- it's -- remaining in the room are you and
10 Girvin and Reinking. Tell me what happens.
11 A. Basically like we did with the midterm
12 evaluation. Reinking went first, she went over her
13 ratings; Girvin went next, went over his ratings.
14 Girvin said he was surprised and dismayed that this
15 would happen, because he saw such a turnaround for me
16 from midterm, and this shocked him. And then, as I
17 said before, Nicole said that she did not believe that
18 I was being truthful and honest when I said that that
19 blog text was not about her.
20 Q. Did she seem mostly -- did Reinking seem mostly
21 angry that she thought you were criticizing her?
22 A. She seemed angry overall.
23 Q. Okay. Did -- but did she indicate she was
24 pissed off, taking it personally, that you were

44 (Pages 170 to 173)

Page 174

1 attacking her somehow?
2 A. I think so.
3 Q. Okay.
4 A. That's only my personal opinion.
5 Q. No, that's -- I'm trying to get a sense of the
6 dynamic here.
7 Did you -- did they -- did Reinking read
8 the document to you, did she discuss all of it, did
9 she choose a certain number of points? How did she
10 present it to you?
11 A. Normally, same as midterm evaluation in
12 this one, number 1, unsatisfactory, number 2 -- and we
13 would go through it that way.
14 Q. Right.
15 A. And then she would read through what she
16 said for the evidence. And Girvin would do the same
17 thing.
18 Q. Was there a dis -- with respect to Reinking's
19 evaluation, after she read the document to you, it
20 sounds like, was there a discussion of the contents of
21 the document?
22 A. No.
23 Q. Was there a discussion of the contents of
24 Girvin's evaluation?

Page 175

1 A. Well, Girvin went into the remainder of
2 his discussion right after his evaluation, that he
3 wasn't expecting what happened to happen, because I
4 made the turnaround from the midterm semester -- or
5 the midterm evaluation, I apologize. And then Nicole
6 added what she wanted to add, and I didn't say
7 anything.
8 Q. Okay. What did Nicole say?
9 A. That she did not believe that I was being
10 honest that that blog text was not about her.
11 Q. Okay. Was there any more discussion about
12 Reinking's evaluation at that meeting?
13 A. No.
14 Q. Okay. Did she give you a copy?
15 A. Yes.
16 Q. All right. Did you respond to her observations
17 in her evaluation at that time?
18 A. Can you repeat it?
19 Q. Did you respond -- I mean, after Reinking read
20 her evaluation to you, did you respond?
21 A. No.
22 Q. Okay.
23 A. I was too afraid to.
24 Q. Why were you afraid?

Page 176

1 A. Well, as of Thursday there was no
2 determining -- or final determination whether I was
3 going to receive any degree. And that's what I was
4 told from the beginning of the week, that I might not
5 receive any degree, that I might receive my Bachelor's
6 of Secondary Education, but it wasn't guaranteed. I
7 felt at that point that if I mentioned anything or
8 said anything that was against them, that I wouldn't
9 get a degree at all.
10 Q. Okay. With respect to the contents of
11 Reinking's evaluation, did you agree with her
12 observations?
13 A. Not with the professionalism and not with
14 the preparation or the knowledge. Obviously I had the
15 knowledge. If I didn't, I wouldn't have taught as far
16 as I did and to as many students as I did for that
17 whole period of time. I felt personally that if I was
18 incompetent and I did not have that knowledge, why was
19 I in the classroom for that long teaching the same
20 students? Why wasn't I taken out before or even
21 confronted before to say, hey, you still don't have
22 the knowledge, we can't have you teach?
23 I was looking for answers, and I had a lot
24 of things going through my head during that final

Page 177

1 evaluation, but they were my main arguments if I would
2 have made any arguments at that point.
3 Q. Okay. But you didn't?
4 A. I didn't.
5 Q. Okay.
6 A. At least not to Nicole.
7 Q. Did you make comments to somebody else?
8 A. I made comments or gave an argument for
9 myself to Girvin in an e-mail that I wrote Tuesday
10 prior to when we spoke.
11 Q. To Girvin?
12 A. Yes.
13 Q. Okay. Well, let's first get this marked as 9,
14 so we don't lose it.
15 - - -
16 (Whereupon, Exhibits Snyder-9, 10 and 11
17 were marked for identification.)
18 - - -
19 MR. KRAMER: Go to the next document,
20 Girvin's Millersville student teaching
21 evaluation. This is 12.
22 - - -
23 (Whereupon, Exhibit Snyder-12 was marked
24 for identification.)

45 (Pages 174 to 177)

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 178

1      - - -
2  BY MR. KRAMER:
3  Q.  So you said Girvin read this document to you at
4  the May 11th meeting?
5      A.  This he read to me on the 12th, with
6  Dr. Wenrich and myself. This final document was
7  composed after the final evaluation.
8      MR. VOIGT: I think you're on a different
9  document.
10  BY MR. KRAMER:
11  Q.  Yeah, we're talking about this one.
12  (Indicating.)
13      A.  Oh, did they stick together? I don't have
14  that.
15  Q.  This is --
16      A.  Oh, they're switched. I'm sorry.
17  Q.  This one, this is Girvin's --
18      A.  Got it now. Sorry.
19  Q.  Not the PDE form, the other one.
20      A.  Okay. Correct. Sorry.
21  Q.  So let's go back. Snyder-12 is Girvin's
22  Millersville evaluation. Did he read this to you at
23  the May 11th meeting?
24      A.  The Conestoga Valley evaluation?

Page 179

1  Q.  Yes.
2      A.  Yes, he read that. He read that on the
3  11th, Thursday the 11th.
4  Q.  That was in the meeting along with Reinking?
5      A.  Yes.
6  Q.  Okay. After he read this document, did you
7  respond to him in any way?
8      A.  No. For the same reasons as I said for
9  Reinking.
10  Q.  All right. And what happened in the meeting
11  after he read the document?
12      A.  Well, what I just said, that he said that
13  he was taken back, that he didn't expect this, that I
14  made a turnaround from the middle of the semester.
15  Nicole had said what she had said about not believing
16  me. Nicole left the classroom, and Girvin stayed with
17  me afterwards to help me clean up my classroom. And I
18  talked to him again about Nicole and, you know, my
19  concerns at midterm placement, how they didn't change
20  and that I felt that no other student teachers should
21  be placed with Nicole again if this is what's going to
22  happen. And he said, "This isn't the time to talk
23  about this."
24  Q.  Okay.

Page 180

1      MR. VOIGT: Barry, if I could just ask a
2  question.
3      Stacy, when you said Girvin told you he
4  didn't expect this, what do you understand he
5  was talking about, "this"?
6      THE WITNESS: All the talk about
7  unprofessionalism. That's what I'm taking it --
8  that's what I took it for.
9      MR. KRAMER: Okay.
10  BY MR. KRAMER:
11  Q.  So -- and did you see Reinking ever again after
12  that meeting?
13      A.  One time I had to come in and pick up my
14  desk, because I couldn't transport it in my car. I
15  came back for my desk. My students threw a party for
16  me, in which I wasn't there, and they gave me a bear
17  and a card as a goodbye, and I picked those items up
18  while I picked up my desk.
19  Q.  How come you didn't use a Conestoga Valley desk?
20  You just brought your own desk?
21      A.  They didn't have one available for me to
22  fit in the classroom.
23  Q.  Okay. All right. That's 12.
24      Girvin's other evaluation, the PDE form --

Page 181

1      A.  Yes.
2  Q.  -- you discussed the next day?
3      A.  Yes.
4  Q.  Did anything else happen on May 11th, the day
5  that you met with Buffington, Reinking and Girvin?
6      A.  I cleaned out my classroom. That was the
7  only other thing.
8  Q.  Okay. Did you have any other contacts with
9  anybody from Conestoga Valley?
10      A.  Just picking up my items, my desk and my
11  items that day. I wrote an apology letter, but that
12  was prior to the final evaluation date.
13  Q.  Okay. I'm talking about after you finished your
14  -- after you cleaned out your desk, you took your desk
15  and all that stuff.
16      A.  No.
17  Q.  Oh, after you cleaned out your desk on May 11th.
18      A.  Okay.
19  Q.  Girvin said this isn't the time to talk about
20  criticisms of Reinking, you went home?
21      A.  Correct.
22  Q.  Any other interactions or contact with anybody
23  from Millersville that day?
24      A.  Not that day.

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 182

1 Q. Okay. At some point did you and Reinking ever
2 discuss her memo "Unprofessional Behavior/Performance
3 in the Classroom"?
4   A. No.
5 Q. Okay.
6   A. Do you want me to turn to that one?
7 Q. Not yet. I'm just trying to get the setup here.
8   A. Okay. Sorry.
9 Q. Here's a copy of your third amended Complaint.
10 Take that. Go to page six, okay, paragraph 28. It
11 says "On or about May 4th, 2006 a CV representative
12 downloaded, without Plaintiff's permission, a
13 photograph and text from Plaintiff's private web page
14 at www.MySpace.com." Tell me how you know that.
15   A. That's what I was told.
16 Q. Okay. And who told you that?
17   A. Mr. Girvin.
18 Q. Do you know who the CV representative is?
19   A. Yes.
20 Q. Who is it?
21   A. Mr. Carly.
22 Q. And when did you find that out?
23   A. Just recently, on paperwork that I read.
24 Q. Okay.

Page 183

1   A. I did not know who the CV representative
2 was, but I knew that it was downloaded by a colleague
3 of Ms. Reinking's.
4 Q. Okay. When you say the photograph and text, am
5 I correct in understanding that it's the photograph
6 and the text on Snyder-10?
7   A. Yes.
8 Q. Okay. Are you aware if anybody from CV
9 downloaded and looked at any other -- of your other
10 web pages, if that's the right term?
11   A. Well, I didn't have any other web pages,
12 but the items on my web page on MySpace, I don't know
13 if they viewed anything else.
14 Q. Okay. So what you're saying, then, is that --
15 well, what you are saying is that Conestoga Valley's
16 decision to bar you from the school was based on
17 Snyder-10?
18   A. It was told, and it's in notes, that
19 that's the camel -- or the straw that broke the
20 camel's back.
21 Q. Okay. That wasn't my question. Are we talking
22 about any other web pages or photograph or text other
23 than what's on Snyder-10?
24   A. No. Sorry. I misunderstood you.

Page 184

1 Q. Yeah, I just --
2     MR. KRAMER: Off the record.
3     - - -
4     (Whereupon, a discussion was held off the
5   record.)
6     - - -
7 BY MR. KRAMER:
8 Q. This is a picture of you on Snyder-10. It's a
9 picture of you making a sort of peace sign with a cup?
10   A. Yeah.
11 Q. All right. And this was taken at a Halloween
12 party at some point?
13   A. No, it's a costume party.
14 Q. Costume party. Okay.
15   A. And the costume party took place in April
16 of 2006.
17 Q. Okay. What was in the cup?
18   A. A beverage.
19 Q. Well, was it a mixed drink?
20   A. Yes.
21 Q. Okay. A mix of what kind of drink?
22   A. I don't remember.
23 Q. Okay. Some kind of alcohol?
24   A. Correct.

Page 185

1 Q. Okay. Did you consider that the photograph was
2 your personal web page?
3   A. It was part of my web page.
4 Q. Okay.
5   A. It was -- basically the whole page was set
6 up the entire time as a way for me to communicate with
7 my other friends that are mothers or that don't have a
8 lot of time to meet with me one on one and I don't
9 have time to meet with them one on one, and it was our
10 way of communicating back and forth. So we would
11 share our pictures to one another and text to one
12 another, so we would know what each other, you know,
13 was doing in our lives.
14 Q. So I take it you consider the photograph and the
15 text as personal and private?
16   A. Yes. At that time you could not have a
17 private setting on your web pages. Now you can.
18 Q. But you certainly had no intention for anybody
19 other than your immediate friends to see it?
20   A. Correct.
21 Q. Okay. Go to the next paragraph, paragraph 29.
22 It says that "The text accompanying the photo
23 contained Plaintiff's personal thoughts and opinions."
24 Is that true?

Page 186

1    A.   Yes.
2    Q.   Okay. Let's talk about the text.
3    A.   Okay. Can I -- hold on, let me bring it
4    up here in front of me.
5    Q.   I'm sorry, yeah.
6    A.   Okay.
7    Q.   You told us Bree is a friend of yours?
8    A.   Yes.
9    Q.   Did Bree tell you which one of your students was
10   looking at the page?
11   A.   Yes, Brittany, who's a third block
12   student.
13   Q.   Okay.
14   A.   Brittany King.
15   Q.   Okay. At any time did you tell your students at
16   Conestoga Valley that you had a MySpace web page?
17   A.   No.
18   Q.   Do you know how Brittany found out you had a
19   personal web page?
20   A.   You can search anybody on there.
21   Q.   You don't know how she found out?
22   A.   No.
23   Q.   What did you mean, quote, and I don't say
24   anything that will hurt me (in the long run)? What

Page 187

1    does that mean?
2    A.   I guess I always critique what I say, and
3    that I felt that if anything on my web page was
4    questioned, that it wouldn't be anything that would
5    hurt me. I don't know why I added "in the long run"
6    in quotations (sic). It was just something I wrote at
7    the moment.
8    Q.   Okay. When do you write these? You write these
9    from your home computer?
10   A.   Oh, yes.
11   Q.   No, I'm not implying you're doing it at
12   Conestoga Valley. No, no, no. I'm just trying to...
13         And so you have -- anybody can have a
14   MySpace web page, and they're able to put on pictures,
15   whatever pictures they want?
16   A.   Correct.
17   Q.   Personal pictures, family photos?
18   A.   Correct.
19   Q.   Okay. How do you get, logistically, the picture
20   that you're holding in your hand to the web page?
21   A.   This was a digital photograph taken by my
22   best friend. She has a whole variety of pictures on
23   her own personalized site, where you need a name and a
24   password.

Page 188

1    Q.   Okay.
2    A.   I took the picture of that off there,
3    downloaded it onto my computer, copied it to a file,
4    put the file onto the MySpace.
5    Q.   Okay.
6    A.   In which it uploaded it and then put it on
7    my page.
8    Q.   All right. How do you get the text into your
9    MySpace page?
10   A.   Type it .
11   Q.   Okay. So in other words, you type it in as if
12   you're typing an e-mail, for example?
13   A.   Correct.
14   Q.   But you're typing it on -- directly onto the
15   MySpace page?
16   A.   Correct.
17   Q.   Okay. You then say, "Plus, I don't think that
18   they would stoop that low as to mess with my future."
19   What does that refer to?
20   A.   That if the students looked at anything,
21   that I don't think that they would say anything about
22   it anyways.
23   Q.   "They" here refers to students?
24   A.   Yes.

Page 189

1    Q.   How would students mess with your future?
2    A.   I don't know. It was just a general
3    thought that I had at the moment.
4    Q.   Okay. So you're saying --
5    A.   I had a lot of students that, in my mind,
6    I thought didn't like me, because I was strict and
7    firm.
8    Q.   I see.
9    A.   And we are all told stories as teachers or
10   upcoming teachers that there are MySpace pages or
11   Facebook pages that are generated by students to hurt
12   the teachers.
13   Q.   Oh, I see.
14   A.   Or that other things have happened to past
15   teachers because a student doesn't like them. So it's
16   always in the back of your mind as a teacher or an
17   upcoming teacher that, hey, these students might not
18   like you, they might have a vendetta, they might try
19   to do something. But that's -- that's what I was
20   implying by that. I don't think that any of my
21   students, as much as they might not have liked me,
22   that they would do something to mess with my future.
23   Q.   Okay. Then you write "I figure a couple
24   students will actually send me a message when I'm no

48 (Pages 186 to 189)

| Page 190 | Page 192 |
|---|---|

Page 190

1 longer their official teacher."
2 Did you consider yourself the students'
3 official teacher?
4 A. At that point, because I was in the
5 classroom all the time and Nicole was hardly in the
6 classroom. And while I wasn't a like school district
7 teacher, I was their teacher. Like they considered
8 Ms. Snyder their teacher, not Mrs. Reinking their
9 teacher. So yes.
10 Q. Did any student ever tell you that?
11 A. Well, they considered me their teacher.
12 Q. Okay. Because you were there in the classroom
13 full-time?
14 A. Yes.
15 Q. It then says "They keep asking me why I won't
16 apply there." Who is "they"?
17 A. My students.
18 Q. Which students?
19 A. All my students in all of my classes.
20 They would ask me, non-traditional and traditional
21 students, I can't think of every single one of their
22 single names, but a lot of them asked me, "Ms. Snyder,
23 why aren't you applying here? Are you going to get a
24 job here? Why not?"

Page 192

1 that, and that that is the reason I contacted
2 Dr. Wenrich about going into elementary education. I
3 felt that if I taught younger students, even under 7th
4 and 8th grade, that they might have more of a passion
5 for learning and that I could really grasp ahold of
6 them as students.
7 Q. Okay.
8 A. So I didn't really want to tell my
9 students that I was turned off by teaching --
10 Q. Because of them?
11 A. Yes.
12 Q. Because of them.
13 A. That would -- that would make it even
14 worse, and that would be unprofessional, to me.
15 So like I said before, it was misconstrued
16 by Mrs. Reinking that that was about her, and it had
17 nothing to do with her.
18 Q. Why didn't you tell her that?
19 A. I told her and she didn't believe me.
20 Q. Oh, okay. Got it.
21 A. Yes.
22 Q. I take it, then, that the experience teaching at
23 Conestoga Valley, separate and apart from the
24 administration not being happy with your performance,

Page 191

1 Q. Okay.
2 A. And then I go on with the rest of it.
3 Q. Okay. Well, "Do you think it would hurt me to
4 tell them the real reason (or who the problem was)"?
5 What are you referring to there?
6 A. Myself. I thought it would be
7 unprofessional to tell them the real reason why I
8 didn't want to be a secondary ed teacher anymore.
9 Q. And why was that?
10 A. Or at least a secondary ed teacher for
11 seniors. The experience that I had at CV, not the
12 administrators or the teacher's fault, but my contact
13 with the students, my interaction with the students,
14 was an eye-opening experience.
15 Q. How so?
16 A. I saw -- I got to see the side of seniors
17 -- or the side of senioritis that 7th and 8th grade
18 teachers don't get to see or that student teachers
19 normally don't get to see, where they're unmotivated
20 and they really don't care about the subject. And I
21 wanted to really teach students that cared about
22 school and they really wanted to be at school.
23 And I felt that I was a problem or I was
24 the problem, because I didn't wholeheartedly grab onto

Page 193

1 you didn't want to teach secondary education anymore?
2 A. I was still going to teach secondary
3 education; however, I was looking for a position in
4 the middle school, so I could have that experience.
5 Q. I see.
6 A. I would have turned down a position
7 teaching seniors, more than likely, due to my
8 experience; however, I still applied at the schools, I
9 still wholeheartedly would have gone for an interview
10 and talked to them about the position they had
11 available and obtained a position --
12 Q. Okay.
13 A. -- if it would have been in a middle
14 school level, because that's what I was looking for.
15 Q. When someone applies to a school district for a
16 job, do you apply for a specific grade, that is, would
17 you apply for 12th grade and only the 12th grade
18 opening, or how does that work?
19 A. Normally it will state in the paper
20 whether it's a middle school position or high school
21 position.
22 Q. Okay.
23 A. And if it does not state in the, you know,
24 the request, the school administrators will actually

Page 194

1  tell you at the interview what they're looking for.
2  Q. I see.
3  A. We have a 9th grade position open, we have
4  an 8th grade position opening.
5  Q. Okay.
6  A. That's what we were told at the seminar,
7  in January, that's how they will operate.
8  Q. Okay. Got it.
9  Did you ever have a conversation with Kim
10  Seldomridge?
11  A. No.
12  Q. Okay. How are you -- you allege that he got
13  involved somehow. Why do you believe that?
14  A. As far as I know, Dr. Huskin (ph), who's
15  the administrator, was not available at the time. I'm
16  not sure exactly why. But Dr. Huskin was not
17  available, so Kim Seldomridge was the next person in
18  line.
19  Q. Okay. But how -- how do you even -- how do you
20  know someone even went to Seldomridge to discuss what
21  was going on?
22  A. Just things I was told by Mr. Girvin
23  throughout that week. You know, this person took the
24  picture here, this person talked to this person. It

Page 195

1  was just basic background information that he gave me
2  to help me understand the situation.
3  Q. Okay. Were you speaking to Buffington at all
4  these days?
5  A. Buffington contacted me on Monday prior to
6  graduation.
7  Q. Right.
8  A. And she told me there was an issue with my
9  professionalism, that I was not allowed to come back
10  on school grounds.
11  Q. Did she say why?
12  A. Just that there was a question with my
13  professionalism.
14  Q. Okay.
15  A. That I was not allowed to come back on
16  school grounds. If I came back on school grounds,
17  that they would escort me away. And that my final
18  evaluation would be Thursday, during the prep period,
19  which is period four.
20  Q. Okay.
21  A. And I said I was sorry for whatever
22  happened. And I actually called her back right after
23  that and apologized again. And I was hysterical. I
24  was crying at that point. And I, you know, told her,

Page 196

1  "I'm sorry. I don't know what I did wrong." And I
2  said, "I will see you on Thursday." And that was the
3  last time I actually talked to Buffington.
4  Q. Okay.
5  A. For the exception of Thursday, of course.
6  Q. Okay. It says, on page seven of the Complaint,
7  if you could go there, at the top it says "Upon
8  viewing the photo and text, Buffington immediately
9  directed Reinking to draft a list of Plaintiff's other
10  allegedly 'unprofessional behavior' at CV."
11  Tell me how you know that.
12  A. Well, I didn't write this.
13  Q. Okay.
14  A. Mark did. But there is actually a
15  document within the items that are in his hands that
16  is an e-mail from Kim Seldomridge asking -- or
17  thanking Nicole for writing this document.
18  Q. Okay.
19  A. Which was after the fact.
20  Q. Okay.
21  MR. VOIGT: You mean from Buffington
22  thanking her?
23  BY MR. KRAMER:
24  Q. Right, I mean, here it says Buffington told

Page 197

1  Reinking to draft the list. I just want to know why
2  -- and if you have no personal information, say so.
3  A. I don't know, I just -- no, I don't.
4  Q. Okay.
5  A. That's what Mark wrote.
6  Q. I mean, I understand that lawyers talk with
7  their clients and write a Complaint, but I want to
8  know what your personal knowledge of the allegations
9  are. That's all.
10  So you don't -- you personally don't know
11  if Buffington directed Reinking to draft a list of
12  the, quote, unprofessional behavior?
13  A. I only know that from what's in the e-mail
14  response.
15  Q. Okay. Next paragraph it says "On March (sic)
16  8th, 2006, Buffington telephoned Girvin to express her
17  outrage over the 'Drunken Pirate' photo and text." Do
18  you have any personal knowledge of that?
19  A. Mr. Girvin told me that Buffington was not
20  happy at all.
21  Q. Okay. It then says "She told Girvin that
22  Seldomridge was involved in the matter and was very
23  upset." Do you have any personal knowledge of that?
24  A. No.

Page 198

1  Q.   Okay. It then says that "Girvin professed his
2  horror over the 'Drunken Pirate' incident and vowed
3  swift action against Plaintiff. He then informed Bray
4  and Wenrich of the incident." Do you have any
5  personal knowledge of any of those allegations?
6      A.   Just through items that are documented.
7  Q.   Okay. You called Girvin after Buffington called
8  you on that Monday?
9      A.   Yes.
10  Q.   At that point did Girvin have any knowledge of
11  what had happened at Conestoga Valley?
12      A.   He had knowledge of what happened. He
13  couldn't give me that knowledge. He couldn't go into
14  detail. I said to him -- he said, "Is there anything
15  you can think of that might be of issue?" And I said,
16  "Not really. I said, "I have a MySpace account, but
17  I didn't say anything about my students or staff
18  members," because we were told in the January meeting
19  we weren't supposed to do that. And I said, "I didn't
20  do that."
21          I said, "I don't understand what's going
22  on." I kept saying that over and over, "I don't
23  understand." Because, to me, what I wrote there had
24  nothing to do -- I wasn't putting anyone down. So I

Page 199

1  was trying to get some information from him, and he
2  said, "I can't talk about it today, but you're on the
3  right track." Meaning I was on the right track as far
4  as the MySpace account was concerned.
5  Q.   Did he actually say that?
6      A.   No, he said that on Tuesday.
7  Q.   Well, I'm not talking about the conver -- the
8  phone conversation you had with him on Monday, he said
9  he -- you said he couldn't give you any more
10  information, and what I want to know is, at that point
11  in time what did Girvin know about what had happened
12  at Conestoga Valley?
13      A.   That it had something to do with my
14  MySpace account.
15  Q.   Okay. And that's all you know?
16      A.   That's all I know that he knew.
17  Q.   Okay.
18      A.   If he knew any more, he didn't tell me.
19  Q.   Is it possible he didn't know anything else?
20          MR. VOIGT: Objection. Speculation.
21  BY MR. KRAMER:
22  Q.   I mean, he didn't imply he knew anything other
23  than what he told you, correct?
24      A.   He wouldn't tell me anything else. He

Page 200

1  said he couldn't tell me.
2  Q.   Okay. Did you have any -- okay. On Monday, the
3  8th of May, do you have any more conversations with
4  anybody from Conestoga Valley or Millersville?
5      A.   The 8th of May?
6  Q.   That Monday.
7      A.   I had a conversation with Buffington and I
8  had a conversation with Girvin.
9  Q.   Right. After you hung up with Girvin, do you
10  have any more conversation with anybody from
11  Millersville --
12      A.   No.
13  Q.   -- or Conestoga?
14      A.   No.
15  Q.   How about the next day, it says you spoke with
16  Girvin. This was -- was this a telephone
17  conversation?
18      A.   I wrote him an e-mail in the morning, and
19  I talked to him concerning the situation in the
20  afternoon.
21  Q.   Okay. And -- okay. Describe the conversation
22  with Girvin.
23      A.   I talked to him concerning my e-mail that
24  I sent him, that if it had to do with MySpace, you

Page 201

1  know, why were we allowed to have them, first. And I
2  said if my MySpace was an issue, why didn't someone
3  bring it up beforehand? Why did it happen Monday
4  before graduation? Why is it an issue now? I said to
5  him that he saw that I was making, you know, a
6  turnaround, that I had the best interests of the
7  students in mind. I said I don't understand where
8  this is coming from. It was all like very confusing
9  for me.
10          And that is when we talked about me
11  removing my MySpace account, and he said that would be
12  in my best interest. And within two hours after we
13  talked, it was gone. And he also told me that my
14  final evaluation would be on Thursday, that he didn't
15  know what Millersville was deciding as far as my
16  degree, that he would give me more information about
17  the meeting with Millersville on Thursday.
18  Q.   All right. Between that conversation on Tuesday
19  and the meeting on Thursday, did you have any
20  conversations or interactions with anybody at
21  Millersville?
22      A.   At Millersville, no. At CV, yes.
23  Q.   Tell me about the CV.
24      A.   I still had documents that I needed to

Page 202

1  grade for my students, and I couldn't get into the
2  classroom to get those documents. So I had e-mailed
3  Nicole -- or Nicole had e-mailed me and I e-mailed
4  Nicole back concerning the grades, concerning the
5  situation. I told her that regardless of the
6  circumstances, that I was looking forward to seeing
7  her on Thursday, that the text and the comments that
8  are in question had nothing to do with her, and I
9  assured her of that. And that was basically it. It
10  was basically all concerning the grades of the
11  students, the homework, and that type of information.
12  Q. Okay. How about after that, any more
13  conversations with anybody from Conestoga Valley that
14  day --
15      A. No.
16  Q. -- or the next day?
17      A. No.
18  Q. Let's talk about Reinking's memo "Unprofessional
19  Behavior/Performance in the Classroom."
20      MR. VOIGT: Want to just stretch your
21  legs? We've been at it for about an hour.
22          - - -
23      (Brief recess.)
24          - - -

Page 203

1  BY MR. KRAMER:
2  Q. Page seven of your Complaint. I think you just
3  had that. Turn to page seven.
4      Paragraph 33, if you'd read paragraph 33
5  and just tell me if you have any personal knowledge of
6  the allegations.
7      A. "On or about May 10, 2006, Wenrich, in her
8  individual capacity, interviewed Buffington and Girvin
9  about 'Drunken Pirate' incident. Buffington explained
10  that the incident was the straw that broke the camel's
11  back regarding Plaintiff's unfitness to teach. She
12  demanded MU deny Plaintiff her BSE and teaching
13  certificate forthwith."
14  Q. Other than documents you may have seen, do you
15  have any personal knowledge of what's alleged here?
16      A. From what other people have told me, yes,
17  that's -- and the documents.
18  Q. Okay.
19      A. That was the only way.
20  Q. You weren't present at the conversations
21  described --
22      A. No.
23  Q. -- here?
24      What did other people tell you?

Page 204

1      MR. VOIGT: Other than what we may have
2  discussed, because that's privileged.
3      THE WITNESS: Yeah, other than the
4  documents that we have discussed --
5  BY MR. KRAMER:
6  Q. Yeah, I don't --
7      A. -- I was told by Girvin that she was
8  upset, that that was the final straw.
9  Q. Okay.
10      A. It wasn't in these exact words, but he
11  implied the same thing as what's on the documents that
12  we have.
13  Q. Okay. I don't want to know, and you can't tell
14  me, if Mark told you something. So when I say what
15  did anybody tell you, I'm talking about the other
16  actors.
17      A. Okay.
18  Q. I don't want to know what Mark said.
19      A. Okay.
20  Q. It says "She demanded MU deny Plaintiff her BSE
21  and teaching certificate forthwith." Again, you have
22  no personal knowledge of that other than what you may
23  have seen in documents or what Mark may have told you?
24      A. Correct.

Page 205

1  Q. Okay. Turn the page. Paragraph 35, sentence
2  says "Upon reading Plaintiff's letter, Buffington gave
3  a note to Girvin, Wenrich and Bray, again expressing
4  her fury over the 'Drunken Pirate' incident."
5      Other than documents you may have seen, do
6  you have any personal knowledge of that?
7      A. Not other than the documents I've seen.
8  Q. Okay. "She emphasized that if Defendants did
9  not deny Plaintiff her BSE in teaching degree, CV may
10  not permit future MU student teachers to perform their
11  internships there."
12      Again, have you personal knowledge other
13  than what you may have seen in documents?
14      A. No, only what I've seen in documents.
15  Q. Okay. Turn to the next page, page nine.
16  Paragraph 40, it says "Reinking, Buffington and Girvin
17  then gave Plaintiff's" -- "then gave Plaintiff
18  Reinking's list of Plaintiff's other allegedly
19  unprofessional behavior."
20      Did they give you a document? And I'm now
21  talking about the document that's next in your packet.
22      A. This one. (Indicating.)
23  Q. Yeah. Did they hand that to you or -- is that
24  the document you're referring to in these allegations?

Page 206

1    A.  Yes, they actually did.
2  Q.  Okay.
3    A.  I think I said before that she didn't give
4  it to me before -- she didn't print it out and hand
5  that to me prior to me being kicked out, but she did
6  hand it to me at that point.
7  Q.  Okay. "She" meaning Buffington gave it to you,
8  or Reinking?
9    A.  One of them.
10  Q.  Okay.
11    A.  I can't remember which.
12  Q.  Okay.
13        MR. KRAMER: Let's call it Snyder -- where
14  are we?
15        COURT REPORTER: 13.
16  BY MR. KRAMER:
17  Q.  And we're going to go through this quickly,
18  because much of it we've been through before.
19    A.  Okay. Should I put this away?
20  (Indicating.)
21  Q.  Yeah, you're done. Yeah.
22    A.  Okay.
23  Q.  I'm now looking at Snyder-13. We talked about
24  this already. A couple of questions that I didn't ask

Page 207

1  before. Had you listened to this -- this is a song by
2  Ben Folds?
3    A.  Ben Folds, yeah. I listened to the song
4  previously and I did not hear the profanity in the
5  end, but the word that's in the song that she took --
6  or that she skipped over was the word "ass."
7  Q.  Okay. When had you heard the song before?
8    A.  It was on a CD that I played normally, but
9  I didn't play every single song all the time.
10  Q.  Okay. Did you apologize to Reinking?
11    A.  Yes.
12  Q.  Okay. Tell me what she said in your
13  conversation?
14    A.  She told me that it was inappropriate for
15  me to play music with swear words in it, and I told
16  her that I was sorry and that I would refrain from
17  playing music, and if I did play music I would make
18  sure that I checked all music before I played it in
19  class, and which I did.
20  Q.  What was the purpose of playing a song?
21    A.  Normally we would play music, especially
22  tapes or CDs that the students were familiar with, to
23  kind of get their mind flowing when they were doing
24  creative writing or writing assignments in class.

Page 208

1  Normally it wasn't like really loud. It was just on a
2  little bit for background music.
3  Q.  Right.
4    A.  That they could kind of get into the music
5  or get into the beat of the music and kind of get
6  their juices flowing. Their mental juices.
7  Q.  So the song was background music --
8    A.  Correct.
9  Q.  -- basically? Sort of Muzak in elevators?
10    A.  Correct.
11  Q.  Did you use this song in any lesson plan?
12    A.  No.
13  Q.  Okay.
14    A.  It was just a -- one of the -- one of the
15  students actually knows Ben Folds, who was one of my
16  favorite artists, and so I picked that CD and we put
17  it in. And that was how we picked that individual CD.
18  Q.  Okay. Let's go to the next point on Reinking's
19  document. Tell me what happened on Valentine's Day,
20  or the day after Valentine's Day?
21    A.  Came into class, this is the third block
22  class, and my students asked me, "Well, Ms. Snyder,
23  what did you do for Valentine's Day?" And I said --
24  it's my first instance where I was actually questioned

Page 209

1  by my students about something personal in my life,
2  and I was kind of like, oh.
3        I said I went to Damon's Grille, I went
4  with my boyfriend and my kids. And I ran into my
5  ex-husband, of all places, and we decided it wouldn't
6  be best if we ate there. So we left and we got pizza
7  at a pizza place. They asked me if I got any gifts,
8  and I told them I got a lion and a bear holding a
9  dandelion. And after that, went right into the class
10  as normal, went through the class.
11        And not only Girvin, but Reinking yelled
12  at me for telling my personal information to the
13  students, that that was inappropriate.
14  Q.  They yelled at you or they --
15    A.  They were very stern and they said that I
16  shouldn't tell my personal information to the
17  students.
18  Q.  And when did they tell you that?
19    A.  After class.
20  Q.  Okay.
21    A.  And it was also in one of the documents
22  that -- in Girvin's document for that class
23  observation, he wrote it on that as well.
24  Q.  Did you apologize to Girvin and Reinking for

Page 210

1  that?
2      A.   Yeah.
3  Q.   Okay. We talked about "Shut up," we talked
4  about "Shut up," so we don't need to do it again.
5          She said that she twice warned you not to
6  have -- she warned you about having a MySpace account?
7      A.   That's ridiculous. That is the most
8  fabricated thing on that page.
9  Q.   Not true?
10     A.   Not true.
11  Q.   Okay.
12     A.   I'm sorry. I'm wholeheartedly upset that
13  she would even say that.
14  Q.   Okay. You said that in the January 2006 student
15  teacher meeting somebody told you about, I guess, web
16  pages? Tell me what they said and who said it.
17     A.   I believe it was Reinking -- I mean, it
18  was Wenrich, sorry, when she was up speaking in front
19  of everyone, and she said, you know, if you have a
20  personal web page, be careful what you put on the web
21  page. She told us about a past student who said some
22  very hostile things about the person -- the principal
23  of the school in which they were student teaching.
24  And she said don't put anything personal about your

Page 211

1  students or personal information about your
2  cooperating teacher. Don't make that move, because
3  you'll end up like the other student that got removed
4  from their placement.
5          So the entire semester, even in that blog,
6  I didn't mention anything about my students
7  personally, their names or anything bad about my
8  students, and I didn't mention anything about Nicole
9  at all.
10  Q.   Reading the text of the posting now, do you see
11  how Reinking might think it was about her?
12     A.   Yes, but she never asked me personally
13  about it.
14  Q.   What do you mean?
15     A.   When -- like when she viewed the text or
16  even the picture, she never confronted me about it.
17  She never came up to me and said this is inappropriate
18  or had a meeting between Girvin and I. She basically
19  took this information and went right above me and
20  didn't even ask me what it meant or why I did it or
21  that I should remove it. None of that happened.
22  Q.   Okay.
23     A.   So the reading it, anybody could read it
24  for what it's worth. It's ambiguous. I mean, all

Page 212

1  text is ambiguous. But she took it for what she
2  wanted to take it for and never asked me personally
3  what it was about.
4  Q.   Okay. On that -- in the text I don't even see
5  Conestoga Valley referenced.
6      A.   No, nothing. Nothing.
7  Q.   Okay. And I don't see Millersville referenced
8  either, correct?
9      A.   No, you're correct.
10  Q.   Okay. I'm going to assume that you're going to
11  say you never encouraged any of your students to look
12  at your MySpace account.
13     A.   Correct. The item right here that is on
14  the sheet, though, however, "On Friday, May 5th,
15  during class, Ms. Snyder asked a few students," that
16  did happen. It wasn't a few students. It was
17  Brittany King, the one that talked to Brianne, my best
18  friend. I will not deny that that did happen. And I
19  said to that student it is unprofessional, it is not
20  needed to contact your teacher's friends outside of
21  school hours.
22  Q.   Wait, are you saying that Brittany contacted
23  your friend Bree?
24     A.   Brittany saw Bree at a tanning salon and

Page 213

1  said, "Aren't you Ms. Snyder's friend?" That's
2  what --
3  Q.   How would she know that?
4      A.   (Indicating.)
5  Q.   Okay.
6          MR. VOIGT: Indicating you don't know?
7  BY MR. KRAMER:
8  Q.   Yeah, I mean, I'm just --
9      A.   Indicating that either she was on my web
10  page and found Bree that way or she saw me out with
11  her someplace before.
12  Q.   Okay. Was there a picture of Bree on your web
13  page?
14     A.   Yes. You have a friends list, and your
15  friends -- normally on a MySpace page it will be your
16  page, and at the very bottom of the page on the
17  right-hand side will be a list of your friends with
18  their pictures.
19  Q.   Okay.
20     A.   And I asked her and I told her that that's
21  not appropriate, that you do not contact or confront
22  your teacher's friends.
23  Q.   Okay.
24     A.   And that was the end of the conversation.

54 (Pages 210 to 213)

Page 214

1  That was the only time I mentioned MySpace at all.
2  Q. Okay. Can I safely assume you didn't intend any
3  of your Conestoga Valley students to see your MySpace
4  account?
5  A. Correct.
6  Q. Okay. Can I safely assume you didn't intend any
7  of the Conestoga Valley administrators or other
8  teachers to see your web space?
9  A. Correct.
10  Q. Reinking says you went above her for some issues
11  and you -- we earlier discussed you getting a key to
12  the room.
13  A. Correct.
14  Q. Were there any other issues, as far as you
15  recall, that concerned Reinking, that pissed her off?
16  A. Well, the one issue she was present and so
17  was the reading teacher, Mrs. Barnett. I can't
18  remember her first name. The two teachers and then
19  Mrs. Buffington were present in her office, and I
20  asked Mrs. Buffington, because I was curious, whether
21  or not student teachers were allowed to come back
22  after they graduate from college just to observe the
23  classrooms and to see the students finish out the
24  remainder of the year until they graduate. And that

Page 216

1  dress down as well.
2  Q. Okay.
3  A. One half day, Nicole was actually absent
4  that day, but she came in in the afternoon. We had a
5  half day, and it was only senior presentations that
6  day. It was also St. Patrick's Day, so we were
7  celebrating that. A lot of the teachers were not
8  wearing their regular attire. They were dressing --
9  Q. In green?
10  A. -- to celebrate the occasion. I wore
11  green flip-flops, and she had told me that I was not
12  adhering to the dress code by wearing flip-flops, and
13  I did not wear them after that point. I didn't even
14  wear sandals as it was getting warmer, because I was
15  afraid I was gonna get yelled at for what I was
16  wearing.
17  Q. And she said you were eager to wear jeans?
18  A. On dress-down days.
19  Q. Just on dress-down days. Okay.
20  A. Yeah, we were allowed to wear jeans on
21  dress-down days. So of course I was eager if I didn't
22  have to dress up as a teacher, but...
23  MR. KRAMER: Okay. Mark this. That's 13.
24  - - -

Page 215

1  was my only question. I was just very curious. I
2  wanted to see how the students did, especially with
3  like their final exams and things like that. And with
4  Nicole present, I didn't think I was going over her
5  head, but she assumed I was going over her head in
6  that instance.
7  Q. Since May 2006 have you spoken to any of your
8  Conestoga Valley students?
9  A. I ran into Andrew Eterline (ph), who's one
10  of my third block students, at Target. He asked me
11  how I was doing. I said fine. I said, "Are you doing
12  good in college," because he was going to Penn State.
13  I ran into another one of my female students, I forget
14  where, it was at like another mall or something like
15  that. I said "Hi" and quickly walked away.
16  Especially because of things that have happened, I
17  really did not want to get in a conversation with them
18  about the litigation.
19  Q. Okay. All right. She said -- Reinking said
20  that you wore flip-flops and dressed down.
21  A. We had dress-down days, which were
22  approved by the faculty. We actually went to a
23  specific person that's in charge of dress-down days
24  and asked them if it was okay for student teachers to

Page 217

1  (Whereupon, Exhibit Snyder-13 was marked
2  for identification.)
3  - - -
4  BY MR. KRAMER:
5  Q. Let's just mark that as Snyder-14. This is the
6  document -- did you write this document? This is the
7  one starting "Dr. Bray."
8  A. For the appeal meeting I took the
9  evaluations that I completed for the classroom
10  teachers, the lyrics to the song, in addition to the
11  responses to each one of the behaviors or the
12  misbehaviors listed --
13  Q. Right.
14  A. -- by Mrs. Reinking, and I wrote this all
15  out for Dr. Bray, so she could read it before she made
16  her decision at the appeal hearing. I thought it was
17  important to explain each one of those points in
18  detail, because just seeing this list wouldn't give
19  her an explanation. In addition to that, my doctor
20  wrote a formal note saying that my appointment was
21  switched, to back up the last thing on the list.
22  Q. Okay. Did you give this document, Snyder-14, to
23  Dr. Bray?
24  A. Yes.

Page 218

1 Q. Did she keep it?
2 A. Yes.
3 Q. Okay. Let's go to the next document. This is
4 -- you can skip that one. And that, you can skip.
5 MR. KRAMER: Okay. The e-mail from you to
6 Barry Girvin mark as next.
7 - - -
8 (Whereupon, Exhibits Snyder-14 and
9 Snyder-15 were marked for identification.)
10 - - -
11 BY MR. KRAMER:
12 Q. Did you write this e-mail?
13 A. Yes.
14 Q. On or about May 9th?
15 A. Yes. I wrote it in the morning, and I
16 spoke to him in the afternoon. That's when he
17 actually told me it was about the MySpace account.
18 Q. And what was your point in writing this e-mail?
19 A. I mean, I even say at the top like I was
20 confused, I have emotions. I was trying to get across
21 to him how I was feeling and things I was thinking,
22 and I told him that I didn't -- I wanted to clarify
23 everything that I was feeling without making anyone
24 angry.

Page 219

1 And it's that I wanted to vent with
2 somebody that knew the whole situation, exactly what I
3 was -- what I have gone through the whole semester,
4 the transition I did make, and I felt that the person
5 that I needed to talk to about this was Mr. Girvin,
6 because he was in the middle of everything.
7 Q. Did you feel that he was essentially on your
8 side during this whole thing, or supporting you?
9 A. Yes.
10 Q. Okay. The second paragraph and the third
11 paragraph relate to some duties that you still need to
12 complete.
13 A. Correct.
14 Q. Are those the duties and tasks that Nicole
15 Reinking finished up for you?
16 A. They were the things that were given to
17 me. I was actually able to retrieve these items, the
18 60 journals and the packets, Mr. Girvin brought them
19 to me, so I could finish -- so I could finish grading.
20 And -- but most of the work the students really didn't
21 hand in, since I wasn't there anymore, and caused them
22 to go into failing grades, because the journals and
23 the packets were a high percentage of their grade.
24 Q. Okay.

Page 220

1 A. And I did not know how I was going to get
2 all of this done, because normally, in the classroom
3 watching -- observing Nicole, I had two periods of
4 over 100 -- or about 100 minutes that I was able to
5 work on these items. And with me being at home and
6 the documents being at school, there was no way for me
7 to work on them. So that was what these two messages
8 -- or the two paragraphs were about.
9 Q. Okay. A couple of paragraphs down, "Lastly, is
10 there a way that I can request that no one is placed
11 with Mrs. Reinking again."
12 Those are -- and you talk about a negative
13 experience most of the semester. Pretty strong words.
14 What's -- why was there -- I mean, what experience was
15 so negative about the semester?
16 A. I actually got a chance to talk to some of
17 my other peers that were doing student teaching
18 placements by that point, and I told them how much I
19 was teaching in the classroom and the amount of work I
20 was doing. It was almost like I was the teacher and I
21 was placed in this situation so she would not have to
22 do the work. That's how it seemed.
23 And I was having a lack of communication
24 and I felt very frustrated, and I told him. You know,

Page 221

1 where it says "I only mentioned a small part to you,"
2 that is what I was referring to, that I had talked to
3 him.
4 And I didn't want to have another student
5 go through those negative experiences, mainly the
6 second part of the year, where I was having the
7 negative experiences. But I didn't want another
8 student to go through that if she was inexperienced as
9 a cooperating teacher. And if she was an experienced
10 cooperating teacher and it wasn't a problem, then
11 that's fine. But from the experience I had and from
12 me getting kicked out of my placement and there --
13 there was no meaning. There was nothing to justify
14 the situation prior to me just getting kicked out. So
15 that was, you know, a main part of it.
16 Q. But I guess what I understand is -- you're
17 referring to a negative experience most of the
18 semester. Is that referring to you feeling
19 overburdened with work?
20 A. No, I mean, that's part of the job. I
21 mean, part of teaching is being overburdened with
22 work. Let me see here. Let me go through it.
23 Q. Take your time, read that paragraph.
24 A. "That no one is placed with Ms. Reinking

| | Page 222 | | Page 224 |
|---|---|---|---|
| 1 | again. I can rate you as a supervisor, but I was | 1 | A. About two hours later. |
| 2 | never able to rate her as a co-op." You can rate your | 2 | Q. All right. Tell me about that conversation with |
| 3 | supervising teachers from Millersville, but you can | 3 | Barry on May 9th. |
| 4 | never rate your cooperating teacher at the school | 4 | A. Well, it was mainly for clarification. |
| 5 | district. | 5 | And he finally told me that it was the web page, like |
| 6 | Q. Okay. | 6 | I said; and it was the caption and the photo, and "the |
| 7 | A. So I never really could evaluate Nicole | 7 | caption" meaning Drunken Pirate, and then the text of |
| 8 | and give her a rating for future supervisors at | 8 | the blog, all three coupled together, that Buffington |
| 9 | Millersville. There was no way for me to do that. "I | 9 | was furious about it, that she contacted Millersville, |
| 10 | don't know how you feel about this, but I had a | 10 | that Millersville doesn't know what they were going to |
| 11 | negative experience most of the semester; I only | 11 | do at that point, if they were going to give me a |
| 12 | mentioned a small part to you." And that was the | 12 | diploma or if they were going to give me nothing. |
| 13 | miscommunication. | 13 | I said, "Would it be in my best interest |
| 14 | Q. Okay. | 14 | to get rid of my MySpace page?" And he said, "Yes, |
| 15 | A. The other negative aspects were, you know, | 15 | you're on the right track." And I got rid of the |
| 16 | the feedback, that I wasn't getting the feedback, that | 16 | MySpace page within two hours. |
| 17 | I felt I was lagging in the beginning of the semester | 17 | Other than that, it was all like "I'll |
| 18 | and I felt that if I was with an experienced co-op | 18 | give you more information on Thursday," concerning the |
| 19 | maybe that would have been a little bit better of an | 19 | Millersville meeting and what we would be doing later |
| 20 | experience. | 20 | in the week -- or, I'm sorry, the Conestoga Valley |
| 21 | "I don't want another student teacher to | 21 | meeting and then what we would be doing later in the |
| 22 | have to go through this. I am sorry that I didn't say | 22 | week with Millersville. |
| 23 | something sooner, and maybe there is nothing I can do | 23 | Q. Okay. Did Buffington tell Girvin or anybody |
| 24 | about it now." Meaning maybe I should have said | 24 | else at Millersville to fail you in the student |

| | Page 223 | | Page 225 |
|---|---|---|---|
| 1 | something before midterm. Maybe I should have said | 1 | teaching course, do you know? |
| 2 | something at the beginning of the semester and then at | 2 | A. Well, the school district gave me an |
| 3 | the middle of the semester and then towards the end. | 3 | unsatisfactory and Girvin has to give me an |
| 4 | Q. Okay. | 4 | unsatisfactory. |
| 5 | A. But I didn't. | 5 | Q. Where does the -- where does the school district |
| 6 | Q. Okay. So just summarizing, the general | 6 | give you an unsatisfactory, on what piece of paper -- |
| 7 | experiences with Reinking were lack of communication | 7 | A. Nicole Reinking gave me an unsatisfactory |
| 8 | with Reinking -- | 8 | on my final evaluation. |
| 9 | A. Lack of experience. | 9 | Q. I see. So -- |
| 10 | Q. Her lack of experience. | 10 | A. And I was informed -- |
| 11 | A. And my lack of experience. | 11 | Q. I got it. |
| 12 | Q. And your lack -- right. And that's -- I mean -- | 12 | A. -- that if Nicole Reinking gives me an |
| 13 | and forgetting for a moment the drunken pirate part at | 13 | unsatisfactory, that Barry Girvin has to give me an |
| 14 | the end -- | 14 | unsatisfactory, then the PDE-340 has to have an |
| 15 | A. Correct. | 15 | unsatisfactory on it, which causes me to fail |
| 16 | Q. -- that's what you refer to here? | 16 | entirely. |
| 17 | A. Correct. | 17 | Q. Okay. |
| 18 | Q. The experience and the communication, that's the | 18 | A. Or get the withdraw. |
| 19 | negative experience? | 19 | Q. Okay. Got it. So the -- and the evaluation |
| 20 | A. Correct. | 20 | that you're referring to, Reinking's evaluation, is |
| 21 | Q. Okay. That's all I wanted to know. | 21 | the final evaluation that we talked about earlier |
| 22 | Did he respond to this e-mail? | 22 | today? |
| 23 | A. No, because we talked two hours later. | 23 | A. Yes. |
| 24 | Q. Okay. | 24 | Q. Okay. Let's talk about the next document. This |

1 is the apology letter. This is 16. Do you have that,
2 Ms. Snyder?
3     A.    Yes.
4 Q.   Okay. You -- it says here you sent this to
5 several people, Reinking, Girvin, Buffington, Wenrich,
6 Bray, and Seldomridge.
7     A.    Yes.
8 Q.   Why did you write this?
9     A.    I felt that -- I wrote it for two reasons:
10 One, I was very upset about the situation. I felt
11 that what I did, what I had posted on my web page, did
12 not interfere with the stuff that I did previously as
13 a teacher, the turnaround I made, the things I did for
14 the students. But I wanted to apologize.
15         Even though I didn't totally agree with
16 how they viewed the situation and the picture and the
17 text, I still wanted to apologize for it. My mom
18 always taught me to respect my elders, and most of the
19 people there were my elders, and I apologized to them
20 for something that I did wrong.
21         But I also went through everything that I
22 did at Conestoga Valley for the members of
23 Millersville, so they were able to see that I did make
24 an impact on these students, that I did try, and that

1 I was responsible as a teacher.
2 Q.   Okay.
3     A.    And I did write it while I was bawling my
4 eyes out.
5 Q.   Okay. Rereading this, is everything you say in
6 here true and accurate?
7     A.    (Pause.) Yes. I didn't want to hurt
8 anyone. I wanted to also present the positive
9 experiences that took me through student teaching and
10 the extra things that I did above and beyond my
11 teaching experience. I did not have to go and help
12 out with events or go to the school plays or go to the
13 sporting events to see my students, but I did that,
14 because the teachers I always had in high school or in
15 college were more involved with their students than
16 just on the surface, and that's what I felt that I
17 needed to do as a student teacher to succeed as well.
18 Q.   Okay.
19     A.    So, yes.
20 Q.   The center paragraph says you had a -- you've
21 had a rewarding, eye-opening experience at Conestoga
22 Valley High School. Does that refer to anything
23 specifically, or just it was an experience that you
24 learned from?

1     A.    Yeah, exactly. I mean, I think that was
2 the reward, that when I went into the semester I was
3 naive and I thought I knew everything as a teacher, in
4 which I didn't, and I did learn a lot. Even though it
5 was difficult and the experience was negative at
6 times, I still learned things. And it was still
7 rewarding, because I got the chance to teach 90
8 students to 120 students, if you want to take all the
9 classes or all the students that I taught. I had a
10 chance to teach that many students and to help them.
11 Q.   Okay.
12     A.    And help them pick out colleges or help
13 them, you know, get an A instead of a C. And that was
14 the biggest reward in itself, even though I wasn't
15 there the entire time. I was there for 14 weeks of it
16 to actually help the students.
17 Q.   Okay. The first paragraph says "I know that
18 this incident has challenged all of you and myself as
19 well." What are you referring to there?
20     A.    The incident of me being removed from the
21 school.
22 Q.   Okay. That's all for this.
23             - - -
24         (Whereupon, Exhibit Snyder-16 was marked

1 for identification.)
2             - - -
3 BY MR. KRAMER:
4 Q.   Okay. Let's mark this next. This is -- and
5 we're just about at the end -- the Request for
6 Exception to Graduation Requirements. I think there
7 are several pages, if you would look at that. Tell me
8 how this came -- how this document came about.
9     A.    After I met with Girvin and Wenrich --
10 well, I met with Girvin and Wenrich, and Girvin had
11 left after he went over the final PDE-430 Form. And I
12 was talking with Wenrich, we had a conversation
13 concerning classes, and I was not able -- I'm not --
14 still not able to take any education classes at
15 Millersville the rest of my life. That's what I was
16 told.
17 Q.   Who said that?
18     A.    That's what I was told from Wenrich. And
19 I said, "I can't even take elementary education
20 courses?" And she said, "No." And I even appealed
21 that in the appeal meeting.
22         However, we talked about those items. I
23 talked to her about graduation and walking and whether
24 they would state that I was graduating with a

1    Bachelor's in Secondary Education or Bachelor of Arts
2    as I walked across to grab my diploma. I said I don't
3    want the -- my peers knowing that this happened,
4    because I was embarrassed. So I asked her will they
5    announce BSE or BA, and she said that they will have
6    BSE cataloged in the flyer that they handed to
7    everyone.
8    Q. What's the fire?
9        A. Well, the -- oh, the flyer that they
10   hand --
11   Q. Oh, flyer.
12       A. Yeah, flyer.
13   Q. I thought you said fire. Sorry.
14       A. No, the flyer that they hand to all the
15   guests attending the graduation. And the actual slip
16   that they read as we walk across is handwritten and we
17   tell them what we're graduating with. So they would
18   state Bachelor's of Secondary Education.
19       She said that I would need to go to
20   Schneller and have her sign this document. Because I
21   was a BSE, I took other credits. When you're a
22   Bachelor of Arts student, you have to take additional
23   gen eds -- I'm sorry.
24   Q. General education?

1        A. Strike that.
2    Q. Oh, I'm sorry.
3        A. You don't have to take general education
4    credits. You have to take additional English credits,
5    and you would have that option, writing or print
6    journalism. You would have some type of option when
7    you're a Bachelor of Arts student.
8        Since I was a secondary ed, those other
9    credits that I obtained would qualify me for the
10   option; however, I did not have enough credits for the
11   actual English portion of the degree.
12   Q. Okay.
13       A. Because I had education credits instead.
14   Q. All right.
15       A. So I had to have Dr. McCollum-Clark sign
16   this -- I'm sorry, Dr. Schneller sign this, and then
17   they had Dr. McCollum-Clark sign it afterwards,
18   because you need your advisor's signature for
19   anything. And I don't think Dr. Bray or Dr. Wenrich
20   had to sign it, but they enforced me getting it signed
21   by the English department.
22   Q. Okay. Your conversation with Wenrich you
23   described a little bit. Anything else about that
24   conversation that you remember?

1        A. We went over, obviously, the PDE-430 Form,
2    and she sat there and told me about that. She told me
3    about the response.
4    Q. And, you know, I don't remember if this is an
5    exhibit, but let's -- this is the PDE-430.
6                  - - -
7            (Whereupon, Exhibits Snyder-17 and
8        Snyder-18 were marked for identification.)
9                  - - -
10   BY MR. KRAMER:
11   Q. I'm sorry, continue.
12       A. She spoke with me about how the caption
13   and the text and the other incidents affected my
14   graduating and that Dr. Schneller, and I'm not sure if
15   she said herself or Dr. Bray, but there was another
16   person involved, decided I would have a Bachelor of
17   Arts instead of nothing. And like I said before, that
18   I would have to get this signed.
19   Q. Okay.
20       A. Main part of the meeting, though, was the
21   PDE-430, going over that and deciding whether I was
22   going to graduate or not.
23   Q. And the PDE-430 is the form that Girvin fills
24   out?

1        A. Correct.
2    Q. Okay. And that's the one in front of you --
3    well, you may have passed it. It's in there
4    somewhere.
5        A. Yeah, we passed through it already. This
6    one? (Indicating.)
7    Q. Got it. That's Snyder-18.
8        Did you and Girvin discuss the PDE-430 in
9    -- at any time?
10       A. We discussed it in that meeting with
11   Wenrich.
12   Q. Okay. Got it. Okay. And they presented to you
13   the information in here, and did you have any response
14   to this?
15       A. No.
16   Q. No. Okay. You just listened to what they were
17   saying?
18       A. Yep. Yes. I'm sorry.
19   Q. On the exception to graduation requirements
20   documents, Snyder-17, it sounds like this was just a
21   document that you and others had to sign off on to
22   transfer -- to transfer your -- sorry, to change your
23   BSE to a BA?
24       A. Correct.

Page 234

1 Q. And this is just the paperwork that --
2 A. Correct.
3 Q. -- Millersville needs to get through?
4 A. Yes.
5 Q. Okay. You later appealed the decision to Bray?
6 A. Yes. I told Wenrich on Friday that I was
7 going to appeal the decision.
8 Q. All right.
9 A. And I set up a meeting in Dr. Bray's
10 office for the following Monday after graduation.
11 Q. And who attended that meeting?
12 A. Dr. Wenrich, Dr. Bray, and my mother, and
13 myself.
14 Q. And how did that go down? What happened in that
15 meeting?
16 A. Dr. Bray said that my mother was the most
17 calm parent that ever stepped foot in an appeal
18 meeting and that I should be applauded, because I was
19 the -- I was the person closest to graduation to lose
20 their degree.
21 MR. VOIGT: Do you want to take a minute?
22 MR. KRAMER: Yeah, take a -- let's go off
23 the record.
24 - - -

Page 235

1 (Brief recess.)
2 - - -
3 BY MR. KRAMER:
4 Q. Can you finish that, then?
5 A. Well, she just said that I was -- I was
6 the person closest to graduation to ever lose their
7 degree, like it was an award or something. And we
8 went through the documents and the things in question,
9 and then I gave her my responses to what -- Nicole's
10 list, or Reinking's list.
11 Q. That's the document we spoke about?
12 A. Yes. And Dr. Wenrich asked me what my
13 philosophy of teaching was, and I had to go through
14 that. And she asked me if I still would want to teach
15 elementary education, like go through those classes,
16 and I said yes. I said I'd like the opportunity to
17 take classes here at Millersville for elementary
18 education. And she also asked me if I ever thought
19 that this would affect my students or their parents,
20 what I wrote in my -- on my web page.
21 And it was a lot of asking me questions on
22 how I felt about the situation and the outcome of what
23 happened. And they said that they would look over all
24 the paperwork, that they would decide what was going

Page 236

1 to happen, they would send me a letter.
2 Q. All right. What paperwork did they have that
3 they reviewed?
4 A. I guess paperwork from Conestoga Valley
5 that I didn't see and the document itself, the caption
6 underneath the picture and then the text of the blog.
7 Q. Right.
8 A. And then Nicole Reinking's list of the
9 unprofessional things and then my response to them.
10 Q. Okay. Do you know if they also considered the
11 midterm evaluations?
12 A. Yes.
13 Q. Do they also consider the final evaluations,
14 that is, the -- let me finish -- the one by Girvin,
15 the one by Reinking and the PDE-430?
16 A. Yes.
17 Q. Okay. Do you know if they considered the
18 various, I guess, notes that we spoke about that
19 Reinking was taking, you know, her observations of --
20 A. I don't know.
21 Q. Excuse me. Of you.
22 A. I don't know.
23 Q. Okay. How about, do you know if they considered
24 Girvin's comments on his eight observations that he

Page 237

1 did of you?
2 A. I believe so, yes.
3 Q. Okay. We're going to make this the next
4 document. We'll make these two together. This is
5 your CV and a cover letter. Proposed CV and a
6 proposed cover letter.
7 Are these -- whose comments are these on
8 here?
9 A. These are Nicole's. I didn't actually
10 know that she took a copy, made a copy of these, but
11 they're my -- it's my resume and my cover letter that
12 I was going to hand in to Deann Buffington.
13 Q. Okay.
14 A. And I asked her to look it over and look
15 for any mistakes. I told her I wrote it very quickly
16 and there might be mistakes, because it was right
17 around the time that I was making my lesson plans; and
18 I had a lot of things to do, but I also wanted to make
19 this a priority, because I had to apply at schools as
20 well.
21 Q. Right.
22 A. So I said, "I wrote it quickly. Can you
23 please look over it?" I didn't know, like I said,
24 that she made copies of it. But the first thing's my

60 (Pages 234 to 237)

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 238

1 resume, and the bottom document's my cover letter.
2 Q. Okay. So -- but you had asked her to review
3 your cover letter and your CV?
4 A. Yes. Yes. And she actually let me see
5 her resume, her cover letter and actual documents that
6 she put together for a portfolio that you would take
7 to an interview, because you have to do that as well.
8 And I got to look through her documents and kind of
9 get a feel of what they're looking for when you're
10 going to apply or go into an interview.
11 Q. Did you ever apply to Conestoga Valley for a
12 job?
13 A. I actually gave Deann Buffington this
14 information, I asked her to look over it, and she made
15 the comment, and I cannot remember word for word, but
16 that they only take superior teachers, and based on my
17 performance thus far, that she would not hire me as a
18 candidate or even look at me as a candidate.
19 Q. Approximately when did that --
20 A. That was before midterm.
21 Q. Okay.
22 A. It was right around midterm. And from my
23 classroom experience that I was having thus far, it
24 would make sense. But it was still really hurtful

Page 239

1 when she said that to me.
2 Q. So sometime in March?
3 A. Yeah. This is actually dated March 20th.
4 So right around that date.
5 Q. Okay. So because of that you never actually
6 formally applied to -- did you ever formally apply to
7 CV for a job?
8 A. No.
9 Q. At the time you were going to use Reinking as a
10 reference?
11 A. Yes.
12 Q. Okay. Were you going to use Girvin as a
13 reference?
14 A. Yes, I actually have -- oh, no, I don't
15 actually have Mr. Girvin down there. We were told to
16 take -- keep our resume under two pages, which was
17 very hard for me, but then they were all supposed to
18 limit our number of references. And since Nicole saw
19 me most of the time in the classroom working, while
20 Girvin didn't, then I chose not to put Girvin down,
21 but after some thought I did. On my second resume
22 that I sent out to the schools, I actually believe I
23 took Linda McDowell off of my resume and put
24 Mr. Girvin down on my resume.

Page 240

1 Q. Okay.
2 A. Linda McDowell was a junior block teacher
3 for me.
4 Q. Okay.
5 A. And I felt that Mr. Girvin had more
6 experience than Linda did at that point.
7 MR. KRAMER: Okay. Mark that, because I
8 have another document.
9 - - -
10 (Whereupon, Exhibit Snyder-19 was marked
11 for identification.)
12 - - -
13 BY MR. KRAMER:
14 Q. This is the e-mail between you and Reinking --
15 A. Oh, wait.
16 Q. This one. (Indicating.)
17 A. Yes.
18 Q. And your response, et cetera. We'll mark that.
19 Tell me how this came to be, this document.
20 A. Well, Nicole wrote me and I responded on
21 the 10th. But she wrote me concerning the unit and
22 what was left and what work needed to be graded and
23 deciding that she'll take care of the Hamlet unit,
24 which was after Macbeth, and that if I wanted to grade

Page 241

1 any more of the Macbeth items that I was supposed to
2 let her know. And Barry Girvin just left CV with a
3 few items of make-up work, that was the stuff that he
4 brought to me, and graded.
5 Q. Okay.
6 A. And that was on Tuesday. I responded to
7 her e-mail. I was very considerate. And I also
8 wanted to emphasize and say sorry once again for the
9 terms we're on, but that I wanted to assure her that
10 anything that's being questioned was not about her or
11 the students or anything bad about Millersville or
12 Conestoga Valley, and I was just trying to make things
13 easier than what they were.
14 Q. Okay. So you wrote --
15 A. On Wednesday, the 10th I wrote this back
16 to her.
17 Q. In the second paragraph you wrote, quote, I am
18 sorry that we had to end on the terms that we are on,
19 but I want to assure you that anything being
20 questioned wasn't about you, any staff member or any
21 other student at CVHS, end quote.
22 A. Yes.
23 Q. And is that what you just referred to, you
24 wanted her -- you wanted Reinking to know that nothing

61 (Pages 238 to 241)

Page 242

1  on the blog on Snyder-10 was about her, Conestoga
2  Valley or anybody at Conestoga Valley?
3      A.    Correct. Correct.
4  Q.   Okay.
5      A.    After finding out the previous day that it
6  was concerning the MySpace page and that was what --
7  the straw that broke the camel's back, as everyone
8  said, I wanted to tell her firsthand privately that it
9  had nothing to do with anyone at the school, and I'm
10 sorry that you felt that way, but that was not the
11 case. I felt it was important to tell her that.
12         MR. KRAMER:  Mark that. And give me a
13 second here.
14             - - -
15         (Whereupon, Exhibit Snyder-20 was marked
16 for identification.)
17             - - -
18 BY MR. KRAMER:
19 Q.   Do you think that Buffington threatened somebody
20 at Millersville that Conestoga Valley would stop
21 accepting Millersville students unless Millersville
22 punished you?
23     A.    Do I believe that, or did I read that?
24 Q.   Well, do you have any firsthand knowledge of

Page 243

1  that?
2      A.    I read a document from Buffington saying
3  that.
4  Q.   Okay. That's the basis for that statement --
5      A.    Yes.
6  Q.   -- what Buffington wrote in her -- in that
7  document?
8      A.    Correct.
9  Q.   Okay. Did you take out any liability insurance
10 while you were --
11     A.    No.
12 Q.   Did other student teachers?
13     A.    Student teachers aren't supposed to take
14 out any liability insurance. We can apply for a
15 membership with PSEA, Pennsylvania State Teacher's
16 Association -- Educator's Association. I apologize.
17 Q.   Right.
18     A.    But the insurance policies that are
19 available are only for teachers.
20 Q.   There's no category called student teacher?
21     A.    Not that I know of.
22 Q.   Okay.
23     A.    Not that I'm aware of.
24 Q.   Just about done. Give me a second. (Pause.)

Page 244

1          Did Bray ever accuse you of encouraging
2  underage drinking?
3      A.    In that meeting she said that the picture
4  and the text, if viewed by a student, would be
5  promoting underage drinking, and then she continued to
6  ask me afterwards "Don't you think? Don't you agree?"
7  Q.   And what did you say?
8      A.    Well, I told her I didn't think that a
9  student or a -- I'm sorry, a student or a parent would
10 view the text. I mean, that wasn't -- going into the
11 student teaching experience and having that web page,
12 even before my student teaching experience, it wasn't
13 my goal to have any parent or any student look at the
14 account. So I told her I don't think I was promoting
15 underage drinking.
16 Q.   Okay.
17     A.    Plus, I was 25 or 26 at the time when that
18 happened. So I definitely didn't think that I was
19 promoting anything.
20 Q.   Did Wenrich or Girvin ever accuse you of
21 promoting underage drinking?
22     A.    No.
23 Q.   If you turn to the Complaint, if you have that
24 in there. It's in the very front.

Page 245

1      A.    I have it.
2  Q.   Okay. Go to page nine. Paragraph 43, it says
3  "On or about May 12, Bray, Girvin, Wenrich, and
4  Schneller met to discuss Plaintiff's possible
5  expulsion."
6          Were you a part of that meeting?
7      A.    No.
8  Q.   So how do you know they met to discuss your
9  possible expulsion?  And if you have no personal
10 knowledge, just tell me.
11     A.    No personal knowledge.
12 Q.   Okay. It then says "Schneller convinced the
13 other three that they had to give Plaintiff some
14 degree to avoid scrutiny from others at MU."
15         Again, do you have any personal knowledge
16 of that?
17     A.    Yes. Dr. Schneller told me that.
18 Q.   Okay.
19     A.    Not that she -- well, not in those exact
20 words, but Dr. Schneller said to me that she contacted
21 them, that something -- I had to receive something for
22 all my hard work and dedication over the past four
23 years.
24 Q.   Okay.

PRECISION REPORTING, INC.  (215) 731-9847

1d37e0d1-e04c-446e-9bc2-5f57ae39ebee

Page 246

1    A.    I actually had Dr. Schneller independently
2  as a teacher, and she knows how hard I worked
3  firsthand, and she said that's the reason that she
4  contacted them.
5    Q.    Okay. Schneller's involvement was to, as
6  English department chairman, was to sign off on the
7  paper to make sure you got a B -- at least got a BA,
8  correct?
9    A.    Correct.
10   Q.    Did she have any involvement in reviewing all of
11  the documents, including the various evaluations,
12  including Girvin's and Reinking's notes, and including
13  the drunken pirate picture and text?
14   A.    I don't know.
15   Q.    Okay. You later took an appeal to the provost?
16   A.    Yes. Prabhu.
17   Q.    Prabhu, right.
18        And I have an understanding of what
19  happened there. What -- what did, as far as you know,
20  Prabhu consider in terms of his decision, what
21  documentation, what testimony, et cetera?
22   A.    All the documentation that Millersville
23  had in their possession.
24   Q.    Okay.

Page 247

1    A.    So everything that I gave Dr. Bray,
2  everything that was documented from the conversations
3  with Conestoga Valley to Millersville. All of that
4  information. He spoke with myself and he also spoke
5  with Dr. Wenrich and Dr. Bray in the meeting, and he
6  said he would make a determination based off of
7  everything that was said at that meeting and all the
8  information he had in his possession. But he didn't
9  tell me the exact items he had in his possession.
10   Q.    Do you know if Prabhu considered the drunken
11  pirate photo and the text in making his decision?
12   A.    Yes. He had it in his possession.
13   Q.    But you don't know that he looked at it or
14  considered it?
15   A.    No.
16   Q.    Okay. I think we're done. Give me a sec.
17  (Pause.)
18        Just one final question. On page 12 of
19  the Complaint, I just want to know if this is true,
20  paragraph 56 says "At the time of the 'Drunken Pirate'
21  incident, MU had no policy, practice or procedure
22  prohibiting students from either posting photos of
23  themselves or personal text messages on their private
24  web pages."

Page 248

1    A.    Correct. Only sports teams did, and that
2  was by --
3    Q.    Again. I'm sorry.
4    A.    No, and only sports teams did, and that
5  was on the basis of each individual coach.
6    Q.    Okay. And that's -- and so the message you put
7  on your MySpace was a personal text message?
8    A.    It was a personal -- it was a personal
9  message in a text format.
10   Q.    I believe that's what -- what does that mean?
11  I'm sorry.
12   A.    Like it was a personal message typed out.
13   Q.    Okay.
14   A.    Yeah.
15   Q.    Okay. You're using "text" in a formal term
16  there?
17   A.    Yeah, yeah, yeah.
18   Q.    Okay. And that was on your private web page?
19   A.    Yes.
20        MR. KRAMER: Okay. I don't have anything
21  else, Mark.
22        MR. VOIGT: Excellent.
23              - - -
24        (Witness excused.)

Page 249

1              - - -
2        (Whereupon, the deposition was concluded
3  at approximately 3:26 p.m.)
4              - - -
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

63 (Pages 246 to 249)

Page 250

1     INDEX
2        * * *
3
WITNESS: STACY SNYDER
4
QUESTIONED BY:                    PAGE
5
MR. KRAMER                    3
6
7
         EXHIBITS
8
          * * *
9
STACY SNYDER DEPOSITION EXHIBITS
10
NUMBER      DESCRIPTION              MK'D
11
   Snyder-1    Student Teaching Background
12            Information document        45
13   Snyder-2   Packet of Academic Major Forms    59
14   Snyder-3   Nicole Reinking classroom
            observation notes          118
15
   Snyder-4    J. Barry Girvin classroom
16            observation sheets        118
17   Snyder-5   Mid-evaluation by Nicole Reinking  137
18   Snyder-6   Mid-evaluation by J. Barry Girvin  140
19   Snyder-7   PDE-430 mid-evaluation       142
20   Snyder-8   Mid-evaluation by Stacy Snyder    149
21   Snyder-9   Final evaluation by Nicole Reinking 177
22   Snyder-10  Photocopy of photograph and text   177
23   Snyder-11  Photocopy of photograph       177
24   Snyder-12  Final evaluation by J. Barry Girvin  177

Page 251

1   STACY SNYDER DEPOSITION EXHIBITS (Continued.)
2   NUMBER      DESCRIPTION          MK'D
3   Snyder-13   Unprofessional Behavior/Performance
            in the Classroom document      216
4
   Snyder-14   Document to Dr. Bray        218
5
   Snyder-15   5/9/06 e-mail            218
6
   Snyder-16   5/10/06 e-mail, apology letter    228
7
   Snyder-17   Request of Exception to Graduation
8            Requirements documents       232
9   Snyder-18   PDE-430 final evaluation      232
10   Snyder-19   Resume and cover letter      240
11   Snyder-20   5/11/06 e-mail           242
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 252

1              CERTIFICATION
2
3        I, Krista L. Schultz, RPR, hereby certify
4     that the foregoing is a true and correct
5     transcript of the proceedings held in this
6     matter, as transcribed from the stenographic
7     notes taken by me.
8
9
10
11
12        KRISTA L. SCHULTZ
13        REGISTERED PROFESSIONAL REPORTER
14
15
16
17
18
19
20        (This certification does not apply to any
21     reproduction of this transcript, unless under
22     the direct supervision of the certifying
23     reporter.)
24