SNYDER v. MILLERSVILLE UNIVERSITY et al

Doc. 33 Att. 3

**EXHIBIT D**



# SARGENT'S COURT REPORTING

**Quality Work. Quality People.**

# Transcript of the Testimony of **J. Barry Girvin**

**Date:** March 3, 2008

**Case:** Stacy Snyder v. Millersville University, et al.

Printed On: March 17, 2008

Sargent's Court Reporting Services, Inc.
Phone: 814-536-8908
Fax: 814-536-9814
Email: legaltrans@sargents.com
Internet: www.sargents.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

STACY SNYDER,                 \*

    Plaintiff          \*    Case No.

    vs.                  \*    07-1660

MILLERSVILLE                 \*

UNIVERSITY, J.               \*

BARRY GIRVIN, DR.            \*

JANE BRAY, DR.               \*

VILAS A. PRABHU,             \*

    Defendants            \*

    \* \* \* \* \* \* \* \*

DEPOSITION OF

J. BARRY GIRVIN

March 3, 2008

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

Page 2

1           DEPOSITION
2              OF
3   J. BARRY GIRVIN, taken on behalf of
4   the Plaintiff herein, pursuant to the
5   Rules of Civil Procedure, taken
6   before me, the undersigned, Susan
7   Koons, a Court Reporter and Notary
8   Public in and for the Commonwealth of
9   Pennsylvania, at One South George
10  Street, Millersville, Pennsylvania,
11  on Monday, March 3, 2008 beginning at
12  9:27 a.m.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        A P P E A R A N C E S
2
3   MARK W. VOIGT, ESQUIRE
4   Plymouth Meeting Executive Campus
5   600 West Germantown Pike
6   Suite 400
7   Plymouth Meeting, PA 19462
8        COUNSEL FOR PLAINTIFF
9
10  BARRY N. KRAMER, ESQUIRE
11  Office of Attorney General
12  Senior Deputy Attorney General In-
13  Charge
14  Litigation Section
15  21 South 12th Street, 4th Floor
16  Philadelphia, PA 19107
17       COUNSEL FOR DEFENDANTS
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2
3   WITNESS:  J. BARRY GIRVIN
4   EXAMINATION
5       by Attorney Voigt      7 - 227
6   CERTIFICATE                    228
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1            EXHIBIT PAGE
2
3                           PAGE
4   NUMBER  DESCRIPTION    IDENTIFIED
5
6            NONE OFFERED
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    OBJECTION PAGE
2
3    ATTORNEY                              PAGE
4    Kramer        21, 34, 43, 48, 49, 61,
5                  86, 89, 106, 11, 119,
6                  120, 126, 131, 136, 137,
7                  138, 139, 140, 156, 158,
8                  161, 163, 165, 172, 175,
9                  180, 182, 184, 190, 194,
10                 196, 199, 201, 206, 207,
11                 209, 210, 213, 215, 216,
12                 218, 219, 220, 221, 223
13
14
15
16
17
18
19
20
21
22
23
24
25

1        P R O C E E D I N G S
2    -------------------------------------
3    J. BARRY GIRVIN, HAVING FIRST BEEN
4    DULY SWORN, TESTIFIED AS FOLLOWS:
5    -------------------------------------
6    EXAMINATION
7    BY ATTORNEY VOIGT:
8    **Q. Would you state your name and**
9    **business address for the record?**
10   A. J. Barry Girvin.  My business
11   address is Millersville University at
12   --- I think at the time that this was
13   filed it was in the government
14   building.
15   **Q. Okay.**
16   A. You have it there.
17   **Q. Describe your educational and**
18   **professional background starting at**
19   **college, please.**
20   A. Well, I went to Millersville
21   for my undergraduate work.  I majored
22   in Social Studies and minored in
23   English and received a certification
24   in both of those areas when I
25   graduated.  That would have been in

1    '62.  After that, I started teaching
2    and I started working on graduate
3    work.  I received a Master's degree
4    in education here at Millersville.
5    That would have been '66, an MED.
6    And then I went on to the University
7    of Delaware where I got an MA in
8    history.
9    Now, over that time I had some
10   decisions to make and I decided to
11   pursue a supervisory certificate and
12   apply for a position as a supervisor
13   in Conestoga Valley where I was
14   teaching, and so I did that.  And I
15   became supervisor of the department
16   and was supervisor for 22 years.
17   **Q. In what department was that?**
18   **History you said?**
19   A. Social Studies.
20   **Q. Social Studies.  Okay.  And**
21   **that's at Conestoga Valley School**
22   **District?**
23   A. Yes.
24   **Q. Okay.**
25   A. As far as other credits, I

1    took numerous courses and received
2    numerous certifications.  You have my
3    résumé so it's on there.  Numerous
4    certifications as far as supervising
5    and working with teachers and my
6    supervisory certificate gave me the
7    same authority to evaluate teachers
8    and hire teachers at Conestoga Valley
9    as a principal.  So they say I had
10   numerous credits over the years and I
11   also had taught --- teaching Social
12   Studies here for 12 years here at
13   Millersville, which was the course
14   that people had to take before they
15   went out to student teach.
16   **Q. Let me interject.  I'm looking**
17   **at your résumé on Exhibit Plaintiff's**
18   **Two.  These are the exhibits.  We**
19   **have two volumes of them.**
20   A. Okay.
21   **Q. All right.  Turn to**
22   **Plaintiff's Two, page two.**
23   A. All right.
24   **Q. This is your Curriculum Vitae;**
25   **right?**

1   A. Yes.

2   **Q. And it's current and up to**

3   **date?**

4   A. Yes.

5   **Q. I'm looking at page two where**

6   **it says supervisor of student**

7   **teachers under part-time. Would you**

8   **elaborate on that? During what time**

9   **frame were you a part-time supervisor**

10  **of student teachers?**

11  A. I never was a full-time

12  supervisor of student teachers. I

13  was never a full-time employee here,

14  always part-time. And I hope that's

15  the answer to that question.

16  **Q. So even after you retired from**

17  **Conestoga Valley in 1996, you**

18  **remained part-time at Millersville;**

19  **correct?**

20  A. Correct.

21  **Q. Okay. How many hours do you**

22  **work at Millersville? Can you give**

23  **me an idea?**

24  A. Do you mean then?

25  **Q. Well, back in 2006 and then**

1   **Q. Yes. Do you know Deann**

2   **Buffington?**

3   A. Yes.

4   **Q. How well do you know her?**

5   A. Not very well. I left there,

6   retired there before she came there

7   as a supervisor. I knew her from

8   having like one student teacher with

9   her when she was at Warwick.

10  **Q. When was that?**

11  A. I don't recall, a couple years

12  before that.

13  **Q. That would be early '90s?**

14  A. Yeah, before she came to ---

15  so I retired in '96, so it was

16  probably in the early '90s sometime.

17  **Q. And what was the student**

18  **teacher's name, do you remember?**

19  A. I don't recall.

20  **Q. Did the student teacher**

21  **eventually receive a certification?**

22  A. No.

23  **Q. Do you know why?**

24  A. Yes.

25  **Q. What would that reason be?**

1   **now.**

2   A. Well, I am not only in the

3   education department, but I'm also in

4   the government department. And so it

5   hasn't varied much over time. My

6   class schedule at Millersville ---

7   usually I had a government course in

8   the spring, and I would supervise

9   maybe three or four student teachers

10  in both the fall and the spring. And

11  then I do summer workshops for

12  teachers, which --- about one week,

13  40 hour a week workshops.

14  **Q. You said you supervised three**

15  **to four student teachers. Would that**

16  **number remain constant since you**

17  **began at Millersville in 1991 or has**

18  **it fluctuated?**

19  A. It hadn't fluctuated very much

20  until these last couple years when I

21  didn't take any.

22  **Q. Okay. Now, you taught at**

23  **Conestoga Valley School District for**

24  **about 24 years; right?**

25  A. Thirty-four (34), I believe.

1   A. He just gave up, he decided

2   teaching wasn't for him.

3   **Q. Did he give up after the**

4   **student teaching semester during**

5   **which Ms. Buffington was his**

6   **supervising teacher?**

7   A. I'm sorry.

8   **Q. Was Buffington the student's**

9   **supervising teacher or was she ---?**

10  A. Cooperating.

11  **Q. Cooperating teacher. Okay.**

12  **So Ms. Buffington was this student's**

13  **cooperating teacher and he gave up;**

14  **is that right?**

15  A. Yes.

16  **Q. Did he give up during the**

17  **cooperating seminar or semester?**

18  A. Yes.

19  **Q. You never asked him why he**

20  **gave up?**

21  A. Yes. He just felt that he

22  couldn't handle the students, that he

23  wasn't --- he just figured this

24  wasn't him and that was it. It was

25  an honest self-appraisal, I felt.

4 (Pages 10 to 13)

## Page 14

1    **Q. You didn't talk to Ms.**
2    **Buffington about her role, if any, in**
3    **students giving up?**
4    A. Yes, I did.
5    **Q. Would you have this student's**
6    **name written down somewhere?**
7    A. I think so.
8    **Q. I just ask that you produce**
9    **the student's name at your earliest**
10   **convenience.**
11   A. Okay.
12   **Q. So you never had any**
13   **involvement with Ms. Buffington and**
14   **student teachers other than that one**
15   **time?**
16   A. Correct.
17   **Q. Did you ever socialize with**
18   **Ms. Buffington?**
19   A. Yes.
20   **Q. How often would you socialize**
21   **with her?**
22   A. Once.
23   **Q. Once. What was the nature of**
24   **that socialization?**
25   A. It was a party that some --- I

## Page 15

1    think it was a retirement party that
2    somebody at CV retired, that she was
3    there and I was there. I don't know
4    if you would say that was socializing
5    or not.
6    **Q. Was alcohol served at that**
7    **party?**
8    A. Yes.
9    **Q. Did you observe Ms. Buffington**
10   **drinking any alcohol during that**
11   **party?**
12   A. I don't recall.
13   **Q. Did you drink alcohol during**
14   **that party?**
15   A. Yes.
16   **Q. Were any photographs taken**
17   **during that party that you know of?**
18   A. Not that I recall.
19   **Q. Do you know Nicole Reinking?**
20   A. Yes.
21   **Q. How well do you know her?**
22   A. Not well at all. I met her
23   the first time when Ms. Snyder was
24   assigned to her as a student teacher.
25   Well, that's not true now that I

## Page 16

1    think about it. She took one of my
2    summer workshops here at
3    Millersville. As I recall, it was
4    local history and geography.
5    **Q. When was that?**
6    A. I would say it was probably a
7    couple years before she had Stacy as
8    a student teacher.
9    **Q. Approximately 2004, 2003?**
10   A. Yeah. Yeah.
11   **Q. Okay. So she was a student at**
12   **Millersville at that time?**
13   A. Yeah, she was taking summer
14   courses to get her permit of
15   teaching.
16   **Q. Okay. Was she an**
17   **undergraduate or did she already have**
18   **---?**
19   A. She was an undergraduate. I
20   mean, she was a graduate student, not
21   undergraduate.
22   **Q. Did you ever socialize with**
23   **Ms. Reinking?**
24   A. No.
25   **Q. During college --- back to**

## Page 17

1    **your résumé. Did you ever drink an**
2    **alcoholic beverage during college?**
3    A. Not that I recall. I didn't
4    drink at all until I was 21. You
5    know, I was not the type of person
6    who did a lot socializing because I
7    had to work to get my way through. I
8    was off campus, and so I didn't get
9    involved in campus-type activities at
10   all.
11   **Q. Did you ever attend a costume**
12   **party at college?**
13   A. No.
14   **Q. Have you had any education or**
15   **training in freedom of speech among**
16   **college students? I know that you're**
17   **a Social Studies professor.**
18   A. Yes.
19   **Q. What courses have you taken in**
20   **that subject?**
21   A. I haven't taken any formal
22   courses but workshops conducted by
23   Dr. --- the superintendent at the
24   Lampeter-Strasburg High School. He
25   is an expert in school law and he

5 (Pages 14 to 17)

| Page 18 | Page 20 |
|---|---|
| 1  does workshops for teachers through | 1  each one of the observations. And I |
| 2  the intermediate community, and I | 2  asked if they had any questions. |
| 3  attended his workshop. | 3  **Q. How long did the meeting last?** |
| 4  **Q. When was that?** | 4  A. I would say a half hour to 45 |
| 5  A. I don't recall. | 5  minutes. |
| 6  **Q. Was it more than five years** | 6  **Q. During this meeting, did you** |
| 7  **ago, more than ten years ago?** | 7  **tell Ms. Snyder that she was an** |
| 8  A. I would say five years ago. | 8  **employee of Conestoga Valley School** |
| 9  **Q. Five years ago. Did you ever** | 9  **District?** |
| 10  **have any education or training in due** | 10  A. No. |
| 11  **process in the public university** | 11  **Q. During this initial meeting,** |
| 12  **setting?** | 12  **did you tell Ms. Snyder that she was** |
| 13  A. No. | 13  **an apprentice at Conestoga Valley** |
| 14  **Q. When you did first meet Stacy** | 14  **School District?** |
| 15  **Snyder?** | 15  A. I'm not sure I used the word |
| 16  A. At the orientation for student | 16  apprentice, but I always tried to get |
| 17  teachers. | 17  it across to student teachers that |
| 18  **Q. Describe your first meeting.** | 18  they were there to learn from other |
| 19  A. I had three student teachers, | 19  teachers, not only their cooperating |
| 20  a Social Studies and an English both | 20  teacher but from other teachers that |
| 21  who were going to be at the middle | 21  they would observe. And that in that |
| 22  school at CV; and then Stacy, who was | 22  category, they needed to know their |
| 23  to be at the high school. They and I | 23  place and they needed to try to |
| 24  listened to all the presentations, | 24  create a good, friendly situation, a |
| 25  and then I met with them privately | 25  respectful situation with faculty and |

| Page 19 | Page 21 |
|---|---|
| 1  and talked about my expectations. | 1  that --- in doing that and creating |
| 2  **Q. Describe that first meeting.** | 2  that kind of a situation, they would |
| 3  **What did you talk about with Stacy?** | 3  open the door for people to know |
| 4  A. Well, I talked to all three of | 4  about them and know about their |
| 5  them at the same time, but I went | 5  qualities and could have implications |
| 6  over the obligations that they had | 6  as far as jobs and so forth. |
| 7  for Millersville University, things | 7  **Q. But you never referred to** |
| 8  that had to be done. And what I'm | 8  **Stacy as an apprentice?** |
| 9  talking about is things like | 9  A. I never used that term that I |
| 10  shadowing students they were going to | 10  recall. |
| 11  have in class, preparing documents | 11  **Q. You never told Stacy that she** |
| 12  about students who had IEPs, | 12  **was anything but a college student** |
| 13  interviewing teachers, observing | 13  **visiting Conestoga Valley; correct?** |
| 14  experienced teachers, preparing their | 14  ATTORNEY KRAMER: |
| 15  unit that they were going to teach | 15  I'm going to object to |
| 16  with Millersville called the CIRQL | 16  the form of the question. It |
| 17  unit. And generally I told them that | 17  assumes a fact that he hasn't |
| 18  if they encountered problems I wanted | 18  testified to. |
| 19  to know about it early on, and that I | 19  ATTORNEY VOIGT: |
| 20  expected to have a good relationship | 20  Okay. |
| 21  with them. | 21  BY ATTORNEY VOIGT: |
| 22  I explained that I would be | 22  **Q. You never referred to Stacy as** |
| 23  coming in to do observations and that | 23  **anything other than a college student** |
| 24  these would be written and that we | 24  **attending classes for --- studying at** |
| 25  would be having a conference after | 25  **Conestoga Valley; correct?** |

| | |
|---|---|
| 1 | A. Well, what I told her and the |
| 2 | other student teachers was that when |
| 3 | they're out in the school they have |
| 4 | to abide by the rules in those |
| 5 | schools. I mean, something as simple |
| 6 | as vacations. You know, when the |
| 7 | other kids may be in Florida, you're |
| 8 | going to be here working because |
| 9 | you're on this schedule. And also |
| 10 | they needed to abide by all the rules |
| 11 | and regulations that were enforced at |
| 12 | the building because for all |
| 13 | practical purposes they were part of |
| 14 | the faculty and therefore, anything |
| 15 | that applied to their cooperating |
| 16 | teacher applied to them. And that |
| 17 | they were also covered by the |
| 18 | school's insurance as far as |
| 19 | liability was concerned and I did |
| 20 | ---. |
| 21 | Q. By the school's insurance |
| 22 | meaning Conestoga Valley? |
| 23 | A. Yes. But I did also suggest |
| 24 | to them that it would be a good idea |
| 25 | for them to join their professional |

| | |
|---|---|
| 1 | organizations for the simple reason |
| 2 | that that gives them additional |
| 3 | insurance. |
| 4 | Q. How do you know that Stacy was |
| 5 | covered by Conestoga Valley's |
| 6 | insurance? |
| 7 | A. Well, anybody who's, you know, |
| 8 | on campus there in any capacity is |
| 9 | covered by the liability insurance. |
| 10 | Q. Did you talk to anybody about |
| 11 | that? |
| 12 | A. No. |
| 13 | Q. You just assumed it? |
| 14 | A. Yes. |
| 15 | Q. You never --- let me just get |
| 16 | it straight. During that initial |
| 17 | meeting, you never told or intimated |
| 18 | to Stacy that her status was no |
| 19 | longer that of a college student? |
| 20 | A. No. |
| 21 | Q. Were you ever Stacy's |
| 22 | instructor at Millersville? |
| 23 | A. No. |
| 24 | Q. You never taught her any |
| 25 | subjects? |

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. Okay. And I take it you had |
| 3 | no interactions with Stacy between |
| 4 | the time she first enrolled at |
| 5 | Millersville and the start of the |
| 6 | seminar or the orientation that you |
| 7 | described; correct? |
| 8 | A. Correct. |
| 9 | Q. Turn to Plaintiff's Exhibit |
| 10 | 25. It's a poor copy so you can look |
| 11 | at mine if you need to. This is the |
| 12 | foundations block evaluation |
| 13 | completed by a Lakisha Harden |
| 14 | (phonetic). Do you see that? |
| 15 | A. Yes. Yes. |
| 16 | Q. Have you ever reviewed this |
| 17 | document? |
| 18 | A. Yes. |
| 19 | Q. Did you review it when you |
| 20 | assumed your role as Stacy's |
| 21 | supervisor in or about January of |
| 22 | 2006? |
| 23 | A. Yes, I did. |
| 24 | Q. Who is Lakisha Harden, do you |
| 25 | know her? |

| | |
|---|---|
| 1 | A. No. |
| 2 | Q. So you have no reason to doubt |
| 3 | Ms. Harden's competence in evaluating |
| 4 | Stacy; correct? |
| 5 | A. Correct. |
| 6 | Q. And turn to page two. And I |
| 7 | know that your copy is poor so let me |
| 8 | show you mine. Who is Barbara |
| 9 | Spangle? Do you see her signature |
| 10 | down there? |
| 11 | A. Well, she's a professor at the |
| 12 | University and at the time she may |
| 13 | have been the department chair. I'm |
| 14 | not sure. She was department chair |
| 15 | for about a year so --- but |
| 16 | nonetheless, she's a professor. |
| 17 | Q. All right. And Ms. Spangle |
| 18 | recommended Stacy for advanced |
| 19 | professional studies; correct? |
| 20 | A. Yes. |
| 21 | Q. And you have reason to doubt |
| 22 | Ms. Spangle's confidence in making |
| 23 | that recommendation; correct? |
| 24 | A. Correct. |
| 25 | Q. Turn to Plaintiff's Four. |

1   This is the Millersville University
2   guide for student teaching; correct?
3   A. Correct.
4   Q. Are you familiar with this
5   document?
6   A. Yes.
7   Q. Did you have any role in
8   preparing this document?
9   A. No.
10  Q. Do you know whether Stacy
11  received a copy of this document?
12  A. Yes, she did.
13  Q. Did you give it to her?
14  A. Yes.
15  Q. And did you give it to her at
16  that first orientation meeting?
17  A. She got it then.  I don't know
18  if I gave it to her or whether they
19  gave it to her at the ---.
20  Q. Do you know if Ms. Reinking
21  got a copy of this?
22  A. Yes.
23  Q. Did you give it to her?
24  A. I'm not sure whether I gave it
25  to her or whether she got it in her

1   A. Uh-huh (yes).
2   Q. Is that a yes?
3   A. Yes.
4   Q. You have to answer yes or no.
5   A. I see it.
6   Q. Okay.  So student teachers are
7   assigned to cooperating teachers, not
8   to schools or school districts.  Do
9   you see that?
10  A. Yes.  Yes.
11  Q. And do you agree with that
12  statement?
13  A. Yes.
14  Q. Before we go any further, I
15  think I was remiss at the start of
16  this deposition in not going over
17  some of the particulars, and it might
18  not be a bad idea to do that now.
19  First of all, the court
20  reporter has administered an oath,
21  and that oath is the same oath as you
22  would take in a court of law and it
23  carries with it the same penalties,
24  so you have to tell the truth, the
25  whole truth and nothing but the

1   packet that was sent to her by
2   Millersville.  But she had it.
3   Q. Turn to page seven, please.
4   These are the policies and procedures
5   that are included in the guide;
6   correct?
7   A. Uh-huh (yes).
8   Q. You did not write these, did
9   you?
10  A. No.
11  Q. Do you know who wrote these?
12  A. They're developed by the
13  department.
14  Q. Would that be Ms. Bray's
15  responsibility to develop policy and
16  procedures like this?
17  A. I'm not sure when these were
18  developed, but she would have had
19  ultimate responsibility for them.
20  Now, whether she actually
21  participated, I don't know.
22  Q. Okay.  I'm looking at the top
23  the first bolded section entitled
24  assignment of student teachers.  Do
25  you see that?

1   truth.  Okay?
2   A. Uh-huh (yes).
3   Q. Is that a yes?
4   A. Yes.
5   ATTORNEY KRAMER:
6   You have to give a
7   verbal response.
8   BY ATTORNEY VOIGT:
9   Q. And also, as you can see, the
10  reporter is transcribing everything
11  that we say on a stenographic
12  machine.  So as your Counsel said,
13  you need to answer yes or no rather
14  then uh-huh or uh-uh, et cetera.  You
15  need to answer with a worded response
16  rather then a nod of the head or a
17  shake of the head, agreed?
18  A. Yes.
19  Q. Good.  Okay.  And you need to
20  wait until the questioner, probably
21  me, is done with the question before
22  you respond because the reporter can
23  not take down two people talking at
24  once.
25  Now, at the conclusion of this

8 (Pages 26 to 29)

```
 1    deposition, the reporter will prepare
 2    a transcript which is word-for-word
 3    recitation of everything that we say
 4    here.
 5  ATTORNEY VOIGT:
 6  And Mr. Kramer, I
 7    didn't discuss this, but I
 8    assume the usual stipulations
 9    are in effect?
10  ATTORNEY KRAMER:
11  Yes.
12  ATTORNEY VOIGT:
13  Okay.  So the signing
14    and sealing are waived of that
15    transcript.  Do you want the
16    witness to read and sign?
17  ATTORNEY KRAMER:
18  Yes.
19  ATTORNEY VOIGT:
20  Okay.  Excellent.
21  ATTORNEY KRAMER:
22  Off the record.
23    OFF RECORD DISCUSSION
24    BY ATTORNEY VOIGT:
25    Q. Going back to Plaintiff's
```

```
 1    Q. And it says in the next
 2    paragraph, a student teacher should
 3    accept every task as a potential
 4    learning experience; correct?
 5    A. Yes.
 6    Q. And two paragraphs down under
 7    professional conduct, it says the
 8    student teacher must continue to
 9    adhere to the MU, which I take it as
10    Millersville University, student code
11    of conduct; correct?
12    A. Correct.
13    Q. And it doesn't say anything
14    about the student teacher adhering to
15    the code of conduct at the
16    cooperating school; does it?
17    A. No.
18    Q. Turn to page ten.  These are
19    the responsibilities of the student
20    teacher.  Do you see that at the top
21    of the page?
22    A. Yes.
23    Q. Okay.  Now, under teaching,
24    the last bullet, it says, as your
25    confidence increases, try unique and
```

```
 1    Four, same page farther down under
 2    professional conduct.
 3    A. Uh-huh (yes).
 4    Q. It says the student teacher is
 5    a guest of the cooperating school.
 6    Do you agree with that?
 7    A. Yes.
 8    Q. It doesn't say anything about
 9    the student teacher being an
10    apprentice at the cooperating school,
11    does it?
12    A. No.
13    Q. It doesn't say anything about
14    the student teacher being an employee
15    of the cooperating school; correct?
16    A. Correct.
17    Q. It says the student teacher is
18    a future member of the teaching
19    profession.  Do you see that?
20    A. Yeah.  Yes.
21    Q. And it doesn't say anything
22    about the student teacher being a
23    current member of the profession;
24    correct?
25    A. Correct.
```

```
 1    innovative teaching procedures.  Do
 2    you see that?
 3    A. Yes.
 4    Q. And do you agree with that
 5    statement?
 6    A. Yes.
 7    Q. Turn to page 11.  These are
 8    the responsibilities of the
 9    cooperating teacher.  It says under
10    modeling assistance and observation
11    the last bullet.  Only the MU student
12    teaching final evaluation is
13    submitted to the University
14    supervisor to be delivered to the
15    field services office and placed in
16    the student's permanent file.  Is
17    that your understanding?
18    A. Where is this now?
19    Q. Last bullet under modeling.
20    A. Oh, okay.  Yes.
21    Q. Okay.  So the midterm
22    evaluation is not a permanent record
23    of the student; correct?
24    A. Correct.
25    Q. And therefore the midterm
```

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

```
 1    evaluation would not constitute some
 2    sort of official probationary status
 3    for the student; correct?
 4  ATTORNEY KRAMER:
 5  Let me object.  You can
 6    ask the question, but let me
 7    object.
 8  ATTORNEY VOIGT:
 9  Okay.
10    BY ATTORNEY VOIGT:
11    Q. Do you remember the question?
12    A. No.
13    Q. Since the midterm evaluation
14    would not be part of the student's
15    permanent file, you would agree with
16    me that it is not a probationary
17    status in some official way at
18    Millersville; correct?
19    A. Not official.
20    Q. Turn to page 12.  These are
21    the responsibilities of the
22    University supervisor.  That would be
23    you in Ms. Snyder's case; correct?
24    A. Correct.
25    Q. And it says the University
```

```
 1    supervisor must communicate
 2    frequently with the cooperating
 3    teacher concerning the student
 4    teacher's progress; correct?
 5    A. Correct.
 6    Q. And that would be your
 7    responsibility to communicate with
 8    Ms. Reinking; would that be correct?
 9    A. Yes.
10    Q. And another responsibility
11    under the student teacher section,
12    bullet number two, would be for you
13    to encourage ongoing professional
14    dialogue between the student teacher
15    and the cooperating teacher; correct?
16    A. Bullet two?
17    Q. Under the student teacher
18    section.
19    A. Encourage ongoing professional
20    dialogue with the cooperating
21    teacher, yes.
22    Q. And that would be your
23    responsibility to facilitate a
24    dialogue between Ms. Snyder and Ms.
25    Reinking; correct?
```

```
 1    A. Yes.
 2    Q. Turn to Plaintiff's Exhibit
 3    Five.  This is the supplement to the
 4    guide for student teaching secondary
 5    edition; correct?
 6    A. Correct.
 7    Q. Secondary education; correct?
 8    A. Correct.
 9    Q. Are you familiar with this
10    document?
11    A. Yes.
12    Q. And was this document in use
13    at the time that Stacy was a student
14    teacher?
15    A. I have to check it here.  Yes,
16    it was.
17    Q. And you gave a copy of this to
18    Stacy?
19    A. Yes.
20    Q. Okay.  Turn to page four.
21    This is a description of the CIRQL
22    project; is that correct?
23    A. That's correct.
24    Q. Okay.  What does CIRQL stand
25    for?
```

```
 1    A. That's a good question.
 2    Collaborate, inquire, reflection and
 3    questions about learning.
 4    Q. Okay.  What is that?  What
 5    does that mean in layman's terms?
 6    A. Well, in layman's terms it
 7    means that learning should be a
 8    collaborative thing, and that it
 9    should not be a traditional thing
10    where the teacher does all the
11    talking and the students just sit
12    there and write down notes.  It means
13    that in the classroom, collaborative
14    learning would be a kind of thing
15    where you would do more group work,
16    you would do more having students
17    respond to situations that you give
18    them.  As far as teacher preparation
19    is concerned, it would mean that we
20    collaborate with each other and we
21    try to learn from each other, and we
22    share the experiences that we've had
23    with each other in trying to become
24    good teachers.
25    Q. So the CIRQL project would
```

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    have encouraged the student teacher
2    to bring in a wide variety of view
3    points and collaborative assistance
4    in preparing her lesson plans;
5    correct?
6    A. Yes.
7    Q. And did you teach the CIRQL
8    project to Stacy in some fashion?
9    A. No, she had that in her
10   teaching of English course.
11   Q. And who taught that to Stacy,
12   do you know?
13   A. McCullough (phonetic).
14   Q. McCullough Clark?
15   A. Yes.
16   Q. Would you agree with me that
17   in the CIRQL project lessons Stacy
18   would be taught to seek out input
19   from a variety of sources including a
20   supervisor at her cooperating school;
21   correct?
22   A. Correct.
23   Q. It was never taught to Stacy
24   --- are you familiar with what is
25   taught in the CIRQL project?

1    permission from the cooperating
2    teacher before they spoke to a
3    supervisor at the cooperating school;
4    correct?
5    A. Correct.
6    Q. Okay. The CIRQL project was
7    an important part of the student
8    teaching experience; correct?
9    A. Correct.
10   Q. How long would a student
11   teacher devote to the CIRQL project
12   during their student teaching seminar
13   --- semester?
14   A. You mean in class?
15   Q. In class --- let's start in
16   class then we'll go to out of class.
17   How long would they devote to the
18   project?
19   A. Well, the project would be one
20   unit. And so it might have been
21   something that would have gone for
22   three weeks, but usually somewhere
23   between two and four weeks.
24   Q. And that would be in-class
25   time; correct?

1    A. Yes.
2    Q. Okay. Have you talked to Ms.
3    McCullough Clark about what she
4    teaches in that project?
5    A. No, I haven't.
6    Q. So what's the basis of your
7    familiarity with the CIRQL project?
8    A. My basis is in having to
9    learn it to supervise student
10   teachers.
11   Q. So you attended some seminars
12   or something on the CIRQL project?
13   A. Yes. Several meetings.
14   Q. All right. And during your
15   experiences with the CIRQL project,
16   no one at Millersville instructed the
17   prospective student teachers that
18   they were not permitted to speak to
19   the supervisors in their cooperating
20   school; correct?
21   A. Correct.
22   Q. And during the CIRQL project
23   meeting that you attended, no one
24   instructed the prospective student
25   teachers that they had to obtain

1    A. Yes.
2    Q. And the student teacher would
3    have to devote to out of class time to
4    it as well; correct?
5    A. A lot of time, yes.
6    Q. How much time out of class
7    would you say? Can you give me a
8    ball park figure on how long it would
9    take?
10   A. Maybe two hours out of class
11   for every hour in.
12   Q. Okay. So if a student was
13   teaching and working on the CIRQL
14   project for three weeks, then they
15   would have to spend approximately six
16   weeks, two hours a day, working on
17   the CIRQL project?
18   A. That might be stretching it a
19   little bit. You know, it depends on
20   the student because it depends on how
21   --- in the first place, it depends on
22   the content. And the students are
23   usually given the chance, and she was
24   to pick the content that she wanted
25   to teach, to develop the unit they're

11 (Pages 38 to 41)

```
1    on.  But then from that point it
2    depends on how well-versed the
3    student is in the content.  You know,
4    how much time it takes them to
5    prepare that, but also it then
6    depends on how much time they spend
7    trying to develop the
8    pre-teaching and post-teaching
9    aspects of the unit and of course the
10   assessment is a very important part
11   of the unit.  Does the assessment fit
12   what was actually taught and so
13   forth.  And so to work all the way
14   through that, I can't give you a
15   definite time, it depends on the
16   student.
17   Q. Okay.  All right.  Well, do
18   you know how much time Stacy spent on
19   it, the CIRQL project?
20   A. I don't know hour-wise but I
21   do know that by looking at a lot of
22   what she did, that she spent
23   considerable time.
24   Q. All right.  Turn to page five
25   of Exhibit Plaintiff Five, page five.
```

```
1    Hold on a second.  I'm sorry, page 12
2    of Plaintiff's Five.  This is the
3    grading for the CIRQL project; is
4    that correct?
5    A. This is the grading for, as it
6    says at the top, shadowing teacher
7    interview prior assessment and
8    planning.
9    Q. Okay.
10   A. This has nothing to do with
11   the actual delivery of the lesson.
12   This is the score sheet for the unit
13   itself as written up, you know.
14   Q. All right.  So this
15   cooperating teacher would give you
16   the lesson plan and you would
17   evaluate it; is that correct?
18   ATTORNEY KRAMER:
19   Let me just object.
20   Cooperating teacher ---.
21   ATTORNEY VOIGT:
22   No, I'm sorry.  Let me
23   rephrase that.
24   BY ATTORNEY VOIGT:
25   Q. So the student teacher, in
```

```
1    order to get a grade on this document
2    would give you a written product,
3    which I understand would be the
4    proposed lesson plan; is that what
5    would happen?
6    A. Proposed unit.  Unit, which
7    there would be a number of lesson
8    plans.
9    Q. Okay.  And you would grade it;
10   correct?
11   A. Yes.
12   Q. How many of these CIRQL
13   projects have you graded over the
14   years?
15   A. Maybe ten.  I'm not sure.
16   Q. And if I look at this thing
17   correctly, exemplary would be the
18   highest grade; correct?
19   A. Correct.
20   Q. And of the ten CIRQL projects
21   that you graded, I take it that not
22   all of them got exemplary?
23   A. Right.  Correct.
24   Q. So only the best of the best
25   would get exemplary; correct?
```

```
1    A. Yes.
2    Q. All right.  Turn to
3    Plaintiff's Exhibit One.  You're on
4    number two.  There we go.  Do you
5    recognize this document?
6    A. I don't know.  It seems
7    familiar but I ---.
8    Q. Is this something that the
9    cooperating school would generate?
10   If you don't know, just say you don't
11   ---.
12   A. I don't know.
13   Q. All right.  Turn to
14   Plaintiff's 26.  This is an
15   evaluation by Sue Fedderoff at
16   Lampeter-Strasburg High School.  Do
17   you know Ms. Fedderoff?
18   A. No.
19   Q. Do you have any reason to
20   doubt her competence as a teacher?
21   A. No.
22   Q. Now, you never observed Stacy
23   at Lampeter-Strasburg High School
24   during her experiences there;
25   correct?
```

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    A. Correct.

2    Q. Did you review this evaluation

3    at the time you assumed Stacy's or

4    your role as Stacy's supervisor for

5    her student teaching experience?

6    A. Yes.

7    Q. Now, this --- are you familiar

8    with this evaluation form?

9    A. Yes.  I've used it many times.

10   Q. All right.  Now, the

11   evaluation to be completed by the

12   teacher in the middle of the page

13   has four numbers, but if you look

14   down, there's only three numbers on

15   the list of professional competencies

16   for the evaluator to circle; do you

17   see that?

18   A. Yes.

19   Q. All right.  Is this a

20   Millersville form that Millersville

21   generates?

22   A. Yes.

23   Q. Do you know why Millersville

24   didn't put fours for the cooperating

25   or for the supervising teacher to

1    circle?

2    A. No.

3    Q. Even though there are no fours

4    printed on the form, Ms. Fedderoff

5    made some fours of her own and

6    circled them in some instances for

7    Stacy; correct?

8    A. Correct.

9    Q. And Stacy commented that ---

10   I'm sorry, Ms. Fedderoff commented

11   that Stacy was very professional; do

12   you see that?  The next page.

13   A. Okay.

14   Q. The next page, in the middle

15   of the page, very professional?

16   A. Yes.

17   Q. Okay.  And also staying on the

18   second page it indicates that Ms.

19   Snyder possesses the skills to make a

20   notable contribution to our

21   profession; do you see that?

22   A. Yes.

23   Q. All right.  And it also says

24   that Ms. Snyder did a great job; is

25   that correct?

1    A. Yes.

2    Q. And you've never spoken with

3    Ms. Fedderoff; am I correct?

4    A. That is correct.

5    Q. Did you consider this

6    evaluation before denying Ms. Snyder

7    her teaching certificate?

8    ATTORNEY KRAMER:

9    I have an objection.  I

10      think you used ---.

11   ATTORNEY VOIGT:

12   All right.  Let me

13      phrase it in a passive voice.

14   BY ATTORNEY VOIGT:

15      Q. Did you consider this

16      evaluation before certain people at

17      Millersville University denied Stacy

18      her teaching certificate?

19   ATTORNEY KRAMER:

20   I'll object again.

21      Millersville does not issue

22      teaching certificates.  The

23      Department of Education issues

24      them.

25      BY ATTORNEY VOIGT:

1    Q. Did you consider this

2    evaluation before setting in motion

3    the denial of Ms. Snyder's teaching

4    certificate?

5    A. Yes.

6    Q. Turn to Plaintiff's 27.

7    ATTORNEY KRAMER:

8    By the way, we're not

9       seeking authenticity of these

10      documents so ---.

11   ATTORNEY VOIGT:

12   Okay.

13      BY ATTORNEY VOIGT;

14      Q. This is an evaluation by Mr.

15      Weidman, Neil Weidman.  Do you know

16      Mr. Weidman?

17      A. No.

18      Q. You have no reason to doubt

19      his competency as a teacher; do you?

20      A. No.

21      Q. And you never observed Stacy

22      at Garden Spot High School; correct?

23      A. Correct.

24      Q. Mr. Weidman rated Stacy with

25      almost all fours; do you see that?

| | |
|---|---|
| 1 | A. Yes. |
| 2 | **Q. And Mr. Weidman called Stacy** |
| 3 | **wonderfully competent; do you see** |
| 4 | **that?** |
| 5 | A. Yes. |
| 6 | **Q. And you have no reason to** |
| 7 | **doubt his evaluative capacities;** |
| 8 | **correct?** |
| 9 | A. Correct. It depends on what |
| 10 | you're evaluating, you know. What |
| 11 | we're talking about here is apples |
| 12 | and oranges. I mean, these things |
| 13 | don't represent real teaching, more |
| 14 | working with kids. And very seldom |
| 15 | do these people get a chance to |
| 16 | actually teach. |
| 17 | **Q. So Mr. Weidman was not** |
| 18 | **competent when he wrote these** |
| 19 | **evaluations?** |
| 20 | A. I'm sure he was very |
| 21 | competent. |
| 22 | **Q. And it also says on the first** |
| 23 | **page that Mr. Weidman rated Stacy as** |
| 24 | **a welcome addition to a secondary** |
| 25 | **faculty; do you see that?** |

| | |
|---|---|
| 1 | professors involved in either the |
| 2 | teaching of English course as a |
| 3 | complimentary course that goes with |
| 4 | it. I don't know exactly what the |
| 5 | name of it is, but McDowell teaches |
| 6 | the education part of it in |
| 7 | compliment and then McCullough the |
| 8 | English part of it. And so I assume |
| 9 | that Doctor McDowell handed this out |
| 10 | during either her teaching of English |
| 11 | course or one of the education |
| 12 | courses that preceded her student |
| 13 | teaching. |
| 14 | **Q. So you assume that Ms. Snyder** |
| 15 | **received these General Guidelines** |
| 16 | **before the orientation where you** |
| 17 | **first met Ms. Snyder; correct?** |
| 18 | A. Yes. |
| 19 | **Q. Now, under the second bullet,** |
| 20 | **it says, the student teachers are to** |
| 21 | **let the co-op, which I believe means** |
| 22 | **cooperative teacher, know that you** |
| 23 | **are there to learn as much about** |
| 24 | **teaching as possible; correct?** |
| 25 | A. Correct. |

| | |
|---|---|
| 1 | A. Yes. |
| 2 | **Q. And you have no reason to** |
| 3 | **doubt his competency to make that** |
| 4 | **prediction; correct?** |
| 5 | A. Correct. |
| 6 | **Q. And did you consider Mr.** |
| 7 | **Weidman's evaluation before setting** |
| 8 | **in motion the denial of Stacy's** |
| 9 | **teaching certificate?** |
| 10 | A. Yes, I considered all of this. |
| 11 | **Q. Turn to Plaintiff's 28,** |
| 12 | **please. This is a document entitled** |
| 13 | **General Guidelines. Do you recognize** |
| 14 | **this document?** |
| 15 | A. Yes. |
| 16 | **Q. What is it exactly?** |
| 17 | A. Well, it's steps to take as |
| 18 | you're preparing to student teach. |
| 19 | **Q. Did you prepare this document?** |
| 20 | A. No. |
| 21 | **Q. Was this document given to** |
| 22 | **Stacy at some time?** |
| 23 | A. Well, I think it was because |
| 24 | Doctor McDowell's name's on it and |
| 25 | she would have been one of the |

| | |
|---|---|
| 1 | **Q. And do you agree with that** |
| 2 | **statement?** |
| 3 | A. Yes. |
| 4 | **Q. And farther down it says, in** |
| 5 | **the same bullet paragraph, know what** |
| 6 | **your role is in the classroom,** |
| 7 | **remembering that above all you are a** |
| 8 | **guest. Do you see that?** |
| 9 | A. I see it. |
| 10 | **Q. Take a look at the document** |
| 11 | **and just confirm for me that the** |
| 12 | **document does not reference anything** |
| 13 | **about a student teacher being an** |
| 14 | **employee of the cooperating school.** |
| 15 | A. What do you want me to |
| 16 | confirm? |
| 17 | **Q. This document does not refer** |
| 18 | **at any point to the student teacher** |
| 19 | **being in some fashion an employee of** |
| 20 | **the cooperating school; correct?** |
| 21 | A. Correct. |
| 22 | **Q. And that document does not** |
| 23 | **refer in any way to the student** |
| 24 | **teacher being an apprentice at the** |
| 25 | **cooperating school; correct?** |

14 (Pages 50 to 53)

| | Page 54 | | Page 56 |
|---|---|---|---|
| 1 | A. That word is not used. | 1 | Q. Well, were you aware that |
| 2 | Q. And this document does not | 2 | Stacy was a single mother when you |
| 3 | refer in any way to the student | 3 | assumed your role as Stacy's |
| 4 | teacher somehow losing their status | 4 | supervisor for the student teaching |
| 5 | as a student at Millersville | 5 | semester? |
| 6 | University by virtue of participating | 6 | A. I'm not sure. I became aware |
| 7 | in a student teaching cooperative; | 7 | of it because she told me, but I'm |
| 8 | correct? | 8 | not sure when she told me. |
| 9 | A. I'm sorry? | 9 | Q. Do you know if Stacy told you |
| 10 | Q. This document does not refer | 10 | that she was a single mother at the |
| 11 | in any way to the student teacher | 11 | time of your first meeting? |
| 12 | losing their status as a Millersville | 12 | A. I don't think she did because |
| 13 | University student while they are | 13 | we were there with two other people, |
| 14 | serving as a student teacher; | 14 | so we didn't get into, you know, |
| 15 | correct? | 15 | anything that personal. |
| 16 | A. Correct. | 16 | Q. Now, turn to page two of that |
| 17 | Q. Turn to Plaintiff's 30. This | 17 | same document. Now, this is a |
| 18 | is background information on Stacy. | 18 | section where the student teacher is |
| 19 | Have you reviewed this document? | 19 | supposed to list her spouse's name; |
| 20 | A. Yes, I have. | 20 | correct? |
| 21 | Q. When did you first review it? | 21 | A. Right. |
| 22 | A. Prior to meeting with the | 22 | Q. And you see that there's |
| 23 | student teachers, I was given a | 23 | nothing listed; correct? |
| 24 | packet with the information --- this | 24 | A. Yeah, I see it. |
| 25 | type of information as well as | 25 | Q. And did you review this --- |

| | Page 55 | | Page 57 |
|---|---|---|---|
| 1 | earlier experiences they had when | 1 | you said you reviewed this document |
| 2 | they went out during their teaching | 2 | before you met with Stacy? |
| 3 | course. And I was to keep these | 3 | A. Yes. |
| 4 | during the semester and then give | 4 | Q. All right. Turn to |
| 5 | them to the student teacher at the | 5 | Plaintiff's Nine. This is the |
| 6 | end of the semester. | 6 | meeting outline regarding the student |
| 7 | Q. So you reviewed this | 7 | teaching seminar. Did you attend |
| 8 | background information of Stacy | 8 | this meeting? |
| 9 | before you even met her or during --- | 9 | A. Yes. |
| 10 | or following the orientation; | 10 | Q. It says, students pick-up |
| 11 | correct? | 11 | packet. What was in that? |
| 12 | A. Correct. | 12 | A. That booklet --- well, there's |
| 13 | Q. So at the time that you | 13 | a list of them here, the calendar, |
| 14 | assumed your role as Stacy's | 14 | things about graduation. The main |
| 15 | supervisor, you were aware that she | 15 | thing that I was interested in was |
| 16 | had two children; correct? Take a | 16 | the student teaching booklet which |
| 17 | look at the file again. | 17 | was also available on the website. |
| 18 | A. Yes. Yes. | 18 | But I had some copies of it, so I |
| 19 | Q. And at the time that you began | 19 | think that I handed out the copies |
| 20 | your supervising role of Stacy, you | 20 | that I had but they could also get it |
| 21 | were aware that she was a single | 21 | on the website. |
| 22 | mother; correct? | 22 | Q. All right. Now, are you |
| 23 | A. Correct. Well, I'm aware of | 23 | familiar with the packet contents, |
| 24 | what's there. I don't know if it | 24 | the student teaching packet contents? |
| 25 | says single mother. | 25 | A. Yes. |

15 (Pages 54 to 57)

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

Page 58

| | |
|---|---|
| 1 | Q. And you would agree with me |
| 2 | that nothing in the packet informs |
| 3 | the attendees that they were |
| 4 | employees of the cooperating school; |
| 5 | correct? |
| 6 | A. Correct. |
| 7 | Q. And you would agree with me |
| 8 | that nowhere in the student teaching |
| 9 | packet referred to in P-9 does |
| 10 | Millersville refer to the student |
| 11 | teachers as apprentices of the |
| 12 | cooperating school; correct? |
| 13 | A. Correct. |
| 14 | Q. How was the decision made that |
| 15 | you would be Stacy's supervisor? |
| 16 | A. It was made in the department. |
| 17 | I don't know, usually it's done to |
| 18 | try to make sure the supervisor has |
| 19 | certification in the area that he's |
| 20 | supervising. And also, to try to |
| 21 | make it convenient so you aren't |
| 22 | running from York County to wherever. |
| 23 | And I was extremely lucky this |
| 24 | semester because I have three student |
| 25 | teachers at Conestoga Valley. And |

Page 59

| | |
|---|---|
| 1 | I'm certified in English and Social |
| 2 | Studies, so it was a good match. I |
| 3 | guess that's how I met up with her. |
| 4 | Q. So all three of the students |
| 5 | that you supervised this semester, |
| 6 | which would have been the Spring of |
| 7 | 2006, were student teachers at |
| 8 | Conestoga Valley; correct? |
| 9 | A. Yes. Two at the middle school |
| 10 | and then Stacy at the high school. |
| 11 | Q. Did the students at the middle |
| 12 | school eventually receive their |
| 13 | teaching certificates? |
| 14 | A. Yes. |
| 15 | Q. Turn to Plaintiff's 18. Do |
| 16 | you recognize this document? |
| 17 | A. Yes. |
| 18 | Q. What is it? |
| 19 | A. It's --- I think it's a guide |
| 20 | for student teaching that accompanies |
| 21 | the state 430 form. I think that's |
| 22 | what it is. |
| 23 | Q. So the Department of Education |
| 24 | issues this document; correct? |
| 25 | A. That's my understanding. |

Page 60

| | |
|---|---|
| 1 | Q. And so it's your understanding |
| 2 | the Department of Education, if you |
| 3 | look at the top on page seven, it |
| 4 | says the student teacher is a guest |
| 5 | of the cooperating school; is that |
| 6 | what it says? |
| 7 | A. Yes. |
| 8 | Q. So it's your understanding |
| 9 | that this is a Department of |
| 10 | Education statement as to the student |
| 11 | teacher's status at the cooperating |
| 12 | school; correct? |
| 13 | A. Yes, if I'm right that this is |
| 14 | out of a 430. |
| 15 | Q. Okay. And later on page seven |
| 16 | or later on the summary which |
| 17 | indicates page seven --- you're on |
| 18 | the right page. It says, the student |
| 19 | teacher is recognized as a |
| 20 | representative of the University by |
| 21 | the student's faculty in the |
| 22 | community to which he or she is |
| 23 | assigned; do you see that? |
| 24 | A. Where is it? |
| 25 | Q. Right there. |

Page 61

| | |
|---|---|
| 1 | A. Okay. Yes, I see it. |
| 2 | Q. And it's your understanding |
| 3 | that this document represents the |
| 4 | Department of Education's view upon |
| 5 | that subject; correct? |
| 6 | ATTORNEY KRAMER: |
| 7 | Asked and answered. He |
| 8 | thought but he wasn't sure. |
| 9 | ATTORNEY VOIGT: |
| 10 | Well, if that's true, |
| 11 | then he can tell me. |
| 12 | A. I think so. |
| 13 | BY ATTORNEY VOIGT: |
| 14 | Q. And do you agree with that |
| 15 | statement that the student teacher is |
| 16 | a representative of the University? |
| 17 | A. I think they're recognized as |
| 18 | such, yes, by their facilities. |
| 19 | Q. And it looks like the third |
| 20 | paragraph down under the same section |
| 21 | which refers to page seven, it says, |
| 22 | the student teacher must adhere to |
| 23 | the MU student code of conduct |
| 24 | throughout his field experience. Do |
| 25 | you see that? |

16 (Pages 58 to 61)

1    A. Uh-huh (yes).
2    Q. Is that a yes?
3    A. Yes.
4    Q. Do you agree with that
5    statement?
6    A. Yes.
7    Q. And this document does not in
8    any way refer to the code of conduct
9    at the cooperating school; correct?
10   A. Correct.
11   Q. Now, we've already established
12   that Stacy's cooperating teacher at
13   Conestoga Valley was Nicole Reinking;
14   right?
15   A. That's correct.
16   Q. And before Stacy began her
17   student teaching assignment, did you
18   ever observe Ms. Reinking teach her
19   class?
20   A. No.
21   Q. Why not?
22   A. I had no reason to.  I
23   observed her a great deal, you know,
24   after that because when I was in
25   talking to Stacy prior to her

1    starting to teach, I sat in on a
2    couple of her classes as well.
3    Q. So you observed Ms. Reinking
4    during --- strike that.
5    You observed Ms. Reinking
6    teach the class that Stacy eventually
7    served in before Stacy started there;
8    correct?
9    A. Well, not a whole class
10   period, you know.  I was in and out
11   and I was there long enough to get
12   the general ---.
13   Q. How long did you observe Ms.
14   Reinking before --- or during that
15   time that --- strike that.
16   How long did you observe Ms.
17   Reinking teach her class during that
18   visit that you were describing prior
19   to Stacy's serving in the classroom?
20   A. You mean in minutes?
21   Q. Yes.
22   A. Well, I recall on one occasion
23   I went in to talk to Stacy and Mrs.
24   Reinking was teaching, so I just
25   stuck around until the end of the

1    class so that I could talk to Stacy.
2    I didn't want to pull her away from
3    --- because I thought she might be
4    teaching that class.  I would say 20
5    minutes.
6    Q. I'm talking about before Stacy
7    began in that class.
8    A. Before she started to teach.
9    You don't go in and start teaching
10   the first day you walk in.
11   Q. Before Stacy was even in the
12   class ---
13   A. Yes.
14   Q. --- did you ever observe Ms.
15   Reinking?
16   A. No.
17   Q. That was my question.  Were
18   you aware during the spring semester
19   of 2006 that Stacy was Ms. Reinking's
20   first student teacher?
21   A. Yes.
22   Q. Did you find that significant?
23   A. Yes.  As a supervisor, I found
24   that significant because I always try
25   to do my level best to help people

1    who are first-time cooperating
2    teachers, to spend more time there,
3    to talk to them more.
4    Q. Did you meet with Ms. Reinking
5    prior to the start of Stacy's service
6    as a student teacher?
7    A. Yes.
8    Q. When was that?
9    A. I think it was actually the
10   first day of student teaching because
11   Stacy was there also, so the three of
12   us talked.  And then I had a private
13   conversation with Mrs. Reinking.
14   Q. So you did not meet with Ms.
15   Reinking before Stacy's first day
16   there?
17   A. I don't recall.  I may have.
18   I don't recall.
19   Q. So if I'm correct, the first
20   day of Stacy's student teaching
21   assignment would have also been the
22   first time that you met Ms. Reinking;
23   correct?
24   A. I think so.
25   Q. And you said you only spoke to

| | |
|---|---|
| 1 | **Ms. Reinking after Stacy had already** |
| 2 | **sat through a class period; is that** |
| 3 | **what you were telling me?** |
| 4 | A. What? |
| 5 | **Q. Let me get the time frame** |
| 6 | **correct. You and Stacy, I guess** |
| 7 | **together, went to Ms. Reinking's** |
| 8 | **class on that first day of Stacy's** |
| 9 | **student teaching; is that correct?** |
| 10 | A. She was there, I dropped in. |
| 11 | **Q. So Stacy was already there?** |
| 12 | A. Yeah. To back up a little |
| 13 | bit, I probably wasn't aware at that |
| 14 | time that Mrs. Reinking was a first- |
| 15 | timer. That's probably when I got |
| 16 | the information during that first |
| 17 | meeting. |
| 18 | **Q. Wouldn't it have been** |
| 19 | **important for you to know that Ms.** |
| 20 | **Reinking had never supervised a** |
| 21 | **student teacher before that first** |
| 22 | **day?** |
| 23 | A. That would have been helpful. |
| 24 | **Q. What do you do differently** |
| 25 | **when you have a first-timer?** |

| | |
|---|---|
| 1 | A. Well, I go over what's in the |
| 2 | handbook with them to make sure they |
| 3 | understand the expectations. I take |
| 4 | a --- I make sure that they know how |
| 5 | to avail themselves of everything |
| 6 | that Millersville has to help them, |
| 7 | including a videotape which they can |
| 8 | get from Millersville to look at. |
| 9 | And generally, just try to review |
| 10 | with them the whole booklet, |
| 11 | handbook, to make sure that we're on |
| 12 | the same page. |
| 13 | And I always make sure as |
| 14 | experienced co-ops know, what we need |
| 15 | to stay in touch, and particularly, |
| 16 | at the mid time in the semester. And |
| 17 | as you said, that mid evaluation is |
| 18 | not official. But the purpose of it |
| 19 | is so that the student teacher who |
| 20 | does their own, the co-op who does |
| 21 | her or his and the supervisor, just |
| 22 | compare notes. And you know, I |
| 23 | always stress that to the people that |
| 24 | are first-timers that, you know, |
| 25 | there is where we really want to make |

| | |
|---|---|
| 1 | sure that we're on the same page as |
| 2 | far as evaluating the student teacher |
| 3 | is concerned. |
| 4 | **Q. Again, walk me through this** |
| 5 | **first time that you met Ms. Reinking.** |
| 6 | **I take it it was during the class** |
| 7 | **period, Stacy was already sitting in** |
| 8 | **the class?** |
| 9 | A. No, no. Stacy was in for a |
| 10 | visit --- I don't know if it was her |
| 11 | first visit with the co-op or not. |
| 12 | They were supposed to go in the week |
| 13 | before, which I assume she did. But |
| 14 | I think it was the first day of |
| 15 | student teaching and I sat down with |
| 16 | both of them. And then I talked with |
| 17 | Mrs. Reinking privately after Stacy |
| 18 | and I talked. That had nothing to do |
| 19 | with that other thing we were talking |
| 20 | about where I sat in on a class. I |
| 21 | mean, you asked me if I saw Reinking |
| 22 | teach, and I did. But that was later |
| 23 | on when I went in there one day to |
| 24 | talk to Stacy about something else. |
| 25 | **Q. Do you remember the date of** |

| | |
|---|---|
| 1 | **this meeting which would have been** |
| 2 | **Stacy's first time in the class and** |
| 3 | **your first visit with Ms. Reinking?** |
| 4 | A. No. |
| 5 | **Q. Was it sometime in February of** |
| 6 | **'06; would that have been about** |
| 7 | **right?** |
| 8 | A. Whenever student teaching |
| 9 | started, I don't recall. But that |
| 10 | sounds about right. I mean, usually |
| 11 | the semester starts the last week in |
| 12 | January and they show up at the |
| 13 | schools usually the first week in |
| 14 | February. So that would be in that |
| 15 | ballpark. |
| 16 | **Q. How long was your meeting with** |
| 17 | **Ms. Reinking and Stacy that first** |
| 18 | **day?** |
| 19 | A. Together I would say that we |
| 20 | talked for maybe 15, 20 minutes and |
| 21 | then --- I don't know how long I |
| 22 | talked to --- probably I talked to |
| 23 | Mrs. Reinking for about the same |
| 24 | amount of time. I'm not sure. I |
| 25 | don't recall exactly. |

18 (Pages 66 to 69)

1  Q. What did you discuss when you
2  were alone with Mrs. Reinking that
3  first day?
4  A. The booklet, basically, the
5  handbook and understanding the
6  schedule and what things Stacy was
7  responsible for.
8  Q. What, if anything, did Mrs.
9  Reinking say during that time that
10 you recall?
11 A. I don't recall.  She seemed to
12 understand everything I went over
13 with her.
14 Q. Was that the first time that
15 Mrs. Reinking had reviewed --- strike
16 that.
17 When you say the booklet, what
18 booklet are you ---?
19 A. The handbook, the Millersville
20 handbook.
21 Q. That would be Exhibit Number
22 Four.
23 A. Yeah.
24 Q. Was it your understanding that
25 that was the first time that Mrs.

1  Reinking had seen this handbook?
2  A. No.  No, that stuff had all
3  been mailed out to her previously, so
4  she was well aware of what was in the
5  handbook.
6  Q. Did she indicate that she had
7  reviewed the handbook?
8  A. Yes.
9  Q. How did the meeting end?
10 A. I guess it ended with me
11 saying, you know, I would be coming
12 in to do my observations and also I'd
13 be dropping in on occasion between
14 just to see how things were going,
15 touch base.
16 Q. Turn to Plaintiff's 44.  This
17 might be a good time to take a short
18 break.
19 SHORT BREAK TAKEN
20 BY ATTORNEY VOIGT:
21 Q. Now, we are on Plaintiff's 44.
22 Now, this is your handwriting;
23 correct, at the bottom?
24 A. Yeah.
25 Q. This would have been your

1  first observation of Stacy in the
2  classroom?
3  A. I think so.
4  Q. How long was your evaluation?
5  ATTORNEY KRAMER:
6  You mean from the time
7  that he sat in, how long ---?
8  BY ATTORNEY VOIGT:
9  Q. Yeah.  How long were you in
10 the room to prepare this?
11 A. The entire class, which is
12 about close to 90 minutes.  That's
13 what block scheduling is.
14 Q. Are these your notes in the
15 margins and on the bottom?
16 A. On the bottom are mine, yes.
17 Q. What about on the sides?
18 A. They're not mine.
19 Q. Do you recognize the
20 handwriting?
21 A. No.
22 Q. So it was your writing when
23 you said conference, dash, good
24 discussion?
25 A. Uh-huh (yes.)

1  Q. Is that a yes?
2  A. Yes.
3  Q. What did you mean by that?
4  A. Give and take, question and
5  answer.
6  Q. Okay.  Did you share these
7  notes with Stacy in a meeting of some
8  sort?
9  A. Yes.  Every observation was
10 followed, either the same day or the
11 following day depending on schedules.
12 And we often spent anywhere from ten
13 minutes to a half hour, usually a
14 half hour talking about the lesson
15 and my suggestions.  And as I say
16 here, classroom management, follow
17 through on the management plan.
18 Perhaps start this class with a
19 sponge.
20 Q. What does that mean?
21 A. Well, a sponge is something
22 that soaks up some time while you're
23 getting organized to teach the class.
24 And if you don't have something to
25 have the students work on, they'll be

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

|  | Page 74 |  | Page 76 |
|---|---|---|---|
| 1 | climbing the walls and you know, | 1 | classroom management. |
| 2 | getting out of line. Then you have | 2 | Q. Turn to page two of the same |
| 3 | to settle them down to start to | 3 | exhibit. This is your signature |
| 4 | teach. But if you go in there with | 4 | dated March 1 of 2006; correct? |
| 5 | something for them to work on until | 5 | A. That is correct. |
| 6 | you get your act together and get | 6 | Q. How long did you observe Stacy |
| 7 | everything set up, then they're ready | 7 | this time? |
| 8 | to start the class. | 8 | A. Ninety minutes. |
| 9 | Q. Just describe the meeting that | 9 | Q. Now, you say at the end --- or |
| 10 | you had with Stacy over, during which | 10 | the beginning of the second |
| 11 | you discussed this initial visit? | 11 | paragraph, the lesson looked good on |
| 12 | A. Well, here, reminder teacher | 12 | paper, paren, lesson plan, close |
| 13 | observations. Stacy was aware that | 13 | paren, but it suffered in the |
| 14 | she was supposed to do these | 14 | delivery. What did you mean by that? |
| 15 | Millersville obligations before she | 15 | A. Exactly what it says. I mean, |
| 16 | started to teach. But she talked | 16 | she seemed to be able to write down |
| 17 | Reinking into letting her start | 17 | what a good lesson would look like, |
| 18 | before she had some of these things | 18 | but when it came around to delivering |
| 19 | done. | 19 | it, it seemed to just fall apart. |
| 20 | So as you look through, you'll | 20 | Basically because she didn't follow |
| 21 | find me reminding her that she hasn't | 21 | her own lesson plan, and, you know, |
| 22 | completed the shadowing, the teacher | 22 | was unable to get it off the ground, |
| 23 | observations and so forth. So do | 23 | unable to deliver the lesson. Part |
| 24 | teacher observations, you haven't | 24 | of that had to do with the lack of |
| 25 | finished those yet. Shadowing she | 25 | classroom control, and so part of it |

|  | Page 75 |  | Page 77 |
|---|---|---|---|
| 1 | hadn't done, and she hadn't | 1 | had to do with, not so much her lack |
| 2 | interviewed her cooperating teacher | 2 | of preparation, I don't think, as her |
| 3 | yet. And so that's what that's all | 3 | lack of knowledge. Now, you know, |
| 4 | about. | 4 | that's another ---. |
| 5 | Now, the conference itself, I | 5 | Q. When you say lack of |
| 6 | talked a lot about classroom | 6 | knowledge, what do you mean? |
| 7 | management. I talked about the idea | 7 | A. Proficiency in the content |
| 8 | that you must establish a strong | 8 | matter. |
| 9 | classroom management routine, so that | 9 | Q. What do you mean by that? |
| 10 | the students know the expectations. | 10 | Stacy didn't know the subject matter |
| 11 | And I also emphasize with her that if | 11 | she was teaching; is that what you're |
| 12 | you set up classroom management rules | 12 | saying? |
| 13 | with consequences, that when | 13 | A. Yes. |
| 14 | something happens, do the | 14 | Q. Did you share these notes with |
| 15 | consequence. Because if you don't | 15 | Stacy? |
| 16 | you're going to be lost. All you | 16 | A. Yes. |
| 17 | have to do is find --- what I mean by | 17 | Q. And that was your a.m. meeting |
| 18 | consequence is maybe detention or | 18 | after the class; right? |
| 19 | whatever is in the classroom rules. | 19 | A. Yes. |
| 20 | But ---. | 20 | Q. Describe that meeting, please. |
| 21 | Q. How did Stacy respond to your | 21 | A. This was a long meeting, and I |
| 22 | comments during the meeting? | 22 | went over a lot that is covered here. |
| 23 | A. She seemed to understand what | 23 | But I guess I talked about the proper |
| 24 | I was talking about, and said that | 24 | planning. I commented on some of the |
| 25 | she would try to work on her | 25 | things she put up on the overhead, |

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

| Page 78 | | Page 80 |
|---|---|---|

| | Page 78 | | | Page 80 |
|---|---|---|---|---|
| 1 | the students couldn't read them | | 1 | **March 1, '06 note?** |
| 2 | because they weren't large enough. I | | 2 | A. Yes. |
| 3 | commented about her --- kind of this | | 3 | **Q. When did you do that?** |
| 4 | introduction that they did every day | | 4 | A. I'm not sure. I always talk |
| 5 | in class that she really didn't | | 5 | to her every time I was in there. |
| 6 | explain why the answers were the | | 6 | **Q. What did you say following the** |
| 7 | answers, but just jumped onto the | | 7 | **March 1, '06 visit; do you remember?** |
| 8 | next thing. | | 8 | A. Well, let's see, I'm trying to |
| 9 | I talked to her about | | 9 | get these observations into sync |
| 10 | monitoring behaviors as you see down | | 10 | here. I talked to her about the |
| 11 | there with positive and negative | | 11 | possibility maybe of changing Stacy's |
| 12 | reinforcement. The lulls that were | | 12 | schedules somewhat. And I said maybe |
| 13 | in the class gave the kids a chance | | 13 | we just need to pull her and let her |
| 14 | to get out of hand. Content | | 14 | start with a new class and see if |
| 15 | mistakes, got some of the smarter | | 15 | she's really understanding what I'm |
| 16 | kids into a smart alecky approach to | | 16 | trying to get across to her. And |
| 17 | try to make a fool out of her. | | 17 | give her some time to catch up on |
| 18 | I talked to her about her | | 18 | these Millersville things. |
| 19 | lesson plans should maybe be done a | | 19 | And at one stage of the game |
| 20 | couple days ahead. The lesson plans | | 20 | there, I offered just to pull Stacy. |
| 21 | were to be shown to the co-op one day | | 21 | I said, you know, if you think she's |
| 22 | ahead, but I suggested it should be | | 22 | damaging to your students, if she's |
| 23 | more than that, so that they could be | | 23 | not doing the job and they're not |
| 24 | reviewed. I talked about the | | 24 | learning anything, I'll just pull |
| 25 | worksheet. When she handed it out | | 25 | her. And she said she didn't want to |

| | Page 79 | | | Page 81 |
|---|---|---|---|---|
| 1 | all kinds of hands went up; obviously | | 1 | do that, you know. She said she felt |
| 2 | they didn't understand. | | 2 | that she could work with her. |
| 3 | **Q. How did Stacy --- I'm sorry,** | | 3 | **Q. When was that conversation?** |
| 4 | **were you done?** | | 4 | A. I don't know. It's probably |
| 5 | A. Well, one other thing that I | | 5 | after this lesson, because this |
| 6 | emphasized as I recall was processing | | 6 | lesson was --- it would have been |
| 7 | content. | | 7 | sometime after this lesson. |
| 8 | **Q. What does that mean?** | | 8 | **Q. Okay. Well ---.** |
| 9 | A. What it means is content just | | 9 | A. This was a first. It would |
| 10 | isn't words that the kids copy down | | 10 | have been --- there's a couple that |
| 11 | and memorize. You have to go into | | 11 | aren't in here. |
| 12 | the meaning. You have to dig the | | 12 | **Q. Would you produce those for** |
| 13 | hole related to something they know | | 13 | **me?** |
| 14 | something about so that they --- some | | 14 | ATTORNEY KRAMER: |
| 15 | level of understanding takes place | | 15 | Yeah, I can get them. |
| 16 | there. So there was a lot there. | | 16 | BY ATTORNEY VOIGT: |
| 17 | **Q. How did Stacy respond to your** | | 17 | **Q. All right. We'll get to those** |
| 18 | **comments?** | | 18 | **then.** |
| 19 | A. She seemed to respond | | 19 | A. 4/7, but there's two |
| 20 | positively, and it seemed to me that, | | 20 | observations on 4/6 that aren't in |
| 21 | you know, the realization was setting | | 21 | there. |
| 22 | in on her that she had some problems | | 22 | **Q. We'll get to those.** |
| 23 | and she had to make some changes. | | 23 | A. All right. |
| 24 | **Q. Did you speak to Ms. Reinking** | | 24 | **Q. What, if anything, did Ms.** |
| 25 | **after this, after preparing this** | | 25 | **Reinking do, to your knowledge, in** |

21 (Pages 78 to 81)

| | Page 82 | | Page 84 |
|---|---|---|---|
| 1 | response to the problems that you | 1 | take it that's your signature at the |
| 2 | were discussing as of March 1, 2006? | 2 | bottom; right? |
| 3 | A. Well, she had a lot of time to | 3 | A. Yes, it is. |
| 4 | sit down with, you know, with Ms. | 4 | Q. All right. And you say here |
| 5 | Snyder and she did some observations | 5 | she researched the topic and prepared |
| 6 | of Ms. Snyder on her own, and you | 6 | an excellent handout; do you see |
| 7 | know, wrote up lessons and went over | 7 | that? |
| 8 | it with her. And as I recall, they | 8 | A. Yes. |
| 9 | were pretty detailed. | 9 | Q. And you agree with that |
| 10 | And I'm not sure how many | 10 | statement? |
| 11 | written ones she did, but I mean | 11 | A. Yes. |
| 12 | there was several. Every day she | 12 | Q. And you say here that Stacy |
| 13 | would have talked to her about those, | 13 | was confident about her content and |
| 14 | the lesson and ---. | 14 | her approach; do you agree with that? |
| 15 | Q. Did you attend any of those | 15 | A. Yes. |
| 16 | meetings between Ms. Snyder and Ms. | 16 | Q. All right. And you go on to |
| 17 | Reinking where they were discussing | 17 | say that Stacy responded quickly to |
| 18 | future lesson plans? | 18 | discipline situations; is that right? |
| 19 | A. Well, the three of us | 19 | A. That's correct. |
| 20 | discussed future lesson plans, but I | 20 | Q. And you complimented Stacy for |
| 21 | mean I didn't attend any of their | 21 | the use of music, familiar music |
| 22 | private meetings because they were | 22 | examples; do you see that? |
| 23 | private. There's a connection | 23 | A. Yes. |
| 24 | between the cooperating teacher --- a | 24 | Q. So you thought that Stacy's |
| 25 | bond between a cooperating teacher | 25 | use of music was appropriate at that |

| | Page 83 | | Page 85 |
|---|---|---|---|
| 1 | and the student teacher that I think | 1 | time; is that correct? |
| 2 | both of them feel that to some extent | 2 | A. Yes. |
| 3 | they can solve their problems without | 3 | Q. And did you speak to Stacy |
| 4 | running to the boogeyman. | 4 | after this evaluation? |
| 5 | Q. Is that the way you talk to | 5 | A. Yes. |
| 6 | yourself? You've thought of yourself | 6 | Q. How did that evaluation --- |
| 7 | as the boogeyman; is that ---? | 7 | how did that conference go? |
| 8 | A. You know, as the supervisor, | 8 | A. It went very well. What's |
| 9 | you know, like if you can't handle | 9 | missing here is the two observations |
| 10 | your problems you go and ---. | 10 | I did on --- well, wait a minute. |
| 11 | Q. So when you say that there | 11 | That's not right, 4/6. |
| 12 | should be a bond between the | 12 | Q. Well, we'll get to those. |
| 13 | cooperating teacher and the student | 13 | Let's focus on March 9th. |
| 14 | teacher, you would refer to that bond | 14 | A. As I recall, this was the new |
| 15 | as a two-way street; right? The | 15 | class, you know, the class she hadn't |
| 16 | student teacher and the cooperating | 16 | had before. And so I had the |
| 17 | teacher must have a give and take; is | 17 | impression that she had gotten the |
| 18 | that correct? | 18 | message and that she was getting off |
| 19 | A. Yes. | 19 | on the right foot with the new class. |
| 20 | Q. Okay. Turn to page three. | 20 | And so I had the conference went very |
| 21 | The notes that you prepared ---. | 21 | well. |
| 22 | A. Page three? | 22 | Q. All right. Turn to |
| 23 | Q. P-44, page three. | 23 | Plaintiff's 42, please. This is an |
| 24 | A. Okay. I'm with you. | 24 | evaluation by an unnamed student at |
| 25 | Q. Yes. The March 9 note, and I | 25 | Conestoga Valley High School. |

1    **Parent's (sic) 42, page one.**
2    A. Yeah, I got it.
3    **Q. The name is blacked out all**
4    **except for the letter B.  You don't**
5    **happen to recognize this student with**
6    **his handwriting?**
7    A. No.
8    **Q. Have you ever seen this**
9    **document before?**
10   A. Not that I recall.
11   **Q. Well, under question eight**
12   **there at the bottom there.  It says**
13   **least favorite teacher, Mrs.**
14   **Reinking, because we don't get along.**
15   **Did you ever review this document**
16   **before denying Stacy her Bachelor of**
17   **Science in Education degree?**
18   ATTORNEY KRAMER:
19   Objection.  He's never
20       seen the document before and
21       he didn't deny her her
22       Bachelor of Science degree.  I
23       don't know how he can answer
24       this because he's never before
25       ---.

1    or so that she taught.  If I saw 10
2    or 12 to compare that would --- add
3    some significance there.
4    **Q. Turn to page four of the same**
5    **document.  This is an evaluation by**
6    **another student in 12th grade at ---**
7    **they're not numbered.**
8    A. Okay.  I'm with you now.
9    **Q. This is an evaluation by**
10   **another student at the Conestoga**
11   **Valley High School; correct?**
12   A. Uh-huh (yes).
13   **Q. Is that a yes?**
14   A. Yes.
15   **Q. Okay.**
16   A. If you say it is, yes.
17   **Q. All right.  Well, it says**
18   **Conestoga Valley High School in**
19   **question two; correct?**
20   A. Correct.
21   **Q. Okay.  Now, look under**
22   **question eight then.**
23   A. Yes.
24   **Q. It says who are your favorite**
25   **teachers, be honest.  And the answer**

1    ATTORNEY VOIGT:
2    Well, if he's never
3        seen it before, then the
4        answer will be self-evident.
5    BY ATTORNEY VOIGT:
6    **Q. Did you ever review this**
7    **document before the events of May**
8    **2006?**
9    A. No.
10   **Q. Would it have been useful to**
11   **know that at least one of the**
12   **students in Ms. Reinking's class**
13   **thought that she was his or her least**
14   **favorite teacher?**
15   A. Not --- no, not at all.
16   **Q. Why not?**
17   A. Well, if you're standing in
18       front of 150 students, how would you
19       like to be evaluated based on what
20       one had to say about you?
21   **Q. So the individual students**
22   **don't matter, their views and such?**
23   **Is that what you're saying?**
24   A. They matter, but this is not a
25       survey.  It's one student out of 90

1    **lists four teachers.  Mrs. Reinking**
2    **is not one of them; correct?**
3    A. That's correct.
4    **Q. How many students would a 12th**
5    **grader at Conestoga Valley High**
6    **School --- strike that.**
7    **How many teachers would a**
8    **student at Conestoga Valley High**
9    **School have during his 12th grade**
10   **year?**
11   A. Eight or ten.  With the block
12       they would have fewer than they would
13       have if they had the old-style ---.
14   **Q. Okay.  So we can assume that**
15   **Mrs. Reinking was not among the**
16   **student's top four out of the eight**
17   **or ten that year she had that year;**
18   **correct?**
19   ATTORNEY KRAMER:
20   I'll object.  The
21       document speaks for itself.
22       The profession speaks for
23       itself.
24       BY ATTORNEY VOIGT:
25   **Q. Would you have wanted to see**

23 (Pages 86 to 89)

1   this document before the events of
2   May 2006?
3       A. No. If I had these documents
4   from a proper sampling, the answer
5   would be yes.
6       Q. Turn to Plaintiff's 45,
7   please, page one. This is your mid-
8   evaluation; is that correct?
9       A. Yes, using the Millersville
10  form.
11      Q. Yes. And it's dated March 17
12  of 2006 on the third page of the
13  exhibit, so you prepared it about
14  that time?
15      A. Yes.
16      Q. Other than the visits that we
17  discussed, prior to preparing this
18  mid-evaluation, you did not observe
19  Ms. Snyder during class any other
20  times; is that right? We discussed
21  certain visits that you made. There
22  are no other visits that you made;
23  are there?
24      A. Yes. My official evaluations
25  --- I had to do six official ones,

1   which I sat in for the whole 90
2   minutes. Now, instead of doing six,
3   I did seven. But I have a way of
4   just dropping in from time to time
5   and not writing anything down, just
6   sitting in for ten minutes or so to
7   see how things are going and then be
8   on my merry way. So I did that on a
9   number of occasions.
10      Q. Do you remember the dates of
11  those ---?
12      A. Yes, I have that if you would
13  like. I could find it out for you.
14  I have them someplace.
15      Q. Did you keep any personal
16  notes from those visits?
17      A. No, I didn't. Let's see ---
18  visits.
19      Q. Did you speak to Stacy
20  following those visits?
21      A. Usually. It depended, you
22  know. If she was in the middle of a
23  class and I had to go to the middle
24  school, then I wouldn't. But usually
25  I did.

1       Q. Okay. Did you speak to Ms.
2   Reinking following those visits?
3       A. Sometimes.
4       Q. All right.
5       A. Depended on whether she was
6   available.
7       Q. Okay. Now, turning back to
8   Plaintiff's 45.
9       A. Yes.
10      Q. Under professionalism, first
11  one, adheres to the Pennsylvania
12  Professional Code of Ethics copyright
13  and privacy laws, you graded her G,
14  good progress evidence; is that
15  correct?
16      A. That's correct.
17      Q. And that was accurate as of
18  the time that you wrote this; is that
19  correct?
20      A. Yes. I felt that was proper.
21  ATTORNEY KRAMER:
22  The authenticity of
23      this document ---.
24      BY ATTORNEY VOIGT:
25      Q. And also on page one of

1   Parent's (sic) 45, you had an N,
2   needs significant remediation for
3   demonstrates in-depth understanding
4   of the subject matter; do you see
5   that?
6       A. Yes.
7       Q. What did you mean by that?
8       A. I meant that she made a lot of
9   mistakes in class. Grammatical
10  mistakes, content mistakes. I'm
11  certified in English and my long suit
12  is literature. And you know, I not
13  only detected mistakes in grammar,
14  but also mistakes in interpretation
15  and mistakes in content, having to do
16  with literature.
17  And I mean, I talked to her
18  many times about these things. I
19  mean, I tried to lead her by the hand
20  and say, look, this is something you
21  need to do better. You need to do
22  more prep just for that part of your
23  lesson.
24      Q. All right. Did you take any
25  steps to help Stacy in that regard,

24 (Pages 90 to 93)

1  such as organizing and mentoring
2  program for her?
3  A. Well, I felt I was a mentor in
4  the program.
5  Q. Okay.
6  A. I did my best to try to help
7  her see not only the aspect of a
8  lesson having to do with keeping on
9  schedule and maintaining discipline,
10  but also in the proper content.
11  Q. All right. Did you arrange to
12  meet with Stacy on a periodic basis
13  where you would review the content of
14  her proposed lesson plans?
15  A. Every time I met with her
16  after the observations ---
17  Q. Okay.
18  A. --- we did this, and I also
19  reviewed her CIRQL unit on a number
20  of occasions.
21  Q. All right. Turn to page two
22  of Plaintiff's 45. You gave Stacy
23  N's on communication and classroom
24  management; is that right?
25  A. Yes.

1  Q. What was the basis for that?
2  A. Well, speaking of
3  communication, many times her lessons
4  fell apart because she didn't clearly
5  communicate to the students what her
6  expectations were. Part of that had
7  to do also with, you know,
8  grammatical errors and so forth.
9  But basically what I was
10  zeroing in on was that her
11  instructions, her communicating with
12  the class, not only in terms of
13  setting up, say, an activity and just
14  exactly what is supposed to happen
15  there, but also just in terms of her
16  style of questioning, which wasn't
17  deep. You know, she never asked
18  questions that would really get the
19  kids to think. It was more a rote-
20  type thing which she just might get
21  it over with and move on to the next
22  point.
23  And as far as the one on
24  classroom management, I think in one
25  of these lesson plans at her --- one

1  of these observation right outside, I
2  describe one of the classes as a
3  disaster because it was as I
4  mentioned earlier, lulls in the
5  lesson where she is going from one
6  activity to the other, and the kids
7  were way out of line. And then she
8  couldn't get them back under control.
9  She got to the point where the
10  kids were playing with her, as she
11  had put up an overhead and some kid
12  would out his foot over and move the
13  projector so that, you know, things
14  would get ---. Things like that that
15  she either ignored or didn't notice.
16  And I was saying you've got to
17  have eyes in the back of your head.
18  I mean, you have to know what's going
19  on in that classroom and not let it
20  go by. And that's what I was talking
21  about.
22  Q. You've never observed this
23  class where these problems were
24  before Ms. Snyder became the student
25  teacher; correct?

1  A. You mean the same kids?
2  Q. Same kids, yeah. You never
3  seen those kids before Ms. Snyder
4  began her student teaching; correct?
5  A. Correct.
6  Q. So you don't know if they were
7  discipline problems or angels before
8  Ms. Snyder came along; correct?
9  A. Well, no, but the class that
10  I'm referring to, there were --- you
11  know, there are two levels that are
12  at CVD. Let me see if can I remember
13  what they are. One's basically the
14  academic, college-bound kids and the
15  other one are the technical. And
16  this was an academic class, so ---.
17  Q. So your position is that
18  academic students never cut up in
19  class?
20  A. No. My position is that I
21  doubt whether there were any real bad
22  actors in there, but if you have a
23  discipline problem, it might be even
24  worse with these kinds of kids
25  because they're smart enough to think

25  (Pages 94 to 97)

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

| | |
|---|---|
| 1 | of more ways to give you a hard time. |
| 2 | And in some cases, might know more of |
| 3 | the content than you do. And so, you |
| 4 | know, that all has to be taken into |
| 5 | consideration. |
| 6 | **Q. Did Ms. Reinking teach these** |
| 7 | **same students during the fall** |
| 8 | **semester of 2005?** |
| 9 | A. Yes. |
| 10 | **Q. Would it not have been Ms.** |
| 11 | **Reinking's responsibility to teach** |
| 12 | **those students discipline during the** |
| 13 | **fall semester of 2005, even before** |
| 14 | **Ms. Snyder began her student** |
| 15 | **teaching?** |
| 16 | A. Well, discipline for her own |
| 17 | teaching. But I mean, when you have |
| 18 | a student teacher, they have to |
| 19 | establish their own discipline, their |
| 20 | own management plan. |
| 21 | **Q. Well, that wasn't the** |
| 22 | **question. My question was wouldn't** |
| 23 | **it have been Ms. Reinking's** |
| 24 | **responsibility to teach her class** |
| 25 | **discipline?** |

| | |
|---|---|
| 1 | A. Well, yes, and for all I know |
| 2 | they were well-disciplined when she |
| 3 | taught them, but I don't think that |
| 4 | carries over. I mean ---. |
| 5 | **Q. For all you know, they weren't** |
| 6 | **well-disciplined when she taught** |
| 7 | **them; correct?** |
| 8 | A. That's true. |
| 9 | **Q. Turn to Plaintiff's 46,** |
| 10 | **please. Page two of the exhibit, you** |
| 11 | **rated Ms. Snyder unsatisfactory in** |
| 12 | **classroom environment; is that** |
| 13 | **correct?** |
| 14 | A. Yes. |
| 15 | **Q. And you listed some** |
| 16 | **justifications for that at the bottom** |
| 17 | **of the page; is that correct?** |
| 18 | A. Correct. |
| 19 | **Q. And that's what we've been** |
| 20 | **discussing; right?** |
| 21 | A. Correct. |
| 22 | **Q. All right. And turn to page** |
| 23 | **four, it says the professionalism** |
| 24 | **section.** |
| 25 | A. Yes. |

| | |
|---|---|
| 1 | **Q. You rated Ms. Snyder superior** |
| 2 | **in professionalism?** |
| 3 | A. Yes. |
| 4 | **Q. And you said that she usually** |
| 5 | **and extensively conducts herself in a** |
| 6 | **very professional manner; is that** |
| 7 | **correct?** |
| 8 | A. That is correct. |
| 9 | **Q. You didn't see any problems** |
| 10 | **with her professionalism at that** |
| 11 | **point; correct?** |
| 12 | A. Well, I would have given her |
| 13 | the exemplary if I saw no problems, |
| 14 | but I didn't see anything unusual for |
| 15 | a student teacher. |
| 16 | **Q. And you discussed your mid-** |
| 17 | **evaluation with Ms. Snyder?** |
| 18 | A. Yes. |
| 19 | **Q. When was that?** |
| 20 | A. It was the same day that we |
| 21 | discussed the Millersville one, |
| 22 | whatever day that was. We sat down |
| 23 | together with co-op and Ms. Snyder |
| 24 | and I ---. |
| 25 | **Q. On or about March 17th?** |

| | |
|---|---|
| 1 | A. Yeah, whatever day it was that |
| 2 | we did the Millersville form, because |
| 3 | there's --- you know, there's the |
| 4 | Millersville form and there was the |
| 5 | 430 in there. |
| 6 | **Q. Well, describe the meeting** |
| 7 | **that you had with Ms. Snyder. And I** |
| 8 | **take it Ms. Reinking was there; is** |
| 9 | **that right?** |
| 10 | A. Yes. |
| 11 | **Q. Describe the meeting, please.** |
| 12 | A. It was kind of solemn because |
| 13 | Ms. Reinking's --- and of course |
| 14 | these evaluations on the Millersville |
| 15 | form went nowhere. I mean, as I |
| 16 | said, they were just ways of seeing |
| 17 | if we're on the same page. |
| 18 | **Q. What do you mean by your** |
| 19 | **comment that these evaluations went** |
| 20 | **nowhere?** |
| 21 | A. Well, what we said earlier, |
| 22 | the Millersville form, the official |
| 23 | one that goes in a letter is the one |
| 24 | at the end. |
| 25 | **Q. Oh, okay.** |

26 (Pages 98 to 101)

| | |
|---|---|
| 1 | A. The one in the middle is just |
| 2 | to see if everybody agrees where |
| 3 | we're at. |
| 4 | Q. All right. |
| 5 | A. And Ms. Reinking and I were |
| 6 | pretty much right on in terms of our |
| 7 | evaluations. And Ms. Snyder had |
| 8 | herself ranked up in the Gs and Rs in |
| 9 | almost everything, which was totally |
| 10 | unrealistic. And so I guess you |
| 11 | might say that I, at that point, kind |
| 12 | of tried to give her a dose of |
| 13 | realism. I did a lot of talking at |
| 14 | that conference, and was more of less |
| 15 | okay, you know, now is the time |
| 16 | things have to change if you want to |
| 17 | get through. |
| 18 | Q. You did not --- well, during |
| 19 | this meeting, you did not tell Ms. |
| 20 | Snyder that she should not be a |
| 21 | student teacher any longer; correct? |
| 22 | A. No. No, I didn't. |
| 23 | Q. Neither did Ms. Reinking; |
| 24 | correct? |
| 25 | A. No. |

| | |
|---|---|
| 1 | Q. And you had it in your power |
| 2 | at that time to remove Ms. Snyder |
| 3 | from ---? |
| 4 | A. Yes. I had discussed the |
| 5 | possibility with Ms. Reinking, and |
| 6 | she said no, I want to --- I think I |
| 7 | can work with her, you know ---. |
| 8 | Q. Okay. And you continued to |
| 9 | ---? |
| 10 | A. Stacy knew nothing about that, |
| 11 | as far as I know. She did know that |
| 12 | she had to shape up if she wanted to |
| 13 | pass. |
| 14 | Q. Okay. Turn to Exhibit 65. |
| 15 | This is Ms. Reinking's mid- |
| 16 | evaluation; is that correct? |
| 17 | A. Yes, it is. |
| 18 | Q. All right. And on the first |
| 19 | page where it talks about |
| 20 | professionalism ---. |
| 21 | A. Wait a minute. |
| 22 | Q. Sixty-five (65). You're on |
| 23 | 64, I believe. |
| 24 | A. Yeah, okay. I'm on the wrong |
| 25 | on. Okay, 65. Midterm. |

| | |
|---|---|
| 1 | Q. Yes. |
| 2 | A. Yes, this is Ms. Reinking's. |
| 3 | Q. And on the first page, Ms. |
| 4 | Reinking gave Stacy a G in adhering |
| 5 | to the Pennsylvania Code of Ethics, |
| 6 | et cetera? |
| 7 | A. Correct. |
| 8 | Q. Did you have any discussions |
| 9 | with Ms. Reinking other than what |
| 10 | we've already discussed concerning |
| 11 | her preparation of this document? |
| 12 | A. Well, everything we've talked |
| 13 | about up to that point probably shows |
| 14 | up in here some place. |
| 15 | Q. Okay. |
| 16 | A. But no, I haven't. I didn't |
| 17 | help her make this up, if that's what |
| 18 | you're saying. |
| 19 | Q. No. Turn to Plaintiff's 77. |
| 20 | A. I'm with you. |
| 21 | Q. This is the Praxis scores that |
| 22 | Stacy received in or about March of |
| 23 | 2006; correct? |
| 24 | A. If you say so, I guess. |
| 25 | Q. Well, take a look at it and |

| | |
|---|---|
| 1 | confirm that for me? |
| 2 | ATTORNEY KRAMER: |
| 3 | We're not disputing the |
| 4 | authenticity of this document. |
| 5 | BY ATTORNEY VOIGT: |
| 6 | Q. All right. And what do you |
| 7 | know about the Praxis examinations? |
| 8 | A. They're a test of competency. |
| 9 | Q. Is it a state-wide test? |
| 10 | A. Yes. |
| 11 | Q. And it tests the competency of |
| 12 | future teachers in their proposed |
| 13 | subject matter areas; is that what it |
| 14 | does? |
| 15 | A. Yes. |
| 16 | Q. Now, at the bottom of the |
| 17 | page, it looks like Stacy took a |
| 18 | Praxis exam in English language, |
| 19 | literature, composition, content and |
| 20 | knowledge; do you see that? |
| 21 | A. Yes. |
| 22 | Q. And she scored a 171; do you |
| 23 | see that? |
| 24 | A. And that would, if you look |
| 25 | under the test date, that would place |

27 (Pages 102 to 105)

1  her in the average performance range;
2  is that correct?
3  A. Yes.
4  **Q. Do you have any reason to**
5  **doubt the authenticity of this**
6  **document?**
7  A. No.
8  **Q. So according to the state,**
9  **Stacy knows English literature and**
10 **composition, et cetera, in a**
11 **satisfactory manner; correct?**
12 ATTORNEY KRAMER:
13 I'll object. The
14 document speaks for itself.
15 She certainly scored as the
16 document indicates. I don't
17 know if can ---.
18 BY ATTORNEY VOIGT:
19 **Q. Well, do you know why Stacy**
20 **would score in the average range on**
21 **the Praxis exam and then in your view**
22 **not present the material in class in**
23 **a satisfactory manner?**
24 A. Can I explain that?
25 **Q. Yes.**

1  A. No, I can't explain it.
2  **Q. Did you look into it? It**
3  **looks like Stacy ---.**
4  A. I wasn't even aware of what
5  she had in her Praxis. I just know
6  she passed it.
7  **Q. Wouldn't it have been useful**
8  **to look into her Praxis scores if**
9  **you're seeing these problems of**
10 **content? Wouldn't it have been**
11 **useful to look up her Praxis scores**
12 **and see if state forms are showing**
13 **the same thing?**
14 A. Well, it would have been
15 useful, I guess, as it relates to
16 what was going on in the classroom.
17 That was --- what's going on in your
18 classroom was the most important
19 thing to me.
20 **Q. All right. Turn to**
21 **Plaintiff's, 47 page one. This is**
22 **your evaluation from block one on**
23 **April 3rd; correct?**
24 A. Yes. It's dated --- the
25 conference was on the 5th, the

1  observation was on the 3rd.
2  **Q. And how long did you evaluate**
3  **Stacy this time, the same, 90**
4  **minutes?**
5  A. Yes.
6  **Q. And you say the lesson plan**
7  **was excellent. Do you see that,**
8  **third line down?**
9  A. Yes.
10 **Q. And you agree with that**
11 **statement?**
12 A. Yes.
13 **Q. And you listed a number of**
14 **glows --- said a new development.**
15 **You didn't have glows and grows**
16 **before; did you?**
17 A. No, but I decided to get
18 creative.
19 **Q. Okay. So you have five glows**
20 **and only two grows; is that correct?**
21 A. That's correct.
22 **Q. All right. And you gave Stacy**
23 **a glow on preparation; is that right?**
24 A. That's correct.
25 **Q. Okay. And you didn't list any**

1  **grows for Stacy concerning**
2  **unprofessional; did you?**
3  A. No, the grows had to do with
4  modeling and key questions.
5  **Q. All right. And did you meet**
6  **with Stacy on or about April 5th?**
7  A. Yes.
8  **Q. And what was the nature of**
9  **that meeting?**
10 A. I think the nature of it was
11 very positive. I thought that she
12 was starting out on the right foot
13 with this class and ---.
14 **Q. Is this a new class?**
15 A. Yes. I may have been in error
16 when I talked about that other
17 observation being the new class. I
18 think this was probably the new
19 class, or maybe they both were.
20 **Q. So Stacy didn't have any**
21 **problems with keeping this new class**
22 **in line; right?**
23 A. Well, I didn't say she didn't
24 have any problems, but it was well
25 within the bounds of reasonable, I

28 (Pages 106 to 109)

1    would say.
2    Q. Do you know who the next
3    teacher was of the old class?  Was
4    that Reinking again?
5    A. Yes, yes.
6    Q. You didn't go visit the old
7    class and determine whether they had
8    suddenly stopped misbehaving now that
9    Ms. ---?
10   A. No, I didn't.
11   Q. Let me finish the question.
12   You didn't go back to the old class
13   to determine whether they had
14   suddenly started behaving,
15   appropriating now that Ms. Reinking
16   was in charge; correct?
17   ATTORNEY KRAMER:
18   I object to the
19      compound question.  He didn't
20      go back to the old class.
21   BY ATTORNEY VOIGT:
22   Q. All right.  You didn't go back
23   to the old class; right?
24   A. Right.
25   Q. Okay.  All right.  P-47, page

1    two.  It says April 6, block one.
2    Same, 90 minutes?
3    A. Yes.
4    Q. And you said that Stacy was
5    highly organized; right?
6    A. Yes.
7    Q. And you complemented her in
8    ten different areas; right?
9    A. Correct.
10   Q. No comments regarding
11   unprofessionalism; right?
12   A. Correct.
13   Q. Did you talk to Stacy about
14   this one?
15   A. Yes.
16   Q. And what was the nature of
17   that conversation?
18   A. I talked to her about trying
19   to get more out of these kids.
20   Unlike the other class, this class
21   tended to be very quiet.  And I'm
22   trying to get them to talk, you know,
23   rather than trying to keep them
24   quiet.
25   Q. Okay.

1    A. Have them speak up when they
2    answered so the other students could
3    hear what they were saying.
4    Q. All right.  And turn to page
5    three.  This is block two from April
6    6th.
7    A. Yes.
8    Q. This is another 90 minutes?
9    A. Yes.
10   Q. And you said that Stacy made
11   good use of her time; is that right?
12   A. To a point.  If you read down
13   through that thing, it went like
14   this.  It was okay for a while and
15   then it went 20 minutes left in the
16   class ---.
17   ATTORNEY VOIGT:
18   Off the record.
19      OFF RECORD DISCUSSION
20   BY ATTORNEY VOIGT:
21   Q. So what happened in the last \
22   --- it says here the last few minutes
23   of the class; what happened then?
24   A. Well, as the first two
25   paragraphs, three paragraphs

1    indicate, things were going well.
2    She had the kids working in pairs.
3    She had specific instructions on what
4    they were supposed to do.  She stated
5    the purpose well.  She got some take-
6    time-to-think-type questions.
7    One of her problems was that
8    she would ask a kid a question and
9    then cut him off.  So you know, she
10   did better with taking time to allow
11   somebody to think before they
12   responded.
13   But then what happened was
14   after they were done working in
15   pairs, instead of moving them back
16   into their regular seats, she just
17   left them stay in pairs, you know.
18   So then they started talking and the
19   class got out of hand and she got
20   mad.  So she said okay, you're not
21   --- I think she said mature enough to
22   do another activity, and then she
23   gave them something to study for the
24   rest of the period, which was about
25   12, 15 minutes.  I'm not exactly sure

29 (Pages 110 to 113)

1    anymore. I say 12 minutes here. And
2    then when they got quiet, she started
3    talking again.
4  So in the conference, I said,
5    you know, if your purpose is to have
6    them sit there quietly because
7    they're not mature enough to handle
8    another activity, once they sit there
9    quietly and listen to what you tell
10   them, then don't start talking again.
11   You know, you're defeating your own
12   purpose.
13  And I said, do you know where
14   the legs fell off of this lesson?
15   And she said, yes, I do. I didn't
16   move them back to their regular
17   seats. And that's --- so that lesson
18   was good, then it went downhill.
19   **Q. You didn't think that Stacy**
20   **was unprofessional during that class;**
21   **did you?**
22   A. No.
23   **Q. All right. Turn to P-47 page**
24   **four, April 18th. And this was**
25   **another 90-minute evaluation?**

1   A. Yes.
2   **Q. You have ten glowing comments**
3   **on Stacy; is that right?**
4   A. Yes.
5   **Q. And you say, among other**
6   **things, excellent CIRQL unit**
7   **planning?**
8   A. Yes.
9   **Q. What does that mean exactly?**
10   A. Well, a CIRQL unit is the unit
11   she did on Macbeth, which was her
12   CIRQL unit.
13   **Q. Oh, okay.**
14   A. And I felt at this stage of
15   the game it was going well, it was
16   going according to plan.
17   **Q. Okay. It also says great**
18   **improvement in content; is that**
19   **right?**
20   A. Yes.
21   **Q. Okay. And as for the grow**
22   **comments, there's no comments about**
23   **unprofessionalism; correct?**
24   A. That's correct.
25   **Q. All right. Now, you did not**

1   **observe Stacy in class after April**
2   **18th; is that correct?**
3   A. That's correct; not formally.
4   **Q. Informally, did you?**
5   A. I'd have to check my visits,
6   which I'm going to give you, but I
7   probably dropped in. I know I
8   dropped in one day when she had a
9   discipline problem down in the
10   library and was convinced that it
11   wasn't a big problem. But I'll have
12   the dates of when I dropped in. I
13   have them some place. I'll find it.
14   **Q. All right. Turn to the table**
15   **of contents which is in the front of**
16   **the first book all the way at the**
17   **front, page three. Now, the table of**
18   **contents lists a number of teacher**
19   **observations and the dates of the**
20   **observations. Were you present**
21   **during any of these observations? If**
22   **not, I'll just move on. But if you**
23   **were, maybe I'll ask some more**
24   **questions.**
25   A. I don't even know what these

1   are.
2   **Q. Well, if you don't know, then**
3   **it's all right. We'll take an**
4   **example then. Turn to Plaintiff's**
5   **33.**
6   A. Okay. Well, it's going to ---
7   it's dawned on me here what this is.
8   Other people ---.
9   **Q. Well, answer the question as**
10   **long as we're on the subject.**
11   **Plaintiff's 33.**
12   A. I think it's backwards. I
13   think she was observing them, not
14   them observing her.
15   **Q. Oh, if that's the case then**
16   **tell me?**
17   A. I know they didn't all come in
18   and observe her classes. She had to
19   go out and observe other classes. So
20   I think that's what it is.
21   **Q. Oh, okay.**
22   A. Her observing ---.
23   **Q. So this is Stacy's**
24   **handwriting; is that what you're**
25   **saying?**

1    A. Yes.
2    Q. Okay.
3    A. Yes, that's what this is.  She
4    had to observe so many teachers, so
5    many in the English discipline, but
6    she was not to restrict herself to
7    the English discipline.  She was to
8    --- she was looking for style, not
9    particularly content.
10   Q. All right.  So no other CV
11   teachers observed Stacy teaching
12   other than Ms. Reinking; is that what
13   you're saying, to your knowledge?
14   A. To my knowledge.
15   Q. Okay.  Shouldn't other
16   teachers come in and observe a
17   student teacher throughout the
18   semester?  Wouldn't that be
19   preferable?
20   A. Well, it might be preferable,
21   but it happens very seldom.  The only
22   time it happens usually is if the
23   person invites somebody in.
24   Q. The person being the teacher?
25   A. The student teacher or the co-

1    op.  Many times they might invite the
2    principal in.
3    Q. So if a teacher gets really
4    bad --- if a student teacher gets
5    really bad or really inappropriate,
6    then the cooperating teacher on
7    occasion would bring in a supervisor
8    or a principal to observe the
9    situation?
10   ATTORNEY KRAMER:
11   I'll object.  That's
12   not what he said.
13   ATTORNEY VOIGT:
14   Well, if it isn't then
15   he can explain.
16   A. I was talking about the
17   offices really .  Usually if a student
18   teacher is doing a good job and the
19   co-op wants to show them off to the
20   principal, in case there's a position
21   open up or in case there's --- they
22   want to have the principal as a
23   reference ---
24   BY ATTORNEY VOIGT:
25   Q. Oh, okay.

1    A. --- or something to that
2    effect.
3    Q. The opposite would be true,
4    too?  If a student teacher was to do
5    a really bad job, it's possible that
6    the cooperating teacher could bring
7    in another teacher or a supervisor or
8    something to observe the interactions
9    in class?
10   ATTORNEY KRAMER:
11   You can answer, but I
12   would object to calls for
13   speculation.  You can answer.
14   A. I never knew if that happened.
15   BY ATTORNEY VOIGT:
16   Q. Okay.  Now, turn to P-47, page
17   five.  There's a CIRQL unit
18   evaluation; right?
19   A. Yes, but as I said previously,
20   that has nothing to do with teaching.
21   That is basically what the --- this
22   is the form I used to evaluate her
23   unit.  And all those things that are
24   listed up there had to go in with her
25   CIRQL unit along with the content and

1    the lesson plans and the whole --- so
2    this does not relate to teaching.  It
3    relates to preparation.
4    Q. So this has no relevance to
5    Stacy's ability as a teacher?
6    A. Certainly it does.  It says
7    that she is a good planner.
8    Q. Planning is an important part
9    of teaching; wouldn't you agree?
10   A. Yes.
11   Q. Describe the project that
12   Stacy completed which lead to this
13   evaluation.  You talked about it a
14   little bit, but describe in more
15   detail, please.
16   A. Well, the CIRQL plan or
17   whatever you want to call it from
18   Millersville includes all these
19   things that are listed here in the
20   planning stages.  And then the CIRQL
21   units are shown off at a CIRQL fair
22   at the end of the semester, where the
23   students not only include this in
24   their booklet, but they also include
25   their best five lesson plans out of

1    all the lesson plans they used.
2    And then they sit around and
3    they collaborate with other students
4    at the end of the semester. And so
5    in preparing this, the student has to
6    prepare a lot of the planning, but
7    also has to prepare the lesson plans
8    and the assessments that go with it.
9    Q. And what did Stacy do in
10   particular? Do you remember what her
11   CIRQL unit plan was that got all
12   these E's?
13   A. Macbeth.
14   Q. What was it about Macbeth that
15   Stacy did that was worthy of
16   exemplary grades?
17   A. Well, I felt that she had
18   taken seriously the earlier
19   discussions about content and that
20   really had the proper content,
21   everything in their proper form. I
22   felt the assessments were much better
23   than any I had seen during the
24   semester so far.
25   Q. Compared to other students, or

1    just compared to ---?
2    A. Compared to her own earlier
3    assessments. I had spoken to her on
4    a number of occasions about how the
5    assessments didn't tend to match her
6    teaching sometimes. Test what you
7    teach. And so I complemented her for
8    the assessments that I felt were
9    right on.
10   Q. Did you meet with Stacy to
11   discuss this evaluation?
12   A. Yes.
13   Q. Was it on or about May 2nd?
14   A. Yes. She had to have this
15   done for the CIRQL. I had to have it
16   evaluated before they had this CIRQL
17   festival or fair or whatever it is.
18   So yes, I would say that that's when
19   I met with her, 5/2.
20   Q. All right. And describe the
21   meeting, please.
22   A. Well, I don't recall much
23   about it except I think it was
24   positive.
25   Q. And at that meeting, you did

1    not discuss any problems with Stacy's
2    professionalism; correct?
3    A. Correct.
4    Q. And at that meeting, you did
5    not give Stacy any indication that
6    she would not be receiving her
7    Bachelor of Science in Education
8    degree; correct?
9    A. Correct.
10   ATTORNEY VOIGT:
11   Let's take a break and
12   then we'll move on to the
13   drunken pirate photo.
14   SHORT BREAK TAKEN
15   ATTORNEY VOIGT:
16   Back on the record.
17   BY ATTORNEY VOIGT:
18   Q. Turn to Plaintiff's 93. Have
19   you ever seen this photo before?
20   A. Not this exact photo.
21   Q. Have you ever seen a similar
22   photo?
23   A. Yes.
24   Q. When did you first see a
25   similar photo?

1    A. I saw the one that was posted
2    on May the 4th. That's the date on
3    it, and the first time I saw it was
4    on May the 8th.
5    Q. So turn to Plaintiff's 51. Is
6    this the photo that you saw on or
7    about May 8th?
8    A. Yes.
9    Q. And you also saw the text on
10   or about that date?
11   A. That's correct.
12   Q. How did you come to receive or
13   see this photo and this text?
14   A. Mrs. Reinking had a copy of
15   it.
16   Q. And how did she go about
17   delivering it to you?
18   A. Well, I went over to the
19   school on the 8th after I was called
20   on the telephone by Mrs. Buffington.
21   Q. And what did --- before we get
22   to that, prior to seeing this photo
23   and text on May the 8th, you had
24   taken no steps to set in motion the
25   denial of Stacy's Bachelor of Science

32 (Pages 122 to 125)

```
1    in Education degree; correct?
2    A. I had nothing to do with that
3    whatsoever, one way or the other.
4    Q. Okay. But to answer the ---.
5    A. You keep referring to me as a
6    policy maker. I'm an adjunct
7    instructor. I'm not a policy maker.
8    Q. Okay. Well, please, answer
9    the question. You took no steps to
10   deny Stacy her Bachelor of Science in
11   Education degree prior to seeing this
12   photo and text; correct?
13   ATTORNEY KRAMER:
14   Objection. He answered
15      that. He doesn't have, as I
16      have said, the authority to
17      take steps to grant or deny
18      the degree.
19   BY ATTORNEY VOIGT:
20   Q. Okay. You make
21   recommendations; do you not?
22   A. Yes.
23   Q. You had taken no steps prior
24   to May 8th of 2006 to make any
25   recommendations regarding the denial
```

```
1    involved in ---. This is an unusual
2    situation.
3    Q. Oh, okay. In this case, did
4    you make a recommendation to Dr. Bray
5    after reviewing this photograph?
6    A. In regard to?
7    Q. In regard to Stacy and the
8    awarding or not awarding to Stacy of
9    her Bachelor of Science in Education?
10   A. I made no recommendation on
11   that.
12   Q. Now, prior to seeing this
13   photo and text, no one at Conestoga
14   Valley, including Ms. Reinking and
15   Ms. Buffington, had complained to you
16   about Stacy's professionalism;
17   correct?
18   A. No, that's not correct.
19   Q. What did they do to complain
20   to you about Stacy's professionalism?
21   A. Well, first of all, before the
22   evaluation --- I've already said,
23   that it was nothing unusual. The
24   only incidence that I was aware of is
25   when she spoke in her class about
```

```
1    of Stacy's Bachelor of Science in
2    Education degree; correct?
3    A. I have no --- it wasn't up to
4    me. I have no authority to say
5    whether she was going to get a
6    Bachelor of Science or whether she
7    wasn't. My job is to evaluate her
8    and to be her supervisor and do the
9    academic evaluation.
10   Q. And to make recommendations;
11   right?
12   A. To make recommendations.
13   Q. Okay. And you make
14   recommendations to Dr. Bray; would
15   that be accurate?
16   ATTORNEY KRAMER:
17   Are you asking in this
18      case or ---?
19   BY ATTORNEY VOIGT:
20   Q. No, just generally in the
21   normal course of things, do you make
22   recommendations to Dr. Bray?
23   A. Not in the normal course of
24   things. In the normal course of
25   things, Dr. Bray is never even
```

```
1    meeting her ex-husband at a --- her
2    and her kids saw her ex-husband at
3    some outlet or something. And I
4    spoke to her about that. I said,
5    remember, you don't get personal, the
6    kids --- the worst thing you can do
7    is try to get buddy, buddy with these
8    kids. And you know, you have to
9    start out, even though it's --- you
10   got to start out as strangers.
11   And the only other thing I was
12   aware of was that she had asked the
13   principal for a key to the room,
14   rather than going through the proper
15   channels.
16   Q. Is that improper in some
17   fashion, to talk to the principal if
18   you're a student teacher?
19   A. Yes. Well, to say, may I have
20   the key to the room, you should go
21   through your co-op.
22   Q. Is that written down somewhere
23   that you have to go through your co-
24   op before you speak to the principal?
25   A. No, no. It's just
```

1    commonsense.

2    **Q. What is your basis for calling**

3    **that commonsense?**

4    A. Because these student teachers

5    are told when they go out there,

6    they're the guests of the school.

7    You know, fit in. Don't sit in

8    somebody's chair on the faculty. You

9    know, do what you're expected to do.

10    Go through the proper chains of

11    command. You know, use some

12    commonsense when you're out there.

13    I'm not saying that was a big thing,

14    or I would have graded her down.

15    What I'm saying is, those are

16    the things I was aware of in the

17    middle. Now, when we met for the

18    mid-conference, I became aware by

19    reading Ms. Reinking's mid-conference

20    that she had told a couple classes to

21    shut up, which up to that point, I

22    had no knowledge of. And I attribute

23    to the fact that, you know, Ms.

24    Reinking was trying to help her,

25    trying to get her through some of

1    these things.

2    But then after the mid, there

3    were some other things that happened

4    that I was told about that Ms.

5    Reinking told me about where, when

6    she went out to complete her

7    observations of other teachers that

8    teachers complained to her because

9    instead of paying attention to the

10    class, she was sitting back there

11    working on lesson plans. There was

12    an incident that I was told about

13    where she played some music that had

14    some foul language in it.

15    **Q. We'll get to all of that. So**

16    **your testimony is that by complaining**

17    **about Stacy speaking to the principal**

18    **at Conestoga Valley without first**

19    **going through Ms. Reinking, is a**

20    **complaint about Stacy's**

21    **unprofessionalism?**

22    ATTORNEY KRAMER:

23    I'll object. He said

24    --- he referred to incidents

25    above and beyond that one

1    particular incident.

2    BY ATTORNEY VOIGT:

3    **Q. Okay. Do you believe ---?**

4    A. I said that that happened

5    before the mid, and I didn't attach

6    no real significance to it because it

7    wasn't unusual for a student teacher.

8    I mean, I spoke to her about it, but

9    I didn't ---

10    **Q. Okay.**

11    A. --- think it was a big deal.

12    **Q. All right. Now, do you know**

13    **whether this photo and text, which is**

14    **Parent's (sic) 51, caused any actual**

15    **disruption at Conestoga Valley School**

16    **District? Let me strike that.**

17    **As you sit here today, you do**

18    **not know of any actual disruption of**

19    **the school environment at Conestoga**

20    **Valley School District due to the**

21    **photo and text, which is Parent's 51?**

22    ATTORNEY KRAMER:

23    If you can just

24    clarify.

25    ATTORNEY VOIGT:

1    Plaintiff's 51.

2    ATTORNEY KRAMER:

3    When you refer to

4    disruption, are you including

5    --- are you referring only to

6    what's going on in the

7    classroom as opposed to,

8    perhaps, Reinking and

9    Buffington getting involved as

10    well?

11    ATTORNEY VOIGT:

12    I'll let the witness

13    define it however he wants.

14    BY ATTORNEY VOIGT:

15    **Q. You do not know of any actual**

16    **disruption of the school environment**

17    **at Conestoga Valley due to Ms.**

18    **Snyder's posting this photo and text;**

19    **P-51?**

20    A. It depends on how you define

21    disruption. But the fact that there

22    were students looking at this, and

23    she says clearly here that that's

24    okay. And then I was informed that

25    on the 5th, which was a Friday, that

1   she had mentioned in one of her
2   classes that one of her students had
3   been on her MySpace website and of
4   course, knowing students, everybody
5   would have gone home and gotten on
6   the website. So I don't know how you
7   define disruption, but I would say
8   that there was at least a ripple
9   going through the community there.
10  Q. Okay. You don't know of any
11  other students beside the one student
12  that you referred to that actually
13  saw this on Ms. Snyder's website;
14  correct?
15  A. Correct.
16  Q. And everything else would be
17  just speculation; correct?
18  A. Yeah. Yes.
19  Q. Okay. Other than what you
20  described there, can you think of any
21  other actual disruption of the school
22  environment due to Ms. Snyder's
23  posting this photo and text?
24  A. Yes.
25  Q. What?

1   blaming all the problems on that
2   person.
3   Q. So you don't see the word
4   Reinking in that?
5   A. I do not see it, but I can't
6   see who else it would be.
7   Q. Are you not speculating as to
8   the nature of that person?
9   A. Yes.
10  Q. And you are not aware of any
11  interference in discipline at
12  Conestoga Valley due to Ms. Snyder's
13  posting this photo and text; correct?
14  ATTORNEY KRAMER:
15  I will object. You can
16  answer it, but I think he's
17  already answered that
18  question.
19  BY ATTORNEY VOIGT:
20  Q. Did discipline break down at
21  Conestoga Valley due to this photo
22  and text?
23  ATTORNEY VOIGT:
24  Go off the record.
25  BRIEF INTERRUPTION

1   A. I would say that the text here
2   got some people up in arms. I don't
3   know that it disrupted the students,
4   but it certainly got some people up
5   in arms in the English Department.
6   Because even though Stacy had been
7   told in teaching of that if she had
8   something like MySpace, it was never
9   to point a finger at anybody, never
10  to be personal, never to mention
11  anybody's name. And secondly, in
12  that orientation, when I was there,
13  they were told if they had these
14  accounts they should delete them.
15  But when you read this last
16  sentence here, they keep asking me
17  why I don't apply there. Do you
18  think it would hurt me to tell them
19  the real reason for who the problem
20  was? Now, if that's not Ms.
21  Reinking, I wouldn't know who --- you
22  might as well just put Reinking's
23  name right down there. And to me,
24  that is a personal pointing the
25  finger at a professional person and

1   BY ATTORNEY VOIGT:
2   Q. There was nothing threatening
3   about this photo and text; correct?
4   A. Correct.
5   Q. You do not consider this photo
6   lewd or obscene; do you?
7   A. No.
8   Q. You don't consider the
9   language accompanying the photo to be
10  lewd or obscene; do you?
11  A. No.
12  Q. Now, in the text, Stacy
13  discusses her decision not to apply
14  for a job at Conestoga Valley; right?
15  A. Correct.
16  Q. Wouldn't someone reading this
17  posting be entitled to know about
18  Stacy's decision in that regard?
19  ATTORNEY KRAMER:
20  I'll object. It's a
21  very bad question. I'm not
22  sure he can answer it.
23  BY ATTORNEY VOIGT:
24  Q. Well, wouldn't it be a matter
25  of public concern that Stacy decided

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

```
                           Page 138                                         Page 140
 1      not to apply?                         1      know why your student teacher wasn't
 2   ATTORNEY KRAMER:                         2      applying for a job there?
 3   I'll object.  That                       3   ATTORNEY KRAMER:
 4      calls for a conclusion ---.           4   Objection.  Calls for
 5      BY ATTORNEY VOIGT:                    5      speculation.
 6      Q. You can answer over objection      6      BY ATTORNEY VOIGT:
 7      pursuant to our usual stipulations.   7      Q. You can answer it.
 8      Wouldn't you agree that it is a       8      A. I don't think I would.  It
 9      matter of public concern at least     9      wouldn't cross my mind actually.
10      within the Conestoga Valley School   10      What would students know about an
11      District concerning whether Stacy    11      opening?  You know, if there was even
12      decided to apply for a job there?    12      a job opening?
13   ATTORNEY KRAMER:                        13      Q. After receiving this photo ---
14   Same objection.  You                    14      strike that.
15      can go ahead and answer.             15   I take it you first learned of
16      A. Well, the Conestoga Valley has    16      this photo through a phone call; is
17      a process that they use to decide    17      that correct?
18      who's going to be interviewed ---.   18      A. Yes.
19      BY ATTORNEY VOIGT:                   19      Q. From Ms. Buffington; is that
20      Q. I'm not concerned about that.     20      correct?
21      I'm concerned with whether this      21      A. Yes.
22      posting discusses a matter of public 22      Q. Okay.  And who is Ms.
23      concern, which is Stacy's decision   23      Buffington?
24      not to apply.                        24      A. She is the English Supervisor
25   ATTORNEY KRAMER:                        25      at Conestoga Valley.

                           Page 139                                         Page 141
 1   I would object.  It                      1      Q. Okay.  What was the nature of
 2      calls for a conclusion that           2      that phone call?
 3      he's ---.                             3      A. The major of it was that she
 4      BY ATTORNEY VOIGT:                    4      said that they had some serious
 5      Q. Okay.  Let me rephrase the         5      objections about Stacy's
 6      question.  Would you agree that       6      professionalism, and she had
 7      Stacy's decision not to apply at      7      discussed this with the acting
 8      Conestoga Valley School District for  8      superintendent because the
 9      a job is a matter of public concern   9      superintendent was away.  And that he
10      at least among the Conestoga Valley  10      had decided that she should not be
11      community?                           11      allowed to continue, that she would
12   ATTORNEY KRAMER:                        12      only be allowed to return on the
13   Same objection.  You                    13      11th, which would be a Thursday, to
14      can answer.                          14      pick up her materials and I was to
15      BY ATTORNEY SMITH:                   15      accompany her and accompany her out.
16      Q. Wouldn't their students want      16      And she was to have no connection
17      to know why she's not applying for a 17      with the students.
18      job?                                 18      Q. What was your response to
19   ATTORNEY KRAMER:                        19      those comments?
20   Or if you don't know,                   20      A. My response was, why me?
21      tell him you don't know.             21      Q. What does that mean?
22      A. I don't know.                     22      A. I mean, that week was one of
23      BY ATTORNEY VOIGT:                   23      the worst weeks of my life is what it
24      Q. If you were a student in          24      means.
25      Stacy's class, wouldn't you want to  25      Q. Okay.  Did you attempt to
```

36 (Pages 138 to 141)

1  defend Stacy?  After all, you just
2  gave her Es on her CIRQL.
3  A. I went in to talk to Reinking
4  and Buffington.
5  Q. Was that on the 8th of '06?
6  A. That would have been the 8th,
7  yes.
8  Q. And what did you say?
9  A. I didn't say much.  I just
10  listened because I was trying to make
11  some sense out of the whole thing,
12  because to me, it was a situation I
13  hadn't encountered before.  So I did
14  most of the listening instead of
15  talking.  I was told that she was not
16  to return until Thursday, and I was
17  to come in with her and go out with
18  her and get her stuff.  That was it,
19  and so ---.
20  Q. What did you say?  Did you
21  defend Stacy?  After all, you just
22  gave her a lot of glowing comments on
23  the last few evaluations.
24  A. Well, I don't recall, you
25  know, what all I said or whether I

1  tried to defend her or whether I just
2  listened to what they were saying
3  because I'm not a real fast thinker,
4  you know.  I have to process stuff a
5  little bit before I decide what I'm
6  doing, so I guess you might say that
7  I just was a listener and trying to
8  process what all this meant.  So I
9  didn't say a whole lot when I was
10  there.
11  Q. How long did the meeting last?
12  A. It was short and sweet.
13  Q. Less than ten minutes, less
14  than five minutes?
15  A. Maybe 15 minutes, I don't
16  know.
17  Q. Who all was at the meeting?
18  A. Mrs. Buffington, Mrs.
19  Reinking, and me.
20  Q. Ms. Seldomridge was not there?
21  A. She wasn't there.
22  Q. Was Dr. Bray at that meeting?
23  A. No.
24  Q. How did the meeting end?
25  A. I don't recall.

1  Q. At that meeting, were you
2  shown a copy of the photo and text on
3  Plaintiff's 51?
4  A. Yes.
5  Q. Did you receive a copy of it?
6  A. Yes.
7  Q. Did you take one home with
8  you?
9  A. Yes, I did.
10  Q. What did you do after leaving
11  the meeting?
12  A. Well, I went home and I
13  reviewed everything that was going on
14  and I --- as I recall, either that
15  day or the next morning, I called out
16  at Millersville or came out here to
17  Millersville to talk to the guy who
18  lines up the students within the
19  Department, you know, who actually
20  does the assigning of student
21  teachers and kind of shared the ---.
22  Q. Who's that?
23  A. That's another one I'll have
24  to ---.
25  Q. Before we get to May 9th,

1  let's stick with May 8th.  P-51, page
2  two.
3  A. All right.  What are we
4  looking at?
5  Q. P-51, page two.  Your copy
6  probably isn't very good.  So this is
7  the note, the post-it note that
8  accompanied the photo and text.  Can
9  you read that for me, please?
10  A. Does not respect professional
11  boundaries.  A way to say she is
12  surely --- or socially, whatever,
13  inept.
14  Q. Let me just read it for the
15  record.  It says, does not respect
16  professional boundaries.  A way to
17  say she is socially inept.  Do you
18  know who wrote that?
19  A. No.
20  Q. Did you ever see that note
21  before?
22  A. No.
23  Q. Did you speak with Stacy on
24  May 8th if 2006?
25  A. I think she called me.

1   Q. Let me turn your attention to
2   Plaintiff's 100, which is all the way
3   in the back, page five.
4   A. Yes.
5   Q. Actually, let's ---. It says
6   here, Plaintiff immediately
7   telephoned Girvin, who, in his
8   individual capacity, refused to
9   disclose any further information. Do
10  you recall a conversation with Ms.
11  Snyder on May 8th?
12  A. Yes. I don't recall whether
13  that was before or after my visit
14  over to CV, but I do recall saying
15  that I didn't know enough about the
16  situation to comment on it.
17  Q. All right. Why did you not
18  give Stacy any further details? Was
19  it just that you didn't know any
20  details?
21  A. Well, if it was before I went
22  over to the school, that would be
23  true. I'm not sure whether it was
24  before or after I went over to the
25  school when I was talking to her on

1   at all with her. That complicates
2   this because she was in the hospital.
3   So that's where Weinrick (phonetic)
4   comes into this thing because
5   Weinrick was the acting dean when I
6   came out here to talk. And the guy I
7   was talking about that set up the
8   student teachers referred me to
9   Weinrick because she was acting dean.
10  Q. All right. So let's take this
11  step by step. You said earlier that
12  on May 9th, you contacted somebody at
13  Millersville who was the supervisor
14  of all the student teachers?
15  A. No, just the secondary ones
16  who assigned them. You know, it was
17  just an administrative task of
18  assigning the student teachers.
19  Q. Okay. What did you say during
20  that conversation?
21  A. Well, I told him what the
22  problem was. I showed him the
23  picture and he referred me to Dr.
24  Weinrick.
25  Q. And the reason for the

1   the phone.
2   Q. Okay. All right. Turn to
3   Plaintiff's 48 on the first page.
4   This is an e-mail from Buffington to
5   Reinking dated May 9 of '06.
6   A. Okay.
7   Q. Did you ever see this e-mail
8   before? First page, we'll get to the
9   second page in a minute.
10  A. No. Oh, wait a minute. Well,
11  since it's sent to me, I guess I did.
12  I'm familiar with what's on the next
13  page if that's what you're referring
14  to.
15  Q. Before we get to the next
16  page, did you have any conversations
17  with Buffington about either the memo
18  or the accompanying text on the
19  following page?
20  A. No, not with Buffington.
21  Q. All right. Did you have any
22  conversations with Bray about the
23  memo? First of all, who is Jane
24  Bray?
25  A. Well, I had no conversations

1   referral to Dr. Weinrick was for
2   what?
3   A. I don't think he wanted to
4   take responsibility for this.
5   Q. Well, I don't mean that. Why
6   was it not referred to Dr. Bray?
7   A. Because she was in the
8   hospital.
9   Q. All right. Did you have a
10  conversation then with Dr. Weinrick
11  on or about May 9th of 2006?
12  A. Yes.
13  Q. What happened during that
14  conversation?
15  A. I explained the situation to
16  her and I also, by that time, had
17  received an e-mail from Stacy, which
18  I also shared with her. I don't know
19  if you have a copy of that or
20  whatever.
21  Q. We'll get to that. Let's talk
22  about your conversation with
23  Weinrick.
24  A. Well, that was part of my
25  conversation with her. You know,

38 (Pages 146 to 149)

| | Page 150 | | Page 152 |
|---|---|---|---|
| 1 | what I wanted ---. In other words, I | 1 | **Q. Does Millersville maintain a** |
| 2 | didn't collaborate with people except | 2 | **list of dirty words not to use in the** |
| 3 | for Reinking. You know, what | 3 | **classroom?** |
| 4 | evaluation to give Stacy was my | 4 | A. No. |
| 5 | decision, an academic evaluation | 5 | **Q. Turn to Plaintiff's 50. Did** |
| 6 | decision. And I was ready to take | 6 | **you ever see this document before?** |
| 7 | the responsibility for that. But | 7 | A. No. |
| 8 | what I wasn't sure of was since she | 8 | **Q. Did you ever hear of a musical** |
| 9 | put in all that time except for one | 9 | **artist by the name of Ben Folds?** |
| 10 | week, whether that was going to have | 10 | A. No. |
| 11 | any influence on how her status was, | 11 | **Q. Now, the first --- second** |
| 12 | you know, going to be as far as her | 12 | **stanza indicates kiss my ass goodbye;** |
| 13 | degree. | 13 | **do you see that?** |
| 14 | **Q. What did Weinrick say?** | 14 | A. Yes, I do. |
| 15 | A. Well, she didn't say much | 15 | **Q. Do you believe that ass is an** |
| 16 | except that she was going to talk to | 16 | **inappropriate word to use in class?** |
| 17 | Dr. Bray about it. | 17 | A. It depends on the context in |
| 18 | **Q. So I take it Dr. Bray would be** | 18 | which you use it. |
| 19 | **the final decision maker on whether** | 19 | **Q. Why? Why does it depend on** |
| 20 | **Stacy received her Bachelor of** | 20 | **the context?** |
| 21 | **Science in Education degree; correct?** | 21 | A. Because you try to stay on a |
| 22 | A. Correct. | 22 | higher plane. I mean, in literature |
| 23 | **Q. All right. Did Weinrick say** | 23 | if you're working with a quote --- |
| 24 | **anything else other than that she** | 24 | and I assume that in some way you |
| 25 | **would talk to Dr. Bray?** | 25 | could defend this in the same way, |

| | Page 151 | | Page 153 |
|---|---|---|---|
| 1 | A. No. She didn't --- well, by | 1 | you know, that being loyal to the |
| 2 | that time ---. I'll save it until we | 2 | context of the material. I think, |
| 3 | get to that e-mail. | 3 | you know, in this sense, maybe she |
| 4 | **Q. All right. My question still** | 4 | could have picked a different song. |
| 5 | **remains, did Dr. Weinrick say** | 5 | **Q. You weren't in the classroom** |
| 6 | **anything else of significance about** | 6 | **when Ms. Snyder played this song;** |
| 7 | **Stacy and the incident during your** | 7 | **correct?** |
| 8 | **conversation on or about May 9th,** | 8 | A. That is correct. |
| 9 | **other than what we've discussed?** | 9 | **Q. Does Millersville have a** |
| 10 | A. No. | 10 | **policy whereby students have to pre-** |
| 11 | **Q. All right. Turn to** | 11 | **listen to the songs?** |
| 12 | **Plaintiff's 48, page 2. So your** | 12 | A. No. |
| 13 | **recollection is that you first saw** | 13 | **Q. You were aware that during** |
| 14 | **these --- this list of unprofessional** | 14 | **Stacy's practical she was teaching** |
| 15 | **behavior/performance in the classroom** | 15 | **Shakespeare; correct?** |
| 16 | **on or about May 9th; is that correct?** | 16 | A. Yes. |
| 17 | A. Yes. | 17 | **Q. Do you have any idea as you** |
| 18 | **Q. Paragraph one, Ms. Snyder** | 18 | **sit here today how many times** |
| 19 | **played a song for background music.** | 19 | **Shakespeare uses the word, ass?** |
| 20 | **Does Millersville instruct its** | 20 | A. Many times. |
| 21 | **student teachers regarding** | 21 | **Q. Should Ms. Reinking be** |
| 22 | **appropriate musical content in the** | 22 | **disciplined for not stopping a** |
| 23 | **classroom?** | 23 | **reading of Shakespeare because he** |
| 24 | A. Not specifically. Not that I | 24 | **uses the word, ass?** |
| 25 | know of. | 25 | A. No. |

39 (Pages 150 to 153)

```
                    Page 154                                       Page 156

1    Q. Paragraph 2 of Parent's 48.              1    alone with you and you know, all
2    A. Okay.                                    2    student teachers are told this stuff.
3    Q. Stacy gave an account of her             3    Chapter and verse, you know, don't
4    Valentine's Day with her boyfriend.         4    get too friendly with your students.
5    A. I was in class for that.                 5    But you know, secondly, I thought it
6    Q. Does Millersville instruct its           6    was inappropriate because it was
7    student teachers not to mention their       7    almost like justifying herself to the
8    significant others in class?                8    class, to me, to Reinking.  It's okay
9    A. Not specifically.                        9    that --- you know, I'm just normal.
10   Q. There's no policy in effect at          10    You know, I'm just a normal person
11   Millersville, which would forbid           11    with a normal family and so forth.
12   student teachers from mentioning           12    Q. Are you telling me that
13   significant others in class; correct?      13    teachers never mention their husbands
14   A. Correct.                                14    or wives in class?
15   Q. And this is in regard to a              15    A. No, I'm not saying that at
16   conversation about Valentine's Day;        16    all.
17   correct?                                    17    Q. Why would it be permissible
18   A. As I recall she and her                  18    for a teacher to mention their
19   boyfriend and her two kids saw her ex       19    husband and wife in class, but Stacy,
20   at I don't know where.                       20    a single mom, not be allowed to
21   Q. What exactly is inappropriate           21    mention her ex-husband?
22   about that comment?                          22    ATTORNEY KRAMER:
23   A. It's very inappropriate.  In a           23    I'll object.  That's
24   straightforward student/teacher             24       not what he said at all.  He
25   relationship, it's not something that       25       actually didn't say that it

                    Page 155                                       Page 157

1    is any of the kid's business.  You          1    was okay that teachers mention
2    know, the personal lives of the             2    their spouses in class.
3    teacher and the student is of no            3    BY ATTORNEY VOIGT:
4    concern.  And to me, and I spoke to         4    Q. I believe you did.  Is it or
5    her about that comment, I thought it        5    is not okay for a teacher to mention
6    was inappropriate for one reason, is        6    their spouse in class?
7    that she was trying to get friendly         7    A. It depends on the context.  If
8    with the kids, you know, to try to be       8    it's the kind of thing where you're
9    their buddy.  Trying to say, well,          9    talking about something personal or
10   you know I was at the mall and this        10    something other than the lesson --- I
11   kind of thing --- which all student        11    mean, let's say their husband is a
12   teachers are told, you don't do that       12    fireman and they talk about him and
13   kind of thing.                             13    his job, there's nothing wrong with
14   But particularly, you know,                14    that.  But there is something ---
15   because student teachers and frankly,      15    teachers have to be good role models.
16   many of them --- most of them are          16    And so to talk about your personal
17   younger than she was, but I try to         17    life to your students is not
18   apply the same standard as if she was      18    something that --- particularly
19   21.  And that is that getting too          19    student teachers are warned against.
20   friendly with students can lead to         20    And of course, even when
21   all kinds of problems where people         21    teachers start their first year of
22   start to confide in you.  They get         22    practice, you know, there's a don't
23   interested in you for reasons other        23    share personal things with your
24   than being their teacher.  They try        24    students.  Be a good role model.  And
25   to get into situations where they're       25    I think that fits into this category.
```

40 (Pages 154 to 157)

```
1   Q. So something about having an
2   ex-husband makes Stacy not a good
3   role model?
4   ATTORNEY KRAMER:
5   Objection. That's not
6       what he said at all.
7   ATTORNEY VOIGT:
8   Well, then he can
9       explain what he said.
10  A. No, I ---.
11  BY ATTORNEY VOIGT:
12  Q. What is it about this comment
13  that makes Stacy not a good role
14  model?
15  A. Well, I think that the comment
16  has to do with, you know, trying to
17  be friendly with the students and
18  share something from her personal
19  life, which I don't think is the
20  proper way to model for your
21  students. I think you need to model
22  the --- I think you need to model the
23  kind of dedication to curriculum,
24  dedication to the school, dedication
25  to teaching, and so forth and keep
```

```
1   A. Well, when we met our student
2   teachers that day. That was a whole
3   day of things, an orientation. So
4   that was gone over during the
5   orientation, somewhere, some way.
6   Q. Turn to Plaintiff's Nine.
7   This is the outline for the
8   orientation. Can you tell me where
9   there's any comment at all about
10  MySpace or similar websites?
11  A. No. There is none here.
12  Q. At the time of the incident
13  that we're talking about, you would
14  agree with me that Millersville had
15  no policy regarding student usage of
16  MySpace, Facebook, et cetera;
17  correct?
18  A. Well, they were told at the
19  orientation --- I don't know if
20  that's a written policy or not.
21  Q. You don't know of any written
22  policy?
23  A. I don't know of a written
24  policy. No.
25  Q. Paragraph 6 of Plaintiff's 48,
```

```
1   your personal life out of it. I
2   mean, if that had been somebody else
3   who had been married and said yeah,
4   my wife and I saw your mother out at
5   --- I would have said the same kind
6   of thing. I mean, it's getting
7   personal with the students.
8   Q. Is not talking about your
9   husband who might be a fireman; isn't
10  that getting personal?
11  A. No, not if --- if something
12  that fits into the curriculum, it's
13  okay.
14  Q. Paragraph 5 of Plaintiff's 48,
15  page 2 begins, twice I warned Ms.
16  Snyder to avoid MySpace.com
17  discussions. Now, you said that you
18  talked to students about not having
19  MySpace accounts before the start of
20  the semester?
21  A. I didn't talk to them. That
22  was part of the general presentation
23  there. And of course, ---.
24  Q. General presentation. What
25  general presentation is that?
```

```
1   page 2, frequently I advised --- you
2   kept asking my department supervisor
3   instead of asking me. As we
4   discussed before, Millersville, in
5   fact, instructed its student teachers
6   to speak with as many teachers and
7   administrators as possible in order
8   to get a well-rounded experience out
9   of their student-teaching semester;
10  correct?
11  ATTORNEY KRAMER:
12  I'll object to the
13      form. It's a very different
14      context.
15  BY ATTORNEY VOIGT:
16  Q. You can answer the question.
17  A. What's the question?
18  Q. At the start of Stacy's
19  student teaching evaluation, was she
20  not advised by you that she should
21  seek out as many teachers and
22  administrators at the cooperating
23  school as possible so that she would
24  get a well-rounded experience?
25  A. I don't think that has
```

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1   anything to do with this paragraph.
2   Q. Please, answer the question.
3   Was Stacy not advised by you that she
4   should seek out other teachers and
5   administrators at Conestoga Valley to
6   get a well-rounded experience out of
7   her student-teaching semester?
8   A. Yes.
9   Q. Paragraph seven. As far as
10  professional dress is concerned; do
11  you see that one?
12  A. Yes.
13  Q. And Millersville did not have
14  any dress code for its student
15  teachers; did it?
16  A. No. They were to follow the
17  dress code of the school.
18  Q. Are you aware of whether the
19  school has a dress code?
20  A. No.
21  Q. Did you ever see a copy of the
22  Conestoga Valley Policies and
23  Procedures Manual?
24  A. I had earlier. I don't know.
25  It's been a year since I saw it, but

1   I never have something that deals ---
2   at one time all the guys had to wear
3   ties. And now they've gone by the
4   board.
5   Q. Do you know whether Stacy ever
6   received a copy of the Conestoga
7   Valley Teachers Policies and
8   Procedures?
9   A. I do not.
10  Q. You didn't give her one, did
11  you?
12  A. No.
13  Q. Because Stacy was expected to
14  follow the Millersville code;
15  correct?
16  A. She was supposed to follow the
17  Conestoga Valley code, whatever that
18  was.
19  Q. Even though she wasn't given a
20  copy of it?
21  ATTORNEY KRAMER:
22  Object.
23  BY ATTORNEY VOIGT:
24  Q. Correct? She wasn't given a
25  copy of it at least by you; correct?

1   A. By me.
2   Q. Plaintiff's 56. This is an
3   e-mail from Stacy to you among others
4   dated May 10 of 2006; correct?
5   A. Yes.
6   Q. And did you receive this?
7   A. Yes.
8   Q. And I take it you also
9   received the letter of apology that
10  Stacy attached to it; correct? Next
11  page. That's right. You received
12  that letter of apology on or about
13  May 10 of 2006; correct?
14  A. Yes.
15  Q. Did you have a conversation
16  with Ms. Buffington about this
17  apology letter?
18  A. She mentioned it on the 11th
19  when I went in with Stacy to get Ms.
20  Robinson's evaluation.
21  Q. And what did she say?
22  A. What did Buffington say?
23  Q. What did Buffington say about
24  this apology letter?
25  A. She said it was --- there were

1   grammatical errors in it. It was
2   self-serving. I don't recall much
3   else.
4   Q. Do you believe this letter is
5   self-serving?
6   A. Well, I think it overplays her
7   attempts to act professional, but it
8   also is --- she does say in here
9   someplace, that I realize that this
10  is all my fault.
11  Q. Do you believe that apology is
12  somehow insincere on Stacy's part?
13  A. Yes.
14  Q. Why is that?
15  A. Because of the tone.
16  Q. Well, what is it about the
17  tone of this letter that you
18  disapprove of?
19  ATTORNEY KRAMER:
20  Objection, he didn't
21  ---.
22  ATTORNEY VOIGT:
23  I believe he just did.
24  He said that ---.
25  ATTORNEY KRAMER:

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    No.  He said it was not
2      sincere.
3      BY ATTORNEY VOIGT:
4      Q. All right.  What is it about
5      the tone of Stacy's letter that you
6      find insincere?
7      A. Well, it's up in the second
8      paragraph, she says, you know, I take
9      full responsibility for my actions.
10     And then she goes on to say the
11     incident has caused me to open my
12     eyes and realize that I am the only
13     person to blame.  And instead of
14     leaving it at that, she goes on then
15     to try to justify herself in such a
16     manner that it seems like she's not
17     really apologizing.  It seems like
18     she's actually rationalizing.
19     Q. What is it about this letter
20     that you find a rationalization
21     specifically?
22     A. When you get down to the last
23     paragraph, she says, I worked
24     diligently inside and outside the
25     classroom and goes on with this.

1      Q. Do you believe that Stacy ---?
2      A. I'd want to correct all the
3      previous problems I encountered.
4      Q. Do you believe that Stacy did
5      not work diligently in her student
6      teaching practical?
7      A. You mean during her student
8      teaching?
9      Q. Yes.  Do you believe that
10     Stacy did not work diligently?
11     A. I think she worked diligently.
12     Q. What else did Buffington say
13     about Stacy's apology letter dated
14     May 10, 2006, during your
15     conversation on May 11 of 2006?
16     A. About the letter?
17     Q. Yeah.  What did she say about
18     the letter?
19     A. Buffington said there were
20     grammatical errors in it and she
21     thought it was self-serving.  I don't
22     remember anything else she said.
23     Q. What did you say in response
24     to Ms. Buffington's comments?
25     A. I didn't say anything because

1      I was in there to have a conference
2      with Mrs. Reinking and go over Mrs.
3      Reinking's evaluation.  And
4      Buffington came in and wanted to have
5      her say.  So I left her have her say
6      and she left.
7      Q. You did not attempt to defend
8      Stacy in any fashion; correct?
9      A. No.
10     Q. Did you have a conversation on
11     or about May 11, 2006 with Ms.
12     Reinking about this apology letter?
13     A. The 11th would have been
14     Thursday.  Oh, that's the same ---.
15     Reinking was there when Buffington
16     spoke about the letter, but Reinking
17     and I didn't talk about the letter.
18     Q. Reinking didn't say anything
19     other than what you told me about
20     what Buffington said?
21     A. I don't recall her saying
22     anything.
23     Q. How did this meeting end?
24     A. After Mrs. Reinking went over
25     her Millersville evaluation form,

1      Stacy had a few questions about
2      materials, you know, we needed to
3      take with us and that was about it.
4      Q. Okay.  Did you have a
5      conversation with Ms. Bray about this
6      Snyder apology letter dated May 10,
7      2006?
8      A. No.
9      Q. Did you have a conversation
10     with Ms. Weinrick about this letter?
11     A. Yes, I think it was something
12     that she had access to.  I'm not sure
13     we discussed it from ---.
14     Q. Well, give it some thought for
15     a minute.  I need --- I sense that
16     your last answer wasn't equivocal.
17     Do you remember whether you had a
18     conversation with Ms. Weinrick about
19     this letter from Stacy?
20     A. As I recall, I did mention the
21     letter and mentioned Mrs.
22     Buffington's response to it.
23     Q. And what did Ms. Weinrick say?
24     A. I don't recall.
25     Q. Turn to Plaintiff's 52.  Have

43 (Pages 166 to 169)

1  you ever seen this document before?
2  A. Yes.
3  Q. When did you see it?
4  A. I'm not sure.  Probably on the
5  11th, but I'm not sure.
6  Q. That would be May 11th of
7  2006?
8  A. Yeah.  Yes.
9  Q. Did Ms. Buffington give you
10 this document?
11 A. Yes.
12 Q. Did she just hand it to you?
13 A. Yes.
14 Q. Was it during your meeting on
15 May 11th that she handed this to you?
16 A. I think so.
17 Q. Did you discuss this e-mail or
18 this document?
19 A. No.
20 Q. Did you read it during the
21 meeting?
22 A. No.  I didn't read it until I
23 left.
24 Q. That last sentence reads, it
25 will be no surprise to me if our

1  excellent teachers here at CV do not
2  volunteer again to serve as
3  cooperating teachers for Millersville
4  students.  Do you see that?
5  A. Yes.
6  Q. Was that a concern to you when
7  you read that?
8  A. No.
9  Q. Why not?
10 A. Well, because Conestoga Valley
11 has over 4,000 students.  That's four
12 elementary schools, a middle school,
13 and high school with nine
14 departments, so what you're talking
15 about is there are nine English
16 teachers at the high school who,
17 after the experience of Stacy being
18 there, may be affected by this.  But
19 it wasn't going to be something that
20 would throw a scare into
21 Millersville.
22 To me it seemed like an
23 isolated thing and I haven't
24 obviously done the research to go
25 back and see how many student

1  teachers we have at CV right now, but
2  I would guess that there hasn't been
3  one iota of difference over this
4  situation.
5  Q. And that's because Stacy was
6  not given her Bachelor of Science in
7  Education degree; correct?
8  ATTORNEY KRAMER:
9  I'll object.
10 ATTORNEY VOIGT:
11 Withdrawn.
12    BY ATTORNEY VOIGT:
13 Q. How many students --- you said
14 there were three students at ---
15 three student teachers from
16 Millersville at Conestoga Valley?
17 A. Well, there were a lot more
18 than that.  I just supervised three
19 of them.
20 Q. Okay.  How many student
21 teachers were there at Millersville
22 --- strike that.
23 How many student teachers did
24 Millersville place at Conestoga
25 Valley during the spring 2006

1  semester?
2  A. I don't know.
3  Q. Was it more than ten?
4  A. You mean in the whole system?
5  Q. Yes.
6  A. Oh, geez.
7  ATTORNEY KRAMER:
8  If you don't know, say
9  you don't know.
10 A. I don't know.
11    BY ATTORNEY VOIGT:
12 Q. All right.
13 A. It would just be a guess.
14 There's elementary, there's
15 secondary.
16 A. Right.
17 Q. You've been doing this for a
18 long time; right?
19 A. Yeah.
20 Q. How many ---?
21 A. Yes.
22 Q. How many teachers --- strike
23 that.
24 How many schools does
25 Millersville place student teachers

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    at; do you know?
2    A. Dozens.
3    Q. Dozens.  How far away is
4    Conestoga Valley from Millersville?
5    A. It's about eight miles.
6    Q. It's probably the closest
7    school, one of the closest schools?
8    A. One of the closest.  The
9    closest is Penn Manor which is right
10   here in Millersville.
11   Q. But Conestoga Valley is right
12   next to Penn Manor.
13   A. Close.
14   Q. It's a close school.  And you
15   were aware at the time that you
16   received this note from Ms.
17   Buffington that Kim Seldomridge was
18   involved in this situation; correct?
19   A. Yes.
20   Q. And you understood at the time
21   that Kim Seldomridge was the acting
22   superintendent; is that correct?
23   A. Yeah.  The superintendent was
24   only gone for a couple of days so she
25   was acting superintendent.

1    Q. And you would agree with me
2    that the acting superintendent has
3    the authority to approve or
4    disapprove of the placement of
5    student teachers by Millersville?
6    ATTORNEY KRAMER:
7    Object.  I don't know
8       that he's ---.
9    ATTORNEY VOIGT:
10   Whether ---.
11   ATTORNEY KRAMER:
12   That's Conestoga Valley
13      information.
14   ATTORNEY VOIGT:
15   Well, maybe, maybe not.
16      BY ATTORNEY VOIGT:
17   Q. Do you believe that the
18   superintendent at Conestoga Valley
19   School District has the authority to
20   bar student teachers from
21   Millersville?
22   A. Yes.
23   Q. Turn to Plaintiff's 100,
24   please.  Page 6, paragraph 27.  Okay.
25   It looks like you next spoke with

1    Stacy on May 10th of 2006; correct?
2    A. Yes.
3    Q. Describe that conversation,
4    please.
5    A. Well, as I said, the first
6    time I talked to her, I'm not sure I
7    even knew what was going on.  Because
8    I didn't know whether that was before
9    or after I went over to the high
10   school.  But by this time, I had an
11   idea, and I told her and I referred
12   specifically to the e-mail that she
13   sent me on the 9th that we haven't
14   got to yet, that I had a lot of
15   problems as far as professionalism
16   was concerned and working on my
17   evaluation.
18   Q. Did you tell Stacy you had
19   problems with her professionalism?
20   A. Yes.
21   Q. Now, even though you wrote you
22   evaluated Stacy with a G in
23   professionalism for her mid-
24   evaluation?
25   A. A G on the Millersville form

1    and an S on the 430, yes.
2    Q. Turn to Plaintiff's 49.  I
3    think that's the e-mail that you're
4    talking about.
5    A. Okay.  I'm with you.
6    Q. Did you receive this e-mail on
7    or about May 9th?
8    A. Yes, I did.
9    Q. Did you respond to it?
10   A. I did not e-mail back.  So no,
11   since I did not respond.
12   Q. All right.  Do you think this
13   e-mail was inappropriate in some
14   fashion?
15   A. Yes.
16   Q. What was inappropriate about
17   it?
18   A. Well, she admits that she had
19   finally changed her MySpace account
20   so everybody couldn't get on it.  And
21   which was, to me, stupid because that
22   was closing the door after the horse
23   was out.  She's saying to prove that
24   I didn't do anything wrong, now only
25   selected persons can get on there.

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    She also --- there was something else
2    here.
3    Q. Let me ask you question. Near
4    the bottom of the page it says, if
5    MySpace, Xanga and Facebook sites are
6    such a big deal to school staff
7    members, why doesn't MU or school
8    district have a policy that tells all
9    teachers to delete them before they
10   teach, question mark? Do you agree
11   with that statement? Bottom of the
12   first page.
13   A. Yeah.
14   Q. Do you agree with that
15   statement?
16   A. It's a legitimate question.
17   Q. Okay. The next sentence. I
18   had my MySpace account months before
19   student teaching, and the only things
20   that were ever brought up to us in
21   Junior Block was a warning, do not
22   post comments about staff members and
23   students, which I didn't. Do you
24   agree with that?
25   A. I agree with it and I think

1    there's one of her major violations.
2    Where it says do not post comments
3    about staff members and students,
4    which I didn't. And she didn't
5    mention Mrs. Reinking, but she might
6    as well have. To me, that's a big
7    red flag in this thing.
8    And also another reason, they
9    asked me previously about my --- what
10   I --- what did you ask me, what I
11   thought of this or how it was?
12   Q. Yes. What do you think of
13   this?
14   A. Well, when you go back to this
15   part where she criticizes her co-op,
16   I don't want to have another student
17   teacher have to go through this. I'm
18   sorry I didn't say something sooner,
19   and maybe there is nothing they can
20   do about it now. She never said one
21   word to me about problems with
22   Reinking. And to me, this was an
23   attempt to put all the blame on Mrs.
24   Reinking. As she probably read
25   through this thing. She said, you

1    know, that I was a great supervisor
2    and all that. And to me it was
3    looking for an excuse to blame her
4    problems on and Mrs. Reinking and of
5    course do not mention her but imply
6    her in that earlier e-mail. And to
7    me, this was much more important than
8    that picture. And to me I felt, in
9    my professional judgment, that if
10   this isn't non-professional and
11   unethical, then I don't known that
12   is.
13   Q. All right. So student
14   teachers are not permitted to
15   criticize their cooperating teachers?
16   A. I didn't say that.
17   Q. Okay. And that would be
18   because Millersville doesn't want to
19   jeopardize its relationship with the
20   supervising school?
21   ATTORNEY KRAMER:
22   Objection. That's not
23      what he said.
24      A. You know, I had said
25   previously that when student teaching

1    started, I said to these student
2    teachers, if you have any problems
3    with your co-op, if you have any
4    problems at all, that I need to know
5    about it. E-mail me, call me up, I'm
6    available 24/7 and she never said
7    anything about problems with
8    Reinking.
9    BY ATTORNEY VOIGT:
10   Q. Now, you observed Ms. Snyder
11   and Ms. Reinking interacting on many
12   occasions; is that correct?
13   A. Yes.
14   Q. You observed Ms. Snyder and
15   Ms. Reinking interacting ---
16   A. Yes.
17   Q. --- in the classroom? Is it
18   your testimony that Ms. Snyder and
19   Ms. Reinking got along well during
20   the classroom experience?
21   A. Yes.
22   Q. At the bottom of P-49, under
23   number two, Stacy says, if this shows
24   a flaw in my character, why is it
25   being brought up during my final week

46 (Pages 178 to 181)

```
 1      of teaching.
 2    Why is it being brought up
 3      only in her final week of teaching?
 4    ATTORNEY KRAMER:
 5    I'll object.  It calls
 6      for speciation because he
 7      didn't bring it up.  You can
 8      attempt to answer the
 9      question.
10    ATTORNEY VOIGT:
11    Okay.  Go ahead and
12      answer.
13      BY ATTORNEY VOIGT:
14    Q. Do you know why all of this
15      business about MySpace and Facebook
16      was brought up only in Stacy's final
17      week of teaching?
18    ATTORNEY KRAMER:
19    Object.  It also
20      assumes it was not brought up
21      before.
22      BY ATTORNEY VOIGT:
23    Q. Go ahead.
24    A. Well, it was brought up
25      before.  Mrs. Reinking, back in one
```

```
 1    of those paragraphs we looked at
 2    earlier, had warned her not to
 3    mention her account to the students.
 4    And so, you know, in that sense, it
 5    was brought up before.  You know, the
 6    timing of this thing came about,
 7    basically, by the fact that Ms.
 8    Snyder mentioned in her class about
 9    her MySpace and how one of her
10    students was on there and that
11    prompted one of the teachers to go
12    look at the thing.  So I mean, ---.
13    Q. Which teacher was that?
14    A. I don't know.  I was never
15    told which teacher it was.
16    Q. So you heard from Ms. Reinking
17    that an unnamed teacher heard in
18    class that ---.
19    A. No.  No.  No.  No.  Ms.
20    Reinking heard in class Ms. Snyder
21    talking about her MySpace account and
22    some student had got on her MySpace
23    account.  That's what I said.
24    Q. Okay.
25    A. All right.  After that one of
```

```
 1      faculty went and got on and that's
 2      where they ---.
 3    Q. You don't know which faculty
 4      member got on MySpace account?
 5    A. I don't know.
 6    Q. Turn to Parent's (sic) 58.
 7    This is your final evaluation; is
 8    that correct?
 9    A. That would be the Millersville
10    form, yes.
11    Q. And you rated Stacy competent
12    or superior in all areas except for
13    professionalism; correct?
14    ATTORNEY KRAMER:
15    I'll object.  The
16    document speaks for itself.
17    ATTORNEY VOIGT:
18    You can answer.
19    A. What was the question?
20      BY ATTORNEY VOIGT:
21    Q. You rated Stacy competent or
22    superior in all areas except
23    professionalism; right?  Preparation,
24    teaching performance, effect on
25    student learning and English specific
```

```
 1    items; right?
 2    A. Yes.
 3    Q. And several of these areas
 4    were improvement from the mid-
 5    evaluation; correct?
 6    A. That is correct.
 7    Q. Okay.  So Stacy's in-depth
 8    knowledge of the subject matter had
 9    gone from an unsatisfactory to a
10    competent; correct?  Number eight?
11    A. Yes.
12    Q. Yet, you found Stacy
13    unprofessional in all areas of
14    professionalism; right?
15    A. Yes.
16    Q. All right.
17    A. Well, not all areas.
18    Q. Except for dispositions?
19    A. It demonstrates a belief that
20    all students include student with
21    disabilities, five.
22    Q. Turn to Plaintiff's 67.
23    ATTORNEY KRAMER:
24    Do you want to take a
25    break?
```

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

| Page 186 | Page 188 |
|---|---|
| 1   ATTORNEY VOIGT: | 1   **communication skills when responding** |
| 2   Do you want to take a | 2   **to an issue within the educational** |
| 3     break? | 3   **environment.  Do you believe that** |
| 4   ATTORNEY KRAMER: | 4   **Stacy's posting a photo and text on** |
| 5   No. | 5   **her MySpace account outside of class** |
| 6   ATTORNEY VOIGT: | 6   **impacts on the educational** |
| 7   All right.  We'll keep | 7   **environment?** |
| 8     muddling through. | 8   A. I don't --- I would say it's |
| 9   BY ATTORNEY VOIGT: | 9     poor judgment, but ---. |
| 10   **Q. Plaintiff's 67.  Chapter 235,** | 10   **Q. Okay.  Turn to Plaintiff's 14.** |
| 11   **Code of Professional Practice.  Is** | 11   ATTORNEY VOIGT: |
| 12   **this the Ethic's Code that you refer** | 12   Actually, I will take a |
| 13   **to in your final evaluation?** | 13     break.  Let's take a break. |
| 14   A. Yeah, I think so.  I refer | 14     SHORT BREAK TAKEN |
| 15     specifically to different sections of | 15   BY ATTORNEY VOIGT: |
| 16     it. | 16   **Q. Parent's (sic) 14.  This is** |
| 17   **Q. You refer to section 4B7 which** | 17   **Weinrick notes regarding conversation** |
| 18   **is on page three of five.  Okay.** | 18   **with you on May 11 of '06.** |
| 19   A. Okay. | 19   A. Correct. |
| 20   **Q. Professional educators shall** | 20   **Q. Have you ever seen this** |
| 21   **exhibit acceptable and professional** | 21   **before?** |
| 22   **language and communication skills.** | 22   A. Yes. |
| 23   **Their verbal and written** | 23   **Q. All right.  Does this document** |
| 24   **communications with parents, students** | 24   **accurately --- does it accurately** |
| 25   **and staff shall reflect sensitivity** | 25   **reflect your conversation?** |

| Page 187 | Page 189 |
|---|---|
| 1   **to the fundamental human rights of** | 1   A. Yes. |
| 2   **dignity, privacy and respect.  And** | 2   **Q. Now, the bottom of the first** |
| 3   **you believe that Ms. Snyder's conduct** | 3   **page, it says, satisfy MU** |
| 4   **in posting a photo of herself on** | 4   **requirements.  Did you say that?** |
| 5   **MySpace violates that?** | 5   A. That refers to the statement |
| 6   A. No. | 6     above that she was told that she |
| 7   ATTORNEY KRAMER: | 7     needed to make some improvements. |
| 8   I ---. | 8     That refers to the middle --- mid- |
| 9   BY ATTORNEY VOIGT: | 9     placement, which is the sentence |
| 10   **Q. Okay.  You don't believe that?** | 10     right before that.  So yes, in the |
| 11   A. No. | 11     mid-placement, she was told that she |
| 12   **Q. All right.  Well, what about** | 12     needed to get those requirements --- |
| 13   **Ms. Snyder's conduct do you believe,** | 13   **Q. All right.** |
| 14   **if anything, violates Section 4B7?** | 14   A. --- done. |
| 15   A. I think I've already covered | 15   **Q. Page two of Plaintiff's 14.** |
| 16     that.  It was a whole range of | 16   **You mentioned that the acting** |
| 17     things, but the comments under the | 17   **superintendent, Kim Seldomridge,** |
| 18     picture and the comments in the e- | 18   **became involved; correct?** |
| 19     mail that she sent me on the 9th | 19   A. Yes. |
| 20     would be, to me, much more important | 20   **Q. This was the first incident in** |
| 21     than the picture. | 21   **which a superintendent became** |
| 22   **Q. And number eight, 4B8.** | 22   **involved in the status of a student** |
| 23   **Professional educators shall be open-** | 23   **teacher; correct?  At least, in your** |
| 24   **minded, knowledgeable and use** | 24   **experience; right?** |
| 25   **appropriate judgment and** | 25   A. In my experience, yes. |

48 (Pages 186 to 189)

1   Q. Okay. Turn to Plaintiff's
2   Ten. This is notes from Weinrick
3   regarding a conversation she had with
4   Buffington.
5   ATTORNEY KRAMER:
6   I'll object. I don't
7       think it says Weinrick on
8       here.
9   ATTORNEY VOIGT:
10  Okay. Well, it's a
11      note from someone.
12  ATTORNEY KRAMER:
13  It doesn't say.
14  ATTORNEY VOIGT:
15  All right.
16      BY ATTORNEY VOIGT:
17  Q. And it says middle. Her
18  behavior was the straw that broke the
19  camel's back; do you see that?
20  A. Yes.
21  Q. Did either Buffington or
22  Weinrick ever tell you that the
23  drunken pirate incident was the straw
24  that broke the camel's back regarding
25  Stacy's future?

1   A. No.
2   Q. Turn to Plaintiff's 58. Mrs.
3   Reinking's final eval.
4   A. Millersville form.
5   Q. Why was Reinking using a
6   Millersville form?
7   A. Because that's the only form
8   she used. I was the only one that
9   used the 430.
10  Q. Well, actually Reinking is on
11  P-59.
12  A. Well, that's mine on 58.
13  Q. And Reinking also rated Stacy
14  unsatisfactory in professionalism;
15  correct?
16  A. Correct.
17  Q. Did you speak with Ms.
18  Reinking about this final eval?
19  ATTORNEY KRAMER:
20  At any time or before
21      or after?
22  BY ATTORNEY VOIGT:
23  Q. Well, at the time that it was
24  prepared? At or near the time it was
25  prepared?

1   A. No, not as far what rating we
2   were going to give her. We had
3   arranged to --- we had earlier
4   arranged to go over her evaluation
5   with her, I think, on Friday of that
6   week, but we had to do it on
7   Thursday. I didn't have mine
8   finished and I didn't want to take
9   that much time in there anyway, so
10  this is --- when we went, this is the
11  first time I saw her evaluation and I
12  had no input into it.
13  Q. All right. Turn to
14  Plaintiff's Exhibit 100 in the other
15  book.
16  A. Okay.
17  Q. Page 6, paragraph 35. On May
18  11th you met with Stacy, Reinking and
19  Buffington; is that correct?
20  A. Buffington come in, had her
21  say and left. She wasn't there when
22  we went over the evaluation.
23  Q. Okay. Prior to that meeting,
24  did you speak with Buffington about
25  the conduct of the meeting?

1   A. When she was talking to me on
2   the phone, I guess it was Monday.
3   Q. What day was that? Like the
4   8th?
5   A. The 8th. I believe she
6   mentioned that she wanted to say
7   something when we got together, but
8   I'm not sure it was then. She may
9   have just popped in for all I know.
10  Q. All right. Did you speak to
11  Reinking before the meeting started
12  about the conduct of the meeting?
13  A. Yeah, I talked to her on the
14  phone. It was pretty much about ---.
15  Q. When was that? When did you
16  talk to her on the phone?
17  A. I think it was on the 9th. It
18  might have been the 10th, but ---.
19  Q. What did you say?
20  A. Well, I said, what would be a
21  good time for us to come in and I
22  related some questions that were in
23  that e-mail that we went over
24  previously about Stacy's questions
25  about materials, you know, papers to

49 (Pages 190 to 193)

1    be graded and papers to be given back
2    and all that kind of stuff. But we
3    --- that was about it.
4    Q. During either of your
5    conversations, the one with
6    Buffington or the one with Reinking,
7    was the subject of the withholding of
8    Stacy's Bachelor of Science in
9    Education degree discussed?
10   A. No.
11   Q. Describe the meeting on the
12   11th.
13   ATTORNEY KRAMER:
14   Objection. Asked and
15      answered. I think he's gone
16      into some detail about that.
17   ATTORNEY VOIGT:
18   No. These were
19      all conversations that took
20      place prior to this May 11th
21      meeting.
22   ATTORNEY KRAMER:
23   No, he discussed the
24      May 11th meeting. But if
25      there are additional matters

1    that relate, you certainly can
2       to do that.
3    ATTORNEY VOIGT:
4    I don't believe we
5       discussed it, but go ahead.
6    A. Well, we did. I said that on
7    May 11th, that's when Stacy and I
8    went over to CV and Buffington came
9    in, talked to her about three minutes
10   and left.
11   BY ATTORNEY VOIGT:
12   Q. All right. What did
13   Buffington say during her three
14   minutes?
15   A. Well, as I said previously,
16   she said that she felt that Stacy had
17   acted unprofessionally. She said
18   that she had a lack of knowledge of
19   content which she said even in this
20   letter of apology, shows poor
21   grammar. She said something to the
22   effect that Stacy should have been
23   removed, which I took as kind of
24   indictment of me. But as I said
25   previous, I had offered to remove and

1    Reinking wanted to ---.
2    Q. Why did you believe that was
3    an indictment of you?
4    A. Well, because I would be the
5    one that would remove her. I mean,
6    it kind of made me angry because if
7    she felt that way, she should have
8    come to me.
9    Q. And she didn't?
10   A. She didn't. No.
11   Q. Now, during this meeting, the
12   subject of Stacy's degree didn't come
13   up; is that what you are saying?
14   A. Not --- the degree didn't come
15   up. No.
16   Q. Well, what ---? Did Stacy ask
17   any questions during that meeting
18   about what degree she was going to
19   get?
20   A. No, not at that meeting.
21   Q. Didn't anybody mention it that
22   this was going to deny Stacy her
23   Bachelor of Science in Education
24   degree?
25   ATTORNEY KRAMER:

1    Object. Form. You can
2       try to answer.
3    ATTORNEY VOIGT:
4    You can answer.
5    A. It was the certification that
6       was discussed not what degree.
7    BY ATTORNEY VOIGT:
8    Q. Okay. Well, what was
9    discussed regarding Stacy's
10   certification? Just that she was not
11   going to pass her practical; right?
12   A. If she did not receive a
13   satisfactory on the 430 for
14   professionalism, she couldn't be
15   certified. Now, that was my academic
16   evaluation. I didn't collaborate
17   with anybody and that was mine. As
18   far as whether she was going to
19   receive any degree, a BS or a BA or
20   whatever, I had no idea where to go
21   with that. And so I put that right
22   in the hands of Doctor Weinrick and
23   Doctor --- or the dean.
24   Q. The dean would be Bray; is
25   that correct?

1    A. Correct. Yeah.
2    Q. Was there ever any discussion
3    about having Stacy repeat her
4    practical?
5    A. I don't think at that time.
6    Q. Why not?
7    A. I don't know why not. I don't
8    recall it being discussed.
9    Q. Have you ever had a situation
10   where a student teacher had to repeat
11   their practical?
12   A. Yes.
13   Q. How many times has it
14   happened?
15   A. I have only known it to happen
16   once with my own student teachers,
17   but ---.
18   Q. Was that at Millersville that
19   the student teacher repeated their
20   student teaching evaluation?
21   A. Yes.
22   Q. Did that student teacher
23   eventually get certified?
24   A. Yes.
25   Q. Yet it never crossed your mind

1    to have Stacy repeat her student
2    teaching program at another school?
3    ATTORNEY KRAMER:
4    Objection. It's not
5        what he said.
6    ATTORNEY VOIGT:
7    Then he can explain.
8    ATTORNEY KRAMER:
9    Ask the question.
10       BY ATTORNEY VOIGT:
11   Q. Did it cross your mind that
12   Stacy might be able to repeat her
13   student teaching assignment at
14   another school and receive her
15   certification?
16   A. Yes.
17   Q. When did it cross your mind?
18   A. Well, I just felt that in
19   spite of everything that went wrong
20   with this semester, that she had
21   worked at it and she did like kids,
22   you know. And I wasn't sure that,
23   you know, she wouldn't continue.
24   Q. Did you discuss with either
25   Doctor Weinrick or Doctor Bray the

1    possibility that Stacy could repeat
2    her student teaching assignment at a
3    different school?
4    A. No.
5    Q. Why not?
6    A. I don't know why not. It just
7    didn't come up. I mean, you keep
8    saying a different school. Why do
9    you say a different school? There
10   was nothing to prevent her from going
11   to a different school and continue
12   her student teaching.
13   Q. Was that your understanding,
14   that there was nothing to prevent her
15   from repeating her student teaching?
16   A. At a different school?
17   Q. Yes.
18   A. Yeah, there would be nothing
19   to prevent her.
20   Q. Even though Stacy would no
21   longer be enrolled at Millersville?
22   She could just knock on the door of a
23   neighboring school and ask to be a
24   student teacher; is that your
25   understanding?

1    ATTORNEY KRAMER:
2    Objection. It calls
3        for speculation.
4    A. I thought you meant another
5    university.
6    BY ATTORNEY VOIGT:
7    Q. So you're ---.
8    A. At another university. That's
9    what I thought you were talking
10   about. Go to another university.
11   That's what I thought you asked.
12   Q. So your idea is that Stacy
13   would go another state school and
14   start all over?
15   A. That's what I --- I thought
16   that's what you were asking me when
17   you said another school. I didn't
18   realize you were talking about
19   another high school.
20   Q. Okay.
21   A. I thought you meant another
22   institution, another ---.
23   Q. Okay. Well, let me rephrase
24   that. Did you or did you not
25   consider the possibly of having

51 (Pages 198 to 201)

1    **Stacy, while still a Millersville's**
2    **student, repeat a student teacher**
3    **assignment at another high school?**
4    A. Yes, I did consider it.
5    **Q. And did you discuss that**
6    **possibility with either Doctor Bray**
7    **or Doctor Weinrick?**
8    A. I never talked to Doctor Bray
9    about it, but Doctor Weinrick ---.  I
10   think it came up in a conversation,
11   but maybe that might be a
12   possibility, and that's about all I
13   remember.
14   **Q. What did Doctor Weinrick say**
15   **in response to your raising that**
16   **subject?**
17   A. I'm not sure I even raised it.
18   I think ---.  The real question was
19   what grade I was going to give her.
20   I needed to be told whether they were
21   going to do --- what they were going
22   to do with that student teaching.
23   That's a lot of credits.  You know,
24   that's 12 credits.  Now, so my
25   question to Doctor Weinrick was,

1    where are you going with this?  Does
2    she have enough credits otherwise to
3    give her a BS, you know, without her
4    certification, or doesn't she?  And I
5    told her my feeling was that if they
6    weren't going to give her credit for
7    that time, in any manner, then I felt
8    I should give her a withdraw from
9    student teaching as opposed to an F
10   because --- well, for a couple of
11   reasons.
12   One, if you have an F, it's
13   like a brand.  You never get rid of
14   it.  I mean, you can repeat
15   something, but you still have the F
16   regardless of where she went from
17   there.  Whether she continued her
18   education or whatever, that would be
19   like a weight on her back, which I
20   didn't think she deserved having, I
21   felt, worked at the situation even
22   though it didn't work out.
23   You know and as I said before,
24   I wasn't sure that --- I mean, I felt
25   she worked at it and beyond

1    everything else that happened, I felt
2    she liked kids.  So I didn't, you
3    know, I say that I think she should
4    get a withdrawal if she's not going
5    to be ---.
6    **Q. Just so we're clear.  During**
7    **this conversation with Doctor**
8    **Weinrick, you did not raise the**
9    **subject of having Stacy repeat her**
10   **student teaching practical at another**
11   **high school while still enrolled at**
12   **Millersville?**
13   A. I don't recall exactly.  I may
14   have.  I may have said, you know,
15   maybe she'll, you know, repeat it.  I
16   don't recall.
17   **Q. Whose decision would it be to**
18   **allow Stacy to repeat her student**
19   **teaching practical while still**
20   **enrolled at Millersville at another**
21   **high school?**
22   A. Doctor Bray.
23   **Q. Doctor Bray.  Not Weinrick?**
24   **Doctor Bray?**
25   A. Doctor Bray.  I mean, Doctor

1    Weinrick was only involved in this
2    because Doctor Bray was in the
3    hospital.  So that's why I was
4    talking to Doctor Weinrick.
5    **Q. All right.**
6    A. Weinrick then talked to Bray,
7    the dean.
8    **Q. The dean would be Doctor Bray?**
9    A. Yes.
10   **Q. Okay.  Turn to Plaintiff's 20,**
11   **page 5.  This is the academic major**
12   **form.**
13   A. Twenty (20) you say?
14   **Q. Yes.**
15   A. All right.
16   **Q. Plaintiff's 20, page 5.**
17   A. Yes, I have it.
18   **Q. Page five.**
19   A. Page five.
20   **Q. This is the academic major**
21   **form which changed Stacy from a BSE**
22   **to BA in English.**
23   A. Okay.  I got it.
24   **Q. All right.  Did you have any**
25   **input into this form?**

```
 1    A. None.
 2    Q. All right.  Who would have had
 3    input into to this form?
 4    A. Well, the way I understand it,
 5    this was an agreement between Doctor
 6    Bray and the English Department.
 7    Q. So Stacy was not involved in
 8    this decision; correct?
 9  ATTORNEY KRAMER:
10  Objection.  It calls
11    for speculation.
12  BY ATTORNEY VOIGT:
13    Q. If you know?
14  ATTORNEY KRAMER:
15  Don't guess.  If you
16    don't know, you don't know.
17    A. I don't know.
18  BY ATTORNEY VOIGT:
19    Q. Okay.  All right.  You are
20    not aware of any policy or procedure
21    at Millersville allowing for the
22    switching of BA in English for a BSE;
23    correct?
24    A. Correct.
25    Q. That was just sort of ad hoc
```

```
 1    in this?
 2  ATTORNEY KRAMER:
 3  Objection.  It calls
 4    for speculation.  You can
 5    answer.
 6    A. I wasn't involved in this.
 7    That's why I take objection to all
 8    this collaboration in this thing for
 9    me because my job is to do my job
10    academically and do my evaluation and
11    that was it.  I'm not a policy maker.
12    I'm an adjunct in the structure.
13  BY ATTORNEY VOIGT:
14    Q. Turn to Plaintiff's 57.  This
15    is the PDE form 430 that you
16    prepared; is that correct?
17    A. It looks like it.  Yes.
18    Q. And you rated Stacy superior
19    or satisfactory in all areas except
20    professionalism; right?
21    A. I rated her ---.
22  ATTORNEY KRAMER:
23  Objection.  Asked and
24    answered.
25  ATTORNEY VOIGT:
```

```
 1  For other forms, but
 2    for the PDE 430.
 3    A. So what was the question?
 4  BY ATTORNEY VOIGT:
 5    Q. You rated Stacy superior or
 6    satisfactory in all areas except
 7    professionalism; right?
 8    A. Yes.
 9    Q. On the first page, you
10    indicate that Stacy violated federal
11    laws and regulations.  Which federal
12    laws do you believe Stacy broke?
13  ATTORNEY KRAMER:
14  Where are you looking?
15  ATTORNEY VOIGT:
16  Bottom of the exhibit
17    which is P-57.  No, P-50 ---.
18    Yeah, P-57, page ---.
19    A. Page what?
20  BY ATTORNEY VOIGT:
21    Q. P-57, page 4.  It says that
22    Stacy --- or you say that Stacy
23    violated Federal laws and
24    regulations.  I'm just curious which
25    ones.
```

```
 1  ATTORNEY KRAMER:
 2  Objection.  That's not
 3    what it says.
 4  ATTORNEY VOIGT:
 5    Well, ---.
 6  ATTORNEY KRAMER:
 7  That's not at all what
 8    it says.
 9  BY ATTORNEY VOIGT:
10    Q. Okay.  It says local state and
11    federal laws and regulations.
12  ATTORNEY KRAMER:
13  Well, it's actually
14    part of a larger sentence.
15  ATTORNEY VOIGT:
16  Well, the sentence says
17    what it says.
18  BY ATTORNEY VOIGT:
19    Q. Do you believe that Stacy
20    violated any federal laws?
21    A. I believe that she violated
22    the law in regard to integrity and
23    ethical conduct.
24    Q. All right.  Turn to Exhibit
25    24.  Do you recognize these children?
```

53 (Pages 206 to 209)

1    A. No.
2    ATTORNEY KRAMER:
3    Off the record.
4        OFF RECORD DISCUSSION
5        BY ATTORNEY VOIGT:
6        **Q. Were you aware at the time**
7        **that you took these actions, in or**
8        **about May of 2006, that Stacy was a**
9        **single mother of two boys?**
10   ATTORNEY KRAMER:
11   Objection. We've been
12       through this already, Mark, at
13       the very beginning of the
14       deposition.
15       BY ATTORNEY VOIGT:
16       **Q. Turn to Plaintiff's 100, page**
17       **8, paragraph 36. This refers to a**
18       **meeting between Bray and Stacy on May**
19       **12th. Did you attend this meeting?**
20       A. No.
21       **Q. All right. Did you have**
22       **any ---?**
23       A. I doubt whether Bray was
24       there. I think that might have been
25       Weinrick.

1    ATTORNEY KRAMER:
2    Don't speculate.
3        Answer the question.
4        A. Okay.
5    ATTORNEY KRAMER:
6    We'll be done a lot
7        faster if you just stick to
8        the question.
9        A. All right.
10   ATTORNEY VOIGT:
11   All right.
12       BY ATTORNEY VOIGT:
13       **Q. So you did not have any input**
14       **into what transpired at this May 12th**
15       **meeting other that what we've already**
16       **talked about; correct?**
17       A. Which May 12th meeting are we
18       talking about?
19       **Q. It says on or about May 12th,**
20       **Stacy met with Bray. Bray accused**
21       **her of promoting underage drinking.**
22       **Do you see that paragraph?**
23       A. Yeah.
24       **Q. All right. You did not have**
25       **any input into that ---**

1    A. No.
2    **Q. --- meeting; correct?**
3    A. No.
4    **Q. All right.**
5    A. No.
6    **Q. Do you believe that the**
7    **drunken pirate photo which we've**
8    **talked about promotes underage**
9    **drinking? And for reference we'll**
10   **turn to 97, I think it is. Nope, not**
11   **97. You know the photos we're**
12   **talking about.**
13   A. Yeah, I know the photos we're
14   talking about.
15   **Q. Do you believe they promote**
16   **underage drinking?**
17   A. They could.
18   **Q. How?**
19   A. I mean, it comes down to this
20   whole thing about being a role model
21   and so forth. And so I think it
22   could be --- some people might get
23   that impression. I don't think I
24   would. I don't think I would say
25   that it promoted underage drinking.

1    **Q. So you disagree with Ms. Bray**
2    **when she says that?**
3    ATTORNEY KRAMER:
4    Objection. That's not
5        what Doctor Bray said. That's
6        what Stacy said she said.
7    ATTORNEY VOIGT:
8    Okay.
9        BY ATTORNEY VOIGT:
10       **Q. Well, assuming that**
11       **Doctor ---. Never mind. Strike it.**
12       **You're aware that Stacy was 25**
13       **years old when the photo was taken;**
14       **correct?**
15   ATTORNEY KRAMER:
16   Objection. If you
17       know?
18       BY ATTORNEY VOIGT:
19       **Q. Do you know that Stacy was 25-**
20       **years old when the photo was taken?**
21       A. I knew she was over 21.
22       **Q. All right. Have you spoken**
23       **with any students at Conestoga Valley**
24       **who saw the photo and text that we've**
25       **been talking about?**

1   A. No.
2   Q. Turn to Parent's 95. Do you
3     know who President Kozloff is?
4   A. On 95?
5   Q. Yes. Those photos? Do you
6     know that person is depicted in the
7     photo?
8   ATTORNEY KRAMER:
9   Is this the first page?
10  ATTORNEY VOIGT:
11  There's two pages.
12  ATTORNEY KRAMER:
13  On which page are
14    you ---?
15  ATTORNEY VOIGT:
16  Either page. They're
17    the same photo.
18  BY ATTORNEY VOIGT:
19  Q. Do you know the person
20    depicted or the woman depicted in the
21    center of that photo?
22  A. No. No, I don't.
23  Q. Let me represent to you that
24    she is the --- is or was the
25    president of Bloomsburg University.

1   Do you believe that this photo
2     promotes underage drinking?
3   A. I can't see it clear enough to
4     see what the details of the picture
5     are.
6   Q. Well, take a look at the text
7     on the first page of Parent's 95 and
8     just read it. The first page.
9   ATTORNEY KRAMER:
10  I'll object. He's
11    never seen this before and
12    asking for his opinion on how
13    this picture may or may not
14    reflect upon anything is
15    really beyond the scope.
16  ATTORNEY VOIGT:
17  All right.
18  A.   I really can't see what they
19    have there, so I don't know.
20  BY ATTORNEY VOIGT:
21  Q. Well, let me represent to you
22    that as it says this is a picture of
23    the president of Bloomsburg
24    University depicted with two students
25    holding up their underage drinking

1     citations. Do you believe that that
2     promotes underage drinking?
3   ATTORNEY KRAMER:
4   I would object.
5     There's no foundation for
6     this. He's never seen it
7     before. The document speaks
8     for itself.
9   ATTORNEY VOIGT:
10  Well, the focus here is
11    on what the standard is at
12    Millersville University for
13    promoting underage drinking.
14    BY ATTORNEY VOIGT:
15  Q. Do you believe that this photo
16    and text promotes underage drinking?
17    A. I don't know.
18  Q. Turn to Plaintiff's 62. This
19    is a letter from Doctor Bray to Stacy
20    dated May 15 of 2006.
21    A. Yeah.
22  Q. Have you ever seen this letter
23    before?
24    A. No.
25  Q. Were you involve in Stacy's

1     so-called appeal?
2     A. No.
3   Q. Turn to --- well, did you have
4     any conversations with Doctor Bray
5     about this so-called appeal?
6     A. Not until after the first ---
7     after the hearing.
8   Q. After what hearing?
9     A. The hearing that was held here
10    ---
11  Q. Okay.
12    A. --- at Millersville.
13  Q. All right. Turn to
14    Plaintiff's 83 which is in the other
15    book. Now, this is a card that
16    Stacy's students made for her. Have
17    you ever seen this before?
18    A. No.
19  Q. Do you believe that views of
20    students as to the effectiveness of
21    the teacher are germane to whether
22    that teacher should be granted a
23    Bachelor of Science in Education
24    degree?
25  ATTORNEY KRAMER:

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1  I will object.  This is
2     --- he's never seen this
3     before.  It speaks for itself.
4     I don't --- representation as
5     to what is.  The document
6     speaks for itself.
7     BY ATTORNEY VOIGT:
8     Q. Well, do you believe that the
9     views of students as to the
10    effectiveness of a student teacher
11    should be germane to whether that
12    student teacher receives a Bachelor
13    of Science in Education degree from
14    Millersville?
15    ATTORNEY KRAMER:
16    Same objection.  Calls
17       for speculation.
18    BRIEF INTERRUPTION
19    BY ATTORNEY VOIGT:
20    Q. Do you understand the
21    question?  Do you remember the
22    question?
23    A. No.
24    Q. All right.  These are student
25    views and comments about Stacy;

1  Same objection.
2     BY ATTORNEY VOIGT:
3     Q. Do you believe these comments
4     by the students are significant in
5     any way concerning Stacy's fitness to
6     be a teacher?
7     A. I think that they, along with
8     a lot of other information, should
9     certainly be taken into account.
10    Q. It's important that the
11    student teacher motivates the
12    students to learn; right?
13    A. Correct.
14    Q. It's important that the
15    student teacher reaches the students;
16    correct?
17    A. Correct.
18    Q. Yet you never saw these before
19    you set in motion the denial of
20    Stacy's ---?
21    ATTORNEY KRAMER:
22    Objection.  We went
23       over this already.
24    ATTORNEY VOIGT:
25    All right.

1     correct?
2     ATTORNEY KRAMER:
3     Objection.  That's not
4        what they said.  That's what
5        you're saying, Mark.
6     ATTORNEY VOIGT:
7     Well, let me represent
8        to you that it is.
9     ATTORNEY KRAMER:
10    Go ahead.
11       BY ATTORNEY VOIGT:
12    Q. Do you believe that student
13    views on a student teacher are
14    germane to whether that student
15    teacher receives a Bachelor of
16    Science in Education degree from
17    Millersville?
18    A. No, because that's not
19    the ---.  The question is not the BS,
20    the question is certification.
21    Q. Okay.  Would these notes have
22    been significant to you in setting in
23    motion the denial of Stacy's teaching
24    certificate?
25    ATTORNEY KRAMER:

1     BY ATTORNEY VOIGT:
2     Q. Have you had any conversations
3     with Doctor Bray regarding this
4     lawsuit outside the presence of
5     Counsel?
6     A. I talked to her on one
7     occasion after the hearing.
8     Q. What did you say?
9     ATTORNEY KRAMER:
10    Well, I'll object to
11       that.  The lawsuit had not
12       been filed yet.  So that's ---
13       you're answering a different
14       question.
15    A. Okay.
16       BY ATTORNEY VOIGT:
17    Q. All right.  Well, I'm talking
18    about conversations with Doctor Bray
19    after --- after the incidents that
20    we've been talking about, but outside
21    the presence of Counsel?
22    ATTORNEY KRAMER:
23    Was Jeff Hawkins there?
24    A. Yeah.  You mean just she and I
25    or what do you mean?

```
 1    BY ATTORNEY VOIGT:
 2    Q. Conversations with Doctor
 3    Bray?  Did you have any about this
 4    lawsuit?
 5        A. Well, we had a meeting.
 6    ATTORNEY KRAMER:
 7    Well, assuming --- I
 8        know what meeting you're
 9        referring to.  But I want to
10        make sure that I wasn't there
11        and that Jeff Hawkins wasn't
12        there.  Because if one of us
13        was there, you don't talk
14        about that meeting.
15        A. Oh, okay.
16    ATTORNEY KRAMER:
17    So ---.
18    BY ATTORNEY VOIGT:
19    Q. Do you believe that Mr. --- do
20    you know who Mr. Hawkins is?
21        A. Yes.
22    Q. What is your understanding of
23    Mr. Hawkins role in this case?
24        A. I don't understand what it is.
25    Q. All right.  Do you believe
```

```
 1    that Mr. Hawkins is your lawyer?
 2    ATTORNEY KRAMER:
 3    I'll object to this.
 4        He's University Counsel and
 5        has been involved as Counsel
 6        in the processing.
 7    ATTORNEY VOIGT:
 8    All right.
 9    BY ATTORNEY VOIGT:
10    Q. Outside of the presence of any
11    Counsel ---
12        A. Yes.
13    Q. --- did you have any
14    discussions with Doctor Bray about
15    this law suit?
16        A. I asked her --- I mean, are
17        you talking about after the lawsuit
18        is filed?
19    Q. Before or after.  Any
20    conversations that we've not
21    discussed.
22    ATTORNEY KRAMER:
23    At which neither Mr.
24        Hawkins nor myself was
25        present.
```

```
 1        A. After the hearing --- I don't
 2        think the lawsuit was filed.
 3    BY ATTORNEY VOIGT:
 4    Q. Okay.
 5        A. After the hearing, I went in
 6        and asked her, I mean, I was --- I
 7        asked her, you know, what's going on
 8        here?  What does she want?
 9    Q. She being Stacy?
10        A. Yeah.
11    Q. Okay.  And what was Doctor
12    Bray's response?
13        A. She said that she wanted to be
14        reinstated into the education
15        department.
16    Q. What did Doctor Bray say?  She
17    said that Stacy wanted to be
18    reinstated.
19        A. Yeah.
20    Q. What did you say?
21        A. I said I didn't know she
22        wasn't still in it.
23    Q. What did you mean by that
24    comment?
25        A. I didn't know that she had
```

```
 1    been denied the right to come back.
 2    Q. What did Doctor Bray say?
 3        A. Well, she explained to me that
 4        that was a decision that was made in
 5        --- along with the Provost and that
 6        was it.
 7    Q. All right.  Did you have any
 8    conversations with Ms. Buffington
 9    apart from what we've discussed here
10    concerning this lawsuit?
11        A. No.
12    Q. What about with Ms. Reinking?
13        A. No.
14    Q. What about with Doctor Prabhu
15    outside of the presence of Counsel?
16        A. I stopped in to see him one
17        day because I was out of the loop on
18        this thing.  Nobody seemed to tell me
19        what was going on, so I stopped in to
20        see what he knew one day.  And he
21        just filled me in on --- and of
22        course then I ---.
23    Q. What exactly did Doctor Prabhu
24    say to you?
25        A. Well, I don't remember exactly
```

57 (Pages 222 to 225)

Page 226

1    when I went in to see him, but it was
2    after the hearing and after the
3    lawsuit was filed. And you know, I
4    said, you know, what do you know
5    about this or what's going on with
6    this? And he just explained to me,
7    the way he understood it at that
8    point.
9    Q. Which is what? What did he
10   say?
11   A. Well, he just used what was
12   the lawsuit itself.
13   Q. Okay. You're aware that there
14   was hearing in or about March of 2007
15   ---
16   A. Yes.
17   Q. --- concerning Stacy; is that
18   right?
19   A. Yes.
20   Q. Did you have any input into
21   that hearing?
22   A. Well, I got an e-mail from
23   Stacy which said that there would be
24   a hearing about her not receiving her
25   BS and certification. And that she

Page 227

1    was inviting anybody who wanted to be
2    a character witness to come to this,
3    although nobody would be subpoenaed.
4    And it also said that I would be
5    receiving a letter also from her
6    Provost about this, which I never
7    did.
8    Q. Did you have any input into
9    the eventual decision concerning
10   Stacy's appeal?
11   A. No.
12   Q. Okay.
13   ATTORNEY VOIGT:
14   I have no further
15   questions.
16
17            * * * * * * * *
18      DEPOSITION CONCLUDED AT 1:25 P.M.
19            * * * * * * * *
20
21
22
23
24
25

Page 228

1         C E R T I F I C A T E
2
3      I HEREBY CERTIFY THAT THIS ELECTRONIC TRANSCRIPT WAS
4   REPORTED BY ME AND THEREAFTER REDUCED TO TYPEWRITING AND THAT
5   THIS TRANSCRIPT IS A TRUE AND ACCURATE RECORD THEREOF.
6
7         SARGENT'S COURT REPORTING SERVICE, INC.
8
9
10   _____
11
12        COURT REPORTER
13
14
15
16
17
18
19
20
21
22
23
24
25

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

**EXHIBIT E**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STACY SNYDER,                           :
                    PLAINTIFF           :
                                        :
         vs.                            : CIVIL ACTION
                                        : NO. 07-1660
MILLERSVILLE UNIVERSITY,                :
ET AL.,.                                :
                    DEFENDANTS          :

DEPOSITION OF: DEANN L. BUFFINGTON

TAKEN BY        :  DEFENDANTS

BEFORE          :  BRENDA S. HAMILTON, RPR
                   NOTARY PUBLIC

DATE            :  MARCH 27, 2008
                   10:35 A.M.

PLACE           :  KEGEL, KELIN, ALMY & GRIMM
                   24 NORTH LIME STREET
                   LANCASTER, PENNSYLVANIA

APPEARANCES:

```
 1
     MARK W. VOIGT, ESQUIRE
 2   PLYMOUTH MEETING EXECUTIVE CAMPUS
     600 WEST GERMANTOWN PIKE
 3   SUITE 400
     PLYMOUTH MEETING, PENNSYLVANIA  19462
 4   610.940.1709
 5       FOR - PLAINTIFF
 6
     BARRY N. KRAMER, ESQUIRE
 7   SENIOR DEPUTY ATTORNEY GENERAL IN-CHARGE
     OFFICE OF ATTORNEY GENERAL
 8   LITIGATION SECTION
     21 SOUTH 12TH STREET, FOURTH FLOOR
 9   PHILADELPHIA, PENNSYLVANIA  19107
     215.560.1581
10
         FOR - DEFENDANTS
11
12   KEGEL, KELIN, ALMY AND GRIMM, LLP
     BY:  HOWARD L. KELIN, ESQUIRE
13   24 NORTH LIME STREET
     LANCASTER, PENNSYLVANIA  17602-2913
14   717.392.1100
15       FOR - DEPONENT
16
17
18
19
20
21
22
23
24
25
```

```
 1            INDEX TO WITNESSES
 2
     DEANN L. BUFFINGTON            PAGE
 3
     BY MR. KRAMER                     4
 4
     BY MR. VOIGT                     82
 5
 6
 7
 8
 9
10            INDEX TO EXHIBITS
                                    PAGE
11
     BUFFINGTON DEPOSITION EXHIBIT NUMBERS:
12
     1 - MAY 4, 2006 MYSPACE POSTING WITH    54
13     PICTURE
14   2 - MAY 8 & 9, 2006 EMAILS WITH         58
       ATTACHMENT
15
     3 - MAY 10, 2008 EMAIL                  68
16
     4 - BUFFINGTON WRITTEN THOUGHTS         68
17
     5 - WENRICH NOTES                       72
18
19
20
21
22
23
24
25
```

```
 1            DEPOSITION SUPPORT INDEX
 2
 3   DIRECTIONS NOT TO ANSWER:
 4   PAGES:  NONE
 5
 6
 7
 8   REQUESTS FOR DOCUMENTS OR INFORMATION:
 9   PAGES:  NONE
10
11
12
13   STIPULATIONS AND/OR STATEMENTS:
14   PAGES:  5
15
16
17
18   MARKED QUESTIONS:
19   PAGES:  52, LINE 12
20           66, LINE 25
21           78, LINE 8
22           79, LINE 20
23           80, LINE 21
24
25
```

```
 1                 STIPULATION
 2        It is hereby stipulated by and
 3   between counsel for the respective parties
 4   that sealing, certification, and filing are
 5   hereby waived; and that all objections, except
 6   as to the form of the question, are reserved
 7   to the time of trial.
 8              - - -
 9        DEANN L. BUFFINGTON, called as a
10   witness, being duly sworn or affirmed, was
11   examined and testified as follows:
12                 EXAMINATION
13   BY MR. KRAMER:
14        Q.   Good morning, Mrs. Buffington.  My
15   name is Barry Kramer.  I'm the attorney for
16   the Millersville University defendants in this
17   case, captioned Stacy Snyder versus
18   Millersville University.
19        I will be asking you questions today
20   in what's called a deposition.  I presume
21   Mr. Voigt will also be asking you questions
22   when I'm finished.
23        Let me give you some introductory
24   remarks.  First, if at any time you don't
25   understand a question that I ask because it's
```

1  **a badly phrased questions -- question, because**
2  **you don't understand my question, because you**
3  **do not hear my question, for any reason, just**
4  **ask and I will rephrase the question, ask it**
5  **again.**
6          **You need to give your responses**
7  **verbally. Meaning you can't do just a shake**
8  **of the head or a nod of the head. You need to**
9  **say, yes, no, et cetera. Understood?**
10     A.  Understood.
11     **Q.  Perfect. Thank you. Any time you**
12  **want to take a break, will you let us know and**
13  **we can accommodate you on that.**
14         **Have you ever had your deposition**
15  **taken --**
16     A.  No.
17     **Q.  -- before? You're under oath. I'm**
18  **going to ask questions. You're going to give**
19  **responses to the best of your ability.**
20  **Mr. Kelin may at times object to a question or**
21  **Mr. Voigt may object to a question. If that**
22  **happens, you should let the lawyers hash it**
23  **out and you'll take your instructions from --**
24  **from Mr. Kelin.**
25         **Any questions before we start?**

1  A.  No.
2  **Q.  Where are you currently employed?**
3  A.  Conestoga Valley School District.
4  **Q.  And are you employed at a certain**
5  **school in the Conestoga Valley School**
6  **District?**
7  A.  I'm a district employee, and my job
8  is twofold.
9  **Q.  Okay.**
10  A.  I'm a supervisor, but I'm also a
11  teacher.
12  **Q.  Right.**
13  A.  My office is at the high school.
14  **Q.  All right. Tell me generally your**
15  **various responsibilities at the high school.**
16  A.  At the high school?
17  **Q.  Yes. At the high school.**
18  A.  At the high school I teach one class
19  each semester. And I supervise -- I believe
20  it's 10 individuals, 11 individuals.
21  **Q.  All right. And are you -- do you**
22  **have some responsibility for supervising the**
23  **student teaching program at Conestoga?**
24  A.  No.
25  **Q.  Do you have -- is Nicole Reinking a**

1  **person, a teacher that you supervise?**
2  A.  Yes.
3  **Q.  All right. Now, in May 2006**
4  **Ms. Reinking was the cooperating teacher for**
5  **Stacy Snyder?**
6  A.  That's correct.
7  **Q.  All right. Do you have any other**
8  **role other than -- you were supervising**
9  **Ms. Reinking, who was the cooperating teacher**
10  **for Stacy Snyder?**
11  A.  That's correct.
12  **Q.  Who was -- do you have any other**
13  **involvement with student teachers at all at**
14  **Conestoga Valley?**
15  A.  I get emails from the district office
16  asking for teachers who may be willing to work
17  with junior block students or student
18  teachers. I relay -- I forward that email and
19  then those teachers get back to Deb Doyle who
20  is a district office secretary.
21  **Q.  Okay. And then what happens?**
22  A.  Our Director of Secondary Education.
23  **Q.  Okay.**
24  A.  At that point it was Dr. Mann, and
25  his title was different. He was the Director

1  of Curriculum and Instruction.
2  **Q.  Okay.**
3  A.  He and Deb would coordinate the
4  student teaching and junior block experiences.
5  **Q.  What is the junior block experience?**
6  A.  When the students are in their junior
7  year, of any school, Elizabethtown, or
8  Millersville primarily. I don't know that we
9  have had junior block students from
10  Elizabethtown, but I believe that some of the
11  colleges -- I believe Elizabethtown, too, and
12  probably others -- send students out on what
13  they call field service experiences.
14  **Q.  What does that entail?**
15  A.  Working -- it used to be that the
16  students would spend several weeks with a
17  teacher, just to get an idea about teaching,
18  maybe doing some mini lessons and so forth.
19         I myself have had junior block
20  students in the past.
21  **Q.  Okay.**
22  A.  And we've continued to have those
23  students.
24  **Q.  All right. From what universities**
25  **does Conestoga Valley High School accept**

1    **student teachers?**
2         MR. KELIN:  Are you asking about in
3    her area or --
4    BY MR. KRAMER:
5         **Q.   I'm sorry.  We're focusing on the**
6    **English communications areas.**
7         A.   Most of the field services
8    experiences and student teachers have been
9    from Millersville, but we have had some from
10   Elizabethtown, and also I believe we had
11   somebody from Lancaster Bible College.
12        **Q.   All right.  In your area, how long**
13   **has Conestoga Valley been accepting**
14   **Millersville University student teachers?**
15        A.   I've been in this capacity as
16   supervisor for eight years, and for the length
17   of my tenure at CV we have had student
18   teachers.
19        **Q.   And shall I refer to this as the**
20   **English department or communications?**
21        A.   It's communications.
22        **Q.   Okay.  And how does that differ, if**
23   **at all, from the English department?**
24        A.   Communications oversees English and
25   reading.  Language arts on the middle school

1    level and elementary level.
2         **Q.   Since May 2006 has Conestoga Valley**
3    **hosted student teachers from Millersville?**
4         A.   Yes.
5         **Q.   Has there been any difference in the**
6    **number of student teachers since that time?**
7         A.   No.
8         **Q.   Since May 2006?**
9         A.   No.
10        **Q.   The current semester, which is, I**
11   **guess, spring 2008, does Conestoga Valley High**
12   **School host some Millersville student**
13   **teachers?**
14        A.   We have one student teacher
15   presently.
16        **Q.   Okay.  And how about last semester,**
17   **do you remember?**
18        A.   Last semester?
19        **Q.   That would have been autumn '07.**
20             MR. KELIN:  And are your questions
21   now still for the communication department?
22             MR. KRAMER:  Yeah, we're just
23   focusing on that.
24             MR. KELIN:  I just wanted to make
25   sure.

1             MR. KRAMER:  Yes.
2             MR. KELIN:  You've been asking in
3    terms of the high school so I wanted to
4    make --
5    BY MR. KRAMER:
6         **Q.   No.  We're focusing on just what you**
7    **know.**
8         A.   We did have a student teacher from
9    Millersville last semester.
10        **Q.   Okay.  A student teacher from**
11   **Millersville, or from any university, follows**
12   **what calendar when he or she is at Conestoga**
13   **Valley?**
14             MR. KELIN:  Objection to form.
15        A.   I am not understanding your
16   question.  What calendar are you speaking of?
17   BY MR. KRAMER:
18        **Q.   Do you know, does a student teacher**
19   **follow the Conestoga Valley academic calendar**
20   **when a student teacher is there?**
21        A.   Primarily.  And I know that they do
22   have some obligations to Millersville, or the
23   other university or college, and may sometimes
24   have to attend meetings at the colleges or
25   universities.

1         **Q.   Do you know if -- is the student**
2    **teacher expected to be in the Conestoga Valley**
3    **classroom every day the cooperating teacher**
4    **was there?**
5         A.   Yes.
6         **Q.   Does the student teacher attend**
7    **faculty meetings?**
8         A.   Student teachers are supposed to
9    participate in department meetings, faculty
10   meetings.
11        **Q.   Do they attend open houses?**
12        A.   I think that's --
13        **Q.   If you know.**
14        A.   That's up to the student teacher and
15   the cooperating teacher.
16        **Q.   All right.**
17        A.   We always think that it's a good idea
18   to have student teachers to meet the parents
19   because it is going to be an experience with
20   sort of a co-teaching situation, at least
21   initially.
22        **Q.   All right.  Do they also attend**
23   **parent/teacher conferences, to the extent the**
24   **high school has parent/teacher conferences?**
25        A.   I don't recall any incidents that we

1 have had with student teachers sitting in on

2 parental conferences.

3    **Q. Okay. Tell me what why -- what --**

4 **what is a student teacher supposed to do at**

5 **Conestoga Valley when student teaching? What**

6 **do they do?**

7    A. Usually at the beginning, observing

8 the cooperating teacher; observing other

9 teachers, not only in the same discipline but

10 in other disciplines; taking note of the

11 students in the classes; doing the preparation

12 necessary to get ready for actual teaching;

13 and then it's a gradual buildup until the

14 student -- as far as taking on classes, until

15 the student teacher assumes the complete role

16 of the cooperating teacher.

17    **Q. And -- and what do you mean the**

18 **student teacher takes over the complete role**

19 **of the cooperating teacher?**

20    A. I believe that it's for a two-week

21 period that the student teacher has to -- has

22 to take all of the classes from the

23 cooperating teacher.

24    **Q. All right. And what does that**

25 **entail?**

1    A. At our school, at CV --

2    **Q. Yes.**

3    A. -- it would be teaching three of four

4 blocks, 82 minutes apiece. Approximately.

5 Our third block is a little longer because of

6 lunches.

7    **Q. Okay.**

8    A. And also covering enrichments.

9    **Q. What's that?**

10    A. Enrichments are right now currently

11 half hour time slots at the end of the day.

12 Last year it was more or less an hour at the

13 end of the day, and our block one students

14 on -- we're on a four-day cycle, our block one

15 students would come back at the end of the day

16 to enrichment on day one.

17    **Q. What is enrichment?**

18    A. Basically it's a time for the

19 students to hone their skills, their

20 communication skills. We have them reading

21 and writing. I would say that our intention

22 is to give them more practice for the PSSA.

23       We also have some technology tools

24 that we use, study islands, students can work

25 on those as well.

1    **Q. Okay.**

2    A. Just again to beef up their -- their

3 communication skills.

4    **Q. When the student teacher is teaching,**

5 **does -- how does his or her functions and**

6 **responsibilities differ from the full-time**

7 **teacher?**

8    A. Not really different at all.

9    **Q. Okay. Does the student teacher grade**

10 **the students on the assignment that he or she**

11 **has, you know, responsibility for?**

12    A. I would say initially the cooperating

13 teacher is probably sitting and working very

14 closely with the student teacher --

15    **Q. And --**

16    A. -- regarding assessment.

17    **Q. Okay.**

18    A. But then what happens is that the

19 student teacher takes on more and more

20 responsibility. I'm not sure that the

21 cooperating teacher completely signs off,

22 because that's the role of the cooperating

23 teacher.

24    **Q. Okay. All right. What is the role**

25 **of the cooperating teacher? Again, generally**

1 **as far as you know.**

2    A. The cooperating teacher is a guide, a

3 coach, a person that delivers information to

4 the student teacher to get that student

5 teacher ready for his or her own classroom.

6 In all areas, in preparation, in classroom

7 management, in professional --

8 professionalism.

9    **Q. Okay. You said you're -- you are**

10 **currently -- are you currently Nicole**

11 **Reinking's supervising teacher?**

12    A. I am.

13    **Q. And you were back in May of '06?**

14    A. Yes, I was.

15    **Q. Tell me, how she was as a teacher?**

16    A. Excellent.

17    **Q. Okay.**

18    A. One of the most outstanding teachers

19 that I have ever supervised.

20    **Q. In spring 2006, which we're going to**

21 **focus on now, how many student teachers from**

22 **Millersville were at -- were in your**

23 **department in the high school?**

24    A. I don't recall. I think that Stacy

25 was the only one, but I'm not certain.

1   **Q.    Okay.  Do you know how it is that**
2   **Nicole Reinking became assigned as Stacy**
3   **Snyder's cooperating teacher?**
4       A.    That would have been Nicole's first
5   opportunity to serve as a cooperating
6   teacher.  The teachers have to have tenure,
7   and she had obtained tenure the year before.
8       **Q.    All right.**
9       A.    And, again, just as I said before, we
10  would have had an email forwarded to me from
11  the district office, from Millersville or from
12  any of the other schools.  That email would
13  have been forwarded from me to the teachers in
14  my department, and then those teachers would
15  contact Deb Doyle, who is our secretary in the
16  district office, to let Deb know that the
17  teacher was interested in serving as a co-op.
18      **Q.    All right.  Do you recall your first**
19  **interaction with Ms. Snyder?**
20      A.    I do.  I welcomed her to the school,
21  as I would any student teacher.
22      **Q.    All right.**
23      A.    Told her that she would be serving
24  under an excellent teacher and role model.
25      **Q.    Okay.  At any time did you observe**

1   **Ms. Snyder actually teaching in the classroom**
2   **that semester?**
3       A.    I had drop-in visits to check on
4   things with Nicole basically, and so there
5   were some -- some cases when I did see Stacy
6   interacting with students or presenting
7   something or whatever.
8       **Q.    Okay.  And what were your impressions**
9   **of her teaching, the bit that you saw?**
10      A.    Well, my -- the very first time that
11  I stepped in the room and she was instructing,
12  she either -- she either had something on the
13  board or -- I believe they were folders that
14  she had made for the students and she had
15  misspelled Shakespeare.  And she was teaching
16  British literature so that, of course, made me
17  look twice at the folders and they were, in
18  fact, misspelled.
19      **Q.    Okay.  And did anything else happen**
20  **in that particular session that you recall?**
21      A.    Not in that session.  It was just a
22  very quick drop-in, as I said, and then I went
23  back to my office.
24      **Q.    How many times would you say you**
25  **observed her teaching that semester, if you**

1   **could recall?**
2       A.    I -- I really didn't observe her
3   teaching.
4       **Q.    Okay.**
5       A.    Again, it was just a drop-in visit to
6   see the person that I did supervise.
7       **Q.    Okay.**
8       A.    And that was Mrs. Reinking at that
9   point.
10      **Q.    All right.  At some point during the**
11  **semester -- and the semester that I'm going to**
12  **refer to is May 2006; that should be clear --**
13  **did Nicole Reinking come do you with some**
14  **concerns about Ms. Snyder's teaching?**
15      A.    You said May 2006.  Do you mean that
16  semester?
17      **Q.    The semester, yeah.**
18      A.    Okay.
19      **Q.    Spring 2006, did Ms. Reinking come to**
20  **you with some concerns about what was going on**
21  **in the classroom?**
22      A.    Very frequently.
23      **Q.    Well, tell me what you remember.  To**
24  **the extent you can take it in chronological**
25  **order.**

1       A.    I can't take it in chronological
2   order.  I can tell you that.
3       **Q.    Tell me what she told you.**
4       A.    I distinctly remember the Valentine's
5   Day episode in that she shared -- Stacy Snyder
6   shared information with students regarding her
7   having been on a date, I believe, and had
8   encountered her husband with a date also and,
9   of course, Nicole told Stacy that sharing
10  such -- such personal information was
11  inappropriate.
12           Stacy herself had stopped in to see
13  me and asked me if she could stay on beyond
14  her student teaching experience and finish out
15  the year with the students, and I told her
16  that she needed to follow channels.  That --
17  of course, it isn't something that we've ever
18  done before.  I didn't know how Mrs. Reinking
19  would feel about that, but that she needed to
20  go back to Mrs. Reinking.
21      **Q.    Okay.**
22      A.    But my -- my response to her, too,
23  was that this was not something that we had
24  ever done before.
25      **Q.    What -- if you could clarify what she**

1  requested of you that wasn't --
2      A.    She wanted -- she wanted to stay
3  beyond her student teaching experience.
4      Q.    As a -- as an employee, as a teacher?
5      A.    I think as a teacher.
6      Q.    Was she applying for a job?
7      A.    I don't know if we had any jobs open
8  at that point. I believe that we -- we did,
9  and we hired some new employees for the
10 2007/'8 school year.
11     Q.    Right. I'm sorry. To me that -- her
12 request sounds vague. Could you -- could you
13 clarify or --
14     A.    Perhaps just additional experience in
15 the classroom.
16     Q.    Okay. And you told her in response
17 what?
18     A.    Well, that she needed to follow
19 channels. Number one, that request should
20 have come from Nicole to me.
21     Q.    Okay.
22     A.    But also that it wasn't anything that
23 CV had ever done before for any other student
24 teachers.
25     Q.    All right. What do you mean that

1  Ms. Snyder had to follow channels?
2      A.    She bypassed Mrs. Reinking at that
3  point, and I told her that she needed to
4  confer with her student teaching co-op.
5  Because Nicole was directly supervising her
6  and I was supervising Nicole; and the request
7  should have come from Nicole to me, not Stacy
8  to me.
9      Q.    Okay. Any other?
10     A.    Other?
11     Q.    Impressions.
12     A.    Yes.
13     Q.    Or things that Ms. Reinking told you?
14     A.    She had worn flip-flops to school.
15 So professional garb. One day Stacy did
16 appear with little pigtails sticking out of
17 her head, and she looked not professional at
18 that point.
19     Q.    Anything else?
20     A.    She shared -- after the -- I believe
21 after the midyear evaluation, Ms. Reinking
22 told me that Stacy talked to her students
23 about the evaluation and that that had -- that
24 conversation had gotten back to Mrs. Reinking
25 through the students.

1      Q.    If -- could you clarify what --
2  you're saying, that after the midterm
3  evaluation?
4      A.    Yes.
5      Q.    Ms. Snyder spoke to?
6      A.    Students.
7      Q.    About?
8      A.    About that evaluation.
9      Q.    And that evaluation being which
10 evaluation?
11     A.    It would have been the evaluation
12 that Mrs. Reinking prepared.
13     Q.    Oh, of Ms. Snyder?
14     A.    Of Ms. Snyder at midterm.
15     Q.    Okay. Okay. Now that I understand
16 that, what else do you remember about that
17 incident, if you will?
18     A.    Just that -- from my recollection,
19 Mrs. Reinking told me that some students had
20 approached her and told her that Ms. Snyder
21 was making negative comments.
22     Q.    About?
23     A.    About Mrs. Reinking.
24     Q.    To?
25     A.    Students.

1      Q.    Okay. Anything else that you
2  remember?
3      A.    A song that Stacy had played as part
4  of a lesson that had profanity in it. She
5  allowed students to use inappropriate language
6  to one another.
7      Q.    Okay. Well, let me go back. This
8  song that you referred to, was that the Ben
9  Folds song --
10     A.    I don't know.
11     Q.    -- that we're talking about?
12     A.    I don't know what song it was.
13     Q.    Do you recall what Ms. Reinking told
14 you about the song incident?
15     A.    That there was profanity and she --
16 Mrs. Reinking got up to stop the -- the record
17 or the song.
18     Q.    Okay. And then after that you said
19 that some students had used inappropriate
20 language?
21     A.    Screaming, I believe, shut up at one
22 another or even swearing. And Ms. Snyder did
23 not address that bad behavior with the
24 students, and Mrs. Reinking, I believe, had
25 to.

1    **Q.    Okay.  What did she do, if you know?**
2    A.    She would have told -- I mean she
3    would have told the students that it's
4    inappropriate.
5    **Q.    Okay.  Anything else you can**
6    **remember?**
7    A.    Are you talking in the classroom
8    or -- or just the entire semester and some of
9    the other situations?  Because you had asked
10   me about department meetings and faculty
11   meetings also.
12   **Q.    Yes.  I'm talking about the entire**
13   **semester in the classroom.**
14   A.    Okay.
15   **Q.    I'm focusing on what Ms. Reinking**
16   **told you about Ms. Snyder's behavior and**
17   **teaching.**
18   A.    Those are some of the examples in the
19   classroom.  I can tell you with -- that at a
20   department meeting she spoke out and -- which
21   is not typical of student teachers.  Usually
22   student teachers are there to monitor what is
23   transpiring with the department members,
24   because that is the purpose of the department
25   meeting.  But Stacy would also make

1    contributions as if she were an employee.
2    **Q.    And you -- and you found that**
3    **inappropriate?**
4    A.    It had never happened before.  We --
5    we all thought, the teachers in the
6    department, as well as I myself, thought that
7    it was a little brash on her part.
8    **Q.    And did you -- did you personally --**
9    **were you personally at those meetings?**
10   A.    I was the person running the meeting.
11   **Q.    Okay.**
12   A.    And she did the same thing at the
13   faculty meeting with all of our faculty
14   members.  And Nicole and I discussed the
15   inappropriateness of Stacy's comments at the
16   faculty meeting as well.  And I don't remember
17   exactly what those comments were.
18   **Q.    Okay.**
19   A.    But we found them to be not something
20   that student teachers, normally, generally
21   do.  They're usually the observers at those
22   meetings.
23   **Q.    Okay.  Anything else that you can**
24   **recall?**
25   A.    I remember Nicole talking with me

1    about one of Stacy's techniques.  She had the
2    students assemble a Popsicle stick with a
3    little stop sign on it.  Now, she was teaching
4    seniors.  And if someone didn't understand
5    something, the person could hold the Popsicle
6    stick with the stop sign up to let Stacy know
7    that there was confusion or a problem.
8    **Q.    And did you find that not**
9    **appropriate?**
10   A.    Not in a senior high school
11   classroom.  We thought that would be something
12   that might be more appropriate on the
13   elementary level or even perhaps the seventh
14   or eighth grade level.
15   **Q.    Okay.  Anything else that you can**
16   **recall?  I know we're going back a long time,**
17   **but ---**
18   A.    She was -- she didn't send in plans
19   when she was out so that Mrs. Reinking would
20   have to pick up, and, of course, Mrs. Reinking
21   was there and she obviously could pick up, but
22   it is the student teachers's responsibility to
23   send in plans just the same as it would be for
24   a regular teacher.
25        She lost student papers, I believe.

1    She also lost an attendance roster, which
2    caused some difficulties with keeping track of
3    the records for that particular day when there
4    were questions that arose from the attendance
5    office.
6    **Q.    These criticisms that Ms. Reinking**
7    **had of Ms. Snyder's professionalism, teaching,**
8    **competence, behavior, was she -- was**
9    **she telling -- was Ms. Reinking telling you,**
10   **you know, these criticisms contemporaneous**
11   **with the -- with the incidents occurring?**
12   A.    Yes.  Almost daily.
13   **Q.    Okay.**
14   A.    Almost daily.  And I can -- I can
15   also say that Nicole, I believe, had advanced
16   composition at the beginning of that semester
17   and, because of Ms. Snyder's poor skills that
18   she had observed to that point, was afraid of
19   turning that class over.  And, in fact, I
20   don't believe she did turn that class over --
21   over to Ms. Snyder.
22   **Q.    Okay.  Why is that?  What's advanced**
23   **composition?**
24   A.    Advanced composition, we have
25   students that take a foundation course.  It's

1 called basic composition.

2    Q.   Right.

3    A.   And then if the students want to, in

4 fact, expand their writing skills, learn

5 different methods of development, and perhaps

6 write longer papers, do some research or

7 whatever, they take advanced composition. And

8 that's a nine weeks' course as well.

9    Q.   All right. And Ms. Reinking thought

10 **Ms. Snyder should not teach that course?**

11    A.   That's right.

12    Q.   Because why?

13    A.   Because she observed that she did not

14 have competence in English grammar skills,

15 puncuation -- puncuation usage. Just the

16 background wasn't there.

17    Q.   All right. And what were you --

18 while -- during the semester while

19 Ms. Reinking was telling you these things, did

20 you do anything in response?

21    A.   It's Ms. Reinking -- Mrs. Reinking's

22 nature, as well as my own, to help anybody,

23 students or student teachers, and so we were

24 trying our best every day to help Stacy to

25 gain the skills that she needed to acquire.

1    Q.   What did you personally do, if

2 anything, to help Ms. Snyder acquire better

3 skills?

4    A.   Not -- that really wasn't my job.

5 That was Ms. Reinking's job.

6    Q.   Did Mrs. Reinking consult with you as

7 to how she should help and support Ms. Snyder?

8    A.   Mrs. Reinking is an excellent

9 teacher, and she has a grasp of what she needs

10 to do with students. And even though this was

11 her first student teacher, she -- she worked

12 diligently with Stacy --

13    Q.   Okay.

14    A.   -- to assist her, to gain the skills.

15    Q.   It sounds to me as if then your

16 function that semester in this context was to

17 act as a sounding board?

18    A.   I was more a sounding board --

19    Q.   Okay.

20    A.   -- than anything else.

21    Q.   Okay. Did Ms. Snyder ever complain

22 to you at any time about Ms. Reinking?

23    A.   No.

24    Q.   I want to focus on the events giving

25 rise to Ms. Snyder being barred from Conestoga

1 **Valley, but just for clarity -- clarity's**

2 **sake, is there anything before that, you know,**

3 **from January '06 until, you know, May 1st,**

4 **thereabouts, that you can remember about**

5 **Ms. Snyder's performance, Mrs. Reinking's**

6 **observations that we haven't touched on so**

7 **far?**

8    MR. KELIN: I just want to object to

9 the use of the word bar.

10    MR. KRAMER: Okay. I understand.

11    MR. KELIN: But subject to that, go

12 ahead.

13    MR. KRAMER: Yeah. That's fine.

14 Just so we can kind of demarcate the time

15 period. That's all.

16    A.   I do recall that around midterm

17 Ms. Reinking was upset with Ms. Snyder's

18 performance at that point, was frustrated,

19 didn't know if she wanted Stacy to continue as

20 her student teacher, I think perhaps spoke to

21 Mr. Girvin regarding a different placement, at

22 the middle school perhaps. I'm not certain of

23 that, but I -- this is my recollection --

24    Q.   Sure.

25    A.   -- at this point. But as is -- as is

1 the case with Mrs. Reinking, she would perhaps

2 see that as a failure on her part and so,

3 again, that willing spirit to help came

4 through and Stacy continued.

5    Q.   Okay.

6    A.   And there were areas of improvement

7 thereafter.

8    Q.   Okay. During the semester -- and,

9 again, before May 1st of 2006 -- did you ever

10 speak with Mr. Girvin about Ms. Snyder?

11    A.   Only in regard to Stacy being with an

12 excellent teacher. I -- I did not discuss

13 Stacy's performance. I believe that that was

14 Nicole's responsibility, Mrs. Reinking's

15 responsibility, as co-op teacher.

16    Q.   At -- at some point there came a time

17 when it's alleged that you called Ms. Snyder

18 and told her she could not return to the

19 school, was barred from the school,

20 something. Tell me first is that --

21    A.   No. Well, not barred.

22    Q.   Okay.

23    A.   I wouldn't have used that term at

24 all.

25    Q.   I'm a lawyer. I'm sorry. That's

1  **just one of the words we use.  Tell me the**
2  **events.  You -- at some point in early May**
3  **you did call her?**
4      A.   I called her on the 8th of May.
5      **Q.   Okay.  Tell me the events which gave**
6  **rise to that phone call.**
7      A.   I believe that that morning one of
8  the teachers in my department showed me a copy
9  of a posting from MySpace that had
10  Ms. Snyder's picture.
11      **Q.   Is that Shaun Karli?**
12      A.   Shaun Karli.  And not only the
13  picture, but also several sentences under that
14  picture as well as a caption:  Dorky.  I think
15  category was life.  That was life, but I think
16  it said mood: Dorky; category: Life, or
17  something like that.  And then there were
18  words, sentences under that.
19      **Q.   Okay.  If you'd, in the documents in**
20  **front of you, go to the fourth page.  I think**
21  **it's the fourth page.  Is that the page that**
22  **Mr. Karli showed you?**
23      A.   It is.
24          MR. KRAMER:  Let's mark that as
25  Buffington 1, please.

1  BY MR. KRAMER:
2      **Q.   Is this the only page from -- that**
3  **Mr. Karli showed you from Ms. Snyder's**
4  **website?**
5      A.   It's the only page that I saw that
6  day.
7      **Q.   I interrupted.  So Mr. Karli showed**
8  **you this page?**
9      A.   Showed me this picture.  I believe
10  Ms. Snyder had left that day.  Went home ill,
11  is my recollection.
12          And Mrs. Reinking also had this as
13  well.  She came to me and was quite upset
14  because she had told Ms. Snyder on several
15  occasions not to post anything on MySpace, not
16  to talk to her students about MySpace, which
17  she had done in the classroom previously.
18      **Q.   And how -- why do you believe that**
19  **Ms. Reinking had told -- had warned Ms. Snyder**
20  **not to --**
21      A.   She had told me that.  I told you
22  that on almost a daily basis, I mean very
23  frequently, she was in my office --
24      **Q.   All right.**
25      A.   -- talking to me about different

1  comments that Stacy had made in class to the
2  students.
3      **Q.   Okay.**
4      A.   Things that were inappropriate.
5      **Q.   All right.**
6      A.   That would have been the reason, the
7  cause, for Ms. Reinking to come to my office,
8  that there was some kind of a problem.
9      **Q.   Okay.**
10      A.   So we've had some situations in the
11  past regarding professional behavior at CV,
12  and my job as a supervisor then was -- because
13  of Mrs. Reinking being upset and my not
14  exactly knowing what my responsibility was at
15  this point in reaction to this, I contacted
16  Kim Seldomridge, who is our Director of
17  Business and Administrative Services.
18      **Q.   Okay.  Explain to me why you**
19  **weren't -- why you yourself weren't sure of**
20  **your responsibility at this point?**
21      A.   Mr. Seldomridge oversees personnel
22  issues.  And anything that has happened, has
23  transpired at CV that would be something that
24  would be less than professional, he would be
25  the person that would have to deal with that

1  circumstance.
2      **Q.   Okay.**
3      A.   And does deal with that kind of
4  circumstance.
5      **Q.   Okay.  So you contacted**
6  **Mr. Seldomridge?**
7      A.   Via phone.
8      **Q.   Okay.  What did you tell him on the**
9  **phone?**
10      A.   I told him about the MySpace
11  posting.  I believe that I read -- I described
12  the picture.
13      **Q.   This is the Buffington 1, the page**
14  **with the photograph?**
15      A.   Yes.
16      **Q.   All right.**
17      A.   I described the picture to him.  This
18  picture is not very clear.  The picture that
19  we had, I think, was more clear than this one.
20      **Q.   Was it about the same size?**
21  **Approximately.**
22      A.   Yes.  And I feel certain that I read
23  to him what was in the posting.  I also
24  believe that I told him that this had been --
25  that her lack of professionalism had been an

1 ongoing problem the entire semester.
2    Q.   And did that --
3    A.   I'm not sure if I shared details.
4    Q.   Okay.  And that -- that refers to the
5 incidents that you've already described for
6 us?
7    A.   That's right.
8    Q.   Okay.
9    A.   And at that point he asked me to
10 either have Nicole -- I think have Nicole
11 contact him because he wanted more
12 information.
13    Q.   Okay.
14    A.   And I did that.  I told Nicole that
15 she needed to be in touch with
16 Mr. Seldomridge.
17    Q.   All right.  And then with respect to
18 your involvement with this, what happened
19 next?
20    A.   I -- I think that at that point I
21 also called Mr. Girvin, because I thought that
22 he should be aware of -- of what was
23 happening.  But I'm not certain that I did.
24    Q.   Okay.
25    A.   I don't know if Ms. Reinking

1 contacted him or if Mr. Seldomridge did or if
2 I did.  I just don't remember.
3    Q.   Okay.  And then what happened?
4    A.   I called -- I called Stacy and I told
5 her that she wasn't to come back in until her
6 evaluation, which was to take place on
7 Thursday of that week.
8    Q.   The 11th?
9    A.   The 11th.
10    Q.   All right.
11    A.   And she wanted a reason, and I told
12 her that I wasn't able to share that reason at
13 that time.
14    Q.   Okay.  Do you know if Mr. Seldomridge
15 ever spoke directly with Ms. Snyder about
16 this?
17    A.   I don't believe that he did.
18    Q.   Okay.  You met on May 11th.  Did you
19 have any contact with Ms. Snyder after the
20 phone call before the May 11th meeting?
21    A.   I don't think that I did.  I don't
22 know.  I don't remember if she might have
23 called a second time to see if she could get
24 in because she had furniture or materials or
25 whatever and she -- she may have.  But I don't

1 remember if that was the case.
2    Q.   All right.  And -- and before the May
3 11th meeting --
4    A.   Yes.
5    Q.   -- did you do anything in preparation
6 for the meeting?
7    A.   Mr. Girvin came in a little earlier
8 than his meeting, which was to be the final
9 evaluation with Stacy and with Ms. Reinking,
10 with Nicole; and he and I chatted in my office
11 about this situation.
12    Q.   What did you talk about or what did
13 you discuss?
14    A.   Just that this posting -- but this
15 was, again, ongoing problems that we had seen,
16 not only in her professionism but also in not
17 having the skills to instruct English.
18    Q.   What did Mr. Girvin say during that
19 conversation?
20    A.   My impression was that Millersville
21 wanted to give Stacy a satisfactory
22 evaluation; but I didn't know what Mr. Girvin
23 had in his evaluation of Stacy, nor did I know
24 what Ms. Reinking had in hers.
25        Mrs. Reinking had talked with me

1 about some of the areas of concern, and she
2 had everything documented so thoroughly.
3 She -- she did give Stacy -- I think the areas
4 were superior and competent, and I don't
5 remember, satisfactory maybe was another, and
6 then unsatisfactory.  And in the areas that
7 she thought that she could give Stacy the
8 satisfactories or above, she did that.  But in
9 those areas that were questionable, she -- she
10 delivered what she thought she needed to do.
11    Q.   Why was it your impression that
12 Millersville wanted to give Ms. Snyder a
13 satisfactory on the evaluation?
14    A.   Mrs. Reinking had talked with me
15 about that at midterm, and I think that she
16 and Mr. Girvin had been in discussion that
17 they were going to sort of ignore what had
18 happened up until the midterm and try to look
19 at her performance from midterm on with that
20 final evaluation.  Rather than the entire
21 semester, the final evaluation would be from
22 midterm on.
23    Q.   All right.
24    A.   Rather than the entire -- rather than
25 that span of time.

1   Q.   Okay.
2   A.   The longer span.
3   Q.   But my question was -- I understand
4   that you said from speaking with Mr. Girvin it
5   was your impression that Millersville wanted
6   to give Ms. Snyder a satisfactory in the
7   evaluation and so that's --
8   A.   Yes.  But I wasn't -- I wasn't
9   certain --
10  Q.   Okay.
11  A.   -- what Ms. Reinking's evaluation
12  would be or what Mr. Girvin's was.
13  Q.   When you spoke with Mr. Girvin right
14  before the May 11th meeting, was he aware of
15  Ms. Snyder's unsatisfactory teaching and
16  professionalism?
17       MR. VOIGT:  Objection to the form.
18  It assumes facts not in evidence, that she was
19  unprofessional.
20  BY MR. KRAMER:
21  Q.   You can answer.
22  A.   I am certain that, because of his
23  observations that are mandatory, he would have
24  had discussions with Mrs. Reinking.  I know
25  that he had discussions with Ms. Reinking

1   regarding these problems that she -- that she
2   shared with me.
3   Q.   Did Mr. Girvin say anything to you in
4   that -- in the meeting before the final
5   meeting that --
6   A.   Only that he was aware of the
7   problems that had transpired over the course
8   of the semester.
9   Q.   Okay.  How long was that meeting that
10  you had with Mr. Girvin?
11  A.   Maybe a half hour.  Perhaps.  Maybe
12  not even that long.
13  Q.   Did you have any input into
14  Ms. Reinking's evaluations of Ms. Snyder?
15  A.   I did not.
16  Q.   Did you have any input into
17  Mr. Girvin's evaluations of Ms. Snyder?
18  A.   No.
19  Q.   What transpired at the meeting -- the
20  meeting in which, as I understand it, it was
21  you, Ms. Snyder, Mr. Girvin, and
22  Mrs. Reinking?  Okay.  What happened at that
23  meeting?
24  A.   We at that point told Stacy why -- we
25  had asked her not to come back until the

1   evaluation, that we were very troubled by the
2   MySpace posting and with the paragraph that
3   she had underneath, also with the current
4   mood:  Dorky.
5   Q.   Explain to me why you were troubled
6   by those things.
7   A.   May I refer to --
8   Q.   Absolutely, yes.
9   A.   -- the picture?
10  Q.   Absolutely.
11  A.   Well, the picture itself doesn't look
12  to be the picture that I would want of a
13  teacher in front of a classroom.  The same
14  with Ms. Reinking and Mr. Girvin as well.
15  Q.   This may be a dumb question, but
16  explain to me why that is.
17  A.   Well, the peace sign, her posture,
18  her demeanor, facial expression, the drink in
19  hand.  The use of the word dorky there.  We
20  don't permit our students to use that in
21  class.  I hear it in the hallways sometimes
22  but --
23  Q.   There's a prohibition on using the
24  word dorky in class?
25  A.   Well, we try to keep our students

1   from saying such things.  I mean if a student
2   would say such and such sucks, we would say
3   that's unappropriate -- or inappropriate.
4   Q.   Okay.  All right.  And what else
5   about that page?
6   A.   The reference to the students looking
7   at her page and, of course, I don't know if
8   the students would have looked at the page had
9   she not been talking about it or perhaps even
10  encouraging them to look at the page earlier
11  in the semester.
12       She says that she has nothing to
13  hide.  I mean this is -- this is blatant.  I'm
14  over 21.
15  Q.   I'm sorry.  Blatant what?  What are
16  you referring to?
17  A.   She's delivering more information to
18  students than we thought was appropriate.
19  Q.   In the first line she says that
20  someone, Bree said that one of my students was
21  looking at my page.
22       Do you have information that, other
23  than this one student, that other students had
24  seen her page?
25  A.   I don't know that.

1    **Q.  Okay.**

2    A.  I had -- I had heard from

3 Mrs. Reinking that students -- other students

4 had seen the page.

5    **Q.  Okay.  Please continue with the text.**

6    A.  The reference I don't think that they

7 would stoop that low as to mess with my

8 future, I think the implication here is that

9 that's a reference to CV perhaps.

10       Bring on the love.  Sounds like

11 something from the '60s.

12       And then her statement here:  I

13 figure a couple students will actually send me

14 a message when I am no longer their official

15 teacher.  I remember when Ms. Reinking and I

16 spoke with one another, after we both had seen

17 a copy of this, we both confirmed the fact

18 that she -- that Ms. Snyder was not really the

19 official teacher.

20    **Q.  And did you take that as somehow**

21 **insulting towards Ms. Reinking?**

22    A.  I did.  And I believe that she did as

23 well.

24    **Q.  That Ms. Reinking took it?**

25    A.  Yes.

1 because all the department members were very

2 aware of what was going on with Ms. Snyder.

3    **Q.  How -- how did that come about?**

4    A.  Mrs. Reinking perhaps sharing

5 information or the teachers observing that

6 same kind of behavior in department meetings,

7 faculty meetings, hallway with the flip flops

8 and the pigtails, ponytails.

9       She -- she would -- other things are

10 coming back to me as I'm talking about this.

11 She would oftentimes complain to the -- to the

12 other department members, felt ill frequently,

13 missed -- missed some student teaching days.

14 I don't recall how many.  Went home one time

15 for what she said was a spider bite and --

16    **Q.  Okay.  Was that a concern?**

17    A.  I mean, of course, it was a concern.

18 I mean if she would have an allergic reaction

19 to the spider bite.  But we had heard problems

20 surface with her health prior to that and so

21 some of the department members, as well as

22 Mrs. Reinking, and as well as --as me, myself,

23 we started to think that some of these were

24 creations.

25    **Q.  Okay.  The last sentence?**

1    **Q.  Okay.**

2    A.  And then, of course, they keep asking

3 me why I won't apply there.

4    **Q.  Who is they, if you know?**

5    A.  I think it's a reference -- I think

6 the pronoun reference is to students, and the

7 "there" I believe is a reference to CV, the

8 school district.

9    **Q.  That's ambiguous, isn't it, would you**

10 **say?**

11    A.  In -- in what regard?

12    **Q.  Well, in terms of understanding the**

13 **pronoun they and the there, is that pretty**

14 **clear to you who she refers to or --**

15    A.  No.  I think -- I think that maybe

16 purposely she's -- I don't know if it's

17 purposely.  I just -- I'm reading it they keep

18 asking me why I won't apply there, I'm

19 assuming that there is CV.  They seemingly

20 would be the students.

21    **Q.  Okay.**

22    A.  And then do you think it would hurt

23 me to tell them the real reason?  It could

24 also be perhaps to department members, other

25 department members, though that's doubtful

1    A.  Do you think it would hurt me to tell

2 them the real reason or who the problem was?

3 And I can't read her mind, but I'm -- I'm

4 thinking that that is perhaps -- Mrs. Reinking

5 and I, as we discussed this, thought this was

6 perhaps in reference to her.

7    **Q.  Her meaning Ms. Reinking?**

8    A.  Yeah.

9    **Q.  And you were -- so it sounds as if**

10 **you were clearly disapproving of the text**

11 **entirely?**

12    A.  Yes.  Because obviously she's --

13 she's posted this on a social network page and

14 students had access.  Students saw it.  And

15 there's negativity.  If I'm reading the text

16 correctly -- and I've read a lot of student

17 papers over the course of my 37 years in

18 education -- I am -- I'm thinking that she's

19 talking about the students.

20    **Q.  You said that you told**

21 **Ms. Reinking -- Ms. Snyder she couldn't return**

22 **to Conestoga Valley?**

23    A.  Until -- until the evaluation date.

24    **Q.  Whose decision was that?**

25    A.  That was -- that was

1  Mr. Seldomridge's recommendation.
2      **Q.  Okay.  He recommended that to you?**
3      A.  Yes.
4      **Q.  Was it ultimately your decision?**
5      A.  No.
6      **Q.  Okay.  It was -- it was -- you're**
7  **saying he recommended.  He told you?**
8      A.  He told me.
9      **Q.  Okay.**
10     A.  I said that Ms. Reinking was upset
11  and I -- I also told him some of the problems
12  that had transpired, that had -- that this was
13  sort of the straw that broke the camel's back.
14     **Q.  You told that to Mr. Seldomridge?**
15     A.  Uh-huh.
16     **Q.  Did you ever tell that to**
17  **Mr. Girvin?**
18     A.  Again, I don't recall whether I spoke
19  with him that afternoon or how he got the
20  information that -- that Ms. Snyder was not
21  going to be there until the final evaluation.
22  I don't know if I made the phone call or if
23  Mr. Seldomridge did or if Ms. Reinking did.
24     **Q.  Okay.**
25     A.  Somehow he probably would have

1  known.  Or maybe -- maybe even Stacy herself
2  could have called him to tell him.
3      **Q.  Okay.**
4          MR. KELIN:  I just want to state,
5  you're to testify to what you recall or know.
6          THE WITNESS:  Okay.
7          MR. KELIN:  Not speculate --
8          THE WITNESS:  All right.
9          MR. KELIN:  -- what may have
10  happened.
11         THE WITNESS:  Right.
12     A.  It just came to mind.  I don't know
13  how Mr. Girvin got the information.
14  BY MR. KRAMER:
15     **Q.  All right.  You were describing what**
16  **else happened in the May 11th meeting with the**
17  **other people.**
18     A.  It was mainly addressing the MySpace
19  and the lack of professionalism that we had
20  seen prior to that.
21     **Q.  All right.**
22     A.  But obviously the focus was on the
23  MySpace page.
24     **Q.  When -- are you saying that it was**
25  **your focus on the MySpace page or the**

1  **conversation was on the MySpace page?**
2      A.  It wasn't -- it was the reason for
3  Stacy not being with us on the 9th, the 10th,
4  I mean I don't want to say that --
5  Mr. Seldomridge gave me the information that
6  we did not have to have Ms. Snyder with us on
7  the 9th and the 10th and that she could return
8  on the 11th.
9      **Q.  Okay.**
10     A.  And basically the MySpace page
11  prompted that.
12         MR. VOIGT:  Mark.
13  BY MR. KRAMER:
14     **Q.  All right.  Did Mr. Girvin have any**
15  **input into -- into the decision to not let**
16  **Ms. Snyder into Conestoga Valley High School**
17  **on May 9th and 10th?**
18     A.  I don't know.
19     **Q.  Do you know if anybody from**
20  **Millersville University had any input in that**
21  **decision?**
22     A.  I don't know.
23     **Q.  What else do you remember about the**
24  **May 11th meeting with the other folks?**
25     A.  Shortly thereafter -- I mean that was

1  the final evaluation.  So after just showing
2  Stacy what the MySpace page -- this basically,
3  and talking to her about the
4  inappropriateness, I left that meeting and
5  Mr. Girvin and Mrs. Reinking then continued to
6  share their evaluations, the final evaluation.
7      **Q.  Okay.  At any time did you advise**
8  **anyone from Millersville University that**
9  **Conestoga Valley would not accept any more**
10  **students from Millersville as student teachers**
11  **if they didn't punish Ms. Snyder?**
12     A.  No.
13     **Q.  At any time have you spoken -- do you**
14  **know who Jane Bray is?**
15     A.  I just know of her.  I -- I don't
16  know her.
17     **Q.  You've never spoken?**
18     A.  I've spoken to her on the phone but
19  not in person.
20     **Q.  And about Stacy Snyder or about**
21  **other -- did you ever talk to her about**
22  **Ms. Snyder?**
23     A.  I don't -- I don't recall if I spoke
24  with Jane Bray or whether I spoke with
25  Judy Wenrich.  Somebody.  I think it was Jane

Page 54

1  Bray -- it's my recollection that maybe she
2  had been ill and somebody was filling in for
3  her at a particular time. I'm not certain.
4      Q.    Did you --
5      A.    I spoke to Millersville, a female
6  Millersville personnel.
7      Q.    Okay. About Stacy Snyder?
8      A.    Yes. But that was -- not at that
9  time. That was later.
10     Q.    Okay. I understand. Sometime in
11 2007?
12     A.    When this case surfaced.
13     Q.    Got it. Okay.
14        MR. VOIGT: Hey, Barry, you want to
15 take just five minutes? I need to freshen up.
16        MR. KRAMER: Sure. Absolutely.
17        (Buffington Deposition Exhibit Number
18 1 was marked for identification.)
19        (Recess was taken from 11:27 a.m. to
20 11:33 a.m.)
21 BY MR. KRAMER:
22     Q.    A couple questions before we get to
23 the documents. At some point did Ms. Snyder
24 apply for a full-time teaching position at
25 Conestoga Valley, to your knowledge?

Page 55

1      A.    I don't believe that she did.
2      Q.    During the semester, spring 2006,
3  Ms. Reinking was telling you her concerns with
4  Ms. Snyder. Did you tell anybody during the
5  semester about these conversations and -- that
6  were -- that you and Ms. Reinking were having?
7      A.    Not to my knowledge. I mean I didn't
8  confer with anybody in the district office at
9  that time. I thought that it was something
10 that Ms. Reinking needed to work out with
11 Mr. Girvin and with Stacy.
12     Q.    Okay. The picture, the posting,
13 Buffington 1, in your opinion does that
14 promote underage drinking?
15     A.    I -- I wouldn't -- I wouldn't say
16 that that's the case. I -- I -- I don't know
17 enough about the picture. I don't know what
18 the drink is. I just think that it -- it
19 doesn't look like the professional educator.
20     Q.    So Mr. Seldomridge decided that
21 Ms. Snyder shouldn't return to Conestoga
22 Valley on May 9th and 10th. Correct? Right?
23     A.    Yes. And what has happened in the
24 past with other situations -- and I have had
25 two of them in my own department. So I think

Page 56

1  that what he needed to do was get more
2  information at that point, and because
3  Ms. Reinking was so terrifically upset, that
4  gave some time.
5        I mean had it been earlier in the
6  semester that would have been one thing, but
7  we were winding down and the evaluation was
8  coming just a few days later.
9      Q.    Okay. Did you have another
10 conversation with Mr. Seldomridge after this
11 first conversation that you described?
12        And let me explain. As I understand
13 it, when you and he finished speaking he said
14 he needs more information, he went to talk to
15 Ms. Reinking. That was on the 8th. And then
16 on the 11th -- no. I'm sorry. And so it was
17 later that day that you told Ms. Snyder she
18 couldn't return to the school?
19     A.    Right.
20     Q.    Did you have any more conversations
21 with Mr. Seldomridge before -- before the May
22 11th meeting?
23     A.    I don't think so. If there had been
24 any conversations, that would have probably
25 been a phone conversation that he needed more,

Page 57

1  additional information from Ms. Reinking.
2      Q.    Okay. Did you advise Ms. -- were
3  there any other prohibitions that you -- that
4  CV placed on Ms. Snyder at that point?
5      A.    No.
6      Q.    The semester was ending, that -- I
7  mean her evaluation --
8      A.    For her it was. I mean her students
9  continued until early June, of course.
10     Q.    Okay.
11     A.    But that was her last week of student
12 teaching.
13     Q.    Did you tell Ms. Rein -- Ms. Snyder
14 that she should not interact with Conestoga
15 Valley students at all?
16     A.    I don't believe that I said that. I
17 just -- I just told her that she should come
18 back on the 11th to meet with Mrs. Reinking
19 and Mr. Girvin.
20     Q.    Look at the documents in front of
21 you. The first document at the bottom it says
22 CVSD 185 and 186.
23        MR. KRAMER: And we'll mark this as
24 Buffington 2.
25        MR. KELIN: The two pages?

15 (Pages 54 to 57)

## Page 58

1      MR. KRAMER: The two pages, yes.
2         (Buffington Deposition Exhibit Number
3   2 was marked for identification.)
4   BY MR. KRAMER:
5      Q.   This isn't -- it's a two-part -- it's
6   a -- two emails.  The bottom from
7   Ms. Reinking.  The top one from you.  Right?
8      A.   Uh-huh.
9         MR. KELIN: Barry, I don't see
10  those.  Where are you looking?
11        MR. KRAMER: It's on top.
12        MR. VOIGT: Mine doesn't have numbers
13  on it.
14        MR. KRAMER: That's weird because
15  mine does.
16        MR. KELIN: Actually -- off the
17  record.
18        (Discussion held off the record.)
19  BY MR. KRAMER:
20     Q.   As I read your email, it seems --
21  good job delineating the problems, Nikke.  I
22  know this took time.  Thanks for taking care
23  of it promptly.
24        Did you tell Ms. Reinking to prepare
25  a document of some kind?

## Page 59

1      A.   I think a final instruction from
2   Mr. Seldomridge, that she should do so.
3      Q.   Okay.  Are you -- are you certain
4   about that?  You're not sure?  What do you
5   remember about that?
6      A.   My recollection is that
7   Mr. Seldomridge told me that he would like to
8   have more information, could I go back to
9   Mrs. Reinking and have her give him a listing
10  of some of the problems that took place over
11  the course of the semester.  And then she --
12  she would have assembled this for him.
13     Q.   All right.  If you would look on the
14  second page, the top, captioned unprofessional
15  behavior/performance in the classroom.  And my
16  question is:  As to each of these, during the
17  semester, did Ms. Reinking advise you of each
18  incident contemporaneous with it occurring?
19     A.   You'll have to give me time to read
20  this.
21     Q.   Right.  Yes.  Take as much time as
22  you need.  I don't mean to rush you.
23     A.   The song yes.  The Valentine's Day
24  situation, yes.  The foul language, yes.
25  Ms. Snyder using shut up herself to quiet the

## Page 60

1   student, yes.  Directing Ms. Snyder not to
2   have discussions about MySpace with her
3   students, yes.  Chain of command channels,
4   yes.  Professional dress, yes.
5         I didn't know about the teacher --
6   the other teacher talking about Ms. Snyder
7   preparing in the back of the room rather than
8   observing.  I did not know that until reading
9   this now.
10     Q.   All right.  That's the second to the
11  last?
12     A.   Second to the last.
13     Q.   Okay.
14     A.   But the last sentence in that second
15  to last paragraph I -- I did know about
16  because I observed it at department meetings
17  and at faculty meetings.
18     Q.   Okay.
19     A.   Last one, yes.
20     Q.   All right.
21     A.   In fact, I talked to the teacher.  I
22  did speak with the department colleague that
23  overheard Ms. Snyder making the appointment.
24     Q.   And who was that?
25     A.   Her name is Arashay Borden, who is

## Page 61

1   now deceased.
2      Q.   The third page, the lyrics of the
3   song, do you recall if they were attached to
4   this email?
5      A.   I wasn't even certain that this was
6   an email.  I don't know whether she sent this
7   as an email or whether she handed me the
8   paper.
9      Q.   Well, on -- if you look at
10  Ms. Reinking's email to you, Kim, Barry,
11  Deann, attached please find a Word document.
12     A.   Attached, okay.
13     Q.   Does that refresh your recollection?
14     A.   Yes.
15     Q.   What, if anything, did you do with
16  this document, the CVSD 186 upon receiving it?
17     A.   At that -- at that point I had
18  started a folder with the MySpace picture, and
19  I perhaps made a copy of that.  Again, just to
20  have that on file for Mr. Seldomridge.  And he
21  solicited that information from Ms. Reinking,
22  from me.  He said, what -- what do you have?
23  I would like to have that information.
24     Q.   Okay.  Turn to the next.
25     A.   Regarding the song?

Page 62

1    Q.    I'm sorry.
2    A.    You asked me about this song.
3    Q.    Yeah, that's right.
4    A.    I had not seen the song.
5    Q.    Okay.
6          MR. KELIN:  Did we produce this to
7    you, Barry?
8          MR. KRAMER:  I don't remember.
9          MR. KELIN:  It's not Bates stamped.
10   That's for sure.
11   A.    This is Nicole's handwriting.  I can
12   tell that this is her handwriting right here.
13   BY MR. KRAMER:
14   Q.    Where it says where the song was
15   stopped?
16   A.    Yes.
17         MR. KRAMER:  Howard, I don't know.
18   BY MR. KRAMER:
19   Q.    Have you seen these lyrics before
20   today?
21   A.    No.  I just knew that there was a
22   song that was played that had profanity in it.
23   Q.    Okay.  All right.  Let's go to the
24   next documents, and that is two pages, the
25   first page being -- well, it's printed, I

Page 63

1    presume, by you, Ms. Buffington?
2    A.    Uh-huh.
3    Q.    It's from Stacy Snyder to Nicole
4    Reinking, et al. and attached is a letter
5    dated May 10th, 2006 from Ms. Snyder.  What is
6    this page?  Have you seen this before?
7    A.    I have seen it before.
8    Q.    And tell me what it is just for the
9    record.
10   A.    It was a letter of apology that she
11   sent to us.
12   Q.    Do you recall receiving it on May
13   10th, on or about May 10th?
14   A.    I see that it's dated the 10th, so
15   I'm assuming that it was sent at that point.
16   Q.    And -- and do you recall receiving
17   this via email?
18   A.    Oh, I recall receiving it, yes.
19   Q.    Okay.  And did you have a reaction to
20   it, to this letter?  And please take your time
21   if you want to review it.
22   A.    Okay.  I remember when I read -- not
23   the attachment but her email, my reaction was
24   to the last sentence, which, once again,
25   confirmed for me that she has some difficulty

Page 64

1    with the English language.  Thank you for your
2    time and regret the circumstances which evolve
3    it.
4    Q.    And what's wrong with that, please?
5    A.    Well, she's missing a comma before
6    and.  She did not put the word I in, the
7    pronoun I in.  I regret the circumstances,
8    which evolve is misused in that sentence.
9    Q.    And the next page, which is the
10   letter itself.  Did you have a reaction to
11   that?
12   A.    Well, I would also --
13   Q.    Oh, I'm sorry.
14   A.    I would also like to share, too, that
15   she wrote a letter of apology which indicated
16   to me that she knew that she was in the wrong.
17   Q.    How so?
18   A.    People obviously don't apologize
19   unless there's been some kind of mistake that
20   has occurred or problem that has developed.
21   Q.    Sure.  All right.
22   A.    You want me to react now to this?
23   Q.    Yes, please.  Review it.
24   A.    In detail?
25   Q.    Yes, please.

Page 65

1          MR. KELIN:  You want to know what her
2    reaction was at the time?
3          MR. KRAMER:  Yes.
4          MR. KELIN:  To the letter?
5          MR. KRAMER:  Yes, I do.
6          MR. KELIN:  Off the record.
7          (Discussion held off the record.)
8    A.    I remember zeroing in on the second
9    paragraph that says this incident has caused
10   me to open my eyes and realize that I am the
11   only person to blame.  I have to take full
12   responsibility for my actions and live with
13   the consequences determined by the
14   administrative staff from Conestoga Valley
15   High School and Millersville University.
16         To me that, in essence, was the
17   purpose for this letter.
18         And then the last -- the very last
19   paragraph, again, her use of the English
20   language again confirmed to me that she just
21   doesn't have a grasp on good writing.  Even
22   though it is not under the best circumstances,
23   I look forward to seeing each and -- everyone
24   should actually be two words -- of you to
25   discuss and -- elevate is misused -- this

17 (Pages 62 to 65)

1 issue.
2 BY MR. KRAMER:
3    **Q. This letter was addressed to you,**
4 **among other people?**
5    A. Yes.
6    **Q. Did you -- did you accept this as a**
7 **letter of apology?**
8    MR. KELIN: Objection to form.
9 BY MR. KRAMER:
10    **Q. You can answer.**
11    A. It is what it is. It is a letter of
12 apology.
13    **Q. Did you think that -- at the time was**
14 **it your impression that it was a sincere**
15 **letter of apology?**
16    A. She -- she states: I have a large
17 heart that only wants to help others, not harm
18 them. So she's -- she's obviously sharing her
19 feelings, and I have worked with students,
20 many students, thousands and thousands over
21 the years, and so I would take this to be an
22 apology.
23    **Q. Okay. All right.**
24    A. For the wrongdoing, for the posting.
25    MR. VOIGT: Mark.

1 BY MR. KRAMER:
2    **Q. If you go, skip over the next two**
3 **pages and we're going to go to this little**
4 **note.**
5    A. Okay.
6    MR. KELIN: I -- I can't read that.
7    THE WITNESS: Yeah.
8 BY MR. KRAMER:
9    **Q. Yes. Did you write this?**
10    A. Did I write this?
11    MR. KELIN: I'll just state for the
12 record I can't read it, so I don't know what
13 it is you're referring to.
14 BY MR. KRAMER:
15    **Q. Yes. Well, its says: Does not**
16 **respect professional boundaries, something.**
17 **All I want to know is if you wrote it.**
18    A. I --
19    MR. KELIN: Well, hold on. You're
20 asking if she wrote it. I can't read it. I
21 don't know how anyone would tell if they wrote
22 it or not.
23    MR. KRAMER: Sure.
24    A. No. No.
25 BY MR. KRAMER:

1    **Q. Okay. That's my only question.**
2    **Okay. Go to the next page, please.**
3 **Sorry. Skip one more. It says at the top in**
4 **handwriting, email that -- looks like -- I**
5 **planned to send to the --**
6    A. To MU.
7    **Q. To MU. Is that your handwriting at**
8 **the top?**
9    A. Right.
10    MR. KRAMER: Let's mark this as
11 Buffington 3 and 4.
12    (Buffington Deposition Exhibit
13 Numbers 3 and 4 were marked for
14 identification.)
15    (Discussion held off the record.)
16 BY MR. KRAMER:
17    **Q. Okay. We'll mark this as Number 4.**
18 **Please explain to me what this is.**
19    A. I felt at that point that I needed to
20 express frustration.
21    **Q. When did you write this?**
22    A. It must have been right after the
23 apology letter came with the email because I
24 reference that somewhere, I believe. Here.
25 Stacy's content knowledge, as is obvious from

1 the numerous errors in this memo and letter
2 because of her lack of knowledge about the
3 English language, is one factor.
4    Okay. So it must have been in
5 response to the email with the attached letter
6 of apology.
7    **Q. So just to be clear, the handwriting**
8 **at the -- on the top is yours and --**
9    A. And I'm not sure when I wrote that.
10 I may have done that when this case surfaced.
11    **Q. When it was filed?**
12    A. Right.
13    **Q. When the lawsuit was filed?**
14    A. Right.
15    **Q. All right. And the other part you --**
16 **you, I presume, typed on your computer --**
17    A. I did.
18    **Q. -- at some point?**
19    A. I did.
20    **Q. Could you amplify what you mean by**
21 **the first sentence?**
22    A. It was just an opinion because of the
23 day-to-day meetings with Ms. Reinking and her
24 frustrations, not only with the lack of
25 competency in English background, but also the

1  lack of professionalism.
2  **Q.  And the lack of professionalism**
3  **refers to what?**
4  A.  The entire semester.
5  **Q.  All right.  It says here at Conestoga**
6  **Valley, if a teacher receives an**
7  **unsatisfactory rating in the professionalism**
8  **category on the state form, the teacher**
9  **receives an unsatisfactory rating overall.**
10  **What does that refer to?**
11  A.  Principals, supervisors, those of us
12  that can evaluate, we have to prepare at
13  midyear, for teachers who are non-tenured and
14  at the end of the year for all employees, an
15  evaluation sheet.
16  **Q.  And that's some PDE form?**
17  A.  It is.  Well, PDE had its own forms,
18  and then they gave the districts the
19  opportunity to devise their own form, which
20  needed to be in sync and then they approved
21  that.
22  **Q.  Okay.**
23  A.  So just within the last couple of
24  years we had a committee assemble an
25  evaluation form for teachers, and there are

1  four different categories for the teachers.
2  **Q.  Okay.**
3  A.  And one of them is professionalism.
4  **Q.  All right.  And so what did you mean**
5  **when you wrote what you wrote?**
6  A.  On those forms, if a teacher receives
7  an unsatisfactory in any of the four, one
8  being preparation, one is classroom
9  management, I believe, or classroom
10  environment, one is professionalism, and I
11  don't recall the fourth.  I should know it,
12  but my mind is not working as well as it
13  should be right now.
14  In any of those areas, if a teacher
15  receives an unsatisfactory, then the teacher
16  is rated overall unsatisfactory.
17  **Q.  And what does that mean in terms of**
18  **the teacher's career?**
19  A.  For -- I don't -- I don't know what
20  it means for other districts, but at our
21  district, if the teacher receives an
22  unsatisfactory the first time, then the
23  teacher goes into a teacher's support
24  program.  And then beyond that, it would be --
25  if it would occur again, another

1  unsatisfactory, then at the district office
2  level they would be dealing with what would
3  have to happen to the teacher.
4  **Q.  Did you ever email this Buffington**
5  **Number 4 to anybody?**
6  A.  I -- I have talked with Howard about
7  that, and I don't know whether I did or not.
8  I don't know if I wrote it and gave it to
9  Mr. Girvin.  I don't know if I emailed it.  I
10  don't know if I wrote it and then just kept a
11  copy of it.
12  **Q.  At the top you wrote email that I**
13  **planned to send to MU.**
14  A.  Right.  When we went back to look to
15  see if we could find this in deleted email, it
16  didn't appear.  But I may have sent it.  I --
17  I don't recall.
18  **Q.  Let's go to the last page, please.**
19  **We're going to mark that as -- I forgot.**
20  **Number 5.**
21  (Discussion held off the record.)
22  (Buffington Deposition Exhibit Number
23  5 was marked for identification.)
24  **BY MR. KRAMER:**
25  **Q.  We're going to mark that as**

1  **Buffington 5.  Will you please read the first**
2  **line on that and tell me if that refreshes**
3  **your recollection?**
4  MR. KELIN:  Out loud or to herself?
5  MR. KRAMER:  Out loud.
6  A.  Wenrich notes:  Re:  Stacy Snyder
7  from conversation with Deann Buffington,
8  Department Chair, 2/20/07.
9  BY MR. KRAMER:
10  **Q.  Earlier you spoke about speaking with**
11  **somebody --**
12  A.  Right.
13  **Q.  -- from Millersville.**
14  A.  And I couldn't remember if it was
15  Jane Bray or Judy Wenrich.  And I believe that
16  Judy Wenrich was in for Jane Bray because of
17  Jane Bray's health issues.  That's what I'm
18  recalling.
19  **Q.  Do you -- did you -- did Dr. Wenrich**
20  **call you at some -- you know, in February '07?**
21  A.  She did.
22  **Q.  Okay.  And what did she say to you?**
23  A.  This was, I believe, in response to
24  the case that had developed or -- no.  I think
25  that she was one of the first persons to tell

1    me that -- that Stacy was -- had a claim
2    against Millersville or whatever.
3        Q.  All right.  I'd like you to go down
4    the list and, you know, review the list in
5    your mind.  You don't need to read it out
6    loud.  And on each item if you would have
7    comment, comments, additional comments that
8    you've got that we haven't already touched on
9    here that you could amplify?
10             MR. KELIN:  So that I'm clear, as
11   she's going down through each item --
12             MR. KRAMER:  Yes.
13             MR. KELIN:  -- if there's anything --
14             MR. KRAMER:  We haven't talked about
15   so far.
16             MR. KELIN:  Other than what she's
17   previously said?
18             MR. KRAMER:  What we've not
19   discussed.  We don't need to repeat some stuff
20   that we've already talked about.
21        A.  Beyond belief seems to be an
22   exaggeration here, but I think it was regard
23   -- with regard to other student teachers and
24   their behaviors.
25        Q.  Okay.

1        A.  I think there is no way that she
2    should have a teaching certificate was at that
3    point confirming what Millersville had done,
4    had decided to do.
5        Q.  Okay.
6        A.  Well, it was intended as a letter of
7    apology, I mean I accepted it as a letter of
8    apology, but I also thought that -- if I could
9    go back and look at the letter -- there were
10   paragraphs where she listed her
11   accomplishments.  And so I think that was what
12   I meant here by saying that she was justifying
13   her accomplishments or her experiences.
14        Q.  Okay.
15        A.  The next statement, we wouldn't
16   tolerate teachers who acted as she had.  We
17   wouldn't tolerate teachers with that lack of
18   preparation.  I think that reflects that we
19   were in there -- in the trenches.  I shouldn't
20   say we.  Nicole was and, of course, I again
21   was the confidante, the sounding board, trying
22   our best to have Stacy be successful.
23             And Nicole was so frustrated at
24   midterm and really wanted to find a different
25   placement for Stacy, but that didn't happen.

1        Q.  Do you know why that didn't happen?
2        A.  I don't know why it didn't happen.
3        Q.  Okay.
4        A.  Again, just from all the interactions
5    that I had with Nicole, my comment I don't see
6    how she could get a satisfactory rating was
7    simply in response to the areas that Nicole
8    had noted on the --
9        Q.  And when you refer to her getting a
10   satisfactory rating, are you referring to
11   Ms. Reinking's evaluation of Ms. Snyder?
12        A.  No.  I think --
13             MR. KELIN:  First of all, let me just
14   say you're -- you're asking did she refer.
15   These aren't her notes.  These are Judy
16   Wenrich's.
17        A.  Yeah, they are.  They're not mine.
18             MR. KELIN:  You're assuming it
19   accurately reflects --
20             MR. KRAMER:  Well --
21             MR. KELIN:  -- the conversation.
22             MR. KRAMER:  Okay.
23        A.  And, of course, I wasn't taking
24   notes, nor did she ask me to email her my
25   comments.  So --

1    BY MR. KRAMER:
2        Q.  Do you have any recollection of the
3    conversation?
4        A.  Oh, I do have recollection of the
5    conversation, yes.
6        Q.  Okay.
7        A.  And I shared with her my feelings
8    about the whole experience with Stacy.
9        Q.  Is there -- are there feelings that
10   you shared with her that you don't see
11   reflected on this page?
12        A.  I don't believe so.
13        Q.  Okay.  Is the -- are the -- are
14   Dr. Wenrich's notes accurate?
15        A.  This -- I don't know about we didn't
16   want to take Foundations Block students.  Just
17   the whole wariness of, just sort of a caution
18   going up, because of the bad experience, and
19   the analogy that I would use here is that when
20   we have a bad experience at a restaurant we
21   might not want to go back to that restaurant.
22   And it was sort of the same thing.
23             And I've had student teachers in the
24   past myself, many, some that were excellent,
25   some that were not good at all, and after a

20 (Pages 74 to 77)

1  bad experience oftentimes teachers just say --
2  they might announce, I'll never take another
3  student teacher again or I don't know if I can
4  do this again.
5      **Q.  All right.**
6      A.  And it's a typical reaction after a
7  bad experience.
8      MR. VOIGT:  Mark.
9  BY MR. KRAMER:
10     **Q.  But you did say, if I recall**
11 **correctly, that since spring 2006 you have**
12 **taken Millersville student teachers?**
13     A.  We have never not been without junior
14 block students or student teachers.  And, in
15 fact, just this past year I hired two
16 Millersville -- I mean I didn't hire them.
17 Our district hired them after a second round
18 interview.  I participated in the first round
19 interview and then sent them off to -- these
20 candidates off to Dr. Huesken and to Dr. Mann,
21 and we hired two Millersville University
22 students for the communications department.
23     And, in fact, one of the -- we're
24 looking at a replacement for Nicole after her
25 maternity leave begins and one of those is a

1  student who did a -- a Millersville student
2  who did her junior block experience with us
3  and that would have been, I think, perhaps the
4  same -- at the same time that Stacy was a
5  student teacher, and then she did her student
6  teaching with one of the other department
7  members last semester, and she is one of our
8  candidates that's actually interviewing
9  probably right now.
10     **Q.  Okay.  In the center it says, quote,**
11 **she made derogatory statements -- comments**
12 **about Nicole (co-op) and the school.  What**
13 **does that refer to?**
14     A.  Twofold.  The derogatory comments
15 about Nicole is in reference to Stacy's
16 sharing midterm evaluation comments with
17 students.  But also in reference to the
18 MySpace posting.
19     **Q.  Okay.**
20     MR. VOIGT:  Mark.
21 BY MR. KRAMER:
22     **Q.  Okay.  Above that like three or four**
23 **lines, it says her behavior was the straw that**
24 **broke the camel's back.  And I'm sorry if I**
25 **asked you this.  Did you ever share that**

1  **sentiment with Mr. Girvin?**
2      MR. KELIN:  Do you know that term,
3  straw that broke the camel's back?
4      MR. KRAMER:  Well, that's why I used
5  the word sentiment.
6      A.  I did say that earlier today in our
7  session today.
8  BY MR. KRAMER:
9      **Q.  Yeah.**
10     A.  I did use that.
11     **Q.  Yeah.**
12     A.  The MySpace posting was a culmination
13 of all of the other behaviors that we -- when
14 I say we, mostly Mrs. Reinking, observed, but
15 that I also observed or at least heard about.
16     **Q.  All right.**
17     A.  And, of course, that -- had that
18 MySpace posting not occurred, there would have
19 been no reason for me to contact
20 Mr. Seldomridge.
21     MR. VOIGT:  Mark.
22 BY MR. KRAMER:
23     **Q.  The last line, quote, we were very**
24 **wary to get back on board placing MU students,**
25 **end quote.  Did you tell that to anybody at**

1  **MU?**
2      A.  I'm sorry.  Where are you?
3      **Q.  The very last line, that you were**
4  **wary about -- to get back on board placing MU**
5  **students.**
6      A.  I probably did say that.
7      **Q.  Do you know who you told that to?**
8      A.  Probably to Judith Wenrich.
9      **Q.  How about in May '06 when this was**
10 **occurring?**
11     A.  Only in reference to the -- the one
12 statement here that it wouldn't be a surprise
13 to me if the teachers wouldn't volunteer
14 again.
15     **Q.  Cooperating teachers volunteer to be**
16 **cooperating teachers?**
17     A.  That's right.
18     **Q.  Okay.  I have no more questions.**
19 **Thank you.**
20     MR. VOIGT:  Do you want to press on
21 or do you want to give the witness a break?
22     THE WITNESS:  I'm okay.
23     MR. VOIGT:  I've got quite a bit.
24     MR. KELIN:  Well, let's take a --
25 let's take -- why don't we take a break?

1   response to the problems that you
2   were discussing as of March 1, 2006?
3   A. Well, she had a lot of time to
4   sit down with, you know, with Ms.
5   Snyder and she did some observations
6   of Ms. Snyder on her own, and you
7   know, wrote up lessons and went over
8   it with her. And as I recall, they
9   were pretty detailed.
10  And I'm not sure how many
11   written ones she did, but I mean
12   there was several. Every day she
13   would have talked to her about those,
14   the lesson and ---.
15   Q. Did you attend any of those
16   meetings between Ms. Snyder and Ms.
17   Reinking where they were discussing
18   future lesson plans?
19   A. Well, the three of us
20   discussed future lesson plans, but I
21   mean I didn't attend any of their
22   private meetings because they were
23   private. There's a connection
24   between the cooperating teacher --- a
25   bond between a cooperating teacher

1   and the student teacher that I think
2   both of them feel that to some extent
3   they can solve their problems without
4   running to the boogeyman.
5   Q. Is that the way you talk to
6   yourself? You've thought of yourself
7   as the boogeyman; is that ---?
8   A. You know, as the supervisor,
9   you know, like if you can't handle
10   your problems you go and ---.
11   Q. So when you say that there
12   should be a bond between the
13   cooperating teacher and the student
14   teacher, you would refer to that bond
15   as a two-way street; right? The
16   student teacher and the cooperating
17   teacher must have a give and take; is
18   that correct?
19   A. Yes.
20   Q. Okay. Turn to page three.
21   The notes that you prepared ---.
22   A. Page three?
23   Q. P-44, page three.
24   A. Okay. I'm with you.
25   Q. Yes. The March 9 note, and I

1   take it that's your signature at the
2   bottom; right?
3   A. Yes, it is.
4   Q. All right. And you say here
5   she researched the topic and prepared
6   an excellent handout; do you see
7   that?
8   A. Yes.
9   Q. And you agree with that
10   statement?
11   A. Yes.
12   Q. And you say here that Stacy
13   was confident about her content and
14   her approach; do you agree with that?
15   A. Yes.
16   Q. All right. And you go on to
17   say that Stacy responded quickly to
18   discipline situations; is that right?
19   A. That's correct.
20   Q. And you complimented Stacy for
21   the use of music, familiar music
22   examples; do you see that?
23   A. Yes.
24   Q. So you thought that Stacy's
25   use of music was appropriate at that

1   time; is that correct?
2   A. Yes.
3   Q. And did you speak to Stacy
4   after this evaluation?
5   A. Yes.
6   Q. How did that evaluation ---
7   how did that conference go?
8   A. It went very well. What's
9   missing here is the two observations
10   I did on --- well, wait a minute.
11   That's not right, 4/6.
12   Q. Well, we'll get to those.
13   Let's focus on March 9th.
14   A. As I recall, this was the new
15   class, you know, the class she hadn't
16   had before. And so I had the
17   impression that she had gotten the
18   message and that she was getting off
19   on the right foot with the new class.
20   And so I had the conference went very
21   well.
22   Q. All right. Turn to
23   Plaintiff's 42, please. This is an
24   evaluation by an unnamed student at
25   Conestoga Valley High School.

1   Parent's (sic) 42, page one.
2   A. Yeah, I got it.
3   Q. The name is blacked out all
4   except for the letter B. You don't
5   happen to recognize this student with
6   his handwriting?
7   A. No.
8   Q. Have you ever seen this
9   document before?
10  A. Not that I recall.
11  Q. Well, under question eight
12  there at the bottom there. It says
13  least favorite teacher, Mrs.
14  Reinking, because we don't get along.
15  Did you ever review this document
16  before denying Stacy her Bachelor of
17  Science in Education degree?
18  ATTORNEY KRAMER:
19  Objection. He's never
20     seen the document before and
21     he didn't deny her her
22     Bachelor of Science degree. I
23     don't know how he can answer
24     this because he's never before
25     ---.

1   ATTORNEY VOIGT:
2   Well, if he's never
3     seen it before, then the
4     answer will be self-evident.
5   BY ATTORNEY VOIGT:
6   Q. Did you ever review this
7   document before the events of May
8   2006?
9   A. No.
10  Q. Would it have been useful to
11  know that at least one of the
12  students in Ms. Reinking's class
13  thought that she was his or her least
14  favorite teacher?
15  A. Not --- no, not at all.
16  Q. Why not?
17  A. Well, if you're standing in
18  front of 150 students, how would you
19  like to be evaluated based on what
20  one had to say about you?
21  Q. So the individual students
22  don't matter, their views and such?
23  Is that what you're saying?
24  A. They matter, but this is not a
25  survey. It's one student out of 90

1   or so that she taught. If I saw 10
2   or 12 to compare that would --- add
3   some significance there.
4   Q. Turn to page four of the same
5   document. This is an evaluation by
6   another student in 12th grade at ---
7   they're not numbered.
8   A. Okay. I'm with you now.
9   Q. This is an evaluation by
10  another student at the Conestoga
11  Valley High School; correct?
12  A. Uh-huh (yes).
13  Q. Is that a yes?
14  A. Yes.
15  Q. Okay.
16  A. If you say it is, yes.
17  Q. All right. Well, it says
18  Conestoga Valley High School in
19  question two; correct?
20  A. Correct.
21  Q. Okay. Now, look under
22  question eight then.
23  A. Yes.
24  Q. It says who are your favorite
25  teachers, be honest. And the answer

1   lists four teachers. Mrs. Reinking
2   is not one of them; correct?
3   A. That's correct.
4   Q. How many students would a 12th
5   grader at Conestoga Valley High
6   School --- strike that.
7   How many teachers would a
8   student at Conestoga Valley High
9   School have during his 12th grade
10  year?
11  A. Eight or ten. With the block
12  they would have fewer than they would
13  have if they had the old-style ---.
14  Q. Okay. So we can assume that
15  Mrs. Reinking was not among the
16  student's top four out of the eight
17  or ten that year she had that year;
18  correct?
19  ATTORNEY KRAMER:
20  I'll object. The
21     document speaks for itself.
22     The profession speaks for
23     itself.
24  BY ATTORNEY VOIGT:
25  Q. Would you have wanted to see

| | |
|---|---|
| 1 | **this document before the events of** |
| 2 | **May 2006?** |
| 3 | A. No. If I had these documents |
| 4 | from a proper sampling, the answer |
| 5 | would be yes. |
| 6 | **Q. Turn to Plaintiff's 45,** |
| 7 | **please, page one. This is your mid-** |
| 8 | **evaluation; is that correct?** |
| 9 | A. Yes, using the Millersville |
| 10 | form. |
| 11 | **Q. Yes. And it's dated March 17** |
| 12 | **of 2006 on the third page of the** |
| 13 | **exhibit, so you prepared it about** |
| 14 | **that time?** |
| 15 | A. Yes. |
| 16 | **Q. Other than the visits that we** |
| 17 | **discussed, prior to preparing this** |
| 18 | **mid-evaluation, you did not observe** |
| 19 | **Ms. Snyder during class any other** |
| 20 | **times; is that right? We discussed** |
| 21 | **certain visits that you made. There** |
| 22 | **are no other visits that you made;** |
| 23 | **are there?** |
| 24 | A. Yes. My official evaluations |
| 25 | --- I had to do six official ones, |

| | |
|---|---|
| 1 | which I sat in for the whole 90 |
| 2 | minutes. Now, instead of doing six, |
| 3 | I did seven. But I have a way of |
| 4 | just dropping in from time to time |
| 5 | and not writing anything down, just |
| 6 | sitting in for ten minutes or so to |
| 7 | see how things are going and then be |
| 8 | on my merry way. So I did that on a |
| 9 | number of occasions. |
| 10 | **Q. Do you remember the dates of** |
| 11 | **those ---?** |
| 12 | A. Yes, I have that if you would |
| 13 | like. I could find it out for you. |
| 14 | I have them someplace. |
| 15 | **Q. Did you keep any personal** |
| 16 | **notes from those visits?** |
| 17 | A. No, I didn't. Let's see --- |
| 18 | visits. |
| 19 | **Q. Did you speak to Stacy** |
| 20 | **following those visits?** |
| 21 | A. Usually. It depended, you |
| 22 | know. If she was in the middle of a |
| 23 | class and I had to go to the middle |
| 24 | school, then I wouldn't. But usually |
| 25 | I did. |

| | |
|---|---|
| 1 | **Q. Okay. Did you speak to Ms.** |
| 2 | **Reinking following those visits?** |
| 3 | A. Sometimes. |
| 4 | **Q. All right.** |
| 5 | A. Depended on whether she was |
| 6 | available. |
| 7 | **Q. Okay. Now, turning back to** |
| 8 | **Plaintiff's 45.** |
| 9 | A. Yes. |
| 10 | **Q. Under professionalism, first** |
| 11 | **one, adheres to the Pennsylvania** |
| 12 | **Professional Code of Ethics copyright** |
| 13 | **and privacy laws, you graded her G,** |
| 14 | **good progress evidence; is that** |
| 15 | **correct?** |
| 16 | A. That's correct. |
| 17 | **Q. And that was accurate as of** |
| 18 | **the time that you wrote this; is that** |
| 19 | **correct?** |
| 20 | A. Yes. I felt that was proper. |
| 21 | ATTORNEY KRAMER: |
| 22 | The authenticity of |
| 23 | this document ---. |
| 24 | BY ATTORNEY VOIGT: |
| 25 | **Q. And also on page one of** |

| | |
|---|---|
| 1 | **Parent's (sic) 45, you had an N,** |
| 2 | **needs significant remediation for** |
| 3 | **demonstrates in-depth understanding** |
| 4 | **of the subject matter; do you see** |
| 5 | **that?** |
| 6 | A. Yes. |
| 7 | **Q. What did you mean by that?** |
| 8 | A. I meant that she made a lot of |
| 9 | mistakes in class. Grammatical |
| 10 | mistakes, content mistakes. I'm |
| 11 | certified in English and my long suit |
| 12 | is literature. And you know, I not |
| 13 | only detected mistakes in grammar, |
| 14 | but also mistakes in interpretation |
| 15 | and mistakes in content, having to do |
| 16 | with literature. |
| 17 | And I mean, I talked to her |
| 18 | many times about these things. I |
| 19 | mean, I tried to lead her by the hand |
| 20 | and say, look, this is something you |
| 21 | need to do better. You need to do |
| 22 | more prep just for that part of your |
| 23 | lesson. |
| 24 | **Q. All right. Did you take any** |
| 25 | **steps to help Stacy in that regard,** |

24 (Pages 90 to 93)

1  such as organizing and mentoring
2  program for her?
3  A. Well, I felt I was a mentor in
4  the program.
5  Q. Okay.
6  A. I did my best to try to help
7  her see not only the aspect of a
8  lesson having to do with keeping on
9  schedule and maintaining discipline,
10  but also in the proper content.
11  Q. All right. Did you arrange to
12  meet with Stacy on a periodic basis
13  where you would review the content of
14  her proposed lesson plans?
15  A. Every time I met with her
16  after the observations ---
17  Q. Okay.
18  A. --- we did this, and I also
19  reviewed her CIRQL unit on a number
20  of occasions.
21  Q. All right. Turn to page two
22  of Plaintiff's 45. You gave Stacy
23  N's on communication and classroom
24  management; is that right?
25  A. Yes.

1  Q. What was the basis for that?
2  A. Well, speaking of
3  communication, many times her lessons
4  fell apart because she didn't clearly
5  communicate to the students what her
6  expectations were. Part of that had
7  to do also with, you know,
8  grammatical errors and so forth.
9  But basically what I was
10  zeroing in on was that her
11  instructions, her communicating with
12  the class, not only in terms of
13  setting up, say, an activity and just
14  exactly what is supposed to happen
15  there, but also just in terms of her
16  style of questioning, which wasn't
17  deep. You know, she never asked
18  questions that would really get the
19  kids to think. It was more a rote-
20  type thing which she just might get
21  it over with and move on to the next
22  point.
23  And as far as the one on
24  classroom management, I think in one
25  of these lesson plans at her --- one

1  of these observation right outside, I
2  describe one of the classes as a
3  disaster because it was as I
4  mentioned earlier, lulls in the
5  lesson where she is going from one
6  activity to the other, and the kids
7  were way out of line. And then she
8  couldn't get them back under control.
9  She got to the point where the
10  kids were playing with her, as she
11  had put up an overhead and some kid
12  would out his foot over and move the
13  projector so that, you know, things
14  would get ---. Things like that that
15  she either ignored or didn't notice.
16  And I was saying you've got to
17  have eyes in the back of your head.
18  I mean, you have to know what's going
19  on in that classroom and not let it
20  go by. And that's what I was talking
21  about.
22  Q. You've never observed this
23  class where these problems were
24  before Ms. Snyder became the student
25  teacher; correct?

1  A. You mean the same kids?
2  Q. Same kids, yeah. You never
3  seen those kids before Ms. Snyder
4  began her student teaching; correct?
5  A. Correct.
6  Q. So you don't know if they were
7  discipline problems or angels before
8  Ms. Snyder came along; correct?
9  A. Well, no, but the class that
10  I'm referring to, there were --- you
11  know, there are two levels that are
12  at CVD. Let me see if can I remember
13  what they are. One's basically the
14  academic, college-bound kids and the
15  other one are the technical. And
16  this was an academic class, so ---.
17  Q. So your position is that
18  academic students never cut up in
19  class?
20  A. No. My position is that I
21  doubt whether there were any real bad
22  actors in there, but if you have a
23  discipline problem, it might be even
24  worse with these kinds of kids
25  because they're smart enough to think

1   of more ways to give you a hard time.
2   And in some cases, might know more of
3   the content than you do. And so, you
4   know, that all has to be taken into
5   consideration.
6   **Q. Did Ms. Reinking teach these**
7   **same students during the fall**
8   **semester of 2005?**
9   A. Yes.
10  **Q. Would it not have been Ms.**
11  **Reinking's responsibility to teach**
12  **those students discipline during the**
13  **fall semester of 2005, even before**
14  **Ms. Snyder began her student**
15  **teaching?**
16  A. Well, discipline for her own
17  teaching. But I mean, when you have
18  a student teacher, they have to
19  establish their own discipline, their
20  own management plan.
21  **Q. Well, that wasn't the**
22  **question. My question was wouldn't**
23  **it have been Ms. Reinking's**
24  **responsibility to teach her class**
25  **discipline?**

1   A. Well, yes, and for all I know
2   they were well-disciplined when she
3   taught them, but I don't think that
4   carries over. I mean ---.
5   **Q. For all you know, they weren't**
6   **well-disciplined when she taught**
7   **them; correct?**
8   A. That's true.
9   **Q. Turn to Plaintiff's 46,**
10  **please. Page two of the exhibit, you**
11  **rated Ms. Snyder unsatisfactory in**
12  **classroom environment; is that**
13  **correct?**
14  A. Yes.
15  **Q. And you listed some**
16  **justifications for that at the bottom**
17  **of the page; is that correct?**
18  A. Correct.
19  **Q. And that's what we've been**
20  **discussing; right?**
21  A. Correct.
22  **Q. All right. And turn to page**
23  **four, it says the professionalism**
24  **section.**
25  A. Yes.

1   **Q. You rated Ms. Snyder superior**
2   **in professionalism?**
3   A. Yes.
4   **Q. And you said that she usually**
5   **and extensively conducts herself in a**
6   **very professional manner; is that**
7   **correct?**
8   A. That is correct.
9   **Q. You didn't see any problems**
10  **with her professionalism at that**
11  **point; correct?**
12  A. Well, I would have given her
13  the exemplary if I saw no problems,
14  but I didn't see anything unusual for
15  a student teacher.
16  **Q. And you discussed your mid-**
17  **evaluation with Ms. Snyder?**
18  A. Yes.
19  **Q. When was that?**
20  A. It was the same day that we
21  discussed the Millersville one,
22  whatever day that was. We sat down
23  together with co-op and Ms. Snyder
24  and I ---.
25  **Q. On or about March 17th?**

1   A. Yeah, whatever day it was that
2   we did the Millersville form, because
3   there's --- you know, there's the
4   Millersville form and there was the
5   430 in there.
6   **Q. Well, describe the meeting**
7   **that you had with Ms. Snyder. And I**
8   **take it Ms. Reinking was there; is**
9   **that right?**
10  A. Yes.
11  **Q. Describe the meeting, please.**
12  A. It was kind of solemn because
13  Ms. Reinking's --- and of course
14  these evaluations on the Millersville
15  form went nowhere. I mean, as I
16  said, they were just ways of seeing
17  if we're on the same page.
18  **Q. What do you mean by your**
19  **comment that these evaluations went**
20  **nowhere?**
21  A. Well, what we said earlier,
22  the Millersville form, the official
23  one that goes in a letter is the one
24  at the end.
25  **Q. Oh, okay.**

26 (Pages 98 to 101)

1    A. The one in the middle is just
2    to see if everybody agrees where
3    we're at.
4    Q. All right.
5    A. And Ms. Reinking and I were
6    pretty much right on in terms of our
7    evaluations. And Ms. Snyder had
8    herself ranked up in the Gs and Rs in
9    almost everything, which was totally
10   unrealistic. And so I guess you
11   might say that I, at that point, kind
12   of tried to give her a dose of
13   realism. I did a lot of talking at
14   that conference, and was more of less
15   okay, you know, now is the time
16   things have to change if you want to
17   get through.
18   Q. You did not --- well, during
19   this meeting, you did not tell Ms.
20   Snyder that she should not be a
21   student teacher any longer; correct?
22   A. No. No, I didn't.
23   Q. Neither did Ms. Reinking;
24   correct?
25   A. No.

1    Q. And you had it in your power
2    at that time to remove Ms. Snyder
3    from ---?
4    A. Yes. I had discussed the
5    possibility with Ms. Reinking, and
6    she said no, I want to --- I think I
7    can work with her, you know ---.
8    Q. Okay. And you continued to
9    ---?
10   A. Stacy knew nothing about that,
11   as far as I know. She did know that
12   she had to shape up if she wanted to
13   pass.
14   Q. Okay. Turn to Exhibit 65.
15   This is Ms. Reinking's mid-
16   evaluation; is that correct?
17   A. Yes, it is.
18   Q. All right. And on the first
19   page where it talks about
20   professionalism ---.
21   A. Wait a minute.
22   Q. Sixty-five (65). You're on
23   64, I believe.
24   A. Yeah, okay. I'm on the wrong
25   on. Okay, 65. Midterm.

1    Q. Yes.
2    A. Yes, this is Ms. Reinking's.
3    Q. And on the first page, Ms.
4    Reinking gave Stacy a G in adhering
5    to the Pennsylvania Code of Ethics,
6    et cetera?
7    A. Correct.
8    Q. Did you have any discussions
9    with Ms. Reinking other than what
10   we've already discussed concerning
11   her preparation of this document?
12   A. Well, everything we've talked
13   about up to that point probably shows
14   up in here some place.
15   Q. Okay.
16   A. But no, I haven't. I didn't
17   help her make this up, if that's what
18   you're saying.
19   Q. No. Turn to Plaintiff's 77.
20   A. I'm with you.
21   Q. This is the Praxis scores that
22   Stacy received in or about March of
23   2006; correct?
24   A. If you say so, I guess.
25   Q. Well, take a look at it and

1    confirm that for me?
2    ATTORNEY KRAMER:
3    We're not disputing the
4    authenticity of this document.
5    BY ATTORNEY VOIGT:
6    Q. All right. And what do you
7    know about the Praxis examinations?
8    A. They're a test of competency.
9    Q. Is it a state-wide test?
10   A. Yes.
11   Q. And it tests the competency of
12   future teachers in their proposed
13   subject matter areas; is that what it
14   does?
15   A. Yes.
16   Q. Now, at the bottom of the
17   page, it looks like Stacy took a
18   Praxis exam in English language,
19   literature, composition, content and
20   knowledge; do you see that?
21   A. Yes.
22   Q. And she scored a 171; do you
23   see that?
24   A. And that would, if you look
25   under the test date, that would place

27 (Pages 102 to 105)

1  her in the average performance range;
2  is that correct?
3  A. Yes.
4  Q. Do you have any reason to
5  doubt the authenticity of this
6  document?
7  A. No.
8  Q. So according to the state,
9  Stacy knows English literature and
10  composition, et cetera, in a
11  satisfactory manner; correct?
12  ATTORNEY KRAMER:
13  I'll object. The
14  document speaks for itself.
15  She certainly scored as the
16  document indicates. I don't
17  know if can ---.
18  BY ATTORNEY VOIGT:
19  Q. Well, do you know why Stacy
20  would score in the average range on
21  the Praxis exam and then in your view
22  not present the material in class in
23  a satisfactory manner?
24  A. Can I explain that?
25  Q. Yes.

1  A. No, I can't explain it.
2  Q. Did you look into it? It
3  looks like Stacy ---.
4  A. I wasn't even aware of what
5  she had in her Praxis. I just know
6  she passed it.
7  Q. Wouldn't it have been useful
8  to look into her Praxis scores if
9  you're seeing these problems of
10  content? Wouldn't it have been
11  useful to look up her Praxis scores
12  and see if state forms are showing
13  the same thing?
14  A. Well, it would have been
15  useful, I guess, as it relates to
16  what was going on in the classroom.
17  That was --- what's going on in your
18  classroom was the most important
19  thing to me.
20  Q. All right. Turn to
21  Plaintiff's, 47 page one. This is
22  your evaluation from block one on
23  April 3rd; correct?
24  A. Yes. It's dated --- the
25  conference was on the 5th, the

1  observation was on the 3rd.
2  Q. And how long did you evaluate
3  Stacy this time, the same, 90
4  minutes?
5  A. Yes.
6  Q. And you say the lesson plan
7  was excellent. Do you see that,
8  third line down?
9  A. Yes.
10  Q. And you agree with that
11  statement?
12  A. Yes.
13  Q. And you listed a number of
14  glows --- said a new development.
15  You didn't have glows and grows
16  before; did you?
17  A. No, but I decided to get
18  creative.
19  Q. Okay. So you have five glows
20  and only two grows; is that correct?
21  A. That's correct.
22  Q. All right. And you gave Stacy
23  a glow on preparation; is that right?
24  A. That's correct.
25  Q. Okay. And you didn't list any

1  grows for Stacy concerning
2  unprofessional; did you?
3  A. No, the grows had to do with
4  modeling and key questions.
5  Q. All right. And did you meet
6  with Stacy on or about April 5th?
7  A. Yes.
8  Q. And what was the nature of
9  that meeting?
10  A. I think the nature of it was
11  very positive. I thought that she
12  was starting out on the right foot
13  with this class and ---.
14  Q. Is this a new class?
15  A. Yes. I may have been in error
16  when I talked about that other
17  observation being the new class. I
18  think this was probably the new
19  class, or maybe they both were.
20  Q. So Stacy didn't have any
21  problems with keeping this new class
22  in line; right?
23  A. Well, I didn't say she didn't
24  have any problems, but it was well
25  within the bounds of reasonable, I

28 (Pages 106 to 109)

```
 1    would say.
 2    Q. Do you know who the next
 3    teacher was of the old class?  Was
 4    that Reinking again?
 5    A. Yes, yes.
 6    Q. You didn't go visit the old
 7    class and determine whether they had
 8    suddenly stopped misbehaving now that
 9    Ms. ---?
10    A. No, I didn't.
11    Q. Let me finish the question.
12    You didn't go back to the old class
13    to determine whether they had
14    suddenly started behaving,
15    appropriating now that Ms. Reinking
16    was in charge; correct?
17    ATTORNEY KRAMER:
18    I object to the
19        compound question.  He didn't
20        go back to the old class.
21    BY ATTORNEY VOIGT:
22    Q. All right.  You didn't go back
23    to the old class; right?
24    A. Right.
25    Q. Okay.  All right.  P-47, page
```

```
 1    two.  It says April 6, block one.
 2    Same, 90 minutes?
 3    A. Yes.
 4    Q. And you said that Stacy was
 5    highly organized; right?
 6    A. Yes.
 7    Q. And you complemented her in
 8    ten different areas; right?
 9    A. Correct.
10    Q. No comments regarding
11    unprofessionalism; right?
12    A. Correct.
13    Q. Did you talk to Stacy about
14    this one?
15    A. Yes.
16    Q. And what was the nature of
17    that conversation?
18    A. I talked to her about trying
19    to get more out of these kids.
20    Unlike the other class, this class
21    tended to be very quiet.  And I'm
22    trying to get them to talk, you know,
23    rather than trying to keep them
24    quiet.
25    Q. Okay.
```

```
 1    A. Have them speak up when they
 2    answered so the other students could
 3    hear what they were saying.
 4    Q. All right.  And turn to page
 5    three.  This is block two from April
 6    6th.
 7    A. Yes.
 8    Q. This is another 90 minutes?
 9    A. Yes.
10    Q. And you said that Stacy made
11    good use of her time; is that right?
12    A. To a point.  If you read down
13    through that thing, it went like
14    this.  It was okay for a while and
15    then it went 20 minutes left in the
16    class ---.
17    ATTORNEY VOIGT:
18    Off the record.
19        OFF RECORD DISCUSSION
20        BY ATTORNEY VOIGT:
21    Q. So what happened in the last \
22    --- it says here the last few minutes
23    of the class; what happened then?
24    A. Well, as the first two
25    paragraphs, three paragraphs
```

```
 1    indicate, things were going well.
 2    She had the kids working in pairs.
 3    She had specific instructions on what
 4    they were supposed to do.  She stated
 5    the purpose well.  She got some take-
 6    time-to-think-type questions.
 7    One of her problems was that
 8    she would ask a kid a question and
 9    then cut him off.  So you know, she
10    did better with taking time to allow
11    somebody to think before they
12    responded.
13    But then what happened was
14    after they were done working in
15    pairs, instead of moving them back
16    into their regular seats, she just
17    left them stay in pairs, you know.
18    So then they started talking and the
19    class got out of hand and she got
20    mad.  So she said okay, you're not
21    --- I think she said mature enough to
22    do another activity, and then she
23    gave them something to study for the
24    rest of the period, which was about
25    12, 15 minutes.  I'm not exactly sure
```

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    anymore.  I say 12 minutes here.  And
2    then when they got quiet, she started
3    talking again.
4  So in the conference, I said,
5    you know, if your purpose is to have
6    them sit there quietly because
7    they're not mature enough to handle
8    another activity, once they sit there
9    quietly and listen to what you tell
10   them, then don't start talking again.
11   You know, you're defeating your own
12   purpose.
13  And I said, do you know where
14   the legs fell off of this lesson?
15   And she said, yes, I do.  I didn't
16   move them back to their regular
17   seats.  And that's --- so that lesson
18   was good, then it went downhill.
19   **Q. You didn't think that Stacy**
20   **was unprofessional during that class;**
21   **did you?**
22   A. No.
23   **Q. All right.  Turn to P-47 page**
24   **four, April 18th.  And this was**
25   **another 90-minute evaluation?**

1    A. Yes.
2    **Q. You have ten glowing comments**
3    **on Stacy; is that right?**
4    A. Yes.
5    **Q. And you say, among other**
6    **things, excellent CIRQL unit**
7    **planning?**
8    A. Yes.
9    **Q. What does that mean exactly?**
10   A. Well, a CIRQL unit is the unit
11   she did on Macbeth, which was her
12   CIRQL unit.
13   **Q. Oh, okay.**
14   A. And I felt at this stage of
15   the game it was going well, it was
16   going according to plan.
17   **Q. Okay.  It also says great**
18   **improvement in content; is that**
19   **right?**
20   A. Yes.
21   **Q. Okay.  And as for the grow**
22   **comments, there's no comments about**
23   **unprofessionalism; correct?**
24   A. That's correct.
25   **Q. All right.  Now, you did not**

1    **observe Stacy in class after April**
2    **18th; is that correct?**
3    A. That's correct; not formally.
4    **Q. Informally, did you?**
5    A. I'd have to check my visits,
6    which I'm going to give you, but I
7    probably dropped in.  I know I
8    dropped in one day when she had a
9    discipline problem down in the
10   library and was convinced that it
11   wasn't a big problem.  But I'll have
12   the dates of when I dropped in.  I
13   have them some place.  I'll find it.
14   **Q. All right.  Turn to the table**
15   **of contents which is in the front of**
16   **the first book all the way at the**
17   **front, page three.  Now, the table of**
18   **contents lists a number of teacher**
19   **observations and the dates of the**
20   **observations.  Were you present**
21   **during any of these observations?  If**
22   **not, I'll just move on.  But if you**
23   **were, maybe I'll ask some more**
24   **questions.**
25   A. I don't even know what these

1    are.
2    **Q. Well, if you don't know, then**
3    **it's all right.  We'll take an**
4    **example then.  Turn to Plaintiff's**
5    **33.**
6    A. Okay.  Well, it's going to ---
7    it's dawned on me here what this is.
8    Other people ---.
9    **Q. Well, answer the question as**
10   **long as we're on the subject.**
11   **Plaintiff's 33.**
12   A. I think it's backwards.  I
13   think she was observing them, not
14   them observing her.
15   **Q. Oh, if that's the case then**
16   **tell me?**
17   A. I know they didn't all come in
18   and observe her classes.  She had to
19   go out and observe other classes.  So
20   I think that's what it is.
21   **Q. Oh, okay.**
22   A. Her observing ---.
23   **Q. So this is Stacy's**
24   **handwriting; is that what you're**
25   **saying?**

30 (Pages 114 to 117)

1    A. Yes.

2    Q. Okay.

3    A. Yes, that's what this is.  She

4    had to observe so many teachers, so

5    many in the English discipline, but

6    she was not to restrict herself to

7    the English discipline.  She was to

8    --- she was looking for style, not

9    particularly content.

10   Q. All right.  So no other CV

11   teachers observed Stacy teaching

12   other than Ms. Reinking; is that what

13   you're saying, to your knowledge?

14   A. To my knowledge.

15   Q. Okay.  Shouldn't other

16   teachers come in and observe a

17   student teacher throughout the

18   semester?  Wouldn't that be

19   preferable?

20   A. Well, it might be preferable,

21   but it happens very seldom.  The only

22   time it happens usually is if the

23   person invites somebody in.

24   Q. The person being the teacher?

25   A. The student teacher or the co-

1    op.  Many times they might invite the

2    principal in.

3    Q. So if a teacher gets really

4    bad --- if a student teacher gets

5    really bad or really inappropriate,

6    then the cooperating teacher on

7    occasion would bring in a supervisor

8    or a principal to observe the

9    situation?

10   ATTORNEY KRAMER:

11   I'll object.  That's

12   not what he said.

13   ATTORNEY VOIGT:

14   Well, if it isn't then

15   he can explain.

16   A. I was talking about the

17   offices really .  Usually if a student

18   teacher is doing a good job and the

19   co-op wants to show them off to the

20   principal, in case there's a position

21   open up or in case there's --- they

22   want to have the principal as a

23   reference ---

24   BY ATTORNEY VOIGT:

25   Q. Oh, okay.

1    A. --- or something to that

2    effect.

3    Q. The opposite would be true,

4    too?  If a student teacher was to do

5    a really bad job, it's possible that

6    the cooperating teacher could bring

7    in another teacher or a supervisor or

8    something to observe the interactions

9    in class?

10   ATTORNEY KRAMER:

11   You can answer, but I

12   would object to calls for

13   speculation.  You can answer.

14   A. I never knew if that happened.

15   BY ATTORNEY VOIGT:

16   Q. Okay.  Now, turn to P-47, page

17   five.  There's a CIRQL unit

18   evaluation; right?

19   A. Yes, but as I said previously,

20   that has nothing to do with teaching.

21   That is basically what the --- this

22   is the form I used to evaluate her

23   unit.  And all those things that are

24   listed up there had to go in with her

25   CIRQL unit along with the content and

1    the lesson plans and the whole --- so

2    this does not relate to teaching.  It

3    relates to preparation.

4    Q. So this has no relevance to

5    Stacy's ability as a teacher?

6    A. Certainly it does.  It says

7    that she is a good planner.

8    Q. Planning is an important part

9    of teaching; wouldn't you agree?

10   A. Yes.

11   Q. Describe the project that

12   Stacy completed which lead to this

13   evaluation.  You talked about it a

14   little bit, but describe in more

15   detail, please.

16   A. Well, the CIRQL plan or

17   whatever you want to call it from

18   Millersville includes all these

19   things that are listed here in the

20   planning stages.  And then the CIRQL

21   units are shown off at a CIRQL fair

22   at the end of the semester, where the

23   students not only include this in

24   their booklet, but they also include

25   their best five lesson plans out of

1    all the lesson plans they used.
2   And then they sit around and
3    they collaborate with other students
4    at the end of the semester.  And so
5    in preparing this, the student has to
6    prepare a lot of the planning, but
7    also has to prepare the lesson plans
8    and the assessments that go with it.
9    **Q. And what did Stacy do in**
10   **particular?  Do you remember what her**
11   **CIRQL unit plan was that got all**
12   **these E's?**
13   A. Macbeth.
14   **Q. What was it about Macbeth that**
15   **Stacy did that was worthy of**
16   **exemplary grades?**
17   A. Well, I felt that she had
18   taken seriously the earlier
19   discussions about content and that
20   really had the proper content,
21   everything in their proper form.  I
22   felt the assessments were much better
23   than any I had seen during the
24   semester so far.
25   **Q. Compared to other students, or**

1    **just compared to ---?**
2    A. Compared to her own earlier
3    assessments.  I had spoken to her on
4    a number of occasions about how the
5    assessments didn't tend to match her
6    teaching sometimes.  Test what you
7    teach.  And so I complemented her for
8    the assessments that I felt were
9    right on.
10   **Q. Did you meet with Stacy to**
11   **discuss this evaluation?**
12   A. Yes.
13   **Q. Was it on or about May 2nd?**
14   A. Yes.  She had to have this
15   done for the CIRQL.  I had to have it
16   evaluated before they had this CIRQL
17   festival or fair or whatever it is.
18   So yes, I would say that that's when
19   I met with her, 5/2.
20   **Q. All right.  And describe the**
21   **meeting, please.**
22   A. Well, I don't recall much
23   about it except I think it was
24   positive.
25   **Q. And at that meeting, you did**

1    **not discuss any problems with Stacy's**
2    **professionalism; correct?**
3    A. Correct.
4    **Q. And at that meeting, you did**
5    **not give Stacy any indication that**
6    **she would not be receiving her**
7    **Bachelor of Science in Education**
8    **degree; correct?**
9    A. Correct.
10   ATTORNEY VOIGT:
11   Let's take a break and
12      then we'll move on to the
13      drunken pirate photo.
14      SHORT BREAK TAKEN
15   ATTORNEY VOIGT:
16   Back on the record.
17      BY ATTORNEY VOIGT:
18   **Q. Turn to Plaintiff's 93.  Have**
19   **you ever seen this photo before?**
20   A. Not this exact photo.
21   **Q. Have you ever seen a similar**
22   **photo?**
23   A. Yes.
24   **Q. When did you first see a**
25   **similar photo?**

1    A. I saw the one that was posted
2    on May the 4th.  That's the date on
3    it, and the first time I saw it was
4    on May the 8th.
5    **Q. So turn to Plaintiff's 51.  Is**
6    **this the photo that you saw on or**
7    **about May 8th?**
8    A. Yes.
9    **Q. And you also saw the text on**
10   **or about that date?**
11   A. That's correct.
12   **Q. How did you come to receive or**
13   **see this photo and this text?**
14   A. Mrs. Reinking had a copy of
15   it.
16   **Q. And how did she go about**
17   **delivering it to you?**
18   A. Well, I went over to the
19   school on the 8th after I was called
20   on the telephone by Mrs. Buffington.
21   **Q. And what did --- before we get**
22   **to that, prior to seeing this photo**
23   **and text on May the 8th, you had**
24   **taken no steps to set in motion the**
25   **denial of Stacy's Bachelor of Science**

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    **in Education degree; correct?**
2    A. I had nothing to do with that
3    whatsoever, one way or the other.
4    **Q. Okay. But to answer the ---.**
5    A. You keep referring to me as a
6    policy maker. I'm an adjunct
7    instructor. I'm not a policy maker.
8    **Q. Okay. Well, please, answer**
9    **the question. You took no steps to**
10   **deny Stacy her Bachelor of Science in**
11   **Education degree prior to seeing this**
12   **photo and text; correct?**
13   ATTORNEY KRAMER:
14   Objection. He answered
15       that. He doesn't have, as I
16       have said, the authority to
17       take steps to grant or deny
18       the degree.
19   BY ATTORNEY VOIGT:
20   **Q. Okay. You make**
21   **recommendations; do you not?**
22   A. Yes.
23   **Q. You had taken no steps prior**
24   **to May 8th of 2006 to make any**
25   **recommendations regarding the denial**

1    **of Stacy's Bachelor of Science in**
2    **Education degree; correct?**
3    A. I have no --- it wasn't up to
4    me. I have no authority to say
5    whether she was going to get a
6    Bachelor of Science or whether she
7    wasn't. My job is to evaluate her
8    and to be her supervisor and do the
9    academic evaluation.
10   **Q. And to make recommendations;**
11   **right?**
12   A. To make recommendations.
13   **Q. Okay. And you make**
14   **recommendations to Dr. Bray; would**
15   **that be accurate?**
16   ATTORNEY KRAMER:
17   Are you asking in this
18       case or ---?
19   BY ATTORNEY VOIGT:
20   **Q. No, just generally in the**
21   **normal course of things, do you make**
22   **recommendations to Dr. Bray?**
23   A. Not in the normal course of
24   things. In the normal course of
25   things, Dr. Bray is never even

1    involved in ---. This is an unusual
2    situation.
3    **Q. Oh, okay. In this case, did**
4    **you make a recommendation to Dr. Bray**
5    **after reviewing this photograph?**
6    A. In regard to?
7    **Q. In regard to Stacy and the**
8    **awarding or not awarding to Stacy of**
9    **her Bachelor of Science in Education?**
10   A. I made no recommendation on
11   that.
12   **Q. Now, prior to seeing this**
13   **photo and text, no one at Conestoga**
14   **Valley, including Ms. Reinking and**
15   **Ms. Buffington, had complained to you**
16   **about Stacy's professionalism;**
17   **correct?**
18   A. No, that's not correct.
19   **Q. What did they do to complain**
20   **to you about Stacy's professionalism?**
21   A. Well, first of all, before the
22   evaluation --- I've already said,
23   that it was nothing unusual. The
24   only incidence that I was aware of is
25   when she spoke in her class about

1    meeting her ex-husband at a --- her
2    and her kids saw her ex-husband at
3    some outlet or something. And I
4    spoke to her about that. I said,
5    remember, you don't get personal, the
6    kids --- the worst thing you can do
7    is try to get buddy, buddy with these
8    kids. And you know, you have to
9    start out, even though it's --- you
10   got to start out as strangers.
11   And the only other thing I was
12   aware of was that she had asked the
13   principal for a key to the room,
14   rather than going through the proper
15   channels.
16   **Q. Is that improper in some**
17   **fashion, to talk to the principal if**
18   **you're a student teacher?**
19   A. Yes. Well, to say, may I have
20   the key to the room, you should go
21   through your co-op.
22   **Q. Is that written down somewhere**
23   **that you have to go through your co-**
24   **op before you speak to the principal?**
25   A. No, no. It's just

1    commonsense.
2    **Q. What is your basis for calling**
3    **that commonsense?**
4    A. Because these student teachers
5    are told when they go out there,
6    they're the guests of the school.
7    You know, fit in.  Don't sit in
8    somebody's chair on the faculty.  You
9    know, do what you're expected to do.
10   Go through the proper chains of
11   command.  You know, use some
12   commonsense when you're out there.
13   I'm not saying that was a big thing,
14   or I would have graded her down.
15   What I'm saying is, those are
16   the things I was aware of in the
17   middle.  Now, when we met for the
18   mid-conference, I became aware by
19   reading Ms. Reinking's mid-conference
20   that she had told a couple classes to
21   shut up, which up to that point, I
22   had no knowledge of.  And I attribute
23   to the fact that, you know, Ms.
24   Reinking was trying to help her,
25   trying to get her through some of

1    these things.
2    But then after the mid, there
3    were some other things that happened
4    that I was told about that Ms.
5    Reinking told me about where, when
6    she went out to complete her
7    observations of other teachers that
8    teachers complained to her because
9    instead of paying attention to the
10   class, she was sitting back there
11   working on lesson plans.  There was
12   an incident that I was told about
13   where she played some music that had
14   some foul language in it.
15   **Q. We'll get to all of that.  So**
16   **your testimony is that by complaining**
17   **about Stacy speaking to the principal**
18   **at Conestoga Valley without first**
19   **going through Ms. Reinking, is a**
20   **complaint about Stacy's**
21   **unprofessionalism?**
22   ATTORNEY KRAMER:
23   I'll object.  He said
24       --- he referred to incidents
25       above and beyond that one

1    particular incident.
2    BY ATTORNEY VOIGT:
3    **Q. Okay.  Do you believe ---?**
4    A. I said that that happened
5    before the mid, and I didn't attach
6    no real significance to it because it
7    wasn't unusual for a student teacher.
8    I mean, I spoke to her about it, but
9    I didn't ---
10   **Q. Okay.**
11   A. --- think it was a big deal.
12   **Q. All right.  Now, do you know**
13   **whether this photo and text, which is**
14   **Parent's (sic) 51, caused any actual**
15   **disruption at Conestoga Valley School**
16   **District?  Let me strike that.**
17   **As you sit here today, you do**
18   **not know of any actual disruption of**
19   **the school environment at Conestoga**
20   **Valley School District due to the**
21   **photo and text, which is Parent's 51?**
22   ATTORNEY KRAMER:
23   If you can just
24       clarify.
25   ATTORNEY VOIGT:

1    Plaintiff's 51.
2    ATTORNEY KRAMER:
3    When you refer to
4        disruption, are you including
5        --- are you referring only to
6        what's going on in the
7        classroom as opposed to,
8        perhaps, Reinking and
9        Buffington getting involved as
10       well?
11   ATTORNEY VOIGT:
12   I'll let the witness
13       define it however he wants.
14       BY ATTORNEY VOIGT:
15   **Q. You do not know of any actual**
16   **disruption of the school environment**
17   **at Conestoga Valley due to Ms.**
18   **Snyder's posting this photo and text;**
19   **P-51?**
20   A. It depends on how you define
21   disruption.  But the fact that there
22   were students looking at this, and
23   she says clearly here that that's
24   okay.  And then I was informed that
25   on the 5th, which was a Friday, that

1  she had mentioned in one of her
2  classes that one of her students had
3  been on her MySpace website and of
4  course, knowing students, everybody
5  would have gone home and gotten on
6  the website.  So I don't know how you
7  define disruption, but I would say
8  that there was at least a ripple
9  going through the community there.
10  **Q. Okay.  You don't know of any**
11  **other students beside the one student**
12  **that you referred to that actually**
13  **saw this on Ms. Snyder's website;**
14  **correct?**
15  A. Correct.
16  **Q. And everything else would be**
17  **just speculation; correct?**
18  A. Yeah.  Yes.
19  **Q. Okay.  Other than what you**
20  **described there, can you think of any**
21  **other actual disruption of the school**
22  **environment due to Ms. Snyder's**
23  **posting this photo and text?**
24  A. Yes.
25  **Q. What?**

1  A. I would say that the text here
2  got some people up in arms.  I don't
3  know that it disrupted the students,
4  but it certainly got some people up
5  in arms in the English Department.
6  Because even though Stacy had been
7  told in teaching of that if she had
8  something like MySpace, it was never
9  to point a finger at anybody, never
10  to be personal, never to mention
11  anybody's name.  And secondly, in
12  that orientation, when I was there,
13  they were told if they had these
14  accounts they should delete them.
15  But when you read this last
16  sentence here, they keep asking me
17  why I don't apply there.  Do you
18  think it would hurt me to tell them
19  the real reason for who the problem
20  was?  Now, if that's not Ms.
21  Reinking, I wouldn't know who --- you
22  might as well just put Reinking's
23  name right down there.  And to me,
24  that is a personal pointing the
25  finger at a professional person and

1  blaming all the problems on that
2  person.
3  **Q. So you don't see the word**
4  **Reinking in that?**
5  A. I do not see it, but I can't
6  see who else it would be.
7  **Q. Are you not speculating as to**
8  **the nature of that person?**
9  A. Yes.
10  **Q. And you are not aware of any**
11  **interference in discipline at**
12  **Conestoga Valley due to Ms. Snyder's**
13  **posting this photo and text; correct?**
14  ATTORNEY KRAMER:
15  I will object.  You can
16      answer it, but I think he's
17      already answered that
18      question.
19  BY ATTORNEY VOIGT:
20  **Q. Did discipline break down at**
21  **Conestoga Valley due to this photo**
22  **and text?**
23  ATTORNEY VOIGT:
24  Go off the record.
25      BRIEF INTERRUPTION

1  BY ATTORNEY VOIGT:
2  **Q. There was nothing threatening**
3  **about this photo and text; correct?**
4  A. Correct.
5  **Q. You do not consider this photo**
6  **lewd or obscene; do you?**
7  A. No.
8  **Q. You don't consider the**
9  **language accompanying the photo to be**
10  **lewd or obscene; do you?**
11  A. No.
12  **Q. Now, in the text, Stacy**
13  **discusses her decision not to apply**
14  **for a job at Conestoga Valley; right?**
15  A. Correct.
16  **Q. Wouldn't someone reading this**
17  **posting be entitled to know about**
18  **Stacy's decision in that regard?**
19  ATTORNEY KRAMER:
20  I'll object.  It's a
21      very bad question.  I'm not
22      sure he can answer it.
23  BY ATTORNEY VOIGT:
24  **Q. Well, wouldn't it be a matter**
25  **of public concern that Stacy decided**

```
 1      not to apply?
 2   ATTORNEY KRAMER:
 3   I'll object.  That
 4      calls for a conclusion ---.
 5      BY ATTORNEY VOIGT:
 6      Q. You can answer over objection
 7      pursuant to our usual stipulations.
 8      Wouldn't you agree that it is a
 9      matter of public concern at least
10      within the Conestoga Valley School
11      District concerning whether Stacy
12      decided to apply for a job there?
13   ATTORNEY KRAMER:
14   Same objection.  You
15      can go ahead and answer.
16      A. Well, the Conestoga Valley has
17      a process that they use to decide
18      who's going to be interviewed ---.
19      BY ATTORNEY VOIGT:
20      Q. I'm not concerned about that.
21      I'm concerned with whether this
22      posting discusses a matter of public
23      concern, which is Stacy's decision
24      not to apply.
25   ATTORNEY KRAMER:
```

```
 1   I would object.  It
 2      calls for a conclusion that
 3      he's ---.
 4      BY ATTORNEY VOIGT:
 5      Q. Okay.  Let me rephrase the
 6      question.  Would you agree that
 7      Stacy's decision not to apply at
 8      Conestoga Valley School District for
 9      a job is a matter of public concern
10      at least among the Conestoga Valley
11      community?
12   ATTORNEY KRAMER:
13   Same objection.  You
14      can answer.
15      BY ATTORNEY SMITH:
16      Q. Wouldn't their students want
17      to know why she's not applying for a
18      job?
19   ATTORNEY KRAMER:
20   Or if you don't know,
21      tell him you don't know.
22      A. I don't know.
23      BY ATTORNEY VOIGT:
24      Q. If you were a student in
25      Stacy's class, wouldn't you want to
```

```
 1      know why your student teacher wasn't
 2      applying for a job there?
 3   ATTORNEY KRAMER:
 4   Objection.  Calls for
 5      speculation.
 6      BY ATTORNEY VOIGT:
 7      Q. You can answer it.
 8      A. I don't think I would.  It
 9      wouldn't cross my mind actually.
10      What would students know about an
11      opening?  You know, if there was even
12      a job opening?
13      Q. After receiving this photo ---
14      strike that.
15   I take it you first learned of
16      this photo through a phone call; is
17      that correct?
18      A. Yes.
19      Q. From Ms. Buffington; is that
20      correct?
21      A. Yes.
22      Q. Okay.  And who is Ms.
23      Buffington?
24      A. She is the English Supervisor
25      at Conestoga Valley.
```

```
 1      Q. Okay.  What was the nature of
 2      that phone call?
 3      A. The major of it was that she
 4      said that they had some serious
 5      objections about Stacy's
 6      professionalism, and she had
 7      discussed this with the acting
 8      superintendent because the
 9      superintendent was away.  And that he
10      had decided that she should not be
11      allowed to continue, that she would
12      only be allowed to return on the
13      11th, which would be a Thursday, to
14      pick up her materials and I was to
15      accompany her and accompany her out.
16      And she was to have no connection
17      with the students.
18      Q. What was your response to
19      those comments?
20      A. My response was, why me?
21      Q. What does that mean?
22      A. I mean, that week was one of
23      the worst weeks of my life is what it
24      means.
25      Q. Okay.  Did you attempt to
```

1  defend Stacy? After all, you just
2  gave her Es on her CIRQL.
3  A. I went in to talk to Reinking
4  and Buffington.
5  Q. Was that on the 8th of '06?
6  A. That would have been the 8th,
7  yes.
8  Q. And what did you say?
9  A. I didn't say much. I just
10  listened because I was trying to make
11  some sense out of the whole thing,
12  because to me, it was a situation I
13  hadn't encountered before. So I did
14  most of the listening instead of
15  talking. I was told that she was not
16  to return until Thursday, and I was
17  to come in with her and go out with
18  her and get her stuff. That was it,
19  and so ---.
20  Q. What did you say? Did you
21  defend Stacy? After all, you just
22  gave her a lot of glowing comments on
23  the last few evaluations.
24  A. Well, I don't recall, you
25  know, what all I said or whether I

1  tried to defend her or whether I just
2  listened to what they were saying
3  because I'm not a real fast thinker,
4  you know. I have to process stuff a
5  little bit before I decide what I'm
6  doing, so I guess you might say that
7  I just was a listener and trying to
8  process what all this meant. So I
9  didn't say a whole lot when I was
10  there.
11  Q. How long did the meeting last?
12  A. It was short and sweet.
13  Q. Less than ten minutes, less
14  than five minutes?
15  A. Maybe 15 minutes, I don't
16  know.
17  Q. Who all was at the meeting?
18  A. Mrs. Buffington, Mrs.
19  Reinking, and me.
20  Q. Ms. Seldomridge was not there?
21  A. She wasn't there.
22  Q. Was Dr. Bray at that meeting?
23  A. No.
24  Q. How did the meeting end?
25  A. I don't recall.

1  Q. At that meeting, were you
2  shown a copy of the photo and text on
3  Plaintiff's 51?
4  A. Yes.
5  Q. Did you receive a copy of it?
6  A. Yes.
7  Q. Did you take one home with
8  you?
9  A. Yes, I did.
10  Q. What did you do after leaving
11  the meeting?
12  A. Well, I went home and I
13  reviewed everything that was going on
14  and I --- as I recall, either that
15  day or the next morning, I called out
16  at Millersville or came out here to
17  Millersville to talk to the guy who
18  lines up the students within the
19  Department, you know, who actually
20  does the assigning of student
21  teachers and kind of shared the ---.
22  Q. Who's that?
23  A. That's another one I'll have
24  to ---.
25  Q. Before we get to May 9th,

1  let's stick with May 8th. P-51, page
2  two.
3  A. All right. What are we
4  looking at?
5  Q. P-51, page two. Your copy
6  probably isn't very good. So this is
7  the note, the post-it note that
8  accompanied the photo and text. Can
9  you read that for me, please?
10  A. Does not respect professional
11  boundaries. A way to say she is
12  surely --- or socially, whatever,
13  inept.
14  Q. Let me just read it for the
15  record. It says, does not respect
16  professional boundaries. A way to
17  say she is socially inept. Do you
18  know who wrote that?
19  A. No.
20  Q. Did you ever see that note
21  before?
22  A. No.
23  Q. Did you speak with Stacy on
24  May 8th if 2006?
25  A. I think she called me.

37 (Pages 142 to 145)

| | Page 146 |
|---|---|
| 1 | **Q. Let me turn your attention to** |
| 2 | **Plaintiff's 100, which is all the way** |
| 3 | **in the back, page five.** |
| 4 | A. Yes. |
| 5 | **Q. Actually, let's ---. It says** |
| 6 | **here, Plaintiff immediately** |
| 7 | **telephoned Girvin, who, in his** |
| 8 | **individual capacity, refused to** |
| 9 | **disclose any further information. Do** |
| 10 | **you recall a conversation with Ms.** |
| 11 | **Snyder on May 8th?** |
| 12 | A. Yes. I don't recall whether |
| 13 | that was before or after my visit |
| 14 | over to CV, but I do recall saying |
| 15 | that I didn't know enough about the |
| 16 | situation to comment on it. |
| 17 | **Q. All right. Why did you not** |
| 18 | **give Stacy any further details? Was** |
| 19 | **it just that you didn't know any** |
| 20 | **details?** |
| 21 | A. Well, if it was before I went |
| 22 | over to the school, that would be |
| 23 | true. I'm not sure whether it was |
| 24 | before or after I went over to the |
| 25 | school when I was talking to her on |

| | Page 147 |
|---|---|
| 1 | the phone. |
| 2 | **Q. Okay. All right. Turn to** |
| 3 | **Plaintiff's 48 on the first page.** |
| 4 | **This is an e-mail from Buffington to** |
| 5 | **Reinking dated May 9 of '06.** |
| 6 | A. Okay. |
| 7 | **Q. Did you ever see this e-mail** |
| 8 | **before? First page, we'll get to the** |
| 9 | **second page in a minute.** |
| 10 | A. No. Oh, wait a minute. Well, |
| 11 | since it's sent to me, I guess I did. |
| 12 | I'm familiar with what's on the next |
| 13 | page if that's what you're referring |
| 14 | to. |
| 15 | **Q. Before we get to the next** |
| 16 | **page, did you have any conversations** |
| 17 | **with Buffington about either the memo** |
| 18 | **or the accompanying text on the** |
| 19 | **following page?** |
| 20 | A. No, not with Buffington. |
| 21 | **Q. All right. Did you have any** |
| 22 | **conversations with Bray about the** |
| 23 | **memo? First of all, who is Jane** |
| 24 | **Bray?** |
| 25 | A. Well, I had no conversations |

| | Page 148 |
|---|---|
| 1 | at all with her. That complicates |
| 2 | this because she was in the hospital. |
| 3 | So that's where Weinrick (phonetic) |
| 4 | comes into this thing because |
| 5 | Weinrick was the acting dean when I |
| 6 | came out here to talk. And the guy I |
| 7 | was talking about that set up the |
| 8 | student teachers referred me to |
| 9 | Weinrick because she was acting dean. |
| 10 | **Q. All right. So let's take this** |
| 11 | **step by step. You said earlier that** |
| 12 | **on May 9th, you contacted somebody at** |
| 13 | **Millersville who was the supervisor** |
| 14 | **of all the student teachers?** |
| 15 | A. No, just the secondary ones |
| 16 | who assigned them. You know, it was |
| 17 | just an administrative task of |
| 18 | assigning the student teachers. |
| 19 | **Q. Okay. What did you say during** |
| 20 | **that conversation?** |
| 21 | A. Well, I told him what the |
| 22 | problem was. I showed him the |
| 23 | picture and he referred me to Dr. |
| 24 | Weinrick. |
| 25 | **Q. And the reason for the** |

| | Page 149 |
|---|---|
| 1 | **referral to Dr. Weinrick was for** |
| 2 | **what?** |
| 3 | A. I don't think he wanted to |
| 4 | take responsibility for this. |
| 5 | **Q. Well, I don't mean that. Why** |
| 6 | **was it not referred to Dr. Bray?** |
| 7 | A. Because she was in the |
| 8 | hospital. |
| 9 | **Q. All right. Did you have a** |
| 10 | **conversation then with Dr. Weinrick** |
| 11 | **on or about May 9th of 2006?** |
| 12 | A. Yes. |
| 13 | **Q. What happened during that** |
| 14 | **conversation?** |
| 15 | A. I explained the situation to |
| 16 | her and I also, by that time, had |
| 17 | received an e-mail from Stacy, which |
| 18 | I also shared with her. I don't know |
| 19 | if you have a copy of that or |
| 20 | whatever. |
| 21 | **Q. We'll get to that. Let's talk** |
| 22 | **about your conversation with** |
| 23 | **Weinrick.** |
| 24 | A. Well, that was part of my |
| 25 | conversation with her. You know, |

38 (Pages 146 to 149)

|  | Page 150 |  | Page 152 |
|---|---|---|---|
| 1 | what I wanted ---. In other words, I | 1 | **Q. Does Millersville maintain a** |
| 2 | didn't collaborate with people except | 2 | **list of dirty words not to use in the** |
| 3 | for Reinking. You know, what | 3 | **classroom?** |
| 4 | evaluation to give Stacy was my | 4 | A. No. |
| 5 | decision, an academic evaluation | 5 | **Q. Turn to Plaintiff's 50. Did** |
| 6 | decision. And I was ready to take | 6 | **you ever see this document before?** |
| 7 | the responsibility for that. But | 7 | A. No. |
| 8 | what I wasn't sure of was since she | 8 | **Q. Did you ever hear of a musical** |
| 9 | put in all that time except for one | 9 | **artist by the name of Ben Folds?** |
| 10 | week, whether that was going to have | 10 | A. No. |
| 11 | any influence on how her status was, | 11 | **Q. Now, the first --- second** |
| 12 | you know, going to be as far as her | 12 | **stanza indicates kiss my ass goodbye;** |
| 13 | degree. | 13 | **do you see that?** |
| 14 | **Q. What did Weinrick say?** | 14 | A. Yes, I do. |
| 15 | A. Well, she didn't say much | 15 | **Q. Do you believe that ass is an** |
| 16 | except that she was going to talk to | 16 | **inappropriate word to use in class?** |
| 17 | Dr. Bray about it. | 17 | A. It depends on the context in |
| 18 | **Q. So I take it Dr. Bray would be** | 18 | which you use it. |
| 19 | **the final decision maker on whether** | 19 | **Q. Why? Why does it depend on** |
| 20 | **Stacy received her Bachelor of** | 20 | **the context?** |
| 21 | **Science in Education degree; correct?** | 21 | A. Because you try to stay on a |
| 22 | A. Correct. | 22 | higher plane. I mean, in literature |
| 23 | **Q. All right. Did Weinrick say** | 23 | if you're working with a quote --- |
| 24 | **anything else other than that she** | 24 | and I assume that in some way you |
| 25 | **would talk to Dr. Bray?** | 25 | could defend this in the same way, |

|  | Page 151 |  | Page 153 |
|---|---|---|---|
| 1 | A. No. She didn't --- well, by | 1 | you know, that being loyal to the |
| 2 | that time ---. I'll save it until we | 2 | context of the material. I think, |
| 3 | get to that e-mail. | 3 | you know, in this sense, maybe she |
| 4 | **Q. All right. My question still** | 4 | could have picked a different song. |
| 5 | **remains, did Dr. Weinrick say** | 5 | **Q. You weren't in the classroom** |
| 6 | **anything else of significance about** | 6 | **when Ms. Snyder played this song;** |
| 7 | **Stacy and the incident during your** | 7 | **correct?** |
| 8 | **conversation on or about May 9th,** | 8 | A. That is correct. |
| 9 | **other than what we've discussed?** | 9 | **Q. Does Millersville have a** |
| 10 | A. No. | 10 | **policy whereby students have to pre-** |
| 11 | **Q. All right. Turn to** | 11 | **listen to the songs?** |
| 12 | **Plaintiff's 48, page 2. So your** | 12 | A. No. |
| 13 | **recollection is that you first saw** | 13 | **Q. You were aware that during** |
| 14 | **these --- this list of unprofessional** | 14 | **Stacy's practical she was teaching** |
| 15 | **behavior/performance in the classroom** | 15 | **Shakespeare; correct?** |
| 16 | **on or about May 9th; is that correct?** | 16 | A. Yes. |
| 17 | A. Yes. | 17 | **Q. Do you have any idea as you** |
| 18 | **Q. Paragraph one, Ms. Snyder** | 18 | **sit here today how many times** |
| 19 | **played a song for background music.** | 19 | **Shakespeare uses the word, ass?** |
| 20 | **Does Millersville instruct its** | 20 | A. Many times. |
| 21 | **student teachers regarding** | 21 | **Q. Should Ms. Reinking be** |
| 22 | **appropriate musical content in the** | 22 | **disciplined for not stopping a** |
| 23 | **classroom?** | 23 | **reading of Shakespeare because he** |
| 24 | A. Not specifically. Not that I | 24 | **uses the word, ass?** |
| 25 | know of. | 25 | A. No. |

39 (Pages 150 to 153)

1   **Q. Paragraph 2 of Parent's 48.**
2   A. Okay.
3   **Q. Stacy gave an account of her**
4   **Valentine's Day with her boyfriend.**
5   A. I was in class for that.
6   **Q. Does Millersville instruct its**
7   **student teachers not to mention their**
8   **significant others in class?**
9   A. Not specifically.
10  **Q. There's no policy in effect at**
11  **Millersville, which would forbid**
12  **student teachers from mentioning**
13  **significant others in class; correct?**
14  A. Correct.
15  **Q. And this is in regard to a**
16  **conversation about Valentine's Day;**
17  **correct?**
18  A. As I recall she and her
19  boyfriend and her two kids saw her ex
20  at I don't know where.
21  **Q. What exactly is inappropriate**
22  **about that comment?**
23  A. It's very inappropriate.  In a
24  straightforward student/teacher
25  relationship, it's not something that

1   is any of the kid's business.  You
2   know, the personal lives of the
3   teacher and the student is of no
4   concern.  And to me, and I spoke to
5   her about that comment, I thought it
6   was inappropriate for one reason, is
7   that she was trying to get friendly
8   with the kids, you know, to try to be
9   their buddy.  Trying to say, well,
10  you know I was at the mall and this
11  kind of thing --- which all student
12  teachers are told, you don't do that
13  kind of thing.
14  But particularly, you know,
15  because student teachers and frankly,
16  many of them --- most of them are
17  younger than she was, but I try to
18  apply the same standard as if she was
19  21.  And that is that getting too
20  friendly with students can lead to
21  all kinds of problems where people
22  start to confide in you.  They get
23  interested in you for reasons other
24  than being their teacher.  They try
25  to get into situations where they're

1   alone with you and you know, all
2   student teachers are told this stuff.
3   Chapter and verse, you know, don't
4   get too friendly with your students.
5   But you know, secondly, I thought it
6   was inappropriate because it was
7   almost like justifying herself to the
8   class, to me, to Reinking.  It's okay
9   that --- you know, I'm just normal.
10  You know, I'm just a normal person
11  with a normal family and so forth.
12  **Q. Are you telling me that**
13  **teachers never mention their husbands**
14  **or wives in class?**
15  A. No, I'm not saying that at
16  all.
17  **Q. Why would it be permissible**
18  **for a teacher to mention their**
19  **husband and wife in class, but Stacy,**
20  **a single mom, not be allowed to**
21  **mention her ex-husband?**
22  ATTORNEY KRAMER:
23  I'll object.  That's
24  not what he said at all.  He
25  actually didn't say that it

1   was okay that teachers mention
2   their spouses in class.
3   BY ATTORNEY VOIGT:
4   **Q. I believe you did.  Is it or**
5   **is not okay for a teacher to mention**
6   **their spouse in class?**
7   A. It depends on the context.  If
8   it's the kind of thing where you're
9   talking about something personal or
10  something other than the lesson --- I
11  mean, let's say their husband is a
12  fireman and they talk about him and
13  his job, there's nothing wrong with
14  that.  But there is something ---
15  teachers have to be good role models.
16  And so to talk about your personal
17  life to your students is not
18  something that --- particularly
19  student teachers are warned against.
20  And of course, even when
21  teachers start their first year of
22  practice, you know, there's a don't
23  share personal things with your
24  students.  Be a good role model.  And
25  I think that fits into this category.

40 (Pages 154 to 157)

1    Q.   You can answer.
2    A.   I did not forbid her.  I merely --
3    Q.   You were just following orders.  Is
4    that what you're saying?
5    A.   I merely called her after I spoke
6    with Mr. Seldomridge.
7    Q.   And you were just following
8    Mr. Seldomridge's directive.  Is that correct?
9    A.   I asked him for his advice as to what
10   we needed to do.  I told him that Ms. Reinking
11   was upset.
12   Q.   Did you consider whether Ms. Snyder
13   was upset at that time?
14   A.   Of course, I knew that she would be
15   upset.
16   Q.   So did you add any independent input
17   into the decision to forbid Ms. Snyder from
18   coming back to Conestoga Valley in May of
19   2006, or were you just relaying
20   Mr. Seldomridge's directive?
21        MR. KELIN:  Objection to form.
22   BY MR. VOIGT:
23   Q.   You can answer.
24   A.   Please restate.
25   Q.   Sure.  When you -- when you called

1    Ms. Snyder and told her that she could not
2    come back to Conestoga Valley School District,
3    were you adding your own input or were you
4    just forwarding Mr. Seldomridge's directive?
5         MR. KELIN:  Objection to form.
6    A.   I did not say that she could not come
7    back.  I said that she would come in on the
8    11th.
9    BY MR. VOIGT:
10   Q.   Was not the implication that she
11   could not come in before the 11th?
12   A.   She was out on the 8th, and she did
13   not come in on the 9th and the 10th, but then
14   she came back on the 11th for that final
15   evaluation.
16   Q.   Right.
17   A.   And she had gone home ill, wasn't
18   apparently feeling well that day anyway.
19   Q.   How did you determine she was not
20   feeling well?
21   A.   Well, she said -- she had a doctor's
22   appointment and she left at 11:30.  She left
23   midday.
24   Q.   Did you ask Ms. Snyder whether she
25   felt well enough to come back on the following

1    day, May 9th?
2    A.   No.  Because Mr. Seldomridge and I
3    had discussed how we should handle the
4    situation and I think he wanted time to
5    pursue, investigate.
6    Q.   So you did tell Ms. Snyder that she
7    could not come back to school until the 11th?
8    A.   I did tell her that on the phone.
9    Q.   Okay.  I have no further questions.
10        MR. KRAMER:  I have no questions.
11        MR. KELIN:  Thank you.
12        THE WITNESS:  Thank you.
13        MR. KRAMER:  Thank you.
14        (The proceedings were concluded at
15   2:44 p.m.)

1    COUNTY OF LANCASTER         :
                                  SS
2    COMMONWEALTH OF PENNSYLVANIA:
3         I, Brenda S. Hamilton, a Notary Public,
4    authorized to administer oaths within and for the
5    Commonwealth of Pennsylvania, do hereby certify that
6    the foregoing is the testimony of DEANN BUFFINGTON.
7         I further certify that before the taking of
8    said deposition, the above witness was duly sworn,
9    that the questions and answers were taken down
10   stenographically by the said Reporter-Notary Public,
11   approved and agreed to, and afterwards reduced to
12   print by means of computer-aided transcription under
13   the direct supervision of the said Reporter.
14        I further certify that I am not a relative
15   or employee or attorney to any of the parties, and am
16   not financially interested, directly or indirectly,
17   in this action.
18        I further certify that the said deposition
19   constitutes a true and correct record of the
20   testimony given by the said witness.
21        In testimony whereof, I have hereunto
22   subscribed my hand this____day of_____, 2008.
23
                              _____
                              Brenda S. Hamilton, RPR
24                            Reporter-Notary Public
     My Commission Expires:
25   May 27, 2011



Thursday, May 04, 2006

So... Updates!!!!!
Current mood: 😕 dorky
Category:

Updates:

First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop that low as to mess with my future. So, bring on the love! I figure a couple students will actually send me a message when I am no longer their offical teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)?

DEPOSITION
EXHIBIT
Buffington #  1
BH 3 27-08

## Deann Buffington

**From:** Deann Buffington

**Sent:** Tuesday, May 09, 2006 11:04 AM

**To:** Nicole Reinking

**Cc:** Kim Seldomridge; 'jbgseg@highstream.net'

**Subject:** RE: Professionalism/Behavior

Good job delineating the problems, Nikke! I know that this took time. Thanks for taking care of it promptly

-----Original Message-----
**From:** Nicole Reinking
**Sent:** Monday, May 08, 2006 6:05 PM
**To:** Kim Seldomridge; jbgseg@highstream.net; Deann Buffington
**Subject:** Professionalism/Behavior

Kim, Barry, and Deann,

Attached please find a Word document that lists some examples of the problems I encountered throughout the school year with my student teacher. If you require additional information, please let me know.

Thank you for your time and your support, Nicole Reinking



DEPOSITION
EXHIBIT
Buffington #2
GH 3-27-68

**CVSD** 185

**Unprofessional Behavior/Performance in the Classroom**

Miss Snyder played a song for background music during one of her first lessons that included profane language. She seemed to be oblivious to the words, so after hearing the first then the second word, I quickly walked over to stop the music.

On February 15, 2006 (with her supervisor in the room), Miss Snyder gave an account of her Valentine's Day with her boyfriend, ex-husband, and children that made me and the students feel very uncomfortable.

Several times in class, the students used foul language ("Shut the hell up!" one student said.) or discussed inappropriate weekend behavior without reprimand from Miss Snyder.

Twice in class—even after I advised her not to the first time—Miss Snyder used "Shut up!" as a means to gain her students' attention. This, unfortunately, led the students to use this phrase to gain the attention of classmates during lessons.

Twice I warned Miss Snyder to avoid Myspace.com discussions with her students and to avoid looking up student accounts or corresponding with students on the website. I could not have been clearer. On Friday, May 5, during class, Miss Snyder asked a few students in her class if they were on her Myspace account. She explained that a friend said that one of her (Miss Snyder's) students (fitting their description) stopped her in the mall and said, "I recognize you from Miss Snyder's Myspace account." After this, of course, a colleague of mine found and shared Miss Snyder's Myspace account with me. A copy of some of the account's content is included.

Frequently, Miss Snyder went above me for answers to issues concerning my classroom or her time at C— even after I explained the appropriate chain of command. Instead of asking me, she decided to ask the assistant principal for a key to my classroom. Also, she asked my department supervisor, instead of asking me, if she could remain at CV after she graduated to continue teaching my senior courses.

As far as professional dress is concerned, I needed to inform Miss Snyder that flip-flops are not professional attire. She was also overly eager to wear jeans and dress down at any and all opportunities; however, she has not made the required donations to participate in the dress down days (to CVEA in support of our scholarship fund and to the Wellness team).

Oftentimes, criticism of Miss Snyder's lack of professionalism came to me from my colleagues at CV, to which I could only apologize on her behalf. One staff member noted that when Miss Snyder observed her class that she sat in the back of the room and scanned her textbook to plan for her next block's lesson instead of observing the teacher's interactions with the class. Many staff members have commented to me that Miss Snyder's forwardness with staff or lack of attention to procedure demonstrated her inability to observe professional boundaries.

Additionally, Miss Snyder asked to leave for an 11:30 doctor's appointment on May 8; however, a department colleague informed me that she overheard Miss Snyder making the appointment with the doctor on her cell phone in the faculty lounge/prep room. According to this teacher, the appointment was clearly set for 3 p.m., which Miss Snyder definitely announced to a substitute teacher in the lounge.

## Deann Buffington

**From:** Stacy Snyder [ssmb112801@yahoo.com]

**Sent:** Wednesday, May 10, 2006 9:46 AM

**To:** Nicole Reinking, J Barry Girvin, Deann Buffington, judith wenrich@millersville.edu, Jane.Bray@millersville.edu; Kim Seldomndge

**Subject:** Formal Apology Letter

Dear Supervisors and Administrative Staff of Conestoga Valley High School and Millersville University:

I have enclosed a formal letter of apology that I hope you read and consider.

Thank you for your time and regret the circumstances which evolve it.

Sincerely,

Stacy L Snyder

Yahoo! Mail goes everywhere you do. Get it on your phone.

DEPOSITION
EXHIBIT
Buffington 43
BH 3-27-08

E-mail that I planned to send to the

In response to Stacy Snyder's letter, I need to state that this young woman, in my opinion, should not pass student teaching. Nicole Reinking has coped with a great deal this semester, and I have served as a confidante and advisor. Stacy's content knowledge, as is obvious from the numerous errors in this memo and letter because of her lack of knowledge about the English language, is one factor. In addition, her lack of professionalism, throughout her stay and most recently with her inappropriate actions, is another factor. Here at Conestoga Valley, if a teacher receives an unsatisfactory rating in the professionalism category on the state form, that teacher receives an unsatisfactory rating overall. It will be no surprise to me if our excellent teachers here at CV do not volunteer again to serve as cooperating teachers for Millersville students.

Deann Buffington, Supervisor of Communications

DEPOSITION
EXHIBIT
Buffington # 4
BH  3-27-08

Wenrich notes re: Stacy Snyder from conversation with Deann Buffington, Department Chair, 2/20/07

Academically, she was poor
No sense of the use of words
Without background knowledge
No sense of decorum
Her behaviors and interactions were beyond belief
English skills were very poor – the copy of the letter that she sent us afterward as an apology was not well written- you wouldn't think she was an English major
She misspelled Shakespeare on the board – it wasn't an oversight; she didn't know how to spell it
Her behavior was the straw that broke the camel's back
Appearance sometimes inappropriate
Her comments were way out of line
She encouraged students to get on and chat
She made derogatory comments about Nicole (co-op) and the school
There is no way that she should have a teaching certificate
She had negative interactions with many other staff members
After the MySpace incident, we met with Stacy (Barry Girvin, Nicole, and me)
We received a letter of apology from her – Well, it was intended as a letter of apology, but it also justified what she had done.
We wouldn't tolerate teachers who acted as she had; we wouldn't tolerate teachers with that lack of preparation
She was a complainer
She was given directions to speak with Nicole, but she would continue to come to me
I don't see how she could get a satisfactory rating
After this experience with Stacy, we didn't want to take Foundations Block students, Professional Block students, student teachers
We were very wary to get back on board placing MU students



**DEPOSITION EXHIBIT**
Buffington # 5
BH 3·27·08