**EXHIBIT F**



# SARGENT'S COURT REPORTING

## Quality Work. Quality People.

# Transcript of the Testimony of **Nicole Reinking**

**Date:** March 6, 2008

**Case:** Stacy Snyder v. Millersville University, et al.

Printed On: March 17, 2008

Sargent's Court Reporting Services, Inc.
Phone: 814-536-8908
Fax: 814-536-9814
Email: legaltrans@sargents.com
Internet: www.sargents.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \*

STACY SNYDER,                          \*

    Plaintiff                          \*

    v s .                              \*    No. 07-1660

MILLERSVILLE UNIVERSITY, \*

J. BARRY GIRVIN,                       \*

DR. JANE BRAY, and                     \*

DR. VILAS A. PRABHU,                   \*

    Defendants                         \*

\* \* \* \* \* \* \* \*

DEPOSITION OF

NICOLE REINKING

MARCH 6, 2008

Any reproduction of this transcript is

prohibited without authorization by the

certifying agency.

1    DEPOSITION
2        OF
3    NICOLE REINKING was taken on behalf of the
4    Defendant herein, pursuant to the Rules of Civil
5    Procedure, taken before me, the undersigned,
6    Susan Koons, a Court Reporter and Notary Public
7    in and for the Commonwealth of Pennsylvania, at
8    the law offices of Kegel, Kelin, Almy & Grimm,
9    LLP, 24 North Lime Street, Lancaster,
10   Pennsylvania, on Thursday, March 6, 2008, at
11   9:45 a.m.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    I N D E X
2
3    WITNESS:  NICOLE REINKING
4    EXAMINATION
5        by Attorney Kramer          7 - 187
6    EXAMINATION
7        by Attorney Voigt          187 - 288
8    RE-EXAMINATION
9        by Attorney Kramer         288 - 294
10   RE-EXAMINATION
11       by Attorney Voigt               295
12   EXAMINATION
13       by Attorney Litts          296 - 297
14   CERTIFICATE                          298

1        A P P E A R A N C E S
2
3    MARK W. VOIGT, ESQUIRE
4    Plymouth Meeting Executive Campus
5    600 West Germantown Pike
6    Suite 400
7    Plymouth Meeting, PA  19462
8        COUNSEL FOR PLAINTIFF
9
10   BARRY N. KRAMER, ESQUIRE
11   Senior Deputy Attorney General In-Charge
12   Office of Attorney General
13   Litigation Section
14   21 South 12th Street
15   Fourth Floor
16   Philadelphia, PA  19107
17       COUNSEL FOR DEFENDANT
18
19   JEFFREY D. LITTS, ESQUIRE
20   Kegel, Kelin, Almy & Grimm, LLP
21   24 North Lime Street
22   Lancaster, PA  17602-2913
23       COUNSEL FOR NICOLE REINKING
24
25

1                    EXHIBIT PAGE
2
3                                          PAGE
4    NUMBER  DESCRIPTION              IDENTIFIED
5    CV-1   Student Teaching Background
6           Information                    21
7    CV-2   Ms. Reinking's notes about
8           Stacy Snyder                   51
9    CV-3   Mid-Evaluation (Reinking)     131
10   CV-4   Self-Evaluation (Snyder)      134
11   CV-5   Stacy Snyder resume           140
12   CV-6   Deann Buffington e-mail       155
13   CV-7   Stacy Snyder letter           171
14   CV-8   Final Evaluation (Reinking)   173
15   CV-9   Series of e-mails             184
16   CV-10  Wenrich Notes                 187
17
18
19
20
21
22
23
24
25

```
 1            OBJECTION PAGE
 2
 3   ATTORNEY                          PAGE
 4   Voigt        126, 144, 160, 165, 169, 174,
 5                175, 183, 290, 292, 293, 294,
 6                                          295
 7
 8   Kramer       244, 246, 248, 249, 250, 251,
 9                256, 257, 258, 259, 263, 271,
10                273, 280, 282, 284, 288
11
12   Litts                                 266
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1            P R O C E E D I N G S
 2   -----------------------------------------------
 3   NICOLE REINKING, HAVING FIRST BEEN DULY SWORN,
 4   TESTIFIED AS FOLLOWS:
 5   -----------------------------------------------
 6   EXAMINATION
 7   BY ATTORNEY KRAMER:
 8   Q. Good morning, Ms. Reinking. My name is
 9   Barry Kramer. I am the attorney for the three
10   Millersville Defendants in this lawsuit, which
11   is captioned Stacy Snyder versus Millersville
12   University. Today I'm going to be taking your
13   deposition. Do you know what a deposition is?
14   A. Yes.
15   Q. What do you think is going to happen now, so
16   we can ---?
17   A. You will ask me questions to clarify or
18   elaborate the case, and it's sworn testimony and
19   it's admissible in Court.
20   Q. You've been prepared well. Excellent. Let
21   me give you some additional instructions beyond
22   that. If I ask you a question that you don't
23   understand, please tell me and I'll try to
24   clarify it. Sometimes my voice drops, I don't
25   speak clearly. If you don't understand the
```

```
 1   question, let me know. If you do answer the
 2   question, I'll assume that you're answering the
 3   same question. Please answer the questions as
 4   fully and completely as you can. Give your
 5   Counsel time after I ask a question. He may
 6   wish to object to one of my questions, and then
 7   he will advise you if you should answer.
 8   If you have any questions generally during
 9   the deposition, if you need to take a break for
10   any reason, please let us know. This is very
11   informal and certainly nobody should be
12   uncomfortable. Finally, your answers have to be
13   verbal, so a shake of the head or a nod won't
14   suffice. It's got to be a verbal answer, a yes,
15   a no, something that the court reporter can
16   transcribe. Do you understand these questions
17   --- these ---?
18   A. Yes, I do.
19   Q. Okay. Thank you very much. Let's start
20   with this. Ms. Reinking, tell me a little bit
21   about your education, starting with college.
22   A. I attended Millersville University and
23   graduated in May of 2001 with a Bachelor of
24   Science in Education degree in English, and
25   began teaching at Conestoga Valley High School
```

```
 1   in August of 2001 and have been employed there
 2   since.
 3   Q. Okay.
 4   A. And while I was there, I obtained a Master's
 5   degree in education from Wilkes University.
 6   Q. When you were at Millersville, did you have
 7   an opportunity to meet or work with Barry
 8   Girvin?
 9   A. No.
10   Q. How about Jane Bray, did you meet her?
11   A. No.
12   Q. Judy Wenrich?
13   A. No.
14   Q. Do you have tenure at Conestoga Valley?
15   A. Yes.
16   Q. And after how many years does one get
17   tenure?
18   A. Three years.
19   Q. So you've been at Conestoga Valley High
20   School since August of 2001?
21   A. Correct.
22   Q. Tell me what you've been teaching there
23   since.
24   A. Sure. For my first three years I taught two
25   levels, traditional and technical, of
```

1  tenth-grade English. And I also taught
2  journalism, which is a semester-long writing
3  elective, and creative writing, and that's a
4  quarter-length class. And then I picked up
5  senior British literature and taught both levels
6  of that for --- I've been teaching that --- I
7  think I'm in my fourth year. And I've also
8  taught advanced composition. I think that's it.
9  **Q. When did you first start supervising the**
10  **student teachers at Conestoga Valley High**
11  **School?**
12  A. My fist and only experience with a student
13  teacher was the spring of 2006.
14  **Q. And you haven't had a student teacher since**
15  **then?**
16  A. No.
17  **Q. Is there a reason for that?**
18  A. No. I just haven't signed up for one. I
19  have had other --- there are, you know, junior
20  block placements.
21  **Q. What's that? What's a junior block**
22  **placement?**
23  A. It's the experience that a pre-service
24  student teacher has prior to --- usually prior
25  to his or her semester of student teaching.

1  and desire to teach.
2  **Q. And when you were a junior block teacher,**
3  **how many hours did you teach?**
4  A. Oh, gosh.
5  **Q. Approximately.**
6  A. Hours is tough. I could probably say how
7  many full blocks of teaching maybe I had.
8  **Q. Okay.**
9  A. Probably --- I probably taught two days of a
10  full day, so maybe six total blocks.
11  **Q. The junior block teacher stays in one**
12  **classroom during the junior block semester or**
13  **goes to different classrooms?**
14  A. One is placed with one teacher, a
15  cooperating teacher, but is out observing other
16  teachers in other classrooms.
17  **Q. So it sounds as if, you know, the majority**
18  **of the assignment, the majority of the work that**
19  **the junior block teacher does is simply**
20  **observing other teachers?**
21  A. More so, yes.
22  **Q. You said that Stacy Snyder was your first**
23  **and only student teacher assigned to you ---**
24  A. Correct.
25  **Q. --- at Conestoga Valley. Since she was your**

1  It's a comparable but shorter placement and less
2  requirements placed on the pre-service teacher.
3  **Q. Okay. Junior block lasts how long?**
4  A. I think they're required to perform 35 hours
5  in a classroom.
6  **Q. During the course of a semester?**
7  A. Uh-huh (yes), while they're taking
8  coursework at Millersville simultaneously.
9  **Q. And junior block students --- is that what**
10  **they're called? Junior block teachers, ---**
11  A. Right.
12  **Q. --- what do they do in the classroom?**
13  A. They spend more time observing a variety of
14  teachers, preparing documents for Millersville.
15  I'm not exactly sure. And I don't completely
16  remember because I was a junior block student at
17  Millersville.
18  **Q. Okay.**
19  A. But they also are expected to teach some
20  lessons.
21  **Q. All right. Approximately how many hours**
22  **does a junior block teacher actually teach in a**
23  **classroom?**
24  A. I think that varies. It just depends on the
25  candidate's comfort level and prior experience

1  **first student teacher, do you think that**
2  **impacted the way you dealt with her during the**
3  **semester?**
4  A. To some degree, probably. That's kind of a
5  difficult question to answer because I haven't
6  had another one, so I can't compare.
7  **Q. Okay.**
8  A. But I'm sure, you know, I spent more time
9  consulting with experienced teachers and with
10  her supervisor.
11  **Q. Okay. And who did you consult with within**
12  **Conestoga Valley?**
13  A. I would ask other professionals I respected,
14  maybe colleagues within my department who have
15  had multiple student teachers. But most
16  predominantly probably my supervisor, Mrs.
17  Buffington ---
18  **Q. Okay.**
19  A. --- and Mr. Garbone (phonetic) also.
20  **Q. Mrs. Buffington, what's her title?**
21  A. She is the supervisor of the Communications
22  Department.
23  **Q. Is that somewhat larger than the English**
24  **Department, I mean, or is it the same --- just**
25  **another name for the English Department?**

4 (Pages 10 to 13)

1  A. It is, but it includes reading.  The reading
2  teachers as well fall under the English
3  Department, so it opened up the name.
4  **Q. Okay.  What are the tools of the teaching**
5  **trade, currently?  When I went to school, they**
6  **were, I suspect, far limited than what they are**
7  **now.  What are they now?**
8  A. Tools?
9  **Q. Pens, pencils, DVD, that kind of stuff.**
10  A. Yeah, pens, paper, DVD players, VHS players,
11  projectors, smart boards, laptops, you know,
12  wireless labs.
13  **Q. It's certainly very different than when I**
14  **went to school.**
15  A. Yes.
16  **Q. What's a ---**
17  A. Smart board?
18  **Q. --- smart board?**
19  A. It's like an interactive large board that
20  you can project the image from your computer
21  screen on, and then it's touch capable.  So you
22  can actually operate the computer screen from a
23  touch screen.  Does that make sense?  So I can
24  navigate web sites actually touching this large
25  screen so that the students can see it

1  displayed.
2  **Q. It sounds like a very sophisticated version**
3  **of what we used to use called overhead**
4  **projectors, but can do much more.**
5  A. Right.  Right.  They've made them obsolete
6  for the most part.
7  **Q. And those tools that you've just described,**
8  **have you used those while teaching?**
9  A. Yes.
10  **Q. And did Conestoga Valley supply any of these**
11  **tools to Ms. Snyder when she was teaching?  Were**
12  **they in your classroom, these tools?**
13  A. That's tough to say.  We've gotten a lot of
14  the technology since she would have student
15  taught.  That was three --- two years ago?  I
16  might have had a board in my room, but not
17  operational and not the one that I'm currently
18  using.  I don't think I did, though, if that's
19  acceptable.  I don't remember.
20  **Q. Whatever these tools that you --- that Ms.**
21  **Snyder used in your classroom, did Conestoga**
22  **Valley supply them to her?**
23  A. Yes.
24  **Q. Where did her teaching take place?  In your**
25  **classroom?**

1  A. Yes.
2  **Q. And that's at Conestoga Valley High School?**
3  A. Correct.
4  **Q. She was your student teacher for how long?**
5  A. From mid-January until the first week of May
6  of 2006.
7  **Q. Did you have the authority to assign her**
8  **additional projects within the student teaching**
9  **context?**
10  A. Not outside the realm of what a student
11  teacher is expected to do as set forth by
12  Millersville University.
13  **Q. Well, certainly she wouldn't get your**
14  **laundry?**
15  A. Oh, no.
16  **Q. But in terms of activities around the**
17  **school ---?**
18  A. No.
19  **Q. Okay.  All right.  Do you know if Conestoga**
20  **Valley insures student teachers?**
21  A. Insures?
22  **Q. Uh-huh (yes), for liability insurance.**
23  A. No.  I don't believe so.  I think that ---
24  you're recommended in college to join the union,
25  the student version of the union, to SPSEA.  I'm

1  not sure if she had an affiliation with them or
2  not.
3  **Q. Okay.  What calendar does the student**
4  **teacher follow at Conestoga Valley?**
5  A. The teacher's calendar.
6  **Q. Your calendar?**
7  A. Uh-huh (yes).
8  **Q. And how about the daily schedule, which one**
9  **would Stacy Snyder have followed?**
10  A. The teacher's daily schedule, not the
11  students'.
12  **Q. Not the Millersville?**
13  A. Not a student at Conestoga Valley's, but a
14  teacher's daily schedule.
15  **Q. Was she supposed to sort of follow you**
16  **around, you know, during the day?  I mean, how**
17  **does that work?  What's your physical**
18  **relationship with her during the beginning of a**
19  **school day?**
20  A. Sure.  Yes.  She would have been right there
21  with me.  Millersville requires them to attend
22  everything that a teacher attends, so a faculty
23  meeting, department meetings.  I'm not sure what
24  else would happen.
25  **Q. An IEP meeting?**

1  A. I'm not so sure that she would be there
2  because of the confidentiality of the nature,
3  but I think sometimes student teachers are
4  there.
5  Q. Okay. How about parent/teacher conferences,
6  would she attend those?
7  A. Yes.
8  Q. How about open houses?
9  A. Yes.
10  Q. And I think you said you attended faculty
11  meetings?
12  A. Uh-huh (yes). Yes.
13  Q. Would she attend faculty inservice meetings?
14  A. Yes.
15  Q. Was she expected to be in the classroom
16  whenever Conestoga Valley was in session?
17  A. Yes.
18  Q. So whenever you were there, she was supposed
19  to be there?
20  A. Correct.
21  Q. What else does a student teacher do at
22  Conestoga Valley in addition to student teaching
23  in a classroom?
24  A. Any projects or components that Millersville
25  expects them to do. So I think she had a

1  checklist of projects outside of just her
2  student teaching placement that she needed to
3  complete. But that would have been supervised
4  by Mr. Girvin. I wouldn't have had any role in
5  that.
6  Q. Okay. Does a student teacher get assigned a
7  cafeteria duty?
8  A. She would be anywhere that I would be. So
9  If I had been assigned to cafeteria duty, Stacy
10  would have gone to cafeteria duty.
11  Q. And what are the kind of duties, I just
12  don't remember, that you would have to do as a
13  teacher, in addition to teaching?
14  A. Bus duty. We don't have a lot of duties,
15  though, outside of that. There might --- the
16  occasional, you know, they need somebody with
17  hall monitoring or, you know, kind of helping
18  with --- during your planning period, you might
19  have to help with various events or activities
20  that are occurring at the high school that day.
21  But it would be sporadic, spontaneous kind of
22  events.
23  Q. Athletic events, too?
24  A. No. You can just attend those if you want
25  to.

1  Q. Do you know if Conestoga Valley arranged
2  transportation for Ms. Snyder to and from
3  school?
4  A. She did not --- or they did not.
5  Q. Did you have any role in the selection of a
6  student teacher in that semester?
7  A. No.
8  Q. So how was it that you came to get a student
9  teacher, Stacy Snyder?
10  A. I understand it to be randomly assigned,
11  that the student teacher candidates, you know,
12  an indication --- they're allowed to suggest a
13  preference for high school or middle school and
14  probably within the county, within Lancaster
15  County. But beyond that, it's a random
16  assignment process.
17  Q. Within a given school, you're saying?
18  A. Yes. Oh, yes.
19  Q. Is Ms. --- and you may not know this, is Ms.
20  Buffington involved in the selection of a
21  student teacher for Conestoga Valley High
22  School?
23  A. I don't believe so. I think that comes
24  through our district office, but I'm not
25  positive.

1  Q. I want to show you a document which is
2  actually in front of you. Maybe you can take
3  off the clip. And the first document, which
4  we're going to mark as CV-1, it's a three-page
5  document. If you'd please look at that.
6  (CV Exhibit One marked for
7  identification.)
8  OFF RECORD DISCUSSION
9  BY ATTORNEY KRAMER:
10  Q. Have you seen this document before?
11  A. Yes.
12  Q. And tell me what it is.
13  A. It's the background information for student
14  teaching that the student teacher fills out for
15  Millersville and then is mailed out to the
16  assigned placement teacher.
17  Q. So when did you receive this document?
18  A. Prior to her --- prior to making contact
19  with her. So I think I probably received it in
20  November or December of 2005.
21  Q. On the last page, at the very bottom, it
22  says, please read and sign. And then it says, I
23  understand, as a student teacher, I am
24  representing Millersville University, and I am a
25  guest in the host school. I understand that I

1    **am subject to the rules and regulations in the**
2    **school district to which I am assigned.  Do you**
3    **know what rules and regulations of the school**
4    **district refer to?  For example, this is the**
5    **Conestoga Valley Professional Handbook.**
6    A. Uh-huh (yes).
7    **Q. Are these the rules and regulations that**
8    **this refers to, if you know?  If you don't**
9    **know, ---**
10   A. I would assume so, ---
11   **Q. --- then you don't.**
12   A. --- but I don't know for sure.
13   **Q. Okay.**
14   A. The language is a little bit vague there,
15   but that's probably because Millersville is
16   dealing with so many school districts.
17   **Q. Are there certain rules and regulations that**
18   **you, as a teacher, are expected to adhere to?**
19   A. Sure.
20   **Q. And where are those found?**
21   A. In the Professional Handbook, in the
22   Professional Code of Conduct for Educators.
23   **Q. Okay.  And where --- that, meaning the**
24   **one --- the regulations ---**
25   A. Yes.

1    **Q. --- you're referring to?**
2    A. Yes.  Uh-huh (yes).
3    **Q. Okay.**
4    A. That all teachers in Pennsylvania --- I
5    believe it's Pennsylvania.  I don't think it's a
6    national document, but it might be, are subject
7    to and for certification through the state.  And
8    also a union contract is probably --- has some
9    rules and regulations for teachers as well, as
10   for union members, though.
11   **Q. For you personally, though, as a tenured,**
12   **full-time teacher there, for guidance as to**
13   **rules and regulations, is the Conestoga Valley**
14   **School District Professional Handbook your**
15   **primary source, would you say, for guidance?**
16   A. Yes.
17   **Q. Tell me about when you first met Stacy**
18   **Snyder.**
19   A. My first meeting would have been, I think,
20   in early January, probably after the holiday.
21   It would be a couple weeks before she was
22   assigned for her placement, probably while she
23   was on break from Millersville University,
24   between sessions.  And she came to the high
25   school, and I took her on a tour of the building

1    and sat down with her and gave her some of the
2    documents that she would need to teach the
3    content at my school.
4    **Q. And for example, what documents did you give**
5    **her?**
6    A. Well, first of all, she would have received
7    a textbook, a teacher's textbook, and she would
8    have received a planned course of what is
9    expected to be taught in the 18 weeks of a
10   semester.  She would have received --- let's
11   see, what else would I have given her, the final
12   exam for the course.  I know that, in addition,
13   I had typed up --- I since can't find it because
14   we've switched computers at our school.  I had a
15   checklist of everything that I needed to go over
16   with her at that meeting.  So I would have gone
17   over procedures and the school calendar and
18   basically anything that an entering student
19   teacher would need to know to be placed with me.
20   **Q. Did you give her the entire --- all the**
21   **documents reflecting the content of the**
22   **semester?  It was a British literature course?**
23   A. Correct.  Yes, she would have had anything
24   that she needed prior to entering.  She would
25   have gotten --- received more documents from me

1    when she arrived.  But this was to allow her to
2    familiarize herself with the works, to ask me
3    questions ahead of time, to start --- we
4    probably figured out maybe what her opening unit
5    would have been, so that we can enter into a
6    dialogue before she came, so that she could be
7    prepared to teach.
8    **Q. All right.  And how did that conversation go**
9    **between the two of you?**
10   A. Very well.
11   **Q. She seemed pleasant?**
12   A. Yeah.  I assumed that she was very eager and
13   excited to student teach, as most student
14   teachers are.  And she expressed her desire to
15   just get in there and get in front of students
16   and, you know, have fun and teach.
17   **Q. Describe to me sort of generally your role**
18   **as the supervising teacher vis-à-vis the student**
19   **teacher during the semester.**
20   A. My role is to act as a coach, a guide,
21   somebody to help her figure out maybe the best
22   teaching practices, not necessarily ---
23   Millersville should have done its job up to that
24   point as far as content is concerned, but there
25   might have been some content requirements that I

7 (Pages 22 to 25)

## Page 26

```
 1   needed to kind of fill in some gaps for her or
 2   suggest that she needed to fill in the gaps
 3   herself.  But my role was to help her become a
 4   facilitator of information in front of students.
 5   Q. And did you at times find that her content
 6   knowledge was lacking?
 7   A. Yes.
 8   Q. Please describe.
 9   A. It was --- well, as indicated by this
10   background of student teaching information, I
11   would have looked at this and I would have
12   looked to see what courses that she took, and I
13   would have had the advantage, having been a
14   Millersville student myself and knowing what
15   would have been taught in those various courses.
16   So I think that's why you probably see some
17   stars ---
18   Q. Yes.
19   A. --- next to some of the courses because I
20   knew that they would apply specifically to what
21   we were teaching, in addition to other courses
22   that were listed here.  And I had noted that
23   there was not a specific course in British
24   literature at that point.  So I spent the --- I
25   spent my time with Stacy being very surprised by
```

## Page 27

```
 1   her lack of content overall, just general
 2   content as far as punctuation, grammar,
 3   mechanics, spelling, vocabulary, just knowledge
 4   of words, base knowledge of just English
 5   literature, poetry, Shakespeare, Chaucer.
 6   Q. The course that she was student teaching was
 7   called British Literature?
 8   A. Technically on the course books, I'm sure
 9   it's called Traditional English IV, but the
10   course is British Literature.
11   Q. And does that mean you'd focus exclusively
12   on the literature of England as opposed to --- I
13   mean, you'd focus on, you know, literature from
14   Wales or Scotland and England as opposed to, you
15   know, just English literature?
16   A. Correct.
17   Q. How was she on knowledge of English
18   literature?
19   A. Fairly --- I think she admitted that that
20   would be, obviously, a challenge for her because
21   she hadn't necessarily studied --- taken a
22   course specifically on that, not that there
23   necessarily are courses at Millersville that are
24   just called British Literature.  And she should
25   have gotten a lot of the history as far as
```

## Page 28

```
 1   Shakespeare, Chaucer.  Those are right in line
 2   with what we would have been teaching, but she
 3   expressed some concern that she was going to
 4   have to do some work to get ready to teach it,
 5   but that she, you know, had taken the coursework
 6   and she thought that this would be a new
 7   challenge for her.
 8   Q. On the page that you're looking at in CV-1,
 9   on the third page, it says --- somebody wrote in
10   handwriting, no Brit lit, question mark.  Is
11   that your handwriting?
12   A. Yes, it is.
13   Q. And when did you write that?
14   A. Prior to meeting Stacy, when I would have
15   received this document.
16   Q. And what does that reflect?
17   A. That would have been indicating to me that I
18   wanted to ask her or have a discussion with her
19   about, you know, what was her experience with
20   British literature up to that point.  I wouldn't
21   have been familiar with her junior block
22   placement prior to student teaching, so I'd like
23   to know what kind of courses she had taught or
24   what kind of background knowledge she had as far
25   as British literature or English literature
```

## Page 29

```
 1   goes.
 2   Q. And did you and she discuss the courses that
 3   she had taken or the courses that she hadn't
 4   taken to prepare her for student teaching?
 5   A. Yes.
 6   Q. And what was that?  What was the discussion?
 7   A. It pretty much pertained to the courses that
 8   were listed here.  And as a Millersville alumni,
 9   I probably would have, you know, wondered who
10   she had for the different courses and what she
11   thought of them and just kind of a light
12   conversation, I'm sure.
13   Q. She had Shakespeare, a course ---
14   A. Yes.
15   Q. --- in Shakespeare?  And is that, I guess
16   star next to the word Shakespeare?
17   A. Yes.
18   Q. Did you write that?
19   A. I believe so.
20   Q. And there's a star next to Chaucer?
21   A. Yes.
22   Q. Did you write that?
23   A. Yes.
24   Q. And there's also a star next to advanced
25   composition?
```

1 A. Correct.

2 **Q. And why did you star those courses?**

3 A. Because I knew that they would be some of

4 the opening units that we would --- because it's

5 a survey course, we work our way chronologically

6 through British history and British literature.

7 **Q. Would you start with Beowulf?**

8 A. We start with --- yeah, with Anglo-Saxon

9 literature, typically. But I believe that when

10 Stacy student taught, we attempted to begin with

11 something that she felt a little bit more

12 comfortable with, which she had an entire course

13 on poetry. So we opened with a survey of

14 British poetry throughout the timeline. And I

15 think --- I'm pretty sure we might have opened

16 with Beowulf, but her first actual unit would

17 have been teaching poetry because it was a

18 strength of hers.

19 **Q. Are you saying that you accommodated the**

20 **teaching schedule of your students to Stacy's,**

21 **in this case, strength?**

22 A. Completely and throughout the placement.

23 **Q. If you could describe that a little more,**

24 **please, how you accommodated your class to her**

25 **needs.**

1 one of those units successfully.

2 So we allowed Stacy to come up with her own

3 unit that she could teach that mirrored one of

4 her courses at Millersville, a unit that she ---

5 the seminar in teaching writing, that she would

6 have worked through as a student herself so she

7 could use some of the same documents and apply

8 some of the same methods and use that to work

9 with these advanced composition students. So

10 they actually completed a unit that wasn't part

11 of what was technically in the curriculum for

12 advanced composition.

13 **Q. And advanced composition is a writing**

14 **course?**

15 A. Yes.

16 **Q. There's no --- you're not focusing on the**

17 **content of poetry or ---**

18 A. Not at all.

19 **Q. --- stories? And how was she in**

20 **composition?**

21 A. In terms of teaching or in her own

22 composition?

23 **Q. Well, first in terms of her own composition?**

24 A. There were glaring errors.

25 **Q. Such as?**

1 A. Sure. Well, as I said, we would have

2 started with poetry, maybe worked a little bit

3 out of order, out of sequence, from what we

4 would usually do. But that wouldn't have, you

5 know, affected anything. I starred advanced

6 composition because that was the third course.

7 There were two British literature courses

8 and then an advanced composition course that she

9 would have become responsible for in assuming

10 the full teaching load, which would have been

11 the first nine weeks of the semester. And

12 quickly we realized --- I realized Stacy's

13 weaknesses, expressed my concern as far as

14 content is concerned in grammar, mechanics,

15 organization, punctuation, just all writing

16 conventions basically, and knew that she would

17 be --- she would be working with students who

18 were --- who could far outpace her as far as

19 advanced composition goes.

20 So I worked with my supervisor in order to -

21 -- actually I just asked her if this would be

22 okay. It's my first time teaching advanced

23 composition. I'm familiar with what's expected

24 to be taught during those nine weeks. However,

25 I don't think that Stacy will be able to teach

1 A. Just in her writing on the board, there

2 would be mistakes in punctuation and spelling,

3 and the students would note those errors and

4 point them out to her. So she didn't actually

5 ever know that they were errors. Or I would

6 point the errors out to her. The wasn't

7 familiar with them. In her e-mails, in her

8 written communication, they would be riddled

9 with errors. In her handouts to the students,

10 there would be mistakes.

11 **Q. Mistakes such as?**

12 A. Spelling, usage, misusing words, clearly not

13 being familiar with what --- the meaning of a

14 word's definition.

15 **Q. You said the students would point these**

16 **errors out to her?**

17 A. (Indicates yes).

18 **Q. That's a yes?**

19 A. Yes.

20 **Q. How would they do that?**

21 A. They would just call out probably or maybe

22 raise their hand and say, do you realize that,

23 you know, that you're --- there's no apostrophe

24 there, or that that's misspelled, or that that's

25 the wrong word, or et cetera.

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    Q. And how would she react?

2    A. She would --- well, I don't know. She

3    would ---.

4    Q. What did you see?

5    A. Sometimes she would defend the error and try

6    --- because I guess, I'm making an assumption,

7    but maybe she didn't want to lose standing in

8    front of the class, so she would actually try to

9    argue the error. And then sometimes I would

10   have to step in and explain to her that the

11   students were right and that she was actually

12   wrong, or sometimes I could wait and just

13   explain it to her after class. Occasionally I

14   could catch her before the students even noticed

15   the mistakes in the handouts or written on the

16   board so to avoid that embarrassment.

17   Q. These are 12th-grade students?

18   A. Correct.

19   Q. Are they college prep?

20   A. The one class would have been a traditional

21   course, which is college preparatory, college

22   bound. And the other course is called

23   technical, but that technical track could be

24   college bound. It could be technical, like

25   vocational school, you know, that type of

1    college bound.

2    Q. These are pretty bright kids for --- pretty

3    bright 17 and 18-year-olds, it sounds like.

4    A. Bright, some of them, certainly. Certainly

5    average at least.

6    Q. Okay. All right. When you looked at the

7    courses she had had and spoke with her about her

8    education, were there specific areas, content

9    areas, that she was definitely lacking in,

10   something more precise than no British

11   literature?

12   A. When she did the poetry unit, she would have

13   been weak as far as just literary devices are

14   concerned, what they mean.

15   Q. Define literary devices.

16   A. Like alliteration within a poem. She would

17   have --- I'm not sure that that's necessarily

18   one that she had a problem with, but she would

19   have, you know, not been quite sure how to

20   explain to the students where alliteration

21   occurs in the line of a poem or what it actually

22   means or to be able to provide examples to

23   clarify for the students when they were

24   confused. But not necessarily alliteration, as

25   I said.

1    Q. I seem to recall there was an issue with

2    metaphors on one of the pages you wrote?

3    A. Most likely. If I note: 'I, absolutely.

4    Q. All right. Any other content areas that,

5    from the get go, you noticed she was weak in?

6    A. Well, I hate to keep harping on the writing

7    and grammar usage, mechanics, but that's such a

8    large part of being an English teacher and

9    trying to help students improve their writing.

10   I remember asking her to ask me for help. You

11   know, suggesting like, if you're about to teach

12   something or if you don't understand something,

13   I feel very comfortable with this content area

14   and I serve --- you know, I help people in my

15   department, actually.

16   You know, I tried to make it clear to her

17   that sometimes we can't know everything, so you

18   just go to somebody who's a little bit more of

19   an expert and you would ask them for advice, and

20   that's my role as her cooperating teacher. And

21   she never asked me for help, and I thought that

22   was strange.

23   And then I even went as far as to give her a

24   grammar and composition textbook that we

25   wouldn't have used with the students in my

1    courses, but that other teachers might have used

2    in the past and gave her the teacher's version

3    of it, so it would have the answers, and just

4    suggested that she work through some of these

5    exercises and units to build her skills.

6    Q. Did she, as far as you know?

7    A. As far as I know, no.

8    Q. Did you offer her, other than that, any

9    other books to read on content, for example,

10   19th century poetry, literature, whatever,

11   whatever you guys teach?

12   A. Her textbook would have been sufficient

13   to be able to teach. It has all the answers in

14   it. It has suggestions. She had the teacher's

15   version of the textbook. So certainly she knew

16   --- and I can't quite remember, but she might

17   have borrowed from my library of books about the

18   story of Britain or, you know, just history

19   texts or further texts on writers.

20   Q. Okay. Let's talk about any other meetings

21   you had with her, conversations, before school

22   actually started. You mentioned one. That was

23   your first, you know, meet-and-greet, as it

24   were.

25   A. Uh-huh (yes).

10  (Pages 34 to 37)

1    **Q. Any other interactions with her before**
2    **school started?**
3    A. Face to face, not that I can recall. And
4    not that anything is standing out to me, because
5    it was two years ago, but I'm sure we would have
6    talked on the phone, probably. But I don't ---
7    you know, at least one phone call just to ---
8    obviously, to set up the meeting in person.
9    Other than that, I think we probably took care
10   of what we needed to at that meeting, and that
11   would be on the first day.
12   **Q. So the first day for her would have --- when**
13   **does --- you know, does school start right after**
14   **the new year?**
15   A. For me, yes, it would have begun on January
16   2nd at Conestoga Valley. At Millersville, she
17   would have begun with the spring semester.
18   However, the first, I think, two or three days
19   of their semester there in student teaching ---
20   I don't know what they would call them, where
21   all the student teachers come together and talk
22   about topics that are relevant and pertinent
23   and ---
24   **Q. Okay.**
25   A. --- meet their supervisors and address their

1    A. But for her first couple days, weeks, she
2    just --- the purpose is to ease her in.
3    **Q. And so how do you ease her in?**
4    A. I think the focus a lot of times for the
5    student teachers, and I think it was Stacy as
6    well, is to complete some of the Millersville
7    requirements, where you would observe some
8    students, shadow some students, observe some
9    teachers, kind of get familiar with the school
10   day, observe me a couple days, and then
11   gradually you begin to take over the classes.
12   **Q. Was the number of courses that you would**
13   **teach in spring 2006 the same number of course**
14   **that, say, you're teaching now, the number of**
15   **classes? I mean, how do you refer to that?**
16   A. Yeah. We're in a block schedule, ---
17   **Q. Okay.**
18   A. --- so each semester a teacher would teach
19   four --- there are four blocks in a day. A
20   teacher would be assigned to teach three blocks.
21   **Q. Okay.**
22   A. And that is the same.
23   **Q. Okay. And courses, blocks, refers only to**
24   **academic courses?**
25   A. No, they're just a block of time that the

1    concerns and questions. So she did that for
2    maybe two or three days before she came to
3    Conestoga Valley.
4    **Q. And do you recall what date she first came**
5    **to Conestoga Valley to teach?**
6    A. No. But I can guess that it would have been
7    the 17th, 18th, 19th, 20th, somewhere in that
8    range.
9    **Q. Of January?**
10   A. Of January.
11   **Q. All right. What were your expectations of**
12   **her on her first day at Conestoga Valley?**
13   A. Minimal. Just for her to --- I can't
14   remember if she actually came in on --- we had a
15   changeover day because our semester breaks right
16   around that time. So I don't --- I think maybe
17   her first day could have even been our
18   changeover day, which is an inservice day but
19   sort of an independent day for teachers to get
20   prepared for their new semester of students,
21   which would have been a very nice day for her to
22   start because there would have been no classes
23   held and it would have been an opportunity to
24   just get set up for the new semester.
25   **Q. All right.**

1    students are in a class for a semester. Unless
2    it's a quarter-long class, then they'd only be
3    in that class for nine weeks.
4    **Q. And the rest of the day, where are they?**
5    A. Well, the teacher --- the students have four
6    classes. Teachers are only assigned three
7    classes, because there's a planning period.
8    **Q. Right.**
9    A. So they would move through a four-period
10   day, where they'd see four difference teachers,
11   that's four different classes, and there'd be a
12   lunch period in there as well.
13   **Q. Okay. So if each class is 80, 90 minutes**
14   **long, you got four of those as a student, that's**
15   **320 minutes, approximately four hours. So they**
16   **have a lunch period and then gym, band, whatever**
17   **other activities?**
18   A. Outside the school day?
19   **Q. Well, I'm just talking about within the**
20   **school day.**
21   A. They would be held primarily within the
22   school day, within a block. You know, if you
23   have a phys ed class, it would be within one of
24   the blocks. There is an enrichment period at
25   the end of the day that is --- back then I think

11 (Pages 38 to 41)

```
 1    it would have been an hour long. Now it's 30
 2    minutes long, where students, like, go back
 3    through their day and have an opportunity for
 4    remediation with their teachers, talk PSSA
 5    remediation or instruction to prepare for the
 6    state tests.
 7    Q. So Stacy arrived physically in your
 8    classroom January 18th, 19th, around there?
 9    A. Correct.
10    Q. And you said then for a few weeks, two
11    weeks, she shadowed, she observed, engaged in
12    more passive activities?
13    A. Yes.
14    Q. So she would sit and observe you how
15    frequently during this period of time?
16    A. How frequently? All day, is that what you
17    mean?
18    Q. Yes. Yes. I mean, ---.
19    A. All day.
20    Q. Okay.
21    A. And then she would just kind of gradually
22    work up to teaching, maybe a small unit within a
23    block, you know, maybe not the entire block, and
24    then maybe take over one block, and then take
25    over a second block and then a third block.
```

```
 1    Q. When you say she would teach a small unit
 2    within a block, a block is 90 blocks long, ---
 3    A. Sure.
 4    Q. --- does that mean she would teach for 15
 5    minutes out of the 90 minutes?
 6    A. Correct.
 7    Q. And so if you're studying Beowulf in a given
 8    block --- a given block might have Beowulf. It
 9    also might have a section on composition, ---
10    A. Sure.
11    Q. --- a section on --- what else might be
12    there?
13    A. It could have a review. There could be a
14    game. There could be a test, a quiz. A writing
15    sample might be taken, a lecture, a discussion.
16    Q. So the intent was to start her off slowly;
17    right?
18    A. Correct.
19    Q. Had someone given you the instructions on
20    how to break in a student teacher?
21    A. There's no formal guideline for exactly how
22    it has to happen for each cooperating teacher
23    and for each student teacher. You kind of ---
24    every student teacher is different. Every
25    cooperating teacher is different. I know of
```

```
 1    colleagues who wouldn't let, you know, a student
 2    teacher teach for the first four weeks that they
 3    were there, you know. They wanted to make sure
 4    that that student teacher waited a while. And
 5    some teachers have a hard time giving over the
 6    classrooms or --- I mean, there's all kind of
 7    variables.
 8    Millersville doesn't set forth any definite
 9    policies about how and when that needs to take
10    place. I believe the only requirement is that,
11    ultimately, the student teacher needs to work
12    her way or his way up to teaching, I think it's
13    two full weeks or three full weeks of a course
14    load. I'm not positive.
15    Q. Okay. And that goal of two to three weeks
16    of a full course load, meaning a student teacher
17    is ultimately supposed to be able to teach three
18    blocks?
19    A. Correct, to run the full cycle of a
20    teacher's day ---
21    Q. Okay.
22    A. --- for at least two to three weeks.
23    Q. That's the goal?
24    A. Right. And most student teachers should go
25    well and above that.
```

```
 1    Q. During these initial several weeks, did you
 2    and Stacy talk about what she was seeing, what
 3    she was learning, what she was thinking?
 4    A. Yes.
 5    Q. And describe that, please. Describe your
 6    interactions before she actually began to teach.
 7    A. She was inquisitive, was probably eager to
 8    teach, as most student teachers are. And
 9    probably we would have just --- most of our
10    dialogue would have been talking about what her
11    actual first unit would have been, and when she
12    would have begun and when she would have
13    started, and what she was seeing when she was
14    out shadowing and observing other students, and
15    what she noticed about the students' in our
16    class strengths and weaknesses. So just
17    everything that is part of being a teacher in
18    that class period.
19    Q. Okay. What's the purpose of having the
20    student teacher shadow students?
21    A. They're expected to follow --- I think they
22    --- I'm not sure what Millersville's requirement
23    is, but you're supposed to pick a student, and
24    potentially it might even be a student who's
25    struggling or lacks motivation, and you're
```

12 (Pages 42 to 45)

```
1    supposed to see how that student operates in
2    four different periods, with four different
3    teachers and teaching styles, and be able to
4    make some kind of comments and observations
5    about that student from that perspective.
6    Q. So the student teacher basically shadows,
7    sticks with the student for the student's day?
8    A. Yes.
9    Q. And for how many days?
10   A. I think just one.  But there might be ---
11   the requirement might be to shadow two different
12   students for one day each.
13   Q. And did Stacy shadow one or more students
14   during these first couple weeks?
15   A. Yes.
16   Q. Do you remember how many she shadowed?
17   A. I think --- not exactly.  It was either one
18   or two for sure.
19   Q. And did she have any comments that she
20   shared with you about that experience?
21   A. I'm sure, not formally in a --- you know, in
22   a written format, but I believe she would have
23   turned that into her supervisor.  I'm sure there
24   was some written requirement.
25   Q. Did you discuss her experience?
```

```
1    A. Definitely.
2    Q. And describe that --- those interactions.
3    A. She would have had comments and things to
4    tell me that I wouldn't have been able to see
5    about that student.  And I would have maybe
6    taken something from it or learned something
7    from it or been able to offer, well, you know,
8    that student --- that's interesting that he did
9    so well in his wood tech class, you know, like
10   an industrial arts-type course, that obviously
11   fits that student's learning style as opposed to
12   sitting in an English class or --- we would have
13   talked about learning styles, modalities, ---
14   Q. During ---
15   A. --- from teachers.
16   Q. --- these initial few weeks, were any new
17   concerns about her competence to teach raised in
18   your head?
19   A. No.  Besides the content, you know, the
20   initial observations about a lack of content, I
21   don't think I would have had any concerns.  I
22   actually remember remarking to a colleague or
23   two that I was hoping to avoid any of the
24   problems that student teachers who are even more
25   --- 21, 22-year-olds, sometimes that they might
```

```
1    bring, that I was working with a --- I can't
2    remember.  She's about my age, so I think she
3    might have been 25 or 26 at the time of her
4    student teaching placement, so working with
5    somebody who would have been a more mature
6    student teacher and also a mom of two children.
7    So I remember saying this is going to be ---
8    this is going to be good.  She's probably going
9    to bring some of her mom classroom management
10   into her teaching practices, and hopefully we'll
11   be able to avoid a lot of the pitfalls that some
12   student teachers encounter.
13   Q. And what kinds of pitfalls are you referring
14   to?
15   A. That sometimes that there's a lack of
16   professionalism or observing boundaries between
17   students and teachers.  And it's not just
18   student teachers.  Obviously, some teachers have
19   those problems.  What other pitfalls?  Just
20   struggling keeping up, working other jobs in
21   addition to student teaching, having sports
22   commitments back at the university.
23   Q. So after these first few weeks are over,
24   then what happened with her student teaching?
25   What did you do?
```

```
1    A. She gradually begins to pick up the classes.
2    But I don't think I'll be able to cite exactly,
3    specifically --- I know that we would have begun
4    her with the traditional course, which is the
5    college-bound course, because it --- just
6    typically it tends to be an easier class to pick
7    up because of classroom management.  And that's
8    a general statement.  It's not always the case.
9    But we would have begun her with that course and
10   then gradually brought in the technical class
11   when she became comfortable with classroom
12   management practices or the content.  And then
13   we save that advanced comp course for last.
14   Q. Why?
15   A. Because that was the one that I was not sure
16   that my supervisor was actually going to allow
17   her to pick up as a student teacher, because we
18   had observed up to that point her lack of
19   content as far as advanced composition would
20   have been concerned.  But we were able to work
21   out, as I said earlier, some type of project to
22   allow her to fulfill that requirement.
23   But I also knew that in the next nine weeks,
24   while Stacy would have still been a student
25   teacher there, I was going to be giving a speech
```

13 (Pages 46 to 49)

Page 50

```
 1   course.  And that that would have been something
 2   that she could have fulfilled her full load, her
 3   full teaching load requirement for Millersville.
 4   She could have taught from the speech class.
 5   Q.  So in other words, you would be teaching a
 6   course in public speaking?
 7   A.  Correct.
 8   Q.  You said that initially her first class was
 9   college prep and that that was an easier class
10   to manage.
11   A.  Yes.
12   Q.  Explain that.
13   A.  Because the students just tend to not have
14   some of the same discipline problems or
15   attendance problems.  We see a lot of
16   absenteeism in the technical classes.  But it's
17   so general.  It's such a general statement.
18   It's not really necessarily always true.
19   Q.  Okay.  And so how did you ease her into
20   teaching?
21   A.  Just by setting up her for success by
22   letting her start with poetry and letting her
23   have that traditional course, and letting her
24   teach something that she felt very comfortable
25   with, and working with her on it ahead of time,
```

Page 51

```
 1   giving her some examples of things that I might
 2   have taught, how I would have done it, counseled
 3   with her what would be the best way to approach
 4   the content.
 5   Q.  And how frequently would you speak with her
 6   about her student teaching?
 7   A.  Every day, all day, you know, in between
 8   classes.  We would be constantly dialoguing.
 9   Whenever I wasn't teaching, obviously.
10   Q.  Okay.  Did you make notes that --- of your
11   observations of her student teaching?
12   A.  Yes.
13   Q.  And I'm going to --- you have in front of
14   you what's going to be the next document ---
15   skip that.  That's it.  Are those your notes?
16   A.  Yes.
17   Q.  All right.  Would you please look through
18   those pages and let me ---?
19   ATTORNEY KRAMER:
20   And let's mark this as CV-2.
21       (CV Exhibit Two marked for
22       identification.)
23   BY ATTORNEY KRAMER:
24   Q.  If you would look through that packet, it
25   starts --- and they're numbered CVSD2006, from
```

Page 52

```
 1   220 and then page 253.
 2   A.  Just to 220, not 222?
 3   Q.  I'm sorry, yes, 222.
 4   A.  And then 253?
 5   Q.  Yes.
 6   A.  Okay.
 7   Q.  Are those --- are these your notes that you
 8   took during the semester that Stacy was student
 9   teaching?
10   A.  Yes.  Some --- I mean, they're not --- it's
11   not comprehensive, but yes, some of them.
12   Q.  Are there more notes that you took that
13   aren't here?
14   A.  I would have taken more notes for sure, but
15   the problem was that --- you know, that this was
16   brought up a year after the student teaching
17   placement.  I had switched classrooms at least
18   twice at that point, so this was probably all
19   that I could find at that point.  There would
20   have been, obviously, more documentation.  This
21   is probably all we could find --- or I could
22   find.
23   Q.  Well, look at the very first page dated
24   1/30/06.
25   A.  Yes.
```

Page 53

```
 1   Q.  Does this --- was this the first time that
 2   Stacy actually attempted to teach in your class?
 3   And please read the document to refresh your
 4   recollection.
 5   A.  I believe so.  I believe this was the first
 6   time.  But like I said, there could have been
 7   --- there potentially could have been a course
 8   or a day previous to this where maybe she had
 9   just, you know, come up in front of the class
10   for 10 or 15 minutes and maybe conducted a game
11   or a review game or something like that.  I'm
12   not sure.  But I do remember that this was the
13   opening day of her poetry unit, so it seems to
14   me it would be her first day.
15   Q.  Okay.  I just need to know this.  What is
16   DOLA, D-O-L-A?
17   A.  Sure.  It's Daily Oral Language or Language
18   Arts.
19   Q.  Okay.
20   ATTORNEY KRAMER:
21   Off the record.
22       OFF RECORD DISCUSSION
23   BY ATTORNEY KRAMER:
24   Q.  The time goes from 9:24 to 10:06.  What does
25   that mean in terms of Stacy's student teaching?
```

1  A. That that would have been the beginning of
2  the activity, and that would have --- I was
3  probably just trying to keep track of her pacing
4  so I could see how long she was spending on
5  something. And that way, if there was too much
6  time spent on something that really only should
7  have taken two minutes, then I could have
8  addressed that. But that was just a tactic that
9  I had been using for a while. I don't know that
10  I necessarily always kept that.
11  **Q. If you could please review this page. And I**
12  **have a couple questions about it.**
13  **WITNESS REVIEWS DOCUMENT**
14  A. Okay.
15  BY ATTORNEY KRAMER:
16  **Q. Obviously, you're writing for yourself and**
17  **for Stacy, so an outsider doesn't necessarily**
18  **understand ---**
19  A. Sure.
20  **Q. --- what's --- you know, exactly what you're**
21  **saying. But what I'd like you to do is go**
22  **through here and tell me which of these comments**
23  **refer to concerns about her teaching that you**
24  **raised?**
25  A. So only concerns is what you're ---?

1  **Q. Or something that you thought was especially**
2  **good. I just don't want this to go on ---**
3  A. Right.
4  **Q. --- forever. And certainly --- at 9:32 it**
5  **says, had to fix errors. I don't know if --- I**
6  **mean, does that have anything to do with Stacy**
7  **or ---?**
8  A. I would think that that note probably meant
9  that either I or students had to fix an error in
10  her discussing the correction of the sentence.
11  Otherwise, it wouldn't make sense. But yes,
12  because in my further note there, it's in DOLA
13  Number Two, needs to be fixed. It was probably
14  an error that she actually missed, that she
15  didn't point out to the students. What they are
16  is just a series of two sentences each day that
17  have --- they're riddled with errors, and the
18  students need to be able to find those errors
19  and explain why it is an error.
20  **Q. Okay.**
21  A. And she would have missed an error at that
22  point, even though she was using a teaching
23  guide that would have had the answers for her.
24  So I knew that I wanted to make sure that we
25  went back and fixed that the next day and that

1  the students knew that that was actually an
2  error.
3  **Q. Okay.**
4  A. I'm not sure if there's any other references
5  to problems specifically noted on this document.
6  **Q. At 9:52 it says, overhead, refrain is**
7  **circled. Should be end-stopped.**
8  A. I'm sorry. I missed that.
9  **Q. What's that refer to?**
10  A. I believe she might have called something a
11  refrain and that she didn't indicate that
12  something was end-stopped or end jammed at that
13  point. I'm not exactly sure, but obviously I
14  noted that.
15  **Q. What does that mean in non-English teacher**
16  **speak?**
17  A. That there was a poem or an example that she
18  had placed up on an overhead and maybe she
19  called something a refrain and used the wrong
20  term to discuss that with the students, one of
21  the vocabulary terms that they would have needed
22  to know. And I was noting here that it needed
23  to be end-stopped, but that she probably was
24  okay on discussing what an end-jammed line
25  looked like in poetry.

1  **Q. The last two comments refer to various**
2  **literary devices, alliteration, repetition,**
3  **metaphor, et cetera. It just has those words.**
4  **Does that ---?**
5  A. That means that she probably covered those
6  at that --- in that example on the overhead.
7  **Q. So you're just observing what she was doing?**
8  A. Sure.
9  **Q. Turn to the next page. Now, this is Block**
10  **Three, whereas the first was Block Two. What**
11  **does that mean?**
12  A. The Block Two class would have been either
13  the traditional or technical class. I want
14  to --- that would have been the technical class,
15  I think, because the students who were absent
16  were Allegra and Max, and there's a reference to
17  a Frank. So I think that that was the technical
18  class. And this Block Three class would have
19  been the traditional class.
20  **Q. And is there anything on at least the top**
21  **part of this page reflecting something other**
22  **than just a simple observation that you were**
23  **noting, neither criticism nor praise, as far as**
24  **I can see.**
25  **Q. No, because it was a repeat of the same**

1  **lesson from the previous block. So I was**
2  **probably just noting that she went over the same**
3  **kinds of things.**
4  **Q. At the bottom you got two columns, glows and**
5  **grows. What does that mean?**
6  A. That was a method that my supervisor had
7  used when I was a student teacher, and I thought
8  that was a very simple way of explaining to the
9  student teacher that these are things that you
10 were glowing on and these are things that you
11 need to grow on. So it's kind of a nicer way of
12 saying strengths and weaknesses probably.
13 **Q. Who was your supervisor when you student**
14 **taught from Millersville?**
15 A. Good.
16 **Q. Who was it?**
17 A. My cooperating teacher or my supervisor?
18 **Q. Who was your super --- who was your coop ---**
19 **who was your supervisor at Millersville?**
20 A. Mr. Bill Laurus (phonetic).
21 **Q. And briefly tell me, just glows and grows,**
22 **what are you saying here?**
23 A. For glows, that she, you know, was able to
24 have a good presence in front of the classroom
25 and appear knowledgeable. She used the

1  overhead, stereo, and a clip. So she used a
2  television also, I think, from The Graduate, a
3  clip from The Graduate. So she would have used
4  a variety of media. She changed the activities
5  frequently, so I was able to note that with the
6  time, and had some good examples with The
7  Graduate and the Simon & Garfunkel song. The
8  grows, I guess her overhead probably was
9  illegible, at least at some points. Suggested
10 that she use a black font or that the black font
11 was smeared or smudged, I'm not sure. But it
12 ended up not being an effective --- it lessened
13 the degree of its effectiveness because it was
14 illegible. And obviously I'm noting that she
15 needs help with her terms.
16 **Q. Terms, meaning?**
17 A. The end-jammed, end-stopped, alliteration,
18 that she would have had some problems there.
19 **Q. Did she ever come to you for assistance in**
20 **that area?**
21 A. Not as she --- in my opinion, not as she
22 should have. She might have asked me --- she
23 might have asked me to clarify at that moment.
24 I don't remember. But I was constantly telling
25 her to ask me for help when she felt like she

1  was in over her head or if there was a term she
2  didn't understand in advance of actually
3  teaching the lesson so I could help her.
4  **Q. Was it your sense that she thought she was**
5  **pretty good at teaching or that she believed ---**
6  **she understood that she was in over her head?**
7  A. I got the impression from her, especially
8  because she wasn't asking me for help, but also
9  just based on her presence, that she --- and
10 based on her mid-evaluation of herself, that she
11 thought that there were no problems, you know,
12 that she was actually doing really well and that
13 there --- she didn't notice a lot of the times
14 when there were problems.
15 **Q. Would you --- so this is from January 30th,**
16 **'06. Would you share this --- these notes with**
17 **Stacy?**
18 A. Yes.
19 **Q. When?**
20 A. She would have seen the glows and grows. It
21 would have been in --- these are all just
22 informal documents.
23 **Q. Sure.**
24 A. I'm not required to submit anything.
25 **Q. Right.**

1  A. And I would have used those to go over
2  strengths and weaknesses with her, but she
3  wouldn't have received a copy of them, I don't
4  think.
5  **Q. So in other words, these were your reference**
6  **notes. And then at some point ---?**
7  A. So we could have a discussion.
8  **Q. And did you discuss these points?**
9  A. Definitely.
10 **Q. Let's go on to the next, which is CVSD**
11 **Number 208. This is from February 1st, '06.**
12 **You wrote this?**
13 A. Yes.
14 **Q. And this is Block Two, which is the tech**
15 **class?**
16 A. Yes.
17 **Q. Tell me about this page.**
18 A. That information up at the top of the page
19 might have been an agenda just referencing what
20 was going to be occurring during that class
21 period, or I might have just noted what was
22 discussed during that class period. And then I
23 have some glows and grows from the technical
24 class, specifically.
25 **Q. Okay.**

16 (Pages 58 to 61)

## Page 62

1  A. And then there's notes on the Third Block
2  course.
3  Q. At the bottom?
4  A. At the bottom, uh-huh (yes).
5  Q. All right. A given lesson plan that she
6  would teach on a given day, what input did you
7  have into what substantively she would teach?
8  A. I would have told her exactly what she ---
9  what content she should be teaching that day.
10 Q. And you would do that when?
11 A. Well, this was that poetry unit, so we would
12 have discussed that weeks in advance of her
13 teaching it, so she would have been very
14 prepared knowing what she needed to teach. And
15 she would have been required to submit lesson
16 plans to me at least a day in advance, according
17 to Millersville's policy. But many times that
18 didn't happen.
19 Q. And would you say something to her when she
20 failed to give a lesson plan in advance?
21 A. Yes.
22 Q. And what would she say?
23 A. I guess invariably there'd be some kind of
24 explanation or excuse for why she couldn't have
25 that prepared a day in advance, that she was

## Page 63

1  working on it the night before or that morning.
2  Q. On the glows it refers to students
3  sleeping, but she addressed it pretty well. Are
4  there issues at this point of her classroom
5  management?
6  A. Yes. Yeah. I'm trying to indicate to her
7  that --- I'm probably still kind of handling her
8  with kid gloves at this point, trying to make
9  sure that I still present most things in kind of
10 a positive light and suggest any time that she's
11 doing something well, but then also say, well,
12 you know, that's good that you addressed it, but
13 that's not going to change the behavior. We
14 probably need to have some kind of firmer
15 expectation that in this class you're not going
16 to sleep and that you have high expectations for
17 your students.
18 Q. And does error in DOLA, missed, ---
19 A. Apostrophe S.
20 Q. --- I guess, apostrophe S ---?
21 A. In teacher's name. So again, she missed an
22 error when she had the teacher's guide in front
23 of her. So I needed to make sure that she
24 addressed that error.
25 Q. Block three on the same page, it says,

## Page 64

1  discussed results of word splash, but we didn't
2  discuss --- you quickly mentioned this, the.
3  What was that?
4  A. And I probably didn't finish my note there.
5  Q. What does this mean, if you remember?
6  A. Results of word splash. I believe she
7  created an activity called a word splash where
8  the page is splashed with words that deal with
9  that unit. So poetry terms, probably, in the
10 poetry unit, and that they needed --- I have to
11 look at my page. I'm not sure. Maybe needed to
12 define the terms or find them or some kind of
13 activity. But we didn't discuss --- discussed
14 results of word splash, what we didn't discuss.
15 She quickly mentioned the --- I don't really
16 remember exactly what that's referencing.
17 Q. On the rest of this page, any other phrase
18 or criticism that these notes will call to your
19 mind?
20 A. Students were still starting --- well, they
21 were starting to show up without the materials
22 that they needed to be prepared for class and
23 that they were starting to bring books. So I
24 was probably noting that we need to make it
25 clear that the students are expected to come to

## Page 65

1  class prepared with their textbooks, their
2  notebooks, et cetera. I was probably
3  questioning her interpretation or her discussion
4  about Christopher Marlowe's poem and the
5  reference to be my love. She must have maybe
6  said something about having sex. And I didn't
7  understand her interpretation of it, so I wanted
8  to make sure that I talked to her about it
9  because I think maybe she was misinterpreting
10 the lines or --- I wanted to see where she was
11 going with that.
12 Q. And did you have that conversation with her?
13 A. I'm sure.
14 Q. And do you remember the conversation?
15 A. Not especially.
16 Q. So it appears here in Block Three she taught
17 from 10:53 in the morning until 11:31.
18 A. Yes. And there's a lunch period. Yes.
19 That's right. That's probably before lunch.
20 Q. Turn to the next page, please. This is
21 CVSD-209, February 2nd, 2006. Again, if you
22 could just go through this, review it quickly,
23 and let me know if anything pops out as being
24 critical or praiseworthy.
25 A. Well, the opening note at the top, checking

17 (Pages 62 to 65)

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1    into earning honors for Frank Zabela

2    (phonetic), that's a note to myself.  In her

3    DOLA sentence, where she would have it written

4    it on the board or on the overhead or, you know,

5    somehow she conveyed it to the students, she had

6    a spelling error.  She didn't spell renowned

7    correctly.  And I must have taught the history

8    review.

9    She had another spelling error either in her

10    handout or, again, on the board when she was

11    writing iambic tentrameter instead of

12    tetrameter.  While she was discussing the

13    Marlowe and Raleigh poems, there would have been

14    three sleeping students that she did not address

15    that with them.  So that's a note for me that I

16    need to talk to her, explain to her, that the

17    expectation in my classroom is that there's not

18    going to be students sleeping and that that

19    should also be her high expectation.

20    I'm making a note that probably in a

21    discussion with her she has indicated that

22    spelling is a weakness of hers.  Kids must have

23    been having a lot of questions, and whatever

24    method she was using at that point was not

25    working for the students, so I was probably

1    writing down a solution for her there.  Students

2    presented.  That's just what would have

3    happened.

4    Block Three, some suggestions about

5    classroom management or how to facilitate a

6    discussion about DOLA.  It was probably just the

7    same student each day answering questions, and

8    she wasn't actually assessing to see whether or

9    not anybody else in the classroom was learning.

10    **Q. It says on the left, something good joking**

11    **rapport with kids.  The kids like her.**

12    A. Yes.

13    **Q. What was your observation?**

14    A. So at that point, she was probably --- she

15    had a nice presence in front of the classroom,

16    that she was trying to kind of banter with the

17    kids a little bit or something like that, and I

18    was making note of that.

19    **Q. Okay.**

20    A. Much better job.  She did a better job

21    explaining, probably, the second time around

22    because I would have talked to her between Block

23    Two and Block Three, I think.

24    **Q. Right.**

25    A. We still need to talk about each day's DOLA

1    so you are able to field their questions.  I'm

2    reminding her again that you need to come to me

3    and talk to me about these errors so that I can

4    help you, so that you can be prepared for the

5    kinds of questions that the students are going

6    to ask you.

7    **Q. Okay.**

8    A. But she never took --- never really --- and

9    I hate to say never, there would have been one

10    time, but she really never took advantage of my

11    help.

12    **Q. Okay.  And was she having a hard time**

13    **fielding the students' questions?**

14    A. Oh, yeah.  She couldn't answer their

15    questions.  If they asked anything that would be

16    a little bit more sophisticated, or could you

17    provide an example, or why does the apostrophe

18    need to go there, or why does a comma need to go

19    there or something, she would've have been

20    familiar enough with the rules to be able to

21    answer the question.

22    **Q. And how did she react in those cases?**

23    A. I don't want to say always, but there were a

24    fair amount of times where, not necessarily even

25    just on DOLA, but on content in general, she

1    would have --- there were a couple times where

2    she just kind of made up an answer or just kind

3    of guessed and would have guessed incorrectly,

4    thereby giving the students a false answer and

5    confusing them more.

6    **Q. Okay.  At the bottom left it says --- it**

7    **says should I help.  And I'm not sure what that**

8    **refers to.**

9    A. She must have been having problems, you

10    know, again, answering questions or

11    something --- it looks like it's a little cut

12    off here, so I can't quite tell what my notes

13    are, but I was offering my help again.  Can I

14    help you get through this?  Can I help you

15    present this material or this information to the

16    students?

17    **Q. Next page, CVSD-210.  Is this the same day?**

18    A. No, it would have been a different day.

19    **Q. Okay.**

20    A. Yeah.

21    **Q. Because I don't see a date at the top of**

22    **this page.**

23    A. This might have been the overall --- this is

24    the overall glows and grows from this day.  I

25    can tell because of the reference to Gray.

1   Q. Okay.
2   A. So this is probably more so what I would
3   have showed her. She might not have seen my
4   little notes because they're more for me than
5   for Stacy, so I would have gone over all of
6   these items with her.
7   Q. Okay. You've got several grows, ---
8   A. Right.
9   Q. --- most of which are self-explanatory or
10  you've already discussed.
11  A. Uh-huh (yes).
12  Q. One of my --- there seems to be an issue of
13  her relating to some students who might be
14  quieter than others, and you want her to call on
15  them ---
16  A. Uh-huh (yes).
17  Q. --- or ---?
18  A. Sure.
19  Q. Describe that.
20  A. I would have been encouraging her to --- her
21  job is to make sure that all the students are
22  learning the content. And when there's quiet
23  students in the classroom who aren't
24  interacting, she's going to have to elicit that
25  --- responses from them instead of just going

1   A. Well, because sitting back as an observer, I
2   could probably tell that with the students
3   sleeping, with the students off task and not
4   paying attention or even students who aren't
5   connecting, who could be daydreaming, I would be
6   a little worried that the students were not ---
7   and it's --- it's not like it's easy content
8   that they could just learn on their own. Most
9   of the time they need the teacher or student
10  teacher to explain it to them, so ---.
11  Q. And these are high school seniors. Don't
12  high school seniors act that way?
13  A. Meaning?
14  Q. Well, sleeping, daydreaming, thinking about
15  something else.
16  A. To some extent. Any student in any classes
17  could, you know, be that kind of student. But
18  in my classroom, my philosophy is to have the
19  expectation that everybody is going to learn and
20  everybody is going to learn what I have to teach
21  them. And I'm going to make sure that they
22  learn, because that's my job. So there wouldn't
23  be sleeping. There wouldn't be students coming
24  unprepared, you know. And if that would be
25  happening, then you address that, and you make

1   with maybe a more aggressive or a more confident
2   student who would be raising a hand or calling
3   out an answer. So that's an important tool for
4   a teacher, to obviously know what's happening
5   with all the students in the class.
6   Q. How many students are in these classes?
7   A. In both these classes, there would have been
8   somewhere between 20 and 28 students, probably.
9   Q. You've got a comment, how do you know what
10  they know? Think about that. You need
11  feedback. What's that refer to?
12  A. Some kind of assessment, either an informal
13  assessment, but some ways to kind of measure
14  have they actually learned anything that I've
15  taught them up to this point, or are they just
16  kind of starting back at me, and then I'm going
17  to hit them with a large test and the students
18  are going to fail? So you need some kind of
19  indication now if any re-teaching needs to
20  happen before, like, a formal assessment takes
21  place.
22  Q. Were you concerned that she did not know
23  what the students knew?
24  A. Yes.
25  Q. Why?

1   it clear that that's not your expectation for
2   them.
3   Q. Okay. At the bottom left you've got
4   concerns, music with swear words, shut up, et
5   cetera. If you could please describe ---.
6   A. I've noted that --- yeah, I've noted that
7   the first two were addressed previously, but I'm
8   kind of getting a running list of things that
9   are beyond grows that I'm just kind of concerned
10  about at this point. Do you want me to explain
11  the ---?
12  Q. Yes. Please do.
13  A. The music with swear words, one of her first
14  couple days of teaching she had played some of
15  her music as kind of a background sound so that
16  --- you know, for the students to be working on
17  something that might not have required
18  concentration, a project or to say. I do
19  remember that it was a Ben Folds Five CD.
20  That's a band. I don't remember exactly which
21  songs it was. I maybe could figure that out,
22  but ---.
23  Q. Actually, if you'll look in that packet, you
24  will see right after CVSD-186 ---.
25  A. We had it before.

1   **Q. Keep going.**
2   **OFF RECORD DISCUSSION**
3   BY ATTORNEY KRAMER:
4   **Q. Was this the song?**
5   A. Yes.
6   **Q. Tell me what happened that day.**
7   A. It was played. And I guess by the third
8   line there was a bad-ass mother. So I heard
9   that, and my ears peaked --- perked up. And I
10  looked around the classroom and there was
11  absolutely no indication that the teacher even
12  noticed that that happened. And the kids kind
13  of looked over at me. A couple of them gave me
14  arched eyebrows, and I said, okay.
15  And then, you know, before I could even
16  stand up or do anything, we were probably four
17  or five more lines later, and then there was
18  kiss my ass goodbye. And if the song had played
19  the whole time through, obviously that looks
20  like it's part of the chorus or --- so it would
21  have been said a couple times. So by then I had
22  run over and stopped the CD. There was no --- I
23  don't think she noticed.
24  **Q. She didn't notice what?**
25  A. That the language was in that song. Or

1   certainly she didn't think about it before she
2   played that song.
3   **Q. I'm going to guess you had never seen this**
4   **song before or heard this song before.**
5   A. It might have been in --- I don't know if it
6   would have been on the radio. I mean, I'm
7   familiar with Ben Folds Five. I don't own their
8   album.
9   **Q. Okay. So did she --- did Stacy indicate to**
10  **you that she had ever heard this song before**
11  **playing it in the classroom?**
12  A. Yeah, she specifically played this --- maybe
13  it was an attempt to kind of connect with the
14  kids, to play something contemporary and also
15  because I think --- I'm sure she expressed many
16  times that it's her favorite band or one of her
17  favorite bands.
18  **Q. And what was your concern?**
19  A. The language, that that's not appropriate
20  for the classroom and that it shouldn't be ---
21  we shouldn't be playing songs as teachers in
22  front of our students that have swear words in
23  them.
24  **Q. But these are 17 and 18-year-old kids. My**
25  **guess is that most of those had heard these**

1   words before.
2   A. I'm sure.
3   **Q. But that didn't matter to you?**
4   A. No.
5   **Q. Why was it not appropriate for a classroom?**
6   A. Well, even just as a school policy, as a
7   school rule, in any high school I would assume
8   that there's no profanity. And as an educator
9   in a classroom, you wouldn't want your students
10  using this language, so you shouldn't be playing
11  music that has this language.
12  **Q. And so you got up and turned off the CD?**
13  A. Yes.
14  **Q. And what did Stacy do?**
15  A. I think I just consulted with her either
16  quietly right at that moment or maybe after that
17  class had ended, I don't think we listened to
18  any more music for the rest of that block, and
19  explained to her that she needs to be --- if
20  she's going to put a song on in front of her
21  students, she needs to know what the content of
22  it is, what the language of it is, and that that
23  can't happen. And I'm sure she was apologetic
24  and said that she hadn't realized that --- you
25  know, didn't do it on purpose, obviously, but

1   was negligent in not knowing what she was
2   playing for her students.
3   **Q. Did any of the students say anything to you?**
4   A. Specifically about it? I think they
5   probably laughed about it, you know, laughed it
6   off, like, oh, my God, the student teacher on
7   one of her first days is playing music with
8   swear words in it. But it would have been
9   informal and with arched eyebrows and kind of
10  laughing with me --- not with me, but laughing
11  --- kind of looking over at me and laughing that
12  the student teacher made a mistake.
13  **Q. And was there any reaction outside the**
14  **classroom? That is, did parents call you? Did**
15  **any administrators contact you?**
16  A. No.
17  **Q. Okay. So there was no ramification beyond**
18  **what happened in the classroom?**
19  A. The fire was put out.
20  **Q. Then it says shut up in your notes. What**
21  **does that mean?**
22  A. She used shut up, probably just once at
23  this point, there's no indication that it was a
24  second, to gain control of her classroom or to
25  get their attention.

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

Page 78

| | |
|---|---|
| 1 | **Q. And is that inappropriate?** |
| 2 | A. Yes. |
| 3 | **Q. Because?** |
| 4 | A. Because there should probably be more of a |
| 5 | measure of control for a teacher to be able to |
| 6 | obtain the students' attention and respect and |
| 7 | to have them listen to you when you say you're |
| 8 | in charge of this classroom, it's time to hear |
| 9 | me out or, you know, pull back from a discussion |
| 10 | or something like that. Shut up isn't |
| 11 | appropriate. |
| 12 | **Q. Was this the first time she said shut up in** |
| 13 | **the classroom?** |
| 14 | A. Judging by this, I'm thinking yes. Because |
| 15 | I think later there are documents that say that, |
| 16 | you know, it was used a second time. So I don't |
| 17 | think this was the second time. |
| 18 | **Q. After shut up it says, minimal knowledge in** |
| 19 | **grammar, vocabulary, spelling.** |
| 20 | A. Yes. |
| 21 | **Q. What does that reference?** |
| 22 | A. Just that I'm indicating that there's this |
| 23 | persistent problem where there's a minimal |
| 24 | knowledge as far as those content areas go. And |
| 25 | I'm a little worried at this point about how the |

Page 80

| | |
|---|---|
| 1 | studying, because Beowulf we were only reading |
| 2 | excerpts from. It's a long narrative tale. So |
| 3 | she would have questions prepared for students |
| 4 | that wouldn't even pertain to anything that we |
| 5 | were learning about. So there'd be sometimes |
| 6 | errors like that. |
| 7 | **Q. And did you tell her these concerns?** |
| 8 | A. Absolutely. But a lot of times I couldn't |
| 9 | address them ahead of time because I wasn't |
| 10 | getting the materials until the day that they |
| 11 | were already photocopied and being handed out to |
| 12 | the students. I'd have an idea of what was to |
| 13 | be taught that day because we would set up a |
| 14 | pacing guide for, you know, we're going to do |
| 15 | Beowulf today, for three days, and then we're |
| 16 | going to be on to "The Searcher", but I wouldn't |
| 17 | necessarily always know what she was handing to |
| 18 | the students and what she was using. |
| 19 | **Q. To be effective, do you, when you're** |
| 20 | **teaching, try to do, in advance of the class,** |
| 21 | **almost a minute-by-minute agenda for yourself as** |
| 22 | **to what you're going to cover and for how long?** |
| 23 | A. You need to have an idea, like this will |
| 24 | take me about 20 minutes, this will be about 15, |
| 25 | so that you can get the idea that you're going |

Page 79

| | |
|---|---|
| 1 | semester is going to proceed and how my students |
| 2 | are going to fare from having a student teacher |
| 3 | who has these weaknesses. |
| 4 | **Q. And this was after her student teaching in** |
| 5 | **the classroom three times?** |
| 6 | A. Yes. And probably from some other |
| 7 | documents, maybe that I had seen or heard the |
| 8 | actual items that she had given to students or |
| 9 | prepared for me in her lesson plans, things like |
| 10 | that. |
| 11 | **Q. Okay. Were there errors in her lesson plans** |
| 12 | **that she gave to you?** |
| 13 | A. Yes. |
| 14 | **Q. Such as?** |
| 15 | A. Again, some grammar, vocabulary, spelling, |
| 16 | but sometimes it would just be content. For |
| 17 | instance, we might be studying Beowulf, and she |
| 18 | seemed to rely pretty heavily on the Internet |
| 19 | for her materials, because there's a world of |
| 20 | information out there for teachers. And instead |
| 21 | of, you know, --- instead of making the |
| 22 | documents herself and preparing the lessons |
| 23 | herself, she would use maybe something that was |
| 24 | already prepared out of the Internet, but it |
| 25 | would pertain to areas that we weren't even |

Page 81

| | |
|---|---|
| 1 | to use up the entire block. There won't be any |
| 2 | idle time, there's time for closure, things like |
| 3 | that. |
| 4 | **Q. And was she doing that, as far as you know?** |
| 5 | A. Probably in a discussion with me we would |
| 6 | probably have tried to guess at how long her |
| 7 | activities would have taken, but I don't |
| 8 | know --- I don't know that we would necessarily |
| 9 | always discuss that. |
| 10 | **Q. Finally, it says, a little too easy. What** |
| 11 | **does that mean?** |
| 12 | A. Just the beginning --- just starting to |
| 13 | notice that compared to what I know, you know, |
| 14 | students --- and any student who's gone through |
| 15 | high school, you now what basically the rigor |
| 16 | and the relevance of what happens in 9th, 10th, |
| 17 | 11th and 12th grade is. We're getting these |
| 18 | students who are to be prepared for college or |
| 19 | prepared for some kind of career education. And |
| 20 | they were --- I was starting to notice that they |
| 21 | really weren't being challenged. There might be |
| 22 | a word find where you find poets' names or |
| 23 | something like that, but y . --- there's no |
| 24 | indication that you actually know what any of |
| 25 | those terms mean or --- it seemed a little --- |

21 (Pages 78 to 81)

1    it seemed a middle school sometimes.

2    **Q. And actually the next page, CVSD-211 is a**

3    **word find.**

4    A. Right.

5    **Q. Who prepared this?**

6    A. That would have been Stacy.

7    **Q. And was this not something that you thought**

8    **she should have done?**

9    A. It could be some kind of quick, for fun,

10    here, here's a minute at the end of the class

11    period or here's --- I'm not even totally sure

12    why you'd use a word find.  I never have for

13    seniors.

14    **Q. And did you tell her that it was probably**

15    **not appropriate for seniors, or you just let it**

16    **go?**

17    A. Well, it was probably just one of those

18    things that I hadn't seen ahead of time.  And I

19    guess this was one of her --- maybe a review

20    activity.  So after the fact, I would have

21    addressed that with her.

22    **Q. Up to this point, had you shared your**

23    **concerns with her competence with anybody else?**

24    A. I'm sure I would have talked to my

25    supervisor.

1    **Q. Deann Buffington?**

2    A. Correct.  And potentially Barry Girvin,

3    though this is still kind of early in the

4    placement.  I'm not sure when he would have

5    begun to officially observe her, but I would

6    have definitely made it known to him.

7    **Q. Okay.  Let's go to the next page.  This is**

8    **CVSD-212.  Is this a continuation of the grows**

9    **and glows from CVSD-210, because I don't see a**

10    **date on the other?**

11    A. No.  It would have been a different day, I'm

12    sure.

13    **Q. Okay.  Because I'm trying to take these in**

14    **order that your Counsel marked them.**

15    A. Okay.

16    **Q. There are some glows at the top.  She seems**

17    **to be --- to have energy and to have a pretty**

18    **good presence in the classroom.**

19    A. Uh-huh (yes).

20    **Q. But there also seem to be some pretty nasty**

21    **issues of classroom management?**

22    A. Right.

23    **Q. Describe that, please.**

24    A. Well, starting over in the margin, some

25    quotes.  We must have had a speaker from a

1    career institute or from a college at that point

2    coming in to speak with our seniors.  And her

3    method of addressing the speaker was to say to

4    the class, I hope you give your speaker more

5    respect than you give me.  And I quoted that

6    because that's obviously --- it's her admitting

7    that the students don't show her respect and

8    don't give her the respect that a teacher should

9    be getting at that point.  And it's --- that's

10    kind of an inappropriate way to introduce a

11    speaker.  And there's an indication of --- out

12    on the margin that a student is asking for help

13    and she's questioning and saying, I don't

14    understand what you're saying, I don't

15    understand how you're explaining this to me.

16    And I wanted to suggest to her that that was an

17    indication that she's not the only one in the

18    class who's having this problem, she's just

19    vocalizing it.

20    **Q. Okay.**

21    A. Do you want me to address all of those

22    problems?

23    **Q. Well, yes, except to the extent that you've**

24    **already talked about ---**

25    A. Okay.

1    **Q. --- something.**

2    A. Classroom management, students talking

3    during test taking is obviously not acceptable,

4    so she needs to address that.  And the still

5    talking obviously indicates that this is

6    something I addressed with her and it's still a

7    problem in the classroom, so we need to come up

8    with another way for you to address this,

9    because the students aren't taking your

10    expectations seriously.

11    Based on a recommendation, you know,

12    proximity is important.  It somebody is

13    misbehaving, you want to kind of stand near

14    them.  You want to circulate.  You want to be

15    moving around the classroom.  So she must have

16    started to do that, but --- but she was

17    circulating, but she wasn't addressing the

18    behavior that was occurring when she would be

19    near, like that's not appropriate or you need to

20    be quiet or whatever, you know, whatever the

21    problem was at that point.

22    **Q. And these notes that you're taking, you're**

23    **taking them while she's doing the student**

24    **teaching?**

25    A. Right.  The students are still talking when

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

```
 1    she's talking.  Only five to ten students are
 2    with you at any point that you're teaching, was
 3    my observation.  You know, the rest of the
 4    class, the other 10 to 15 students would have
 5    been --- or more, would have been off task and
 6    kind of holding their own court at that point.
 7    You call for attention, but you're not
 8    getting it.  And then you compliment the
 9    students at the end of the block, which would
10    have been a mixed signal, to say like, well,
11    that was a great class, good job, when it wasn't
12    any of the behavior that you would have wanted.
13    Q.  Are kids acting out in class?
14    A.  By not paying attention, blatantly
15    disrespecting the student teacher, not really
16    listening --- not listening to her directions or
17    her instructions or her expectations of them.
18    Q.  And how would they do that?  I mean,
19    obviously no one is going to pull a knife on
20    her, but how would they disrespect her and show
21    that they are holding her in disdain as a
22    teacher?
23    A.  Just continue to do what she's asking them
24    not to do, so just to turn their back and start
25    talking to a friend seated behind them or maybe
```

```
 1    to call into question something that she's
 2    asking them to do.  There's a lot of different
 3    ways that they could.
 4    Q.  And how was she reacting to that disrespect?
 5    A.  Probably at a loss, you know, trying to ---
 6    not sure what she should do at that point.
 7    Maybe getting frustrated.
 8    Q.  And was that evident to you in class, that
 9    she was frustrated?
10    A.  Yes.
11    Q.  Would she try to, to use the term, get
12    buddy-buddy with the students, to gain their
13    affection or attention?
14    A.  That was definitely a method that she
15    probably resort --- that would have been a last
16    resort for her or --- any teacher in a classroom
17    wants to be liked by the students, wants to have
18    that rapport with them, where there's kind of a
19    camaraderie or --- but it's all --- it all
20    translates from respect, and so she was looking
21    for that.  But a lot of times it seemed she
22    wanted --- because they were 17, 18-year-old
23    students, she was looking to be more on a peer
24    level with them, is my understanding of it.
25    Q.  And you can continue to look on that page or
```

```
 1    go to the next page, which seems to be a
 2    continuation.  This CVSD-213 seems to be an
 3    entire page of criticisms.
 4    A.  It is continuing from the last page, I
 5    believe.
 6    Q.  It says at the top, we discussed shut up.
 7    You did discuss shut up once ---
 8    A.  Before.
 9    Q.  --- already.  Is this a repetition of that?
10    A.  Probably.  Or this could be indicating that
11    there was a second occurrence of it.  But I'm
12    not --- you know, I can't tell exactly without a
13    date or, you know, more specific reference.
14    Q.  Okay.  It says parent follow-ups.  What's
15    that refer to?
16    A.  That if there's some kind of student who's
17    failing or some disrespect, one of the
18    procedures for writing a student up for a
19    detention is that you first need to make contact
20    with the parent and that, you know, if a student
21    is failing, you need to let the parent know.
22    Q.  Uh-huh (yes).
23    A.  So I would have discussed that with her.
24    It's probably just a note for me, obviously,
25    what I've discussed.
```

```
 1    Q.  Oh, so this doesn't indicate she wasn't
 2    doing this.  It's just a note ---?
 3    A.  Just for myself, like okay, I made sure that
 4    I've discussed the fact that we need to be
 5    following up with parents.  The chain of command
 6    was discussed at this point, and that was ---.
 7    Q.  What's that mean?
 8    A.  That was --- the first example would have
 9    happened --- Stacy would have wanted a key to my
10    classroom so that she could have one, maybe feel
11    to feel more like a teacher, just did not have
12    to borrow my key, which is the standard protocol
13    for student teachers.  And I don't --- I think
14    she might have asked me if she could have one,
15    and I said that I would check into that for her
16    but that I think the policy is to not hand out
17    multiple keys, you know, just as a safety and
18    security measure.
19    And before I was able to get back to her
20    with an answer, either later that day or the
21    next day she actually approached our assistant
22    principal in the hallway and asked him if she
23    could have a key to the classroom.  And he
24    explained to her that that wasn't possible, that
25    they don't give student teachers keys.
```

1   **Q. And what's the reference to chain of**
2   **command?**
3   A. I explained to her that there's --- there's
4   a system. There's a --- that if she has
5   questions or issues, that she needs to come to
6   me first with that, and that that was how it
7   originated, but that she had gone above me even
8   when I explained to her that I was the person
9   who was looking into it.
10   **Q. Then it says number four, block activities.**
11   **What's that reference?**
12   A. Probably --- I'm guessing that that probably
13   indicates I'm just trying to help her come up
14   with some different strategies and activities to
15   use to break up the 80-minute, 90-minute block.
16   **Q. At this point, was she teaching the entire**
17   **block?**
18   A. Yes.
19   **Q. Why did you let her teach the entire block**
20   **with all the other inadequacies that she has**
21   **shown?**
22   A. Well, the intention --- my goal, my job, is
23   to get her to be able to complete student
24   teaching. So she needs to be able to work her
25   way up to teaching a full load. And it doesn't

1   mean that every day she was necessarily a
2   teaching a full block, she wasn't teaching a
3   full load at this point, but that she needed to
4   start to have the experience of a teacher where
5   you need to know how to plan for an 80-minute
6   block before you can plan for three 80-minute
7   blocks.
8   **Q. To the left in the margin at the top, could**
9   **you read that part?**
10   A. To the left?
11   **Q. Yeah, the very top.**
12   A. Shouldn't be just one person doing all the
13   work? That's the middle one.
14   **Q. I'm sorry. I'm thinking the left, in the**
15   **margin up here.**
16   A. As of 2/27, students in Block Two still do
17   not know the figurative language you are trying
18   to teach/have taught since you started.
19   **Q. What is that?**
20   A. That there's an indication based on their
21   assessments or based on discussions, hey,
22   where's the metaphor in this line or, you know,
23   where's the simile in this passage? They're
24   still not able to actually identify any of the
25   things that she should have been teaching them

1   for the past month.
2   **Q. Tests, assessments for the students on a**
3   **given subject, who prepared them? Does she**
4   **prepare them or do you prepare them?**
5   A. As part of her unit, she would have prepared
6   them. She would have access to mine, and I
7   doubt she would have used mine, you know, as ---
8   she wouldn't have handed my test out. She would
9   have made her own test to match up with the
10   content that she had taught.
11   **Q. Okay. And who grades them?**
12   A. Stacy would.
13   **Q. And if she's teaching a given block for a**
14   **semester, does she give the final grade to the**
15   **student?**
16   A. If she had been there from the start to the
17   finish of a semester, which student teachers
18   aren't, I guess technically she would have, but
19   with my consultation because it's my grade book.
20   **Q. Okay. So teachers are pretty proprietary**
21   **about their grade books, are they?**
22   A. Well, you have your own password, your
23   own --- it's assigned to you, and that roster is
24   ultimately assigned to you, that roster of
25   students, so you have to be okay with the grade

1   that the students ultimately receive in your
2   course. If a student teacher leaves, you're
3   still the teacher.
4   **Q. Okay. And so when you say grade book,**
5   **you're talking about access in a grade book on a**
6   **computer as opposed to a ---?**
7   A. Right, which is how we do it now.
8   **Q. Okay. How about in the margin in the**
9   **middle, what does that say?**
10   A. That I have indicated that to you already.
11   Activities and questions on materials, study
12   guides, units, that she's using with the
13   students have errors and problems and she
14   doesn't catch them ahead of time, nor do I see
15   them ahead of time before the students get
16   to --- the kids get to number six and then they
17   say, I don't understand how to answer this
18   question, and the answer is, oh, it's not even
19   on anything you've read and it's an error. I
20   think what I was trying to point out is relying
21   too heavily on the Internet to prepare your
22   materials for you is probably not the best
23   method.
24   **Q. Finally, on the left you say, shouldn't be**
25   **just one person doing all the work, in quotes.**

1   A. I'm just quoting her.  And that's just
2   indicating that there's really only one or
3   two --- you know, a very --- a small amount of
4   students actually answering the questions, and
5   she's indicating that the rest of the students
6   need to get involved, but not beyond that quote.
7   She's not doing anything to ensure that the
8   other students in the classroom are getting
9   involved, so I would have been pointing that out
10  to her.
11  **Q. So if I understand it, it's her --- you're**
12  **quoting her?**
13  A. I'm quoting her, yes.
14  **Q. So it sounds like she's trying to lay a**
15  **guilt trip on the students to some extent, you**
16  **know, you guys need to work, too?**
17  A. Sure.  Sure.  Sure.  You know, trying to
18  make them feel responsible, that they need to
19  get involved and making them feel a little
20  guilty, like you need to step it up.
21  **Q. And did that work?**
22  A. No.
23  **Q. And how do you know?**
24  A. Because we just had the same problem for
25  most of the semester, most of the time that she

1   was there.
2   **Q. Okay.  If you go down --- do you need to**
3   **take a break, by the way?**
4   A. I'm fine.
5   ATTORNEY VOIGT:
6   I'd like to take a break.  We've
7   been at this for 45 minutes.
8   ATTORNEY KRAMER:
9   Okay.  Let's take a break.
10  SHORT BREAK TAKEN
11  BY ATTORNEY KRAMER:
12  **Q. Still on the same page, in the center you**
13  **wrote, you suggest an idea then crumble based on**
14  **what the students want.  They run the show.  I**
15  **think we should do it this way, grade it this**
16  **way, and then discussion ensues.  What does that**
17  **refer to?**
18  A. Just refers to a weakness in classroom
19  management, that when you're the teacher, you
20  explain how you're going to structure your
21  activities and your timeline or when something
22  is due, and that's basically it.  It's really
23  not open for discussion.  You have a pace that
24  you need to keep, and you're the teacher.  You
25  know what's best.  And the students would always

1   override whatever she would say or get her ---
2   you know, talk her out of it in a certain way
3   or --- there doesn't need to be discussion about
4   things that --- when you're the professional in
5   front of the classroom, it's what you say goes.
6   **Q. Did you instruct her on how to better manage**
7   **the class?**
8   A. Yes.
9   **Q. And you described --- I mean, here it says,**
10  **I think we should do it this way.  Is that you**
11  **telling her to simply be more forceful?  I mean,**
12  **what are you telling her to do?**
13  A. I'm quoting her.  She'll say, I think we
14  should do it this way, grade it this way, but
15  then --- so she'll put out there, I think we
16  should do it this way, but that opens it up for
17  a forum for discussion, and it shouldn't.
18  **Q. Okay.**
19  A. But all of these things where I'm writing
20  like glows and grows and writing all of these
21  things out, these would have all been shared
22  with her and I would have gone point by point
23  over them, explained whatever the grow was or
24  the glow was, commended her or had a discussion
25  with her about how we could improve it or what

1   we should do instead, let me ask me questions
2   or ---.
3   **Q. Okay.  At the bottom it says, language,**
4   **quote, shut the hell up, end quote, and you**
5   **didn't address it.**
6   A. Right.
7   **Q. What happened there?**
8   A. I'm just --- as an observer in the back of
9   the classroom or to the side of the classroom, I
10  can hear language around the room that's
11  audible, that anybody in the room would hear,
12  but there's no indication from her that that's
13  inappropriate language.
14  There was another place where it was
15  referenced, like inappropriate weekend behavior,
16  talking about potentially like drinking on the
17  weekends or going to parties or just things ---
18  even drugs like that shouldn't --- that
19  shouldn't be part of your classroom.  Nobody
20  should be idly sitting around discussing things
21  like that.  You need to be able to uphold that
22  that's not appropriate in a classroom, and it
23  just wouldn't be addressed.
24  **Q. Did she --- did that kind of problem arise**
25  **other times, other than her not addressing the**

25  (Pages 94 to 97)

| | |
|---|---|
| 1 | **shut the hell up, or other incidents you can** |
| 2 | **recall?** |
| 3 | A. Not specifically, but I know for sure |
| 4 | somewhere in here I think that it's referenced |
| 5 | that, you know, weekend plans were discussed. I |
| 6 | probably didn't note it every time that it would |
| 7 | have happened, just because it was starting to |
| 8 | become a pattern, and I would have just |
| 9 | addressed it with her at that moment. Or at |
| 10 | some point I might have even stood up and said, |
| 11 | you know, that's not appropriate, or explain it |
| 12 | to the students. |
| 13 | **Q. The next page, CVSD-214, is dated February** |
| 14 | **13th. If there are dates for which there is no** |
| 15 | **note, does that --- I mean, where ---?** |
| 16 | A. They could be ---. |
| 17 | **Q. What does that mean?** |
| 18 | A. They could be later, especially since this |
| 19 | page previous, CVSD-212, says, as of 2/27, |
| 20 | students in Block Two. So I'd say that these |
| 21 | documents could be out of order and that's |
| 22 | faulty dating. |
| 23 | **Q. Right. And actually the next document,** |
| 24 | **which is number 215, it's dated 2/3.** |
| 25 | A. Right. |

| | |
|---|---|
| 1 | **Q. Okay.** |
| 2 | A. All over the place. |
| 3 | **Q. But we'll stick with CVSD-214.** |
| 4 | A. Okay. |
| 5 | **Q. At this point, have you switched her to a** |
| 6 | **different class, different block?** |
| 7 | A. No. |
| 8 | **Q. You did that at some point during the** |
| 9 | **semester?** |
| 10 | A. Yes. At some point I take over the |
| 11 | technical class, because it's not working out |
| 12 | very well. |
| 13 | **Q. With her as teacher?** |
| 14 | A. Right. And also of note, we were able to, |
| 15 | at the change of the marking period, after the |
| 16 | nine weeks and that advanced composition course |
| 17 | ended, we would have picked up a speech class. |
| 18 | But because there was a transition with another |
| 19 | colleague in my department to teaching some |
| 20 | guidance counselor kind of positions, he |
| 21 | eventually moved into that spot. He --- his |
| 22 | schedule changed. |
| 23 | He was able to take our speech class and --- |
| 24 | and I wouldn't have made this change, except |
| 25 | that I had a student teacher and we were having |

| | |
|---|---|
| 1 | problems, that would have allowed her to pick up |
| 2 | his traditional senior English class, thereby |
| 3 | creating just one prep, if you will, like only |
| 4 | one content that you have to be familiar with, |
| 5 | and that's just the British literature, which |
| 6 | isn't typical for a teacher. You usually have |
| 7 | to wear a couple different hats in the course of |
| 8 | a day, but we were able to see that that would |
| 9 | probably be the best situation as far as helping |
| 10 | Stacy complete her student teaching and allowed |
| 11 | that switch to take place. And my supervisor |
| 12 | condoned that and said, sure, do that was |
| 13 | something that we kind of went above and beyond |
| 14 | to try to help her out a little bit. |
| 15 | **Q. Okay. On the top of CVSD-214 you wrote** |
| 16 | **something, Stacy explained on Sunday evening,** |
| 17 | **there's an asterisk. What --- does that mean** |
| 18 | **anything other than just what it says? Does** |
| 19 | **that raise a concern?** |
| 20 | A. No, it's just I'm indicating --- it raises a |
| 21 | concern. I'm raising a concern there. |
| 22 | **Q. What's the concern?** |
| 23 | A. That she's having a hard time keeping up and |
| 24 | that she's not turning her plans in completed or |
| 25 | on time, the lesson plans, or even the |

| | |
|---|---|
| 1 | materials, but getting the lesson plans to show |
| 2 | me what she's intending to teach that day, not |
| 3 | even the materials, which previously hadn't been |
| 4 | turned in on time. And then she became ill. I |
| 5 | think she was sick already that day. She maybe |
| 6 | --- I think there were at least --- I think |
| 7 | there were four days, don't quote me, I may be |
| 8 | wrong, but I think maybe four days that she |
| 9 | missed of student teaching because of being ill. |
| 10 | **Q. Okay.** |
| 11 | A. So maybe the next day she ended up calling |
| 12 | out sick or something. |
| 13 | **Q. And what is she telling you about what's** |
| 14 | **going on?** |
| 15 | A. With? |
| 16 | **Q. With her inability to be prepared and** |
| 17 | **turning notes in in advance.** |
| 18 | A. I don't remember any specific reasons that |
| 19 | she was citing, because I can't believe she was |
| 20 | working. I believe student teaching --- and |
| 21 | being a mom, that that was the only thing that |
| 22 | she had going on. So I'm not sure. |
| 23 | **Q. Okay. So the rest of her life was also** |
| 24 | **quite busy. I mean, she had a lot of other** |
| 25 | **things going on in her life as well?** |

26 (Pages 98 to 101)

1  A. I assume.
2  **Q. The bottom says constant chatter.**
3  A. That drives me crazy, because I'm trying to
4  take notes and the kids are --- it's just ---
5  it's like nails on a chalkboard to a teacher
6  when you know that the students aren't paying
7  attention, aren't learning, are wasting that
8  period. And it's hard for me to even --- to sit
9  in the classroom and to not want to step in and
10 not want to take charge. So it's hard for me to
11 kind of step back and watch the way this is
12 going.
13 **Q. Well, why don't you step in during class?**
14 A. To some degree I want to make sure that, at
15 this point, she's --- that she can be the
16 authority in the classroom and that they don't
17 see her as being less of an authority figure.
18 If I'm constantly stepping in, it makes her look
19 more and more like a student and more on level
20 with them. She needs to be able to be the
21 professional in front of the classroom, and I
22 try not to undermine that for her. I'd rather
23 try to address it with her outside of class and
24 then make some suggestions and then hope for
25 some improvement the next day, knowing that

1  there's going to be some error.
2  **Q. Anything else on this page, CVSD-214, that**
3  **really stands out and that we haven't already**
4  **discussed in terms of her problems teaching?**
5  A. No, just more of the same.
6  **Q. The next page. This is CVSD-215. And**
7  **actually, this is February 3rd, '06. Just take**
8  **a look at that and tell me if anything pops out**
9  **on this page.**
10 A. That she was doing some of the things that I
11 asked her to do. Obviously, she was reminding
12 the students about not sleeping in the class.
13 She really did not understand "Ode on a Grecian
14 Urn", John Keats' poem, and I was making a note
15 of that, and that I needed to talk to her about
16 it, obviously. But it was --- it was a poem
17 that she had studied in her coursework at
18 Millersville, so I assumed --- and the teacher's
19 text, it walks you through the poem stanza by
20 stanza. So obviously, I assumed that she'd be
21 able to discuss that poem with the students, and
22 she really didn't understand it, and it's pretty
23 clear.
24 **Q. And it says --- how was it so clear?**
25 A. Well, even by the last two lines, that she

1  completely misinterpreted it. She made the same
2  kind of error that maybe a student who had never
3  seen the poem before might have made looking at
4  it. So I needed to make sure that she
5  understood what the poem meant and that she
6  could re-teach that to the students.
7  **Q. And after speaking with her, do you think**
8  **she did understand the poem?**
9  A. I'm not sure. To the best of her ability or
10 --- hopefully, I was able to explain it to her.
11 **Q. It says, last two lines are most important.**
12 **Apologized to students for reading definition of**
13 **ode. What's that mean?**
14 A. She apologized to students for reading
15 because she mispronounced a few of the words and
16 wasn't able to read it very fluently, as a
17 teacher probably should. And I probably needed
18 to make sure that she knew what the definition
19 of an ode was because the poem is called "Ode on
20 a Grecian Urn", and she either didn't explain it
21 well or didn't explain it at all. And it would
22 have been one of the terms they needed to know.
23 **Q. And then it says, the last two lines, we**
24 **should discuss. The historian is the urn, but**
25 **there is a speaker.**

1  A. Yeah, like a persona for the poem. I
2  believe she thought that there was a historian.
3  She was misinterpreting the entire poem, the
4  most important aspect of the poem, and I needed
5  to make sure that she understood that.
6  **Q. Okay. At this point --- well, actually,**
7  **let's go to the next page, CVSD-218. This is**
8  **dated February 24th. At this point, have you**
9  **been raising your concerns to Ms. Buffington**
10 **about Stacy's competence?**
11 A. Yes. And certainly by 2/24, to Barry
12 Girvin, as well. He would have been in to
13 observe her.
14 **Q. All right. Tell me about your concerns that**
15 **you raised with Ms. Buffington.**
16 A. I didn't know how she was going to go. It
17 was feeling pretty --- it was feeling --- it was
18 feeling like I had a student teacher who didn't
19 have the preparation, the content, the knowledge
20 or the classroom management, basically all the
21 tools that she should have come to me with or
22 started to develop up to that point, that it was
23 severely lacking. She was having a hard time.
24 She was really struggling. And it wasn't ---
25 the situation wasn't changing with the students,

1    by and large. The students were still being,
2    you know, disrespectful, disruptive, challenging
3    her, not respecting her authority in the
4    classroom.
5    And there was probably a couple times ---
6    any time that Stacy would have been out, I would
7    have been the teacher, obviously. Any time that
8    she wouldn't have been in the room, I would have
9    taken advantage of the opportunity to remind the
10   students and would have set up her teaching that
11   way, to say like, she is the authority, she is
12   the teacher, you need to respect her, and I
13   remember reminding them of that throughout the
14   semester. And the students would explain to me
15   that it's kind of hard to learn from somebody
16   who knows less than you know about something or
17   is less prepared than you are on certain days.
18   Yeah.
19   **Q. And what did you tell Ms. Buffington?**
20   A. Probably just asked her, what should I do?
21   What do you do in a situation like this where
22   there are such problems? And I've tried
23   basically everything I can think to try up to
24   this point, and I'm starting down the rest of
25   the student teacher placement thinking, what can

1    we do? So I know that we made that adjustment
2    for the advanced composition course for her,
3    where I explained that she was able to teach a
4    unit that wasn't part of the curriculum.
5    **Q. Right.**
6    A. And we made the adjustment for her to be
7    able to teach a similar prep as opposed to
8    having to learn some new content in a public
9    speaking course. And to Barry Girvin, I know at
10   one point, I'm not sure --- I'm sure one of your
11   documents has the date for the mid-evaluation.
12   It would have been in March.
13   **Q. Right.**
14   A. So not too many weeks after this. And I
15   would have been suggesting that maybe we should
16   be considering another placement because my
17   students are not going to be able to take a
18   final --- the final exam for this course.
19   They're not going to be able to pass. They're
20   not going to have any of the content that they
21   should have had at the end of this course.
22   We're doing them a disservice.
23   **Q. Was it that bad?**
24   A. It was getting that bad, yeah.
25   **Q. Okay. All right. You said you're raising**

1    **these concerns with Stacy as well. Is she**
2    **changing? Is what she's telling you changing?**
3    **I mean, is she understanding that you were very,**
4    **very concerned about the students?**
5    A. She should be. I mean, everything that
6    you've seen me --- that I have written here she
7    would have seen also, so I can't ---.
8    **Q. Okay.**
9    A. I can't read her mind, but she should have
10   been concerned. But again, I think I said Barry
11   Girvin and I were both almost flabbergasted by
12   her self-evaluation of herself at her mid-eval
13   because she really didn't give herself very many
14   areas, if any areas, where she needed any kind
15   of radical improvement.
16   **Q. Right.**
17   A. And if you compare hers to our assessment of
18   her, it's night and day. And Barry and I were
19   on the same page, but Stacy wasn't, so I'm not
20   sure why she misinterpreted her abilities.
21   **Q. I'm trying to --- I'm looking on this 2/18,**
22   **trying to find things that we haven't already**
23   **discussed or are self-explanatory. It says sort**
24   **of in the center, too much time, this is what it**
25   **is, this is where it is, now you find one in the**

1    **passage. Students are rebelling. This is hard.**
2    **What's this mean?**
3    A. She probably spent a lot of time, it looks
4    like maybe 14 minutes had elapsed at that point,
5    and all she needed to do was say, like, this is
6    what the definition of this term is, this is
7    where you can find it in the passage and give
8    them some practice to be able to practice
9    finding it on their own, but that she must have
10   been spending a lot of time and the students
11   were rebelling and starting to notice. She
12   might have said that this is hard, the content
13   is hard to the students, you know, explaining
14   her ineffectual teaching or something. I'm not
15   sure.
16   Went on to the --- so they'll ask questions.
17   They'll say that they don't understand something
18   or she'll gloss over something, and then she
19   would move on to the next example without making
20   sure that the students understood the first
21   example. And it was --- she was just kind of
22   trying to get through the period, it seemed to
23   me is probably what I'm noting at that point.
24   **Q. What's the last word in the circle?**
25   A. Kenning.

28 (Pages 106 to 109)

1  Q. Oh, okay.  Got it.  Okay.  It says, you've
2  got about four students with you at any given
3  point.
4  A. Right.  So she's leaving a lot of students
5  behind, out of 20 to 28 students.
6  Q. And those who are not with her are doing
7  what?
8  A. Either they're lost and confused and, you
9  know, talking to somebody near them, trying to
10 figure what exactly she's talking about or
11 trying to, you know, get caught up.  Because I
12 think I notice down at 9:58 Steph said, I don't
13 get it and I can't find it.  I don't see it in
14 the line.  You know, she said something like
15 that.  And Stacy's response was, well, then come
16 see me outside of class.  But I was noting, no,
17 the entire class would have to see you out of
18 class then, because they all don't get it, you
19 know, so --- and again, these are my notes for
20 myself.  I don't think I would have necessarily
21 snowed these with her.  I would have then tried
22 to turn them into glows and grows.  So if things
23 aren't self-explanatory, it's probably because
24 it made sense to me at the time.
25 Q. Right above that it says, at 9:56, it's a

1  guessing game.
2  A. You know, where is the imagery in this
3  passage?  And they're just throwing out
4  random --- they obviously have no idea.  They
5  can't find imagery from a doorknob, so ---.
6  Q. All right.  And in other words, Stacy is
7  failing in her responsibility to teach the
8  students?
9  A. Definitely.
10 Q. The last line says, the kids just shout out
11 in class.
12 A. Yes.  I was suggesting to her kind of a
13 basic aspect of classroom management to try to
14 get the students to raise their hands so she can
15 call on them so she could hear what they were
16 saying as opposed to having the students just
17 chaotically shout out answers or shout out
18 questions.
19 Q. And the last word is it's chaos.
20 A. Yeah, it felt like chaos.
21 Q. Okay.
22 A. Uh-huh [yes].
23 Q. Are you getting any feedback from ---
24 outside of class from students about this?
25 A. Yes.

1  Q. What are you hearing?
2  A. Can you please be our teacher, Mrs.
3  Reinking?  We're lost.  We're worried about
4  taking the final or, you know, just basically
5  anything that you would assume that the students
6  would be saying at this point.  They were coming
7  up and saying that.  And I'm trying to say, we
8  have to give her the benefit of the doubt.  You
9  know, we need to allow her to complete the
10 student teaching here.  And a lot of times it
11 wasn't necessarily the students who were
12 misbehaving.  They were probably enjoying having
13 a class period off where they didn't really have
14 to do very much.  It would be more the students
15 who were very concerned about their grades and
16 their content knowledge and going to college or
17 going on to some kind of schooling.  But yes,
18 they were raising some concerns.
19 And I had a couple informal parent questions
20 where they were just wondering how long was this
21 student teacher going to stay and would the
22 students still be required to know the same kind
23 of content, basically expressing the same kind
24 of concerns that their sons or daughters would
25 have been expressing.

1  Q. Okay.  This is not an AP class.  It's just
2  an honors ---?
3  A. It's not an honors.
4  Q. Just a standard ---
5  A. Right.
6  Q. --- college prep?
7  A. It's kind of your average student who wants
8  to go to college or your average student who
9  might want to go to college, but might want to
10 do a career --- vocational school instead or
11 something like that.
12 Q. Okay.  On the next page, CVSD-219, I just
13 don't --- it says Tuesday, Wednesday, Thursday,
14 Friday.  What does it say to the right of that?
15 A. That for four days we had gone over only
16 Beowulf and "The Seafarer", which usually would
17 have only taken maybe two days and should have
18 only taken two days.  So I'm starting to raise
19 the concern that we're falling behind as far as
20 pacing goes because it's my requirement, you
21 know, as the teacher of the survey course, to
22 get from Anglo-Saxon, the beginning of the time
23 period, to the modern period before they take
24 the final.
25 Q. Okay.  So it's now ---?

1    A. This is probably early ---.

2    **Q. This is now the end of February and you're**

3    **still in Anglo-Saxon poetry?**

4    A. Right, because we did --- we did kind of a

5    survey of all poetry prior to that, where we

6    were working through Keats and other poems ---

7    poets.

8    **Q. Top left, you've got something written and**

9    **then circled. What does that say?**

10   A. Can we take down the urns? Probably just

11   because it's two or three weeks old at that

12   point and the students completed like an

13   artistic project, where they drew in and made

14   notes on an urn, and it connected to Keats'

15   poem, "Ode on a Grecian Urn". So it's just a

16   note to myself.

17   **Q. Okay. Center of the page, under 10 --- at**

18   **10:27 in the morning, completed the poem.**

19   **What's the theme of the poem? Someone is**

20   **talking. Give her respect. And the students**

21   **just keep talking. What's going on here?**

22   A. This is --- there's no quotation marks, but

23   I guess there should be. She might have thrown

24   out the question, what's the there of the poem?

25   And a student started to answer and Stacy said

1    to the rest of the students, someone is talking,

2    give her respect, like listen to her answer to

3    what is the theme of the poem, but the students

4    just kept talking anyway.

5    **Q. All right.**

6    A. I was noting that they were packing up

7    early. I'm not sure exactly what time that

8    block would have ended, but that was obviously a

9    problem, that they were packing up and wrapping

10   up the course maybe before they should have.

11   **Q. And the next note, Stacy informed me that**

12   **she lost a student's test, something for lost?**

13   A. And lost the ---.

14   **Q. Okay. And lost the attendance roster. I**

15   **need for the attendance ---.**

16   A. Secretary.

17   **Q. Okay. What happened here?**

18   A. Well, she lost a student's test, so the

19   student spent his or her time completing the

20   test, and she lost it. So the student would

21   have had to have retested. So that's a problem.

22   Not a huge problem, but the student is going to

23   have to retake the test. And they would have

24   already seen all the questions, so it would be

25   not hard for them to study and then take the

1    test again.

2    **Q. Okay.**

3    A. And then the attendance --- we have to keep

4    a roster of who's in our class every single day,

5    and we have to have that ready to go in case

6    there's questions about class cuts or just any

7    kind of attendance inquiry. And the attendance

8    secretary needed the roster, and Stacy had lost

9    it. So that posed a problem, a serious problem,

10   for the attendance secretary to be able to

11   verify whether or not the student was in class

12   that day or those days.

13   **Q. Next it says, did not follow lesson plan**

14   **format for "The Seafarer", and didn't get to**

15   **riddles. What's that mean?**

16   A. So she would have prepared a lesson plan in

17   advance of teaching something and then departed

18   from that lesson plan and didn't do what she

19   said she was going to do during that unit, so

20   that's a problem.

21   **Q. Okay.**

22   A. And during that class period, she was

23   supposed to be able to get to the riddles unit,

24   and because she's taking too much --- because

25   things are taking too much time or the pace is

1    so slow, she's not getting to what she said she

2    was going to cover.

3    **Q. Okay. And what's the final note on that**

4    **page about?**

5    A. At the end of the class, after she taught,

6    she would come up to me and say, I think that

7    went well, and she'd put me in an awkward

8    position because she clearly didn't see any of

9    the problems that were so obvious. So I said,

10   yeah, like there were some --- you know, I

11   wanted to indicate that, yeah, there were some

12   good things about how that went, but that I have

13   to go through some suggestions with you. I have

14   some comments that I need to go over with you.

15   **Q. And you did make those suggestions to her?**

16   A. Absolutely.

17   **Q. And how did she respond to you?**

18   A. I'm sure she just heard me and like as ---

19   there's kind of a record drawing here that, you

20   know, there's some things that she would try to

21   implement, but there were some things that she

22   just didn't implement, she didn't make happen in

23   the classroom.

24   **Q. There seems to be a huge disconnect between**

25   **your observations of her performance and her**

1    self-evaluation.
2    A. Yes.  And Barry's, Barry Girvin's also.
3    Q. All right.  Go into some detail on that.
4    What's going on that you're saying?
5    A. I can't really explain why it's happening,
6    but she seems to be clueless as to --- after a
7    lesson like that, where things really hadn't
8    gone very well, for her to come up and say that
9    she thought things went really well, I don't
10   know what that means, what she exactly thought
11   went well, especially when she departed from the
12   lesson plan.  I don't know how to explain what
13   was happening in her head or how she was
14   assessing her teaching performance.
15   Q. And you and Barry Girvin are having
16   conversations during this period of time, end of
17   February, early March?
18   A. Yes.
19   Q. What are you two discussing?
20   A. Well, we're starting to gear up for the mid-
21   evaluation because we need to be able to put
22   something on paper for her that's formal.  So
23   I'm --- and I think --- I would always get a
24   copy of his evaluations also when he would be in
25   the classroom, so I would see that he's trying

1    to, you know, point out --- everybody is trying
2    their best to point out anything positive that
3    she would do, but then we also have to address
4    the concerns, the growing concerns that we have.
5    So we would have been in dialogue a fair amount.
6    Q. You and Barry?
7    A. Uh-huh (yes).
8    Q. In dialogue, meaning you would talk on the
9    phone, you would see each other, you would
10   e-mail?
11   A. Probably just seeing each other.  When he
12   would stop in, he would, you know, perform some
13   --- he stepped up his number of evaluations, I
14   think, compared to what he did for other student
15   teachers, what's expected of him, informally and
16   formally.  So I would see him a fair amount.
17   Q. And at this point, it's still early March,
18   is there --- did you guys have a plan to improve
19   this situation?
20   A. I think the plans are the things that I've
21   referenced so far, that we were going to try to
22   figure out other teaching arrangements for her.
23   And then I did raise the suggestion, is this
24   something that we do, you know, that if --- at
25   the mid-evaluation I believe she would have

1    technically failed, accord... to the documents
2    that he filled out as far as the state was
3    concerned and as far as our evaluations.
4    In that situation, is there some kind of
5    precedent established where we would then send
6    her to the middle school or put her with some
7    kind of a placement where she would be not quite
8    so challenged by the content and could focus
9    just on the classroom management, as opposed to
10   having such a difficult time trying to juggle
11   both, because it wasn't working.
12   Q. Okay.
13   A. But because --- and also because that's my
14   first student teacher, ---
15   Q. Right.
16   A. --- so I didn't know what the protocol is
17   when this happens.
18   Q. Okay.
19   A. And I think he discussed it.  That's --- you
20   know, we try to avoid that and we want to try to
21   set her up for success if we can, and let's come
22   up with some other solutions for how we can
23   evaluate her and how we can get her to grow and
24   learn as a teacher from this experience.
25   Q. And what was Ms. Buffington saying at this

1    point in response to these concerns?
2    A. She was just --- she just had the exact same
3    concerns that I had, you know, that she was
4    worried about the quality of the education that
5    our students were receiving, especially compared
6    to, you know, a student in a senior English
7    class across the hall, that it's night and day,
8    that it's not comparable.
9    Q. Go to the next page, please, CVSD-220.  This
10   is Block Two, February 27, '06.  Can you
11   translate --- are these criticisms?  Are they
12   praise?  Are they just general notes, reminders
13   to you?  What is this?
14   A. Well, she opened with giving the kids their
15   progress reports so that they would see how they
16   were doing in the course at that point, probably
17   like a little bit beyond a midpoint in the
18   marking period, so again, close to having a
19   final grade for the marking period.  She
20   assigned new seats.  And that was something that
21   we experimented with constantly, trying to
22   change the seats of the students as a classroom
23   management tool.  So she took me up on that
24   suggestion.  That all the students who were
25   failing, according to their progress reports,

31 (Pages 118 to 121)

1　she was requiring, as per my suggestion, to get
2　the parent signature so as a tool for feedback
3　for the parents.
4　As far as students --- students were then
5　questioning the grading of the DOLA quiz, and
6　she must have done a good job kind of backing up
7　how she assigned point values to different
8　questions on that quiz.
9　Q. Okay.
10　A. She stressed again that students need to
11　come see her and --- to come see her outside of
12　class if they're struggling probably, and
13　students worked on riddle figurative language in
14　groups.
15　Q. It says, third line down, students seem to
16　be in control most of the time. What's that
17　mean?
18　A. When she is discussing her grading practices
19　or when she's talking about the timelines, as
20　I've said before, that the students can question
21　and kind of override her decisions.
22　Q. Okay. And that's a problem?
23　A. Yes.
24　Q. Go to the next page, please, CVSD-222. This
25　is Block Three, 3/1/06. At the top it says, had

1　to start late due to previous block's testing
2　situation.
3　A. Uh-huh (yes).
4　Q. What's that mean?
5　A. Probably that the test ran late, ---
6　Q. Okay.
7　A. --- you know, that the students had to stay
8　a little bit later until the block ---.
9　Q. Okay.
10　A. There could be more to that, but I don't
11　remember.
12　Q. How about DOLA underneath that, I mean, that
13　just --- is that just an observation of yours?
14　That has nothing to do with Stacy?
15　A. Right. Right.
16　Q. How about the next line, "Sir ---"?
17　A. "Sir Gawain".
18　Q. Okay. Stacy needed text to discuss. What
19　does that mean?
20　A. They probably were just having a discussion
21　about it and they were asking her questions and
22　she wasn't able to answer the questions, so she
23　needed --- she wasn't familiar enough with it,
24　so she needed to be able to go back and reread
25　the text or probably consult a teacher's guide

1　for the answer.
2　Q. And was she doing that in front of the
3　students?
4　A. Yes.
5　Q. Below that it says errors on PP. What's PP
6　stand for?
7　A. She made a PowerPoint presentation for the
8　students, and there were errors throughout it.
9　And Courtney, who would have been a pretty
10　gifted student in that class and pretty good
11　with grammar and punctuation mechanics and
12　things like that, she was watching the errors.
13　And I was just noticing that at least that's
14　good, that somebody is pointing out the errors
15　so that the students aren't being misinformed
16　about what's correct and what's not correct.
17　Q. And how does Stacy react when a student
18　catches her on an error?
19　A. Again, probably embarrassed. But a lot of
20　times she would attempt to defend the error or
21　give them misinformation, but not always. You
22　know, at some points she'd stand corrected,
23　which is probably what happened here.
24　Q. Okay. And the bottom right-hand side, under
25　grows, okay, errors in PowerPoint, still not

1　getting lesson plans the day before during Block
2　Four for our discussions. Sometimes I do, but
3　not always.
4　Q. Uh-huh (yes). And there again, there's a
5　modification because, technically, the lesson
6　plan should have been turned in, you know,
7　by --- the day before, so that morning --- so
8　that I could have the day to look over it. But
9　I was actually just saying could you get it to
10　me by our prep period, the period that we have
11　off, so that I can at least look at it during
12　our planning period and be able to go over it
13　with you. And she was still not doing that ---
14　Q. When Stacy ---?
15　A. --- consistently.
16　Q. When Stacy is not in class and you're
17　teaching, these same students who are giving her
18　a hard time, are they cooperative with you?
19　A. For sure.
20　Q. Okay. Turn to the next page. This is
21　actually 253. At the bottom it says grows.
22　Many students are sleeping; yes?
23　A. Yes.
24　Q. Still not sitting in assigned seats. Is
25　that happening as well?

## Page 126

1  A. Right. So the students were moved to
2  different seats to avoid maybe disruptions, so
3  and so sitting next to so and so, and they were
4  just moving and sitting wherever they wanted to
5  in class as opposed to observing the assigned
6  seats.
7  **Q. There seems to be a complete breakdown in**
8  **discipline.**
9  ATTORNEY VOIGT:
10  Objection to the form.
11  BY ATTORNEY KRAMER:
12  **Q. Is there a breakdown in discipline in her**
13  **class?**
14  A. As a pattern throughout ---
15  **Q. Yes.**
16  A. --- throughout everything, yes.
17  **Q. And it's getting in the way of the students**
18  **learning?**
19  ATTORNEY VOIGT:
20  Objection to the form.
21  BY ATTORNEY KRAMER:
22  **Q. Is that getting in the way of the students**
23  **learning?**
24  A. Yes.
25  **Q. It says here, one of your --- now, this is**

## Page 127

1  **in a box. Some of you are only thinking of**
2  **getting out of here. I'm feeling you. I'm**
3  **feeling you. What's that?**
4  A. That's Stacy being a senior also,
5  technically, in college, so she's referencing
6  that the students --- is this April 5th? I
7  think, probably, right at the top.
8  **Q. Yes, it is. It is.**
9  A. So you know, we're getting toward --- we're
10  in spring, and she's saying to the students that
11  --- she's trying to acknowledge that I'm sure
12  some of you have senioritis as well. I'm
13  feeling you. I have it, too. You know, she's
14  trying to indicate that she knows what it's like
15  to be a senior, nearing graduation.
16  **Q. Okay. Now, this is the end of the notes**
17  **that I received dated April 5th, your notes.**
18  A. Uh-huh (yes).
19  **Q. Are there additional notes that you took**
20  **that you think you don't have, or would this**
21  **have been the end of the notes that you took?**
22  A. I'm sure that there are more notes, ---
23  **Q. Okay.**
24  A. --- but I just don't know where they are.
25  **Q. Okay.**

## Page 128

1  A. I couldn't find them a year after.
2  **Q. Okay. And that would have been from April**
3  **5th through approximately when?**
4  A. The end of the month. the end of April,
5  probably.
6  **Q. Is that when the student teaching ends?**
7  A. That's about when it was --- I'm sure it was
8  wrapping up at that point, because she would
9  have finished her placement the first week of
10  May.
11  **Q. Okay. The month of April that isn't here,**
12  **can you recall anything that happened of note**
13  **that reflected Stacy's continuing inability to**
14  **teach?**
15  A. There could be from --- I think you have
16  probably a list of other examples of lacks of
17  professionalism or lacks of content. They would
18  be referenced on those pages.
19  **Q. If you would turn to the next page. This is**
20  **CVSD-194.**
21  A. Uh-huh (yes). Can I also make it clear that
22  there's probably less notes also because I would
23  have begun to start taking back over some of the
24  classes, so she would have been teaching fewer
25  courses at that point.

## Page 129

1  **Q. Why? Why is that?**
2  A. That's just natural. You build up and then
3  you build back down from the number of courses
4  that you teach.
5  **Q. During the time --- she was student teaching**
6  **in your class February, March and April. During**
7  **that time, describe how frequently you were**
8  **talking to Deann Buffington about your concerns**
9  **with Stacy's teaching.**
10  A. On a weekly basis and probably sometimes on
11  a daily or --- pretty regularly, I would think.
12  Because as my supervisor, she needs to know what
13  --- I feel like, you know, the responsibility
14  ultimately falls on me for what my students are
15  learning and any kind of parent or student
16  feedback that I'm getting, so she needs to be
17  kept informed for sure.
18  **Q. And how about with Barry Girvin, were you**
19  **discussing these concerns with him during those**
20  **February, March, April ---?**
21  A. Yes.
22  **Q. Okay. You mentioned a couple of parents**
23  **called in.**
24  A. Or it would be maybe more as an informal
25  type where maybe I'd be at a basketball game, a

1  student basketball game, and they'd be there
2  also, and they would want to talk to me about
3  what's happening in class, or at some kind of
4  after-school function or Parents' Night, things
5  like that.
6  **Q. And what would they tell you?**
7  A. They would just raise the same kind of
8  concerns that their sons or daughters were
9  raising. And again, it was --- it wasn't that
10  many. It would probably be two or three. And
11  they just wondered when was I going to pick back
12  up with the teaching and what would the students
13  be required to know at the end of the course.
14  **Q. Did any of them expressly reflect concern**
15  **about Stacy's performance?**
16  A. Yes.
17  **Q. How so?**
18  A. By indicating that their son or daughter was
19  worried about, you know, not --- their grades
20  were dropping. A lot of the students' grades
21  weren't very good, so the parents obviously were
22  concerned about that. So they were just worried
23  ultimately for what was going to happen as far
24  as the students' academic record was concerned
25  and, like I said, preparation.

1  **Q. Did you express your concerns at this point**
2  **to anybody higher in the administration, higher**
3  **than Deann Buffington?**
4  A. No.
5  **Q. The next page is CVSD-194. I don't know if**
6  **you can read that. I really just want to know**
7  **if you wrote this.**
8  A. No.
9  **Q. Do you have any idea who did write it? This**
10  **might be --- I'll show you a better copy.**
11  A. Does not respect professional boundaries, a
12  way to she is socially inept. I don't even know
13  where that came from, I don't think. I don't
14  recognize the handwriting. It's not mine. It's
15  not Deann's. I'm not sure.
16  **Q. Let's go on to the next documents, which is**
17  **the mid-evaluation that you completed, dated**
18  **March 20, 2006. And we're going to mark this as**
19  **CV-3.**
20  **(CV Exhibit Three marked for**
21  **identification.)**
22  BY ATTORNEY KRAMER:
23  **Q. Did you write this whole document?**
24  A. Yes. The narrative comments on the right I
25  wrote.

1  **Q. All right. Most of this is**
2  **self-explanatory. We don't need to go into more**
3  **detail on this. I do want to know, on the first**
4  **page, and you've got the first page of the**
5  **evaluation, you've got letter grades on the**
6  **left.**
7  A. Uh-huh (yes).
8  **Q. And it looks to me like G is kind of an A, R**
9  **is a B. I mean, what's the scale for this?**
10  **What is the ---?**
11  A. To some extent, I think so. But I think
12  even if you note, for the G, continued ongoing
13  development is expected. So you're expecting
14  that this person is going to be able to continue
15  on a path to, by the final evaluation, be able
16  to complete that objective, to be able to say
17  that they know that or do that or whatever it
18  is.
19  **Q. Okay.**
20  A. And that there's good progress evidence. At
21  this point, when you're dealing with a student
22  teacher mid-evaluation, you're not going to try
23  to have grand expectations for him or her.
24  **Q. I see under preparation you've got an N next**
25  **to number seven. That's under knowledge.**

1  **You've got an NA and some other ---. What's**
2  **going on there? What are you trying to say?**
3  A. That there are some areas where significant
4  or some attention --- significant remediation or
5  attention is needed. I have to say that the
6  letters on the left are important and they
7  indicate something, but that the narratives
8  comments are the best way to communicate to
9  somebody now they're doing, that those letters
10  are kind of --- a little bit arbitrary or
11  abstract.
12  **Q. Okay. Go ahead.**
13  A. No, go ahead.
14  **Q. Looking down on the right-hand side, which**
15  **--- on both pages, really, on all three pages,**
16  **if you would take a look at that, really, and**
17  **just focus on things we have not yet discussed,**
18  **issues that we haven't discussed already, if**
19  **there are any.**
20  A. It's a bit of a repeat of a lot of what we
21  discussed at this point.
22  **Q. Okay.**
23  A. That seems to be a lot of what we've already
24  discussed.
25  **Q. At the time you wrote this, I believe that**

| | |
|---|---|
| 1 | **was true and correct to the best of your** |
| 2 | **observation and belief?** |
| 3 | A. Yes. |
| 4 | **Q. Did you share this document with Stacy?** |
| 5 | A. Yes. And I have a copy of it. |
| 6 | **Q. And how did you share it with her? Did you** |
| 7 | **talk about it?** |
| 8 | A. We would have had a formal meeting for me, |
| 9 | for Barry and for --- Mr. Girvin, and for Stacy |
| 10 | to sit down and share what we --- how she |
| 11 | self-evaluated and how we evaluated her. |
| 12 | **Q. Okay. Let's go on then next, which is her** |
| 13 | **self-evaluation, and we'll mark that as CV-4.** |
| 14 | **(CV Exhibit Four marked for** |
| 15 | **identification.)** |
| 16 | BY ATTORNEY KRAMER: |
| 17 | **Q. And I don't know --- I don't want to go into** |
| 18 | **detail on what she wrote, but I want to hear** |
| 19 | **about the conversation that you, Barry Girvin** |
| 20 | **and Stacy had when discussing the mid-term** |
| 21 | **evaluation.** |
| 22 | A. Just that Barry and I were on a same |
| 23 | page --- a similar page because he and I |
| 24 | actually met before we would have met with Stacy |
| 25 | so that there would be no surprises as far as |

| | |
|---|---|
| 1 | what I was evaluating her and how I was |
| 2 | evaluating her, and how he was evaluating her. |
| 3 | And to some extent Barry expressed the desire to |
| 4 | make sure that we would be close with our --- |
| 5 | not necessarily our narrative report had to |
| 6 | reflect the same things. We would be looking |
| 7 | for different things maybe, but that our |
| 8 | letters, the letters, the codes that we used |
| 9 | would be pretty close. So you know, we went |
| 10 | over that, and then he and I sat down and --- I |
| 11 | believe he or I went first. And I know that she |
| 12 | went last because she said --- she said |
| 13 | something to the effect of, wow, my evaluation |
| 14 | of myself is way different from what you guys |
| 15 | had said. So she indicated that she knew that |
| 16 | going into it. And then she would have worked |
| 17 | through her comments about herself, but I think |
| 18 | she was surprised to see the difference in our |
| 19 | evaluations. |
| 20 | **Q. How could that be? I mean, what happened?** |
| 21 | **What did you think was going on?** |
| 22 | A. I really was flabbergasted. I don't know |
| 23 | how to explain it. And I believe Barry --- it |
| 24 | seemed that Barry was as well because he and I |
| 25 | had been giving her feedback for a couple weeks |

| | |
|---|---|
| 1 | at that point. |
| 2 | **Q. And what do --- do you file the document you** |
| 3 | **wrote someplace after --- what do you do with it** |
| 4 | **when you're done discussing it with Stacy and** |
| 5 | **Barry Girvin?** |
| 6 | A. That's the end of it. There's no formal |
| 7 | record of it, I don't think, and --- yeah, Stacy |
| 8 | gets a copy of it and Barry gets a copy of it. |
| 9 | **Q. And you keep a copy for yourself?** |
| 10 | A. Uh-huh (yes). |
| 11 | **Q. Okay.** |
| 12 | A. And maybe this might be important, that from |
| 13 | here I believe we tried to keep coming up with |
| 14 | some kind of a plan for Stacy for the second |
| 15 | half of the placement. Because as I |
| 16 | acknowledged earlier, this was --- she wasn't |
| 17 | doing very well at this point. And we made some |
| 18 | kind of a deal where we were going to try for |
| 19 | the final evaluation to only look at her growth |
| 20 | and improvement from the mid-evaluation to the |
| 21 | final evaluation so that she wouldn't have to |
| 22 | keep carrying around, you know, black marks from |
| 23 | the first half of her placement, so that we |
| 24 | could really just look for that growth and |
| 25 | improvement. |

| | |
|---|---|
| 1 | **Q. Okay.** |
| 2 | A. So that might explain why, sometimes some of |
| 3 | the things that we would have referenced in the |
| 4 | mid-evaluation weren't necessarily brought up |
| 5 | again and, you know, hammered on again in the |
| 6 | final evaluation. |
| 7 | ATTORNEY VOIGT: |
| 8 | Excuse me? |
| 9 | ATTORNEY KRAMER: |
| 10 | Yes. |
| 11 | ATTORNEY VOIGT: |
| 12 | Could we just take a short |
| 13 | five-minute break? |
| 14 | ATTORNEY KRAMER: |
| 15 | Absolutely. |
| 16 | SHORT BREAK TAKEN |
| 17 | BY ATTORNEY KRAMER: |
| 18 | **Q. At some point before May 1st, we'll use that** |
| 19 | **as the demarcation line, had you discussed with** |
| 20 | **Ms. Snyder the importance of maintaining a** |
| 21 | **professional relationship with her students and** |
| 22 | **to not become overly familiar with them?** |
| 23 | A. Yes. |
| 24 | **Q. Describe that.** |
| 25 | **Q. Starting with that --- starting with --- I** |

1  know that the --- we can go right to the MySpace
2  incident, to allude to that some.  Earlier, I
3  know that it had come up in class, that she had
4  referenced that she had a MySpace page, and that
5  I indicated to her in private after --- you
6  know, not in front of the students that I didn't
7  have a MySpace page, that teachers don't have
8  MySpace pages or shouldn't have MySpace pages
9  that are really personal information, that
10  there's a boundary there, that you actually
11  don't want your students involved in your
12  personal lives to that extent.  And I also
13  indicated that I wouldn't even know how to get
14  on MySpace or how to even check a MySpace page.
15  So I know that that had come up a couple times,
16  I think twice.
17  Q. When, approximately?  Mid-semester?
18  A. Sure.  Yeah.  Probably.  I don't know
19  exactly when.  I don't think I referenced any
20  dates.
21  Q. Okay.  What other --- anything else you
22  remember telling her about maintaining proper
23  boundaries with the students?
24  A. Well, the chaperones --- or I chaperoned a
25  dance and Stacy wanted to chaperone that dance

1  Q. There are marks on the resume.
2  ATTORNEY KRAMER:
3  And actually, let's mark that as
4  CV, I think Five.  Yes, CV-5.
5  (CV Exhibit Five marked for
6  identification.)
7  BY ATTORNEY KRAMER:
8  Q. Are these corrections yours?
9  A. Yes.
10  Q. Okay.
11  A. And suggestions, things --- I think what ---
12  in my opinion, what it shows is that she's
13  comfortable enough with me to come to me and ask
14  --- to show me her personal documents, like her
15  cover letter and her resume, and let me know
16  that she's interesting in applying at that
17  point, and I would be able to give her feedback
18  and give her anything from my experience.  I
19  think I shared my cover letter and my resume
20  with her and some of the materials that I would
21  have prepared for an interview.
22  Q. I see you've made a fair number of
23  corrections on the resume.  A couple things,
24  just to clarify.  Under teaching experience, it
25  says student teaching.  You wrote something on

1  also.  It was for a charity.  And she had
2  indicated that she kind of wanted to get out
3  there and dance with the students, like dance
4  while they were dancing.  And I said, that's not
5  my role here.  I'm actually chaperoning.  I'm
6  not going to dance with the students.  So you
7  know, you want to observe that line.  So I know
8  that that was discussed.  Just discussion of
9  personal business, personal life, that that
10  would have come up.  Presenting yourself as a
11  professional in front of the classroom as in
12  like your attire and how you dress would have
13  been discussed.
14  Q. At some point during the semester did she
15  apply for a job at Conestoga Valley?
16  A. She didn't officially apply, I don't think,
17  but that she was planning on it because she did
18  obviously show me her cover letter and her
19  resume and ask for feedback on that.  I'm not
20  sure that she --- I don't know.  She might have
21  officially submitted her application.
22  Q. What's on the --- go to the last three pages
23  in the packet, actually.  It's Stacy's resume
24  and a letter dated March 20th, 2006.
25  A. Uh-huh (yes).

1  the right-hand side, Y something.  Do you know
2  what that says?
3  A. YF fragment.  All the --- the sentences in
4  that, you know, it's not parallel structure.
5  Q. And is that the same comment that you made
6  right below that, under pre-service learning
7  grades ten ---
8  A. Yes.
9  Q. --- and 11?  What did you think of her
10  resume when you first saw it?  What was your
11  reaction?
12  A. That she needed to clean it up and catch
13  errors before she would actually show it to
14  anybody for an English position ---
15  English teaching position.
16  Q. Did you find grammatical errors?
17  A. A couple.  It was pretty well proofread.  I
18  mean, there were usage errors with words and
19  some punctuation marks and just some kind of
20  content issues that I thought we should work
21  out, capitalization, her word choice.
22  Q. How did she react when you made these
23  changes on her letter?
24  A. I think she was probably grateful for the
25  help, for the feedback.

Q. And then the next page, which is CVSD-246, and we'll make that part of CV-5, this is a cover letter, your changes, revisions here as well. Did you make those revisions?

A. Yes.

Q. Did you make them at the same time you made the revisions to her resume?

A. Yes.

Q. Any other ---? Anything else you remember about your conversation with Stacy on the revisions of her resume and cover letter?

A. Nope.

Q. Did you ever talk to Ms. Buffington about Stacy applying for a job in that general subject?

A. Sure. Yes.

Q. And tell me, what was that discussion?

A. At that point, I would have indicated that she was interested in applying and that --- or maybe --- and Mrs. Buffington may have even come to me and said that Stacy had indicated that she was planning on applying.

Q. Okay.

A. Because how that would have involved Mrs. Buffington is that she would have wanted to get

in and observe her, ---

Q. I see.

A. --- as you would any potential applicant.

Q. And did that --- anything else that you know about Stacy applying for a job?

A. No.

Q. Let's go to the next, which is CVSD-185. This is an e-mail.

OFF RECORD DISCUSSION

BY ATTORNEY KRAMER:

Q. This is an e-mail printed from Deann Buffington's computer. We have two e-mails. The bottom one you sent to Kim Seldomridge, I believe the next one is Barry Girvin and Deann Buffington.

A. Yes.

Q. Tell me about this list, this document, including the next page or two.

A. Right.

Q. What is it?

A. I was asked at this point, which would have been May 9th, a Tuesday, the Monday following the discussion for when Stacy was notified that she wasn't going to be reporting back to Conestoga Valley. I was asked to prepare a list

of professionalism --- unprofessional behavior or performance in the classroom, so I sent it and attached it.

Q. Who else did?

A. I think Deann asked me through Kim, because he is our director of --- I'm not exactly real sure what his title is, the director of human resources, something like that, and he wanted to have some specifics just for his file about --- just to follow what was happening at this point with Stacy Snyder.

ATTORNEY VOIGT:

Let me just object. Who was asking for specifics? I missed that.

A. Kim Seldomridge.

BY ATTORNEY KRAMER:

Q. Was he acting principal at this time?

A. No. He works in our district office, and he's in charge of personnel matters. Somehow his job must have covered this. He's our district solicitor, I think, too. Is that possible? I might be just making that up. I'm sorry.

Q. So you prepared the document CVSD-186?

A. Yes.

Q. Did you prepare that by yourself?

A. Yes.

Q. Well, let's go through the list. I don't want to go into detail on issues that we've already talked about.

A. Okay.

Q. So why don't you start going down the list. And if we discussed it and there's nothing else to add, let us know. If there's something to discuss, ---

A. Okay.

Q. --- then we'll talk about it.

A. Do you want me to actually read what it says?

Q. Yes, so she can transcribe it. Well, you don't need to read the whole ---

A. Just reference it.

Q. --- paragraph. Just reference it. The first one about Ms. Snyder playing a song.

A. Right. The first one was already covered with the Ben Folds Five song.

Q. Okay.

A. The second one is in reference to an awkward account of a Valentine's Day that Stacy gave in front of the students and the supervisor.

37 (Pages 142 to 145)

1  **Q. Which supervisor?**
2  A. Barry Girvin.
3  **Q. Okay.**
4  A. And that made everybody, I think, in the
5  room feel kind of uncomfortable, not sure
6  exactly what to say, and they weren't prepared
7  for the answer they got. Because what happened
8  was the students just said probably on February
9  15th, the day after, yeah, on February 15th, Ms.
10  Reinking, how was your Valentine's Day? Fine.
11  Thank you for asking. They just smiled and
12  that's basically all they wanted to hear. They
13  just wanted to be courteous and ask me.
14  **Q. Right.**
15  A. Ms. Snyder, how was your Valentine's Day?
16  And then apparently she looked at me and she
17  said, can I share with them what I said to you
18  earlier, what happened? And I knew what she was
19  hinting at because she had come in that day and
20  told me about how her Valentine's Day had played
21  out the night before. And before I could even
22  answer, I just kind of looked over at Barry
23  Girvin, thinking, are you serious? You really
24  want to say this to the kids? Before I could
25  even say anything, she had launched into the

1  story.
2  **Q. What's the story?**
3  A. And the story was something to the effect
4  that she went to dinner at a restaurant, her
5  favorite restaurant, Damon's. She went with her
6  two sons and her boyfriend, and that he gave her
7  some gifts. But that when they got there, their
8  dinner was ruined because her ex-husband or
9  boyfriend, her ex, ex-husband, and his
10  girlfriend, and that that just ruined it.
11  They got up in, you know, the middle, without
12  finishing their dinner, paid their bill or
13  didn't even finish ordering, I'm not sure, and
14  left and just went to a bowling alley and had
15  pizza and bowled. And it was kind of --- it was
16  just kind of awkward because they had only known
17  her for, you know, a couple weeks at this point
18  and it just didn't seem like something a teacher
19  would share with her students.
20  **Q. Would it have been okay if she had said**
21  **something at the end of the semester, or is this**
22  **kind of thing really never appropriate for a**
23  **teacher?**
24  A. I don't --- I can't imagine why any teacher
25  would ever share this at any point in the

1  semester. But they really didn't even know her
2  at this point, so it seemed like such a personal
3  thing to confide or to say.
4  **Q. What's your concern about that?**
5  A. I didn't have --- you know, I wasn't
6  necessary thinking she shouldn't be pulled out of
7  student teaching because she said this, but I
8  knew that Barry Girvin was going to address this
9  with her and explain to her that there's just
10  some personal boundaries, as were discussed, you
11  know, throughout the semester that your personal
12  life is your personal life and it's not supposed
13  to cross over into the classroom and that you
14  don't want your --- you know, I'm thinking you
15  don't want your students sharing details of
16  their Valentine's Day with you necessarily.
17  **Q. All right. It said here the students felt**
18  **uncomfortable. What did you observe that made**
19  **you think that?**
20  A. Just the gestures and the looks that they
21  gave each other around the room. And again,
22  usually there would be lots of glancing back at
23  me and looking to see what my reaction to things
24  would be. And I just sort of put my head down
25  and felt kind of embarrassed by the situation

1  and didn't know exactly how to respond, not that
2  there was a need for me to respond at that
3  moment, but everybody kind of felt like, wow, we
4  weren't prepared for that.
5  **Q. Did you discuss this with Ms. Snyder**
6  **afterwards?**
7  A. No. I talked to Mr. Girvin about it because
8  he was there and he's her supervisor and he
9  could discuss that with her, and he did.
10  **Q. And how come you didn't raise it with Ms.**
11  **Snyder?**
12  A. Because I went to Girvin about it.
13  **Q. Okay.**
14  A. I just figured I had probably come --- not
15  come down on her, but I was constantly
16  explaining to her that her choices as far as
17  content or as far as professionalism were
18  concerned were not appropriate. You know, I
19  would always be explaining things to her. I
20  thought it might be good for her to hear it from
21  her supervisor.
22  **Q. Did any of the students come to speak with**
23  **you about this incident?**
24  A. No.
25  **Q. Okay. Let's move on to the next one.**

1   A. Yeah, this references the foul language and
2   inappropriate weekend behavior that would be
3   discussed around the room that she would not
4   address, she just sort of turned a deaf ear to.
5   **Q. The students would discuss weekend behavior**
6   **out loud?**
7   A. Yes.  So on a Monday morning or a Monday
8   afternoon they'd be talking about how they spent
9   their weekend.  Or on a Friday they'd be talking
10  about how they planned to spend their weekend.
11  **Q. Okay.**
12  A. And I would hear references to it.  And you
13  know, they'd be kind of loud enough to be heard
14  but quiet, and she wouldn't choose to address
15  that.  But there's an inconsistency there
16  because also on her desk calendar, prominently
17  displayed on her teacher desk that she brought
18  in, you know, her weekend plans sometimes would
19  be written out in large block letters.  So it
20  would say The Village, The Village, across like
21  her Friday-night plans, so she would be
22  indicating how she was spending her weekend.
23  And The Village is, of course, a nightclub
24  and ---
25  **Q. Okay.**

1   A. --- like a dance club bar, so ---.
2   **Q. Okay.**
3   A. The next one is the MySpace situation.  Do
4   you want me to ---?
5   **Q. Hang on.**
6   A. I'm sorry.  The example before that is that
7   twice Ms. Snyder used shut up as a means to gain
8   her students' attention.  Even though it was
9   addressed, she reverted to it the second time.
10  Her defense of that, when I explained to her
11  that I didn't want her to use that as a
12  classroom management tool, was that she used
13  that with her children and it was natural, so
14  you know, that was her way of explaining why she
15  resorted to that.  And then that led to students
16  in the class then using shut up as a way of
17  gaining each other's attention or quieting the
18  class down.
19  **Q. Let's go on to the next one.**
20  A. Do you want me to explain the whole
21  situation?
22  **Q. Yes, please.**
23  A. So after at least two discussions, and I
24  think it was two, two discussions with Ms.
25  Snyder regarding the MySpace page and whether or

1   not to have one and her referencing that she had
2   one in front of the students ---
3   **Q. In class?**
4   A. --- in class and it had come up that the
5   students might be talking about their MySpace
6   pages and she would enter into that discussion,
7   let's say.  And I reminded her that that was
8   inappropriate.  She brought it up again.  And I
9   tried to --- the list I would have completed,
10  you know, pretty soon after the incident, so I
11  would rely on this better than my memory, that
12  you know, a student had stepped --- basically
13  that she was bringing up, which one of you was
14  on MySpace page because one of my friends, you
15  know, informed me that you ran up to them at the
16  mall or something like that, how it's explained
17  here.
18  **Q. Okay.**
19  A. And after that happened, that she was even
20  entering into that dialogue again, yet again,
21  even after I asked her not to, I went to lunch
22  and I vented in the lunch room in front of some
23  colleagues and said, I can't believe --- I don't
24  know how to get through to this student teacher.
25  I mean, if I say it twice, then she still does

1   it a third time.  She's still courting disaster
2   by talking about her MySpace page.  I still had
3   not seen it, never went on to try to find it.
4   You know, I didn't even know --- for all I know,
5   there would be pictures of her puppies on there.
6   I don't know.  So I had vented.  And then that
7   Friday evening I was out to dinner and a
8   colleague had called me and said, you need to
9   see her MySpace page.  And he told us some of
10  the things that were on it, which are, I think,
11  photocopied probably in your document.
12  **Q. Who was that?**
13  A. Shaun Karli.  And at that point, we made it
14  clear to Mrs. Buffington.  We printed it out and
15  brought it in for her to see.  And then I just
16  turned it over to her and put it in her hands
17  and let her decide what should happen at that
18  point.
19  **Q. Did you ever see the MySpace page?**
20  A. I do think I did.  I've been very unclear
21  about, like, did I actually go on and try to
22  find it, but I think I probably went on and
23  tried to find it because that's just my nature.
24  It was over the weekend.  And that's how that
25  material actually surfaced at Conestoga Valley.

1    (CV Exhibit Six marked for
2    identification.)
3    BY ATTORNEY KRAMER:
4    Q. Okay. I'm going to --- and this is part of
5    CV Six, but this is a page ---. If you'd look
6    at --- is that the page that you recall seeing?
7    A. Yes. That would have been, you know, cut
8    and pasted from the Internet onto, like, a
9    document and then printed out.
10   Q. Okay. You may have answered this, but did
11   you actually see the MySpace page on the
12   computer ---
13   A. Yes.
14   Q. --- or you saw it after printed out?
15   A. I saw it on the computer.
16   Q. Okay. And what did you see on the computer
17   screen?
18   A. Like blog entries, maybe pictures of her
19   friends, like who the different people are that
20   are commenting that she's dialoging with and
21   photos of her posing with cups.
22   Q. Was that one of the photos you saw?
23   A. Yes.
24   Q. And the text underneath that, was that on
25   the MySpace page as well?

1    A. That picture may have been over to the ---
2    you know, to the side, and then that was the
3    blog entry on that page. I'm really not ---
4    other than going on this one time, I've never
5    been on MySpace since, so I don't know. I'm not
6    that familiar with it.
7    Q. So that's a blog entry, as far as you know,
8    the text?
9    A. Right.
10   Q. Okay.
11   A. Where she would keep track of how she feels,
12   almost like a diary entry, I think.
13   Q. And tell me what's inappropriate about this
14   whole scenario?
15   A. Well, it's referencing that she knows that
16   students are on here looking at her page, and
17   that's fine. So that's contrary to everything
18   that I had asked her to do. And after the fact,
19   in discussing this with Barry Girvin, I had
20   learned that Millersville had advised its
21   student teachers to --- you know, that they had
22   put out at that opening seminar before they went
23   out to student teach, that they had discussed
24   that MySpace pages were inappropriate, that
25   they're --- you know, you shouldn't have them,

1    that that content can get you into trouble.
2    That's --- as the media points out for other
3    professions as well. It's kind of a hot-button
4    issue.
5    Q. Right.
6    A. So that was frustrating. And then she
7    references the fact that there are pictures of
8    her drinking on there, that she has nothing to
9    hide because she's saying she's over 21, and
10   that anything that she says in here can't hurt
11   her in the long run, meaning probably outside of
12   her student teaching placement. So it's fine
13   that students can be on there seeing her
14   pictures and hearing whatever she has to say
15   each day.
16   She doesn't think that any of her students
17   would stoop so low as to mess with her future,
18   meaning call her out, actually go in and tell
19   the teacher that they have seen her MySpace page
20   and there's pictures of her posing with drinks.
21   And she says, so bring on the law.
22   And here she's referencing that she kind of
23   hopes to start using this as a tool for
24   communication with her students, especially
25   after --- she says, I figure a couple students

1    will actually send me a message when I'm no
2    longer their official teacher, when she's no
3    longer the professional in front of the
4    classroom.
5    And then she references, the students keep
6    asking why I won't apply to be the teacher
7    there, because it was well known that there was
8    a teacher retiring within our department and
9    that we would need to have a replacement. And
10   she says that --- she's posing a question, I
11   guess --- I don't know to whom, anyone who
12   reads her blog, I guess, would it hurt her to
13   tell the students what the real reason is for
14   why she's not applying or what the problem was,
15   indicating some person.
16   Q. What does that mean to you?
17   A. I'm --- it's cryptic. I'm baffled by it.
18   I'm not sure, but maybe she's trying to
19   reference me or she's trying to reference some
20   kind of CV official, I would think. Because why
21   else would she be worried about telling the
22   students? So my best way to read this is
23   obviously, she's probably talking about me at
24   this point.
25   Q. How did you feel when you saw this?

1   A. I kind of had spent the entire semester
2   working pretty hard to help her get through the
3   student teaching placement, and if felt kind of
4   like a stab in the back, especially --- there's
5   another document where she references that I'm
6   the worst student teaching co-op ever or
7   something like that. And that blindsided me as
8   well, because I thought that I had --- I thought
9   I had tried to be kind to her as possible and
10  give her every benefit of the doubt throughout
11  the placement.
12  Q. Are you aware if --- it references there
13  that one of her students was looking at her
14  MySpace page. Are you aware if other students
15  saw her MySpace site?
16  A. I'm not sure how many would have been on
17  there.
18  Q. Okay. So there may not have been any
19  others, as far as you know?
20  A. As far as --- let me think about that for a
21  second just to make sure, but no, I don't know
22  exactly how many students would have looked.
23  Q. Okay. You told her --- before this came to
24  your knowledge, you told her, it seems at least
25  two times, not to have a MySpace page?

1   A. Right. Not to discuss it with the students.
2   Q. And did she discuss it in class on several
3   occasions?
4   A. It had been referenced twice in class.
5   That's what prompted me to explain to her that
6   that's not appropriate. And by this --- this is
7   the third time when she had indicated the third
8   time that the students were looking at it.
9   Q. Before this picture --- before you got this
10  picture, are you aware --- have you seen any
11  other pictures from her MySpace account?
12  A. No.
13  Q. Did any students come to you and say they
14  had seen her MySpace account?
15  A. No.
16  Q. You said one --- Shaun Karli had given you -
17  -- had told you, you might want to look at her
18  MySpace page?
19  A. Right.
20  Q. Did you discuss Ms. Snyder's MySpace page
21  with any other Conestoga Valley employees?
22  A. No.
23  Q. How about with Deann Buffington?
24  A. She wouldn't have been at that lunch when I
25  would have had --- when I would have said, I

1   don't know why she's not listening to me. She
2   referenced her MySpace page again. I might have
3   brought up just in kind of --- it ongoing
4   dialogue with her about her unprofessionalism or
5   her lack of content. I'm sure it probably came
6   up, but I don't have any specific recollection
7   of it.
8   Q. Any parents contact you about the MySpace
9   ---?
10  A. No.
11  Q. It seems that your primary concern --- well,
12  your primary concern was that she had gotten too
13  personal with the students with this ---?
14  ATTORNEY VOIGT:
15  Objection to the form.
16  BY ATTORNEY KRAMER:
17  Q. What are your primary concerns about the
18  MySpace episode, if you will?
19  A. It was consistent with kind of a long-
20  running list of examples, in my opinion, of her
21  being overly familiar with the students and just
22  inviting the students into her personal life,
23  and then coupling that with, obviously, pictures
24  of her drinking isn't inappropriate. And then
25  this reference at the very end that she's trying

1   to kind of use this as a tie, to maybe go around
2   me and have --- turn them against me. You know,
3   I don't know exactly what's she's planning on.
4   I'm just guessing. But yeah, those were all
5   problems. And just her failure to listen to me
6   when I explained to her that this is
7   inappropriate. She's not taking my advice.
8   She's not listening to my professional judgment.
9   Q. I don't see, at least on that page, a
10  reference to alcohol. Why do you believe she
11  was --- I'm presuming when you say she was
12  drinking, she was drinking alcohol and not, you
13  know, grape juice.
14  A. She's referencing the fact that she's over
15  21, and that is the legal age to drink. That
16  picture, she's kind of posing in a goofy way
17  with a cup that has something in it. And other
18  pictures that were later dropped by her have
19  captions, drunken pirate and things like that.
20  So I think that makes it kind of obvious that
21  she admitted that it was alcohol in the cup.
22  And there were other pictures, obviously, on the
23  web site, and I didn't take the time to post
24  them all in and didn't think it would turn into
25  a federal lawsuit.

1  Q. Who knew? Did you and Ms. Snyder discuss
2  this?
3  A. No.
4  Q. Never?
5  A. No. Because I came in Monday morning and
6  made sure that Mrs. Buffington saw it. And I
7  believe she was there that morning and then
8  needed to leave for a doctor's appointment or,
9  you know, there was something going on that she
10  was leaving early that day because she wasn't
11  well.
12  Q. Okay.
13  A. And then I believe I got a phone call at
14  home. But all of that took place outside of my
15  --- I wasn't involved in it. At that point it
16  was out of my hands.
17  Q. Okay. Before we get into that, let's finish
18  with this page --- the other page in front of
19  you, CVSD-186.
20  A. Okay.
21  Q. Okay. Frequently Ms. Snyder went above me
22  for answers to issues concerning my classroom or
23  her time at Conestoga Valley. What's that
24  about, and have you ever discussed it with
25  anyone else?

1  A. We did discuss the key example. We didn't
2  discuss the fact that Ms. Snyder had gone to
3  Mrs. Buffington, not to me, who has no official
4  capacity as far as her student teaching is
5  concerned, other than, you know, being my
6  supervisor and the supervisor of the department,
7  to ask her if she could, after graduation,
8  remain at Conestoga Valley and teach my courses
9  for me.
10  Q. What does that mean, teach your courses?
11  A. Just to continue as the teacher of those
12  courses.
13  Q. Was she asking for your job?
14  A. In essence, she wanted to stay on and just
15  continue working with the students and continue
16  teaching, which isn't even possible and it
17  doesn't make any sense, but ---.
18  Q. Okay.
19  A. It's a little out of touch. I don't know
20  why she would do that. That's kind of strange.
21  Q. What's the concern about her bypassing the
22  appropriate chain of command?
23  A. I think that that would kind of fall under
24  professionalism and her inability to understand
25  where she is in a professional capacity

1  within --- you know, that you have a supervisor
2  that I report to, that I don't go to Doctor
3  Huesken, the superintendent, when I need
4  something. That that's just not the way that it
5  happens in the professional world.
6  Q. Let's go on to the next one about her
7  professional attire.
8  A. There's a reference to the fact that she
9  wore flip-flops to school, and that's not
10  professional teaching attire. And this also just
11  references the fact that she --- she was looking
12  for every opportunity to be able to dress down
13  or to be able to wear jeans, when those
14  opportunities are provided as fundraisers,
15  basically, for a scholarship fund in the
16  teacher's pay in advance to be able to dress
17  down on those days. It's not necessarily
18  something that they just --- the district wants
19  to let you let loose a couple times a year.
20  They're profiting because they're going to raise
21  money for a scholarship. And typically student
22  teachers don't necessarily take advantage of
23  those kinds of days, because they're looking for
24  every opportunity they can to separate
25  themselves from the students and to just be

1  professional at all times. But they're always
2  on their best behavior. They're trying to
3  always put their best foot forward.
4  Q. And that's not how Stacy was behaving
5  during ---?
6  ATTORNEY VOIGT:
7  Objection to the form.
8  BY ATTORNEY KRAMER:
9  Q. Was that how Stacy was behaving during the
10  semester?
11  A. In reference to her wanting to wear jeans?
12  Q. Well, more in reference to wanting to be
13  very friendly with the students.
14  A. I think that --- yes. But I think that it
15  even falls maybe a little bit more in line with
16  the next point, ---
17  Q. Okay. Go ahead.
18  A. --- which references the fact that she
19  didn't understand that she was a student teacher
20  and not actually a professional staff member who
21  was hired to teach at that point at Conestoga
22  Valley. So she didn't realize that maybe when
23  she was at a faculty meeting and there were
24  issues being discussed from the fall semester,
25  that she --- when she wasn't even placed at

1    student teaching in a professional capacity,
2    that she maybe shouldn't raise her hand and
3    comment on it, that that wasn't necessarily her
4    role at that point in that meeting.
5    At a department meeting, where we were
6    talking about course selection materials for
7    next year or instructional materials, like
8    textbooks, for next year, she probably shouldn't
9    necessarily be raising her hand and making
10   suggestions because she's not necessarily going
11   to be at Conestoga Valley next year. So it
12   seemed like there was always situations where
13   she --- there were a number of situations where
14   she didn't understand that she wasn't --- that
15   she wasn't actually --- I don't know how to say
16   it. I'm losing my words. I probably said it
17   better here, actually.
18   **Q. All right.**
19   A. The forwardness I guess is kind of what I'm
20   getting at and lack of attention to
21   procedure ---
22   **Q. Okay.**
23   A. --- and professional boundaries. That's
24   what I was looking for.
25   **Q. Let's go to the last one.**

1    A. And that one involved just information that
2    came to me, that I know that on that May 8th,
3    that Monday that she was asked if she could
4    leave for an 11:30 doctor's appointment, but
5    that my department had come up to me and --- a
6    department member had come up to me and said
7    that they overheard a phone conversation where
8    the appointment was actually at three o'clock
9    but that she wanted to leave at 11:33.
10   **Q. Who told you that, what staff member?**
11   A. Arashay Burden.
12   **Q. Spell that.**
13   A. A-R ---
14   **Q. Okay.**
15   A. --- A-S-H-A-Y.
16   **Q. Okay.**
17   A. A-R-A-S-H-A-Y. Borden, B-O-R-E-D --- or
18   B-O-R-D-E-N. She's actually deceased, so you
19   won't be able to ask her.
20   **Q. So I guess we're not going to depose her.**
21   **All right. Are there any --- we've gone through**
22   **a very long litany of deficiencies on her part.**
23   **Are there any that we haven't already discussed,**
24   **that we haven't talked about on this page or**
25   **that we haven't previously talked about with**

1    **respect to your notes?**
2    A. No. Nothing is jumping out at me.
3    **Q. Okay. CV-6 is the e-mail and unprofessional**
4    **behavior, performance in the classroom. Was**
5    **this included in your e-mail?**
6    ATTORNEY VOIGT:
7    This being what?
8    ATTORNEY KRAMER:
9    This being the picture of Stacy on
10   MySpace and the blog.
11   BY ATTORNEY KRAMER:
12   **Q. Did you include that in your e-mail?**
13   A. I think I had --- I didn't have an
14   electronic version of it, but on the document
15   CVSD-186 I say that the copy of some of the
16   account's content is included.
17   **Q. Okay.**
18   A. So that's probably what I'm referencing. So
19   he did have a copy of that, Mr. Feldomrione.
20   **Q. And then finally there's the song by Ben**
21   **Folds that you reference in your ---?**
22   A. Uh-huh (yes).
23   **Q. Okay.**
24   A. Yes.
25   **Q. Now, --- and this I think would probably be**

1    **pretty quick, you --- Monday morning you went to**
2    **Ms. Buffington?**
3    A. Yes.
4    ATTORNEY VOIGT:
5    Objection. Monday morning ---?
6    BY ATTORNEY KRAMER:
7    **Q. Monday morning, on approximately May ---**
8    A. Eighth.
9    **Q. --- May 8th ---**
10   A. Uh-huh (yes).
11   **Q. --- you went to Ms. Buffington?**
12   A. Right.
13   **Q. What happened?**
14   A. I showed her the picture and the content
15   from the MySpace page, and she took over at that
16   point and I think discussed --- probably went to
17   Doctor Huesken or to Mr. Mr Geldomridge and had
18   gotten in touch with Mr. Cirvin and decided what
19   should happen with Stacy, as far as she was
20   concerned.
21   **Q. What, if anything, did Ms. Buffington say to**
22   **you in that May 8th discussion?**
23   A. Nothing specific, just that she --- you
24   know, that she supported me and she thought that
25   this was kind of the last straw, the last

1  example of unprofessionalism.  And we were in
2  the last week of the student teaching placement
3  as well, and there wasn't any real need to have
4  her actually in the classroom.  She had
5  completed as much as we could get her to
6  complete at that point, so it was a pretty easy
7  decision to have her not come in for the rest of
8  that week.
9  **Q. Were you involved in that decision?**
10  A. No.
11  **Q. Whose decision was that?**
12  A. I don't know.  I don't know whose ultimate
13  decision it was.
14  **Q. Do you have any role in whether a student**
15  **teacher passes student teaching?**
16  A. No.
17  **Q. So in other words, you don't recommend, in**
18  **this case to Barry Girvin, that Stacy pass or**
19  **not pass ---**
20  A. No.
21  **Q. --- her course?  Okay.**
22  A. Just to do the final evaluation with my
23  narrative comments.
24  **Q. Let's go to the next document, which is**
25  **printed from Deann Buffington's printer.  This**

1  **is the apology letter.**
2  A. Yes.
3  ATTORNEY KRAMER:
4  We'll call this CV-7.
5  (CV Exhibit Seven marked for
6  identification.)
7  BY ATTORNEY KRAMER:
8  **Q. This was sent to you along with other**
9  **people?**
10  A. Yes.
11  **Q. And you received it on or about May 10th?**
12  A. Correct.
13  **Q. And did Stacy tell you that she was writing**
14  **an apology letter?**
15  A. No.
16  **Q. When was the last time you saw Stacy Snyder?**
17  A. Monday, May 8th.
18  **Q. And the context of that final interaction**
19  **was what?**
20  A. Just her explaining that she needed to leave
21  for a doctor's appointment and that she wasn't
22  feeling well.
23  **Q. And at that point, you --- I see that you**
24  **and she had not discussed ---**
25  A. Anything.

1  **Q. --- the MySpace picture ---**
2  A. No.
3  **Q. --- or anything like that?**
4  A. No, nothing.
5  **Q. Have you spoken to her since then,**
6  **telephone?**
7  A. No.
8  **Q. Okay.**
9  A. We had a final evaluation meeting on, I
10  think, Thursday, May 11th.
11  **Q. Okay.**
12  A. I would have seen her one last time.
13  **Q. And we'll get to that.  This letter of**
14  **apology, what do you know about this?**
15  A. All I know is that it was sent to me, you
16  know, that discussions had ensued with Barry
17  Girvin and maybe potentially people from
18  Millersville, but I'm not sure, and potentially
19  Kim Seldomridge as well.  He might have made
20  some of the contacts.  I'm not sure.  And that
21  was her explanation of --- this is her
22  explanation of her weeks at Conestoga Valley,
23  what happened, I guess.
24  **Q. And what is your reaction to her apology**
25  **letter?**

1  A. Well, the apology is really only the second
2  paragraph, and then the third and fourth
3  paragraphs are just descriptions of her
4  experience teaching, and it's not necessarily an
5  apology, I don't think, from there on out.  But
6  that second paragraph, I guess is where she
7  explains that she takes full responsibility and
8  she's willing to live with the consequences of
9  her actions.
10  **Q. Did you discuss this --- the May 10th letter**
11  **with anybody else?**
12  A. No.
13  **Q. Okay.  What do you --- here we now sit,**
14  **almost two years later.  What do you think about**
15  **this in retrospect, this letter?**
16  A. I really don't have any --- I still see
17  errors and usage problems and I just see --- I
18  see that Stacy was trying to --- she wasn't even
19  explaining.  I'm not even sure exactly what she
20  was aware of at that point.  I don't know what
21  she knew what was going to happen as far as
22  Millersville was concerned.  I have no idea.  I
23  don't even know what prompted her to write this,
24  if someone suggested that to her or if she was
25  just feeling guilty or sad or confused or ---

1    I'm not sure.

2    **Q. During the course of the semester, did she**

3    **appear to you sad at times?**

4    ATTORNEY VOIGT:

5    Objection, speculation.

6    BY ATTORNEY KRAMER:

7    **Q. You can answer. Did she appear to you sad?**

8    A. Would she be, like, depressed periodically?

9    **Q. Yes. What was your --- I mean, you saw her**

10    **almost every day for several months. What were**

11    **your observations of her?**

12    A. She was a bit mopey sometimes because she

13    knew that she wasn't doing that well, as far as

14    student teaching was concerned, after the

15    mid-evaluation and that she was trying to

16    express that she was trying to improve and

17    trying to do things differently, but that the

18    students weren't necessarily receptive or that

19    she was just lacking in content. So she would

20    kind of appear a little sad about that, I guess.

21    And unfortunately, I don't know why I needed

22    to know her personal affairs, but I guess she

23    felt like she could confide in me or that that

24    was appropriate to talk to me about that, that

25    she was --- at some point she had --- she and

1    her boyfriend had broken up. And she had also

2    shared this with her students, because the

3    students told me that. So I guess she was sad

4    toward the end of the placement because of that,

5    but I don't have any other comments to make.

6    **Q. The students told you sometime during the**

7    **semester that she told them she and her**

8    **boyfriend had broken up?**

9    A. Yes.

10    **Q. And how did the students react to that?**

11    A. Just kind of surprised to have that

12    relationship with someone that they even knew

13    that private business of a teacher.

14    **Q. Let's move on a couple of pages back to**

15    **your final evaluation.**

16    A. Okay.

17    **Q. We're going to mark this as CV-8.**

18    **(CV Exhibit Eight marked for**

19    **identification.)**

20    BY ATTORNEY KRAMER:

21    **Q. Did you write this whole thing, Mrs.**

22    **Reinking?**

23    A. Yes.

24    **Q. Did you do this alone or in consultation**

25    **with anybody else?**

1    A. This is my own work, and it would have begun

2    prior to the MySpace incident. I would have

3    begun to work on this probably in mid to late

4    April and would have wrapped it up and continued

5    to work on it up to the evaluation review, which

6    would have been, I think, on Thursday, Thursday

7    the 11th.

8    **Q. I don't see a reference anywhere in this**

9    **document to the MySpace incident.**

10    A. Right.

11    **Q. Am I wrong? Am I right about that?**

12    A. You're correct. And the evidence for the

13    professionalism category, there's references to

14    her having poor judgment and in regard to one

15    specific instance, and I referenced the PA Code,

16    Section 4(b)(8), and that I hope she will learn

17    from this experience and that she was

18    unsatisfactory in these areas. But I don't know

19    if I asked someone if I shouldn't put that on

20    there or if I just --- I didn't have a lot of

21    space, so it wasn't --- and I don't know that it

22    was necessarily appropriate to write that in

23    there.

24    **Q. Okay.**

25    A. I didn't know what the --- you know, what

1    the ramifications would be, as --- as far as

2    privacy or something goes, but I have to stress

3    that this is the document that people who are

4    receiving her application to teach at their

5    schools, that this is --- that they would place

6    a lot of stock in the final teaching evaluations

7    because they're served on a number of hiring

8    committees, ---

9    **Q. Okay.**

10    A. --- who have seen various student teaching

11    final evaluations from candidates. And they

12    would put a lot of emphasis on how they

13    performed in student teaching, and then they

14    would also look for recommendation letters,

15    particularly from the cooperating teacher,

16    because that would be their best understanding

17    with that teaching --- that teaching candidate's

18    ability, so ---.

19    **Q. Did Stacy ask you for a recommendation**

20    **letter at any time?**

21    A. No.

22    **Q. The one specific instance that you referred**

23    **to, is that the MySpace incident that you're**

24    **referring to there?**

25    A. Yes.

1   **Q. Okay. But overall, under professionalism,**
2   **she had --- the first four grades are**
3   **unsatisfactory. How did you come up with those**
4   **unsatisfactories? I mean, what was your**
5   **thinking?**
6   A. When I read the criteria and you read what
7   unsatisfactory says, it says that the candidate
8   rarely, never, inappropriately or superficially
9   demonstrates those indicators of performance.
10  So based on everything we've discussed so far at
11  this deposition, that's why she deserved the
12  unsatisfactory, in my opinion.
13  **Q. Separate and apart from the MySpace posting?**
14  ATTORNEY VOIGT:
15  Objection to the form.
16  ATTORNEY KRAMER:
17  I didn't ask a question yet.
18  BY ATTORNEY KRAMER:
19  **Q. Separate and apart from the MySpace posting,**
20  **would your grades have changed?**
21  ATTORNEY VOIGT:
22  Objection to the form.
23  BY ATTORNEY KRAMER:
24  **Q. You can answer.**
25  A. Would my grade have changed?

1   **Q. Well, you got four unsatisfactories here.**
2   A. She would have still been unsatisfactory.
3   It would be hard to say where she wouldn't have
4   been and when she wouldn't have been, but she
5   still would have received unsatisfactory in some
6   of the areas under professionalism.
7   **Q. So I want to understand to what extent, if**
8   **any, the MySpace posting helped make your**
9   **determination of her grades here?**
10  A. It was just one more, maybe more serious and
11  more obvious aspect of her unprofessionalism,
12  but it was just one more example after a
13  semester of examples of unprofessionalism.
14  **Q. Did you discuss this final evaluation with**
15  **Ms. Snyder?**
16  A. Yes.
17  **Q. And that was at the final meeting?**
18  A. Yes.
19  **Q. And that was on Thursday of, I guess,**
20  **May ---**
21  A. Eleventh (11th).
22  **Q. --- 11th? Who was at that meeting?**
23  A. I was. Mrs. Buffington was, I'm pretty
24  sure, and Mr. Girvin and Stacy.
25  **Q. Did you discuss other evaluations or**

1   **documents at that meeting?**
2   A. No, just this.
3   **Q. And tell me how the meeting went?**
4   A. Stacy was very sad and apologetic seeming. I
5   don't know that she necessarily apologized, but
6   she might have opened up and said she sent an
7   apology letter the day before. She might have
8   referenced that or ---. And she also
9   understood, as I explained to her, that I tried
10  to give her every benefit of the doubt still on
11  this final evaluation and tried to still see
12  where I could still give her competent or
13  superior ratings so that I didn't necessarily
14  gloss over the fact that she had made some
15  examples of growth since the mid-evaluation,
16  that I tried to indicate that for her. Because
17  at this point, I didn't know whether or not
18  she'd be an applicant for a job at some point
19  or, you know, she would need this document. And
20  she --- I remember her smiling and just kind of
21  saying, thank you, you know, that I had given
22  her that courtesy, which I should.
23  **Q. And this document, the final evaluation, is**
24  **used how in terms of someone getting a job?**
25  A. Oh, it's just part of the materials that

1   would be --- that any school would want to see
2   as far as a teaching applicant portfolio is
3   concerned. They would want to know how that
4   student completed student teaching.
5   **Q. And how would one of these panels get a hold**
6   **of the document, this final evaluation?**
7   A. She would submit it. She would submit it
8   with her application. Or at the interview she
9   would have it in her portfolio.
10  **Q. Is there anything in the document, this**
11  **final evaluation, that you would change at this**
12  **point, or at the time was it accurate and**
13  **correct?**
14  A. I think what my --- my only --- my flaw as a
15  person is that I probably tried to be a little
16  too soft or a little too lenient or a little too
17  --- not even too complimentary, but I tried my
18  hardest, because it was such an awkward,
19  unfortunate situation at the end of the
20  placement, it had been such a debacle, that by
21  the end I tried my hardest to just try to
22  highlight anything that was really positive in
23  her and that I didn't include anything from the
24  first half of the student teaching placement.
25  But the only thing that I would have --- I could

1    have gone lower on a couple of her criteria over

2    on the left.

3    **Q. And where? What would you have done?**

4    A. And it wouldn't have dropped significantly.

5    It would be the difference between a superior

6    dropping to a competent. I think I probably put

7    an --- I think I put unsatisfactory down every

8    place that absolutely had to have unsatisfactory

9    recorded.

10   **Q. We don't need to mark this necessarily, but**

11   **this is a document, probably the next --- let's**

12   **see what we have next.**

13   A. We have ---.

14   **Q. This is actually Ms. Snyder's response to**

15   **summary of unprofessional behaviors.**

16   A. I've never seen this before.

17   **Q. Okay. That was my question. If you go to**

18   **the third page or incident number five,**

19   **myspace.com, third line, Mrs. Reinking never**

20   **warned me about MySpace, end quote. How do you**

21   **respond to that?**

22   A. That's absolutely untrue, unfortunately.

23   **Q. She also actually --- why don't you read**

24   **that whole paragraph to yourself?**

25   WITNESS COMPLIES

---

1    BY ATTORNEY KRAMER:

2    **Q. She seems to say you're lying, Mrs.**

3    **Reinking.**

4    ATTORNEY VOIGT:

5    Objection to the form.

6    A. Fabricated. It's just completely untrue.

7    And I think that there are staff members that

8    would be able to say that, yes, Mrs. Reinking

9    indicated that she had referenced multiple times

10   that she had discussed this with the teacher,

11   the student teacher. And if you had to depose

12   students from that class, I think they'd be able

13   to --- gosh, it's two years now, but maybe

14   they'd be able to remember that it was obviously

15   brought up in class.

16   The reference that she said that she was

17   told by Millersville to avoid talking about

18   staff, students or faculty on your page, again,

19   it's cryptic, but I think it's clear that there

20   was some reference to somebody at CV, and it was

21   probably me. And she clearly did talk about

22   students on her page, so --- and that she was

23   inviting students to use it in a forum.

24   **Q. Go to --- skip that one, skip that. Go to**

25   **the e-mail --- it's actually from Deann**

---

1    **Buffington's printer. The e-mail was from you,**

2    **dated May 11th, CVSD-183 and 184. And we'll**

3    **mark this as CV-9.**

4    **(CV Exhibit Nine marked for**

5    **identification.)**

6    BY ATTORNEY KRAMER:

7    **Q. What is the context of these e-mail**

8    **communications?**

9    A. This is after she's been removed from

10   student teaching. And I need to read what I

11   said initially.

12   **Q. Yes.**

13   WITNESS REVIEWS DOCUMENT

14   A. Okay.

15   BY ATTORNEY KRAMER:

16   **Q. What's going on in these e-mails?**

17   A. This is just a discussion on the day of the

18   final evaluation. That morning she had sent me

19   --- or I had started the chain, it looks like

20   maybe. Maybe she had started it. I'm not sure.

21   But I said that I could take care of closing out

22   the grade book, that she was indicating that she

23   had work from students that she still needed to

24   turn back in or grades that still needed to be

25   entered or she was wondering if she still needed

---

1    to --- she was still trying to act in the

2    capacity of the student teacher at this point,

3    after she had been asked not to come back to CV.

4    And I explained to her that it wouldn't be much

5    --- it wouldn't take much for me to be able to

6    wrap up the unit that she had, and any materials

7    that the students had I would try to incorporate

8    it if I could, that I would be fine, that I

9    could definitely close out everything that's

10   happening at that point in the courses and that

11   I was in charge at that point.

12   And then she e-mailed me back and she said

13   in the first paragraph, she's saying, thank you

14   for making a sound judgment with the students

15   about the assignment that I gave. I know that

16   you have the students' best interests in mind.

17   Thanks for all your help with the unit system,

18   and she's just thanking me.

19   **Q. And your response was you sent Stacy's**

20   **e-mail to Deann Buffington and you wrote, quote,**

21   **she drives me crazy. What does that mean?**

22   A. There's a disconnect. There seems like

23   there's always a disconnect, like I'm explaining

24   to her that she's finished at this point, she

25   doesn't need to do anything else as a student

1  teacher, and she's still --- there's just kind
2  of a tone in the opening paragraph where she's
3  saying --- not condescending, but she's kind of
4  indicating like, of course, you can wrap this
5  up, and she's still indicating that she was in
6  charge at that point and when she had already
7  been asked to step down. And this was only part
8  --- I think when I sent this to her it was part
9  --- I think I had a phone conversation with her.
10 And there's probably more e-mails that
11 aren't part of this, because I'm saying I'm e-
12 mailing to clear up any confusion that there may
13 be concerning work because she's still going to
14 Barry and indicating that there's all this
15 material hanging over her head that she still
16 needs to complete as it pertains to her student
17 teaching experience. And everything was taken
18 care of and wrapped up and explained to her,
19 that she was fine. But she's still e-mailing me
20 and telling me that, oh, okay, that sounds good.
21 You know, it was just annoying.
22 **Q. Final document, which is the last --- turn**
23 **the page. Yeah. These are notes that Judy**
24 **Wenrich of Millersville took from a conversation**
25 **she had with you on February 20th, 2007.  I**

1  **really just want you to read that and confirm**
2  **it's an accurate summary of the things you and**
3  **Doctor Wenrich discussed.**
4  **(CV Exhibit 10 marked for**
5  **identification.)**
6  A. Yes.  Over the phone she would have called
7  me, and I would have just rattled off a list of
8  examples of things that happened during the
9  semester or answer questions that she had.  And
10 then she, I guess, put this together as a
11 summary of what she thought was the most
12 important from what I had said.
13 ATTORNEY KRAMER:
14 I'm finished.  Thank you.
15      OFF RECORD DISCUSSION
16      EXAMINATION
17 BY ATTORNEY VOIGT:
18 **Q. Mrs. Reinking, my name is Mark Voigt.  I**
19 **represent Stacy Snyder in this lawsuit.  I'm**
20 **going to be asking you some questions as well.**
21 **So that the same rules apply that applied with**
22 **Mr. Kramer's questioning, which is, number one,**
23 **you're still under oath, so you have to tell the**
24 **truth, the whole truth and nothing but the**
25 **truth, et cetera; correct?**

1  A. Correct.
2  **Q. Okay.  Number two, please keep your voice up**
3  **because the court reporter is taking down**
4  **everything that we say.  Also, please wait until**
5  **I'm done with my question before you respond**
6  **because the reporter cannot take down two people**
7  **talking at once.  Please also refrain from**
8  **uh-huhs or uh-uhs because even though we can**
9  **communicate on that level, often it's difficult**
10 **for the reporter to transcribe.  If you need to**
11 **take a break, certainly we can accommodate you,**
12 **et cetera.  Are you married?**
13 A. Yes.
14 **Q. Any children?**
15 A. I'm expecting, but no ---.
16 **Q. No other children, okay.  I believe you said**
17 **you were approximately the same age as Stacy; is**
18 **that correct?**
19 A. I'm guessing.
20 **Q. Well, Stacy is 25.  How old are you?  Stacy**
21 **was 25 at the time of these events, I should**
22 **say.**
23 A. I was 26 then.  I'm 28.
24 **Q. Now, you testified that you were an**
25 **undergrad at Millersville; is that correct?**

1  A. Correct.
2  **Q. And you also --- you did your --- you got**
3  **your Master's in Education at King's College or**
4  **Wilkes College?**
5  A. Wilkes College.
6  **Q. Wilkes College.**
7  A. Wilkes University.
8  **Q. All right.  While in college or in graduate**
9  **school, did you ever drink an alcoholic**
10 **beverage?**
11 A. Yes.
12 **Q. While in college or graduate school, were**
13 **you ever photographed with an alcoholic beverage**
14 **in your hand?**
15 A. Probably, yes, not that I own ---.
16 **Q. How many times would you say you were**
17 **photographed with an alcoholic beverage in your**
18 **hand?**
19 A. That would be hard to guess.
20 **Q. More than one, more than five, more than**
21 **ten?  Do you know?**
22 A. More than five.
23 **Q. And at the time you were --- well, were you**
24 **photographed with an alcoholic beverage while**
25 **you were at Millersville?**

1  Object. That's totally ridiculous.
2    And I strongly object to the use of the
3    Columbine reference. It's highly inflammatory.
4  ATTORNEY KRAMER:
5  Well, then there's certainly a
6    reference to this angry dwarf, who's the singer,
7    shooting other students, and I'm wondering ---.
8  ATTORNEY VOIGT:
9  It speaks for itself.
10 ATTORNEY KRAMER:
11 Absolutely. And that's what I'm
12   asking her to interpret.
13 A. Well, I had never heard the song the entire
14   way through until I was presented with these
15   lyrics. So I did quickly read them through and
16   tried to figure out what the heck is this song
17   even about. And I don't know why --- when you
18   hear the whole lyrics, why you would even play
19   this at school. I don't know why it would be
20   something that you would want to share with your
21   students. So I do see what you're saying.
22 There's a very angry person in the song.
23 BY ATTORNEY KRAMER:
24 Q. And it's in bad taste.
25 ATTORNEY VOIGT:

1  EXAMINATION
2  BY ATTORNEY LITTS:
3  Q. There have been a number of discussions
4  about the song that's referenced as Exhibit 50.
5  And again, can you just explain to the context
6  where this song was even brought to your
7  classroom?
8  A. Right. The students were working on a
9  project independently at their desks, and this
10 was background music that Ms. Snyder wanted to
11 play, using the CD player, just for sound in the
12 background to work to.
13 Q. So Ms. Snyder never had the students sit
14 down and read this lyric sheet to analyze the
15 message or the imagery or what was said in this
16 song?
17 A. No. It had absolutely no connection to
18 what was happening in class that day.
19 Q. So there's a series of questions about
20 different pieces of literature or songs to
21 analyze, and this particular song, this
22 lyric --- at Plaintiff's Exhibit 50, that was
23 never used as a curriculum tool?
24 A. No, it has no connection.
25 Q. Okay. I just wanted that being clear.

1  Objection.
2  ATTORNEY KRAMER:
3  No more questions.
4  ATTORNEY VOIGT:
5  I have a couple more questions.
6  RE-EXAMINATION
7  BY ATTORNEY VOIGT:
8  Q. Are you familiar with James Joyce? Have you
9  ever read James Joyce?
10 A. Yes.
11 Q. How is James Joyce's language?
12 A. What do you mean how is it?
13 Q. Well, James Joyce refers to some pretty
14 graphic things, can we agree on that?
15 A. I only --- I haven't read it since college.
16 Q. And you teach British literature and you
17 don't know about James Joyce?
18 A. He's not in our curriculum.
19 ATTORNEY VOIGT:
20 All right.
21 ATTORNEY KRAMER:
22 Jeff, you had a question, I
23 believe?
24 ATTORNEY LITTS:
25 If you don't mind.

1  ATTORNEY LITTS:
2  That's the only question I have.
3  ATTORNEY KRAMER:
4  Thank you.
5  A. Thank you.
6         * * * * * * * *
7         DEPOSITION CONCLUDED AT 3:51 P.M.
8         * * * * * * * *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SARGENT'S COURT REPORTING SERVICES, INC.
814-536-8908

1                    C E R T I F I C A T E

2

3        I HEREBY CERTIFY THAT THIS ELECTRONIC TRANSCRIPT WAS

4    REPORTED BY ME AND THEREAFTER REDUCED TO TYPEWRITING AND THAT

5    THIS TRANSCRIPT IS A TRUE AND ACCURATE RECORD THEREOF.

6

7        SARGENT'S COURT REPORTING SERVICE, INC.

8

9

10       _____

11

12       COURT REPORTER

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT G**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| STACY SNYDER, | | CIVIL ACTION |
|---|---|---|
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

## Declaration

I, Jane Bray, hereby declare as follows:

1.      I am Dean of the School of Education at Millersville University.

2.      I first met Stacy Snyder when she came to my office on or about May 13, 2006 on her appeal of a denial of a B.S.Ed. degree.

3.      Ms. Snyder presented written materials for appeal. We discussed the written materials and she orally presented arguments as to why she believed she should be entitled to pass student teaching and to receive a B.S.Ed. degree.

4.      I reviewed the written materials that Ms. Snyder provided relating to her student teaching at Conestoga Valley High School.

5.      I also discussed Ms. Snyder's entire student teaching performance at Conestoga Valley High School as well as the observations of the cooperating teacher, Nicole Reinking with Mr. Girvin and Dr. Judith Wenrich. I learned that Ms. Snyder had failed on the mid-term PDE-430 form. Unsatisfactory performance in the mid-placement PDE-430 form that is mandated by the PDE equates to failing student teaching although at mid-semester the PDE-430 is designed to provide the student with feedback and an opportunity to improve. I also learned of her unsatisfactory performance on the final PDE-430 prepared by Mr. Girvin. I had no input or influence on Mr. Girvin's evaluations of Ms. Snyder and no authority to change his final grade for Ms. Snyder.

6.      I was particularly concerned that because of her unprofessional behavior during the semester Conestoga Valley administrators had barred her from entering the school except for the final conference.

7.      Plaintiff's internet posting, the so-called "drunken pirate" picture and accompanying text, did not play any role in my decision. In light of the factors that I have described above, it was clear to me that Ms. Snyder was not a competent or professional teacher.

8.      I had no concern that if we did not take action towards Ms. Snyder that Conestoga Valley would not permit future Millersville students to student teach there.

9.      It is not unusual for student to have difficulties with their student teaching and to voluntarily withdraw or be removed by the school district from student teaching. Since fall semester 2005, five Millersville students have voluntarily withdrawn from their student teaching placement; seven were removed by the school district; and nine did not successfully complete student teaching for a variety of reasons.

I declare under penalty of perjury that the foregoing facts are true and correct.

Millersville, PA

DATED:                                       Jane Bray  4-7-08
                                             Jane Bray

**EXHIBIT H**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

### Declaration

I, Barry Girvin, hereby declare as follows:

1. In spring semester 2006, I was an adjunct professor at Millersville University. One of my functions was to act as supervisor for three student teachers at Conestoga Valley School District, including Stacy Snyder, who was student teaching at the high school.

2. As described in my deposition in this case and as reflected in my various evaluations Ms. Snyder's student teaching and professionalism were deficient during the semester.

3. Nicole Reinking was the cooperating teacher at Conestoga Valley. Ms. Reinking agreed that Ms. Snyder's student teaching and professionalism were unsatisfactory. Based upon Ms. Reinking's observations that she relayed to me and upon my own observations, I had serious concerns about Ms Snyder's competence and professionalism during the semester.

4. Because Conestoga Valley barred plaintiff from entering the high school and from teaching their students, she did not complete the semester.

5. In my opinion, Ms. Snyder's most egregious unprofessional behavior was that in a May 9, 2006 email to me she criticized Ms. Reinking for her own failures and sought to shift her deficient performance to Ms. Reinking without accepting responsibility for her own behavior. I thought this was very immature and unprofessional.

6.     I was aware of the plaintiff's internet posting, the so-called "drunken pirate" picture and the attached text. Nonetheless, the picture played virtually no role in my decision to rate her as unsatisfactory for professionalism. Even had it never come to my attention, in light of all the other factors Ms Snyder would not have passed student teaching. These factors include unprofessional actions during the semester, Conestoga Valley barring Ms Snyder from the high school, and the May 9, 2006, email sent to me.

7.     It was a result of my professional evaluation of Ms Snyder's performance at Conestoga Valley that she did not receive a B.S.Ed. In accordance with evaluations done by Ms Reinking and myself and the fact that Ms Snyder did not complete the semester, she did not pass student teaching. She received a grade of W (withdrawal).

8.     I had no concern that Conestoga Valley would not host future Millersville student teachers.

I declare under penalty of perjury that the foregoing facts are true and correct.

Millersville, PA

DATED: 4 - 8 - 0 8          *Barry Girvin*
                            Barry Girvin

**EXHIBIT I**



# SARGENT'S COURT REPORTING

**Quality Work. Quality People.**

## Transcript of the Testimony of **Beverly Schneller**

**Date:** April 4, 2008

**Case:** Snyder v. Millersville University

Printed On: April 7, 2008

Sargent's Court Reporting Service, Inc.
Phone: 814-536-8908
Fax: 814-536-4968
Email: schedule@sargents.com
Internet: www.sargents.com

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

STACEY SNYDER,     \*

   Plaintiff    \*  Case No.

   vs.        \*  07-1660

MILLERSVILLE     \*

UNIVERSITY,      \*

   Defendant   \*

              \*

\* \* \* \* \* \* \* \*

DEPOSITION OF

BEVERLY SCHNELLER, PH.D.

April 4, 2008

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

```
 1
 2                    OF
 3  BEVERLY SCHNELLER, PH.D., taken on
 4  behalf of the Plaintiff herein,
 5  pursuant to the Rules of Civil
 6  Procedure, taken before me, the
 7  undersigned, Hilary Culver, a Court
 8  Reporter and Notary Public in and for
 9  the Commonwealth of Pennsylvania, at
10  Millersville University, Dilwerth
11  Building, 1 North George Street,
12  Millersville, Pennsylvania, on Friday,
13  April 4, 2008 beginning at 1:30 p.m.
14
15
16
17
18
19
20
21
22
23
24
25
26
```

```
 1                 I N D E X
 2
 3  WITNESS: BEVERLY SCHNELLER, PH.D.
 4  EXAMINATION
 5     by Attorney Voigt          7 - 86
 6  EXAMINATION
 7     By Attorney Kramer        86 - 88
 8  CERTIFICATE                        89
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        A P P E A R A N C E S
 2
 3  MARK VOIGT, ESQUIRE
 4  Law Offices of Mark Voigt
 5  Plymouth Meeting Executive Campus
 6  600 W. Germantown Pike
 7  Suite 400
 8  Plymouth Meeting, PA  19462
 9     COUNSEL FOR PLAINTIFF
10
11  BARRY KRAMER, ESQUIRE
12  Office of Attorney General
13  21 South 12th Street
14  Philadelphia, PA  19107
15     COUNSEL FOR DEFENDANT
16        MILLERSVILLE
17
18
19
20
21
22
23
24
25
```

```
 1  EXHIBIT PAGE
 2
 3                 PAGE
 4  NUMBER DESCRIPTION       IDENTIFIED
 5  104    Photograph         32
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25  EXHIBITS NOT ATTACHED
```

2 (Pages 2 to 5)

1    OBJECTION PAGE
2
3    ATTORNEY                    PAGE
4    Kramer    19, 19, 20, 29, 36, 39, 40
5        41, 42, 45, 50, 51, 53, 57
6        58, 70, 72, 73, 78, 83, 83
7                84, 85
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

1    the truth.
2    Additionally, as you can see,
3    the reporter is taking down everything
4    that we say, using a mouthpiece as well
5    as a tape recorder.  So you need to
6    keep your voice up.  Please answer all
7    questions audibly rather than with a
8    nod of the head or a shake of the head.
9    Please wait until the questioner, which
10   will probably be me, is done with the
11   question before you respond since the
12   reporter cannot take down two people
13   talking at once.
14   Additionally, please answer with
15   a worded response rather than an uh-huh
16   or uh-uh, since the reporter cannot
17   take down those types of responses
18   accurately.  Additionally, at the
19   conclusion of this testimony, you will
20   receive a transcript, which is a
21   word-for-word recitation of everything
22   that we say.  You have the right to
23   read and sign that transcript if you
24   want.
25   ATTORNEY KRAMER:

1    P R O C E E D I N G S
2    -------------------------------------
3    BEVERLY SCHNELLER, PH.D., HAVING FIRST
4    BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
5    -------------------------------------
6    EXAMINATION
7    BY ATTORNEY VOIGT:
8    Q. Would you state your name and
9    business address for the record,
10   please?
11   A. My name is Beverly Schneller,
12   and our business address is
13   Millersville University, P.O. Box 1002,
14   Millersville, PA 17551.
15   Q. Have you ever had your
16   deposition taken before?
17   A. No.
18   Q. Well, let me go over some of the
19   ground rules.  First of all, the court
20   reporter has administered an oath to
21   you.  That oath is the same oath that
22   you would take if you were in a court
23   of law and it carries with it the same
24   penalties.  So you need to tell the
25   truth, the whole truth and nothing but

1    We'll waive.
2    ATTORNEY VOIGT:
3    All right.  Thanks a lot.
4    BY ATTORNEY VOIGT:
5    Q. If you need to take a break,
6    please feel free to do that.  If you
7    need to speak to your Counsel, I'll be
8    happy to let you do that, provided
9    there's no question pending.  If you do
10   not understand a question, please let
11   me know, I'll rephrase.  Otherwise, I
12   will assume that you understand the
13   question.  Are we clear on those ground
14   rules?
15   A. We are.
16   Q. What are your professional
17   duties at Millersville?
18   A. I'm a full professor in the
19   Department of English and a department
20   chair elected by members of my faculty.
21   Q. And what are the duties of the
22   department chair?
23   A. Department chairs establish the
24   curriculum in conjunction with the
25   faculty for the courses that are being

SARGENT'S COURT REPORTING SERVICES, INC.
(814) 536-8908

1    offered in the semester.  We prepare
2    schedules four times a year for course
3    offerings, evaluate faculty in their
4    professional roles as teachers, assist
5    with recruitment and orientation of
6    students, serve as faculty advisors to
7    students, work on marketing materials,
8    advise the administration in our
9    professional capacities.  We're
10   expected to serve the campus community.
11   We're expected to serve the community
12   at large in capacities that are
13   relevant to our degrees.  And we are
14   expected to publish and otherwise
15   maintain recognizable scholarly
16   credentials.
17   **Q. As department chair, do you have**
18   **any role in the student teacher program**
19   **at Millersville?**
20   A. No, I do not.
21   **Q. Describe your educational and**
22   **professional background, starting with**
23   **college.**
24   A. I graduated from the University
25   of St. Thomas in Houston, Texas with a

1    B.A., Magna Cum Laude.  I hold a
2    Master's and a PhD. from the Catholic
3    University of America in Washington,
4    DC.  Prior to coming to Millersville in
5    1989, I taught at Marist College as a
6    full-time faculty member in
7    Poughkeepsie, New York.  Prior to that,
8    I was a graduate assistant, and prior
9    to that, I was a substitute high school
10   teacher in Houston when I was finishing
11   my degree.
12   **Q. How long have you been here in**
13   **Millersville?**
14   A. Since 1989.
15   **Q. Now, during college or graduate**
16   **school, did you ever drink an alcoholic**
17   **beverage?**
18   A. Yes.
19   **Q. And during college or graduate**
20   **school, did you ever allow yourself to**
21   **be photographed wearing a costume at a**
22   **party?**
23   A. No.
24   **Q. During college or graduate**
25   **school, did you ever allow yourself to**

1    **be photographed with an alcoholic**
2    **beverage?**
3    A. No.
4    **Q. Have you ever had any education**
5    **or training in freedom of speech among**
6    **college students?**
7    A. No.
8    **Q. Have you ever had any education**
9    **or training in due process for students**
10   **in the public university setting?**
11   A. No.
12   **Q. When did you first meet Stacey**
13   **Snyder?**
14   A. Possibly 2000 --- it must have
15   been 2004.
16   **Q. In what capacity did you meet**
17   **her?**
18   A. She came to my office because
19   she needed an exception, or she needed
20   something related to curriculum, or she
21   wanted to get into a course, or
22   something along those lines.  And we
23   discussed whether she could get into
24   the course or not.  I think that was
25   the first time.

1    **Q. Why would she come to your**
2    **office?**
3    A. Everyone comes to the department
4    chair's office.  If you call --- no,
5    I'm serious.  If you call for
6    information on this campus for
7    anything, the answer in every office
8    is, call the department chair in the
9    subject area in which you're
10   interested.  So she would have come to
11   me because I either have the
12   instructional information or the
13   informational expertise to direct her
14   or anyone else who calls the office to
15   wherever they need to go.
16   **Q. And describe the nature of your**
17   **meeting.  What was discussed, other**
18   **than what you've already told us?**
19   A. Well, I told you.  She either
20   came to see about getting into a class
21   or she came to ask a question about a
22   class she had to take or something like
23   that.
24   **Q. And how did the meeting end?**
25   A. I presume that I gave her the

1    information that she needed because
2    she's not there now, so ---. She came
3    and she left.
4    **Q. Turn to Exhibit 21, please. Do**
5    **you recognize this document?**
6    A. Yes.
7    **Q. What is it?**
8    A. This is a printoff of the
9    student's DARS Audit not generated by
10   the map system, but by the student
11   using their myBill account.
12   **Q. That brings me to three**
13   **questions. What is a DARS?**
14   A. DARS is an acronym for the
15   Degree Audit Record System. It's a
16   living transcript for the student that
17   records the courses that they've
18   already taken, the courses in which
19   they're currently enrolled, their
20   grades, the place where the course fits
21   in either Liberal Arts core or the
22   student's major, the number of credits
23   that the course bears, their QPA and
24   their GPA. It's an advisement tool
25   that is very similar to the transcript,

1    but does not bear the same authority as
2    the transcript because it never has the
3    registrar's seal.
4    **Q. What is the significance of the**
5    **registrar's seal on a transcript?**
6    A. The registrar's seal is the
7    indication that the state or the
8    Commonwealth has agreed to confer the
9    degree.
10   **Q. And you mentioned some other**
11   **acronyms having to do with this. I**
12   **can't recall what they were offhand.**
13   **You said that this is a living**
14   **transcript.**
15   A. That's what I refer to it as.
16   **Q. What does that mean?**
17   A. That just means that it's
18   updated every semester as the students
19   complete their courses in contrast to a
20   transcript. It's not a transcript.
21   It's a record of what the students are
22   taking while they're still students at
23   Millersville.
24   **Q. In looking at page one, it says**
25   **GE area. What does that mean?**

1    ATTORNEY KRAMER:
2    What are you looking at?
3    ATTORNEY VOIGT:
4    Page one where it says GE
5    area.
6    A. General Education. That's part
7    of the Liberal Arts core.
8    BY ATTORNEY VOIGT:
9    **Q. What's the difference between**
10   **General Education credits and some**
11   **other types of credits?**
12   A. Students at the university take
13   a major. If they're a BA student, they
14   have a major and a minor. If they're a
15   BSE, candidate the BSE is a double
16   major. That's half of --- I guess
17   about half of what they do. The other
18   half is the Liberal Arts core, because
19   this is a Liberal Arts institution, so
20   that's what the General Education core
21   is.
22   **Q. And are major specific courses**
23   **listed in some other way on this**
24   **document?**
25   A. Probably --- can I turn the

1    page?
2    **Q. Uh-huh (yes).**
3    A. Probably not on this one because
4    this one is done chronologically. On
5    the one that we use that comes directly
6    from the Registrar's Office for the
7    students when they don't generate it
8    off their own account, there's a
9    different version of this that shows it
10   by the major, by the minor. And then
11   the GE core is like three pages in.
12   There's a couple pages in the back of
13   university requirements.
14   **Q. Were you ever Stacey Snyder's**
15   **instructor at Millersville?**
16   A. I was.
17   **Q. When was that?**
18   A. In the fall of 2005.
19   ATTORNEY KRAMER:
20   Just for the record,
21   she's referring to Exhibit 21.
22   BY ATTORNEY VOIGT:
23   **Q. Which class was that?**
24   A. English 441, Section 6.0. It
25   was a poetry course that she took in

1  the fall semester of her senior year.
2  If you look at fall of 2005, it's the
3  fourth course down on the left.
4  **Q. It looks like Stacey got an A in**
5  **that class.**
6  A. Yes, she did.
7  **Q. And what was your impression ---**
8  **well, first of all, do you recall**
9  **Stacey being in that class?**
10  A. This was an independent study
11  course. She was the only student in
12  the class, so, yes.
13  **Q. How much interaction did you**
14  **have with Stacey in this course?**
15  A. She either came once a week or
16  she came once every couple of weeks for
17  an hour or so of --- well, for an hour
18  or so.
19  **Q. And what did Stacey have to do**
20  **to get a grade in your class?**
21  A. She had to read the books that I
22  assigned her. She had to complete, I
23  think, two --- maybe two or three
24  written assignments. And then because
25  she was a teacher education candidate,

1  we did a lesson plan as her final
2  project.
3  **Q. How long were the written**
4  **assignments, numbers of pages, do you**
5  **recall? Were they more than a page,**
6  **more than five pages?**
7  A. They would have been between
8  maybe three and five pages. I don't
9  know.
10  ATTORNEY KRAMER:
11  If you don't remember,
12  don't guess.
13  A. I don't remember. I don't give
14  one-page papers, I can tell you that
15  much.
16  BY ATTORNEY VOIGT:
17  **Q. Do you grade for grammar in your**
18  **class, or did you grade for grammar in**
19  **Stacey's poetry class?**
20  A. Yes.
21  **Q. Can you give me an opinion as to**
22  **how Stacey's grammar was in the poetry**
23  **class?**
24  A. No.
25  **Q. Why not?**

1  A. Well, I don't have the artifacts
2  in front of me. And you asked me to
3  give you an opinion, which I'm not
4  going to do.
5  **Q. Is it safe to say that you would**
6  **not have given Stacey an A if she had**
7  **poor grammar?**
8  A. No.
9  **Q. So a student can have poor**
10  **grammar and still get an A in your**
11  **class?**
12  ATTORNEY KRAMER:
13  Well, this would be an
14  independent study, which may be
15  different than the other
16  classes. And your question is
17  vague, so I object to the form.
18  BY ATTORNEY VOIGT:
19  **Q. Am I correct that a student can**
20  **have poor grammar and still get an A in**
21  **your upper level college English class?**
22  ATTORNEY KRAMER:
23  Object to the form. You
24  can try to answer that.
25  A. It depends on what you mean by

1  poor grammar.
2  BY ATTORNEY VOIGT:
3  **Q. Well, what do you mean by poor**
4  **grammar?**
5  A. Well, that's not an issue. I
6  mean it's your question, so what do you
7  mean by it?
8  **Q. Well, are you familiar with**
9  **grammar as it is used in the English**
10  **language?**
11  A. Of course.
12  **Q. Do you know what poor grammar is**
13  **when it's used in the English language?**
14  A. Yes.
15  **Q. And can a student in your class**
16  **get an A and still have poor grammar?**
17  ATTORNEY KRAMER:
18  I'll object as to the
19  form. It's a really vague
20  question because poor grammar is
21  almost by definition a vague
22  term. If you can answer it, you
23  certainly can.
24  ATTORNEY VOIGT:
25  Well, it's just a brief

1    response.  She's the chairman of
2    the English Department at an
3    accredited college.  She should
4    be able to tell me what poor
5    grammar is.
6    ATTORNEY KRAMER:
7    You can try to answer the
8    question.
9    BY ATTORNEY VOIGT:
10   **Q. Can a student get an A in your**
11   **class, your poetry class, an upper**
12   **level class at a public university, and**
13   **still have poor grammar?**
14   A. A student can --- in and out of
15   the classroom, a student can have
16   grammatical errors in their speech or
17   in their writing that are going to
18   remain with them beyond college
19   instruction.  It's one of the issues
20   that you face as a writing teacher, as
21   a professor in general, that because
22   grammar is taught in elementary schools
23   and through the high schools if the
24   emphasis is placed on things other than
25   precision in language use by the high

1    schools, it's very difficult to
2    correct.  It's sort of imbedded
3    mistakes that a person might make.
4    So technically a person can continue to
5    make what might be viewed as
6    grammatical errors at any point in
7    their life, whether they have college
8    instruction or not.
9    **Q. So can a student get an A in**
10   **your upper level poetry class and still**
11   **have poor grammar?**
12   A. Well, the other part of the
13   equation is that in any course, and
14   especially individualized instruction,
15   grading can be based on the written
16   product, the revisions of the written
17   product.  I mean, to simply concentrate
18   on whether perfection in grammar has a
19   core relationship to the grade is
20   really not understanding the nature of
21   the grading process.  It is probably
22   possible for any student to have
23   grammatical errors in their writing or
24   any other thing and get an A in
25   anybody's course.  So if you want a yes

1    or no answer, yes, it's possible.
2    Okay?
3    **Q. Other than your poetry class,**
4    **describe your interactions, if any,**
5    **with Stacey from your first meeting in**
6    **2004 until approximately May 1, 2007 or**
7    **2006.  Did you have any?**
8    A. The only two that I am certain
9    about are the one that I mentioned,
10   when she came to the office and needed
11   some assistance, because that was the
12   first day that I met her.  And then
13   because she had a scheduling problem,
14   completing her degree, I offered her
15   the opportunity to teach the
16   independent study with me.
17   At the time that she was
18   enrolled, I guess I had just come off
19   being a full-time faculty member.  I
20   teach a lot of students, so without
21   seeing the name of the professor that
22   she taught (sic), she may have been in
23   another course that I taught, but I'm
24   not sure because I teach many students.
25   And over the courses and number of

1    years, I don't even try to remember
2    what class somebody is in.  It's
3    usually pointless.  And if they want to
4    do a letter of recommendation, they'll
5    come back and tell me what classes they
6    were in, for example.  So I can tell
7    you that I taught her in poetry class
8    for sure.
9    **Q. You mentioned some independent**
10   **study class.**
11   A. That is the poetry class.
12   **Q. You mentioned some other**
13   **independent study class having to do**
14   **with student teaching; is that right?**
15   A. No.
16   **Q. You said that because Stacey was**
17   **having ---?**
18   A. I said because she couldn't meet
19   her requirement related to completing
20   her degree, I gave her the opportunity
21   to do the independent study poetry
22   course, which fills the requirement for
23   the major.  She had a scheduling
24   conflict.
25   **Q. So the poetry class is what you**

1 were talking about?
2 A. Yes, it is.
3 Q. Turn to Exhibit Four. It's in
4 the other book. This is a document ---
5 actually, it's in the same book.
6 Sorry. This is a document entitled
7 Millersville University Guide for
8 Student Teaching. Have you ever seen
9 this document before?
10 A. No.
11 Q. So I take it you played no role
12 in the drafting or approval of this
13 document; correct?
14 A. No.
15 Q. Are you familiar with something
16 called the Teacher Education Council?
17 A. TEC, T-E-C.
18 Q. Dr. Bray referred to something
19 called the Teacher Education Council.
20 Are you familiar with that
21 organization?
22 A. There's a committee on campus
23 that is --- no, I think it's the same
24 thing. No. I'm thinking about the
25 Teacher Education Committee. That's an

1 approval body for curriculum. No. I
2 don't know anything about the Teacher
3 Education Council.
4 Q. Well, let's talk about the
5 Teacher Education Committee. Are you
6 familiar with that?
7 A. Yes.
8 Q. Are you on that committee?
9 A. No.
10 Q. Do you have any role on that
11 committee?
12 A. No. That's a faculty curriculum
13 committee. It has nothing particular
14 to do with this.
15 Q. Are you familiar with something
16 called the Educational Foundations
17 Department?
18 A. Yes.
19 Q. What is that?
20 A. They offer pedagogical
21 instruction for students who are
22 involved in the secondary education
23 programs.
24 Q. And what is pedagogical
25 instruction?

1 A. Teaching teacher education
2 candidates how to teach.
3 Q. And do you have any role in that
4 department?
5 A. No.
6 Q. Turn to Exhibit Five. This is a
7 supplement to the Guide for Student
8 Teaching. I take it you played no role
9 drafting or approving this document?
10 A. No.
11 Q. Turn to page four of that
12 document. This refers to something
13 called a Circle Project. Are you
14 familiar with the Circle Project?
15 A. Yes.
16 Q. What is your familiarity with
17 that?
18 A. This is a project that the
19 students in the BSE program complete.
20 My familiarity with it is it's an
21 assessment --- well, it's a tool that
22 we use data from collected by the Ed
23 Foundation's Department for our NCATE
24 assessment.
25 Q. What's an NCATE assessment?

1 A. NCATE, N-C-A-T-E.
2 Q. What's that?
3 A. It's the accrediting body for
4 schools of education.
5 Q. That's N-C-A-T-E?
6 A. Right.
7 Q. Is that here at Millersville
8 University?
9 A. No. That's a national ---.
10 NCATE's national. It's an accrediting
11 body for schools of education
12 nationwide.
13 Q. Have you ever supervised a
14 student teacher in their Circle
15 Project?
16 A. I supervise no student teachers,
17 no.
18 Q. Turn to Exhibit 89. This is a
19 letter from John Short to Stacey, dated
20 February 2, 2006. Have you ever seen
21 this letter before?
22 A. No.
23 Q. Are you familiar with something
24 called the Outstanding Students in the
25 School of Humanities and Social

1     Sciences?
2     ATTORNEY KRAMER:
3     I'll just object. That's
4        not --- and your question
5        implies that's a label of
6        something, and in the letter
7        it's just ---.
8     ATTORNEY VOIGT:
9     Let me rephrase.
10       BY ATTORNEY VOIGT:
11       Q. Are you familiar with the
12       requirement for a student to make it on
13       the Dean's list?
14       A. No.
15       Q. Do you have any idea of the
16       criteria --- well, first of all, do you
17       know who John Short is?
18       A. Yes, I do.
19       Q. Do you have any idea as to the
20       criteria that Mr. Short uses in writing
21       these letters?
22       A. No.
23       Q. Did you observe Stacey at
24       Conestoga Valley School District during
25       her spring 2006 internship?

1     A. No.
2     Q. Turn to Exhibit 47.
3     A. I'm getting the hang of it. I
4        can do this. I can even --- hold on.
5        I'll try to keep it neat.
6     Q. Now, these are evaluations
7        completed by Barry Girvin, as to
8        Stacey. Do you know Barry Girvin?
9     A. No, I do not.
10       Q. Have you ever seen these
11       evaluations before?
12       A. No, I have not.
13       Q. Turn to Exhibit 77. Now, these
14       are praxis scores. What are praxis
15       scores, if you know?
16       A. The scores?
17       Q. Well, what is praxis? Do you
18       know?
19       A. Praxis is the test that the
20       student teachers take.
21       Q. Why?
22       A. So that they can be certified as
23       teachers, I presume.
24       ATTORNEY KRAMER:
25       Don't presume.

1     A. Sorry. So they can be certified
2        --- as part of the certification
3        process for the undergraduate.
4     BY ATTORNEY VOIGT:
5     Q. On this document, it indicates
6        that Stacey passed her English
7        language, literature, composition
8        content and knowledge class. Do you
9        see that in the middle?
10       A. Yes, I do.
11       Q. Are you familiar for the
12       criteria for use on those tests?
13       A. No, I'm not.
14       Q. Turn to Exhibit 93. Have you
15       ever seen this before? This is a
16       photograph of Stacey.
17       A. Yes.
18       Q. And when did you see it?
19       A. When this lawsuit was made
20       public. Would that have been last
21       summer?
22       Q. Did you see this photograph in
23       or about May 2006?
24       A. No.
25       ATTORNEY VOIGT:

1     Let me show you a
2        different photograph. We'll
3        mark this as Exhibit 104.
4        (Exhibit 104 marked for
5        identification.)
6        OFF RECORD DISCUSSION
7     BY ATTORNEY VOIGT:
8     Q. So this would be 104. Have you
9        ever seen that photograph before?
10       A. No.
11       Q. Turn to Exhibit 51. This is a
12       photograph and text. Have you ever
13       seen this before?
14       A. No.
15       Q. When did you first learn of
16       issues regarding Stacey Snyder and her
17       graduation from Millersville?
18       A. Could you clarify issue?
19       ATTORNEY KRAMER:
20       He can clarify that.
21       BY ATTORNEY VOIGT:
22       Q. When did you first learn that
23       Stacey might not graduate with her
24       Bachelor of Science Education Degree?
25       A. Well, she --- I don't have any

SARGENT'S COURT REPORTING SERVICES, INC.
(814) 536-8908

1  control over whether she graduates with
2  any degree or not. So I'm not exactly
3  sure how to answer that question,
4  because that presumes that I would have
5  some say in whether she graduates.
6  Q. All right. Let's take you
7  back ---.
8  A. I'm not sure what you are asking
9  there.
10  Q. Let's take you back to May of
11  2006.
12  A. Okay.
13  Q. Did you have any conversations
14  with anyone at Millersville concerning
15  Stacey Snyder's graduation?
16  A. Yes.
17  Q. When was your first
18  conversation?
19  A. The Friday before the
20  commencement day, whatever date that
21  was. It would be Friday --- because
22  spring commencement is on Saturday. So
23  it would be the Friday before.
24  Q. And that would be May 12, 2006;
25  correct?

1  A. I don't have a calendar. I
2  don't know.
3  ATTORNEY KRAMER:
4  I think that's right,
5  Mark.
6  A. I think that may be correct. I
7  don't know.
8  OFF RECORD DISCUSSION
9  BY ATTORNEY VOIGT:
10  Q. Does that refresh your
11  recollection that it was Friday, May
12  12th?
13  A. It was always Friday. You just
14  asked me what the date was, and I don't
15  remember the date.
16  Q. Well, do you remember now?
17  A. Sure. Yes.
18  Q. And it is May 12th?
19  A. Yes.
20  Q. What was the conversation that
21  you had about Stacey on May 12th?
22  First of all, who was it with?
23  A. Oh, the administrator's
24  conversation you mean? That's what
25  we're talking ---?

1  Q. Yes.
2  A. I know that I talked to Dean
3  Bray.
4  ATTORNEY VOIGT:
5  Let me turn your
6  attention to Exhibit 100, page
7  six, paragraph 43.
8  ATTORNEY KRAMER:
9  Mark, this is the second
10  amended complaint that I have.
11  ATTORNEY VOIGT:
12  Well, I have a third
13  amended complaint. Do you have
14  that?
15  ATTORNEY KRAMER:
16  No, it's not ---.
17  ATTORNEY VOIGT:
18  Let's go off the record
19  for a second.
20  OFF RECORD DISCUSSION
21  BY ATTORNEY VOIGT:
22  Q. Exhibit 100, page six, paragraph
23  43.
24  A. Okay.
25  Q. Let me just take that back and

1  I'll read you the question.
2  A. Here you go.
3  Q. The first sentence of paragraph
4  43 reads, on or about May 12, 2006,
5  Bray, Girvin, Wenrich and Schneller, in
6  their official capacities, met to
7  discussion Plaintiff's possible
8  expulsion. Is that a true statement?
9  ATTORNEY KRAMER:
10  I'll object. It includes
11  conclusive legal language and is
12  a compound question.
13  BY ATTORNEY VOIGT:
14  Q. Is it a true statement?
15  A. No.
16  Q. What about that statement is not
17  true?
18  ATTORNEY KRAMER:
19  Can she see it?
20  ATTORNEY VOIGT:
21  Sure.
22  A. I have never met Mr. Girvin.
23  BY ATTORNEY VOIGT:
24  Q. Do you know who Dr. Judith
25  Wenrich is?

1　A. Yes, I do. We didn't physically
2　--- well, to my recollection, we did
3　not physically meet, because I'm in one
4　building on one side of the campus,
5　they're in a different building on the
6　other side of the campus. And when we
7　consult, we consult by phone. And I
8　have no recollection of an alleged
9　physical meeting.
10　**Q. All right. But you do remember**
11　**a phone call with Dr. Bray; is that**
12　**correct?**
13　A. Dean Bray and I would have
14　talked about the situation. We
15　certainly didn't discuss anything
16　related to expulsion.
17　**Q. And what did you and Dr. Bray**
18　**discuss?**
19　A. We would have discussed ---
20　well, we would have discussed how
21　to ---. I'm trying to remember now if
22　it was actually --- because I know at a
23　certain point I did talk to Dean Bray
24　about this. I know I probably also
25　talked to Dr. Wenrich about it, because

1　she and I are the ones who usually deal
2　with situations in which we need to
3　transition a student from one degree
4　program to another, but we usually did
5　--- I usually do that in consultation
6　with the Dean, just to be sure that
7　we're all on the same page.
8　**Q. Well, let's talk about this**
9　**conversation you had with Dr. Bray on**
10　**May 12th. Do you recall that**
11　**conversation?**
12　A. I'm not going to recall any
13　specifics of conversations with them
14　other than the broad outlines of what
15　you asked me about. I mean, I can't
16　say she said this and I said that.
17　**Q. And what was the general nature**
18　**of the conversation?**
19　A. We discussed how to transition
20　Miss Snyder from the BSE to a BA degree
21　so that she could graduate on Saturday
22　the 13th of May.
23　**Q. Was Miss Snyder consulted about**
24　**that conversation?**
25　A. She was present for the first

1　one.
2　**Q. Was Ms. Snyder in your office on**
3　**May 12th when this conversation took**
4　**place with Bray?**
5　A. No. Well, she might have been
6　there when I was on the phone. I'm not
7　sure.
8　ATTORNEY KRAMER:
9　Don't speculate.
10　A. Sorry.
11　ATTORNEY KRAMER:
12　If you don't remember,
13　say you don't remember.
14　A. She was there. I don't know for
15　how long.
16　BY ATTORNEY VOIGT:
17　**Q. How long did the conversation**
18　**last, do you know?**
19　A. No.
20　ATTORNEY KRAMER:
21　Object to the form.
22　BY ATTORNEY VOIGT:
23　**Q. How long did the conversation**
24　**with Dr. Bray on May 12th, 2006 last?**
25　A. I don't know.

1　**Q. How did the conversation end?**
2　A. Well, we agreed that we would
3　initiate the paperwork to change the
4　degree from a BSE to a BA, which was
5　the purpose of the call, one way or the
6　other, in the first place.
7　**Q. Have you ever had a call from**
8　**Dr. Bray before about changing a BSE to**
9　**a BA before?**
10　A. Ever?
11　**Q. Ever in the course of your life.**
12　A. No, not at that time.
13　**Q. Did you not think it was unusual**
14　**that Dr. Bray would be calling you to**
15　**change a BSE to a BA the day before**
16　**graduation?**
17　ATTORNEY KRAMER:
18　Well, I'll object. I
19　don't know that she said Bray
20　called her.
21　A. I don't remember which way it
22　started.
23　BY ATTORNEY VOIGT:
24　**Q. Let me rephrase. Did you not**
25　**think it was unusual to be having a**

1    conversation with Dr. Bray about
2    changing a student's designation from a
3    BSE to a BA the day before graduation?
4    ATTORNEY KRAMER:
5    Object to the form. It's
6    a compound question. You can
7    answer.
8    A. Did I not think it was unusual?
9    Well, Dean Bray wasn't calling to
10   change the grade or change the degree.
11   The student was present. And in order
12   for the student to be able to graduate
13   on time, which was Dean Bray's and Dr.
14   Wenrich's and my interest, the only
15   logical thing to do was transition it
16   to a BA so that she could graduate with
17   college degree as she had planned.
18   So there's no --- it's a false
19   characterization to say that Dean Bray
20   called to change Miss Snyder's degree.
21   I mean, obviously no one does that. I
22   mean, not just pick up the phone out of
23   the blue and say, let's change this
24   person's grade or change this person's
25   degree program.

1    BY ATTORNEY VOIGT:
2    Q. So, it's your belief that a BSE
3    and a BA are the same thing?
4    ATTORNEY KRAMER:
5    Objection. That's not at
6    all what she said.
7    A. That's not what I said.
8    ATTORNEY VOIGT:
9    Let me clarify.
10   A. That's not what I said.
11   BY ATTORNEY VOIGT:
12   Q. You said that you and Dr. Bray
13   were not discussing changing Stacey's
14   degree, is that what you said?
15   A. No. That's not what I said.
16   Q. Okay. Do you believe that a
17   student can be a teacher with a BA
18   degree?
19   A. Do I believe that they can?
20   Q. Yes.
21   A. Well, that depends on state
22   certification. It doesn't have
23   anything to do with what I believe or
24   not. State rules are different per
25   state.

1    Q. When you had this conversation
2    with Dr. Bray, was it your
3    understanding that a decision had
4    already been made that Stacey would not
5    be graduating with a BSE?
6    A. I don't know.
7    Q. Why don't you know? I mean, if
8    somebody calls ---?
9    A. That decision is not in the
10   parameter of things that I was asked to
11   deal with. Stacey is a student in the
12   English program, and in order for her
13   to graduate, because of the
14   circumstances ---. She wanted to
15   graduate. We wanted to see her
16   graduate, so we enabled her to do that
17   by offering her the opportunity to take
18   a BA. Your question asks me to
19   speculate on what was in Dean Bray's
20   mind ---.
21   Q. I'm trying to get an
22   understanding of this conversation.
23   Dean Bray calls you or you call Dean
24   Bray, and it is said, Stacey's not
25   going to get her BSE. Is that what was

1    said?
2    A. As I said, I don't know the
3    details of the dialogue. Generically,
4    that would have been what the
5    conversation was about.
6    Q. Did you inquire of Dr. Bray why
7    Stacey was not getting a BSE?
8    A. I don't know.
9    Q. Would that not be something
10   you'd ask ---?
11   A. Well ---.
12   Q. Let me finish the question
13   before you interpose your objection.
14   Having never had a conversation with
15   Dr. Bray about changing a BSE to a BA,
16   would it not ---?
17   A. Well, no. You're ---.
18   Q. Let me finish the question.
19   A. I'm sorry.
20   Q. Having not had a conversation
21   with Dr. Bray before about changing a
22   student's designation from a BSE to a
23   BA, would you not ask why that was
24   being done?
25   A. Well, if a student needs to

1  change a degree, they initiate the
2  conversation with their department
3  chair or with me in this case.  So I
4  don't know that it would have been
5  necessary to ask anyone else why when
6  Stacey --- when Miss Snyder was
7  present, otherwise this whole thing
8  wouldn't have happened.  She was in my
9  office.  So, in other words, I'm saying
10  to you, why would I ask someone to
11  confirm something when I have the
12  person involved sitting in front of me?
13  **Q. So it's your understanding that**
14  **Stacey was asking you to change her BSE**
15  **to a BA the day before graduation,**
16  **voluntarily?**
17  A. Stacey ---.
18  **Q. It's a yes or no question.**
19  **Could you please answer with a yes or**
20  **no answer?**
21  ATTORNEY KRAMER:
22  I object to the form.
23  It's a compound and vague
24  question.  You can answer it.
25  A. Repeat the question.

1  BY ATTORNEY VOIGT:
2  **Q. Sure.  Stacey was in your office**
3  **during the call that you and Bray**
4  **engaged in on May 12th, 2006.  Is that**
5  **what you testified to?**
6  A. As I said, initially she may
7  have still been there when that call
8  took place.
9  **Q. Do you remember Stacey's**
10  **demeanor during your conversation with**
11  **Bray on the phone?**
12  A. If she wasn't present while Dean
13  Bray and I were on the phone, then I
14  can tell you what her demeanor was when
15  she came into the office and initiated
16  the conversation.  You want to pin me
17  on the chronology of a phone call and I
18  cannot give you that.
19  **Q. What was Stacey's ---?**
20  A. You don't see what the scenario
21  is.
22  **Q. Oh, I see it perfectly.  What**
23  **was Stacey's demeanor when you spoke to**
24  **her on May 12th, 2006?**
25  A. Stacey was upset when she came

1  to my office.
2  **Q. She was in tears; correct?**
3  A. She was distressed.
4  **Q. She was in tears; correct?**
5  A. I don't recall that.
6  **Q. And what, if anything, did**
7  **Stacey say to you?**
8  A. She said that something had gone
9  wrong with her student teaching and
10  that --- the phrase used was removed
11  from student teaching.  And so I
12  believe that she would have said to me
13  either she was removed from student
14  teaching or she was about to be
15  dismissed from student teaching.
16  Again, it's hard to reconstruct the
17  dialogue from two years ago, but it was
18  something along those lines.
19  **Q. Did you ask Stacey why she was**
20  **being removed from student teaching?**
21  A. No.  I mean, not beyond the ---
22  not beyond the sort of shock reaction
23  of why.  You know, not the sort of ---
24  the kind of thing when someone comes
25  and tells you something completely

1  unexpected, and you say, oh, my gosh,
2  why did that --- you know why.
3  **Q. Well, did you ask her why?**
4  A. In the context of a normal human
5  reaction to something that you don't
6  expect.
7  **Q. Well, did you ask Stacey why she**
8  **was ---?**
9  A. I said why or what happened.
10  **Q. And what was Stacey's response?**
11  A. She said ---.  She said ---
12  well, see again, I mean I don't want to
13  be pinned to a specific dialogue, but
14  she something like something had
15  happened with her placement.
16  **Q. Did you ask Stacey to elaborate**
17  **on that comment?**
18  A. No.
19  **Q. Was it at that point that you**
20  **called Dr. Bray or Bray called you?**
21  A. No.
22  **Q. What point did the conversation**
23  **with Dr. Bray occur?**
24  A. For the record, Dr. Bray or Dr.
25  Wenrich.  After Stacey and I had

1    discussed her options for what she
2    could do in terms of how she would
3    complete --- how she would graduate,
4    since she had been working very hard
5    towards graduation and it was the next
6    day ---. So my immediate interest and
7    hers was how we were going to graduate
8    --- or how she was going to graduate.
9    I was going to say, how we were going
10   to graduate her, but how she was going
11   to graduate the following day.
12   **Q. Turn to Exhibit 70. Do you**
13   **recognize this document?**
14   A. Yes.
15   **Q. Now, in the middle of the page**
16   **there's a signature saying Schneller,**
17   **indicating advisor's signature.**
18   A. Correct.
19   **Q. Did you consider yourself to be**
20   **Stacey's advisor?**
21   A. Well, no. Well, it depends.
22   Students are assigned faculty advisors.
23   And when the advisors are not available
24   --- when the assigned advisor is not
25   available for signature --- as you can

1    see there the faculty advisor she lists
2    is Dr. Clark. When the advisor is not
3    available for signature, I, as
4    department chair, can sign any form to
5    keep student's paperwork going. And
6    then we just leave a copy of the form
7    for the --- this is a faculty advisor,
8    the person who assists them with their
9    curriculum.
10   **Q. Did you believe that you had any**
11   **obligation to Stacey in your role as**
12   **advisor?**
13   ATTORNEY KRAMER:
14   Object to the form.
15   BY ATTORNEY VOIGT:
16   **Q. Did you believe that you were**
17   **looking after Stacey's best interest in**
18   **your role as advisor?**
19   A. Yes.
20   **Q. In looking at Stacey's best**
21   **interest, did you ever tell Stacey that**
22   **maybe she should fight to keep her BSE**
23   **degree?**
24   A. No.
25   **Q. Why not?**

1    A. Well, I don't know. When you
2    say fight to keep her degree, I mean,
3    Stacey came with a situation and we
4    were concerned with how she could
5    obtain her college degree. And to the
6    degree that I have any student's best
7    interest, that is the best interest
8    that I have for them, that they will
9    attain the college --- they will attain
10   a college degree.
11   **Q. Of any sort?**
12   A. Yes.
13   **Q. Did you know as of May 12th,**
14   **2006 that Stacey had been seeking a BSE**
15   **degree?**
16   A. Yes.
17   **Q. Did you know as of May 12th,**
18   **2006 that a BSE degree is necessary in**
19   **Pennsylvania for somebody to teach?**
20   ATTORNEY KRAMER:
21   I object. That's
22   actually not correct, but you
23   can certainly answer the
24   question.
25   A. A BSE is a way for a person to

1    become a certified teacher in the
2    Commonwealth of Pennsylvania. There
3    are other ways that one can do that.
4    BY ATTORNEY VOIGT:
5    **Q. And the other ways include going**
6    **to that ABCTE. Are you familiar with**
7    **that?**
8    A. No.
9    **Q. You're aware that a student with**
10   **a BA in English cannot become a**
11   **certified teacher?**
12   A. Well ---.
13   **Q. Yes or no?**
14   A. A person can become a certified
15   teacher if they pursue certification
16   with a BA in any degree.
17   **Q. Is that your understanding?**
18   A. Yes.
19   **Q. What else, if anything, did you**
20   **tell Stacey during your meeting on May**
21   **12th of 2006?**
22   A. We would have discussed --- I
23   would have gotten her registrar's
24   generated DARS Audit and we would have
25   looked at the courses as these exhibits

1    show for the exceptions. We would have
2    looked at how to move some of the
3    courses around to get them to count in
4    the BA sequence. Either then or
5    shortly thereafter we talked about
6    certification as an option for her, and
7    we talked about possibly her
8    reenrolling in the graduate program for
9    the MED.
10   **Q. What is MED?**
11   A. Masters in Education.
12   **Q. Did you know at that time that**
13   **Dr. Wenrich had told Stacey that she**
14   **would not be allowed to take anymore**
15   **classes at Millersville?**
16   ATTORNEY KRAMER:
17   Objection. That's not
18   what Dr. Wenrich said. Don't
19   answer the question.
20   A. Okay.
21   BY ATTORNEY VOIGT:
22   **Q. Was it your understanding at**
23   **that time that Stacey would be**
24   **permitted to reenroll at Millersville**
25   **and take graduate-level education**

1    **classes?**
2    A. No, but I would have no reason
3    to even be thinking about where she
4    would pursue graduate work at the time
5    of this meeting.
6    **Q. But you were encouraging Stacey**
7    **to pursue an MED; is that correct?**
8    A. I did not encourage her. I
9    mentioned to her to provide her with as
10   much information as possible and to
11   allay her distress that there were
12   other ways for her to complete --- or
13   there were other ways for her to reach
14   her goal. I also discussed the
15   possibility of being an emergency
16   certified substitute teacher, and I
17   mentioned charter schools to her,
18   because charter schools are a little
19   bit more relaxed as far as what degree
20   you come in with, depending on what
21   charter school you apply to.
22   **Q. Was it your belief as of May**
23   **2006 that a person can be a substitute**
24   **teacher in a Pennsylvania public school**
25   **without a teacher certification?**

1    A. Yes.
2    **Q. Did you tell Stacey that?**
3    A. Well, yes. I just said I
4    mentioned emergency certification to
5    her. I don't know the --- I don't know
6    the rules of that, but I know that I
7    have had students with BAs and MAs be
8    certified in the School District of
9    Lancaster with emergency certification.
10   **Q. And did you do any research**
11   **under the Pennsylvania School Code to**
12   **determine whether you were correct that**
13   **a person could be an emergency**
14   **certified teacher without a --- strike**
15   **that.**
16   Did you do any research to
17   **determine whether a person could teach**
18   **in a public school either as a**
19   **substitute or in some other fashion**
20   **without a certification?**
21   A. No.
22   **Q. Did you attempt to contact an**
23   **attorney to determine whether that was**
24   **true?**
25   A. No.

1    **Q. You said that you were trying to**
2    **allay Stacey's distress; is that**
3    **correct?**
4    A. Yes.
5    **Q. So Stacey was in distress at the**
6    **time of your meeting. Would that be an**
7    **accurate statement?**
8    A. Yes.
9    ATTORNEY KRAMER:
10   She already ---.
11   ATTORNEY VOIGT:
12   Well, then let her answer
13   it.
14   A. Yes. I said that she came ---
15   she was upset when she came to my
16   office.
17   BY ATTORNEY VOIGT:
18   **Q. Paragraph 43, sentence two of**
19   **the third amended complaint reads,**
20   **Schneller convinced the other three**
21   **that they had to give Plaintiff some**
22   **degree to avoid scrutiny from others at**
23   **MU; is that true?**
24   A. No.
25   **Q. Did you believe that if you did**

1   **not change Stacey's courses around that**
2   **she would graduate at all from MU?**
3   ATTORNEY KRAMER:
4   Objection to the form.
5     It's a vague and confusing
6     question. Do you understand the
7     question?
8     A. I think I do.
9   ATTORNEY KRAMER:
10  So, Mark, can you try to
11    clarify?
12  BY ATTORNEY VOIGT:
13    **Q. Did you think that Stacey would**
14    **graduate from Millersville with any**
15    **type of degree if you did not change**
16    **her credits around?**
17    A. Well, yes and no, because she
18    was not going to graduate on Saturday
19    the 13th with a BSE, because she had
20    not passed student teaching. So in
21    order for her to achieve her goal of
22    graduating, then the BA was the option.
23    **Q. And there were no other options;**
24    **correct, in your view?**
25    A. I don't deal with any other

1     options. I mean, what the school ---
2     it's a dual responsibility. So what
3     the School of Education does is what
4     they do and what we did was what we did
5     in her best interest.
6     **Q. Would it not have been in**
7     **Stacey's best interest to graduate with**
8     **a BSE?**
9   ATTORNEY KRAMER:
10  I'll object to the form.
11    You can try and answer it.
12  BY ATTORNEY VOIGT:
13    **Q. You said that you were acting in**
14    **Stacey's best interest. Would it not**
15    **have been in her best interest to**
16    **graduate with a BSE?**
17  ATTORNEY KRAMER:
18  Well, no. She
19    didn't ---.
20    A. She didn't meet the requirements
21    to graduate with a BSE, so I can't
22    really answer that. It was her desire
23    to graduate with a BSE. She was not
24    able to complete that. It was her
25    desire to obtain a college degree. By

1     getting a BSE, or getting a BA, she was
2     able to do that.
3   BY ATTORNEY VOIGT:
4     **Q. Are there any written criteria**
5     **at Millersville that you're aware of**
6     **for the conversion of a BSE to a BA?**
7     A. Written criteria, no. Not that
8     I know of, no.
9     **Q. And this is the first time that**
10    **you had converted a student's grade or**
11    **a student's degree from a BSE to a BA;**
12    **correct?**
13    A. No.
14    **Q. You had done that before?**
15    A. Yes.
16    **Q. When did you do that before?**
17    A. Oh, I don't know. 2000 ---. I
18    don't know. I don't remember the date.
19    At least once prior.
20    **Q. Was that under similar**
21    **circumstances or ---?**
22    A. No. No, it was not.
23  ATTORNEY KRAMER:
24  Let him finish the
25    question.

1   BY ATTORNEY VOIGT:
2     **Q. Was that under similar**
3     **circumstances where the student was**
4     **being denied a BSE?**
5     A. No.
6     **Q. So the instance where you**
7     **previously had assisted in changing a**
8     **student's graduation diploma from a BSE**
9     **to a BA was based on that student's**
10    **voluntarily wanting that change; is**
11    **that correct?**
12    A. Yes.
13    **Q. During your conversation with**
14    **Bray, did you inquire as to the**
15    **procedural or policy basis for changing**
16    **a student's BSE to a BA?**
17    A. No, because I had done it
18    before.
19    **Q. Turn back to Exhibit 70, page**
20    **105.**
21  ATTORNEY KRAMER:
22  Seven or 70?
23  ATTORNEY VOIGT:
24  Seventy (70).
25    BY ATTORNEY VOIGT:

1  Q. Now, in the upper right it says,
2  student removed from student teaching,
3  changed degree to BA. Is that your
4  writing?
5  A. No.
6  Q. Do you know whose writing it is?
7  A. Yes.
8  Q. Whose writing is it?
9  A. Dr. Umble's.
10 Q. Who is Dr. Umble?
11 A. Dr. Umble is the Acting
12 Associate Dean.
13 Q. Why would he write something
14 like that?
15 A. She.
16 Q. She, why would she write
17 something ---?
18 A. Because if you look at --- well,
19 I don't know ---. Why she wrote that,
20 I don't know.
21 Q. Okay. And in the middle on the
22 left it looks like it says multiple
23 changes/substitutions. Who wrote that?
24 A. Dr. Umble.
25 Q. Now, there is a signature at the

1  bottom of the page here where it says
2  for exception requests to requirements
3  in General Education or university
4  academic policy ---?
5  A. Dr. Umble's signature.
6  ATTORNEY KRAMER:
7  You have to let him
8  finish.
9  BY ATTORNEY VOIGT:
10 Q. Is that Dr. Umble's signature?
11 A. Uh-huh (yes).
12 Q. Is that a yes?
13 A. Yes.
14 ATTORNEY KRAMER:
15 Let him ask the question.
16 A. I'm sorry.
17 BY ATTORNEY VOIGT:
18 Q. Now, turn to page two of five of
19 Exhibit 70. Whose signature is that?
20 A. That's Dr. Umble's.
21 Q. What does that mean, I need 235
22 substituted for 233, and 240 moved to
23 elective? Is that what that says?
24 A. Yes, it is.
25 Q. What does that mean?

1  A. Well, it means that the request
2  was to take one English course to count
3  for another one and move one course
4  that was in one spot to another spot.
5  Q. When you say one spot to another
6  spot, can you be more specific?
7  A. In the student's degree programs
8  for the BA and the BSE, they have to
9  take a certain number of courses that
10 fill requirements within those degrees.
11 And so when they go on to the DARS
12 Audit, they go on in the slots that
13 they fill towards the degree. So there
14 was one course being counted one place
15 that needed to be counted someplace
16 else.
17 Q. Turn to page three of five. Why
18 is there an approved stamp in the upper
19 right?
20 A. Because it was approved for the
21 change.
22 Q. By who?
23 A. I don't know.
24 Q. Was it you?
25 A. No.

1  Q. And turn to page four of five.
2  This says, I need 331 moved to Amer.
3  Lit, that's A-M-E-R, and 321 moved to
4  Elective.
5  A. Uh-huh (yes).
6  Q. Why would that be necessary?
7  A. To complete requirements for the
8  BSE degree for the same reason that we
9  moved the other courses around in the
10 first form.
11 Q. And turn to page five of five.
12 Now, it says here, I am requesting an
13 exception to requirement. And then
14 there's an X in General Education.
15 A. Uh-huh (yes).
16 Q. Is that a yes?
17 A. Yes. I'm sorry.
18 Q. Did you write that, that X?
19 A. No. Probably --- I'd say ---
20 no.
21 Q. Well, you can compare the
22 writing on the X before General
23 Education with the writing on Stacey
24 Snyder's signature. And you would
25 agree, would you not, that a different

17 (Pages 62 to 65)

1  **pen was used?**
2  A. I don't know. I have no way of
3  knowing that.
4  **Q. Doesn't it appear that way, that**
5  **a felt tip marker ---?**
6  A. One is bolder. One is bolder
7  than the other.
8  **Q. Now, compare Exhibit Five of**
9  **five with Exhibit One of five. Would**
10  **you not agree that Stacey's signature**
11  **is exactly the same on both?**
12  ATTORNEY KRAMER:
13  I'm not going to have her
14  become an expert graphologist on
15  this, Mark. The signatures are
16  what they are. She doesn't ---
17  you know, I'm not going to have
18  her compare the signatures.
19  ATTORNEY VOIGT:
20  Well, a lay person can
21  see that it is.
22  ATTORNEY KRAMER:
23  Well, I don't know that
24  they ---.
25  A. I have no expertise in

1  handwriting analysis.
2  BY ATTORNEY VOIGT:
3  **Q. Let me ask you a question. How**
4  **is it that Kim McCollum-Clark signed on**
5  **May 17th on a document that Stacey**
6  **signed on May 12th?**
7  ATTORNEY KRAMER:
8  Are you on five of five
9  now?
10  ATTORNEY VOIGT:
11  Yes, five of five.
12  BY ATTORNEY VOIGT:
13  **Q. How is it that Kim McCollum-**
14  **Clark signed that document?**
15  ATTORNEY KRAMER:
16  Answer only if you know.
17  A. You mean, do I know where Kim
18  was when this was signed?
19  BY ATTORNEY VOIGT:
20  **Q. Why does this document exist?**
21  **Why was it necessary for you to write**
22  **yet another exception to graduation**
23  **requirements?**
24  A. Well, as the form indicates,
25  there had to be a change in --- there

1  had to be a change in the General
2  Education core to create a minor
3  because the BA students have to
4  graduate with a minor and Dr. McCollum-
5  Clark must have been on campus that day
6  and signed the form for Stacey.
7  **Q. Stacey didn't sign this**
8  **form ---?**
9  A. No. She signed her own name.
10  **Q. Let me finish my question.**
11  **Stacey did not sign this form on May**
12  **17th, 2006. We can agree on that?**
13  ATTORNEY KRAMER:
14  Well, it says 5/12. We
15  can assume that she signed it
16  5/12. But Dr. Schneller has no
17  information when she signed ---.
18  BY ATTORNEY VOIGT:
19  **Q. Did you observe her sign this**
20  **document?**
21  A. I'm not sure.
22  **Q. When Stacey was in your office**
23  **on May 12th, 2006, did you have her**
24  **sign blank authorizations so that you**
25  **could fill in what was necessary later?**

1  A. No. She was present when ---
2  the back page --- there should be a
3  second side ---.
4  **Q. Answer the question, please.**
5  A. No. She didn't sign any blank
6  documents.
7  **Q. Then how is it that Stacey**
8  **signed these two documents that one**
9  **bears your signature on advisor's line**
10  **and one bears Kimberly McCollum-**
11  **Clark's signature on a different date?**
12  ATTORNEY KRAMER:
13  Don't speculate.
14  A. We filled out these forms on
15  Friday, when Stacey --- we filled out
16  these forms when Stacey was in my
17  office on Friday for the change of
18  major.
19  BY ATTORNEY VOIGT:
20  **Q. But can we agree that you added**
21  **additional information to the form**
22  **after May 12th, 2006 when Stacey signed**
23  **the document?**
24  A. She was --- well, are we talking
25  about one, three or five?

1  **Q. Five. You added more**
2  **information after Stacey's signature;**
3  **right?**
4  A. Five. For five we added
5  signatures of approval after Stacey
6  signed the document.
7  **Q. Did you tell Stacey about that?**
8  **Did you ever share this document, P-70,**
9  **page five of five with Stacey?**
10 A. This was part of the form.
11 These were part of the forms that had
12 to be signed for her to get the BA, so,
13 yes, she knew what forms had to be
14 filled out and she knew why.
15 **Q. Now, on the third amended**
16 **complaint, paragraph 44, it reads, at**
17 **the time Plaintiff lacks sufficient**
18 **course credits in the English**
19 **Department to graduate with a BA in**
20 **English. Is that true?**
21 ATTORNEY KRAMER:
22 If she could, please, see
23 that.
24 ATTORNEY VOIGT:
25 Sure. Second page.

1  BY ATTORNEY VOIGT:
2  **Q. Is that a true statement?**
3  ATTORNEY KRAMER:
4  I'll object to the form.
5  A. Did you ask me if it's true?
6  ATTORNEY VOIGT:
7  Yes.
8  A. No. No, it's not.
9  BY ATTORNEY VOIGT:
10 **Q. So, you ---?**
11 A. Because ---.
12 **Q. Let me finish my question. So**
13 **you did not --- strike that.**
14 **You changed certain credits from**
15 **General Education credits to English**
16 **Department specific credits on Stacey's**
17 **behalf; correct?**
18 A. No, not General Education.
19 **Q. What type of credits would you**
20 **consider the ones that you changed on**
21 **Stacey's behalf?**
22 A. Well, we changed English degree
23 --- we changed English program credits
24 to have the courses that are shown on
25 these exception forms that were

1  originally counted in one place for the
2  BSE degree to substitute for things
3  that were needed for her to complete
4  the BA degree. But this says that she
5  lacks sufficient course credits, which
6  she didn't. We just had to --- we just
7  had to move them from one curriculum
8  design to the other.
9  **Q. What's a curriculum design?**
10 A. Well, do you not have the
11 curriculum sheets that shows the
12 degrees ---?
13 **Q. Just answer the question.**
14 **What's a curricular design? He can't**
15 **help you. What's a curricular design?**
16 A. Well, it's just a --- it's just
17 how the courses are put together for
18 the programs. So it was just a way of
19 describing them. So to move from one
20 program to the other with the courses
21 that she had, we had to flip them
22 around.
23 **Q. Now, you have students majoring**
24 **in English who are not seeking a BSE**
25 **degree; correct?**

1  A. Yes.
2  **Q. And those students have to**
3  **fulfill all of the requirements,**
4  **including all the various pigeonholes**
5  **of curricular exactitude that you have**
6  **in place; correct?**
7  ATTORNEY KRAMER:
8  Object to the form. You
9  can answer.
10 BY ATTORNEY VOIGT:
11 **Q. They have to meet certain**
12 **criteria and take certain courses to**
13 **graduate with a BA in English; is that**
14 **correct?**
15 A. Yes.
16 **Q. Yet Stacey didn't have to do**
17 **that; right?**
18 A. We moved her --- we moved
19 courses around that she already had
20 completed so that she would have the
21 120 credits necessary to graduate with
22 a BA.
23 **Q. Did you believe that was fair to**
24 **the other English Department students**
25 **who had to work hard in each and every**

1    **core curricular area?**
2    ATTORNEY KRAMER:
3    I object to the form.
4        You can try to answer.
5        A. I really wasn't terribly
6    concerned about the other students at
7    the time. I was concerned about
8    helping Stacey.
9    BY ATTORNEY VOIGT:
10   **Q. Did you consult with Dr. Wenrich**
11   **during your effort to change Stacey's**
12   **credits around at the time?**
13   A. Yes.
14   **Q. And what, if any, conversations**
15   **did you have with Dr. Wenrich?**
16   A. We would have discussed what ---
17   we would have discussed what was on
18   Stacey's audit that we could use to
19   accomplish the BA, because we would
20   need to corroborate on the completed
21   forms for them ---.
22   **Q. Am I correct that if you do not**
23   **fill the forms out correctly, the**
24   **Registrar's Office will contact you?**
25   A. No.

1    **Q. What will happen if you don't**
2    **fill the forms out correctly?**
3    A. If we don't fill out the
4    exception forms correctly?
5    **Q. Yes.**
6    A. They go from us to the Dean's
7    Office. So the Dean's Office would
8    look at them. And if there was a
9    problem, that would be the party that I
10   would deal with.
11   **Q. And who in the Dean's Office**
12   **would become involved if you did not**
13   **fill the forms out correctly?**
14   ATTORNEY KRAMER:
15   That calls for
16   speculation.
17   BY ATTORNEY VOIGT:
18   **Q. If you know. Who in the Dean's**
19   **Office would contact you if you did not**
20   **fill out the forms on Stacey's behalf**
21   **correctly?**
22   A. The Dean.
23   **Q. And who would the Dean be?**
24   A. At that time, I guess it was
25   Dean Short.

1    **Q. The same person that put Stacey**
2    **on the Dean's List; correct?**
3    A. It is the same person. He is
4    the same person.
5    **Q. Have you ever had a case ---**
6    **strike that.**
7    Up until May of 2006, had you
8    **ever had a case in which Dean Short**
9    **contacted you to question the**
10   **exceptions that you filled out on a**
11   **student's behalf concerning courses?**
12   A. I don't remember now.
13   **Q. Is Dean Short in some capacity**
14   **your supervisor or your superior?**
15   A. Yes.
16   **Q. In what way? How is he your**
17   **superior?**
18   A. In an academic institution we
19   use the phrase direct report. And the
20   Dean is my direct report, so he is
21   aware --- in the hierarchy of the
22   university, he is aware of what we do
23   as department chairs.
24   **Q. And does he in some way prepare**
25   **documents or otherwise evaluate your**

1    **fitness as a department chair?**
2    ATTORNEY KRAMER:
3    Are you asking if he does
4    performance evaluations?
5    BY ATTORNEY VOIGT:
6    **Q. Yes. As of May 2006, did Dean**
7    **Short prepare performance evaluations**
8    **on you?**
9    A. No.
10   **Q. Did he evaluate you in any way**
11   **as of May 2006? You said he was your**
12   **superior of some kind.**
13   A. As a tenured faculty member, we
14   have five year review post tenure. He
15   may have been the person who did that,
16   but there were transitions in the
17   Dean's Office, so I'm not sure if he
18   did.
19   **Q. And is it possible that an**
20   **incorrectly completed exception request**
21   **might be an item that could come up on**
22   **your five year tenure review?**
23   A. No.
24   **Q. They don't care about things**
25   **like that?**

1    A. I'm a teaching faculty member
2    and a professor at the university.
3    **Q. So they don't care about**
4    **graduation exceptions?**
5    A. These forms you can't --- these
6    forms you can't mess up. I mean, the
7    only thing --- the only thing that they
8    could say is, they could look at what
9    you were asking for and say, we don't
10   --- you know, is there another way that
11   the student could, you know, complete a
12   course or, you know, they might ask or
13   they might turn it back and say, well,
14   this person is asking for an exception
15   and they're a freshman. They're going
16   to graduate in four years.
17   There's not any way that you can
18   that you can --- you keep saying could
19   they be filled out incorrectly. There
20   isn't any way to fill them out
21   incorrectly. This is a curriculum
22   approval amendment process or
23   adjustment process.
24   **Q. Isn't it possible that the Dean**
25   **might ask you why you were changing a**

1    **student's degree from a BSE to a BA the**
2    **day before graduation? Isn't that**
3    **possible?**
4    ATTORNEY KRAMER:
5    It calls for speculation.
6    ATTORNEY VOIGT:
7    You can answer.
8    A. Anything is possible.
9    BY ATTORNEY VOIGT:
10   **Q. Why did you pick English to have**
11   **Stacey graduate as an English degree?**
12   **Why not some other degree?**
13   A. She's involved in my department.
14   She chose English as her degree.
15   **Q. She chose a BSE, not a ---.**
16   ATTORNEY KRAMER:
17   Objection. It's
18   argumentative.
19   BY ATTORNEY VOIGT:
20   **Q. Did you attend Stacey's**
21   **graduation?**
22   A. Yes.
23   **Q. Did you speak to her that day?**
24   A. Yes. I think I did.
25   **Q. Describe that conversation.**

1    A. It wasn't a conversation.
2    **Q. Well, you spoke to her, but it**
3    **wasn't a conversation.**
4    A. Well, we smiled at each other.
5    She hugged me. I said congratulations.
6    You don't have conversations with
7    people at graduation. You say hello,
8    goodbye, good luck. I mean, that's
9    basically it, you know.
10   **Q. Since the event of May 2006,**
11   **have you had any conversations with Dr.**
12   **Bray about the events in this lawsuit,**
13   **outside the presence of counsel?**
14   A. Can you be more specific about
15   what you mean by events?
16   **Q. Do you understand the events**
17   **that are complained of in this lawsuit?**
18   A. Yes.
19   **Q. About those events, did you have**
20   **any conversations with Dr. Bray since**
21   **May of 2006?**
22   A. Yes.
23   **Q. When?**
24   A. After the lawsuit was made
25   public and we saw it in the papers, the

1    local papers.
2    **Q. What did you talk to Dr. Bray**
3    **about?**
4    A. I said, I was surprised that
5    Stacey had --- that Stacey was doing
6    this.
7    **Q. Why were you surprised?**
8    A. Because she was so --- because
9    she --- because she was so glad when
10   she graduated on May 13th to have a
11   degree. And she was very upset. She
12   was --- you know, she was looking at
13   her career and saying, what am I going
14   to do? And we sat in my office. We
15   talked about the forms. We talked
16   about the degree transition and she ---
17   you know, she left --- she left happy.
18   I mean, in the sense that if you think
19   that your career is --- you know, that
20   you're not going to get something that
21   you had worked so hard for, for four
22   years and you're looking at it saying,
23   my career is going to be over or
24   whatever. And then someone can say,
25   well, we can fix it like this. A human

1   response is to be ---.
2   **Q. Is that what you think you did?**
3   **Do you think you fixed it for Stacey?**
4   A. Well, not fix. I mean to offer
5   her another alternative to give her a
6   way to achieve her goal.
7   **Q. You're aware that Stacey has**
8   **never received her teaching degree;**
9   **correct?**
10  ATTORNEY KRAMER:
11  Don't speculate.
12  A. No.
13  BY ATTORNEY VOIGT:
14  **Q. Are you aware that Stacey now**
15  **works as a waitress at the local**
16  **American ---?**
17  A. No.
18  **Q. Are you aware that Stacey works**
19  **as a clothing salesman?**
20  A. No.
21  **Q. Are you aware that Stacey has**
22  **never become a teacher?**
23  A. Well, yes, because that was what
24  was mentioned in the original newspaper
25  articles. But other than that, I don't

1   know anything about what she is doing
2   or what she has done. I only know what
3   was reported in the newspaper. And I
4   looked at it one time when I saw the
5   picture on the cover of the paper and
6   that was it.
7   **Q. Are you aware that Stacey could**
8   **not repay her student loans?**
9   A. No.
10  **Q. Are you aware that because of**
11  **that Millersville would not release**
12  **Stacey's transcript for almost two**
13  **years?**
14  A. No.
15  **Q. Since May of 2006, have you had**
16  **any conversations with Dr. Wenrich**
17  **about the matters complained about in**
18  **this complaint?**
19  A. No.
20  **Q. Since May of 2006, have you had**
21  **any conversations with Barry Girvin**
22  **about the matters set forth in the**
23  **complaint?**
24  A. No.
25  **Q. Since May of 2006, have you had**

1   **any conversations with Deann Buffington**
2   **about the matters in the complaint?**
3   A. No.
4   **Q. Have you had any conversations**
5   **with Nicole Reinking about the matters**
6   **in the complaint?**
7   A. No.
8   **Q. Who do you believe made the**
9   **decision to deny Stacey her Bachelor of**
10  **Science in Education Degree?**
11  ATTORNEY KRAMER:
12  If you know the answer,
13  you may answer.
14  A. I don't know the answer to that.
15  BY ATTORNEY VOIGT:
16  **Q. Why not?**
17  ATTORNEY KRAMER:
18  I'll object.
19  BY ATTORNEY VOIGT:
20  **Q. Why don't you know the answer?**
21  ATTORNEY KRAMER:
22  Object as to form. And
23  you can try to answer.
24  A. Why don't I know?
25  BY ATTORNEY VOIGT:

1   **Q. Well, you're a department head**
2   **at Millersville. Do you not know who**
3   **would make the decision from one of**
4   **your English Department students not to**
5   **get a BSE degree?**
6   ATTORNEY KRAMER:
7   It's a different
8   department.
9   ATTORNEY VOIGT:
10  I appreciate your
11  coaching, but why don't you let
12  the witness answer.
13  BY ATTORNEY VOIGT:
14  **Q. Why would you not know something**
15  **like that?**
16  A. Well, it doesn't come up in my
17  routine work.
18  **Q. But it came up in Stacey's case;**
19  **right? Would it not behoove you to**
20  **know who made the decision that Stacey**
21  **would not receive a BSE?**
22  ATTORNEY KRAMER:
23  Objection, argumentative.
24  BY ATTORNEY VOIGT:
25  **Q. In Stacey's case, why would you**

1 **not want to know who made the decision**
2 **to deny Stacey her BSE degree?**
3 A. My only part in this was to help
4 Stacey achieve a college degree because
5 that's what she wanted. And the way to
6 do that was to process her through from
7 a BSE to a BA. The Commonwealth of
8 Pennsylvania, as far as I understand,
9 at the end of commencement when the
10 President says, according to the powers
11 vested in me by the Commonwealth, I
12 confer on you your degree, you know, I
13 have no reason to even think about
14 anything like that because that's not
15 what I do. I'm not a university
16 president and I don't have a role in
17 that.
18 **Q. Did you take Dr. Bray's word for**
19 **it when she called you that time and**
20 **said, we're changing Stacey's degree**
21 **from a BSE to a BA?**
22 ATTORNEY KRAMER:
23 I object. She said
24 Stacey came in and explained
25 that, not Dr. Bray.

1 BY ATTORNEY VOIGT:
2 **Q. During your --- let me rephrase**
3 **that. You had one conversation with**
4 **Dr. Bray about Stacey. Is that the sum**
5 **total of your conversations with Dr.**
6 **Bray?**
7 A. I told you I don't remember how
8 many conversations there were. It's
9 been two years ago.
10 **Q. In that conversation, did Dr.**
11 **Bray say to you that Stacey was getting**
12 **a --- was not getting a BSE? Is that**
13 **what she said to you?**
14 A. I don't know that she said that
15 to me.
16 ATTORNEY VOIGT:
17 Let's take a short break
18 and I'll take a look at my
19 notes.
20 SHORT BREAK TAKEN
21 EXAMINATION
22 BY ATTORNEY KRAMER:
23 **Q. When Ms. Snyder went to you on**
24 **May 12th, 2006, ---**
25 A. Uh-huh (yes).

1 **Q. --- what information did she**
2 **tell you about her situation?**
3 A. She said to me that she was not
4 going to be able to complete her
5 student teaching.
6 **Q. Did she tell you why?**
7 A. She said there had been a
8 problem at the school.
9 **Q. Anything else that she said?**
10 A. She expressed concern about how
11 she was going to be able to graduate
12 the next day.
13 ATTORNEY KRAMER:
14 Nothing else.
15 ATTORNEY VOIGT:
16 Thank you.
17 A. Uh-huh (yes).
18 * * * * * * * *
19 DEPOSITION CONCLUDED
20 * * * * * * * *
21
22
23
24
25

1 CERTIFICATE
2
3 I HEREBY CERTIFY THAT THIS ELECTRONIC TRANSCRIPT WAS
4 REPORTED BY ME AND THEREAFTER REDUCED TO TYPEWRITING AND THAT
5 THIS TRANSCRIPT IS A TRUE AND ACCURATE RECORD THEREOF.
6
7 SARGENT'S COURT REPORTING SERVICE, INC.
8
9
10 _____
11
12 COURT REPORTER
13
14
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT J**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

### Declaration

I, Vilas A. Prabhu, hereby declare as follows:

1.  I am the Provost at Millersville University. In that capacity, among other responsibilities, I hear students' academic appeals.

2.  In February 2007, Stacy Snyder appealed the May 2006 denial of a B.S.Ed. degree and requested a hearing pursuant to Millersville's Academic Appeals Policy.

3.  As Provost, I conducted that hearing. As described in my March 26, 2007, letter to Ms. Snyder and her counsel, which is attached hereto, I denied her appeal because the evidence showed, among other things, that she failed to satisfy the University academic requirements for student teaching.

4.  Plaintiff's internet posting, the so-called "drunken pirate" picture and accompanying text, did not play any role in my decision. In fact, at that time I had not even seen a copy of the internet posting in question.

I declare under penalty of perjury that the foregoing facts are true and correct.

Millersville, PA

DATED: *04/03/2008*

Vilas A. Prabhu


 P.O. Box 1002
Millersville, PA 17551-0302
www.millersville.edu

Provost and Vice President for Academic Affairs
Phone: 717-872-3596
Fax: 717-871-2251

March 26, 2007

CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Ms. Stacy L. Snyder                    Mark W. Voigt, Esq.
847 Bunker Hill Road                   Attorney at Law
Strasburg, PA 17579                    Plymouth Meeting Executive Campus
                                       Suite 400
                                       600 West Germantown Pike
                                       Plymouth Meeting, PA 19462

### RE: Academic Appeal of Stacy Snyder - Student Teaching Performance

Dear Ms. Snyder and Mr. Voigt:

The purpose of this letter is to inform you of my decision regarding your academic appeal. Specifically, you requested that I review the determination that Dr. Jane Bray, Dean of the School of Education, made on May 15, 2006. My understanding is that Dr. Bray denied your appeal because you failed to satisfy the University's academic requirements for student teaching. Your failure to satisfy the proficiency standards of the Pennsylvania Department of Education ("PDE") precludes you from receiving teacher certification, and played a critical role in Dr. Bray's determination.

Pursuant to Millersville University's Academic Appeals Policy published on page 53 of the 2006-2007 Undergraduate Catalog, I personally met with you, in the presence of your attorney, and carefully reviewed the materials you submitted in support of your academic appeal. Dr. Bray and Dr. Judith Wenrich, Student Teaching Coordinator in the School of Education, also attended the meeting and submitted materials regarding your student teaching performance.

The documentation shows that Millersville University admitted you into its Advanced Professional Studies Program, which required you to complete a student teaching component in order to receive a Bachelor of Science in Education (B.S.Ed.) degree. Prior to your student teaching assignment, the University provided you with a Guide for Student Teaching. The Guide states that in order to receive teaching certification in Pennsylvania, a Millersville University student must satisfactorily complete student teaching. Each student teacher candidate is evaluated in the categories set forth in the PDE-430 form, which are Planning and Preparation, Classroom Environment, Instructional Delivery and Professionalism. According to the Guide, each candidate must receive a satisfactory rating in all of the categories listed on the PDE-430 in order to be eligible for certification by the Commonwealth. The Guide also states, under the heading "Professional Conduct," the following requirement: "...the Student Teacher needs to maintain the same professional standards expected of the teaching employees of the cooperating school."



$P-63$

with regard to professional matters, you displayed poor judgment throughout the entire semester.

Consistent with these evaluations, the final PDE-430 form completed by your University supervisor, and required by the Commonwealth of Pennsylvania for eligibility for teaching certification, shows an unsatisfactory rating in Professionalism. There are eight performance indicators for the Professionalism category. The University supervisor cited half of the total list as not having been demonstrated. These included the following:

- Integrity and ethical behavior, professional conduct as stated in <u>Pennsylvania Code of Professional Practice and Conduct for Educators</u>; and local, state, and federal, laws and regulations
- Effective communication, both oral and written with students, colleagues, paraprofessionals, related service personnel, and administrators.
- Ability to cultivate professional relationships with school colleagues.
- Knowledge of Commonwealth requirements for continuing professional development and licensure.

In addition, the University supervisor rated your performance in the professionalism component of the student teaching evaluation as unsatisfactory.

Based on a review of the entire record, I have decided to uphold the determination of Dr. Bray. Your overall poor performance during student teaching resulted in your ineligibility to receive teaching certification from the Commonwealth. Accordingly, it is my determination that Dr. Bray fairly resolved this academic issue by allowing you to graduate on time with a Bachelor of Arts degree in English.

I wish you success in your future pursuits.

Sincerely,

Vilas A. Prabhu
Provost and Vice President
 for Academic Affairs

nhk

c:   Mr. Jeffrey Hawkins, University Legal Counsel, Pennsylvania State System
     of Higher Education

In addition to the PDE-430 form, Millersville University assesses student teachers' performance and provides them with feedback through a University assessment form, the Millersville Student Teaching Mid-Evaluation and Final Evaluation.

A review of the record shows the following:

Throughout your student teaching semester, you received feedback from your cooperating teacher and the University supervisor regarding your overall student teaching performance. The Millersville University evaluation forms document multiple concerns at both the mid-point and end of your student teaching semester.

At the midpoint of the semester, the cooperating teacher's Millersville Student Teaching Mid-Evaluation – English evaluated you as needing improvement or significant remediation in twelve different areas. The cooperating teacher's comments included the following:

- "Many errors were made in daily lessons that were partly due to weak content knowledge..."
- "Too many students are left behind as a result of ineffective lessons..."
- "... frequently, she resorts to talking over the students, twice shouting 'shut up,' and overall feeling and showing that she is frustrated and not in control."
- "Many students who completed Miss Snyder's earlier units in the course would not, I'm afraid, demonstrate a strong evidence of learning."

The cooperating teacher further reported numerous incidences of unprofessional behavior within the context of your supervised student teaching performance during the semester. This included playing a song that included profane language, attempting to regain order by telling the students to "shut up," discussing personal matters in front of students, failing to wear appropriate professional attire and not following the proper chain of command at the school. In addition, your cooperating teacher warned you to avoid discussions about myspace.com and looking up student online accounts or corresponding with students on the website. You acknowledged in writing that several of these incidents did occur.

Also at the mid-point of the semester, the University supervisor evaluated you as needing improvement or significant remediation in twelve areas on the Millersville Student Teaching Mid-Evaluation - English. Consistent with this, he rated your performance as unsatisfactory in the Classroom Environment category of the mid-placement PDE-430 form. This equates to a failure, although at mid-placement the PDE-430 is a formative evaluation to provide the student teacher with feedback.

At the end of the semester, the final Millersville evaluations still show unsatisfactory performance in multiple areas, despite improvements noted in other areas. The cooperating teacher's final Millersville Student Teaching Final Evaluation – English shows unsatisfactory ratings in four of the six indicators of Professionalism and in two indicators of Preparation. As evidence, the cooperating teacher stated, "Most of Miss Snyder's written and oral communications with students and staff contained numerous grammatical and/or content errors, which is a cause for concern for an evaluator of a future English teacher. Frequently, in fact, her students corrected her during her lessons." In addition, the cooperating teacher noted that



**EXHIBIT K**



# SARGENT'S COURT REPORTING

**Quality Work. Quality People.**

# Transcript of the Testimony of **Gerald Huesken**

**Date:** April 4, 2008

**Case:** Snyder v. Millersville University

Printed On: April 7, 2008

Sargent's Court Reporting Service, Inc.
Phone: 814-536-8908
Fax: 814-536-4968
Email: schedule@sargents.com
Internet: www.sargents.com

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT

OF PENNSYLVANIA

\* \* \* \* \* \* \* \* \*

\*

STACEY SNYDER,    \*

    Plaintiff    \*   Case No.

    vs.    \*   07-1660

MILLERSVILLE    \*

UNIVERSITY,    \*

    Defendant    \*

\*

\* \* \* \* \* \* \* \*

DEPOSITION OF

GERALD G. HUESKEN, ED.D.

April 4, 2008

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

```
 1                    DEPOSITION
 2                        OF
 3      GERALD G. HUESKEN, ED.D., taken on
 4      behalf of the Plaintiff herein,
 5      pursuant to the Rules of Civil
 6      Procedure, taken before me, the
 7      undersigned, Hilary Culver, a Court
 8      Reporter and Notary Public in and for
 9      the Commonwealth of Pennsylvania, at
10      the law offices of Kegel, Kelin, Almy &
11      Grimm, LLP, 24 North Lime Street,
12      Lancaster, Pennsylvania, on Friday,
13      April 4, 2008 beginning at 10:30 a.m.
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2
 3      WITNESS:  GERALD G. HUESKEN, ED.D.
 4      EXAMINATION
 5         by Attorney Voigt          7 - 60
 6      EXAMINATION
 7         by Attorney Kramer        61 - 66
 8      CERTIFICATE                        67
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1          A P P E A R A N C E S
 2
 3      MARK VOIGT, ESQUIRE
 4      Law Offices of Mark Voigt
 5      Plymouth Meeting Executive Campus
 6      600 W. Germantown Pike
 7      Suite 400
 8      Plymouth Meeting, PA  19462
 9         COUNSEL FOR PLAINTIFF
10
11      BARRY KRAMER, ESQUIRE
12      Office of Attorney General
13      21 South 12th Street
14      Philadelphia, PA  19107
15         COUNSEL FOR DEFENDANT
16         MILLERSVILLE
17
18      HOWARD KELIN, ESQUIRE
19      Kegel, Kelin, Almy & Grimm, LLP
20      24 North Lime Street
21      Lancaster, PA  17602
22         COUNSEL FOR
23         CONESTOGA VALLEY
24
25
```

```
 1              EXHIBIT PAGE
 2
 3                         PAGE
 4      NUMBER  DESCRIPTION        IDENTIFIED
 5      102    Student Teacher List   24
 6      103    Summary Policy         27
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25      EXHIBITS NOT ATTACHED
```

1    OBJECTION PAGE
2
3   ATTORNEY                    PAGE
4   Kelin           11, 18, 18, 45,
5                   47, 50, 59, 64
6   Voigt                      64
7   Kramer                     50
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1       P R O C E E D I N G S
2   -------------------------------------
3   GERALD G. HUESKEN, ED.D., HAVING FIRST
4   BEEN DULY SWORN, TESTIFIED AS FOLLOWS:
5   -------------------------------------
6   EXAMINATION
7   BY ATTORNEY VOIGT:
8   Q. Would you state your name and
9   business address?
10  A. My name is Gerald G. Huesken.
11  And my business address is Conestoga
12  Valley School District, 2110 Horseshoe
13  Road, Lancaster, 17601.
14  Q. Could you spell Huesken?
15  A. H-U-E-S-K-E-N.
16  Q. Mr. Huesken --- is it Dr.
17  Huesken?
18  A. Dr. Huesken.
19  Q. My name is Mark Voigt. I'm the
20  attorney representing Stacey Snyder in
21  a lawsuit against various individuals
22  at Millersville University and this is
23  your deposition in that case. Have you
24  ever had your deposition taken before?
25  A. No.

1   Q. Well, have you had a chance to
2   talk to Mr. Kelin about how depositions
3   proceed?
4   A. I did.
5   Q. Well, let me just go over some
6   of the ground rules. First of all, the
7   court reporter has administered an oath
8   to you that is the same oath as you
9   would take if you were in a court of
10  law and it carries with it the same
11  penalties, so you tell the truth, the
12  whole truth and nothing but the truth.
13  Additionally, as you can see the
14  reporter is transcribing everything
15  that we say on a computer with a
16  mouthpiece, so you need to, number one,
17  wait until the questioner, either
18  myself or somebody else, is done with
19  the question before you respond because
20  the reporter has a hard time taking
21  down two people talking at once.
22  Additionally, please keep your
23  voice up so the reporter can hear you.
24  Please answer questions with a worded
25  response rather than a nod of the head

1   or a shake of the head or a uh-huh or
2   uh-uh because the reporter has a hard
3   time taking those things down as well.
4   Are you under the influence of any
5   medications or any other pain relievers
6   or anything that might influence your
7   testimony today?
8   A. I'm under the influence of a
9   cold, but no medications.
10  Q. Well, let's get started then.
11  What is your position at Conestoga
12  Valley?
13  A. I'm the superintendent.
14  Q. And would you briefly review for
15  the reporter your educational and
16  correctional background?
17  A. My educational background, I
18  have an undergrad degree from
19  Susquehanna University. I have a
20  Master's Degree from the University of
21  Pennsylvania and a Doctorate Degree
22  from Temple University. I'm in my 29th
23  year of experience in the field of
24  education, most of it which would have
25  been in administration. I have five

1    years teaching in a classroom and 24
2    years as a building and central office
3    administrator.
4    **Q. How long have you been at**
5    **Conestoga Valley now?**
6    A. Twenty (20) years, ten years as
7    superintendent.
8    **Q. Are you familiar with Stacey**
9    **Snyder?**
10   A. I'm familiar with the case.
11   **Q. And you're aware that Ms. Snyder**
12   **was a student teacher at Conestoga**
13   **Valley here in the spring of 2006;**
14   **right?**
15   A. Yes.
16   **Q. Did you have any interaction**
17   **with Ms. Snyder when she was a student**
18   **teacher?**
19   A. No.
20   **Q. You never met her or spoke to**
21   **her?**
22   A. No.
23   **Q. Well, you're aware that Ms.**
24   **Snyder eventually was forbidden to**
25   **return to Conestoga Valley School**

1    **District prior to the end of her**
2    **student teaching assignment?**
3    ATTORNEY KELIN:
4    Objection to the form.
5    Go ahead, you can answer the
6    question, if you're able to.
7    BY ATTORNEY VOIGT:
8    **Q. Well, let me rephrase the**
9    **question. You're aware that an**
10   **incident occurred regarding Ms. Snyder**
11   **and Conestoga Valley School District in**
12   **or about early May of 2006; correct?**
13   A. I'm aware of the situation.
14   **Q. Did you play any role in the**
15   **events that transpired in early May of**
16   **2006?**
17   A. No.
18   **Q. Were you informed of those**
19   **events as they were transpiring?**
20   A. Yes. I was briefed.
21   **Q. Who briefed you?**
22   A. My assistant.
23   **Q. Who was that?**
24   A. Kim Seldomridge.
25   **Q. And what is it --- is it Mr.**

1    **Seldomridge, I take it?**
2    A. Yes, it is.
3    **Q. Does he hold a Doctorate Degree**
4    **or no?**
5    A. No.
6    **Q. Does he hold a Master's Degree?**
7    A. I believe he does, yes.
8    **Q. What were you told about Ms.**
9    **Snyder's incident?**
10   ATTORNEY KELIN:
11   Again, you're asking back
12   in May of '06?
13   BY ATTORNEY VOIGT:
14   **Q. Yes, in May of 2006.**
15   A. I know I was briefed on the
16   situation. I can't say exactly what
17   was said to me at that time, especially
18   given what has transpired since then.
19   So it would be difficult for me to say
20   exactly what was said to me, but I was
21   briefed on the situation. I was aware
22   of it.
23   **Q. Well, I'm not expecting you to**
24   **remember verbatim what was said, but do**
25   **you remember when you were briefed?**

1    A. No.
2    **Q. Do you remember what time of day**
3    **it was?**
4    A. No.
5    **Q. Was it by telephone or in**
6    **person?**
7    A. It was probably in person, but I
8    couldn't say that I remember.
9    ATTORNEY KELIN:
10   I'd just ask the witness
11   not to speculate. If you can't
12   remember, just say you don't
13   remember.
14   BY ATTORNEY VOIGT:
15   **Q. What, if any, response did you**
16   **have to Mr. Seldomridge?**
17   A. I can't recollect what my
18   response was.
19   **Q. Did you have any conversations**
20   **with --- well, first of all do you know**
21   **who Deann Buffington is?**
22   A. Yes.
23   **Q. Did you have any conversations**
24   **with Miss Buffington at or near May of**
25   **2006?**

1 A. I can't say definitely that I
2 did about this case.
3 Q. Do you know who Nicole Reinking
4 is?
5 A. Yes, I do.
6 Q. Did you have any conversations
7 with Ms. Reinking about the matter?
8 A. No.
9 Q. Do you know who Jane Bray is?
10 A. Yes.
11 Q. Have you had any discussions at
12 any time about this case with Jane
13 Bray?
14 A. No.
15 Q. Have you had any discussions at
16 any time about this --- strike that.
17 Do you know who Vilas Prabhu is?
18 A. No.
19 Q. Do you know who Judith Wenrich
20 is?
21 A. No. The name's familiar, but I
22 can't say that I know her.
23 Q. Do you know who Beverly
24 Schneller is?
25 A. No.

1 Q. Do you know who Barry Girvin is?
2 A. Yes.
3 Q. Have you had any conversations
4 with Mr. Girvin about Stacey's case at
5 any time?
6 A. No.
7 Q. Have you had any discussions
8 with Ms. Buffington at any time about
9 the circumstances of this case, outside
10 the presence of counsel?
11 A. About this case? About this
12 deposition?
13 Q. Yes, either the deposition or
14 the case.
15 A. Only recently. She wanted to
16 make sure I had the packet that I
17 brought today. She had to make sure I
18 didn't read it and I didn't.
19 ATTORNEY KELIN:
20 It was the deposition
21 transcript that she returned to
22 me through Mr. Huesken ---
23 through Dr. Huesken.
24 BY ATTORNEY VOIGT:
25 Q. Did you discuss the nature of

1 the case at any time with Ms.
2 Buffington outside the presence of
3 counsel?
4 A. Outside the presence of counsel?
5 Q. Correct.
6 A. I can't recollect that I did.
7 Q. Did you discuss this case at any
8 time with Nicole Reinking outside the
9 presence of your attorney?
10 A. No.
11 Q. Now, you have a couple of three-
12 ring binders available here. Turn to
13 Exhibit 97, please. Are you familiar
14 with this document?
15 A. Yes.
16 Q. This is the professional
17 handbook dated September 2007.
18 A. Uh-huh (yes).
19 Q. Do you know whether there were
20 any changes in the professional
21 handbook?
22 A. I wouldn't be able to say, no.
23 I'm sure there were some updates.
24 Q. Let me finish the question
25 before you answer. I know you might

1 anticipate my questions, but ---. The
2 event that we're here about occurred in
3 May of 2006. Do you know whether this
4 handbook was updated in any way between
5 May of 2006 and September 2007?
6 A. I can't say.
7 Q. Turn to page 13 of the
8 professional handbook, please.
9 A. That was page 13. I'm sorry.
10 OFF RECORD DISCUSSION
11 BY ATTORNEY VOIGT:
12 Q. Now, the first paragraph last
13 sentence it says, this handbook applies
14 to all exempt, paren, salary, close
15 paren, employees certificated by the
16 Department of Education. Do you know
17 whether this handbook is provided to
18 student teachers at the time that they
19 start?
20 A. They are given direction how to
21 access it. It's online.
22 Q. Who gives them that direction?
23 A. The building principal.
24 Q. Now, based on this sentence, was
25 Ms. Snyder an employee of the Conestoga

1    **Valley School District at any time?**
2    ATTORNEY KELIN:
3    I object as to form.  I
4      also suspect that's outside his
5      scope of knowledge.
6    ATTORNEY VOIGT:
7    That's fine.  Let me
8      rephrase the question.
9    BY ATTORNEY VOIGT:
10   **Q. Was Ms. Snyder an employee at**
11   **Conestoga Valley School District at any**
12   **point in time?**
13   ATTORNEY KELIN:
14   And I'll just object to
15     the use of the term employee.
16     You can answer it to the best of
17     your ability as a layman.
18     That's a compliment.
19   A. Thank you.  I appreciate that.
20     She was not a paid employee of the
21     school district.
22   BY ATTORNEY VOIGT:
23   **Q. Was she an unpaid employee of**
24   **the school district?**
25   A. Student teachers are really

1    apprentices or teachers in training.  I
2    look at them that way.
3    **Q. Was she certificated?**
4    A. That's what she was working on,
5    her certificate.
6    **Q. But she was not certificated at**
7    **the time that she was at Conestoga**
8    **Valley School District; correct?**
9    A. That's correct.
10   **Q. And the manual applies to salary**
11   **employees, is that what it says?**
12   A. That's what it says.
13   **Q. And did Ms. Snyder receive a**
14   **salary at any time while she was at**
15   **Conestoga Valley?**
16   A. No.
17   **Q. Now, are you familiar with the**
18   **contents of the professional handbook?**
19   A. To a certain extent.  I don't
20   have it memorized.
21   **Q. Is there any definition in the**
22   **professional handbook for the word**
23   **apprentice that you used?**
24   A. I don't think so.
25   **Q. Now, turn to page 44.  This**

1    **appears to be a section on company**
2    **files, facilities and equipment,**
3    **personal use of the phone, fax and**
4    **computers, et cetera.  Are you familiar**
5    **with this section in the handbook?**
6    A. To a certain extent, yes.
7    **Q. Are there any other policies or**
8    **procedures in effect at Conestoga**
9    **Valley having to do with internet usage**
10   **or computer usage of any type that**
11   **you're aware?**
12   A. There's an Appropriate Use
13   Policy.
14   **Q. Is that in the handbook?**
15   A. It should be referenced in here.
16   I'm sure it's in here.  It talks about
17   use of the internet.
18   **Q. There's an Acceptable Use**
19   **Policy.**
20   A. On the next page Acceptable Use
21   Policy.
22   **Q. Page 46.**
23   A. Right.  And it's not the policy
24   verbatim, but most of it's in there.
25   Consequences of inappropriate use, I

1    think that's what follows.
2    **Q. Page 48, it says consequences of**
3    **inappropriate use.**
4    A. That's correct.
5    **Q. In May of 2006, did the district**
6    **have any policy having to do with**
7    **MySpace accounts?**
8    A. No.
9    **Q. As of May of 2006, did the**
10   **district provide any training or**
11   **education to its staff on appropriate**
12   **use of MySpace accounts?**
13   A. I can't answer that.
14   **Q. Why not?**
15   A. Well, I'm not directly involved
16   in staff development to say that we
17   didn't have a staff developer piece
18   that talked about MySpace at that time.
19   I can't say definitely one way or the
20   other.
21   **Q. Turn to page 54 of the policy**
22   **manual, please.  This talks about**
23   **employment classifications.  Are you**
24   **familiar with this section?**
25   A. Uh-huh (yes).

1   **Q. Is that a yes?**
2   A. Yes. I'm sorry.
3   **Q. Now, there was no reference to**
4   **apprentices in your employment**
5   **classification section; correct?**
6   A. That's correct.
7   **Q. Turn to page 98 or not 98,**
8   **Exhibit 98. This is a letter that I**
9   **sent to Helen, dated February 2, 2008.**
10  **Have you ever seen this letter?**
11  A. Yes.
12  **Q. And turn to Exhibit 99, please.**
13  **Now, this is a response, dated February**
14  **19, 2008. Have you ever seen this?**
15  A. Yes.
16  **Q. And on page two you are copied**
17  **on the document; is that correct?**
18  A. Yes.
19  **Q. So am I correct that you had**
20  **input into the preparation of this**
21  **document?**
22  A. Yes.
23  **Q. Now, question number one asks**
24  **for all employment manuals pertaining**
25  **to the hiring of teachers in the**

1   **district. And on page 99, or Exhibit**
2   **99, you say, I'm not sure what you mean**
3   **here.**
4   ATTORNEY KELIN:
5   Well, he didn't say it.
6   I said it.
7   BY ATTORNEY VOIGT:
8   **Q. Well, it says, not sure what you**
9   **mean here. Now, I take it there's a**
10  **district professional manual.**
11  A. Excuse me?
12  **Q. There's a district professional**
13  **employee's manual?**
14  A. That's what we just looked at.
15  ATTORNEY KELIN:
16  Exhibit 98.
17  BY ATTORNEY VOIGT:
18  **Q. Exhibit 98, the professional**
19  **employee's manual. So other than that,**
20  **there are no manuals pertaining to the**
21  **employment or hiring of teachers?**
22  A. There is a hiring manual. I'm
23  not sure --- I don't think he made you
24  copies yet.
25  ATTORNEY KELIN:

1   No, I did. I'll just go
2   on record --- I did provide you
3   the hiring manual. It was after
4   this letter ---.
5   BY ATTORNEY VOIGT:
6   **Q. I take it you're familiar with**
7   **the procedures for hiring employees in**
8   **the district, professional employees in**
9   **the district; is that correct?**
10  A. Yes.
11  **Q. And you would agree with me that**
12  **professional employees who are hired**
13  **must be approved by the school board?**
14  A. That's correct.
15  ATTORNEY VOIGT:
16  And you were kind enough
17  to provide us with a list of
18  student teachers for the spring
19  semester of 2005-2006. And
20  we'll mark that as Exhibit ---
21  we'll call that 102 here in this
22  file.
23  (Exhibit 102 marked for
24  identification.)
25  BY ATTORNEY VOIGT:

1   **Q. Do you have that in front of**
2   **you, sir?**
3   A. No.
4   **Q. Was this approved, this list**
5   **approved by the school board?**
6   A. Yes.
7   **Q. In what fashion was it approved**
8   **by the school board?**
9   A. It's on their consent agenda and
10  they vote on that agenda.
11  **Q. And what is a consent agenda?**
12  A. Consent agenda is a list of
13  items that are either routine or have
14  been talked about by the Board before
15  and they actually vote on them as a
16  group.
17  **Q. So the school board would be**
18  **presented with a list similar to P-102?**
19  A. Correct.
20  **Q. And they would vote yes or no on**
21  **it?**
22  A. Yes.
23  **Q. Is that procedure different from**
24  **the procedure in hiring a teacher as a**
25  **professional employee?**

1  Q. But Millersville performs the
2  clearance check; right?
3  A. Millersville collects the forms
4  from the students.
5  Q. Number five says, documentation
6  that the district reviewed appropriate
7  citizenship documents from Stacey to
8  ensure that she's not an illegal alien.
9  Did the district do so?
10  A. No.
11  Q. Why not?
12  A. We don't do that for student
13  teachers.
14  Q. But you would do that for
15  teachers --- with respect to teachers;
16  correct?
17  A. That's correct.
18  Q. Is there a reason for the
19  difference?
20  A. I can't say that I have one.
21  Q. And number six on P-98 asks for
22  copies of all W-4 forms and IRS
23  recordkeeping documents, returning to
24  Exhibit 99. There are no such
25  documents; correct?

1  A. Not for her, no.
2  Q. And why not?
3  A. She's not paid a salary.
4  Q. And number seven asks for a copy
5  of Stacey's personnel file. And I
6  think there's no documents for that?
7  A. She does not have a personnel
8  file in my office.
9  Q. And the teachers do; correct?
10  A. The teachers do? I don't know
11  what you mean.
12  Q. Well, teachers that are employed
13  by the Conestoga Valley School District
14  have personnel files; correct?
15  A. In my office, that's correct.
16  Q. And number eight asks for proof
17  that the district's school board
18  approved Stacey's hiring. You gave me
19  P-102; is that correct?
20  A. That's correct.
21  Q. Is there any other proof that
22  the district approved Stacey's hiring?
23  A. That would be the approval.
24  Q. And number nine asks for a copy
25  of Stacey's written employment

1  contract. And I take it there was no
2  such document; right?
3  A. That's correct.
4  Q. Why not?
5  A. She doesn't receive a salary.
6  Q. Are you familiar with the
7  guidelines under the school code for
8  employment contracts? Is that a yes?
9  A. Yes.
10  Q. Do you know whether the school
11  code differentiates between salary and
12  non-salary, or does it just apply to
13  all teachers?
14  A. Teachers that we hire and pay a
15  salary, I would say that applies to
16  them.
17  Q. And number ten asks for the
18  report of Stacey's pre-employment
19  medical examination. And I believe
20  that none was completed; correct?
21  A. Not for us, no.
22  Q. Do you know if Millersville did
23  one?
24  A. I'm not sure that they do
25  require one or not. I know that that

1  might be a possibility.
2  Q. But the district requires
3  medical examinations for all
4  perspective teachers; correct?
5  A. That is correct.
6  Q. Number 11 asks for proof that
7  Stacey read, understood and agreed to
8  comply with the district's policy
9  manual. And you said, see the
10  acknowledgement at the bottom, Bate
11  stamped CVSD 204. Other than the
12  response that Mr. Kelin gave in
13  paragraph 11 on P-99, are you aware of
14  any other proof that Stacey agreed to
15  comply with the district's policy
16  manual?
17  A. I'm not aware that she signed
18  off on anything other than what she
19  signed for Millersville. However, we
20  don't ask our employees to sign off
21  on ---.
22  Q. Do you know whether Stacey
23  actually received a policy manual?
24  A. As I said earlier, they're given
25  the website to access it online.

1  **Q. Now, if teachers were hired, are**
2  **they actually given a copy of the**
3  **policy manual?**
4  A. No. They're given the address,
5  the web address, where they can access
6  it online.
7  **Q. And number 12 it asks for proof**
8  **that Stacey received a copy of the**
9  **district's collective bargaining**
10 **agreement. I take it that Stacey did**
11 **not?**
12 A. Stacey did not.
13 **Q. Did not receive a copy of the**
14 **district's collective bargaining**
15 **agreement?**
16 A. Not from my office, no.
17 **Q. And you would agree with me that**
18 **Stacey is not subject to the district's**
19 **collective bargaining agreement?**
20 A. That's correct.
21 **Q. But all your teachers are**
22 **subject to the collective bargaining**
23 **agreement; correct?**
24 A. Not all of our teachers belong
25 to the local association, but we would

1  apply the document to all our teachers.
2  **Q. And number 13 asks for proof**
3  **that the district provided Stacey a**
4  **notice of her rights under the Family**
5  **and Medical Leave Act. And I take it**
6  **that you have no such proof; correct?**
7  A. That's correct.
8  **Q. And what would be the reason for**
9  **that?**
10 A. I don't believe that applies to
11 her.
12 **Q. And why not?**
13 A. I think it applies to folks that
14 work a certain number of hours during
15 the course of the year for paid
16 service.
17 **Q. You would agree that paid**
18 **service differentiates.**
19 A. A certain number of hours, but
20 I'm not an expert on all of that.
21 **Q. And number 14 asks for proof**
22 **that Stacey received a copy of the**
23 **district's Sexual Harassment and**
24 **Improper Conduct policy. Does the**
25 **district have such a policy?**

1  A. Yes, we do.
2  **Q. Did the district provide a copy**
3  **of that policy to Stacey?**
4  A. Not specifically.
5  **Q. Would you say in some sort of**
6  **general way?**
7  A. There's information that talks
8  about appropriate conduct in our
9  materials that we give them, however,
10 the policy and a signoff on that policy
11 was not given to her.
12 **Q. And what was the reason for**
13 **that?**
14 A. We generally do that for the
15 paid employees.
16 **Q. But you don't do that for your**
17 **student teachers; correct?**
18 A. No.
19 **Q. Why not?**
20 A. Why not?
21 **Q. Why not?**
22 A. I think the requirement is for
23 the paid employees to get it.
24 **Q. Number 15 asks for proof that**
25 **the district notified Stacey of the**

1  **requirement that she must report all**
2  **incidents of suspected child abuse to**
3  **the authorities and you did not supply**
4  **proof; is that correct?**
5  A. I believe that's in the Code of
6  Ethics that the state establishes. So
7  that's something that is referenced in
8  our employee manual that employees need
9  to be familiar with that. I'm sure
10 Millersville teaches that as well.
11 **Q. What makes you so sure?**
12 A. Because you're required to make
13 sure that folks be prepared --- know
14 about that Code of Ethics. In fact, I
15 go over that Code of Ethics with all
16 our induction --- pre-teachers in our
17 induction program.
18 **Q. But back to my point ---.**
19 ATTORNEY KELIN:
20 Are you making points or
21 asking questions?
22 ATTORNEY VOIGT:
23 Back to my question.
24 BY ATTORNEY VOIGT:
25 **Q. Do you have any proof that the**

10  (Pages 34 to 37)

1  district notified Stacey of the
2  requirement that as an employee she
3  must report all incidents of suspected
4  child abuse?
5  A. I have no proof.
6  Q. And number 16 asks for a form
7  signed by Stacey documenting her
8  understanding of the district's
9  prohibition of unlawful discrimination?
10 A. I believe I answered that one.
11 Q. I don't think so, but could you
12 repeat it, if you did.
13 A. Well, I said we have a copy of
14 our policy, and our paid employees sign
15 off on that. And I didn't have one for
16 her.
17 Q. And number 17 asks for copies of
18 all notices given to Stacey concerning
19 the district's Workers' Compensation
20 designated physicians. Did you give
21 Stacey a copy of that?
22 A. No.
23 Q. Why not?
24 A. She's not a paid employee.
25 Q. So Stacey, to your knowledge,

1  would not have been covered under the
2  district's Workers' Compensation
3  policy?
4  A. Correct.
5  Q. Does the district have a Medical
6  Insurance Policy for its teachers?
7  A. Yes.
8  Q. Would Stacey have been covered
9  under the district's Medical Insurance
10 Policy?
11 A. No.
12 Q. Why not?
13 A. She's not a paid employee.
14 Q. Number 18 asks for a copy of an
15 acknowledgment form signed by Stacey
16 documenting the district's prohibition
17 against teachers wearing religious garb
18 or jewelry. Did you give that to
19 Stacey?
20 A. There are references to dress
21 code in our employee manual. And,
22 again, we don't have our paid employees
23 or student teachers sign off on that.
24 Q. But there is an acknowledgement
25 form that's required under the school

1  code; correct?
2  A. For what?
3  Q. For teachers to acknowledge that
4  the district prohibits them from
5  wearing religious garb or jewelry.
6  A. I can't say where that signoff
7  is included, no. There are things that
8  we put our new teachers through.
9  Q. But in any event, Ms. Snyder did
10 not sign one, to your knowledge?
11 A. That's correct.
12 Q. And number 19 asks for documents
13 or rather forms signed by Stacey
14 concerning or acknowledging her rights
15 under the Family Education Rights and
16 Privacy Act. You don't have one of
17 those either; correct?
18 A. No.
19 Q. And the reason for that is what?
20 A. She's not a paid employee.
21 Q. Number 20 asks for a copy of any
22 notice provided to Stacey concerning
23 her rights under the Pennsylvania
24 Whistleblower Law. I take it you don't
25 have one of those either?

1  A. That's correct.
2  Q. Same reason?
3  A. Yes.
4  Q. And number 21 asks for copies,
5  an acknowledgement form signed by
6  Stacey concerning her obligation to act
7  in accordance with the various state
8  criminal laws applicable to district
9  employees. And I take it you don't
10 have anything responsive to that?
11 A. That's correct.
12 Q. Same reason?
13 A. She's not a paid employee.
14 Q. And 22 asks for copies of all
15 acknowledgement forms signed by Stacey
16 concerning her eligibility for
17 unemployment compensation benefits
18 during holidays and school recesses.
19 Do you see that?
20 A. Yes, I see that.
21 Q. And there's no documents;
22 correct?
23 A. That's correct.
24 Q. And you would agree with me that
25 after Stacey or after the events of May

1    **2006, Stacey would not have been**
2    **eligible for unemployment**
3    **compensation ---?**
4    A. Correct.
5    **Q. Let me finish my question,**
6    **please. After the events of May 2006,**
7    **you would agree with me that Stacey**
8    **would not have been eligible for**
9    **unemployment compensation through the**
10   **district by virtue of her**
11   **relationship with ---?**
12   A. Could you repeat the question,
13   please?
14   **Q. You would agree with me that**
15   **after the events of May 2006, Stacey**
16   **was not eligible for unemployment**
17   **compensation through Conestoga Valley;**
18   **correct?**
19   A. Correct.
20   **Q. And the reason for that is ---?**
21   ATTORNEY KELIN:
22   Can we take a break?
23       A. Yeah. That would be great.
24   ATTORNEY VOIGT:
25   Let's take a quick break.

1        SHORT BREAK TAKEN
2        BY ATTORNEY VOIGT:
3    **Q. And let's see, 23 asks for**
4    **copies of all forms signed by Stacey**
5    **concerning her duty not to falsify time**
6    **records. I take it that Stacey did not**
7    **execute one of those; correct?**
8    A. That's correct.
9    **Q. And you make your teachers sign**
10   **those; correct?**
11   A. I can't answer that directly,
12   because when you're talking about time
13   records, that sounds more like
14   classified employees, so I would check
15   on that personnel requirement.
16   **Q. All right. Twenty-four (24)**
17   **asks for proof that the district**
18   **notified Stacey of her eligibility for**
19   **healthcare benefits as required by**
20   **COBRA. Do you see that?**
21   A. Yes, I see that.
22   **Q. And to your knowledge the**
23   **district did not do so; correct?**
24   A. That's correct.
25   **Q. And am I correct that after the**

1    **events of May of 2006, Stacey would not**
2    **have been eligible for continued**
3    **healthcare benefits through the**
4    **district under COBRA; correct?**
5    A. That's correct.
6    **Q. And the reason for that is what?**
7    A. She was not a paid employee
8    eligible for benefits.
9    **Q. But your regular teachers would**
10   **have been. If they would have been**
11   **laid off during the school year, they**
12   **could have applied for COBRA; correct?**
13   A. If they were eligible for
14   benefits.
15   **Q. Why would they not be eligible**
16   **for benefits?**
17   A. If they were part time.
18   **Q. And 25 asks for a copy of the**
19   **new hire report filed with the state by**
20   **the district on Stacey. I take it you**
21   **didn't do one of those; correct?**
22   A. No, we did not.
23   **Q. But you do that on your new**
24   **teachers; correct?**
25   A. That's correct.

1    **Q. Are you familiar with the term,**
2    **professional employee, as it's used in**
3    **this book?**
4    A. Yes.
5    **Q. And you would agree with me that**
6    **Stacey was not a professional employee**
7    **here at the school district as used**
8    **under the school code?**
9    ATTORNEY KELIN:
10   Well, I'll object --- as
11   he understands it.
12   ATTORNEY VOIGT:
13   As you understand it.
14       A. As I understand it, I can't say
15   that I know all of the legal intentions
16   that were implied by the statute, but I
17   assumed it would be a paid employee.
18   BY ATTORNEY VOIGT:
19   **Q. And the professional employee**
20   **designation applies only to those who**
21   **are certificated as teachers; correct,**
22   **if you know?**
23   A. I don't know if that's always
24   the case, but in most cases it's a
25   certificated employee.

1  **Q. Now, all of the teachers that**
2  **you have at Conestoga Valley School are**
3  **certificated; am I correct?**
4  A. All the employees?
5  **Q. All the teachers.**
6  A. All the teachers are
7  certificated.
8  **Q. Are you familiar with the term,**
9  **temporary professional employee at the**
10 **School District?**
11 A. Yes.
12 **Q. You would agree with me that**
13 **Stacey was not a temporary professional**
14 **employee ---?**
15 A. That's correct.
16 **Q. Let me finish the question. You**
17 **would agree with me that during her**
18 **internship or her student teaching**
19 **assignment in the spring of 2006,**
20 **Stacey was not a temporary professional**
21 **employee of the Conestoga Valley School**
22 **District as defined by the school code;**
23 **correct?**
24 A. That is correct.
25 **Q. Are you familiar with the**

1  **Pennsylvania Ethical Standard and**
2  **Financial Disclosure requirements?**
3  A. Yes, generally.
4  **Q. Are you familiar with the term**
5  **public employee ---?**
6  A. Yes.
7  **Q. And let me finish the question.**
8  **Are you familiar with the term public**
9  **employee as it's set forth in the**
10 **Ethics Standards and Financial**
11 **Disclosures section of the Pennsylvania**
12 **statutes?**
13 A. Yes.
14 **Q. And you would agree with me that**
15 **Stacey was not a public employee at the**
16 **time that she was performing her**
17 **student teaching assignment?**
18 ATTORNEY KELIN:
19 I have a continuing
20 objection to asking Dr. Huesken
21 to apply his layman's knowledge
22 to principle of law as covered
23 by the regulations of the
24 statute.
25 ATTORNEY KRAMER:

1  Well, I'm going to --- if
2  you're going to go into the
3  Ethics Act, the definition of a
4  public employee is very
5  different than the definition
6  for an employee, in any event.
7  So there's even further fuel
8  here on the questions about
9  employees.
10 ATTORNEY VOIGT:
11 Okay. Well, you can
12 answer the question because it's
13 a simple answer.
14 A. Know what answer?
15 BY ATTORNEY VOIGT:
16 **Q. The answer to whether Stacey was**
17 **a public employee under the terms of**
18 **the Ethics Act when she was a student**
19 **teacher here.**
20 A. I'm not sure --- that document
21 --- and I may be misaligning it with
22 something --- applies to --- more
23 applies to administrators and Board
24 members and elected officials.
25 ATTORNEY KRAMER:

1  It doesn't apply to
2  teachers, so I mean you're
3  really wasting time.
4  BY ATTORNEY VOIGT:
5  **Q. You referenced that Stacey was**
6  **an apprentice. Are you applying some**
7  **definition of an apprentice that you**
8  **can fill me in on?**
9  A. My understanding, student
10 teachers are apprentices. I use that
11 term like a teacher in training. We
12 expect them to come in and act like a
13 teacher and not act like a student.
14 They're learning the profession.
15 **Q. Are you aware that during her**
16 **time at Conestoga Valley School, Stacey**
17 **attended some faculty meetings? Do you**
18 **remember that?**
19 A. Student teachers aren't required
20 to attend faculty meetings, but many of
21 them do so that they're gaining the
22 full experience of being a teacher.
23 **Q. And you're aware that one of the**
24 **criticisms that Ms. Reinking levied**
25 **against Stacey was that she spoke up at**

13  (Pages 46 to 49)

| | | | |
|---|---|---|---|
| 1 | **faculty meetings? Do you know that?** | 1 | in there, a parking tag that would |
| 2 | ATTORNEY KELIN: | 2 | normally be given to them. Let's see, |
| 3 | Objection to the form. | 3 | the staff ID, which they would have |
| 4 | ATTORNEY KRAMER: | 4 | their picture taken like our other |
| 5 | I'm just going to object | 5 | employees and have to wear that. And |
| 6 | as to form. Moreover, he's | 6 | then also the athletic schedule. We |
| 7 | already testified he had no | 7 | didn't have any more of those and we |
| 8 | involvement in what took place | 8 | didn't think you needed it. |
| 9 | in May 2006, so I'm not sure | 9 | ATTORNEY KELIN: |
| 10 | what you're ---. | 10 | And let me just add. I |
| 11 | ATTORNEY VOIGT: | 11 | had asked Dr. Huesken, at the |
| 12 | I'll withdraw it. | 12 | request of counsel involved in |
| 13 | BY ATTORNEY VOIGT: | 13 | litigation, if he could bring to |
| 14 | **Q. You gave us a faculty and staff** | 14 | the deposition the packet that |
| 15 | **manual for 2007-2008. Do you have that** | 15 | had been given to student |
| 16 | **or does your counsel have that?** | 16 | teachers at the high school in |
| 17 | ATTORNEY KELIN: | 17 | the spring of 2006. And to the |
| 18 | Is it 2006 through 2007 | 18 | extent the materials from that |
| 19 | or 2005 through 2006? | 19 | time were no longer available, |
| 20 | A. Well, do you want me to just | 20 | he simply produced the more |
| 21 | explain what this packet ---? | 21 | updated version of those |
| 22 | ATTORNEY KRAMER: | 22 | materials, and I believe that's |
| 23 | They tried to approximate | 23 | what this includes. |
| 24 | --- do you want me to explain | 24 | I will just note that the |
| 25 | it? | 25 | document that is affixed to the |

| | | | |
|---|---|---|---|
| 1 | ATTORNEY VOIGT: | 1 | packet does appear to be the |
| 2 | Well, let me ask the | 2 | procedural manual from 2005- |
| 3 | question, that way the reporter | 3 | 2006. So that does appear to be |
| 4 | doesn't misunderstand. | 4 | one document that was, as I |
| 5 | BY ATTORNEY VOIGT: | 5 | understand it, given to student |
| 6 | **Q. Please explain what this purple** | 6 | teachers in the spring of 2006 |
| 7 | **pack is.** | 7 | at the high school. The others |
| 8 | A. This is an approximation of a | 8 | appear to be more updated |
| 9 | packet that would have been given to a | 9 | versions of what had been given |
| 10 | student teacher in the spring of 2006. | 10 | at that time. |
| 11 | Unfortunately they have this year's | 11 | BY ATTORNEY VOIGT: |
| 12 | date on the front cover, which might be | 12 | **Q. Well, let's start with the** |
| 13 | confusing you. And some of the | 13 | **faculty/staff procedural manual. Do** |
| 14 | documents inside, like the calendar, | 14 | **you know whether this was given to** |
| 15 | like the student handbook, like the | 15 | **student teachers at the start of the** |
| 16 | professional handbook are updated from | 16 | **spring semester 2006?** |
| 17 | that time. Also, if you look down the | 17 | A. This packet was given to student |
| 18 | list on the itemized list, there's no | 18 | teachers when they start in our |
| 19 | parking tag in there. | 19 | building, so, yes. |
| 20 | ATTORNEY KELIN: | 20 | **Q. Why did they receive a** |
| 21 | By the list he's | 21 | **faculty/staff procedural manual?** |
| 22 | referring to the documents. | 22 | A. They were given these materials |
| 23 | A. Student teacher packet, itemized | 23 | because, as I said earlier, they're |
| 24 | list of what's included in here. There | 24 | teachers in training and we expect them |
| 25 | are certain things that aren't included | 25 | to act like teachers, not like |

1    students, which is why we share with
2    them the same materials that we give
3    our teachers.
4    **Q. Now, I have not had time to**
5    **review this, but I suspect that there**
6    **is nothing in here about MySpace**
7    **accounts?**
8    A. That's correct.
9    **Q. Why not?**
10   A. I don't know if MySpace was
11   something that was on the horizon at
12   that time.
13   **Q. And can we also agree that there**
14   **is nothing in this procedural manual**
15   **having to do with internet usage by a**
16   **teacher or a student teacher outside of**
17   **the confines of Conestoga Valley?**
18   A. I know there are references to
19   appropriate use, whether or not it
20   defines it between on site or off site,
21   I can't say.
22   ATTORNEY KELIN:
23   Just for the record, the
24   document speaks for itself, so I
25   don't think we need to get into

1    a rhetoric this morning.
2    A. That's true.
3    BY ATTORNEY VOIGT:
4    **Q. Did you personally brief any of**
5    **the student teachers when they came to**
6    **the building the first time?**
7    A. No, I did not.
8    **Q. Do you know who did?**
9    A. The building principal.
10   **Q. And in Ms. Snyder's case, who**
11   **would that have been?**
12   A. At the time, it would have been
13   Mr. Ginter. She would have been a part
14   of faculty meetings. The student
15   teacher also works with their
16   cooperating teacher. And to some
17   extent I'm sure the department
18   supervisor would be involved, but I
19   would say the primary folks would be
20   the building principal just in the
21   general procedures, and the cooperating
22   teacher who is directly responsible for
23   the student teacher.
24   **Q. And that would be --- you said**
25   **the principal would be Mr. Ginner; is**

1    **that right?**
2    A. Ginter, G-I-N-T-E-R.
3    **Q. Is he still employed by the**
4    **district?**
5    A. No, he is not.
6    **Q. Do you know where he is?**
7    A. He's the principal of Warwick
8    High School.
9    **Q. And you also --- it looks like**
10   **you gave a notebook ---.**
11   A. Well, that's a handbook, a
12   student handbook.
13   **Q. Student handbook. Why would you**
14   **give a student teacher a student**
15   **handbook?**
16   A. Well, we give teachers a student
17   handbook so they know what students are
18   getting and they know what rules that
19   they need to reinforce with the
20   students. So this is also something
21   that they use for passage in the
22   hallways. Students have to have that
23   with them at all times. And they sign
24   off on it to give them permission to
25   move from one area to another during

1    classes. It's their passbook.
2    **Q. Now, I'm just thumbing through**
3    **this, but I don't see anything in the**
4    **student handbook either about MySpace**
5    **accounts.**
6    A. I believe there are some
7    references to use of the internet in
8    there, but I'm sure it doesn't mention
9    MySpace.
10   **Q. Well, actually I'm looking at**
11   **page 23 of this little spiral-bound**
12   **notebook thing, where it appears to**
13   **have an Internet Access, E-mail and**
14   **Network Resources Acceptable Use**
15   **Policy. Do you see that?**
16   A. Yes, I do.
17   **Q. Is that the same policy that**
18   **would be in effect for teachers or is**
19   **it different than that?**
20   A. I'm sure it's different in some
21   fashion, but basically the same things
22   are imbedded in both policies.
23   **Q. Now, under purpose at the top,**
24   **you would agree with me that the**
25   **purpose is to regulate internet use**

15  (Pages 54 to 57)

1　within the Conestoga Valley School
2　District, at least within the building,
3　use of computers in the building;
4　correct?
5　A. That's correct, or where outside
6　use impacts the inside school
7　environment.
8　Q. Where do you see that?
9　A. Well, I would think if a student
10　made a threat from home about a
11　teacher, certainly we'd have to take
12　some action on that.
13　Q. But my question is, where in the
14　policy on page 23 do you see reference
15　to usage out of ---?
16　A. I don't know if it speaks to
17　internet out of school. It just talks
18　about inappropriate use of the
19　internet.
20　Q. Now, let's see here. Is there
21　anything else that you gave to student
22　teachers other than this purple packet,
23　that you know of?
24　A. Not that I'm aware of.
25　Q. It looks like on this blue sheet

1　there's a staff directory. Can we
2　agree that --- well, this is from '07-
3　'08. Was there a similar staff
4　directory published by the district for
5　'05-'06?
6　A. I'm sure there was.
7　Q. And can we agree that Stacey was
8　not on it?
9　A. We generally don't put student
10　teachers on that list.
11　Q. And what's the reason for that?
12　A. They're not permanent paid
13　employees.
14　Q. Stacey testified that she
15　brought her own desk in during her
16　student teaching assignment? Am I
17　correct that the district does not give
18　student teachers desks?
19　ATTORNEY KELIN:
20　I would object. That's
21　actually not in evidence. In
22　fact, the contrary is in
23　evidence, but you can answer.
24　BY ATTORNEY VOIGT:
25　Q. Does the district give student

1　teachers desks?
2　A. If there is a workspace
3　available in the room, we'd certainly
4　provide that for a student teacher.
5　Q. If there is not one available,
6　what would happen?
7　A. I'm sure that they always try to
8　find some place where they can sit down
9　and at least work on things.
10　Q. Does the district provide the
11　teachers a desk?
12　A. Yes, we do.
13　Q. Turn to Exhibit 52. This is a
14　note prepared by Deann Buffington.
15　Have you ever seen this before?
16　A. I may have seen it through our
17　discussions with Howard.
18　Q. I'm not concerned with that,
19　really. Did you ever see this in or
20　about May of 2006?
21　A. I can't say that I did.
22　ATTORNEY VOIGT:
23　I have no further
24　questions.
25　EXAMINATION

1　BY ATTORNEY KRAMER:
2　Q. Good morning, Dr. Huesken.
3　A. Good morning.
4　Q. Barry Kramer, I represent the
5　Millersville Defendant. I have just a
6　few questions.
7　A. Okay.
8　Q. Are student teachers expected to
9　comport themselves to act as employees
10　in their relationship with other ---
11　with the students in the school?
12　A. As I said earlier, I truly
13　believe student teachers are teachers
14　in training and we want them to act
15　like teachers and carry themselves like
16　teachers and follow the same levels of
17　standards for behavior as we expect of
18　our teachers.
19　Q. So the rules and regulations of
20　Conestoga Valley that relate to how
21　full-time paid teachers should behave
22　would also apply to student teachers?
23　A. I would say so, since they're
24　teachers in training.
25　Q. Was Ms. Snyder at Conestoga

1   **Valley to take courses?**
2   A. No.
3   **Q. Was she there in any sense as a**
4   **pupil?**
5   A. No.
6   **Q. Was she expected, or student**
7   **teachers, expected to comport**
8   **themselves as employees when dealing**
9   **with appearance?**
10  A. Yes.
11  **Q. Same question with respect to**
12  **dealing with other teachers?**
13  A. Yes.
14  **Q. How about same question with**
15  **respect to dealing with other school**
16  **personnel?**
17  A. Yes.
18  **Q. After the lawsuit was filed in**
19  **Federal Court, were you aware that**
20  **there was some media attention about**
21  **the lawsuit?**
22  A. Yes.
23  **Q. What do you remember about that,**
24  **about the media attention?**
25  A. I remember that there was an

1   things along those lines.
2   ATTORNEY VOIGT:
3   I'm going to object.
4   ATTORNEY KELIN:
5   Yes. I'm going to
6      object, too, to the extent that
7      you're going to go into detail.
8      Again, he said he wasn't
9      involved at the time.
10  ATTORNEY KRAMER:
11  Actually, that's not what
12      I'm asking. I'm asking about
13      what he saw in the newspaper.
14  ATTORNEY KELIN:
15  Well, I understand. I
16      understand. I'd just like you
17      to move on. I'm not sure what
18      the relevance of any of this is.
19  ATTORNEY VOIGT:
20  And newspaper articles
21      will speak for themselves. The
22      newspaper articles will say what
23      they say.
24  BY ATTORNEY KRAMER:
25  **Q. Did you have any involvement in**

1   article in the newspaper and that there
2   was some subsequent information in the
3   newspaper following that. I'm not sure
4   I know what you're asking.
5   **Q. Well, naturally --- and what I'm**
6   **asking is, what kind of --- what do you**
7   **remember, if anything, ---**
8   A. Uh-huh (yes).
9   **Q. --- about the substance of the**
10  **articles, the media attention given to**
11  **the lawsuit?**
12  A. Well, the focus seemed to be
13  more on the MySpace issue than anything
14  else. And I knew there were other
15  issues below the surface that weren't
16  really being addressed in the articles.
17  **Q. And if you could explain to us,**
18  **what were these other issues below the**
19  **surface?**
20  A. Just concerns about her
21  performance as a student teacher.
22  **Q. And can you expand upon that at**
23  **all?**
24  A. I know there were concerns about
25  professionalism, directions, different

1   **preparing a notice that was on**
2   **Conestoga Valley's website?**
3   A. Yes.
4   **Q. What do you remember about**
5   **putting that together?**
6   A. Well, I think we wanted to put
7   together the facts of the case from our
8   perspective, that it wasn't just
9   MySpace, that there were other issues
10  involved. Although we didn't get
11  specific in that document, we did want
12  to make a statement to the public that
13  there were other issues involved.
14  **Q. But you don't have any personal**
15  **knowledge of these other issues that**
16  **you're referring to, I presume?**
17  A. Personal in terms of, did I
18  observe them, was I involved in being a
19  supervisor in the classroom, no.
20  **Q. But how did these other issues**
21  **come to your attention?**
22  A. Through my assistant.
23  **Q. Mr. Seldomridge?**
24  A. Yes.
25  ATTORNEY KRAMER:

17 (Pages 62 to 65)

Page 66

```
 1   I have no more questions.
 2       Thank you.
 3   ATTORNEY VOIGT:
 4   Thank you.
 5   ATTORNEY KELIN:
 6   No questions.
 7          * * * * * * * *
 8       DEPOSITION CONCLUDED AT 11:22 A.M.
 9          * * * * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 67

```
 1            CERTIFICATE
 2
 3   I HEREBY CERTIFY THAT THIS ELECTRONIC TRANSCRIPT WAS
 4   REPORTED BY ME AND THEREAFTER REDUCED TO TYPEWRITING AND THAT
 5   THIS TRANSCRIPT IS A TRUE AND ACCURATE RECORD THEREOF.
 6
 7   SARGENT'S COURT REPORTING SERVICE, INC.
 8
 9
10   _____
11
12   COURT REPORTER
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SARGENT'S COURT REPORTING SERVICES, INC.
(814) 536-8908