## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 07-1660 |
| | : | |
| MILLERSVILLE UNIVERSITY, J. BARRY | : | JURY TRIAL DEMANDED |
| GIRVIN, DR. JANE S. BRAY, DR. VILAS | : | |
| A. PRABHU, DR. JUDITH WENRICH and | : | |
| DR. BEVERLY SCHNELLER | : | |
| Defendants | : | |

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    ISSUES PRESENTED

A.    Whether Stacy Properly States a Claim Against Defendants in Their Individual Capacities Under 42 U.S.C. §1983 and The First and Fourteenth Amendments Since Their Dismissal of Stacy from Millersville University's ("MU's") School of Education Violated Her Right to Freedom of Speech?

    1.    Whether Stacy's Posting Violate *Morse v. Frederick* by impermissibly promoting underage drinking?

    2.    Whether Stacy Was Either a "Public Employee" or an "Apprentice" and Not a Tuition-Paying Student at MU For Purposes of Her First Amendment Rights?

B.    Whether Eleventh Amendment Immunity Does Not Bar Stacy's Section 1983 Claims Since Plaintiff Brings Her Action Against the Individual Defendants in their Individual Capacities.

C.    Whether Stacy Properly States a Claim Against the Individual Defendants in their Official Capacities for Injunctive Relief Based on Their Denial of Stacy's Free Speech Right?

D.    Whether Stacy Properly States a Claim Under Section 1983 Since her Myspace Posting Was the "Moving Force" in MU's Denial of her BSE?

1

Dockets.Justia.com

**E.** **Whether Stacy's Claims Are Not Barred by Qualified Immunity Since No Reasonable Persons Would Take Away Stacy's BSE the Day Before her Graduation Based on an Innocent Internet Posting that Hurt No One?**

**SUGGESTED ANSWERS TO ALL THE ABOVE:** **YES**.

## II. STATEMENT OF FACTS

### A. Factual Background.

The pertinent facts are set forth at length in the Third Amended Complaint ("3AC") of Plaintiff, Stacy Snyder ("Plaintiff" or "Stacy") as well as Stacy's Affidavit, Exhibit "A" hereto. Briefly, Stacy overcame single motherhood to two boys to enroll in MU in June, 2002. (Snyder Aff., ¶2.) There, she enrolled in MU's School of Education, expecting to achieve her dream of becoming a teacher. *Id*. Despite working and raising two children alone, Stacy made the Dean's list, and MU's Dean lauded her as "one of [MU's] finest student scholars." *Id*.

During her teacher training, Stacy successfully completed several "field experiences" in area public schools. One supervising teacher, Neil Weidman, lauded Stacy as "exceptionally professional" and predicted she "will become an excellent teacher." (*Id.*, ¶7; Exh. "1".)

Stacy was scheduled to graduate from MU with her Bachelors of Secondary Education ("BSE") degree in May, 2006. (Snyder Aff., ¶34; Exh. "8.") As her final requirement, she served as a student teacher at Conestoga Valley High School ("CV"). (*Id.*; ¶9.) Her cooperating teacher was Nicole Reinking, and her MU faculty advisor was J. Barry Girvin. (*Id.*; ¶9, 11.)

During the semester, Reinking, a first-time cooperating teacher, was largely uncommunicative and unhelpful to Stacy. (*Id.*;¶11.) Stacy told Girvin about her difficulties with Reinking, but nothing changed. *Id*. In his March 17, 2006 "mid evaluation," Girvin awarded Stacy the highest mark in

ethics. (MU's Motion for Summary Judgment ["MSJ"], Exh. C-5.) Similarly, in her March 20, 2006 "mid evaluation," Reinking awarded Stacy high marks in "professionalism." (*Id.*; Exh. C-9.)

Admittedly, in their mid evaluations, Reinking and Girvin identified areas in which Stacy needed extra work. *Id.* Thereafter, Stacy redoubled her efforts, and her teaching performance improved dramatically. (Snyder Aff., ¶11.) Girvin's classroom observations recorded Stacy's improvement. (MSJ, Exh. C-4.) On April 3, 2006, Girvin extolled Stacy's "excellent" lesson plan. (*Id.*, p. 5.) In an April 18, 2006 note, Girvin commended Stacy for her "great improvement in content" and "excellent CIRQL unit planning." (*Id.*, p. 8.)

During the semester, Stacy worked hard on a CIRQL project. (Snyder Aff., ¶12.) The CIRQL project requires student teachers to prepare representative lesson plans using a wide variety of viewpoints and collaborative assistance. (Girvin dep., MSJ Exh. "D," pp. 37-38.) On May 2, 2006, Girvin awarded Stacy **excellent marks** on her CIRQL project on Shakespeare's *MacBeth*, explaining:

> "I felt that she had taken seriously the earlier discussions about content and that [she] **really had the proper content**, everything in proper form. I felt the assessments were much better than any I had seen during the semester so far. . . . And so I complemented her for the **assessments that I felt were right on.**" (*Id.*; pp. 122-123- emphasis added.)

On Friday, May 6, 2006, CV teacher Shawn Karli, without notice or permission, snooped onto Stacy's web page at www.myspace.com. (Reinking dep., MSJ Exh. "F," p. 153.) There, he discovered a picture of Stacy at a costume party outside of school hours wearing a party hat and holding a plastic cup. (*Id.*, ¶30.) The photograph does not show the cup's contents. (*Id.*; Bray dep, Exh. "C" hereto, Dep. Exhibits 51 and 104) Stacy believes the photograph bore the insignia "drunken

pirate." (*Id.*)  Importantly, Karli also found the following "update" on Stacy's web site:

> "First, Bree said that one of my students was on here looking at my page, which is fine.  I have nothing to hide.  I am over 21, and I don't say anything that will hurt me (in the long run).  Plus, I don't think that they would stoop that low as to mess with my future.  So, bring on the love!  I figure a couple of students will actually send me a message when I am no longer their official teacher.  They keep asking me why I won't apply there.  Do you think it would hurt me to tell them the real reason (or who the problem was)?"  (*Id.*, ¶30; Dep. Exhibits. 51 and 104, attached to Bray Dep, Exhibit "C" hereto.)

Karli alerted Reinking to the posting that evening.  *Id*.  Reinking recalled her outrage at the discovery:

> "Well, it's referencing that she knows that students are on here looking at her page, and that's fine.  So that's contrary to everything that I had asked her to do.. . . .  **So that was frustrating**.  And then she references the fact that there are pictures of her drinking on there, that she has nothing to hide because she's saying she's over 21. . . .  And then she references, the students keep asking why I won't apply to be the teacher there, . . ..  And she says that – she's posing a question, I guess – I don't know to whom, anyone who reads her blog, I guess, would it hurt her to tell the students what the real reason is for why she's not applying or who the problem was, indicating some person. . . . So my best way to read this is obviously, **she's probably talking about me at this point**."  (Reinking dep., MSJ Exh. "F," pp. 155-157- emphasis added.)

On the morning of May 8, 2006, Reinking showed Buffington, her supervisor, Stacy's myspace posting.  (Buffington dep., MSJ Exh. "E," p. 34.) As Buffington recalls:

> "[Reinking] came to me and was **quite upset** because she had told Ms. Snyder on several occasions not to post anything on myspace, which she had done in the classroom previously."  (*Id*.; p. 35.- emphasis added.)

Buffington then called Acting Superintendent Kim Seldomridge and explained the myspace incident. (*Id*.; p. 98.)  She directed Reinking to deliver Stacy's posting to Seldomridge immediately.

(*Id.*)  Seldomridge then ordered Stacy barred from returning to CV.  *Id.*

On the afternoon of May 8, 2006, Buffington telephoned Stacy at home.  (Snyder Aff., ¶16.)  She advised Stacy that an "issue" had just arisen concerning her "professionalism" as a teacher.  (*Id.*)  Buffington then forbade Stacy from returning to CV until Thursday, May 11, 2006.  (*Id.*)  A few minutes later, a tearful Snyder telephoned Buffington at CV.  (*Id.*; ¶17.)  She apologized for whatever happened and explained she looked forward to meeting with her on Thursday.  *Id.*

Buffington then called Girvin and ordered him to meet with Reinking and her at CV that afternoon.  (Girvin dep., MSJ Exh. "D," pp. 125, 142.)  At the meeting, Buffington showed Girvin the myspace posting.  Girvin was outraged:

> "I would say **the text [of the myspace posting]** . . . **certainly got some people up in arms** in the [CV] English department.  Because even though Stacy had been told in teaching of that if she had something like myspace, it was never to point a finger at anybody, never to be personal, never to mention anybody's name. . . . But when you read this last sentence here, they keep asking me why I don't apply there.  Do you think it would hurt me to tell them what the real reason for who the problem was?  Now, if that's not Ms. Reinking, I wouldn't know who - you might as well just put Reinking's name right down there.  **And to me, that is a personal pointing the finger at a professional person and blaming all the problems on that person.**"  (*Id.*, pp. 135-136.)

Later on May 8, 2006, Stacy telephoned Girvin.  (Snyder Aff., ¶18.)  She was still in tears.  *Id.*  She asked Girvin what was going on.  *Id.*  Girvin coyly queried whether she had any idea what it could be about.  *Id.*  She told Girvin that, while she was unsure, the only thing she could think of was her myspace account.  *Id.*  Stacy explained she never posted anything derogatory about any CV staff or students on her myspace page.  *Id.*  Girvin said only that I was thinking along the right lines.  *Id.*  She asked Girvin if I should remove my myspace page, and he suggested she do so.  *Id.*  That

evening, she deleted her myspace account. *Id.*

Stacy next spoke to Girvin on Tuesday, May 9, 2006. (*Id.*, ¶19.) Crying, she asked Girvin about the seriousness of her situation. *Id.* **Girvin admitted that officials at MU and CV were extremely upset over a photograph and caption on her myspace account.** *Id.* **He told Stacy the administrators were so angry that MU might not award her any degree at all**. *Id.*

On May 10, 2006, Stacy spoke with Girvin about her final evaluation the following day. (Snyder Aff., ¶22.) Girvin told her precisely when and where to enter the building at CV for her meeting. *Id.* He told Stacy exactly what items she was allowed to bring. *Id.* He emphasized that she must enter the CV building so none of her students could see her. *Id.* Girvin said Stacy would meet with certain MU personnel on Friday, May 12, 2006 to learn whether MU would award her a degree of any type. *Id.*

Also on May 10, 2006, Girvin prepared Stacy's "final evaluation." (MSJ, Exh. C-12.) He rated Stacy "superior" or "competent" in all areas except "professionalism." (*Id.*) In that area, Girvin deemed Stacy's performance "unsatisfactory," explaining only that she made unspecified "errors in judgment that allegedly violated Pennsylvania's 'Code of Professional Practice and Conduct for Educators.'" (*Id.*)

On the afternoon of May 10, 2006, Stacy wrote an apology letter to the staff at CV and MU. (Exh. C-16 to MU's MSJ.) She wanted not only to apologize but also to help them appreciate the hard work and dedication she invested in my student-teaching assignment. (Snyder Aff., ¶23.) She cried the whole time she wrote the letter. *Id.*

At approximately noon on Thursday, May 11, 2006, Stacy went to CV as directed. (Snyder Aff., ¶24.) She sat in the English Department teachers' lounge by herself until her third block class

left the area. *Id*. While Stacy waited, Buffington gave Girvin an e-mail she wrote expressing her shock over the myspace incident. (Girvin dep., Exh. "D" to MSJ, p. 170; Dep. Exh. 52, Exh. "B" hereto.) The last sentence reads:

> "It will be no surprise to me if our excellent teachers here at CV do not volunteer again to serve as cooperating teachers for [MU] students." *Id*.

MU had a long-standing student-teacher placement arrangement with CV, one of the closest public schools to MU. (Bray dep., Exh. "C" hereto, pp. 118-119.) In fact, during the spring semester, 2006, MU placed 37 student teachers at CV. (Huesken dep., Exh. "K" to MSJ, p. 24, Dep. Exh. 102, attached hereto as Exh. "D.").

Officials then ushered Stacy into the classroom to meet with Buffington, Reinking and Girvin. *Id*. Buffington began by claiming Stacy's teaching skills were inadequate. *Id*. She called Stacy unprofessional and alleged her apology letter was insincere. *Id*.

Before that moment, Buffington had never criticized either Stacy's teaching skills or her professionalism. *Id*. Stacy raised her voice and apologized to Buffington. *Id*. She explained I made grammatical errors in her apology letter because she was hysterical and crying when she wrote it. She told Buffington "I haven't been able to eat or sleep or spend time with my kids because all I do is cry. Is that sincere enough for you?"

Buffington then left the meeting. (Snyder Aff., ¶25.) Next, Girvin and Reinking grilled Stacy about the picture and text from her myspace account (*Id*., ¶25; Exh. ["Exh.]"6 thereto.") Stacy told Reinking the text was not about her. *Id*. Reinking said she did not believe here. *Id*. Reinking and Girvin then reviewed Stacy's final evaluation. (Exh. C-12 to MSJ.) Girvin rated Stacy either "competent" or "superior" in every area except professionalism. *Id*.

During the meeting, Reinking gave Stacy a list of her allegedly "unprofessional behavior/performance in the classroom." (Exh. S-13 to MSJ.) This was the first time Stacy had ever seen Reinking's list. (Snyder Aff., ¶26.) Reinking then left the meeting, and Stacy gathered her belongings. *Id*.

After Reinking left, Stacy spoke to Girvin alone. (*Id*., ¶27.) She was still crying. *Id*. Stacy told Girvin again about her problems communicating with Reinking during the entire semester. *Id*. Girvin would not listen. *Id*. He told Stacy she would meet with Dr. Judith Wenrich and him at MU early in the afternoon of the following day, Friday, May 12, 2006. (*Id*.; ¶28.) He said that, by then, MU would determine if she would graduate at all. *Id*. Stacy believed she was only meeting with Wenrich because Dr. Bray was ill. *Id*. She then removed as many of her belongings from the classroom as she could carry and went home.

Early in the afternoon of May 12, 2006, Stacy went to Wenrich's office. (*Id*.; ¶29.) She waited in the hallway while Wenrich and Girvin met privately. *Id*. The two then ushered Stacy in and informed her she would graduate only with a BA in English and not a BSE. *Id*.

Girvin then review Stacy's final PDE Form 430. (Exh. C-18 to MSJ.) **He told Stacy that, because of the "myspace incident," he awarded her a "U," or "unsatisfactory" in professionalism.** (Snyder Aff., ¶30.) **Girvin explained that, without a passing grade in "professionalism" on this form, the Pennsylvania Department of Education ("PDE") would not certify Stacy as a teacher.** *Id*.

At Wenrich's request, Girvin then left the meeting. Wenrich then told Stacy that, in addition to not receiving a BSE, MU would not allow her to take any other education classes there. *Id*. She implied that, given the myspace incident, MU and other colleges would fear that Stacy would behave

"unprofessionally" in any subsequent professional or educational setting.  *Id.*

Wenrich explained that Schneller, head of MU's English Department, and Bray had decided to rearrange her credits so that she could graduate with a BA in English.  (Snyder Aff., ¶31.)  She directed Stacy to report to Schneller's office so Schneller and she could sign the necessary paperwork and fax it to the Registrar's office.  Stacy told Wenrich she now hoped to attend MU and pursue an advanced degree in elementary education.  Wenrich explained MU would not allow her to do so.

Stacy advised Wenrich she planned to attend graduation ceremonies at MU the following morning along with my family and friends.  (*Id.*; ¶32.)  She asked her whether MU would state during the ceremony that she was only graduating with a BA in English. (Snyder Aff., ¶32.)  Wenrich said no.  *Id.*  She explained MU had already printed the graduation brochures listing me as receiving a BSE in English.  *Id.*  She said it was too late to change them now.

Wenrich told Stacy she could appeal her decision to Bray.  (*Id.*; ¶33.)  Stacy then went to Bray's office, where she scheduled her appeal for Monday, May 15, 2006, two days after graduation. *Id.*  Next, she went to Schneller's office.  *Id.*  Stacy was in shock and crying intermittently.  *Id.*

At the time, she lacked sufficient English Department credits to graduate with a BA in English. *Id.*  Schneller explained that after consultation with Bray and Wenrich, the three decided to transfer some of her general education credits to English Department credits. (*Id.*; Schneller dep., Exh. "I" to MSJ, pp. 37-40.)  She then signed Schneller's "Exception" Form enacting the above changes.  (Exh. C-17 to MU's MSJ.).

Stacy attended MU's graduation ceremony on Saturday, May 13, 2006 at 10:00 a.m.  The commencement flyer listed her as graduating with a BSE.  (Snyder Aff., ¶34; Exh. "8.")

On Monday morning, May 15, 2006, Stacy and her mother, Dottie Snyder, attended MU's "appeal hearing." (*Id*.; ¶35.) Both Bray and Wenrich were present. *Id*. Stacy and her mother told Bray that MU's outrage over the "myspace incident" seemed out of proportion. *Id*. They pointed out that no parent or student at either MU or CV complained about the posting. *Id*. They suggested Reinking was punishing Stacy out of some misguided hatred or sense of jealousy toward her. *Id*.

Stacy gave Bray Reinking's list as well as her typed response to each of Reinking's complaints. (Snyder Aff., ¶36; Exh. C-13 and C-14 to MSJ.) Bray told Stacy that her myspace picture and caption promoted underage drinking. (Snyder Aff., ¶37.) She joked that Stacy should feel flattered because she got closer to graduating from MU with a BSE than anyone ever had before. *Id*. **She said I was lucky MU gave her a BA instead of nothing at all.** *Id*. Wenrich asked Stacy why she still wanted to major in elementary education even though she could no longer be a teacher. *Id*.

Bray then promised to read all the information and make her decision by the end of the week. *Id*. In a two-paragraph, one-page letter dated the same day, May 15, 2006, Bray denied Stacy's appeal. (Snyder Aff., ¶38; Exh. "9.")

By letter dated January 28, 2007, Stacy's counsel requested MU provide Plaintiff with an impartial due process hearing in accordance with her constitutional rights as well as the Student Code of Conduct. (Aff. of Mark W. Voigt, Esq., Exh. "E" hereto, ¶2.) In response, Bray, Girvin and Prabhu, in their individual capacities, offered Plaintiff only an "academic appeal" before Prabhu. (*Id*.)

On February 21, 2007, Prabhu, in his individual capacity, in consultation with Bray, Wenrich and Girvin (in their individual capacities) conducted an "academic dismissal" hearing in this matter.

Counsel attended the hearing with Stacy. (*Id.*; ¶3.) Prabhu refused to allow counsel to question either his client or any MU personnel. *Id.* Prabhu also refused to allow counsel to speak during the hearing, much less argue in opposition to their expulsion of Plaintiff. Id. By letter dated March 26, 2007, Prabhu, in his individual capacity, denied Plaintiff's appeal. *Id.*

### B. Procedural History.

On or about April 25, 2007, Stacy (through undersigned counsel) filed a Complaint (later amended) in this Honorable Court. Therein, Stacy alleged Defendants violated her right to free speech (Count I) and due process of law (Count II). Stacy further contended MU violated her rights under 42 U.S.C. §1983 by failing to train its employees in protecting the constitutional rights of its students (Count III.)

 In Count IV of the Amended Complaint, Stacy contended Defendants' actions violated the Pennsylvania Public School Code of 1949 (the "School Code.") Stacy next alleged the individual Defendants' actions constituted intentional infliction of emotional distress (Count V). Lastly, Stacy contended that, by giving her a BA and not the BSE she earned, MU breached its contract with Stacy (Count VI).

By Order dated September 17, 2007, the Honorable Paul S. Diamond, Judge, granted in part Defendants' Motion to Dismiss. The Judge dismissed with prejudice Plaintiff's claims against MU under §1983. He granted Plaintiff leave to amend her Complaint regarding the §1983 claims against the individual Defendants so her demands were limited to injunctive relief. (Order, ¶13.)

The Judge then determined Plaintiff's claims against the individual Defendants in their individual capacity were ambiguous. (*Id.*, ¶14.) He granted Plaintiff 30 days to amend her Complaint against the individual Defendants in their individual capacities with adequate specificity. Finally, the

Judge reserved ruling on Defendants' Motion to Dismiss Plaintiff's state law claims pending the filing of a Second Amended Complaint. (*Id.*, ¶16.)

On or about October 12, 2007, Stacy filed a six-count Second Amended Complaint against Defendants. In Count I, Stacy contended the MU Defendants (in their **individual capacities**) violated Stacy's right to freedom of speech by dismissing her for exercising her First Amended free speech rights in posting the "drunken pirate" photo and caption. (See, e.g., ¶¶74, 76-86.)

Next, Stacy claimed the MU defendants (in their **official capacities**) violated her First Amendment rights by denying Stacy the BSE she earned and refusing the necessary documentation to the Pennsylvania Department of Education ("PDE") so Stacy can obtain her teaching certificate. (2AC, ¶¶77-78.) In Count III, Stacy contends the MU Defendants (in their individual capacities) violated her Fifth Amendment due process rights by taking away her property interest in a BSE without any meaningful notice or an opportunity to be heard. Stacy also contends the MU Defendants (in their individual capacities) violated the school code by expelling Stacy from MU's School of Education without proper administrative procedures. (Count IV.)

Stacy next alleged the MU Defendants (in their individual capacities) committed intentional infliction of emotional distress through their shocking and egregious misconduct. (Count V.) Lastly, Stacy avers MU breached its contract with her by awarding Stacy a BA degree and not the BSE she earned. (Count IV.)

On or about October 17, 2007, Defendants filed a Motion to Dismiss the Second Amended Complaint. In it, Defendants asserted, *inter alia*, that official and Eleventh Amendment immunities barred Plaintiff's claims. Plaintiff filed a timely Answer to the Motion to Dismiss, denying all material allegations.

On or about January 30, 2008, this Honorable Court granted in part and denied in part the Motion to Dismiss. The court dismissed Stacy's procedural due process and state law claims. However, it let stand Stacy's claim that Defendants violated her First, Fifth and Fourteenth Amendment rights.

Stacy then filed a Third Amended Complaint, *inter alia* naming Schneller and Wenrich as additional Defendants. The parties then engaged in truncated discovery. Thereafter, Defendants filed the present Motion for Summary Judgment. This Brief follows.

## III.  ARGUMENT

### Standard of Review

The court's role under Rule 56 is narrowly limited to assessing the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91, L.Ed.2d 202 (1986). Thus, the court shall believe as true the evidence of the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550-555, 119 S.Ct. 1545, 1551-1552, 143 L.Ed.2d 733 (1999). It must resolve all doubts against the moving party and construe all evidence in the light most favorable to the non-moving party. (*Id.*) The court must draw all reasonable inferences in the non-moving party's favor. (*Id.*) In ruling on a Motion for Summary Judgment, the court will not weigh the credibility of witnesses or other evidence. *Anderson, supra*. Evaluating credibility, weighing evidence and drawing factual inferences are all functions reserved for the jury. (*Id.*)

> **A.  Stacy Properly States a Claim Against the Individual Defendants in Their Individual Capacities Under 42 U.S.C. §1983 and The First and Fourteenth Amendments Since Their Dismissal of Stacy from MU's School of Education Violated Her Right to Free Speech.**

Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. §1983, imposes civil liability upon any person who, acting under the color of state law, deprives another individual of any rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Shuman, et al. v. Penn Manor Sch. Dist., et al.*, 422 F.3d 141, 146 (3rd Cir. 2005). In this case, it is beyond dispute that the individual defendants were acting under color of state law, specifically 24 P.S. §20-2001-A, *et seq.*, when they deprived Stacy of her BSE degree and teaching certificate.

The First Amendment provides "Congress shall make no law . . . abridging the freedom of speech, . . . ." The Fifteenth Amendment provides, in pertinent part:

**"Section 1"**

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty or property, without due process of law; . . . ."

\* \* \*

**"Section 5"**

"The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

The touchstone for First Amendment cases in the public school context is *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 21 L.Ed.2d 731, 89 S.Ct. 733 (1969). In *Tinker*, the Supreme Court established that a public school building was not off limits to free speech rights. *See Killion v. Franklin Regional Sch. Dist., et al.*, 136 F. Supp. 2d 446, 452 (W.D. Pa. 2001). In recognizing students' expressive rights, the *Tinker* court imposed a significant burden on the school to justify punishment of speech by demonstrating ". . . that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline

in the operation of the school.'" *Tinker*, 393 U.S. 503, 509 (citation omitted).

Since there was little evidence that Tinker's black arm band either actually or potentially disrupted in the school, the *Tinker* court found in favor of the student. (*Id.*) According to the Court, the Constitution required more than an "undifferentiated fear or apprehension of disturbance." (*Id.*, at 508.) Instead, the school must present evidence of a substantial disruption. (*Id.*)

Applying *Tinker*, Federal courts are loathe to find "substantial disruption" when the speech in question occurs off campus, over the internet. For instance, in *Killion*, *supra*, a high school student compiled a "top ten" list on his home computer disparaging the district's athletic director. (*Id.*, 136 F. Supp. 2d 446, 448). The student then e-mailed the list to his friends from his home computer. He never brought the list to school or distributed it on school premises. (*Id.*)

The *Killion* court found the First Amendment protected the student's speech. (*Id.*, pp. 455-456.) In finding no "actual disruption," the *Killion* court rejected the district's argument that the list could ". . . impair the administration's ability to appropriately discipline the students." (*Id.*, p. 456.) The court continued:

> "We cannot accept, without more, that the childish and boorish antics of a minor could impair the administrators' abilities to discipline students and maintain control. Accord *Tinker*, 393 U.S. at 508 ("in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression"); *Klein v. Smith*, 635 F. Supp. 1440, 1442 ("the court cannot accept, however heartfelt it may presently be, [that] the future course of the administration of discipline . . . [will] dissolve, willy-nilly, in the face of the digital posturing this splenetic, bad-mannered little boy")." *Killion*, 136 F. Supp. 2d at 456.

Similarly, in *Latour v. Riverside Beaver Sch. Dist.*, 2005 U.S. Dist. LEXIS 35919, No. 05-1076, 2005 WL 2106562 (W.D. Pa. 2005), the District expelled a student for writing and recording

four rap songs in his home over a two year period. *Id.* at *2-3. The student uploaded one of the songs onto his personal internet website. *Id.* The songs featured titles such as "Massacre" and "Murder, He Wrote." *Id.*

The court granted the student's request for a preliminary injunction regarding the expulsion, observing:

> "There was no evidence that copies of the songs were sold in school or otherwise distributed in school, no fights in the hallways about the songs, and no evidence that the classroom instruction was disrupted. . . . Thus, based on the testimony at the hearing and the exhibits presented, I find that there is also a likelihood that Plaintiffs will prevail on the issue of whether the songs caused a material and substantial disruption or whether there was a specific fear of substantial disruption.

> \* \* \*

> . . . unquestionably, the loss of First Amendment freedoms, even for a minimal amount of time, constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976). Furthermore, there is a strong public interest in protecting First Amendment rights guaranteed by the United States Constitution. Thus, the third and fourth factors weigh in favor of granting a preliminary injunction. *Id.* at *6-7.

Similarly, in *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200 (3rd Cir. 2000), Plaintiff sought to enjoin the District's anti-harassment policy which prohibited, in pertinent part, "any unwelcome verbal, written . . . conduct which offends, denigrates or belittles an individual. . .." The *Saxe* court struck down this policy based on *Tinker* and the First Amendment, emphasizing:

> ". . . SCASD could argue that speech creating a "hostile environment" may be banned because it "intrudes upon . . . the rights of other students." *Tinker*, 393 U.S. at 504. . . . it is certainly not enough that the speech is merely offensive to some listener. Because the Policy's "hostile environment" prong does not, on its face, require any threshold showing of severity or pervasiveness, it could conceivably

16

be applied to cover any speech about some enumerated personal characteristics the content of which offends someone. . . . Such speech, when it does not pose a realistic threat of substantial disruption, is within a student's First Amendment rights." Saxe, 240 F. 3d at 217 (citations and notations omitted.)

In the case at bar, applying the above, the photo, caption and text Stacy posted did not substantially disrupt education at either MU or CV. According to Bray, the only disruption was in the frenzied reaction of the CV administrators. (Bray Dep, p. 82.) Further, Stacy's speech occurred off campus and was composed on her private, home computer. (Snyder Dep, Exh. "C" to MSJ, p. 187.)

There is no evidence any students at either CV or MU even saw Stacy's posting. (Girvin dep., p. 134.) Stacy did not produce her posting in connection with any class or school project. (Snyder dep., p. 187; *Killion, supra*, citing *Emmett v. Kent Sch. Dist. No. 415*, 92 F. Supp. 2d 1088 (W.D. Wa. 2000)). Although undoubtedly upsetting to certain CV and MU administrators, Stacy's comments did not threaten anyone. *Killion* at 455. Accordingly, under the above cases, Stacy's speech enjoys First Amendment protection.

MU next contends Stacy's web posting is not protected speech because it could have offended "the children for whom she had responsibility." (MU Brief, p. 31.) However, school officials may only punish lewd or indecent speech "to make the point to pupils that such speech is wholly inconsistent with the 'fundamental values of public education.'" *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 686-687; *Killion*, 136 F. Supp. 2d at p. 456. Moreover, where the allegedly lewd and obscene speech occurs off school grounds, schools cannot punish the students absent exceptional circumstances. *Killion, supra; Thomas v. Bd. of Educ., Granville Central Sch. Dist.*, 607 F.2d 1043 (2nd Cir. 1979).

17

In the case at bar, Stacy's speech and expression was neither lewd nor obscene. The photo does not depict the contents of the plastic cup. (Snyder Aff, Exh. 6; Dep Exhibits 51 and 104, attached to Bray dep..) MU and CV merely concluded from the "drunken pirate" caption that the cup contained alcohol. Even if it did, Stacy was 25 years old when the photo was taken. (*Id.*, ¶20.) She broke no laws whatsoever by drinking an alcoholic beverage in her free time.

The MU defendants seek to infantilize the "children" at CV. In reality, the students who, theoretically, could have seen Stacy's posting are in high school. It is ridiculous for anyone to pretend that seeing a plastic cup that may or may not contain alcohol would in any way shock them. In fact, in just a year or two, these "children" will be serving in the army, voting and otherwise assuming the responsibilities of adulthood. If they are unprepared for life in the "marketplace of ideas," then MU and CV have failed miserably in their educational mission. The Constitution protects Stacy's free speech.

MU next contends Stacy does not enjoy First Amendment protection because the "drunken pirate" photo, caption and text is not "inherently expressive." (MU Brief, pp 15-18.) It claims Stacy's web posting equates to the manufacturer's logo on a t-shirt, lacking any "kernel of expression." (*Id.*, p. 17.)

However, MU's argument ignores the "drunken pirate" caption and the meaningful text accompanying Stacy's photo. In her commentary, Stacy raises concerns about the improper motives of the individual defendants and other teachers and administrators at CV and MU. Nor is the speech meaningless. Girvin believed he knew exactly what Stacy's posting meant:

> "I would say that the text here got some people up in arms. I don't
> know that it disrupted the students, but it certainly got some people
> up in arms in the English Department. Because even though Stacy

had been told in teaching of that if she had something like myspace, it was never to point a finger at anybody, never to be personal, never to mention anybody's name. And, secondly, in that orientation, when I was there, they were told if they had these accounts, they should delete them.

\* \* \*

But when you read this last sentence here, they keep asking me why I don't apply there. Do you think it would hurt me to tell them the reason for who the problem was? **Now if that's not Ms. Reinking, I wouldn't know who - - you might as well just put Reinking's name right down there**. And to me, that is a personal pointing the finger at a professional person and blaming all the problems on that person." (Girvin Dep., pp. 135-136.)

Reinking was certain Stacy's posting was about her. (Reinking Dep., pp. 155-157.) Buffington described Stacy's posting as full of "derogatory comments" about Reinking and CV. (Buffington Dep., pp. 128-129.) If Stacy's posting had "no intent [at least to Reinking, Girvin and Buffington] to convey any message, let alone a particularized message," then those three would not have barred Stacy from CV's property the moment they read it. (See MU MSJ, p. 17.) Far from meaningless, Stacy's expressions are precisely what the framers of the Constitution sought to protect when the penned the First Amendment.

Even focusing just on the photo, it is well established that symbolic speech enjoys First Amendment protection. For instance, in *Klein v. Smith*, 635 F. Supp. 1440 (D. Me. 1986), the court struck down the suspension of a student who gave his teacher "the finger" after school hours and off school grounds. The *Klein* court reasoned ". . . the First Amendment protection of freedom of expression may not be made a casualty of the effort to force feed good manners to the ruffians among us." (*Id.* at 1441-1442.)

In the case at bar, Stacy's photo symbolizes the rebellious spirit of youth. It underscores the

19

importance of sucking the marrow of life while one is young, before job, family and other adult responsibilities sap the free spirit. This message resonates with young adults even if MU's teachers and administrators are incapable of understanding it. Under the above cases, the "drunken pirate" photo constitutes protected free expression.

1. **Stacy's Posting Does Not Violate *Morse v. Frederick* by impermissibly promoting underage drinking**.

MU claims the Supreme Court's decision in *Morse v. Frederick*, 127 S.Ct. 2618 (2007)(the "Bong Hits 4 Jesus" case) supports its denial of Stacy's BSE. (MU MSJ, pp. 19-20, 29-31.) However, the facts of *Morse* are easily distinguishable from those at hand. In *Morse*, students displaying an arguably pro-drug use banner at a **school function during school hours**. (*Id.*, at p. 2622.) The students obviously sought to infuriate and humiliate the District during the well-publicized event. Here, Stacy posted a photo on her private web page, not out in the open. She did so **outside of school hours**. Stacy never intended anyone at CV to see the posting.

Also, the *Morse* banner refers to marijuana use. Here, while Stacy's photo arguably refers to her use of alcohol, this is a completely legal activity for a 25-year-old adult like her. No underage persons appear in the photo. Nothing in the photo or text even remotely encourage minors to drink. Moreover, the *Morse* court noted the students displayed the banner in question for the benefit of television cameras covering a high-profile media event. (*Id.*, p. 2622.) Here, MU presented no evidence that any students saw Stacy's web posting.

Further, in *Morse*, the school suspended the students in question for eight days pursuant to Board Policy Number 5520. This policy provides: "The Board specifically prohibits any assembly or public expression that . . . advocates the use of substances that are illegal to minors. . . . ." (*Id.*,

p. 2623.)

Here, **neither MU nor CV had any policy limiting in any way the rights of student teachers like Stacy either to consume alcohol socially or to make internet postings like this one on their home computer.** Without any policy, Stacy had no advance warning that MU would discipline her based on her behavior. MU's lack of policy guidance in this regard clearly is subject to abuse. Is a student teacher who has a drink with dinner at a restaurant subject to discharge? What if a student in her class is in the restaurant? What if a malicious student doctors a teacher's photo and posts it on the web. Is the teacher somehow promoting underage drinking?

Are administrators at Pennsylvania public schools free to snoop into the private, home-based web pages or e-mails of student teachers and discharge those whose postings they dislike? Defendants seek to parlay the present climate of fear involving anything remotely attached to drug or alcohol use into a *carte blanche* to expel students whenever they choose. MU's Motion for Summary Judgment must fail.

      2.      **Stacy Was Neither a "Public Employee" nor an "Apprentice For Purposes of Her First Amendment Rights.**

MU then avers Stacy enjoys no free speech rights since her student-teaching assignment at CV magically transformed her from a tuition-paying, finals-cramming student into an unpaid "public employee." (MU Brief, pp. 31-34.) This argument, however meritless, presents a question of fact for the jury. Stacy has the right for a judge or jury to decide her employment relationship, if any, with Defendants. Since factual questions remain, the Court must deny individual defendants' motion. *See Carino v. Stefan*, 376 F.3d 156, 159 (3rd Cir. 2004).

Further, Pennsylvania law specifically limits "public employees" as follows:

"'Public employee.' Any individual employed by the Commonwealth or a political subdivision who is responsible for taking or recommending official action of a non-ministerial nature with regard to:

    (1)      Contracting or procurement;

    (2)      Administering or monitoring grants or subsidies;

    (3)      Planning or zoning;

    (4)      Inspecting, licensing, regulating or auditing any person; or

    (5)      Any other activity where the official action has an economic impact of greater than a de minimis nature on the interests of any person.

**The term shall not include individuals who are employed by this Commonwealth or any political subdivision thereof in teaching as distinguished from administrative duties."** 65 Pa. C.S. §1102. (Emphasis added.)

In the case at bar, if the Court believes Defendants, then Stacy was a "teacher" at CV. Under the above, as such, Stacy cannot be a "public employee." Thus, the MU Defendants' claimed "public employee" status should be denied.

Next, MU relies on two out-of-state cases, *Hennessy* and *Watts*, for the proposition that, during her student-teaching assignment, Stacy miraculously became either an "apprentice" or an "employee." (MU MSJ, p. 24.) Importantly, Defendants never specify whether Stacy was an "apprentice" or an "employee" of CV, MU or both. This fatal flaw underscores the weakness of their position.

Moreover, the courts in *Hennessy* and *Watts* interpreted the public school laws of other states. In Pennsylvania, public schools are governed entirely by statute. 24 P.S. §1-101, *et seq.* The

22

Pennsylvania Statutory Construction Act provides:

> "In all cases where a remedy is provided or a duty is enjoined or anything is directed to be done by a statute, **the directions of the statute shall be strictly construed**, and no penalty shall be inflicted, or anything done agreeably to the common law, in such cases, further than shall be necessary for carrying out such statute into effect." 1 Pa. C.S. §1504 (2007) (emphasis added.)

Here, the Pennsylvania Public School Code provides:

> "(1)    The term "professional employee" shall include those who are **certificated as teachers,** supervisors, supervising principals, principals, . . . ." 24 P.S. §11-1101(1).

In the case at bar, by definition, a student teacher lacks a teacher certification. Thus, Stacy was not a "professional employee" at either CV or MU during the time in question.

Further, the School Code prohibits districts from employing any individual in a category or classification for which they are not properly certified. 24 P.S. §12-1202 provides:

> "State certificates shall be issued as herein provided. Each such certificate shall set forth the branches which its holder is entitled to teach. No teacher shall teach, in any public school, any branch which he has not been properly certificated to teach." 24 P.S. §12-1202; *See Greater Johnstown Sch. Dist. v. Greater Johnstown Educ. Assn.*, 167 Pa. Cmwlth. 50, 647 A.2d 611 (1994).

Thus, if the MU Defendants are correct and CV "employed" an uncertified teacher like Stacy, CV would be in violation of Pennsylvania law.

Moreover, the State Board of Education Regulations define "student" as:

> "A person matriculated into a degree or nondegree program of study. The term does not include a person participating in noncredit programs or correspondence courses." 22 Pa. Code §33.102.

Here, it is beyond dispute that Stacy was matriculated into MU's BSE program at the time of the events in question. (Snyder Affidavit, Exh. "10.") Thus, Stacy was a "student" and not an

"employee" or "apprentice" at any time.

Further, under Pennsylvania law, the relationship between student and university is contractual. *Ross v. Penn State Univ.*, 445 F. Supp. 147, 152 (M.D. Pa. 1978); *Strank v. Mercy Hosp. of Johnstown*, 383 Pa. 54, 117 A.2d 697 (1955). Thus, the Court should look to MU's official publications and policies to determine its legal relationship with Stacy. *Ross, supra*, 445 F. Supp. at p. 152.

MU publishes *A Guide For Student Teaching* ("the Guide"), which it distributes to all its student teachers, including Stacy. (Bray Dep., Exh. "C hereto, pp. 29-30; Dep. Exh. 4.) According to the Guide, student-teaching assignments are merely an extension of the student's undergraduate experience. For instance:

> "The overall policies in regard to student teaching are determined by the various teacher education departments, with the approval of the dean of the School of Education [specifically, Bray]. The administration of student teaching is a **joint responsibility of [MU's] coordinator of field services and the education faculty** of the professional education unit." (*Id*.; p. 7 of 25; emphasis added)

The Guide goes on to provide:

> "Assignments for student teaching locations are made by the coordinator **in cooperation with [MU] departmental personnel**, and administrators and teachers in cooperating school districts. **Student teachers are assigned to cooperating teachers, not to schools or school districts.** Student teachers are responsible for arranging their own transportation to and from their school assignments." (*Id.*; emphasis added.)

Importantly, MU considers **the student teacher a guest, not an employee, of the cooperating school.** (*Id,* p. 7 of 25) The Guide mentions nothing about MU's recently invented "apprentice" or "employee" relationships. Rather, MU expects student teachers to continue their

education by "[accepting] every task as a potential learning experience." *Id*. MU emphasizes that "receiving compensation for student teaching is also forbidden," again belying its novel theory. (*Id.*, p. 9 of 25.)

Further, on a background certification prepared by MU, Stacy attested, in pertinent part:

> "I understand that as a student teacher I am representing [MU] and
> am a guest at the host school." (MU MSJ, Exh. C-1, p. 3).

Superintendent Gerald Huesken, CV's designated representative for employment matters, agreed Stacy was not an "employee" of CV. (Huesken Dep., Exh. "K" to MU's MSJ.) Dr. Huesken did not maintain a personnel file on Stacy as he does for all CV teachers. (*Id.*, p. 31.) Stacy did not have a written employment contract as all teachers do. (*Id.*, pp. 31-32.) CV did not require Stacy to undergo a medical examination as required by law for all prospective teachers. (*Id.*, p. 33.)

Stacy did not receive a copy of CV's collective bargaining agreement as all CV teachers do. (*Id.*, p. 34.) CV did not notify Stacy of her rights under the FMLA as it does for all teachers. (*Id.*, p. 35.) CV never gave Stacy a copy of its sexual harassment and improper conduct policy as required by law for all new "teachers." (*Id.*, pp. 35-36.)

Stacy was not covered under CV's workers' compensation policy as required of all "employees" under state law. (*Id.*, p. 39.) Stacy was not covered under CV's medical insurance policy since she was not a "paid employee." Dr. Huesken went on to confirm that, in Stacy's case, CV did not follow many other laws and regulations pertaining to "teachers" as well. Clearly, the novel notion that Stacy was an "employee" has no basis either in Pennsylvania law or in fact.

MU directs the court to *Hennessey v. City of Melrose*, 194 F.3d 237 (1st Cir. 1999), to support its claim. (MU Brief, pp. 30-31.) However, the facts of *Hennessey* are entirely different

from those in the case at bar. Initially, the *Hennessey* court only considered whether the **cooperating school** (in this case, CV) violated plaintiff's First Amendment rights by terminating his student teaching assignment. (*Id.*, p. 244.) The court also specifically refused to address any First Amendment claims plaintiff raised against the individual defendants in their individual capacities. *Id*.

Next, the cooperating school in *Hennessey* contended plaintiff engaged in "erratic behavior" and made numerous improper remarks **during class** over a long period of time**.** (*Id.*, p. 243.) Here, the "drunken pirate" incident occurred **outside of school**. Therefore, the *Hennessey* court scrutinized plaintiff's allegedly protected speech much more closely than is warranted here.

Further, the court in *Hennessey*, **applying another state's school law**, found the relationship between **the cooperating school** and the student teacher more closely resembled that of master/apprentice than pupil/school. (*Id.*, p. 245.) Here, Plaintiff brings her claims against the individual MU defendants in their individual capacities, not the cooperating school.

Moreover, the *Hennessey* court never considered the contractual relationship between the parties. Here, MU's student handbook specifically prohibits the creation of any employer/ employee relationship between the student teacher and the cooperating school. (Exh. "C," Dep. Exh. 4, p. 7 of 25.) It emphasizes that student teachers are assigned to cooperating teachers, not to schools or school districts. (*Id.*) The Guide stresses that the student teacher is "a representative of the university," not an employee and not an affiliate of the cooperating school. Lastly, because *Hennessey* is a First Circuit case, its erroneous holding is not binding on this Honorable Court.

MU's reliance on *Watts v. Florida International Univ.*, 495 F.3d 1289 (11th Cir. 2007) is similarly misplaced. (MU Brief, pp. 31-32.) *Watts* is an Eleventh Circuit case and has no precedential or even persuasive value. Moreover, the *Watts* court interpreted Florida's school law, which may be

entirely different from Pennsylvania's.

Finally, *Watts* relied on violations of "the institution's rules and procedures." (MU Brief, p. 32.) Here, neither MU nor CV had any remotely applicable rules and procedures in place making Stacy an "apprentice" or "employee." during her student teaching assignment. Since, *Hennessey* and *Watts* are inapplicable to the present case, the court should deny individual defendants' creative attempt to dodge their First Amendment responsibilities.

Assuming *arguendo* that the Court considers her a "public employee" of MU, Stacy still has an actionable First Amendment claim. To state a §1983 claim under the First Amendment in an employment context, a plaintiff must show (1) she engaged in a protected activity; (2) defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising her rights; and (3) a causal connection between the protected activity and the retaliatory action. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 284-287 (1987). (MU Brief, p. 26.)

Initially, the "drunken pirate" photo, caption and text clearly constitute protected speech. Reinking, Girvin and others clearly interpreted the text accompanying Stacy's photo as critical of Reinking's teaching and administrative skills. They obviously concluded Stacy's statement that she harbored secret reasons for not to applying to teach at CV as a threat to reveal misconduct by staff either at CV or MU. (See e.g., Girvin dep., pp. 134-138.)

Misconduct in the public schools and universities is a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147 (1983). Stacy's speech threatens to bring to light potential wrongdoing or breach of public trust by CV and MU officials. *Holder v. City of Allentown*, 987 F.2d 188, 195 (3rd Cir. 1993). Additionally, the Third Circuit has recognized that speech disclosing malfeasance by public officials is protected under the First Amendment. *Swineford v. Snyder County of Penna.*, 15

F.3d 1258, 1270 (3rd Cir. 1994).  Thus, the first prong of the §1983 test is satisfied.

Next, individual defendants dismissed Stacy from its School of Education in response to her exercising her First Amendment rights.  Stacy now toils at low-paying, menial jobs to support her family.  Clearly, the threat of financial ruin and the denial of one's lifelong dream constitutes retaliatory action sufficient to deter a person of ordinary firmness from speaking out against individual defendants.  Thus, the second prong of the test is met.

Finally, individual defendants expelled Stacy from the School of Education just days after discovering the photo, caption and text in question.  Individual defendants told Stacy they did so because of the photo.  (Snyder Aff., ¶30; Girvin dep., pp. 135-138.)  Clearly, there is a "causal connection" between the protected activity and the retaliatory action.  Accordingly, Stacy meets the third prong.  Based on the above, even under MU's "employer/employee" theory, Stacy has stated a cause of action for a First Amendment violation.

**B.     Eleventh Amendment Immunity Does Bar Plaintiff's Section 1983 Claims Since Plaintiff Brings Her Action Against the Individual Defendants in their Individual Capacities.**

The MU defendants claims that, as a state institution, under the Eleventh Amendment,  MU is immune from liability even for misconduct that violates the First, Fifth and Fourteenth Amendments.  (MU's MSJ, pp. 38-40.)  The court rejected this argument when it denied in part MU's motion to dismiss Stacy's second amended complaint.  There is no reason to reconsider this dead issue again.

Eleventh Amendment immunity does not bar claims against state officials in their individual capacities.  For instance, in *Melo, et al. v. Hafer, et al.*, 912 F.2d 628 (Third Circuit 1990), various Plaintiffs sued the auditor general of Pennsylvania and other state officials under 42 U.S.C. §1983,

alleging their discharge from employment was political and therefore violated their due process and First Amendment rights. (*Id.*, p. 630.) Plaintiffs sought, *inter alia*, monetary relief. (*Id.*) Defendants moved for summary judgment, contending Plaintiffs' claims were barred by the Eleventh Amendment. (*Id.*, p. 632.)

The *Melo* court held that the Eleventh Amendment does not bar Plaintiffs' claims for damages against Defendants **in their individual capacities**. (*Id.*, p. 637.) Citing *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the *Melo* court observed:

> "The *Will* court's conclusion that §1983 suits could not be brought against state officials in their official capacity followed from the court's earlier Eleventh Amendment decisions. Although the *Will* court did not have occasion to consider the status of personal capacity suits against state officials under §1983, we conclude, borrowing the same Eleventh Amendment jurisprudence that the *Will* court looked to, **that because personal capacity suits against state officials are actions against the individual and not the state, state officials sued for damages in their personal capacities are "persons" under §1983 and therefore subject to suit."** (*Melo*, 912 F.2d at p. 635. [emphasis added])

The *Melo* court went on to find the "Gurley Plaintiffs" explicitly stated their monetary claims were against Hafer in her individual capacity. (*Id.*, p. 636.) Moreover, Hafer raised the defense of qualified immunity, which is only available to government officials when they are sued in their personal, not official, capacity. (*Id.*) Because of this, the *Melo* court found the "Gurley Plaintiffs" properly stated their claims against Hafer in her individual capacity. (*Id.*, pp. 635-636.)

The Third Circuit's decision in *Melo* governs the present matter. Like the "Gurley Plaintiffs" in *Melo*, Stacy explicitly states she seeks monetary damages from the individual Defendants **in their individual capacities**. (Second Amended Complaint, p. 21.) The individual Defendants understand they are being sued in their personal capacities as evidenced by their raising the defense of qualified

immunity in the Motion to Dismiss. Indeed, Stacy's Complaint specifies each act done by the individual Defendants in their personal capacities which form the basis for her claims. (See, e.g., 2AC, ¶¶26-37.)

Further, immunity from suit "is a fundamental aspect of the sovereignty which the states enjoyed before the ratification of the Constitution, and which they retain today . . . except as altered by the plan of the convention **or certain Constitutional amendments**." *Northern Ins. Co. v. Chatham County*, 547 U.S. 189, 190, 126 S.Ct. 1689, 164 L.Ed.2d 367 (2006) (emphasis added.)

In this regard, the Supreme Court has held that the Fourteenth Amendment supersedes the state sovereignty embodied in the Eleventh Amendment. For instance, in *Fitzpatrick, et al. v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), petitioners, present and retired male employees of the state of Connecticut, sued the State Employees Retirement Commission for back pay pursuant to Congressional legislation enacted under §5 of the Fourteenth Amendment. (*Id.*, p. 453.) The state contended the Eleventh Amended precluded such claims. (*Id.*)

The *Fitzpatrick* court rejected the state's sovereign immunity claim, finding that well-established Constitutional jurisprudence:

> ". . . has sanctioned intrusions by Congress, acting under the Civil War Amendments, into the judicial, executive, and legislative spheres of autonomy previously reserved to the states. The legislation considered in each case was grounded on the expansion of Congress's powers - with the corresponding diminution of state sovereignty - found to be intended by the framers and made part of the Constitution upon the state's ratification of those amendments, . . . . It is true that none of these previous cases presented the question of the relationship between the Eleventh Amendment and the enforcement power granted to Congress under §5 of the Fourteenth Amendment **but we think that the Eleventh Amendment, and the principle of state sovereignty which it embodies, are necessarily limited by the enforcement provisions of §5 of the Fourteenth Amendment.** In

that section Congress is expressly granted authority to enforce "by appropriate legislation" the substantive provisions of the Fourteenth Amendment, which themselves embody significant limitations on state authority." (*Id.*, pp. 455-456; emphasis added.)

Similarly, in *Seminole Tribe v. Florida, et al.*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Court reaffirmed that states enjoy no sovereign immunity in actions brought under the Fourteenth Amendment:

> "In *Fitzpatrick*, we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal powers struck by the Constitution. We noted that §1 of the Fourteenth Amendment contained prohibitions expressly directed at the states and that §5 of the amendment expressly provided that "the Congress shall have power to enforce, by appropriate legislation, the provision of this article." **We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that §5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that amendment**." (*Id.*, at p. 59; emphasis added.)

The Supreme Court has, on numerous occasions, applied the Bill of Rights with equal force to state and federal action. For instance, in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 1492, 12 L.Ed.2d 653, 657 (1965), the court held the Fifth Amendment's privilege against self-incrimination applied to actions in state court. In reaching this decision, the *Malloy* court cited prior Supreme Court decisions which:

> ". . . [held] immune from state invasion every First Amendment protection for the cherished rights of mind and spirit -- the **freedoms of speech**, press, religion, assembly, association, and petition for redress of grievances." *(Id.* at 1492; emphasis added.)

Citing *Malloy*, in *Siebert v. Missouri*, 542 U.S. 600, 607, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), the Supreme Court found:

"[t]he **Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement**--the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." (*Id.*, emphasis added.)

Given the above, the MU defendants' absurd argument that they can ignore Stacy's civil rights under the Bill of Rights merely because MU is an arm of a "sovereign state" must fail.

In its original Brief, MU cited numerous cases in which sovereign immunity barred plaintiffs from suing certain arms of Pennsylvania government under various federal statutes. (MU original Brief, pp. 6-9.) For instance, in *O'Hara v. Indiana Univ. of Penna., et al.*, 171 F. Supp.2d 490 (W.D. Pa.), the court held that the Eleventh Amendment bars plaintiff's suit under Title VII of the Civil Rights Act of 1964 against the state university for whom she taught. (*Id.*, at 495.)

However, each of those cases involved Congressional action under its general law-making authority, Article I of the Constitution. None involved actions by Congress pursuant to Section 5 of the Fourteenth Amendment. Moreover, none held the Eleventh Amendment and sovereign immunity barred plaintiffs from suing the state or its administrative arms for Constitutional violations under the Fourteenth Amendment**.** (MU original Brief, pp. 6-9.)

In this regard, the Court in *Seminole Tribe* reasoned:

> "*Fitzpatrick* was based upon a rationale wholly inapplicable to the Interstate Commerce Clause, viz., **that the Fourteenth Amendment, adopted well after the adoption of the Eleventh Amendment and the ratification of the Constitution, operated to alter the preexisting balance between state and federal power achieved by Article III and the Eleventh Amendment**." (*Seminole Tribe*, at 1128; emphasis added.)

Here, Stacy's free speech and due process claims rest on the First and Fifth Amendments, respectively, as applied to the states through the Fourteenth Amendment. Under *Fitzpatrick* and

*Seminole Tribe*, sovereign immunity does not apply to these claims.

Abrogation of sovereign immunity here fosters essential public policy concerns. The Bill of Rights sets forth the most fundamental beliefs in American society. The Founding Fathers endured a long and bloody revolutionary war to ensure that all citizens would enjoy both freedom of speech and the right to due process of law. Years later, our nation fought a terrible Civil War to ensure no state could ignore the rights of any of its citizens, black or white, under the Constitution. The Fourteenth Amendment, once and for all, enshrined the primacy of the federal government over the states.

Under the individual defendants' twisted vision of the Constitution, any state agency could ignore the Bill of Rights with impunity. States could restore slavery, enact religious prohibitions, eliminate free speech or seize the life, liberty or property of their disfavored citizens with impunity. Under this view of the Eleventh Amendment, since states enjoy absolute sovereign immunity, no aggrieved citizen could challenge such decisions in State or Federal Court. This Honorable Court should not sanction such a catastrophic result. The Motion to Dismiss should be denied.

## C. Stacy Properly States a Claim Against the Individual Defendants in their Official Capacities for Injunctive Relief Based on Their Denial of Stacy's Free Speech Right.

In *Melo*, *supra*, the court held that: " . . . a §1983 claim for reinstatement may be maintained against Hafer in her official capacity . . . ." (*Melo*, 912 F.2d at 637.) Following *Melo*, this Honorable Court, in its September 18, 2007 Decision, stated:

> "Accordingly, with regard to Plaintiff's §1983 claims against Defendants Dr. Jane S. Bray, J. Barry Girvin, and Dr. Vilas A. Prabhu in their official capacities, Plaintiff shall be granted 30 days to amend her request for relief so that it is limited to injunctive relief only." (*Id.*, ¶13.)

33

Stacy followed the court's Order precisely, demanding the individual Defendants, in their official capacities, (1) withdraw Plaintiff's BA and issue her the BSE she earned; and (2) take all necessary steps to ensure PDE issues Plaintiff the initial teaching certificate she deserved. (2AC, p. 21.)

Courts routinely consider reinstatement as an element of injunctive relief. (*See, e.g., Francis v. Joint Force Headquarters National Guard*, 2007 U.S. App. LEXIS 21513 (3rd Cir. September 7, 2007); *Huertas, et al. v. City of Camden, et al.*, 2007 U.S. App. LEXIS 19358 (3rd Cir., August 10, 2007).)

MU erroneously avers Stacy's claim for the injunctive relief of reinstatement is equivalent to a preliminary injunction. (MU Brief, pp. 43-44.) To the contrary, Plaintiff only seeks reinstatement as an equitable remedy at the conclusion of this litigation. Thus, the four-step test for preliminary injunctive relief cited by MU is irrelevant. Plaintiff's claims for reinstatement under *Melo*, *supra*, should stand.

**D.      Stacy Properly States a Claim Under Section 1983 Since her Myspace Posting Was the "Moving Force" in MU's Denial of her BSE?**

The MU Defendants contend Stacy cannot state a cause of action because "they would have acted the same even had she not posted on the internet." (MU Brief, pp. 28-29.) Defendants cite no case law at all to support this claim.

It is well established that a plaintiff states a cause of action under §1983 when, *inter alia,* he or she demonstrates that the constitutional violation complained of was "the moving force" in Plaintiff's injury and damages. *Monell v. Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L. Ed. 2d. 611 (1977).

In the case at bar, Stacy clearly meets this causation standard. Prior to May 8, 2006, five days before graduation, no one either at MU or CV ever suggested MU would not allow Stacy to graduate with a BSE. (Snyder Aff., ¶13.) Before then, no one at either MU or CV even hinted that Stacy's classroom behavior or performance was "unprofessional." In fact, in her midterm evaluation, Girvin gave Stacy passing grades in all areas of professionalism. (Exh. C-6 to MU's MSJ.)

Buffington admits the "myspace incident" was "the straw that broke the camel's back," leading her and Seldomridge to end Stacy's student-teaching experience. (Buffington Dep., pp. 79-80.) Buffington explained:

> "And, of course, that - - **had that myspace posting not occurred, there would have been no reason for me to contact Mr. Seldomridge**." (*Id.*, p. 80.- emphasis added.)

Girvin, Bray, Schneller and Wenrich all admit that, before seeing Stacy's myspace photo and text, they took no steps to deny Stacy her BSE degree. (Girvin Dep., pp. 124-125; Bray Dep., p. 89; Wenrich Dep., Exh. "F" hereto, pp. 125-126.) Before the myspace incident, MU never withheld a BSE degree from a student teacher this close to graduation. (Snyder Aff., ¶37.) Both Girvin's final PDE Form 430 and his final evaluation of Stacy rate her "competent" or above in all areas except "professionalism." (Exh. C-18.) The only reason Girvin gave for Stacy's lack of "professionalism" was the myspace incident. *(Id.;* Girvin dep., pp. 134-138.)

According to Bray, state law only authorizes Girvin, as Stacy's cooperating teacher, to complete the PDE 430 Form. (Bray Dep., pp. 91-92.) Bray believes she lacked the authority to overrule Girvin's ratings of Stacy on the form. (*Id.*, pp. 93-94.) Without passing grades in all areas on the PDE Form 430, the Pennsylvania Department of Education will not certify Stacy as a teacher in this state. (Bray Dep., pp. 91-95.) Thus, when Girvin gave Stacy an "unsatisfactory" in

professionalism based on the myspace incident, he killed any chance Stacy had to become a teacher. (*Id.*; MU MSJ, Exh. C-18, p. 4.) Obviously, the myspace incident was the moving force in Stacy's demise.

Similarly, the denial of Stacy's BSE is the "moving force" in Stacy's enormous monetary and general damages. Plaintiff's expert in rehabilitation consultation, Robert Cipko, Ph.D., calculates that, as a result of Defendants' denial of Stacy's BSE, Stacy suffered a wage loss ranging from $1,755,203.00 to $1,873.803.00. (Snyder Aff., Exh. "12," p. 20.) Additionally, due to the myspace incident, Stacy is unable to repay the $27,535.00 she owes in student loans. (*Id.*, ¶43.) During the last two years, Stacy earned $9,851.00 and $11,295.00, respectively, working as a bartender/waitress, clothing salesman and clerk. (*Id.*, p. 40.) Stacy has huge medical bills which she cannot repay because she cannot afford health insurance. (*Id.*)

Equally important, due to Defendants' reaction to the myspace incident, Stacy will never know the satisfaction of teaching America's youth. She is permanently relegated to unsatisfying, menial, low-paying jobs so she can feed her family. MU's Motion for Summary Judgment should be denied.

**E.** **Stacy's Claims Are Not Barred by Qualified Immunity Since No Reasonable Persons Would Take Away Stacy's BSE the Day Before her Graduation Based on an Innocent Internet Posting that Hurt No One.**

The MU defendants contend qualified immunity bars Stacy's §1983 damages claims. (MU Brief, pp. 47-53.) Initially, qualified immunity does not apply to suits against public entities. A defendant acting in his official capacity is the equivalent of the public entity itself. Thus, the court should deny the motion for summary judgment as to Stacy's claims for injunctive relief against the MU defendants in their official capacities.

In a suit against public officials for alleged Constitutional violations, a court considering qualified immunity must determine the following: Taken in the light most favorable to the party asserting the injury, do the facts alleged show that the state official's conduct violated a Constitutional right? *Saucier v. Katz*, 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If so, the court must inquire whether the right was "clearly established." (*Id.*, p. 201.) A right is "clearly established if its contours are sufficiently clear that a **reasonable official** that his conduct was unlawful in the situation he confronted. (*Id.*, p. 202.- emphasis added.)

In the case at bar, MU wisely does not dispute that Stacy's First, Fifth and Fourteenth Amendment claims meet this first prong of the qualified immunity test.

Second, the MU defendants wrongly claim Stacy's First Amendment rights were not "clearly established" since "there is virtually no case law to touching on free speech rights in public schools on the internet." (MU Brief, p. 36.) In *Tinker, supra*, the Supreme Court observed:

> "The Supreme Court has held time and again, both within and outside of the school context, that the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it." *Tinker*, 393 U.S. at 509.

Applying *Tinker*, the Pennsylvania Code sets forth the right of public school students to free expression:

> (a)  The right of public school students to freedom of expression is guaranteed by the Constitution of the United States and the Constitution of the Commonwealth.

> (b)  Students shall have the right to express themselves unless the expression materially and substantially interferes with the educational process, threatens serious harm to the school or community, encourages unlawful activity or interferes with another individual's rights. 22 Pa. Code §12.9.

Since Tinker, many courts have recognized a student's off-campus free speech rights. For instance, in *Flaherty v. Keystone Oaks Sch. Dist.*, 247 F. Supp. 2d 698 (W.D. Pa. 2003), the District disciplined the student-plaintiff for posting "trash talk" about an interscholastic volleyball game on an internet message board. *Id.*, p. 701. In granting summary judgment for the student, the court observed:

> "While Mr. Hagy [a school official] believes that he can discipline a student for bringing "disrespect, negative publicity, negative attention to our school and to our volleyball team," this is simply not sufficient to rise to the level of "substantial disruption" under *Tinker*. Thus, I find that relevant policies in the Student Handbook (even when considered in conjunction with the Board Policies) are so vague that it could permit Defendants to apply them arbitrarily." Id., p. 704-705 (citations omitted.)

Similarly, in *Killion, supra*, the student-plaintiff compiled a "top 10 list" about the District's athletic director on his **home computer** but **never distributed it.** *Killion*, 136 F. Supp. 2d 446, 448 (W.D. Pa. 2001). Another student brought a copy into school without Plaintiff's knowledge or consent and gave it to several friends. *Id.* The administration discovered the list and suspended the student who authored the list. *Id.*

In granting summary judgment for the student, the *Killion* court cited **numerous cases** dating back to 1973, in which courts applied the *Tinker* analysis to permit student off-campus speech even where it makes its way onto campus. *Id.*, p. 455. The *Killion* court concluded:

> "Admittedly, [District teachers] and others found the list to be rude, abusive and demeaning. However, "disliking or being upset by the content of a student's speech is not an acceptable justification for limiting student speech under Tinker." *Beussink*, 30 F. Supp. 2d 1175, 1180 (E.D. Mo. 1998). Indeed, "the mere desire to avoid 'discomfort' or 'unpleasantness' is not enough to justify restricting student speech under *Tinker*." *Id*.

In the case at bar, applying the above, the Constitution absolutely protects Stacy's right to post her personal thoughts and opinions on her private web site via her personal computer outside of school hours. Stacy never brought the posting onto school grounds. Officials at CV found the postings without her permission and brought them to school, setting in motion MU's denial of Stacy's BSE and ruining Stacy's life. Thus, the present case is squarely on point with *Killion*.

Further, Bray, Wenrich, Schneller and Prabhu hold doctorate degrees, while Girvin has a master's degree. The MU Defendants are high-ranking instructors in a large public university. Their job is to prepare teachers to instruct students in the public schools. If they can't or won't understand and appreciate student off-campus free-speech as guaranteed by the First Amendment, then they have no business instructing future Pennsylvania teachers. MU's claim that these well-educated professional educators were unaware that all citizens, including Stacy, hold a First Amendment right to free speech is extremely disingenuous.

Qualified immunity is designed to protect police officers who are often forced to make split second judgments about the amount of force that is necessary in a particular situation. *Saucier*, 533 U.S. at 204-205. Here, Defendants have the State System of Higher Education's general counsel's office as well as the Pennsylvania Office of Attorney General at their disposal. Experienced attorneys from those powerful agencies have been actively involve in this case from the outset.

Moreover, qualified immunity does not protect "the plainly incompetent or those who knowingly violate the law." *Malloy v. Briggs*, 475 U.S. 335, 341, 89 L.Ed.2d 271, 106 S.Ct. 1092 (1986). Here, if they cared to do so, Defendants had plenty of time to pick up the phone and consult their attorneys about any Constitutional questions regarding the myspace incident.

In their zeal to keep CV happy and protect it as a no-cost outlet for MU's student-teacher

training, Defendants sacrificed Stacy's career. Defendants decided the future of a single mother like Stacy, with a mountain of student-loan debt, who came from a working-class background and perhaps lacked certain educational refinement, simply did not matter. Defendants rejected out of hand the obvious solution, allowing Stacy to re-take her student teaching semester elsewhere, because they feared CV would see them as "soft" and not allow future student teacher placements. (*See* Girvin testimony, pp. 201-205; Weinrich Dep, pp. 195-196; *See also*, Buffington note, Exh. "B" hereto.) Defendants' taking away Stacy's BSE the day before her graduation (**and joking about it afterward** like Bray did- *See* Snyder Aff, ¶37) is callous and cruel. Under *Briggs*, this court should hold Defendants responsible for destroying Stacy's life and not let them hide behind qualified immunity.

Defendants cite *Morse, supra,* to support their claim for qualified immunity. In *Morse*, the Supreme Court issued several different Decisions offering conflicting viewpoints on qualified immunity and First Amendment freedoms. Defendants seek to exploit the High Court's confusion and turn it into **absolute immunity** for public school teachers in First Amendment cases. Under Defendants' view, public universities could squelch student off-campus free speech arbitrarily. They could expel students for any type of political, social, religious or other posting on the internet just because an administrator at MU or elsewhere found it "offensive." They could suppress student criticism through fear and intimidation. This Honorable Court should not write off the First Amendment in academia in this fashion.

Moreover, the facts of *Morse* are completely different than those at bar. In *Morse*, during a **school-sponsored event**, as a joke, the students hung a banner for all to see apparently promoting drug abuse. To the contrary, Stacy made her posting **off campus** on her **home computer**. She never

intended anyone but her close friends to view it. Further, the school suspended the students in *Morse* for ten days or so. Here, Defendants took away Stacy's BSE, destroyed her teaching career and ruined her life **all because of one innocuous internet posting**. There is no way the Supreme Court would sanction such a result under *Morse*.

Finally, the essence of qualified immunity is the "**reasonable person**" standard. *Saucier, supra* at 202. Here, Defendants took away Stacy's BSE degree the day before graduation based on an innocent web posting she intended for her friends. Stacy never meant to insult anyone at MU or CV. There is no evidence whatsoever that, apart from CV's and MU's overheated response, Stacy's posting harmed the educational process at CV in any way.

Any" reasonable person" would be outraged by MU's actions. Any thinking human being would consider MU's punishment to Stacy completely out of proportion to her actions. If they had any compassion in their hearts for Stacy whatsoever, or if they held any respect for the First Amendment, Defendants never would have ruined Stacy's life as they did. This Honorable Court should not allowing Defendants to escape justice for their outrageous misdeeds by hiding behind qualified immunity.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff, Stacy Snyder, respectfully requests this Honorable Court

**DENY** Defendants' Motion for Summary Judgment.

Dated: <u>4/18/08</u>                                Respectfully submitted,

                                **LAW OFFICE OF MARK W. VOIGT**

                BY:        <u>   /s/ Mark W. Voigt                    </u>
                                **MARK W. VOIGT, ESQUIRE**
                                Attorney I.D. No. 64387
                                Validation of Signature Code: MWV6003
                                Plymouth Meeting Executive Campus, Suite 400
                                600 West Germantown Pike
                                Plymouth Meeting, PA 19462
                                (610) 940-1709
                                (Attorney for Plaintiff, Stacy Snyder)