# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACY L. SNYDER, | : |
| Plaintiff | : CIVIL ACTION |
| | : |
| v. | : NO.: 07-1660 |
| | : |
| MILLERSVILLE UNIVERSITY, J. BARRY | : JURY TRIAL DEMANDED |
| GIRVIN, DR. JANE S. BRAY, and DR. VILAS | : |
| A. PRABHU, | : |
| Defendants | : |

## AFFIDAVIT OF STACY L. SNYDER

1. I, Stacy L. Snyder, am an adult individual and the Plaintiff in the above-captioned matter. I make this Affidavit in opposition to Defendants' Motion for Summary Judgment.

2. I am a single mother of two children, Kyle Snyder (age ten) and Ian Nieves (age nine). While attending Millersville University ("MU"), in order to pay the tuition and support my family, I held down as many as three jobs at a time. I waitressed at Friendly's and sold tupperware. I also worked in MU's Alumni Services Department. Despite my work and home commitments, I made the dean's list at MU. (See Exhibit "1.")

3. In the summer of 2004, after my sophomore year, I changed my major to a Bachelor of Secondary Education ("BSE") in English. I decided to become a teacher so I could teach journalism to high school kids. My major remained BSE in English until May 12, 2006, the day before my graduation.

4. During the spring semester, 2005, I completed a secondary field experience at La Academia Charter School. (See Exhibit "2.") I achieved the highest possible "competency" ratings in all areas. My cooperating teacher, Lakesha Hargin, stated on my final evaluation that I did an

1  EXHIBIT "A"

"excellent job" and that I had a "personality conducive to teaching." (*Id.*)

5. On September 16, 2005, I filled out a background information sheet indicating that I want to be a secondary education English, language arts or reading teacher at the seventh or eighth grade level. (Exhibit C-1 to MU's Memorandum of Law.) I also listed the education courses I had taken at MU. I specifically indicated the only ones related to British literature were seminars on Chaucer and Shakespeare. (*Id.*)

6. That fall, I completed a secondary field experience at Lampeter-Strasburg High School. (See Exhibit "3.") My co-operating teacher, Sue Fetterolf, rated me "outstanding" in many areas. She stated I was "very professional" and predicted I would "make a notable contribution to our profession." (*Id.*)

7. Also during the fall semester, 2005, I completed a secondary field experience at Garden Spot High School. (Exhibit "4.") My cooperating teacher, Neil Weidman, commented that I was "highly competent and motivated." He too predicted I "will be a welcome addition to a secondary [school] faculty." (*Id.*)

8. Like many college students, I have had a myspace account for a long time. In January, 2006, I attended a two-day seminar presented by Dr. Bray, Dr. Wenrich and others designed to prepare student-teachers for the classroom. I recall one presenter cautioned students not to criticize any officials at their cooperating school on their myspace pages. However, no one at MY ever forbade student teachers from having myspace accounts while student-teaching. I know of no policies at either MU or Conestoga Valley School District ("CV") regulating such pages.

9. Representatives from MU and CV assigned me to cooperating teacher Nicole Reinking for my spring semester, 2006 student teaching experience. Ms. Reinking teaches twelfth

2

grade British literature. Neither MU nor CV consulted with me about this placement. I had very little familiarity with British literature at the time. I advised Ms. Reinking of my unfamiliarity during our first meeting in January, 2006.

10. Admittedly, I struggled during the first few weeks of my student-teaching assignment. I was reading many of the poems and prose for the first time. Also, the second semester seniors I taught proved difficult to motivate and control, partly because they were looking forward to graduating in a few weeks.

11. My faculty advisor at MU for my student-teaching semester was J. Barry Girvin. Mr. Girvin prepared notes documenting his observations of my student-teaching that semester. I admit that some of Girvin's criticisms of my teaching during my first few weeks are valid. It did not help my performance that Reinking, a first-time cooperating teacher, was largely uncommunicative and unhelpful toward me during the semester. I told Girvin about my difficulties with Reinking, but nothing changed. After my mid-term evaluation, I improved my teaching performance dramatically. I worked even harder than before to prepare for each class. On his April, 2006 evaluations, Mr. Girvin spoke very favorably of my teaching performance.

12. While student-teaching, I also completed a CIRQL project, which required a great deal of time and effort. In a note dated May 2, 2006, Mr. Girvin, my CIRQL project advisor, awarded me "exemplary" marks in every area. (See Exhibit "5.")

13. Prior to May 8, 2006, no one either at MU or CV ever suggested MU would not allow me to graduate with a BSE. Before that date, no one at either MU or CV hinted in any way that my classroom behavior or performance was "unprofessional." In fact, on my mid-term evaluation, Mr. Girvin gave me passing grades in all areas of "professionalism." (Exhibit C-6 to MU's Motion for

3

Summary Judgment ["MSJ"].) Girvin gave me the highest possible grade in my adherence to the Pennsylvania Professional Code of Ethics. (*Id.*)

14. On the morning of May 8, 2006, I was having breathing troubles at home. The previous day, I was bitten by a spider and suffered an allergic reaction. At approximately 8:00 a.m., I told Ms. Reinking I was not feeling well. I explained I planned to get a doctor's appointment as soon as possible and leave school early. At approximately 8:30 a.m., I called the doctor's office and received an afternoon appointment.

15. During my prep period, the doctor called me and told me he had an earlier appointment for me. I changed my plans and decided to leave before lunch, in the middle of my third block class.

16. At approximately 2:00 p.m. on May 8, 2006, Deanne Buffington, the head of the Communications Department at CV, telephoned me at home. Buffington explained "questions" had just arisen concerning my "professionalism." She told me CV had barred me from entering school grounds until Thursday, May 11, 2006. At that time, I would receive my final evaluation from Girvin and Reinking. Buffington refused to give me any further information.

17. Fifteen minutes later, I telephoned Buffington at CV. I was crying during the conversation. I apologized for whatever happened and told her I look forward to meeting with her on Thursday.

18. At approximately 2:30 p.m. on May 8, 2006, I telephoned Girvin. I was still in tears. I asked him what was going on. Girvin asked me if I had any idea what it could be about. I told him that, while I was unsure, the only thing I could think of was my myspace account. I told Girvin I did not post anything derogatory about any CV staff or students on my myspace page. Girvin said only

4

that I was thinking along the right lines. I asked Girvin if I should remove my myspace page, and he suggested I do so. That evening, I deleted my myspace account.

19. On the morning of May 9, 2006, I emailed Reinking concerning student grades and paperwork. That afternoon, I spoke to Girvin by telephone about the seriousness of my situation. I again was crying during this conversation. **Girvin admitted that officials at MU and CV were extremely upset over a photograph and caption on my myspace account. He told me the administrators were so angry that MU may choose not to award me any degree at all**.

20. Attached as Exhibit "6" is the photograph and caption to which Girvin referred. I never intended any students or faculty either at MU or CVSD to view my myspace postings. The photo at the top was taken at a costume party after school hours when I was 25 years of age. I believe the caption of the photograph read "drunken pirate." I did not intend to promote underage drinking through the photo and caption. In the text I wrote: "Do you think it would hurt me to tell them the real reason (or who the problem was)?" At the time, I felt the "real reason" and the "problem" was me. I no longer wanted to teach high school students. I decided I would rather teach at the seventh or eighth grade level. I never intended anything in this posting either to disparage or even refer to any teachers or administrators either at CV or MU.

21. On or the morning of Wednesday, May 10, 2006, I exchanged correspondence with Reinking concerning student grades and paper work. I wanted to make sure my sudden departure did not adversely affect the students I was helping to teach. I true and correct copy of my email, together with Reinking's response, is attached as Exhibit "7."

22. At approximately noon on May 10, 2006, I spoke with Girvin about my final evaluation the following day. Girvin told me precisely when and where to enter the building at CV

5

for my meeting. He told me exactly what items I was allowed to bring. He emphasized that I must enter the CV building so that none of my students could see me. Girvin told me I would meet with MU personnel on Friday, May 12, 2006 to decide my fate. He promised to give me more information about the MU meeting during the CV meeting on Thursday, May 11, 2006.

23. On the afternoon of May 10, 2006, I wrote an apology letter to the staff at CV and MU. (Exhibit C-16 to MU's MSJ.) I wanted not only to apologize but also to help them appreciate the hard work and dedication I invested in my student-teaching assignment. I cried the whole time I wrote the letter.

24. At approximately noon on Thursday, May 11, 2006, I went to CV as directed. I sat in the English Department teachers' lounge by myself until my third block class was out of the area and into their fourth block classes. I was then ushered into the classroom to meet with Buffington, Reinking and Girvin. Buffington began by telling me my teaching skills were inadequate, that I was unprofessional and that my apology letter was not sincere. She never criticized either my teaching skills or my professionalism before that moment. I raised my voice and told Buffington I was sorry. I explained I made errors in my apology letter because I was hysterical and crying when I wrote it. I told Buffington "I haven't been able to eat or sleep or spend time with my kids because all I do is cry. Is that sincere enough for you?"

25. Buffington then left the meeting. Girvin and Reinking then grilled me about the picture and text from my myspace account (Exhibit "6.") I told Reinking the text was not about her. Reinking said she did not believe me. Reinking and Girvin then reviewed my final evaluation. (Exhibit C-12 to MU's MSJ.) Girvin rated me either "competent" or "superior" in every area except professionalism.

26. During the meeting, Reinking gave me a list she prepared documenting my allegedly "unprofessional behavior/performance in the classroom." (Exhibit S-13 to MU's MSJ.) This was the first time I had ever seen Reinking's list. Reinking then left the meeting, and I gathered my belongings.

27. Girvin talked to me after Reinking left. I told Girvin again about the problems I had communicating with Reinking during the entire semester. Girvin would not listen.

28. Girvin explained I would meet with Wenrich and him at MU early in the afternoon on Friday, May 12, 2006. He said that, by then, MU would determine if I would graduate at all. He told me the meeting would take place in Wenrich's office at the Education Building. I was crying during this conversation. I believed I was only meeting with Wenrich because Bray was ill. I then cleaned up the classroom, removed as much of my belongings as I could carry and went home.

29. I went to Wenrich's office early in the afternoon of Friday, May 12, 2006. I waited in the hallway while Wenrich and Girvin met privately. The two then ushered me in and informed me I would graduate only with a BA in English instead of a BSE.

30. Girvin then review my final PDE Form 430. (Exhibit C-18 to MU's MSJ.) **He told me that, because of the "myspace incident," he gave me a "U" in professionalism. (*Id.*) He explained that, without a passing grade in "professionalism" on this form, the Pennsylvania Department of Education would not certify me as a teacher.** After Girvin reviewed the PDE Form 430, Wenrich asked him to leave. Wenrich then told me that, in addition to my not receiving a BSE, MU would not allow me to take any other education classes there ever again. She implied that, given the myspace incident, MU and other colleges would fear that I would create another issue regarding my professionalism.

7

31. Wenrich explained that Schneller and Bray decided to rearrange my credits so that I would graduate with a BA in English. She told me to report to Schneller's office after she excused me so Schneller could sign the necessary paper work and fax it to the Registrar's office. I told Wenrich I planned to attend MU to pursue an advanced degree in elementary education. Wenrich explained I would not be allowed to do so.

32. I advised Wenrich I planned to attend graduation ceremonies at MU the following morning along with my family and friends. I asked her whether MU would state during the ceremony that I was only graduating with a BA in English. Wenrich said no. She explained MU had already printed the graduation brochures listing me as receiving a BSE in English. She said it was too late to change them now.

33. Wenrich told me I could appeal her decision to Bray. I said I would like to do so. She then sent me to Bray's office, where I scheduled my appeal. After doing so, I went to Schneller's office. I was in shock and crying intermittently. At the time, I lacked sufficient English Department credits to graduate with a BA in English. Schneller explained she transferred some of my general education credits to English Department credits. She then gave me an "Exception" Form, which I signed. (Exhibit C-17 to MU's MSJ.).

34. I attended MU's graduation ceremony on Saturday, May 13, 2006, at 10:00 a.m. The commencement flyer listed me as graduating with a BSE. (Exhibit "8.")

35. On Monday, May 15, 2006, at approximately 9:00 a.m., my mother, Dottie Snyder, and I attended the "appeal hearing." Both Bray and Wenrich were present. My mother and I explained MU's outrage over the "myspace incident" seemed out of proportion. We told Bray and Wenrich that no parent or student complained about the posting. We suggested Reinking was acting

8

out of some sense of jealously toward me.

36. I showed Bray Reinking's list and my typed response to each complaint. (Exhibits C-13 and C-14 to MU Memorandum of Law.) Bray took them.

37. **Bray told me my myspace picture and caption promoted underage drinking.** She said I should feel flattered because I got so close to graduating from MU with a BSE. **She said I was lucky MU gave me a BA instead of nothing.** Wenrich asked my why I still wanted to be an elementary education major even though I could no longer be a teacher. She inquired as to my "teaching philosophy."

38. Bray then told me she would read all the information before making a decision. She said I should receive her decision by the end of the week. In a two-paragraph, one-page letter dated May 15, 2006, Bray denied my appeal. (Exhibit "9.")

39. During my entire student-teaching experience at CVSD, I considered myself a student at MU and not an "employee" or "apprentice" of CVSD. Attached is my registration printout from MU listing my student-teaching experience as a twelve-credit college course. (Exhibit "10.") No one either at CV or MU ever referred to me as a "public employee," "employee" or "apprentice."

40. During the litigation, various persons suggested I have not sustained any damages due to my receiving a BA instead of a BSE. Since graduation, I have been unable to obtain a teaching certificate. Instead of teaching, I worked as a bartender/ waitress at the local American Legion post. I have sold clothing. Currently, I work as a clerk for a reprographics company. Attached as Exhibit "11" are my federal tax returns from 2006 and 2007. As you can see, I earned $11,295.00 in 2006 and $9,851.00 in 2007. I also have attached an expert report and curriculum vitae from Robert Cipko, Ph.D., documenting the considerable loss of wages and benefits I suffered due to MU's

9

wrongful denial of my BSE and teaching certificate.

41. The MU defendants also claim I was an unsatisfactory student-teacher throughout the semester. However, after my removal, my former students prepared a large "good luck card" containing some very flattering statements. (Exhibit "14.") They also gave me a stuffed bear holding a fuzzy book entitled "World's Best Teacher." Additionally, several students wrote me notes and gave me pictures of themselves to remember then by.

42. Attached as Exhibit "14," is an article which appeared in the Lancaster Newspaper on April 7, 2006. The article lists me as among those students completing their student-teaching assignments.

43. Since MU's denial of my BSE, various persons associated with this case have suggested I go back to school somewhere else and retrain myself for another career. Unfortunately after attending four years at MU, I owe $27,535.00 in student loans. (Exhibit "16.") Due to MU's actions, I am in default on my loans. There is no way I could obtain any additional loans to attend another college. Even if some institution would loan me more money and allow me to enroll, I could not pay my bills and care for my children while going back to school.

44. The foregoing facts are known by me to be true, of my own knowledge. I am competent to testify to such facts, and I would so testify at the trial of this matter. I hereby declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Lancaster, PA
on 04/17/08

*/s/ Stacy L. Snyder*
STACY L. SNYDER

10