IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | |
| MILLERSVILLE UNIVERSITY, et al. | : | 07-1660 |
| Defendants. | : | |

### DEFENDANTS' PROPOSED FINDING OF FACTS AND CONCLUSIONS OF LAW

**I.     PROPOSED FINDING OF FACTS**

1. In spring semester 2006, Stacy Snyder, who hoped to receive a Bachelor's degree in Secondary Education from Millersville University of Pennsylvania ("MU") was a student teacher at Conestoga Valley High School ("Conestoga Valley" or "CV").

2. To be eligible to receive a B.S.Ed. degree at MU and to receive initial teaching certification in Pennsylvania, a student teacher must pass the student teaching practicum. I at 204, 233-235, 245-248; II at 117-124, 134-135. See Exhibit 4 at 9.

3. Nicole Reinking was plaintiff's cooperating teacher at CV. I at 15; II at 10.[1]

4. Deann Buffington, CV's Communications Department Chair, was Reinking's supervisor.  I at 40; II at 79-80.

---

[1] "I" refers to Volume I of the trial transcript, May 6, 2008, and "II" refers to Volume II of the trial transcript, May 7, 2008.

5. Plaintiff was provided with the MU Guide to Student Teaching at the student teaching orientation on or about January 16, 2006, prior to the start of her student teaching. I at 13, 110; Exhibit 4. See Exhibit 9.

6. Plaintiff was forewarned at the MU orientation for student teachers about having personal websites and specifically warned about referring to students or teachers on personal web pages. I at 112, 138-140.

7. Plaintiff was specifically advised at the MU orientation for student teachers that one student teacher had been removed from a student teaching placement because of negative references to the cooperating school's principal on a personal website. I at 112-113, 231; II at 231.

8. Snyder had opened her myspace account months before she started student teaching and it was open while she was student teaching at CV. I at 136.

9. While student teaching, Snyder was subject to Conestoga Valley's rules and regulations. I at 109-112; Exhibit 30 at 3.

10. As with teachers, student teachers must first be approved by the Conestoga Valley School Board. Deposition of Gerald Huesken at 24-26 ("Huesken").

11. As with teachers, student teachers must first pass background checks. Huesken at 27-30; Exhibit 7.

12. As a student teacher, plaintiff was expected to adhere to CV's rules and regulations and to comport herself as an employee, not as a student, in relating to CV teachers, students, parents and administrators. Exhibit 30 at 3; Huesken at 49, 61-62.

13. Snyder was required "to maintain the same professional standards expected of the teaching employees of the cooperating school" and "to fulfill as effectively as possible every role of the classroom teacher ..." Exhibit 4 at 7.

14. As with teachers, student teachers are given staff parking permits and staff identification cards. Huesken at 51-52.

15. Plaintiff was placed at Conestoga Valley not to take courses offered there and was not a pupil at the school in any sense. I at 128; Huesken at 49, 53-54, 61-62.

16. Plaintiff's position at CV paralleled that of an apprentice or teacher-in-training and CV relied on her in the same way that it would rely on any teacher-in-training or teacher's aide. Huesken at 18-19, 49, 53-54.

17. While student teaching, plaintiff was expected to be in the assigned classroom every day the school was in session. II at 14.

18. While student teaching, plaintiff was expected to follow the school calendar and, specifically, to follow Nicole Reinking's schedule, to attend in-service meetings, faculty meetings and special school events. II at 14.

19. During spring semester 2006, plaintiff was student teaching at CV full time; she was not taking any courses at MU. I at 129.

20. For the first weeks of the semester, Snyder observed Reinking's twelfth grade English classes. I at 19-20, 115; II at 12.

21. Thereafter, plaintiff gradually assumed increasing responsibility for teaching Reinking's classes. I at 19-20, 115; II at 12-13.

22. Plaintiff developed the plans for the lessons she taught. I at 115.

23. While Snyder was teaching, Reinking was observing and taking notes about plaintiff's teaching. I at 115; II at 14. See Exhibit 82.

24. Reinking and Snyder discussed the latter's teaching on virtually a daily basis throughout the semester. I at 23-24, 117; II at 17-19, 33-34.

25. Throughout the semester, Reinking repeatedly raised concerns about plaintiff's teaching competence and professionalism. II at 31, 72-73, 81-86.

26. Snyder found Reinking's mentoring helpful and appreciated that Reinking sought to assist her. I at 129.

27. At MU, plaintiff had courses in Chaucer, Shakespeare and poetry. I at 113; II at 52. See Exhibit 30.

28. Plaintiff nonetheless lacked subject matter knowledge in the twelfth grade course in British Literature that she was teaching. I at 22-25, 29, 36, 116, 188-190; II at 16-19, 32.

29. Despite having an annotated "teacher's edition," plaintiff did not understand the content she was teaching. I at 22, 114; II at 12-13, 16-17.

30. Plaintiff's grammar and spelling were deficient. II at 19.

31. The students did not understand what plaintiff was teaching. II at 31-33, 41-42.

32. Plaintiff had problems with students sleeping during class during the entire semester. I at 119: II at 20.

33. Plaintiff was not able to manage some students who were talking and being disruptive and refusing to do the homework she assigned. I at 20-21, 28, 34, 119-120, 190-198; II at 20-21.

34. Reinking offered plaintiff study materials and assistance during the semester. I at 113, 116; II at 11, 18-19.

35. Plaintiff referred to her myspace account several times in class and each time Reinking warned her about maintaining professional boundaries with the students. II at 37-38, 63-65, 84-85.

36. Snyder told the class to "shut up." I at 65; II at 20.

37. Snyder did not react when a student told another student to "shut up" or when students discussed weekend behavior involving drugs and drinking in the classroom. II at 23-24.

38. Plaintiff played a song as background music that she had not previewed and contained the inappropriate phrases "a badass mother G.I. Joe," "kiss my ass goodbye" and "Don't give me that bullshit …." I at 61-63, 120-121; II at 26-27; Exhibit 50.

39. Snyder circumvented the chain of command at CV several times during the semester. I at 70-71, 122-123; II at 27-30, 85-87.

40. Plaintiff described her Valentine's Day to her students in an unprofessional manner by telling them personal details of the episode. I at 64-65, 122, 195-196; II at 22.

41. As a student teacher, plaintiff's functions and responsibilities were essentially the same as a full-time teacher. I at 126; II at 16, 80-81

42. The students considered plaintiff, not Reinking, as their teacher. I at 127-128. See Exhibit 51.

43. Plaintiff considered herself the students' teacher. I at 128. See Exhibit 51.

44. During the semester, plaintiff took over all the teaching responsibilities for the literature class of another CV teacher and was the sole teacher in that class. I at 118, 126.

45. Girvin was Snyder's MU supervisor while she was student teaching at CV. I at 183-185.

46. Girvin observed Snyder's teaching during the semester. I at 21, 132, 187. See Exhibits 44 and 47.

47. Girvin raised similar criticisms as Reinking about plaintiff's student teaching and shared his observations with plaintiff. I at 21, 132, 187, 196-197. See Exhibits 44 and 47.

48. Girvin was consistently helpful as plaintiff's MU supervisor throughout the semester. I at 132-133; Exhibit 49.

49. At the semester midpoint, Reinking and Girvin formally evaluated plaintiff as needing improvement or significant remediation in multiple different areas. I at 27-28, 200-202; II at 39-43. See Exhibits 45 and 65.

50. Girvin also rated plaintiff's performance as unsatisfactory in the mid-placement PDE-430 form that is mandated by the PDE. Exhibit 46.

51. Snyder acknowledges that her performance was unsatisfactory and that Reinking's and Girvin's criticisms were valid. I at 31-33, 124, 133.

52. There was a vast "disconnect" between plaintiff's self-evaluation and Reinking's and Girvin's mid-term assessments. I at 124-125, 202-203; II at 39-40. See Exhibits 45, 46, 64, 65.

53. Plaintiff posted the "drunken pirate" photograph and "blog" on her myspace website on or about May 4, 2006. I at 53; Exhibit 51.

54. Plaintiff wrote on her myspace blog:

    First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop that low as to mess with my future. So, bring on the love! I figure a couple of students will actually send me a message when I am no longer their offical (sic) teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)?

    I at 53; Exhibit 51.

55. The image and text in Exhibit 51 is the sole posting that Buffington brought to plaintiff's attention and the sole basis for Snyder's contention that she was improperly denied a B.S.Ed. degree. I at 135.

56. After Buffington learned about plaintiff's internet posting from a colleague, she contacted Kim Seldomridge, CV School District Director of Business and Administrative Services, for instructions. II at 87-88.

57. On or about May 8, 2006, pursuant to a directive from Seldomridge, Buffington directed Reinking to prepare a litany of plaintiff's unprofessional behavior during the semester. II at 42-43, 89-90.

58. In a document titled "Unprofessional Behavior/Performance in the Classroom," Reinking noted examples of plaintiff's unprofessional behavior during the semester. II at 43-44; Exhibit 48.

59. On May 8, 2006, at Seldomridge's direction, Buffington telephoned plaintiff and forbade her from entering CV until the final evaluation because of unprofessional behavior. I at 41, 133; II at 87-92.

60. Buffington advised plaintiff that she would be escorted off school grounds if she returned to CV. I at 133.

61. Plaintiff surmised that the unprofessional behavior referred to her myspace posting. I at 42-43.

62. Because CV administrators barred plaintiff from entering CV, plaintiff did not complete her student teaching practicum. II at 106-107

63. Buffington later advised Girvin that CV administrators had barred plaintiff from entering CV until the final evaluation. I at 204.

64. Girvin had no involvement in CV's decision to bar plaintiff from returning to CV. I at 204.

65. In a May 9, 2006, e-mail to Girvin, plaintiff failed to accept responsibility for her own mistakes and sought to blame Reinking for her own failures during the semester. I at 205-206; Exhibit 49.

66. Plaintiff did not complain to Girvin about Reinking's supervision until May 9. I at 206-207. See Exhibit 49.

67. Girvin believed that plaintiff unprofessionally criticized Reinking in her myspace posting and in the May 9 e-mail. I at 205-206; Exhibits 49 and 51.

68. On May 11, 2006, plaintiff met with Buffington, Reinking and Girvin. I at 49.

69. Buffington criticized plaintiff's student teaching as incompetent, her level of knowledge as inadequate and her conduct as "unprofessional" and showed her the posting from plaintiff's website. I at 50-51, 134.

70. Reinking and Buffington thought the blog posting was critical of Reinking and CV. II at 46-47, 103-104.

8

71. CV's decision to bar plaintiff from CV was based on plaintiff's incompetent and unprofessional behavior throughout the entire semester. II at 89-94, 100-101. See Exhibit 52.

72. Plaintiff says that her "Drunken Pirate" picture signifies nothing and that her facial expression is "stupid." I at 52.

73. The cup in the "drunken pirate" photograph contained alcohol. I at 137.

74. Plaintiff condoned that at least one student had been looking at her website and concedes that the blog referenced her students. I at 138-140; Exhibit 51.

75. Snyder says that the phrase in the posting "I don't think that they would stoop so low as to mess with my future" refers to her students. I at 56, 138-140.

76. Snyder says that the reference in the internet posting "Do you think it would hurt me to tell them the real reason (or who the problem was)?" was to herself. I at 56, 141-143.

77. Snyder says that CV and MU and their personnel are not referenced in the posting. I at 52, 92-93, 136, 156-157.

78. Snyder says that the posting is "personal and private" and contained her "personal thoughts and opinions." I at 137.

79. Snyder uses the website as a personal "diary" and as a way for her to communicate with girlfriends who she doesn't have time to meet with. I at 137.

80. Snyder says that the posting was not intended for CV or MU teachers or students to view. I at 52, 55.

81. Snyder says it would be inappropriate for her students to view her myspace pages. I at 69.

82. Reinking's final evaluation of plaintiff reflects unsatisfactory ratings in four of the six indicators of Professionalism and in two indicators of Preparation. II at 48-49; Exhibit 59.

83. Girvin rated plaintiff's performance in the Professionalism component of the MU student teaching evaluation as unsatisfactory. Exhibit 58.

84. The final PDE-430 completed by Girvin and required by the PDE for eligibility for initial teaching certification reflects an unsatisfactory rating in Professionalism. Exhibit 57.

85. Girvin permitted plaintiff to withdraw from the student teaching practicum so that her academic transcript would not reflect a failure. I at 208-209.

86. For Girvin, the determinative factors in deciding not to pass plaintiff in student teaching were that she was barred from entering CV and that in her May 9 e-mail she unprofessionally criticized Reinking for her own failures. I at 205-209.

87. Plaintiff's internet posting play virtually no role in Girvin's decision to not pass her in student teaching. I at 208.

88. Because CV barred plaintiff from returning, plaintiff did not complete the student teaching practicum and was not eligible to pass student teaching. I at 77, 204, 245-248; II at 117-124.

89. Because plaintiff had not passed student teaching, pursuant to MU's academic requirements, she was not eligible to receive a B.S.Ed. I at 204, 233, 245-248; II at 117-124.

90. Because plaintiff had not passed student teaching, pursuant to PDE's regulations, she was not eligible to receive initial teaching certification in Pennsylvania. I at 235; II at 134-135. See Exhibit 4 at 9.

91. Buffington never threatened that CV would not permit future MU students to student teach there if MU did not take action towards plaintiff. II at 93-94.

92. Since spring 2006, CV has continued to host MU student teachers. II at 94, 124-125.

93. Girvin had no concern that CV would not host future MU student teachers if he did not take action against plaintiff. I at 209-212.

94. On or about May 12, 2006, plaintiff went to Dr. Judith Wenrich, MU Coordinator for Student Teaching, and advised her that she had been barred from CV and had not passed student teaching. I at 230-233.

95. In considering plaintiff's options, Wenrich reviewed plaintiff's documented unsatisfactory student teaching performance during the semester at CV. I at 233-236, 241.

96. Wenrich was primarily concerned that CV had barred plaintiff from entering the school. I at 240-241.

97. Wenrich had no concern that CV would not host future MU student teachers if she did not take action against plaintiff. I at 237-238.

98. Other student teachers who have been removed from the cooperating schools have not passed the student teaching practicum. I at 234-235.

99. Plaintiff's internet posting played no role in Wenrich's actions. I at 239-244.

100. Wenrich referred plaintiff to Dr. Beverly Schneller, Chair of MU's English Department, to see if she could receive a B.A. I at 178-180.

101. Plaintiff met with Schneller who granted an exception to graduation requirements, which permitted her to graduate in May 2006 with a B.A. in English Literature. I at 178-180; Exhibit 70.

102. Schneller was not aware of plaintiff's internet posting.

103. Plaintiff took an academic appeal of the denial of the B.S.Ed. to Dean Jane Bray. II at 112-113.

104. On or about May 13, plaintiff presented written materials to Bray, including her response to Reinking's litany of unprofessional performance, and argued that she should pass student teaching and receive a B.S.Ed. II at 113-115. See Exhibit 60.

105. Plaintiff conceded that most of the unprofessional conduct documented by Reinking had occurred. Exhibit 60.

106. Bray reviewed the written materials and learned that plaintiff had failed both the mid-term and final PDE-430. II at 113-117.

107. Bray was particularly concerned that CV administrators had barred plaintiff from the school. II at 117-121.

108. Bray denied plaintiff's appeal. II at 119-121. See Exhibit 62.

109. Plaintiff's internet posting played no role in Bray's decision. II at 119.

110. In February 2007, plaintiff requested a hearing pursuant to MU's Academic Appeals Policy to Provost Prabhu and appealed the denial of the B.S.Ed. degree. Exhibit 63.

111. After evaluating the evidence before him, Prabhu denied her appeal. Exhibit 63.

112. Prabhu was not aware of plaintiff's internet posting, which played no role in the denial of her appeal. Exhibit 63.

## II. PROPOSED CONCLUSIONS OF LAW

1. In deciding whether to grant a permanent injunction, a court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest. American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Board of Ed., 84 F.3d 1471, 1477 nn. 2-3 (3d Cir. 1996).

2. A party seeking a mandatory injunction bears a particularly heavy burden in demonstrating its necessity. Acierno v. New Castle County, 40 F. 3d 645, 653 (3d Cir. 1994) (citation omitted).

3. In an educational setting, a student bears a heavy burden in persuading the courts to set the largely subjective academic appraisals of faculty. Mauriello v. University of Medicine and Dentistry, 781 F. 2d 46, 50 (3d Cir. 1986). See Board of Curators of the University of Missouri v. Horowitz, 435 U.S. 78, 92 (1978); Regents of the University of Michigan v. Ewing, 474 U.S. 214, 225 (1985).

4. To state a claim of First Amendment retaliation, the plaintiff must show that: (1) the activity in question is protected by the First Amendment; (2) defendants responded with retaliatory adverse action; and (3) the protected activity was a "substantial factor" in causing the alleged retaliation. <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 241 (3d Cir. 2006). <u>See</u> <u>Mount Healthy City Board of Ed. v. Doyle</u>, 429 U.S. 274, 284-287 (1987); <u>Feldman v. Comm. College of Allegheny</u>, 85 Fed. Appx. 821, 2004 WL 50784 (3d Cir. 2004).

5. A defendant may rebut a prima facie case of retaliation by showing that "the same adverse action would have taken place in the absence of the protected conduct." <u>Ambrose v. Twp. of Robinson</u>, 303 F.3d 488, 493 (3d Cir.2002) (for protected conduct to be a substantial or motivating factor in a defendants' decision, the decisionmaker must be aware of the protected activity); <u>Baldassare v. New Jersey</u>, 250 F.3d 188, 194 (3d Cir. 2001).

6. First Amendment protection is available only where "an intent to convey a particularized message was present, and the likelihood was great that the message would be understood by those who viewed it." <u>Spence v. Washington</u>, 418 U.S. 405, 410-11 (1974). <u>See</u> <u>Rumsfeld v. FAIR</u>, 547 U.S. 47, 65-66 (2006); <u>United States v. O'Brien</u>, 391 U.S. 367, 376 (1968); <u>City of Dallas v. Stanglin</u>, 490 U.S. 19, 24-25 (1989).

7. Cases in the school context also require that plaintiff satisfy the two-part particularized message test. <u>Montanye v. Wissahickon School Dist</u>., 218 Fed.

Appx. 126, 130 (3d Cir. 2007). See Brandt v. Board of Education of the City of Chicago, 480 F.3d 460, 465-66 (7th Cir. 2007).

8. Plaintiff's does not sustain the burden of showing that her posting is constitutionally protected because the posting did not satisfy the particularized message test.

9. Plaintiff's failure in student teaching and unprofessional behavior culminating in CV's barring her from the school were the determinative, if not the sole, reasons for MU's action. Her internet posting was not a substantial factor in MU's decision to award her a B.A. and not a B.S.Ed. degree.

10. For First Amendment purposes, plaintiff's status as a student teacher puts her in the status of public employee. Watts v. Florida International University, 495 F. 3d 1289 (11th Cir. 2007); Hennessy v. City of Melrose, 194 F. 3d 237 (1st Cir. 1999). See Andersen v. McCotter, 100 F.3d 723, 726 (10th Cir.1996).

11. Under the public employment standard, the first prong requires plaintiff to show that she was engaged in a protected activity, which requires her to show that the activity addressed a matter of public concern. Pickering v. Board of Education, 391 U.S. 563, 568 (1968); Connick v. Myers, 461 U.S. 138, 146 (1983).

12. Plaintiff's internet posting was not on a matter of public concern and was not protected by the First Amendment.

THOMAS W. CORBETT, JR.
                                            ATTORNEY GENERAL

                              BY:    s/s Barry N. Kramer
                                     BARRY N. KRAMER
                                     Chief Deputy Attorney General

Office of Attorney General
21 South 12th Street, 3rd Floor
Philadelphia, PA 19107-3603
Tel: (215) 560-1581
Fax: (215) 560-1031

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACY SNYDER, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MILLERSVILLE UNIVERSITY, | : | |
| et al. | : | 07-1660 |
| | : | |
| Defendants. | : | |

## CERTIFICATE OF SERVICE

    I, Barry N. Kramer, hereby certify that on May 20, 2008, Defendants' Proposed Findings of Fact and Conclusions of Law has been filed electronically and is available for viewing and downloading from the Court's Electronic Case Filing System. The ECF System's electronic service of the Notice of Electronic Case Filing constitutes service on all parties who have consented to electronic service:

    Mark W. Voigt, Esquire
    Plymouth Meeting Executive Campus
    Suite 400
    600 West Germantown Pike
    Plymouth Meeting, PA  19462

                                        BY:    s/s Barry N. Kramer
                                                          BARRY N. KRAMER