**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| STACY SNYDER, | : | |
| Plaintiff | : | CIVIL ACTION |
| | : | |
| v. | : | NO.: 07-1660 |
| | : | |
| MILLERSVILLE UNIVERSITY, J. BARRY | : | JURY TRIAL DEMANDED |
| GIRVIN, DR. JANE S. BRAY, DR. BEVERLY | : | |
| SCHNELLER, DR. JUDITH WENRICH | : | |
| and DR. VILAS A. PRABHU, | : | |
| Defendants | : | |

---

**PLAINTIFF'S PROPOSED FINDINGS OF FACT,
CONCLUSIONS OF LAW AND ORDER**

## I.        PROPOSED FINDINGS OF FACT

1.        Plaintiff, Stacy Snyder, is a divorced single mother to two boys.  (N.T., 5/6/08, pp. 2-3.)  In the summer of 2002, Stacy enrolled at Millersville University ("MU") as a full-time student.  (*Id.*, p. 3.)  After majoring in biology for one year, Stacy switched her focus to education.  (*Id.*, pp. 4-5.)  Eventually, she became an education major.  (*Id.*, p. 5.)

2.        In the spring of 2005, Stacy completed a "sophomore block" "field experience" at La Academia Charter School.  (N.T., 5/6/08, pp. 6-7; P-25.)  There, Stacy worked in a mixed classroom of sixth through twelfth graders who were either failing or near failing in their regular school settings.  (*Id.*, p. 7.)  Stacy's teacher at La Academia was Lakesha Welch.  (N.T., 5/7/08, p. 3.)  On her evaluation, Ms. Welch gave Stacy the highest marks possible in all areas.  She explained:

> "I just found her to be very competent, and once again, I can't stress enough how much the students really took to her, which I think in teaching that is probably the most important thing . . . I've had several sophomore block students from [MU] and Stacy was exceptional. She was probably the best one I had."  (*Id.*, p. 8.)

1

3.     Stacy next completed a field experience at Lampeter-Strasburg High School in the fall of 2005.  (N.T., 5/6/08, p. 9.)  There, she conducted classroom observations and taught two mini-lessons.  (*Id.*, pp. 163-164.)  Her cooperating teacher, Sue Fetterolf, recalled Stacy "did very well" and commented that "the students responded well" to Stacy's instruction.  (*Id.*, p. 164.)  Ms. Fetterolf went on to say:

> "I recall [Stacy] was enthusiastic about teaching the lessons . . . .  But she seemed very enthusiastic about the [teaching] profession.  I recall she brought in some of her own materials like cutouts from magazines and that was going above and beyond what she needed to, . . . ."  (*Id.*)

4.     Ms. Fetterolf even wrote a letter of recommendation for Stacy, explaining:

> "[Stacy's] maturity and creativity make her a valuable catch for a school district.  I hope, for these reasons, that you consider Stacy Snyder for a position at your school."  (P-113.)

5.     On or about September 16, 2005, Stacy completed an MU background information sheet concerning her upcoming student-teaching assignment.  (P-30.)  At the end of the document, Stacy read and signed a statement prepared by MU which reads, in pertinent part:

> "I understand that as a student teacher I am representing [MU] **and am a guest in the host school.**"  (P-30, p. 3.- emphasis added.)

6.     In the fall of 2005, Stacy worked with various students in Neil Weidman's ninth grade class at Garden Spot High School.  (N.T., 5/6/08, p. 11; P-27.)  Mr. Weidman also was Stacy's instructor at MU in a class called "pedagogy of writing."  (*Id.*, p. 152.)  Stacy was one of four students from that class who went on to instruct in Mr. Weidman's class at GSHS.  (*Id.*, pp. 152-153.)

7.     On his evaluation, Mr. Weidman rated Stacy "highly competent and motivated."  He

predicted Stacy "will be a welcome addition to a secondary faculty." (*Id.*, P-27.) During his testimony, Mr. Weidman explained:

> "I really felt that [Stacy] had the potential to become an excellent teacher. It wasn't just that she was fulfilling a duty when she was in my classroom. I could tell that what she was doing was coming from her heart. . . . But, what I saw was someone who was willing to go on well beyond what would have been the expected in a classroom." (*Id.*, p. 158.)

8.  No one at any of the schools where Stacy assisted before coming to CV criticized Stacy's professionalism. (N.T., 5/6/06, p. 11.) No one there asserted Stacy was unethical or otherwise unfit to be a teacher. (*Id.*)

9.  On January 16 and 17, 2006, Stacy attended an orientation meeting for future student-teachers. (N.T., 5/6/08, p. 12; P-9.) Dr. Jane Bray, dean of MU's School of Education, and Dr. Judith Wenrich, chair of MU's Department of Elementary and Early Childhood Education, spoke to the students during the meeting. (P-9; N.T., 5/6/08, p. 230; N.T., 5/7/08, p. 112.)

10.  No one either from MU or CV ever told Stacy that, while student-teaching, she was either an "apprentice" or an "employee" either of MU or their cooperating schools. (N.T., 5/6/08, pp. 12-13; 220.) No one at the meeting forbade students from having myspace accounts while student teaching. Rather, MU officials generally cautioned students against criticizing officials at their cooperating schools via any internet postings.

11.  During the orientation meeting, MU gave all assembled students, including Stacy, a copy of its Guide for Student Teaching. (N.T., 5/6/08, p. 13; P-4.) Under "professional conduct," the Guide states: "The student teacher is a guest of the cooperating school." (P-4, p. 7.) Nowhere in the Guide does MU describe student-teachers as either "apprentices" or "guests" of their

cooperating school. (P-4.) Nothing in the Guide prohibits students from having myspace accounts.

12. Stacy requested MU assign her a cooperating teacher in the seventh or eighth grade (middle school) level so she could teach English, language arts or reading. (P-30, p. 1; N.T., 5/6/08, p. 15.) Instead, without consulting Stacy, MU and Conestoga Valley School District ("CV") decided that CV teacher Nicole Reinking would be Stacy's cooperating teacher. (*Id.*, p. 15.) Reinking teaches twelfth grade British literature, a subject with which Stacy has very little familiarity. (N.T., 5/6/08, p. 17; P-30, p. 3; N.T., 5/7/08, p. 10.)

13. Before Stacy began her student-teaching, Reinking knew Stacy had little background in British literature and wanted a seventh or eighth grade placement. (*Id.*, pp. 51-52.) Before Stacy's assignment, Reinking never had served as a cooperating teacher. Neither CV nor MU provided Reinking with any training on handling a cooperating teacher.

14. Stacy met with Reinking and her MU student teaching instructor, J. Barry Girvin, for the first time in January, 2006. (N.T., 5/6/08, pp. 17-18.) She made it clear that she was unfamiliar with British literature. (*Id.*) Public schools typically allow experienced teachers an entire summer to prepare to teach an unfamiliar subject.

15. Neither Reinking nor Girvin helped Stacy prepare to teach this new subject. Neither sought to reassign Stacy to a more appropriate placement. (N.T., 5/7/08, p. 52; N.T., 5/6/08, p. 219.) As a result, Stacy had just two to three weeks to learn Contemporary British Literature. (*Id.*, p. 219.)

16. Stacy made the Dean's list in February, 2006. (*Id.*, p. 19.) She was proud of this accomplishment because:

" . . . I worked three part-time jobs, I was taking 18 credits, and I was

being a mom and I still achieved the dean's list, honors." (*Id.*)

17.    At MU, student teaching is a 12-credit academic course. (P-29.) Stacy began student-teaching in Ms. Reinking's class in January, 2006. She soon encountered several problems. (N.T., 5/6/08, p. 20.) Apparently, Reinking had done little to instill discipline, manners or respect for elders in her students. Moreover, because the students were seniors, they were generally unmotivated. (*Id.*) As a result, Stacy struggled initially with class control and discipline. (*Id.*) Despite these difficulties, Stacy made progress during the first part of her student-teaching semester. (*Id.*, p. 21.)

18.    On February 15, 2006, Girvin conducted a classroom evaluation of Stacy. (P-44; N.T., 5/6/08, p. 22.) Girvin criticized Stacy for "surface teaching." (*Id.*) Afterwards, Girvin and Reinking discussed their observations with Stacy. (P-44, p. 1.) The two gave Stacy some "suggestions for classroom management." (*Id.*)

19.    During the early part of the semester, Stacy sought Reinking's counsel on proper teaching techniques. (N.T., 5/6/08, p. 24.) Unfortunately, Reinking displayed little interest in helping Stacy. Often, she would respond to Stacy's questions with "well, what do you think you should do?" Stacy found Reinking's approach unhelpful. (*Id.*)

20.    Since she was unfamiliar with the course content, Stacy was required not only to prepare her lessons but also to read and research the subject matter for her upcoming classes. (N.T., 5/6/08, p. 25.) She would spend up to four hours on one lesson and she taught five lessons per week. (*Id.*)

21.    Girvin next observed Stacy on March 1, 2006. (P-44, p. "9 of 47.") Girvin criticized Stacy's "content" knowledge, complaining that the information on Stacy's PowerPoint was not "deep

processed." (*Id.*) Still, Girvin "complimented" Stacy on moving around the room, utilizing positive reinforcement and following through on her management plan. (*Id.*)

22.     Reinking took copious notes on Stacy's performance prior to March 1, 2006. (*Id.*, p. 53; P-82, pp. 1-16.) The compulsively organized Reining claims she "lost" all her notes on Stacy after that date, except for a short one dated April 5, 2006. (*Id.*, pp. 53-54; P-82.).

23.     Girvin next critiqued Stacy's classroom performance on March 9, 2006. (P-44, p. "10 of 47.") He complimented Stacy for her "excellent handout." He lauded Stacy's confidence about her content and her use of "familiar music examples." (*Id.*)

24.     On March 17, 2006, Girvin and Reinking met with Stacy to discuss Stacy's mid-term evaluation. (P-45; N.T., pp. 27-28.) Girvin awarded Stacy a "G," the highest mark, for her adherence to the Pennsylvania Professional Code of Ethics. (*Id.*) He went on to note several areas in which Stacy needed "significant remediation," including "understanding of the subject matter," and "positive classroom management." (*Id.*, pp. "11 of 47 and 12 of 47.")

25.     Neither Girvin nor Reinking criticized Stacy's professionalism during the meeting. (N.T., 5/6/08, pp. 28-29.) Rather, in her mid-year evaluation, Reinking gave Stacy three "G's" under "professionalism." (*Id.*, p. 61; P-65.) To Reinking a "G" on an evaluation means the student's performance is "off the charts." (*Id.*, p. 62.)

26.     Girvin told Stacy that she was "doing everything that [she] needed to do to be a professional educator." (N.T., 5/6/08, p. 31.) Neither Girvin nor Reinking told Stacy that she was on any sort of probationary status or otherwise in danger of not becoming a teacher. (*Id.*, p. 30.)

27.     On or about March 21, 2006, Girvin prepared a Pennsylvania Statewide Evaluation Form for Student Professional Knowledge and Practice ("PDE-430") on Stacy. (P-46.) On it, Girvin

gave Stacy a "superior" mark in "professionalism," explaining:

> "Ms. Snyder usually and extensively conducts herself in a very
> professional manner." (P-46, p. "25 of 47.")

28.     The Pennsylvania Department of Education ("PDE") considers the mid-year PDE-430 as "formative." Evaluators and students should use the mid-year PDE-430 to correct or improve deficiencies. (P-4, p. 18.)

29.     After the mid-year evaluation, Stacy redoubled her efforts in the classroom. When he next observed Stacy on April 3, 2006, Girvin complimented Stacy on her "extensive planning." (P-47, p. "31 of 47.") He noted Stacy's "unit plan was well done" and her "lesson plan was excellent." (*Id.*) Girvin complimented Stacy for her "personal touches" when she asked her students to pass on senior pictures to her so she could remember them. (*Id.*; N.T., 5/6/08, pp. 33-34.)

30.     Girvin next observed Stacy during block one on April 6, 2006. (P-47, p. 32 of 47.) He wrote Stacy's "lesson plan and supplementary material were excellent." (*Id.*, p. 32 of 47.) Girvin congratulated Stacy on her classroom management ("telling students when they need to raise their hands and when they may speak out") and, her "smooth transitions - no lulls."

31.     Girvin also observed Stacy during block two on April 6, 2006. (P-47, p. "33 of 47.") He congratulated Stacy for her "good use of time limits, transitions and supplementary materials." He noted Stacy "asked quality stimulus questions." (*Id.*, p. "33 of 47.")

32.     Girvin last observed Stacy on April 18, 2006. (P-47, p. 34 of 47.) He complimented Stacy on her "great improvement in content - preparation and level of processing." He explained: "students have come to respect the product - value the learning." Girvin also gave Stacy a "glow" for her organization, pace and class participation. (*Id.*)

33.     As part of its student-teaching curriculum, MU requires all student-teachers, including Stacy, to complete a "CIRQL" project.  The CIRQL project is an important part of a student-teacher's experience.  (N.T., 5/6/08, p. 216.)  Students devote between two and four weeks of their student-teaching semester to this assignment.  (*Id.*)  On May 2, 2006, eleven days before graduation, Girvin prepared an evaluation of Stacy's CIRQL project.  (P-47, p. "35 of 47.")  On it, he rated Stacy "exemplary," the highest mark, in all areas of the project.  (*Id.*)

34.     Prior to May 8, 2006, no one at either CV or MU ever suggested to Stacy that she would not receive her BSE degree.  (N.T., 5/6/08, p. 38.)  Before that day, no one at CV or MU either criticized Stacy's professionalism or claimed she was unethical as a teacher.  (*Id.*)  Until that time, no one at either CV or MU took any steps to terminate Stacy's student-teaching at CV.  (N.T., 5/7/08, p. 50.)

35.     Reinking never asked Buffington to observe Stacy's student-teaching.  (*Id.*, p. 61.)  She never gave Stacy any written assistance plan apart from her mid-year evaluation and the notes she claims she lost.  (*Id.*)  No other teachers at CV besides Reinking ever observed Stacy's student-teaching.  (*Id.*, p. 224.)

36.     By Monday, May 8, 2006, Stacy had, by all meaningful measures, completed her student-teaching course at CV. (*Id.*, p. 78.) Stacy was not scheduled to student-teach Reinking's class any more.  (N.T., 5/7/08, p. 78.)  She had no more assignments to complete.  (*Id.*) During her last few days, Stacy would simply "observe" Reinking, remove her personal belongings and perhaps grade some papers.  (*Id.*)  Stacy's final evaluation was on Thursday, May 11, 2006, and she was scheduled to graduate on Saturday, May 13, 2006.  (N.T., 5/6/08, p. 39.)

37.     On or about May 5, 2006, Shawn Karli, a CV teacher, accessed Stacy's myspace

account. To do so, Karli needed either a myspace account of his own or access myspace through a third party's account. (*Id.*, p. 54.) Karli then had to search through the myspace accounts to discover Stacy's "search name." Stacy frequently changed her search name to keep her messages private. Karli then hacked into Stacy's password-protected account and found a photo and text which he found offensive. (P-51.)

38. The photo depicts Stacy holding a cup and wearing a pirate hat. *Id.* The contents of the cup are not visible. *Id.* A friend took the photo of Stacy at a costume party in April, 2006. (*Id.*) All persons at the party were over the age of 25. (*Id.*) No students or teachers attended the party. (N.T., 5/6/08, p. 52.) Stacy never intended to share the picture with her students. (*Id.*)

39. Stacy's posting also contained the following text:

> First, Bree said that one of my students was on here looking at my page, which is fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt me (in the long run). Plus, I don't think that they would stoop that low as to mess with my future. So, bring on the love! I figure a couple students will actually send me a message when I am no longer their official teacher. They keep asking me why I won't apply there. Do you think it would hurt me to tell them the real reason (or who the problem was)? P-51.)

40. Stacy wrote the blog on or about May 4, 2006. (*Id.*, p. 53; P-51.) She wrote the first part of the blog to explain to any students accessing her account that they should not be doing so. (N.T., 5/6/08, pp. 55-56.) Also, she had heard horror stories of educators who were hurt by students making up imaginary blogs in the teacher's name. Stacy explained she did not believe her students would do that to her. (*Id.*)

41. Stacy addressed the remainder of her blog to her best friends, the ones allowed to access her web page. (*Id.*; P-51.) She explained she decided not to teach at CV because she no

longer had a passion for instructing twelfth grade students. (*Id.*) Stacy never intended to insult either Reinking or anyone at CV or MU through her posting. (*Id.*)

42.     Karli showed the photo and text to Reinking who gave it to Deann Buffington, Reinking's supervisor and the head of CV's communications department. Buffington then brought the matter to Kim Seldomridge, CV's acting superintendent. Seldomridge told Buffington to bar Stacy from further student teaching. To conceal the real reason for Stacy's dismissal, Seldomridge directed Buffington to tell Reinking to concoct a list of Stacy's prior unprofessional behavior.

43.     Buffington then alerted Girvin to the matter. It was obvious to Girvin that the text Stacy wrote referred to Reinking. (N.T., 5/7/08, p. 225.) Girvin also believed Stacy's myspace photo could promote underage drinking. (*Id.*, p. 228.)

44.     Stacy was ill on the morning of May 8, 2006. (N.T., 5/6/08, p. 39.) She suffers from severe asthma and was having trouble breathing after sustaining a bite over the weekend. (*Id.*) Stacy made a doctor's appointment for later in the afternoon. However, the doctor's office later switched her appointment to an earlier time. Because of this, Stacy left for the day after lunch. (*Id.*, pp. 39-40.)

45.     Around 2:00 p.m., Buffington telephoned Stacy. (*Id.*, p. 40.) She simply told Stacy a question had arisen concerning her professionalism. (*Id.*, p. 41.) She refused to go into detail. Buffington ordered Stacy not to return to CV under any circumstances until Thursday, May 11, 2006, when she would receive her final evaluation. (*Id.*) Buffington never asked Stacy for her side of the story regarding the myspace incident. (*Id.*, p. 110.)

46.     Stacy then telephoned Girvin, who refused to explain the situation. (*Id.*, p. 42.)

Instead, Girvin slyly asked Stacy whether she could think of any potential problem. (*Id.*) Stacy explained the only thing she could think of was her myspace account. (*Id.*) A few days earlier, one of Stacy's students spoke Stacy's friend Brianne, at a tanning salon. (*Id.*, p. 43.) The student told Brianne that she recognized her as Stacy's friend. Stacy assumed the student somehow gained access to her myspace account.

47. On Tuesday, May 9, 2006, Stacy emailed Reinking to straighten out some student paperwork. (N.T., 5/6/08, p. 44.) She also emailed Girvin. (P-49.) In it, Stacy asked Girvin to explain why, if it was so wrong for a student-teacher to have a myspace account, MU and CV did not have policies against such accounts. (*Id.*) Stacy also pointed out that she had her myspace account months before she began student-teaching. (*Id.*) She questioned why, if her actions were so unprofessional, MU and CV waited until her final week of student teaching to raise them. *(Id.)*

48. Stacy also spoke to Girvin by telephone on May 9, 2006. Girvin explained that, when Stacy came to CV for her final evaluation on May 11, 2006, she must enter the building secretly to avoid any contact with her former students. (*Id.*) He directed Stacy to sit in the teachers' lounge until all students were out of the area. (*Id.*)

49. Girvin at last admitted to Stacy that CV and MU took these Draconian actions against her because of her myspace posting. (N.T., 5/6/08, p. 45.) As of May, 2006, neither CV nor MU had no policy regulating or prohibiting myspace accounts. (P-4; Huesken Dep., p. 21.) Stacy immediately deleted her account. (*Id.*) Girvin also told Stacy that, because of the myspace incident, she might not graduate or, if she did, she would not receive her coveted BSE degree. (*Id.*)

50. The myspace incident was the "straw that broke the camel's back" regarding terminating Stacy's student-teaching at CV. (*Id.*, pp. 105-106.) But for the myspace incident,

Buffington would not have contacted Seldomridge, who barred Stacy from CV. (*Id.*, p. 106.) Prior to the myspace incident, no one at either CV or MU took any steps whatsoever to terminate Stacy's student-teacher placement. (N.T., 5/6/08, pp. 96-97; N.T., 5/7/08, p. 213.)

51.     Stacy then prepared a letter of apology to all CV and MU staff and supervisors dated May 10, 2006. (P-56.) She was distraught and crying the entire time she wrote the letter. (N.T., 5/6/08, pp. 48-49.)

52.     On Thursday, May 11, 2006, Stacy had her final evaluation at CV. Girvin directed Stacy into the lounge area to wait. (*Id.*) CV administrators then actually redirected Stacy's students down an opposite hallway so they would not see her. (*Id.*) Eventually, officials ushered Stacy into her former classroom where Girvin, Reinking and Buffington sat. (*Id.*)

53.     Buffington met briefly with Girvin before meeting with Stacy on the morning of Thursday, May 11, 2006. (*Id.*, p. 97.) Buffington believed that Stacy's myspace posting was a blatant act of insubordination against Reinking. (*Id.*, p. 100.) It was Buffington's impression that Girvin still wanted to give Stacy a satisfactory evaluation. (*Id.*)

54.     At that point, Buffington gave Girvin a note which reads, in pertinent part:

> "In response to Stacy Snyder's letter, I need to state that this young woman, in my opinion, should not pass student teaching. . . . It will be no surprise to me if our excellent teachers here at CV do not volunteer again to serve as cooperating teachers for Millersville [University] students." (N.T., 5/6/08, p. 98; P-52.)

55.     Girvin had no reason to doubt Buffington's sincerity. (*Id.*, p. 212.) He knew Buffington already had spoken with acting superintendent Kim Seldomridge about the myspace incident. (*Id.*) In the spring of 2006, MU placed 37 student-teachers at CV. (P-107.)

56.     Stacy then was ushered into the meeting. Buffington began by showing Stacy a photo

and text that CV personnel downloaded from Stacy's myspace account without Stacy's permission. (N.T., 5/6/08, p. 51; P-51.) Buffington asserted the photo and text were unprofessional and questioned what would have happened if Stacy's students had seen them. (*Id.*)

57.     Even though she had never watched Stacy teach and had not examined any of Stacy's work product, Buffington then accused Stacy of incompetence. (*Id.,* pp. 94-95) She claimed Stacy's apology letter showed her lack of educational knowledge. (N.T., 5/6/08, p. 57.) Stacy explained that she was crying the whole time she wrote the letter. (*Id.*) Stacy questioned why CV was only attacking her professionalism a few days before graduate. (*Id.*)

58.     Buffington then left the meeting. After that, Girvin and Reinking grilled Stacy on what would have happened if one of her students viewed the picture and text. (*Id.*, p. 58.) Reinking told Stacy she thought the blog was about her. (*Id.*) Stacy explained it was not, but Reinking did not believe her. (*Id.*) No students ever told Reinking that they saw Stacy's myspace posting. (*Id.*, p. 64.) Reinking never forbade Stacy from having a myspace account. (*Id.*, p. 65.)

59.     Girvin and Reinking then discussed Stacy's final evaluations. (N.T., 5/6/08, p. 59; P-58 and P-59.) Girvin said he was very pleased with Stacy's improvement since the mid-term evaluation. (*Id.*) In fact, compared to the mid-term evaluation, Girvin gave Stacy the same or better grades in every area except professionalism. (P-58.) Girvin expressed his astonishment that Stacy's professionalism came in questions so close to graduation. (*Id.*, p. 59.)

60.     Regarding professionalism, Girvin explained Stacy exhibited "errors in judgment" that relate to Pennsylvania's Code of Professional Practice and Conduct for Educators. (*Id.*; p. 60; P-58.) In her final evaluation, Reinking gave Stacy a "U" in professionalism, explicitly stating:

        "In terms of professionalism, Ms. Snyder evidenced some aspects of

13

poor judgment during the semester, **especially in regard to one specific instance** (PA Code: §4.B.8)." (P-59, p. 1- emphasis added.) (*Id.*, pp. 62-63; P-59.)

61.     Reinking based her "U" on the myspace incident. (*Id.*, p. 63.) Before that time, Reinking never gave Stacy any written warning that her classroom behavior was unprofessional. (*Id.*) Of her approximately 90 students, Reinking can only recall two that complained about Stacy. (*Id.*, p. 77.)

62.     On either May 11, 2006 or May 12, 2006, officials at CV and MU confronted Stacy with Reinking's list her allegedly "unprofessional behavior in the classroom." (N.T., 5/6/08, pp. 61-62; P-48, p. 2.) Reinking prepared the list on or about May 9, 2006, at Buffington's direction. (P-48, p. 1.) This was the first time Stacy ever saw Reinking's list.

63.     The first instance involved Stacy's playing a song in class for background music. The song contained the word "ass." Stacy was not familiar with the words to the song when she played the CD. (*Id.*, p. 63.) CV has no rule against teachers playing music in the classroom. (*Id.*, p. 54.) CV has no prohibited list of "dirty words." (*Id.*)

64.     Reinking's list next referred to a Valentine's Day incident. (N.T., 5/6/08, p. 64; P-48, p. 2.) One of Stacy's students asked her what she did for Valentine's Day. (*Id.*) Stacy explained that she accompanied her boyfriend and children to a restaurant but left after they ran into her ex-husband.

65.     After class, Reinking and Girvin explained to Stacy that she should not talk about her personal life to her students in class. (*Id.*, p. 65.) No students verbalized any complaints to Reinking about Stacy's Valentine's Day story. (*Id.*, p. 57.)

66.     Reinking could not define the circumstances under which a teacher may disclose

personal information to her class. (*Id.*, p. 55.) Hypocritically, Buffington routinely informs her students that she is a widow and a breast cancer survivor. Reinking admits it is permissible for Buffington to so inform her students if she did so in the proper "context." (*Id.*, p. 56.)

67. Reinking's list then refers to some students saying "shut the hell up" during one of Stacy's classes. (*Id.*) Such outbursts decreased significantly after Stacy changed her classroom discipline system. (*Id.*, pp. 65-66.)

68. Reinking next falsely claimed she warned Stacy twice to avoid myspace discussions. Importantly, CV has no internet usage policies regarding student-teachers, and no one at CV or MU ever told Stacy to remove her myspace account. (*Id.*, pp. 66, 67, 101.) Reinking has no written documentation of any such warnings. To the contrary, Reinking and Stacy only had one general discussion about myspace accounts. (*Id.*, pp. 66-67.)

69. On May 5, 2006, Stacy spoke with Brittany King, the student who spoke to Stacy's friend Brianne. Stacy told Brittany that it was unacceptable for students to confront a teacher's friends and relatives outside of school. (*Id.*, p. 67.) Brittany agreed and vowed not to do it again. (*Id.*, pp. 67-68.)

70. On her list, Reinking also accused Stacy of speaking to Reinking's superiors without prior permission from Reinking. (*Id.*, p. 70.) Importantly, CV has no policy prohibiting such contacts. Once, Stacy asked a supervisor if CV permitted student-teachers to have keys to the classroom available to them. (*Id.*, p. 70.) Stacy wanted extra time to prepare for class. (*Id.*) The supervisor said, "no," and Stacy let the matter drop. (*Id.*, pp. 70-71.)

71. Reinking then claimed Stacy inappropriately participated gladly in CV-sanctioned teacher "dress-down days." (*Id.*, p. 71; P-48, p. 2.) Even though she was not a teacher, Stacy

15

obtained approval from a supervisor to join in teacher dress-down days. (*Id.*, p. 71.) For St. Patrick's Day, a dress-down day, Stacy wore green flip flops. (*Id.*) Afterward, Reinking told Stacy that, while sandals were acceptable, flip flops were not. (*Id.*)

72.     CV naturally has no policy regulating such matters. Rather, Reinking drew upon her college experience as a sorority girl to meet the challenge of her self-appointed role of CV fashion policewoman.

73.     On her list, Reinking next claims other staff members told Reinking about Stacy's "lack of professionalism." (*Id.*, p. 72.) No other staff members ever told Stacy that she was unprofessional in any way. (*Id.*) Reinking cannot recall the name of a single faculty member who criticized Stacy's unprofessional behavior. (*Id.*, p. 74.)

74.     Reinking next falsely alleged Stacy prepared her lesson plan during a classroom observation session. (*Id.*, p. 72; P-48, p. 2.) In fact, Stacy kept minute-by-minute notes of her classroom observation. (P-31 to P-40.)

75.     Lastly, Reinking wrongly accused Stacy of leaving school early for an afternoon doctor's appointment on May 8, 2006. (*Id.*, p. 74.) To the contrary, Stacy's doctor later gave Stacy a morning appointment. (*Id.*) Reinking never bothered to contact either Stacy or the doctor to verify her assertions.

76.     **Importantly, virtually all the incidents on Reinking's list occurred early in the semester and went unmentioned during Stacy's mid-year evaluation. (*Id.*, p. 66.)**

77.     On Friday, May 12, 2006, Stacy met with Girvin and Dr. Judith Wenrich, MU's Field Services Supervisor, to review her final PDE-430. (N.T., 5/6/08, p. 75; P-57.) On it, Stacy's score in "planning and preparation" improved from a "satisfactory" to a "superior" since the mid-year

evaluation. (*Cf.* P-46 and P57.) Similarly, Stacy's "classroom environment" score improved from an "unsatisfactory" to a "satisfactory." (*Id.*) Stacy's "instructional delivery" grade remained "satisfactory." Importantly, all these are passing grades. (*Id.*)

78. However, Girvin lowered Stacy's grade in "professionalism" from a "superior" in his mid-year PDE-430 to "unsatisfactory," a failing grade. (*Id.*) Unless Girvin gave Stacy passing grades on all areas of the PDE-430 Form, Stacy cannot be certified as a teacher. (N.T., 5/6/08, p. 225.)

79. At mid-year, Girvin noted Stacy "usually and extensively conducts herself in a very professional manner." (P-46, p. 4.) Now, Girvin found Stacy's professionalism "unsatisfactory" due to a "lack of judgment." (P-57, p. 4.) Neither Girvin nor Wenrich mentioned any incidents other than the myspace incident to justify this claim. (N.T., 5/6/08, pp. 76-77.)

80. During the May 12, 2006 meeting, Girvin expressed his shock at Stacy's behavior in the myspace incident. (*Id.*, p. 77.) Prior to that moment, Girvin never advised Stacy at any time not to have a myspace account. (*Id.*, p. 226.) Girvin never asked Stacy who she was referring to in her blog. (*Id.*, p. 228.)

81. Girvin went on to claim that he made a "strong argument" to the higher powers that Stacy should pass student teaching despite the myspace incident. (*Id.*) He confessed he had to give Stacy the "unsatisfactory" mark due to the severity of the myspace incident and CV's resulting removal of Stacy from her placement. (*Id.*) Girvin also explained CV's decision to bar Stacy from her student teaching assignment mandated the "unsatisfactory" mark in "professionalism" on the PDE-430. (*Id.*, pp. 77-78.)

82. After the meeting, Girvin told Stacy that Wenrich told him MU would not permit Stacy to take any more education courses there. (N.T., 5/6/08, pp. 78-79.) Girvin explained that,

because of Stacy's "unprofessionalism," MU could not trust that Stacy would not create a similar incident in the future. (*Id.*, p. 79.)

83.     Girvin then left the meeting, leaving Stacy and Wenrich alone. (N.T., 5/6/08, p. 78.) Wenrich explained Stacy was only receiving a BA in English, not a BSE. (*Id.*, p. 80.) Stacy felt she had no choice but to accept the situation, lest she receive no degree at all. (*Id.*)

84.     Wenrich encouraged Stacy to attend MU's graduation ceremonies the following day. (*Id.*, p. 81.) She explained that, because the printer had already prepared MU's commencement flyers, MU officials would announce that Stacy received a BSE degree even though she did not. (*Id.*; P-2)

85.     After her meeting with Wenrich ended, Stacy went to Dr. Bray's office and scheduled an appeal for Monday, May 15, 2006. (*Id.*, p. 83.) She then met with Dr. Beverley Schneller, the head of MU's English Department. (*Id.*, pp. 83-84.) Schneller told Stacy she "went to bat" for her earlier with Bray and others. Schneller claimed she helped ensure MU awarded Stacy a BA instead of nothing. (*Id.*, p. 84.)

86.     As of May 12, 2006, Stacy lacked sufficient credits to graduate with a BA in English. (*Id.*, p. 85.) On May 12, 2006, Bray and Schneller discussed how to "transition" Stacy from a BSE to a BA. (*Id.*, p. 172.)    There is no policy at MU authorizing the conversion of a BSE to a BA. (*Id.*, p. 175.)

87.     To remedy the myspace situation, Schneller altered some of Stacy's credits so that, to any prying superior, it would appear that Stacy met MU's graduation requirements. (*Id.*, pp. 85-86.) Schneller never had a similar conversation with Bray about any student before. (*Id.*) She never asked Bray why Stacy was not getting her BSE. (*Id.*, p. 173.)

88.    Stacy attended graduation ceremonies on Saturday, May 13, 2006. (N.T., pp. 87-88.) The commencement flyer noted Stacy was graduating with a BSE. (*Id.*; P-2.) The commencement speaker announced likewise. (*Id.*, p. 88.)

89.    On Monday, May 15, 2006, Stacy met with Bray for her appeal. (*Id.*, p. 88.) Wenrich and Stacy's mother, Dottie Snyder, also attended. (*Id.*, pp. 88-89.) Stacy provided Bray with a lengthy letter explaining her side of the story. (*Id.*, p. 89; P-60.)

90.    **Bray held up Stacy's myspace photo and told Stacy that it could promote underage drinking.** (*Id.*, p. 89; N.T., 5/7/08, p. 146.) Bray joked that she had the pleasure of denying Stacy's BSE closer to graduation than any student before her. (*Id.*, p. 90.)

91.    At the end of the meeting, Bray promised to review all the information and render a written decision within a few days. (*Id.*, p. 91.) However, Bray believed that, because of "collective bargaining issues," she lacked the power to change Girvin's findings on Stacy's PDE Form 430. (N.T., 5/7/08, p. 135.) The same day, May 15, 2006, Bray issued a half-page, two-paragraph letter to Stacy denying her appeal. (P-62.)

92.    Nothing in MU's Student Code of Conduct, MU's Guide for Student Teaching or Pennsylvania's Code of Professional Practice and Conduct for Educators in any way prohibits student-teachers from posting personal information either on myspace or the world wide web in general. (P-4, P-16, P-18, P-19, P-66.)

93.    Stacy eventually received a "hearing" before Dr. Vilas Prabhu, MU's provost. (N.T., 5/6/08, p. 95.) During the hearing, Stacy was not allowed to question any witnesses from either MU or CV during the hearing. (*Id.*) Stacy's attorney, Mark W. Voigt, Esquire, while present at the hearing, was not allowed to speak to anyone. (*Id.*) MU did not present Stacy with any documents

19

during the hearing. *Id.* Not surprisingly, by letter dated March 26, 2007, Prahbu denied Stacy's appeal.

94. Stacy's student's wrote Stacy a thank-you card and left it on her desk. (N.T., 5/6/08, p. 97; P-83.) Stacy's students also gave her a stuffed bear entitled "world's best teacher." (*Id.*, p. 97; P-2.)

95. Buffington admits Stacy was neither a teacher nor an employee at CV during her student-teaching assignment. (*Id.*, pp. 102-103.) Neither MU nor CV ever paid Stacy. (*Id.*, p. 98.) Neither provided Stacy with a stipend or offered her health insurance. (*Id.*)

96. Neither MU nor CV ever made Stacy sign an IRS Form W-4 as a new "employee. " Neither notified Stacy of her rights under the Family and Medical Leave Act. (*Id.*) When she departed CV, neither MU nor CV advised Stacy of her right to ongoing health coverage under COBRA. (*Id.*)

97. Neither MU nor CV ever notified Stacy that she could seek unemployment compensation benefits during the summer months. (*Id.*) No one at either MU or CV offered Stacy membership in CV's teachers' union. ((N.T., 5/6/08, p. 99.)

98. CV failed to obtain documentation that Stacy is not an illegal alien as required of all new teachers by 8 U.S.C. §1324. (P-98-99; Huesken Dep., p. 30.) CV failed to maintain W-4 forms or other IRS records regarding Stacy as it would  for teachers. (*Id.*)

99. CV failed to maintain a personnel file on Stacy as it would for a teacher. (*Id.*, p. 31.) CV did not enter into a written employment contract with Stacy as required of all teachers by 24 P.S. §10-1089. (*Id.*; p. 32.)

100. CV failed to ensure Stacy completed a pre-employment medical examination, as

required of all teachers by 24 P.S. §14-1418. (*Id.*) CV never obtained proof that Stacy received, read, understood and agreed to comply with its policy manual, as required of all CV teachers. (*Id.*, p. 33.)

101. CV did not provide Stacy with a copy of its Collective Bargaining Agreement with the teacher's union. (P-98, p. 2; P-99, p. 2; Huesken Dep., p. 34.) As a student-teacher, Stacy has no rights under the FMLA. (*Id.*)

102. CV did not require Stacy to sign off on the District's Sexual Harassment and Improper Conduct Policy as all teachers there do. (*Id.*, p. 36.) Stacy was not required to report incidents of suspected child abuse to the authorities as all CV employees are pursuant to the Child Protective Services Act. (*Id.*; p. 38.)

103. Unlike with its teachers, CV did not require Stacy to sign a form documenting her understanding of the District's Prohibition Against Unlawful Discrimination. (*Id.*, pp. 38.39.)

104. Stacy was not covered under the District's medical insurance policy for its teachers. (*Id.*, p. 39.) CV was not covered under the District's Workers' Compensation Policy. (*Id.*, pp. 38-39.)

105. CV did not require Stacy to sign an acknowledgment form concerning the District's prohibition against teachers wearing religious garb or jewelry in accordance with 24 P.S. §11-1112.

106. Unlike teachers, Stacy had no rights under the Family Education Right to Privacy Act. (*Id.*, p. 40.) CV never notified Stacy of her rights under Pennsylvania's Whistleblower Law, as required for all teachers by 43 P.S. §1428.

107. CV never required Stacy to sign an Acknowledgment Form concerning her obligation to act in accordance with the various state criminal laws particularly applicable to District

"employees." (*Id.*; pp. 40-41.)

108. Stacy was not eligible for unemployment compensation benefits due to CV's actions in May, 2006. (Huesken Dep., pp. 41-42.) CV never required Stacy to acknowledge in writing that she would not falsify time records, as required of all teachers pursuant to the Fair Labor Standards Act, 29 C.F.R. Part 516.

109. After the events of May, 2006, Stacy was not eligible for continued health care benefits through CV pursuant to COBRA. (Huesken Dep., p. 44.) After Stacy began her student-teaching assignment, CV did not file a "New Hire Report" with the state as required by 23 Pa. C.S.A. §4392.

110. Stacy owes $27,535.00 in student loans as a result of her attending MU. (N.T., 5/6/08, pp. 99-100.)

111. Since "graduating" from MU, Stacy has tried unsuccessfully to obtain employment as a teacher. (*Id.*, p. 100.) The School District of Lancaster would not grant Stacy an "emergency certification" to teach there. (*Id.*, p. 101.)

112. Stacy cannot even get a job at Sylvan Learning Centers because they require certified teachers. (*Id.*, p. 101.) Stacy cannot afford to enroll in another state university to complete her teaching degree all over again. (*Id.*, p. 102.) To do so, Stacy would need to retake many courses and recomplete her student-teaching assignment, thereby incurring thousands of dollars in additional tuition expenses. (*Id.*)

113. The day after graduation, five school districts telephoned Stacy about interviewing for teaching jobs. (N.T., 5/6/08, p. 169.) Stacy turned them down because she lacked certification. (*Id.*)

114. As dean of the School of Education, Dr. Bray is the "certification officer" at MU.

(N.T., 5/7/08, pp. 112, 119-120.)  As such, Bray is charged with making sure the PDE Form 430 is properly completed.  (*Id.*, p. 120.)

115.     Bray also must complete a form PDE 338C, College/University Verification Form, on behalf of students seeking teacher certification.  (*Id.*, p. 134.) On it, Bray must certify Stacy has achieved at least a satisfactory rating on the PDE Form 430. (*Id.*, p. 134; See sample PDE-338C, attached as Exhibit "A") She must check off a block confirming Stacy has successfully completed all the necessary PDE forms.  (*Id.*, pp. 134-135.)  Bray then sends the PDE-338C to PDE.  (*Id.*, pp. 135-136.)

116.     PDE conducts an independent investigation into the prospective teacher's qualifications.  (*Id.*, p. 135.)  In Bray's experience, PDE only will raise an issue if the student lacks appropriate background clearances.  (*Id.*, p. 136.)

## II.     PROPOSED CONCLUSIONS OF LAW

1.     The First Amendment to the United States Constitution gives public school students a right to freedom of speech and expression. *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 21 L.Ed.2d 731, 89 S.Ct. 733 (1969).

2.     Public schools bear a significant burden to justify punishment of student speech by demonstrating ". . . that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.'" *Tinker*, 393 U.S. 503, 509.

3.     The photo, caption and text Stacy posted on her myspace account did not either substantially or materially disrupt education at either MU or CV, particularly since the speech occurred off campus.

4. Public school officials may only punish lewd or indecent speech "to make the point to pupils that such speech is wholly inconsistent with the 'fundamental values of public education.'" *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 686-687; *Killion v. Franklin Regional Sch. Dist., et al.*, 136 F. Supp. 2d 446, 456 (W.D. Pa. 2001).

5. Stacy's myspace posting was neither lewd nor indecent.

6. No exceptional circumstances justify punishing Stacy for her off-campus speech. *Killion, supra; Thomas v. Bd. of Educ., Granville Central Sch. Dist.*, 607 F.2d 1043 (2nd Cir. 1979).

7. Stacy's posting does not impermissibly promote underage drinking. *Morse v. Frederick*, 127 S.Ct. 2618 (2007)(the "Bong Hits 4 Jesus" case).

8. Stacy was neither a "public employee" nor an "apprentice" at either MU or CV for purposes of her First Amendment rights. 65 Pa. C.S. §1102; 1 Pa. C.S. §1504 (2007); 24 P.S. §11-1101(1); 24 P.S. §12-1202 ; 22 Pa. Code §33.102.

9. Stacy's posting the photograph and text in question on her private myspace page constitutes an activity protected by the First Amendment.

10. Defendants denied Stacy a BSE degree and failed to take all appropriate action so that the Commonwealth of Pennsylvania would certify Stacy as a public school teacher.

11. Bray, Girvin, Wenrich and all other decision-makers at MU were aware of Stacy's myspace posting when they denied her BSE. *Ambrose v. Township of Robinson, Pa.*, 303 F.3d. 488, 493 (Third Circuit 2002).

12. Stacy's myspace posting played a substantial part in the MU Defendants' decision to a) deny Stacy her BSE and b) refuse to take the necessary steps to ensure PDE issued Stacy her teacher certification. *Bradley v. Pittsburgh Board of Education*, 913 F.2d. 1064 (3rd Cir. 1990).

13.     MU learned of Stacy's myspace posting on or about May 8, 2006. MU denied Stacy her BSE and refused to certify Stacy as a teacher candidate on May 11 and 12, 2006. Thus, there is a temporal proximity between the knowledge of the MU decision-makers and their adverse action against Stacy. *Ambrose, supra.*

14.     Stacy's myspace posting was a substantial motivating factor in the Defendants' adverse action. *Ambrose, supra; Bradley, supra.*

15.     Defendants contend they would have denied Stacy her BSE and refused to certify her as an eligible teacher even if Stacy's speech and expression had never occurred. *Feldman v. Community College of Allegheny*, 85 Fed. Appx. 821, 2004 W.L. 507 84 (3rd Cir. 2004). However, Defendants may not rebut Plaintiff's case by rationalizing their actions after the fact. *Tygertt v. Barry*, 627 F.2d 1279, 1286 (DC Cir. 1980). Similarly, a fact-finder may not rummage through a Plaintiff's past to find a valid basis on which Defendant's might have chosen to take action against Plaintiff. (*Id.*)

16.     Defendants did not deny Stacy her BSE until the day before her graduation. Reinking did not prepare her list of Stacy's allegedly unprofessional behaviors until May 9, 2008, after CV and MU discovered Stacy's myspace posting. Almost all of Reinking's alleged incidents of Stacy's "unprofessional behavior" (apart from the myspace incident) occurred prior to Stacy's mid-term evaluation in which she received the highest marks in "professionalism."

17.     Since MU's justifications for denying Stacy her BSE are mere after-the-fact "rationalizations," MU's affirmative defense fails.

18.     As MU's certifying officer, Dr. Bray is responsible for completing the PDE Form 338C, "College/University Verification Form." Certifying officers like Bray use this form to

recommend a candidate to the Commonwealth for teacher certification. (P-4, p. 18.) On the PDE Form 338C, Dr. Bray may verify that the teacher candidate has achieved at least a satisfactory rating on the PDE Form 430. (*Id.*)

19.    All evaluations with the PDE Form 430 are considered to be formative with the exception of the final one, which is considered to be the summative evaluation. All others are used in order to give the student-teacher/candidate an opportunity to correct or improve any deficiencies. (*Id.*)

20.    Regarding teacher certification, the State Board of Education Regulations provide:

"**Basic requirements.**

Applicants for a certificate shall have completed, in addition to all legal requirements, a program of teacher education approved by [PDE] and shall have the recommendation of the preparing institution." 22 Pa. Code §49.71.

21.    The regulations go on to require PDE to issue an "instructional I certificate" to applicants who:

(1)    Possess a baccalaureate degree;

(2)    Successfully complete a [PDE]-approved teacher certification program;

(3)    Present evidence of having passed the [PDE]-prescribed tests under §49.18(a) (relating to testing);

(4)    Receive recommendation for certification from a college or university." 22 Pa. Code §49.82.

22.    Importantly, the regulations require **completion of a teacher certification program, not a student teaching assignment,** as a prerequisite for teacher certification. 22 Pa. Code §49.82. The legislature undoubtedly made this distinction to afford schools like MU flexibility in administering

their teaching programs.

23. **The regulations do not require a student teacher to maintain perfect attendance during her student teaching assignment in order to receive an Instructional I certificate.** *Id.* Indeed, such a requirement would lead to absurd results since PDE would not be able to certify an otherwise capable student teacher who missed even one day of student teaching due to illness, emergency or the like.

24. Stacy possesses a baccalaureate degree.

25. Stacy student-taught at CV from mid-January, 2006 until May 8, 2006. She only missed the final two or three days of her student teaching assignment due to CV's decision to bar her from its premises. During those final days, Stacy would not have done any meaningful student teaching. Rather, she only would have observed Reinking, packing up her belongings and attending a going-away party.

26. For all practical purposes, Stacy successfully completed her PDE-approved teacher certification program at MU. But for MU's violation of Stacy's First Amendment rights, Stacy would have completed the final two or three insignificant days of her student-teaching assignment.

27. MU's violation of Stacy's First Amendment rights is a substantial motivating factor in the refusal of Defendants to recommend Stacy for teacher certification.

28. Stacy has passed the PDE prescribed PRAXIS examinations. (P-76 and P-77.)

29. To date, Defendant Bray has wrongfully refused to recommend Stacy for certification as in Instructional I teacher because of the myspace incident.

30. Stacy meets all the requirements for an Instructional I certificate in the Commonwealth of Pennsylvania. 22 Pa. Code §49.82.

**III.    PROPOSED ORDER**

**AND NOW**, this        day of                    , 2008, it is hereby **ORDERED** as follows:

1.        Plaintiff's claim for injunctive relief against Defendants if **GRANTED**.

2.        Defendant Girvin shall prepare a new PDE 430 form stating that Plaintiff received a "superior" rating in "professionalism," the same rating she received in her mid-year PDE 430.  All other grades on the final PDE 430 shall remain the same.

3.        As certifying officer, Bray shall prepare a PDE 338C, College/University Verification form, indicating that Stacy has achieved at least a satisfactory rating on the PDE Form 430.  A partially-completed copy of the form is attached hereto.  Bray then will forward the completed PDE-338C, along with all appropriate accompanying documents, to the proper officials at PDE.

4.        Defendants will cooperate fully with any PDE inquiry into Plaintiff's application for teacher certification.  In the event of a PDE inquiry, Defendants will assist in the process necessary to certify Stacy as a teacher.  Defendants shall take no action to prevent Stacy's certification as a teacher.

5.        Defendants will provide Stacy with at least a neutral recommendation in response to any and all inquiries from her prospective employers.

**BY THE COURT:**

_____

DIAMOND, J.

-

Dated: May 21, 2008                    Respectfully submitted,

**LAW OFFICE OF MARK W. VOIGT**

By:    */s/ Mark W. Voigt/*
        **MARK W. VOIGT, ESQUIRE**
        Attorney I.D. No.: 64387
        Validation of Signature Code: mwv6003
        Plymouth Meeting Executive Campus, Suite 400
        600 West Germantown Pike
        Plymouth Meeting, PA 19462
        (610) 940-1709
        (Attorney for Plaintiff, Stacy Snyder)