**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **STACEY SNYDER** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 07-1660** |
| | : | |
| **MILLERSVILLE UNIVERSITY, et al.** | : | |
| **Defendants** | : | |

Diamond, J.                                                      December 3, 2008

## MEMORANDUM

Plaintiff Stacey Snyder alleges that Defendants -- five Millersville University administrators -- violated her First Amendment right to freedom of expression. Having held a two day non-jury trial, I enter judgment for Defendants and offer my supporting factual findings and legal conclusions. Fed. R. Civ. P. 52.

## PROCEDURAL HISTORY

From June 2002 until May 2006, Plaintiff attended Millersville University, where she majored in education.  On May 13, 2006, after Defendants determined that Plaintiff had not successfully met the prerequisites for obtaining the degree of Bachelor of Science in Education, they allowed Plaintiff to graduate from MU with a Bachelor of Arts in English.  Plaintiff unsuccessfully appealed that decision to Dr. Jane S. Bray, Dean of MU's School of Education and Dr. Vilas A. Prabhu, MU's Provost and Vice President for Academic Affairs.

On April 25, 2007, Plaintiff filed a Complaint in this Court against Millersville University, Bray, Prabhu, and J. Barry Girvin, her supervisor in MU's Student Teaching Program.  She included three state law claims, and also alleged that Defendants had violated her

First Amendment free speech rights and her Fifth and Fourteenth Amendment due process rights. 42 U.S.C. § 1983.

On September 17, 2007, I dismissed Plaintiff's claims against MU with prejudice on Eleventh Amendment sovereign immunity grounds.  (Doc. No. 15).  I gave Plaintiff leave to amend: (1) her ambiguous claims against the remaining Defendants in their individual capacities; and (2) her request for relief against those same Defendants in their official capacities.  Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989); Melo v. Hafer, 912 F. 2d 628, 635 (3d Cir. 1990), aff'd 502 U.S. 21 (1991).

On October 12, 2007, Plaintiff filed a Second Amended Complaint, again alleging that Bray, Prabhu, and Girvin, acting in their individual and official capacities, violated her First Amendment free speech rights and her Fifth and Fourteenth Amendment due process rights. Plaintiff also brought several state law claims against Defendants in their individual capacities.  I dismissed the Fifth and Fourteenth Amendment claims, ruling that Defendants had afforded Plaintiff adequate process.  (Doc. No. 23).  I also dismissed Plaintiff's state law claims as non-cognizable and barred by sovereign immunity.  I denied Defendants' Motion to Dismiss as to Plaintiff's First Amendment claim.

On March 18, 2008, Plaintiff filed a Third Amended Complaint, adding as Defendants Dr. Judith Wenrich, MU's Student Teaching Coordinator and Director of Field Services, and Dr. Beverly Schneller, the Chair of MU's English Department.  Plaintiff alleged that Defendants Bray, Prabhu, Girvin, Wenrich, and Schneller violated her First Amendment free speech rights. She sought monetary damages from Defendants in their individual capacities and injunctive relief from Defendants in their official capacities.

2

On April 11, 2008, Defendants moved for summary judgment. I granted Defendants'
Motion in part, ruling that qualified immunity barred Plaintiff's claims against Defendants in
their individual capacities. (Doc. No. 39).

On May 6 and May 7, 2008, I conducted a non-jury trial on Plaintiff's claim for
mandatory injunctive relief against Defendants in their official capacities. Plaintiff asks me to
compel Defendants to: (1) award her a BSE and the teaching credits that will enable her to seek
teaching certification from the Pennsylvania Department of Education; and (2) "take all
necessary steps" to ensure that the PDE approves Plaintiff's application for initial teaching
certification. (Doc. No. 31 at 18-19.)

Under PDE regulations, Defendants do not have the authority to award Plaintiff a BSE or
the teaching credits she seeks, nor can they recommend her for initial teaching certification.
Moreover, Defendants did not violate her First Amendment rights. Accordingly, I conclude that
Plaintiff is not entitled to mandatory injunctive relief.


**FINDINGS OF FACT**

In the summer of 2002, when she was twenty-two, Plaintiff enrolled at Millersville
University as a full-time student. She majored in biology for one year before switching to
English and, eventually, to education. (Tr. May 6, 2008 at 4-5.) As part of the required
education curriculum, in 2005 Plaintiff completed various field assignments at area schools,
where she observed teachers and taught two mini-lessons. (Tr. May 6, 2008 at 6-7, 9, 11.)
During the entire Spring Semester of 2006, Plaintiff was enrolled in MU's Student Teaching
Program, which entailed considerably greater responsibilities, including lesson and curriculum

3

planning, teaching a full course load, and administering exams.  (Tr. May 6, 2008 at 25), (Tr. May 7, 2008 at 13-15), (Pl.'s Exs. 4, 5).  She anticipated that upon her successful completion of the Student Teaching practicum, she would receive a BSE on May 13, 2006.

Millersville University's Practicum Requirements

The Pennsylvania Department of Education closely regulates the training and certification of those who seek to become public school teachers.  MU's policies and requirements reflect those regulations.  For instance, MU requires that every student who seeks a BSE must successfully complete a Student Teaching placement.  (Tr. May 6, 2006 at 204, 233-235, 245-248), (Tr. May 7, 2008 at 117-124).  This reflects the PDE's regulation providing that every applicant must complete a "Department-approved teacher preparation program" -- which must include a "full-time student teaching experience" -- before seeking initial teaching certification from the PDE.  22 Pa. Code §§ 49.82(b)(2), 354.25(f); (Pl.'s Ex. 4 at 9).  The regulations also provide that each applicant for initial teaching certification must receive a recommendation for certification from his or her university.  Id. § 49.82(b)(4).  MU cannot recommend a candidate for initial teaching certification without confirming that he or she has "achieved at least a satisfactory rating" in Student Teaching.  (Doc. No. 45, App. 1), (Tr. May 6, 2008 at 235), (Tr. May 7, 2008 at 134-136).

Plaintiff's Student Teaching Assignment

On January 16 and 17, 2006, Plaintiff attended MU's student teacher orientation conducted by Drs. Bray and Wenrich.  (Tr. May 6, 2008 at 12), (Pl.'s Ex. 9).  Plaintiff there

received a copy of the Millersville University Guide to Student Teaching.  (Tr. May 6, 2008 at 14), (Pl.'s Ex. 4).  Plaintiff read and understood that manual before she began student teaching.  (Tr. May 6, 2008 at 111.)  The Guide provides that MU student teachers are required to "maintain the same professional standards expected of the teaching employees of the cooperating school" and to "fulfill as effectively as possible every role of the classroom teacher . . . ."  (Pl.'s Ex. 4 at 7.)  The Guide also provides that the "student teacher is a guest of the cooperating school."  (Pl.'s Ex. 4 at 7.)  During the January orientation, Bray explained that student teachers are "novice teachers."  (Tr. May 7, 2008 at 139:4.)

In January 2006, Plaintiff was assigned to student teach at Conestoga Valley High School, where full-time CV faculty member Nicole Reinking would serve as her Cooperating Teacher.  (Tr. May 6, 2008 at 15-16).  In Mid-January, Plaintiff met with Reinking in the CV Teachers' Lounge.  (Tr. May 6, 2008 at 16, 113).  Reinking reviewed plans for the Semester and discussed Plaintiff's responsibilities.  (Tr. May 6, 2008 at 16).  Reinking also gave Plaintiff a Teacher's Edition of the course book and a copy of the final exam for one of the courses Plaintiff would teach.  (Tr. May 6, 2008 at 113-114), (Tr. May 7, 2008 at 11-12).  From the time Plaintiff began as a CV student teacher in January 2006 through May 2006, she took no classes at MU.  (Tr. May 6, 2008 at 129.)  Plaintiff followed the CV school year calendar (rather than the MU academic calendar), and was responsible for conforming to Reinking's schedule.  (Tr. May 7, 2008 at 14.)

After spending her first weeks observing Reinking's twelfth grade English classes, Plaintiff "started [her] teaching experience."  (Tr. May 6, 2008 at 20:8-9), (Tr. May 7, 2008 at 12).  Within two months, Plaintiff was responsible for teaching two courses while Reinking observed.  (Tr. May 6, 2008 at 23, 126).  Plaintiff also taught another CV literature course, where

she was the "sole teacher" and had "complete responsibility for the students." (Tr. May 6, 2008 at 126:9-13.) By April 2006, Plaintiff taught a "full load" of courses at CV. (Tr. May 6, 2008 at 117-118, 126), (Tr. May 7, 2008 at 13). Her responsibilities included "writing out the lesson plans and getting the documents ready for the students," as well as understanding material "well enough to teach [it] back to the students." (Tr. May 6, 2008 at 25:2-9), (Tr. May 7, 2008 at 16). Plaintiff referred to the pupils in those CV classes as "my students," and thought that they believed her to be "their official teacher." (Pl.'s Ex. 51.) Plaintiff considered the other CV teachers -- with whom she attended faculty meetings -- to be her colleagues. (Tr. May 6, 2008 at 93:2.)

Mid-Placement Evaluations

Throughout the practicum, Plaintiff experienced great difficulty with respect to her competence and over-familiarity with her students. Those difficulties were described in Plaintiff's evaluations, and would eventually lead to the difficulties that caused Plaintiff to bring this lawsuit.

J. Barry Girvin was Plaintiff's MU Supervisor during her time at CV. He was responsible for observing Plaintiff in the classroom and for evaluating her teaching. Girvin observed Plaintiff seven times during the Semester. (Tr. May 6, 2008 at 187.) Plaintiff's "problems with discipline and also with content" concerned him. (Tr. May 6, 2008 at 187:20-21.) He noted that she had difficulty maintaining a formal teaching manner. (Tr. May 6, 2008 at 190-191.) Plaintiff explained at trial that Girvin helped her understand the importance of "putting [her] foot down." (Tr. May 6, 2008 at 20:24.) Girvin had advised her not to let the students "walk all over" her,

6

and to remember "I'm the teacher, they're the students."  (Tr. May 6, 2008 at 28:20-22).

At the middle and end of Plaintiff's CV placement, Girvin evaluated her work in two separate forms -- an MU evaluation and a PDE 430.  (Tr. May 6, 2008 at 185-186.)  Girvin completed Plaintiff's mid-placement evaluation on March 21, 2006.  He indicated that Plaintiff showed "good" or "reasonable" progress in most professionalism categories, but needed to work on appropriate communication with others -- including students, supervisors, and cooperating teachers -- and on establishing "proper teacher-student boundaries."  (Pl.'s Ex. 45 at 1.)  Girvin rated Plaintiff's overall performance "satisfactory."  (Pl.'s Ex. 46 at 4-5.)  He found her professionalism "superior," but her classroom environment "unsatisfactory," and indicated that she needed to employ a "more 'down to business' approach" with the students.  (Pl.'s Ex. 46 at 2.)  Plaintiff understood that she needed to attain satisfactory ratings in all PDE 430 categories before MU could recommend her for Pennsylvania teaching certification. (Tr. May 6, 2008 at 30.)

Throughout the practicum, Reinking criticized Plaintiff's competence -- especially her ignorance of basic grammar, punctuation, spelling, and usage -- her inadequate classroom management, her poor understanding of the subjects she attempted to teach, and her inappropriate manner with students.  (Tr. May 7, 2008 at 16-39.)  Reinking found that on several occasions Plaintiff would "make up an answer" or "give the wrong answer" to student questions about literature or grammar.  (Tr. May 7, 2008 at 32:9-20.)  Reinking believed that the students were aware of Plaintiff's errors.  (Tr. May 7, 2008 at 32:22-33:4.)

On March 20, 2006, Reinking completed her mid-placement evaluation of Plaintiff.  (Pl.'s Ex. 65.)  She indicated that Plaintiff needed "significant remediation" in several areas, including

7

preparation, performance, and student learning. (Pl.'s Ex. 65 at 1-3.) Reinking noted that Plaintiff's lesson plans had "[m]any errors," and that "[t]oo many students are left behind as a result of ineffective lessons." (Pl.'s Ex. 65 at 1-2.) Reinking indicated that Plaintiff's professionalism showed "reasonable" or "good" progress, and that Plaintiff was interested in "getting to know her students on a personal level." (Pl.'s Ex. 65 at 1.) Reinking was concerned, however, that at times Plaintiff's efforts to "share her personal life" with the students crossed into "unprofessionalism." (Tr. May 7, 2008 at 21:8-11), (Pl.'s Ex. 65 at 1-2). Reinking thought it especially inappropriate that Plaintiff told an English class that her Valentines Day had been "ruined" when she encountered her former husband while dining out with her boyfriend. (Tr. May 7, 2007 at 22.) Reinking also noted that when Plaintiff could not control classroom behavior, she resorted to "talking over the students." (Pl.'s Ex. 65 at 1-2.) Reinking cited two instances when Plaintiff shouted "Shut-Up" at the students. (Pl.'s Ex. 65 at 2.)

It was apparent from Plaintiff's trial testimony that she greatly disliked Reinking, believing her criticisms to be unfair. (Tr. May 6, 2007 at 66, 70-74.)

Plaintiff's MySpace Webpage

During the January orientation, Bray and Wenrich cautioned the student teachers not to refer to any students or teachers on their personal webpages. Wenrich described a student teacher's dismissal from his practicum after he had posted information about his Cooperating School on his personal webpage. (Tr. May 6, 2008 at 231-232.) Wenrich recounted this incident because she wanted the student teachers to understand that "schools have the prerogative to remove student teachers from their placements." (Tr. May 6, 2008 at 232:1-3.) Plaintiff

remembered that Wenrich directed her not to post information about her students or her Cooperating Teacher on her personal webpage. (Tr. May 6, 2008 at 139-140.)

Contrary to the advice and directives she received, Plaintiff sought to communicate about personal matters with her CV students through the MySpace webpage that she maintained throughout her CV placement. On several occasions, she informed the students during class that she had a MySpace webpage. (Tr. May 7, 2008 at 37-38.) Plaintiff also informed Reinking that she had discovered that "a lot of [her] students were on [MySpace]." (Tr. May 6, 2008 at 66-67.) Reinking warned Plaintiff that it was not proper to discuss her MySpace account with the students, and urged Plaintiff not to allow students to become involved in her personal life. (Tr. May 7, 2008 at 38.)

In early May 2006, Plaintiff learned that one of her CV students had recognized and approached Plaintiff's friend Bree while off campus. (Tr. May 6, 2008 at 53.) Plaintiff believed that the student had recognized Bree from photos posted on Plaintiff's MySpace webpage. Plaintiff testified that she confronted the student, informing her that it was "unacceptable to talk to [her] teacher's friends and relatives outside of school basis." (Tr. May 6, 2008 at 67:21-22.) Plaintiff testified it was "inappropriate" for her student to look at a teacher's MySpace account because "there's a boundary line and there's personal information on there that [the student] should know not to look at as a student." (Tr. May 6, 2008 at 69:8, 69:16-18.) Plaintiff explained that although the student could properly have looked at the webpage of a personal acquaintance, it was improper to look at Plaintiff's webpage because Plaintiff was "a person of a higher standard." (Tr. May 6, 2008 at 69:19-24.)

Plaintiff's suggestion that she had heeded the direction of Reinking and others not to

9

share personal information with her students through her webpage was belied by Plaintiff's May

4, 2006 MySpace posting:

> First, Bree said that one of my students was on here looking at my page, which is
> fine. I have nothing to hide. I am over 21, and I don't say anything that will hurt
> me (in the long run). Plus, I don't think that they would stoop that low as to mess
> with my future. So, bring on the love! I figure a couple of students will actually
> send me a message when I am no longer their official teacher. They keep asking
> me why I won't apply there. Do you think it would hurt me to tell them the real
> reason (or who the problem was)?

(Pl.'s Ex. 51.)

Although Plaintiff denied at trial that Reinking was "the problem" at CV, that denial was not

credible. (Tr. May 6, 2008 at 141-43.) Plaintiff acknowledged at trial that "my students"

referred to her CV students. (Tr. May 6, 2008 at 139-140.) Plaintiff thus wanted "[her] students"

to know that "their official teacher" had "nothing to hide" respecting her difficulties with

Reinking. (Pl.'s Ex. 51.)

Plaintiff's posting also included a photograph that showed her wearing a pirate hat and

holding a plastic cup with a caption that read "drunken pirate." (Pl.'s Ex. 51.) At trial, Plaintiff

explained that she had a "mixed beverage" in the cup. (Tr. May 6, 2008 at 52.) She believed

that the photograph showed her with a "stupid expression on my face . . . giving the peace sign . .

. expressing myself at the moment, basically, peace, love, happiness. . . ." (Tr. May 6, 2008 at

52:7-12.)

Plaintiff testified at trial that the photograph and caption had an entirely personal

meaning. (Tr. May 6, 2008 at 52.) She also acknowledged that her May 4th posting was not

directed at any CV administrators or anyone that she had "professional [contact] with . . . ." but

was "really directed [to her] best friends." (Tr. May 6, 2008 at 55:22-24, 56:7-11.)

On Friday, May 5, 2006, another CV teacher accessed Plaintiff's MySpace account and saw Plaintiff's May 4th posting.  (Tr. May 7, 2008 at 44.)  The teacher showed the posting to Reinking, who believed that the last lines referred to her.  (Tr. May 7, 2008 at 47.)  Reinking also thought that it was inappropriate for a student teacher to invite her students to view a photograph of herself drinking alcohol.  (Tr. May 7, 2008 at 67.)  Reinking showed the posting to her CV Supervisor, Deann Buffington.  (Tr. May 7, 2008 at 49.)  At trial, Buffington stated that Reinking was "very upset."  (Tr. May 7, 2008 at 88:7.)  Buffington thought Plaintiff's posting represented a "blatant act of insubordination against Mrs. Reinking."  (Tr. May 7, 2008 at 100:23-24.)  Before the May 5th conversation, Reinking had reported to Buffington that she had been frustrated "on numerous occasions" by Plaintiff's lack of preparation, "inappropriate or unprofessional behavior," and problems with grammar and language.  (Tr. May 7, 2008 at 81:25-82:3, 84), (Pl.'s Ex. 48).

Buffington contacted Acting CV Superintendent Kim Seldomridge and told him of Plaintiff's MySpace posting and of Plaintiff's "other problem areas in the way of professional responsibilities."  (Tr. May 7, 2008 at 89.)  Seldomridge instructed Buffington to tell Plaintiff that she could not return to CV until her final evaluation.  (Tr. May 7, 2008 at 88.)  Seldomridge also told Buffington to ask Reinking to prepare a list of Plaintiff's other unprofessional actions.  (Tr. May 7, 2008 at 90.)

Conestoga Valley Does Not Allow Plaintiff To Complete The Practicum

On Monday, May 8, 2006, Buffington phoned Plaintiff at home and informed her that an issue had arisen respecting Plaintiff's professionalism.  (Tr. May 6, 2008 at 41.)  Buffington told

11

Plaintiff not to return to CV "under any circumstance[s]" until Thursday, May 11, 2006, when

she would receive her final evaluation.  (Tr. May 6, 2008 at 41:17-22.)  According to Buffington,

Conestoga Valley's administration "really did not want [Plaintiff] at [the] school at that point."

(Tr. May 7, 2008 at 92:14-15.)  Buffington then told Girvin that CV had barred Plaintiff from

campus.  On May 9, 2006, Buffington asked Reinking to document Plaintiff's "unprofessional

behavior."  (Tr. May 7, 2008 at 63:5-8), (Pl.'s Ex. 48).

     After speaking with Buffington, Plaintiff phoned Girvin, who suggested she think about

what could have caused her difficulties at CV.  (Tr. May 6, 2008 at 42.)  Plaintiff testified that

the "only thing that [she] could think of that would be in question was [her] MySpace account."

(Tr. May 6, 2008 at 42:15-16.)  Plaintiff spoke with Girvin again on May 9, 2006. He told her

that she might not graduate or that she might not receive a BSE. (Tr. May 6, 2008 at 54:15-17.)

     On May 9th, Plaintiff also wrote an email to Reinking "concerning student paperwork . . .

documents that [she] would have been accountable for if [she] was in the school."  (Tr. May 6,

2008 at 44:12-17), (Pl.'s Ex. 55).  On May 10, 2008, Plaintiff emailed a letter to Reinking,

Girvin, Buffington, Wenrich, Bray, and Seldomridge regarding the "situation that has been

evolving over the past three days."  Plaintiff stated, "I am the only person to blame. I have to take

full responsibility for my actions and live with the consequences determined by the

administrative staff in Conestoga Valley High School and Millersville University."  (Pl.'s Ex. 56

at 2.)  Plaintiff went on:

> Secondly, It is necessary that I present not only an apology to those involved, but
> also all present the positive experiences . . . I have excelled in my own personal
> life by interacting with the community, especially with elementary-aged functions
> . . . All of these experiences . . . show essential qualities of a teacher: professional
> interaction with staff and students inside and outside the school duration . . . I
> look forward to seeing each and everyone of you to discuss and elevate this issue.

(Pl.'s Ex. 56 at 2.)

The grammar and usage errors in Plaintiff's letter disturbed Buffington.  (Tr. May 7, 2008 at 93.)

On May 11, 2006, Buffington wrote a note to Girvin stating, "this young woman, in my opinion, should not pass Student Teaching . . . It will be no surprise to me if our excellent teachers here at CV do not volunteer again to serve as cooperating teachers for Millersville students."  (Tr. May 7, 2008 at 98), (Pl.'s Ex. 52).

That same day, Buffington, Girvin, and Reinking met with Plaintiff at CV for the final evaluation of her student teaching.  Buffington criticized Plaintiff's teaching competence, especially her inadequate subject knowledge.  (Tr. May 6, 2008 at 50.)  Buffington then showed Plaintiff her MySpace posting, which Buffington described as "unprofessional," and asked Plaintiff what she would have done if one of her students had seen the posting.  (Tr. May 6, 2008 at 51:8-10.)  After Buffington left the meeting, Plaintiff reviewed her final evaluations with Reinking and Girvin.  Although they mentioned Plaintiff's "drunken pirate" photo, they were far more concerned with the posting's text.  Both Girvin and Reinking believed that in remarking about "the real reason (or who the problem was)" Plaintiff had referred to Reinking. (Tr. May 6, 2008 at 58), (Tr. May 7, 2008 at 47, 206).

In her final evaluation, Reinking rated Plaintiff's professionalism as "unsatisfactory," and noted that Plaintiff "evidenced some aspects of poor judgment during the Semester, especially in regard to one specific instance."  (Pl.'s Ex. 59 at 1), (Tr. May 7, 2008 at 62-63).  Reinking also rated Plaintiff "unsatisfactory" in several areas of preparation because Plaintiff did not demonstrate strong general education, knowledge, or an in-depth understanding of the subject matter.  (Pl.'s Ex. 59 at 1), (Tr. May 7, 2008 at 46-47).  She rated Plaintiff as "competent" or

"superior" in all other categories. (Pl.'s Ex. 59 at 2-3.)  In Girvin's final PDE 430 evaluation,

which he completed on May 12, 2006, Girvin rated Plaintiff as "competent" or "superior" in all

categories except professionalism, which he described as "unsatisfactory" based on "errors in

judgment."  (Pl.'s Ex. 58), (Tr. May 6, 2008, at 77:9-12, 208).  He noted that Plaintiff did not

communicate effectively with "students, colleagues, para-professionals, related service

personnel, and administrators," and had not shown an ability to "cultivate professional

relationships with school colleagues."  (Pl.'s Ex. 57 at 4.)  He gave Plaintiff satisfactory or

superior ratings in all other categories.  (Pl.'s Ex. 57.)

 At trial, Reinking, Girvin, and Buffington all testified credibly that they believed Plaintiff

had acted unprofessionally in criticizing Reinking -- her Cooperating Teacher -- on her webpage.

(Tr. May 6, 2008 at 206; May 7, 2008 at 47, 100-101, 206).


Millersville University Is Unable To Award Plaintiff a BSE Degree

 Conestoga Valley decided to bar Plaintiff from campus because Buffington and Reinking

believed that Plaintiff: (1) had disobeyed Reinking by communicating about personal matters

with her students through her webpage; (2) had acted unprofessionally by criticizing Reinking to

her students in the May 4th posting; and (3) had otherwise performed incompetently as a student

teacher.  No one at MU had anything to do with that decision.  Once CV did not allow Plaintiff to

complete the practicum, however, MU could not award Plaintiff a BSE degree.

 For instance, Girvin could not, consistent with MU's PDE-approved course of study, pass

Plaintiff in Student Teaching because she had not completed the course.  (Tr. May 6, 2008 at

204:15-24.)  Plaintiff understood that she could not pass Student Teaching because CV had

removed her from her placement.  (Tr. May 6, 2008 at 134:22-25.)  Rather than fail her, however, Girvin allowed Plaintiff to withdraw from Student Teaching.  (Tr. May 6, 2008 at 208-209.)

As MU's Director of Field Services, Wenrich did not have the authority to reinstate Plaintiff into the practicum.  The Millersville University Guide to Student Teaching provides that in consultation with a Cooperating Teacher and University Supervisor, Wenrich has "the authority to change or terminate" a Student Teaching assignment "if professional conduct is not maintained."  (Pl.'s Ex. 4 at 7.)  Wenrich does not have authority, however, to pass someone in the Student Teaching Program and award her the requisite student teaching credits once that person has been removed from his or her placement.  (Tr. May 6 2008 at 248:8-14, 245:17-23, 247:22-24.)  Moreover, as Wenrich explained at trial, under MU's PDE-approved course of study, no one at Millersville University had the authority to give Plaintiff a BSE "on the basis of that work she had done."  (Tr. May 6 2008 at 248:8-14, 245:17-23, 247:22-24.)

Wenrich and Girvin spoke with Plaintiff on May 12, 2006 and explained that because she had not met MU's state-mandated Student Teaching requirement, she could not receive a BSE. (Tr. May 6, 2008 at 75, 233, 243:9-10, 247:22-24).  Wenrich told Plaintiff that she had spoken with English Department Chair Schneller, and they had thought of a way to "move credits around" so that Plaintiff would receive a BA in English "instead of just no degree at all."  (Tr. May 6, 2008 at 80:10-19, 234.)  This was consistent with the way Wenrich had handled similar situations involving other students.  (Tr. May 6, 2008 at 234.)

After meeting with Wenrich and Girvin, Plaintiff scheduled an academic appeal with Bray, the University's PDE Teacher Certification Officer.  Plaintiff then met with Schneller and signed transfer credits so that she could receive a BA in English.  (Tr. May 6, 2008 at 83-84),

15

(Pl.'s Ex. 70). Once Schneller changed Plaintiff's general education credits to English Department credits, Plaintiff qualified for a BA degree in English. (Tr. May 6, 2008 at 85.) Schneller informed Plaintiff that "she went to bat" for Plaintiff because she felt that Plaintiff had "worked hard and that [she] . . . deserved something instead of nothing." (Tr. May 6, 2008 at 84:10-12.) On May 13, 2006, Plaintiff graduated from Millersville University with a BA in English. (Pl.'s Ex. 2.)

On May 15, 2006, Plaintiff met with Wenrich and Bray to appeal the decision to grant her a BA instead of a BSE. Bray explained why she could not overturn Wenrich's decision: by failing to complete Student Teaching, Plaintiff had not fulfilled MU's state-mandated prerequisites for obtaining a BSE. (Tr. May 7, 2008 at 124.) Apart from Plaintiff's failure to complete the practicum, the unsatisfactory evaluation she received on her final PDE 430 also constituted a failure of Student Teaching. (Tr. May 7, 2008 at 122.) Accordingly, Bray denied Plaintiff's appeal on May 15, 2006. (Pl.'s Ex. 62.)

As Teaching Certification Officer, Bray has a legal responsibility to recommend candidates to the Pennsylvania Department of Education for initial teaching certification. Bray fulfills this responsibility by completing a PDE Form 338C, which requires the Certification Officer to verify that a candidate has "achieved at least a satisfactory rating on the final PDE 430." (Doc. No. 45, App. 1, PDE Form 338), (Pl.'s Ex. 4 at 18), (Tr. May 7, 2008 at 134-135). Bray does not have the authority to change that evaluation. (Tr. May 7, 2008 at 121-122, 140), (Pl.'s Ex. 16 at 2). Accordingly, Bray could not recommend Plaintiff for initial teaching certification.

Plaintiff appealed Bray's denial to Prabhu, who, on February 21, 2007, held an academic

appeal hearing at which Plaintiff was represented by counsel.  On March 26, 2007, Prabhu denied

the appeal, concluding that the dispute respecting Plaintiff's BSE had been resolved

appropriately by allowing her to graduate timely with a BA.  (Pl.'s Ex. 63 at 3.)  He also

determined that Plaintiff was not eligible for teaching certification because she had failed "to

satisfy the proficiency standards of the Pennsylvania Department of Education."  (Pl.'s Ex. 63 at

1.)


<u>During Her Time At CV, Plaintiff Was A "Teacher" More Than A "Student"</u>

As I discuss below, whether Plaintiff was a student or a teacher during the practicum is

relevant to her First Amendment claim.  This question appears to be one of law and fact, to be

resolved by the finder of fact.  <u>See</u> <u>Hennessy v. City of Melrose</u>, 194 F.3d 237, 245 (1st Cir.

1999) (examining factual context of practicum relationship before concluding that plaintiff was

entitled to the legal protections of a public employee).

From January through May 2006, Plaintiff did not attend any courses at MU.  (Tr. May 6,

2008 at 129.)  Her responsibilities arose entirely from her full-time assignment to CV.  She

followed the CV school calendar (not the MU calendar).  (Tr. May 7, 2008 at 14.)  CV relied

upon Plaintiff in much the same way it relied on its full-time teachers.  Plaintiff planned lessons

and was responsible for teaching three separate English courses.  (Tr. May 6, 2008 at 16.)

Although she was observed by Reinking in two of the courses, Plaintiff taught the third course

entirely by herself.  (Tr. May 6, 2008 at 126:9-13.)  She taught from the Teacher's Edition of the

course book.  (Tr. May 6, 2008 at 113-114), (Tr. May 7, 2008 at 11-12).  Plaintiff attended in-

service meetings, faculty meetings, and special school events.  (Tr. May 7, 2008 at 14-15), (Pl.'s

Ex. 4 at 7). She used the Teachers' Lounge. (Tr. May 6, 2008 at 113.) Others, including CV students, perceived Plaintiff to be a teacher. Plaintiff learned at the practicum's outset that she was required to "maintain the same professional standards expected of the [CV] teaching employees." (Pl.'s Ex. 4 at 7.) Indeed, Plaintiff considered herself a teacher and believed the pupils in her CV classes were her students. (Tr. May 6, 2008 at 139-140.)

During the Spring 2006 Semester, Plaintiff was also a student at MU, student teaching so that she could obtain her BSE. Her CV-related activities plainly dominated her professional life during those five months, however. She had no assignments from MU unrelated to the practicum, and devoted virtually all her time to fulfilling her responsibilities at CV. In these circumstances, I find that during her CV Student Teaching Placement, Plaintiff was an apprentice more akin to a public employee/teacher than a student.

## CONCLUSIONS OF LAW

Plaintiff proceeds under § 1983, which allows suits against persons acting under color of state law for constitutional violations. 42 U.S.C. § 1983; W. v. Atkins, 487 U.S. 42, 50 (1988) ("[A] public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."). Plaintiff argues that her First Amendment right to free expression protected the text and photograph in her May 4th MySpace posting. She alleges that Bray, Girvin, Prabhu, Wenrich, and Schneller, as administrators of a public university, violated her rights because the MySpace posting "played a substantial part" in both their decision to deny her the BSE and their "refus[al] to take the necessary steps" to ensure that she received PDE teacher certification. (Doc. No. 45 at 24.) Plaintiff seeks mandatory injunctive

relief against Defendants in their official capacities, demanding that they award her a BSE degree and recommend her to the Pennsylvania Department of Education for initial teaching certification.

As I have found, Defendants do not have the authority to award Plaintiff a BSE because she failed to complete Student Teaching. As a result, Plaintiff is not eligible for initial teaching certification. Moreover, Defendants did not violate Plaintiff's First Amendment right to free expression. Accordingly, I deny her demand for mandatory injunctive relief.

A.    Injunctive Relief -- Standards

A plaintiff seeking a permanent injunction must demonstrate: (1) actual success on the merits of the underlying dispute; (2) irreparable injury; (3) the inadequacy of remedies available at law; (4) that the balance of hardships between the plaintiff and defendant weigh in favor of injunctive relief; and (5) that the public interest would not be disserved by the injunction. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001); Ciba-Geigy Corp. v. Bolar Pharmaceutical Co., Inc., 747 F.2d 844, 850 (3d Cir. 1984). Injunctive relief is an "extraordinary remedy which should be granted only in limited circumstances." Am. Tel. and Tel. Co. v. Winback and Conserve Program, Inc., 42 F.3d 1421, 1427-28 (3d Cir. 1994) (quotations omitted). Mandatory injunctions, which require defendants to take some affirmative action, are "looked upon disfavorably and are generally only granted in compelling circumstances." Florham Park Chevron, Inc. v. Chevron U.S.A., Inc., 680 F. Supp. 159, 166 (D.N.J. 1988).

Under § 1983, a plaintiff raising a First Amendment claim may seek related injunctive relief -- such as reinstatement to remedy past violations -- against state actors in their official capacities.  See Melo v. Hafer, 912 F.2d 628, 630 (3d Cir. 1990), aff'd 502 U.S. 21 (1991) (in a § 1983 action against a public official, plaintiffs properly sought reinstatement for wrongful termination in violation of their First Amendment and due process rights); see also Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1985) (plaintiff entitled to reinstatement if he establishes wrongful termination).

B.       Availability Of Relief

In her Third Amended Complaint, Plaintiff demands that I order the MU Defendants to award her a BSE and the teaching credits she needs to obtain a teaching certificate, and to recommend her to the Pennsylvania Department of Education for initial teaching certification.  I believe this demand is akin to the requests for reinstatement in Melo and Dwyer.  Plaintiff is not entitled to injunctive relief, however.  Under PDE regulations, the Millersville University administrators against whom she has chosen to proceed lost the authority to grant her a BSE once Conestoga Valley did not allow her to complete Student Teaching.  Plaintiff's demand that I nonetheless order MU to recommend her for certification would be impermissibly futile.

The MU Defendants Do Not Have The Authority To Grant Plaintiff a BSE

As I have discussed, under PDE regulations, Plaintiff cannot obtain her BSE without successfully completing a Student Teaching placement.  22 Pa. Code § 49.82(b)(2), 354.25(f). Plaintiff argues that because only several days remained in the practicum when CV terminated her, "[f]or all practical purposes" she successfully completed her Student Teaching Placement.

(Doc. No. 45 at 27.)  I disagree.  The evidence is undisputed that CV did not allow Plaintiff to complete her Student Teaching placement.  The evidence is also undisputed that no one at MU could compel CV to allow Plaintiff to complete the practicum.  Accordingly, under those same regulations MU does not have the authority to award Plaintiff the requisite student teaching credits or grant her a BSE because MU cannot give her a passing grade in a practicum she did not complete.

Although CV administrators did not allow Plaintiff to complete the practicum, Plaintiff has decided not to sue anyone at Conestoga Valley.  As I explain below, that decision was strategic.  In proceeding instead only against individuals who do not have the authority to afford her the desired relief, however, Plaintiff's request for a mandatory injunction necessarily fails.  See, e.g., Okpalobi v. Foster, 244 F.3d 405, 431 (5th Cir. 2001) ("[I]f the suit is against the wrong officials, no claim for injunctive relief has been stated."); see also Williams v. Doyle, 494 F. Supp. 2d 1019, 1024 (W.D. Wis. 2007) ("[A] claim for injunctive relief can stand only against someone who has the authority to grant it.").

Ordering Defendants To Recommend Plaintiff For Certification Would Be Impermissibly Futile

Over the course of this litigation, Plaintiff has repeatedly altered her demand for relief, as her lack of entitlement to the relief she most recently sought became apparent.  Thus, when it became apparent at trial that the MU Defendants lacked the authority to award Plaintiff a BSE once CV barred her from campus, I asked if Plaintiff wished to amend her Complaint a fourth time to include Defendants from CV.  (Tr. May 7, 2008 at 246-47).  Plaintiff did not do so.  Instead, she submitted a Proposed Order with her Proposed Findings and Conclusions in which she does not mention her demand that I compel Defendants to award her a BSE.  Rather, she

identifies in greater detail the actions the MU Defendants must take to recommend Plaintiff for initial teaching certification.  (Doc. No. 45 at 28.)  Plaintiff now demands that I order: (1) Girvin to complete a new PDE 430 giving Plaintiff a "superior" rating in professionalism; (2) Bray to complete a new PDE 338C certifying that Plaintiff received a satisfactory rating on her PDE 430 and recommending her for initial teaching certification; and (3) all MU Defendants to "cooperate fully with any PDE inquiry into Plaintiff's application for teacher certification."  (Doc. No. 45 at 28.)

As I have discussed, under PDE regulations, the MU Defendants do not have authority to pass Plaintiff in Student Teaching or award her a BSE.  It is less clear, however, as to whether they have the authority to recommend Plaintiff to the PDE for initial teaching certification.  MU uses the PDE 430 to evaluate a candidate's performance in Student Teaching.  The University uses the PDE 338C to recommend candidates for initial teaching certification by verifying that the candidate received at least a satisfactory rating on the PDE 430.  Neither the PDE 430 nor the PDE 338C contemplates the unusual situation presented here, however.  Although Girvin testified that CV's decision to bar Plaintiff from campus played a "significant" role in his evaluation, he did not testify that he was required to give Plaintiff an unsatisfactory rating on her PDE 430 as a result of CV's decision.  (Tr. May 6, 2008 at 208.)  The PDE regulations do not address the question.  It is thus possible (albeit quite unlikely) that Girvin could have given Plaintiff a satisfactory rating on her PDE 430 even though she was barred from CV.

The MU Defendants thus may have the authority to recommend Plaintiff for initial teaching certification.  Plaintiff assumes that once MU makes this recommendation: (1) she will be eligible for initial certification under PDE regulations; and (2) that, as a practical matter, the PDE will grant Plaintiff initial teaching certification without inquiring as to whether she actually

completed her Student Teaching assignment. Plaintiff's first assumption is incorrect; her second assumption is contrary to the public interest.

Plaintiff assumes that because the regulations require "completion of a teacher certification program, not a student teaching assignment," her failure to complete the practicum will not prevent her from obtaining PDE certification, provided she has a recommendation from MU. (Doc. No. 45 at 26.) This is simply incorrect. Each applicant for certification must complete "a Department-approved teacher preparation program," which must include a "minimum 12 week full-time student teaching experience." 22 Pa. Code § 49.82(b)(2), 354.25(f). Because Plaintiff did not complete MU's PDE-approved teacher preparation program -- which requires successful completion of Student Teaching -- she is ineligible under PDE regulations for certification. Accordingly, assuming *arguendo* that MU officials have the authority to recommend Plaintiff to the PDE, she would remain ineligible for certification. In these circumstances, ordering MU to recommend Plaintiff to the PDE would be pointless and impermissibly futile. See Virginian Ry. Co. v. Sys. Fed'n No. 40, 300 U.S. 515, 550 (1937) ( "[A] court of equity may refuse to give any relief when it is apparent that that which it can give will not be effective or of benefit to the plaintiff."); United States v. Bernard Parish, 756 F.2d 1116, 1123 (5th Cir. 1985) ("It is black letter law that an injunction will not issue when it would be ineffectual."); see also Migliore v. City of Lauderhill, 415 So.2d 62, 65 (Fla. Dist. Ct. App. 1982) ("Neither mandamus nor injunctive relief is available to require the performance of a futile act."); Levine v. Black, 44 N.E.2d 774, 775 (Mass. 1942) ("It is a principle of wide application that relief by injunction will not be granted where the granting of it would be but a futile gesture . . . .").

Plaintiff apparently believes that because the Pennsylvania Department of Education will automatically certify her upon receiving MU's recommendation, her request for relief is not futile. Plaintiff emphasizes Bray's testimony that after receiving a recommendation for teaching certification from the candidate's university, the PDE typically does not inquire independently into a candidate's qualifications. (Doc. No. 45 at 23.) Accordingly, because my Order requiring Millersville University to submit a new PDE 338C would effectively conceal Plaintiff's failure to complete the practicum, it would result in the PDE's approval of Plaintiff's application.

I believe Plaintiff's proposed deception of the Pennsylvania Department of Education would "disserve the public interest" and so would be an impermissible abuse of this Court's equitable powers. MercExchange, 547 U.S. at 391; see also Gidatex, S.r.L. v. Campaniello Imps., Ltd., 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999) (under the doctrine of unclean hands, "[a] court may deny injunctive relief . . . where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue" in the litigation); see also Ne. Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1354 (3d Cir. 1989) (in applying the doctrine of unclean hands to a plaintiff's request for affirmative injunctive relief, "courts are concerned primarily with their own integrity . . . and with avoiding becoming the abettor of iniquity") (quotations omitted). Accordingly, I will not order the MU Defendants to make it possible for Plaintiff to subvert PDE regulations.

## C.      First Amendment

Finally, regardless of MU's authority to forgive Plaintiff's failure to complete the practicum, she is not entitled to mandatory injunctive relief because Defendants did not violate her First Amendment rights. Plaintiff's free speech claim triggers different tests, depending on

whether she was a "teacher" or a "student" when she created her MySpace posting.  The Supreme

Court and the Third Circuit afford the speech of public employees -- like public school teachers -

- First Amendment protection if their speech relates to matters of public concern:

> So long as employees are speaking as citizens about matters of public concern,
> they must face only those speech restrictions that are necessary for their employers
> to operate efficiently and effectively.

Garcetti v. Ceballos, 547 U.S. 410, 411 (2006); see also Pickering v. Bd. of Ed., 391 U.S. 563,

568 (1968); Brennan v. Norton, 350 F.3d 399, 412 (3d Cir. 2003).  By contrast, to promote

academic freedom, these same Courts confer First Amendment protection on all student speech

unless school officials can make out a specific and significant fear that the challenged speech

would substantially disrupt or interfere with the work of the school or the rights of other students.

Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 509 (1969), Saxe. v. State Coll.

Area Sch. Dist., 240 F.3d 200, 211 (3d Cir. 2001); see also DeJohn v. Temple Univ., 537 F.3d

301, 314 (3d Cir. 2008) ("[T]he First Amendment rights of speech and association extend to the

campuses of state universities.") (quoting Widmar v. Vincent, 454 U.S. 263, 268-69 (1981)).

     If I determine that Plaintiff was a public employee or a teacher when she created her

MySpace posting, she would be obligated to show that the posting related to matters of public

concern to receive First Amendment protection.  See Connick v. Myers, 461 U.S. 138, 147

(1983).  If I determine that Plaintiff was a student when she created the posting, Defendants

would bear the burden of showing that they had a constitutionally valid reason for regulating her

speech beyond "a mere desire to avoid . . . discomfort and unpleasantness."  Tinker, 393 U.S. at

509; DeJohn, 537 F.3d at 317 ("a school must show that speech will cause actual, material

disruption before prohibiting it").

     I have found that Plaintiff's role as a student teacher at CV was akin to that of a public

employee. This is in accord with the First Circuit's analysis in Hennessy v. City of Melrose, 194

F.3d 237 (1st Cir. 1999). There, an elementary school terminated a college student from his

student teaching placement because of comments he made during the practicum. Id. at 242-43.

The elementary school thus precluded Mr. Hennessy from passing the university course in which

he was enrolled. Id. at 243. The First Circuit determined that although Hennessy was in the

practicum as part of his university training, he was not "in any meaningful sense a pupil," and his

position as a student teacher "more nearly approximated that of an apprentice" who was entitled

to the First Amendment protections afforded public employees. Id. at 245. Other courts have

also rejected the First Amendment claims of those removed from their practicum placements

because of speech that did not touch on matters of public concern. Miller v. Houston County Bd.

of Educ., No. 06-940, 2008 WL 696874, *13 (M.D. Ala. March 13, 2008) (same); see also Watts

v. Fla. Int'l Univ., 495 F.3d 1289, 1293 (11th Cir. 2007) (graduate student terminated from his

placement in a hospital counseling practicum was a public employee); Andersen v. McCotter,

100 F.3d 723, 726 (10th Cir. 1996) (student intern working for college credit in a penitentiary

was a public employee in relation to the penitentiary officials who terminated him from the

program). Plaintiff notes that unlike the plaintiffs in these cases -- who sued their practicum

administrators -- she has not proceeded against anyone at CV. Plaintiff's strategic choice does

not alter my analysis of her posting, however. Like the plaintiff in Miller, Plaintiff's challenged

speech concerned the school where she taught, not the university where she was enrolled as a

student. 2008 WL 696874, at *13. In these circumstances, whether Plaintiff's MySpace posting

was protected speech does not turn on her choice of defendants.

Plaintiff contends that because she was enrolled at Millersville University in May 2006,

and because her MySpace posting had academic consequences at MU, she is entitled to a

student's First Amendment protections.  In support, she offers a decision that high school administrators violated a student's First Amendment rights when they suspended him for writing an insulting document about a teacher on his personal computer.  Killion v. Franklin Reg'l Sch. Dist., 136 F. Supp. 2d 446, 457 (W.D. Pa. 2001); (Doc. No. 45 at 24).  That decision is inapposite.  Unlike Mr. Killion, who was only a student, Plaintiff was a student teacher who explicitly acknowledged in her MySpace posting that she was the "official teacher" of "[her] students."  Like the Plaintiff in Hennessy, Plaintiff was not "in any meaningful sense a pupil" during the practicum.  194 F.3d at 245.  Accordingly, I believe Plaintiff's status is indistinguishable from the student teacher plaintiffs in Hennessy, Miller, Watts, and Andersen. Like these plaintiffs, when Ms. Snyder created her challenged posting, she was more a teacher than a student.  194 F.3d at 245; 495 F.3d at 1293; 100 F.3d at 726; 2008 WL 696874, at *13.

In these circumstances, insofar as Plaintiff's posting touched on any matter of public concern, it was protected by the First Amendment.  Garcetti, 547 U.S. at 419; Pickering, 391 U.S. at 568; Brennan, 350 F.3d at 412.  Plaintiff conceded at trial, however, that her posting raised only personal matters.  (Tr. May 6, 2008 at 55:22-24, 56:7-11.)  Accordingly, the First Amendment does not protect Plaintiff's MySpace posting.  Connick, 461 U.S. at 147 (federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken when a public employee speaks upon matters of a personal interest); Brennan, 350 F.3d at 412 (the First Amendment does not protect public employees' purely personal speech).  Defendants' response to the posting thus did not violate Plaintiff's First Amendment rights.

In sum, Plaintiff has not prevailed on the merits of her First Amendment claim. Accordingly, she has not shown a legal entitlement to a mandatory injunction against the Millersville University Defendants.  See Ciba-Geigy Corp., 747 F.2d at 850.

## <u>VERDICT</u>

I return a verdict in favor of Defendants and against Plaintiff.  Plaintiff's request for

injunctive relief is denied.

An appropriate Order follows.

**BY THE COURT.**

*s/ Paul S. Diamond*

_____

**Paul S. Diamond, J.**